## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MHL CUSTOM, INC.,<br><br>                Plaintiff,<br><br>    v.<br><br>WAYDOO USA, INC. and SHENZHEN<br>WAYDOO INTELLIGENCE TECHNOLOGY<br>CO., LTD,<br><br>                Defendant. | C.A.  No. 21-0091-RGA<br><br><br>**CONFIDENTIAL – FILED<br>UNDER SEAL** |

## PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND TO EXCLUDE <u>CERTAIN EXPERT OPINIONS UNDER *DAUBERT*</u>

Dennis D. Murrell (KY 84017, *pro hac vice*)
dmurrell@middletonlaw.com
Robert J. Theuerkauf (KY 89068, *pro hac vice*)
rjt@middletonlaw.com
Brian P. McGraw (KY 90447, *pro hac vice*)
bmcgraw@middletonlaw.com
Megan E. Gibson (KY 97237, *pro hac vice*)
mgibson@middletonlaw.com
**MIDDLETON REUTLINGER**
401 S. Fourth Street, Suite 2600
Louisville, Kentucky 40202-3410
Telephone: (502) 584-1135

Blake A. Bennett
bbennett@coochtaylor.com
**COOCH AND TAYLOR, P.A.**
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19899
Telephone: (302) 984-3889

*Attorneys for Plaintiff/Counter Defendant,
MHL Custom, Inc.*

**November 7, 2022**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ……………………………………………….. iv

LIST OF EXHIBITS ……………………………………………….. vi

I. SUMMARY OF ARGUMENT …………………………………….. 1

II. NATURE AND STAGE OF THE PROCEEDINGS …………………………. 4

III. STATEMENT OF FACTS ……………………………………………... 4

IV. SUMMARY OF APPLICABLE LAW …………………………………… 5

   A. THE COURT SHOULD DENY DEFENDANTS' *DAUBERT* MOTIONS …. 5

      1.  DR. STEC'S OPINIONS ON THE REASONABLE ROYALTY RATE
         SHOULD NOT BE EXCLUDED …………………………………… 5

        a. The Fliteboard License and the Manta/MSLR Negotiations …………… 7

        b. The Fliteboard License is the Most Comparable License of Record …... 9

        c. The Fliteboard License Contemplated a Per-Unit Royalty Rate ……….. 13

        d. License Offers and Negotiations Can be Considered ……………….. 14

      2.  MR. BARRY'S STABILITY OPINIONS SHOULD NOT BE
         EXCLUDED ……………………………………………… 15

        a.  Barry's Opinions on "Stability", Including Both "Static" and
          "Dynamic" Stability, Are Proper and Reliable ………………….…... 17

          i.  The Court's Claim Construction …………………………… 17

          ii.  Barry Does Not Offer Opinions That are Contrary to the Court's
            Claim Construction ………………………………………. 18

          iii. Barry Properly Provides Opinion as to the Plain and Ordinary
            Meaning of "Stability" and "Passively Stable" ………………….. 21

          iv. Barry's Stability Analysis is Consistent with the Asserted Patents ... 22

          v.  Barry Does Not Misunderstand Stability ………………………... 23

ii

b.  Barry's Stability Analysis, Consisting of His Review of Engineering Drawings, Review of Videos, and Computer Analysis Using the AVL Software, is Based on Sound Methodology ……………………………    27

i.   Barry's Stability Analysis is Not Based on "Inspection Alone" ..…    27

ii.  Barry Properly Relied Upon and Used the AVL Software ………..    29

3.  BARRY'S OPINIONS ON STABILIZING FACTORS SHOULD NOT BE EXCLUDED …………………………………………………………..    34

4.  BARRY'S SECONDARY CONSIDERATIONS SHOULD NOT BE EXCLUDED ……………………………………………………………    36

B.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY AND NO INFRINGEMENT SHOULD BE DENIED ………    38

1.  DEFENDANTS CANNOT ESTABLISH BY CLEAR AND CONVINCING EVIDENCE THAT CLAIMS 16-20 OF THE '659 PATENT ARE INVALID FOR LACK OF A WRITTEN DESCRIPTION ……………………………………………………    38

2.  DEFENDANTS FAIL TO MEET THEIR BURDEN TO SHOW THAT NO REASONABLE JURY COULD FIND THAT THE ACCUSED PRODUCTS INFRINGE THE PATENTS-IN-SUIT…...………………    40

a.  The '044 Patent Does Not Require Dynamic Stability ………………    41

b.  The Accused Products Are Dynamically Stable ………………………    43

V. CONCLUSION ……………………………………………………………    45

## TABLE OF AUTHORITIES

**Cases**                                                                                           **Pages**

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
299 F.3d 1336 (Fed. Cir. 2002) …………………………………………………        41

*ART+COM Innovationpool GmbH v. Google Inc.*,
155 F. Supp. 3d 489 (D. Del. 2016) …………………………………………….        10

*Atlantic Thermoplastics Co., Inc. v. Faytex Corp.*,
5 F.3d 1477 (Fed. Cir. 1993) …………………………………………………….        15

*AVM Techs., LLC v. Intel Corp.*,
927 F. Supp. 2d 139 (D. Del. 2013) …………………………………………….        10, 15

*Breidor v. Sears, Roebuck & Co.*,
722 F.2d 1134 (3d Cir. 1983) …………………………………………………...        5

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*,
 289 F.3d 801 (Fed. Cir. 2002) ………………………………………………….        41-43

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
492 F. Supp. 3d 495 (E.D. Va. 2020) …………………………………………...        11

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
958 F.3d 1348 (Fed. Cir. 2020) …………………………………………………        42

*Cot'n Wash, Inc. v. Henkel Corp.*,
56 F. Supp. 3d 626 (D. Del. 2014) …………………………………………….        36

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) …………………………………………………………….        5

*Electro Sci. Indus., Inc. v. Dynamic Details, Inc.*,
307 F.3d 1343 (Fed. Cir. 2002) …………………………………………………        38

*EMC Corp. v. Pure Storage, Inc.*,
154 F. Supp. 3d 81 (D. Del. 2016) …………………………………………….        22

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010) ………………………………………………….        5

*ICU Medical, Inc. v. Alaris Medical System, Inc.*,
558 F. 3d 1368 (Fed. Cir. 2009) ……………………………………………...        38

*IMS Tech., Inc. v. Haas Automation, Inc.*,

206 F.3d 1422 (Fed. Cir. 2000) ................................................................ 42-43

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (Fed. Cir. 2004) ............................................................. 38

*In re Paoli R.R. Yard PCB Litig.*,
916 F.2d 829 (3d Cir. 1990) ................................................................. 5

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ............................................................... 9

*M2M Sols. LLC v. Enfora, Inc.*,
167 F. Supp. 3d 665 (D. Del. 2016) ...................................................... 10

*M2M Sols. LLC v. Sierra Wireless Am., Inc.*,
No. CV 14-1102-RGA, 2020 WL 7767639 (D. Del. Dec. 4, 2020) ................. 19, 21

*Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*,
599 F.3d 1308 (Fed. Cir. 2010) ............................................................ 19

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017) ............................................................ 11

*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co.*,
853 F.3d 1370 (Fed. Cir. 2017) ............................................................ 11

*ResQNet.com v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) ............................................................. 10-11

*ScriptPro LLC v. Innovation Assocs., Inc.*,
833 F.3d 1336 (Fed. Cir. 2016) ............................................................ 39

*TransCore, LP v. Elec. Transaction Consultants Corp.*,
563 F.3d 1271 (Fed. Cir. 2009) ............................................................ 9

## Statutes & Rules

35 U.S.C. § 284 ................................................................................. 5
Federal Rule of Evidence 403 ............................................................... 17
Federal Rule of Evidence 702 ............................................................... 5, 17

## <u>LIST OF EXHIBITS</u>

Exhibit 1: Fliteboard License Agreement

Exhibit 2: Steward Wagner Deposition Exceprts

Exhibit 3: Steward Wagner Declaration

Exhibit 4: Jeffery Stec Deposition Excerpts

Exhibit 5: Email MHL_0001544-703

Exhibit 6: Email MHL_0001526-531

Exhibit 7: Email MHL_001515-519

Exhibit 8: Christopher Barry Deposition Excerpts

Exhibit 9: Christopher Barry Claim Construction Report

Exhibit 10: Michael Triantafyllou Deposition Excerpts

Exhibit 11: Jacob Langelaan Deposition Excerpts

Exhibit 12: Nick Leason Deposition Excerpts

Exhibit 13: Online Article MHL_100360-61

Exhibit 14: Online Article MHL_100362-63

Exhibit 15: Online Article MHL_100376-78

Exhibit 16: Online Article MHL_100379-81

Exhibit 17: Online Article MHL_100431-33

Exhibit 18: '659 Patent Notice of Allowance

Exhibit 19: Tao Zhao Deposition Excerpts

Exhibit 20: '044 Patent Prosecution History

Plaintiff, MHL Custom, Inc. ("Plaintiff"), submits this answering brief in opposition to the *Daubert* Motions and Motion for Summary Judgment [DI 81] filed by Defendants Waydoo USA, Inc. ("Waydoo USA") and Shenzhen Waydoo Intelligence Technology Co., Ltd. ("Shenzhen Waydoo") (collectively "Defendants"):

## I.    <u>SUMMARY OF ARGUMENT</u>

**<u>Daubert</u>**. Defendants seek to exclude the entirety of Plaintiff's expert testimony arguing that such testimony is unreliable, conclusory and/or otherwise likely to confuse the jury. However, in making their arguments, Defendants expose no real methodological flaws with the experts' opinions. Defendants' arguments reflect nothing more than disagreement with the conclusions provided, or analysis performed, by Plaintiff's experts. This does not form the proper basis for exclusion under *Daubert*. Defendants' disagreements go more toward weight rather than admissibility.

With respect to Plaintiff's damages expert, Dr. Jeffery A. Stec, Defendants primarily take issue with Stec's consideration of a license agreement for the patents-in-suit entered between Plaintiff and a company named Fliteboard. They argue that his opinions on a reasonable royalty are not reliable and should be excluded because, in their view, the Fliteboard license is not an agreement that is comparable to the hypothetical negotiation. Defendants' argument for exclusion is based on the unsupported position that the Fliteboard agreement was "litigation driven" and that "litigation driven" agreements can never be considered as comparable in the reasonable royalty analysis. Not only is this argument flat out wrong, factually, but there is no standard whereby "litigation driven" – or even settlement agreements – are *per se* excluded as being incomparable agreements. Similarly, Defendants mistakenly take issue with Stec's consideration of prior license offers or negotiations – again arguing that offers or negotiations can never be considered in the

reasonable royalty analysis.  That is not the law.  The reality in this case is that Fliteboard license agreement is the most comparable license agreement to the hypothetical negotiation in the record. The Fliteboard license agreement is not a settlement agreement and it involves a relatively simple license to a direct competitor to practice the inventions of the patents-in-suit in exchange for royalty payments. This would be virtually identical to the situation presented through a hypothetical negotiation between Plaintiff and Defendants in this case.  Stec's reasonable royalty opinions, and his consideration of the comparable Fliteboard license agreement, are well-supported by the record and grounded in sound methodology and reasoning. There is no basis to exclude his opinions under *Daubert*.

Defendants spend a majority of their opening brief trying to discredit and exclude the testimony of Plaintiff's technical expert, Christopher Barry.  Most of Defendants' objections relate specifically to Barry's analysis and conclusions on stability – i.e. his conclusion that the Commercial Embodiments and Accused Products demonstrate stability as taught by the patents-in-suit.  Defendants first take issue with Barry's position that "stability" and "static stability" are used interchangeably in the patents-in-suit.  Plaintiff and Barry are "readdressing" their original claim construction arguments in this regard as invited by the Court and further offering interpretations of the plain and ordinary meaning of those terms.  Even if the Court ultimately disagrees with Plaintiff, however, Barry still engaged in a stability analysis which considered static <u>and</u> dynamic stability as separate components of overall stability – which is consistent with the Court's prior claim construction as well as the teachings and limitations of the patents-in-suit.

Defendants then challenge Barry's stability analysis as being unreliable – by first incorrectly implying that Barry's analysis was solely based on his review of videos of the eFoils in operation.  To the contrary, his analysis was based on a detailed review of engineering drawings,

review of videos of the eFoils in operation, as well based on the results of a computer-based stability analysis. Barry's three-tiered approach served as a reliable method of determining stability, with each tier of his analysis checking and/or validating the other. The end result of Barry's analysis was his supported and well-reasoned opinion that the Accused Products and the Commercial Embodiments were both statically and dynamically stable. Defendants' motion should be denied.

Defendants also attack the software program Barry used to test stability, in the process challenging both the applicability of the software and Barry's use of it. Defendants say that the AVL software (defined and discussed in detail herein) can't be used to analyze stability in eFoils because it is designed for analyzing aircraft stability. This is despite the fact that it cannot reasonably be disputed that aircraft stability principles apply directly to the design and function of eFoils. The very same AVL software that Barry used to measure stability was used by the inventor in designing and developing the inventions of the patents-in-suit. It only makes sense that Barry would use that same software to test stability now. Defendants' attack on Barry's use of the AVL software, as well as the remaining "kitchen sink" of objections asserted by Defendants, more appropriately relate to the weight of Barry's testimony, not its admissibility. There are no grounds to exclude Barry's opinions under *Daubert*. Defendants' motion should be denied.

**Summary Judgment**. Defendants move for summary judgment of invalidity as to claims 16-20 of the '659 Patent for lack of a written description. Defendants also move for summary judgment of non-infringement of the patents-in-suit because the Accused Products are dynamically unstable and, therefore, do not meet the stability limitations of the patents. Neither of these arguments have merit. Defendants have failed to establish by clear and convincing evidence that the '659 Patent is invalid for lack of a written description because the specification provides no

clear intent to limit the scope of the claims as including stability. Defendants have likewise failed to show that a jury could not rule in Plaintiff's favor on its claim for infringement of the patents-in-suit. There is, at least, a disputed issue as to (1) whether the '044 Patent requires dynamic stability; and/or (2) whether the Accused Products are dynamically stable. Defendants ignore and attempt to discredit the evidence supporting Plaintiff's arguments against summary judgment presented through Mr. Barry which confirm that the Accused Products are dynamically stable. A reasonable jury could hear this evidence and rule in Plaintiff's favor on its claim for infringement. For these reasons, and the reasons fully addressed below, Defendants' motions for summary judgment should be denied.

## II.  NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff incorporates by reference the nature and stage of proceedings section from its Opening Brief. DI 80. Plaintiff further states that it filed its own motions for partial summary judgment and to exclude certain testimony of Defendants' expert witnesses on October 24, 2022. *See* DI 74-76 (*Daubert* motions) and DI 77-79 (motions for partial summary judgment). Defendants filed their motions for summary judgment and to exclude Plaintiff's experts that same day. *See* DI 81. The parties both filed opening briefs to support their respective motions under seal. *See* DI 80 ("Plf. Op. Brief") and DI 83 ("Def. Op. Brief").

## III.  STATEMENT OF FACTS

Except to the extent certain facts are addressed within the body of the summary of applicable law section below, Plaintiff incorporates by reference its statement of facts from its Opening Brief. DI 80.

IV.     **SUMMARY OF APPLICABLE LAW**

A. **THE COURT SHOULD DENY DEFENDANTS' *DAUBERT* MOTIONS**

Defendants move to exclude Plaintiff's experts, Dr. Jeffery Stec and Christopher Barry, under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.* 509 U.S. 579, 595 (1993).  The Federal Rules of Evidence "embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact and for dealing with the risk of error through the adversary process." *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 857 (3d Cir. 1990) (citations omitted).  "When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010).  Stated differently, "[w]here there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."  *Breidor v. Sears, Roebuck & Co.*, 722 F.2d 1134, 1138-39 (3d Cir. 1983).

1.  **Dr. Stec's Opinions on the Reasonable Royalty Rate Should Not be Excluded**

Plaintiff intends to present the expert testimony of Dr. Jeffery A. Stec on the issue of reasonable royalty-based damages under 35 U.S.C. § 284.  Stec opines that Plaintiff suffered reasonable royalty damages and that the reasonable royalty should be calculated at ███████ ███████  ████████████████ .  *See* Expert Report of Jeffery Stec ("Stec Rep."), attached as Exhibit 11 to Def. Op. Brief (DI 85), pp. 2-3.  In forming his opinions as to the reasonable royalty rate, Stec analyzed the *Georgia Pacific* factors, and specifically determined that, *inter alia*, (a) the hypothetical negotiation between Plaintiff and Defendants would have taken place on ████████████ (*Id.*, pp. 20-21); (b) that there were no non-infringing alternatives to the patents-

in-suit (*Id.*, p. 21); (c) the higher, per board royalty rate was supported by the prior licensing of the patents-in-suit, including the Fliteboard License Agreement and the existing negotiations between Plaintiff and MSLR and Manta (*Id.*, pp. 21-27)[1]; (d) Plaintiff and Defendants were direct competitors (*Id.*, p. 28); (e) the sale of the Accused Products helped promote the sale of other, non-patented products sold by Defendants; (f) the Plaintiff's sales revenues as well as the Defendants' infringing revenues supported his royalty rate (*Id.*, pp. 32-33); (g) the utility and advantages of the patents-in-suit support his proposed rate (*Id.*, pp. 33-34); (h) the profitability of the Accused Products supported his rate (*Id.*, p. 34); (i) Defendants would not be able to sell a commercially successful product without the teachings of the patents-in-suit (*Id.*, pp. 35-36); and (j) the testimony of Plaintiff's technical expert supported his proposed royalty rate (*Id.*, p. 36).  Stec weighed the various *Georgia Pacific* factors to arrive at an appropriate opinion as to the reasonable royalty rate.

Defendants challenge the entirety of Stec's reasonable royalty analysis on the grounds that: (1) he considered a non-comparable license that was "driven primarily by litigation concerns"; (2) he improperly set the royalty rate on a per-unit basis contrary to that same license; and (3) he improperly considered license offers or negotiations in his analysis.  *See* Def. Op. Brief, DI 83, pp. 2, 32-39. Defendants' attempt to challenge Stec's testimony under *Daubert* lacks merit and is unsupported by the law.  There is nothing unreliable about the methodology Stec used to provide his opinions.  There are no legitimate grounds to exclude his reasonable royalty opinions under *Daubert* or the Federal Rules.

---

[1] Stec also considered the Langelaan license agreement upon which Defendants' expert bases the entirety of his analysis. *Id., see also* Expert Report of Philip Kline ("Kline Rep."), attached as <u>Exhibit 11</u> to Pl. Op. Brief (DI 83-11), ¶¶ 62-79, 83-87.

### a.  The Fliteboard License and the Manta/MSLR Negotiations

Defendants' primary contention is that Stec's testimony should be excluded because he considered as comparable the license agreement entered between Plaintiff and an Australian company, Fliteboard Pty. Ltd. ("Fliteboard), on August 30, 2019.  A copy of the Fliteboard License Agreement ("Fliteboard License") is attached as **Exhibit 1**.  Under the agreement, Plaintiff granted Fliteboard a worldwide, non-exclusive, royalty-bearing license to make, have made, use, sell, offer for sale, lease, export, and import eFoil products covered by the patents-in-suit (as well as a related wireless controller patent). *Id*.  Generally speaking, the agreement allows Fliteboard the right to practice the patented invention in exchange for payment of royalties.  *See* Deposition of Steward Wagner dated June 10, 2022 ("Wagner Dep."), 149:20-24, excerpts attached as **Exhibit 2**. The Fliteboard License provided for an initial lump sum payment of $███ followed by payments of a royalty rate of ███ of net sales in the United States.  *Id*.  The royalty rate equated to around $██ per eFoil sold by Fliteboard. Wagner Dep., Ex. 2, 156:15-22.

The negotiations between Plaintiff and Fliteboard began in 2018 with Fliteboard reaching out to Plaintiff before it entered the U.S. market (i.e. before it was infringing). Wagner Dep., Ex. 2, 145:21-147:12. The relationship between Fliteboard and Plaintiff was not adversarial. *Id*. Negotiations ensued between Plaintiff and Fliteboard over the course of at least a year, until an agreement was finalized in August of 2019.  *See* Ex. 1.  At no time during the negotiations was litigation initiated by either party. *See* Declaration of Steward Wagner ("Wagner Dec."), ¶ 7, attached as **Exhibit 3**. There were a number of communications exchanged between representatives of Plaintiff and Fliteboard during those negotiations. Many of those communications, including the emails referenced by Defendants in their Opening Brief (*see* Exhibits 23-25, DI 85), certainly reference the possibility of Plaintiff having to either defend or

enforce its rights to the patents-in-suit against infringers of those rights.  Similarly, representatives of Fliteboard continually referenced the possibly of it and/or third parties challenging the validity of Plaintiff's rights.  *See e.g.*, Defendants' Ex. 24 at 4012.  This is a standard negotiation practice where parties seek to leverage the other into favorable deal terms.  Wagner Dec., Ex. 3, ¶ 9. This does not mean that the negotiations – or more importantly the decision to enter the agreement – was "litigation driven" as argued by Defendants.  There was not, and never has been, litigation between Plaintiff and Fliteboard.  Wagner Dec., Ex. 3, ¶ 7.  Defendants misconstrue the nature of the negotiations and offer no evidence to support their speculative position that Fliteboard only entered into a license with Plaintiff to avoid litigation costs.  The unrebutted testimony of record is that the Fliteboard License was never labeled or considered a settlement agreement. Wagner Dec., ¶ 8.  It was entered as the result of an arms-length transaction, negotiated in good faith, by two sophisticated business parties who were not adversarial.  Wagner Dec., Ex. 3, ¶ 10; and *see* Wagner Dep., Ex. 2, 145:17-149:24.

    Defendants' other point of contention is Stec's consideration of ongoing negotiations between Plaintiff and other third-party competitors considering entry into the U.S. market. Plaintiff has been engaged in negotiations, and is currently finalizing a license agreement, with a Canadian company named MSLR which would involve a license to MSLR to practice the patents-in-suit in exchange for a royalty payment of $ ▮ per eFoil sold. Wagner Dep., Ex. 2, 82:4-83:24, 151:9-153:11.  Plaintiff is also in negotiations with a French company named Manta Foil under similar terms – i.e. a license to practice the patents-in-suit in exchange for a royalty payment of $ ▮ per eFoil sold. Wagner Dep., Ex. 2, 153:12-154:8.[2]

---

[2] Defendants question the veracity of Plaintiff's testimony concerning the offers associated with the MSLR and Manta deals and describe the testimony as "self-serving".  Def. Op. Brief, DI 83, p. 38.  However, Defendants offer no evidence to rebut the Plaintiff's testimony.

**b. The Fliteboard License is the Most Comparable License of Record**

Defendants argue that the Fliteboard Agreement is not comparable to the hypothetical negotiation in this case because it was a "litigation-driven" agreement. In so arguing, Defendants suggest that the Court should adopt a legal standard wherein expert opinions as to reasonable royalties which consider "licenses negotiated under threatened or actual litigation" must be excluded out-of-hand. Def. Op. Brief, DI 83, p. 33. This is <u>not</u> the proper standard. Not one of the cases cited by Defendants stand for the blanket prohibition of licenses that were entered under the "<u>threat</u> of litigation." Nor do Defendants articulate what "threatened litigation" means. It could be argued that every license agreement would necessarily involve the threat of litigation should the potential licensee proceed with practicing the patented invention without a license.[3] *See e.g., TransCore, LP v. Elec. Transaction Consultants Corp*., 563 F.3d 1271, 1275–76 (Fed. Cir. 2009) (holding all non-exclusive licenses, at their core, are designed to eliminate the potential for litigation). There is no *per se* rule that such agreements cannot be considered comparable. It depends on both the circumstances surrounding the agreement and the analysis underlying the expert's opinions.

For example, in *LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d 51, 77–78 (Fed. Cir. 2012), the decision primarily relied upon by Defendants to support their heightened standard for exclusion, the license agreement at issue was an actual settlement agreement. The court determined that it should not be considered because it was a settlement agreement that was executed "on the eve of trial", just after the party had been sanctioned by the court putting it at a

---

[3] If the theoretical "threat" of litigation was the triggering standard for exclusion that Defendants would have courts exclude any evidence of any license agreement entered between a patent owner and a party who is practicing the patented invention or is otherwise infringing the patent. The "threat" always exists. Defendants' proposed standard makes no sense.

legal and procedural disadvantage, and because it reflected a payment amount six times higher than twenty-nine other license agreements it had entered that were not settlement agreements. *Id*. The court excluded the agreement under Rule 403[4] because it reflected the "least reliable license by a wide margin." *Id*. As for other cases cited by Defendants as supporting their proposed standard, in *AVM Techs., LLC v. Intel Corp*., 927 F. Supp. 2d 139, 143–44 (D. Del. 2013) (emphasis added), the court precluded the use of a underline settlement agreement involving a different patent where the expert did not perform any sort of analysis of the settlement context or any analysis of other license agreements that were alleged to be comparable. Likewise, in *M2M Sols. LLC v. Enfora, Inc*., 167 F. Supp. 3d 665, 678 (D. Del. 2016), the reasonable royalty opinion was excluded where the expert cited to litigation settlement agreements unrelated to the patent-in-suit, provided no analysis or background related to the underlying litigation, and provided no context as to the settlement. And finally, in *ART+COM Innovationpool GmbH v. Google Inc*., 155 F. Supp. 3d 489, 512 (D. Del. 2016), this Court clarified that in order to rely upon past settlement agreements, the expert must at least undertake an analysis of the underlying litigation that led to the settlement in order to make his/her economic comparability conclusion fall in line with sound economic and factual predicates. *Id*., p. 511. Put simply, all of the cases where expert opinions were excluded involved actual settlement agreements and/or situations where the expert provided little to no analysis of the context surrounding the execution of the settlement agreement at issue.

Compare those cases to cases where the court determined that a settlement agreement license could be considered. In *ResQNet.com v. Lansa, Inc*., 594 F.3d 860, 870–72 (Fed. Cir. 2010), for example, the plaintiff's expert relied on seven different licenses to formulate his reasonable royalty opinion. Five of those were licenses for technology other than the patent in

---

[4] Defendants do not challenge the Fliteboard License under Rule 403.

suit. *Id*. at 870. The other two were direct licenses of the patents-in-suit which stemmed from settlement of litigation. *Id*. The court determined that at least one of the settlement-based agreements was "the most reliable license in [the] record" when compared with the other licenses that did not "even mention[ ] the patents-in-suit or show[ ] any other discernable link to the claimed technology". *Id*. The Federal Circuit permitted consideration of the settlement license on remand with the caveat that the district court would be required to consider the license in its proper context within the hypothetical negotiation framework to ensure that the reasonable royalty rate reflects "the economic demand for the claimed technology." *Id*. at 872. *See also Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1370-71 (Fed. Cir. 2017) (permitting consideration of a settlement agreement where consideration was given to aspects of the litigation giving rise to the settlement); *Rembrandt Wireless Techs., LP v. Samsung Elecs. Co*., 853 F.3d 1370, 1381 (Fed. Cir. 2017) (holding the district court did not abuse its discretion in allowing plaintiff's expert to discuss a settlement agreement patent license because it involved the patents at issue – the expert's reliance on that agreement was a matter of credibility to be evaluated by the jury); and *Centripetal Networks, Inc. v. Cisco Systems, Inc*., 492 F. Supp. 3d 495 (E.D. Va. 2020) (allowing license agreement reached through settlement of litigation where the license related to the patents-in-suit, the parties were direct competitors, no other licenses were submitted as examples of comparable licenses, and the royalty amount reflected an adequate point of comparison). Stec's consideration of the Fliteboard License was proper and does not justify exclusion of his reasonable royalty opinions for two primary reasons.

First, the Fliteboard License was not a settlement agreement. There was no underlying litigation between those parties. Nor was the Fliteboard License "litigation driven" as argued by Defendants. Fliteboard initiated the discussions with Plaintiff and those negotiations took place

on and off over the course of a year.  It was an arms-length transaction entered after lengthy negotiation between two sophisticated business entities. None of the cases where courts have questioned or rejected the reliance upon settlement agreement licenses are applicable.

Second, even if the Fliteboard Agreement could somehow be considered a settlement agreement, under the actual standards set forth above, Stec's consideration of that agreement in his analysis was reasonable and warranted.  Stec spends roughly four pages of his Expert Report discussing the Fliteboard License and recites the history surrounding its negotiation and execution. *See* Stec Rep., Ex. 11 to Def. Op. Brief (DI 85), pp. 23-26.  He provides substantial context for his conclusion that the Fliteboard License would be comparable to the hypothetical negotiation.  He provides even further context in his Reply Report.  *See* Reply Expert Report of Jeffery Stec ("Stec Reply"), Exhibit 12 to Def. Op. Brief (DI 85), pp. 15-20. His reasoning for considering the Fliteboard License include the simple facts that (a) it involved the patents-in-suit, (b) it involved a direct competitor, (c) it was executed in the same year as the hypothetical negotiation, and (d) there were otherwise no customary royalty rates in the eFoil industry.  Stec Rep., pp. 24, 36-37.  As for Defendants' contention that the Fliteboard License was "litigation driven", there was no underlying litigation for Stec to consider in his analysis, there were only negotiations (and he did review and evaluate those negotiations).  The only evidence cited by Defendants to support their arguments are snippets taken from negotiation communications which counsel for Defendants argue constitute MHL threatening litigation.  Stec confirmed that he saw no evidence to support the speculative conclusion that the Fliteboard License royalty rate was "impacted by any purported threat of litigation."  Stec Reply, p. 19.  Further, when Defendants confronted Stec about the litigation sound bites during his deposition, he acknowledged that the possibility of litigation exists

in connection with the failure to execute <u>any</u> license agreement.  *See* Deposition of Jeffery Stec dated September 29, 2022 ("Stec Dep."), 223:22-224:23, 226:21-227:10, attached as **Exhibit 4**.

Stec reviewed all the possible license agreements or negotiations that could be compared to the hypothetical negotiation in this case, including the agreement relied upon by Defendants' expert.  Stec considered all the circumstances surrounding the entry of the Fliteboard License.  He offered a detailed, supported, and reasoned analysis and formed his final opinion as to a reasonable royalty after accounting for all relevant considerations. His methodology was sound and his opinion reliable.

### c.  The Fliteboard License Contemplated a Per-Unit Royalty Rate

Defendants also argue that Stec "fundamentally altered" the economic terms of the Fliteboard License to reach his opinion that the reasonably royalty in this case should be based on a per-unit as opposed to a percentage of sales.  That is, in Stec's analysis he considered the fact that MHL desired a per unit dollar amount as the basis for the royalties.  Defendants cry foul, arguing that Stec's analysis renders the Fliteboard License economically un-comparable to the hypothetical negotiation.  However, as articulated by Stec in his Reply Report (pp. 18-19) he reviewed and considered various negotiation correspondence between Plaintiff and Fliteboard, including the emails containing the sound bites Defendants latch on to, and concluded that subsequent discussions between the parties showed that there were royalty expectations of specific dollars per unit based upon expected Fliteboard eFoil price points. *See e.g.*, Email Correspondence, MHL_0001544-703 (at 548, 550-51), attached as **Exhibit 5**; MHL_0001526-531, attached as **Exhibit 6**; and MHL_001515-519 (at 517), attached as **Exhibit 7**. In these communications, Plaintiff expressed concerns about the possibility of Fliteboard offering discounted pricing and/or lower priced units that would not yield satisfactory rates in terms of the royalty. *Id*.  Because of

these concerns, the parties ultimately agreed to a higher royalty rate in terms of a percentage. *Id*.
*See* Stec Rep., pp. 23-25; Stec Reply, pp. 18-19; and Ex 1 (Fliteboard License).

Stec considered all of this in concluding that it was appropriate to use a per-unit royalty in connection with the hypothetical negotiation between Plaintiff and Defendants. The ███ ███████ articulated by Stec reflects the average per-unit royalty rate of the Fliteboard sales during the period of the hypothetical negotiation. He offers support for his analysis based on the negotiations between Plaintiff and Fliteboard, and this amount accounts for the concerns and risks associated with having a competitor enter the market offering a product at a substantially lower price. *See* Stec Rep., pp. 29-30, 36-38.

Despite Defendants' protests, the Fliteboard License remains the best evidence of a reasonable royalty in the record. The terms of that agreement and the circumstances surrounding its execution are virtually identical to what would be the terms of a hypothetical negotiation in this case. The only difference between the Fliteboard License and the hypothetical negotiation is the fact that Defendants sell a cheaper eFoil. Stec accounts for this difference, and Plaintiff's significant concern about a competitor selling discounted products and avoiding the reasonable royalty, by considering a per-unit royalty rate comparable to the per-unit rate of the Fliteboard License. There are no grounds to exclude Stec's reasonable royalty opinions based on his consideration of the Fliteboard License and a per-unit royalty rate. Defendants' challenge to Stec's opinions are more appropriate for cross-examination.

### d. License Offers or Negotiations Can be Considered

Defendants further take issue with Stec's consideration of the pending license negotiations between Plaintiff and MSLR and Manta to serve as a "check" against his reasonable royalty analysis. Defendants argue that an offer cannot be used in the comparable license analysis. Def.

Opening Brief, DI 83, p. 38.  Tellingly, Defendants cite no case law to support the argument that it is improper to consider such negotiations or offers. This is likely because it is not improper or unusual for experts to rely upon license offers or negotiations in supporting a reasonable royalty analysis.  In fact, this Court previously dealt with an almost exact argument for exclusion in the *AVM Technologies* case and rejected it.  There, the defendant sought to exclude testimony about the inventor's prior offer to license the patent-in-issue on the grounds that it was irrelevant and unreliable. *AVM Techs*., 2017 WL 1787562 at *2.  Your Honor held that "[s]uch an offer is relevant to the parties' hypothetical negotiation and there is evidence in the record to support its reliability. I will not exclude this testimony." *Id*.  *See also Atlantic Thermoplastics Co., Inc. v. Faytex Corp*., 5 F.3d 1477, 1482 (Fed. Cir. 1993) (affirming reasonable royalty award based on patentee's prior license offer).

It was not improper for Stec to consider the pending license negotiations – both of which demonstrate support for Stec's per unit royalty in the amounts as articulated through his expert opinions.  As to the timing of those offers being ███████████████████████, this would be a challenge Defendants could raise on cross examination. In any event, Stec's consideration of the pending negotiations and/or offers should not provide a basis for excluding his reasonable royalty opinions and analysis.  There is ample support for Stec's opinions and his consideration of the MSLR and Manta negotiations as a check on his reasonable royalty conclusion.  Defendants' *Daubert* motion to exclude Stec's opinions should be denied.

### 2.  MR. BARRY'S "STABILITY" OPINIONS SHOULD NOT BE EXCLUDED

Mr. Barry is an expert in the field of naval architecture and engineering. *See* Barry Invalidity Report ("Barry Inv. Rep."), Ex. 30 (DI 80-30) to Plf. Op. Brief, ¶¶ 5-13. Broadly speaking, Barry provides opinions in this case on the issues of infringement and invalidity.  In his

infringement analysis, Barry opines that the Accused Products sold by Defendants literally contain every element of, *inter alia*, claim 1 of the '044 Patent (*see* Expert Report of Christopher Barry ("Barry Inf. Rep."), DI 80-23, ¶¶ 88-98), as well as every element of claim 1 of the '659 Patent (*Id*., ¶¶ 152-162).  As part of his infringement opinion as to claim 1 of the patents-in-suit, Barry concluded from a review of 3D engineering drawings, videos of the craft in operation, and a computer analysis, that the Accused Products demonstrate static and dynamic stability.  *Id*., ¶¶ 89, 93-96, 153-156.  In his analysis, Barry likewise concluded that the Commercial Embodiments of the patents-in-suit – the Plaintiff's *Lift* eFoils – are both statically and dynamically stable.  *See* Barry Inv. Rep., DI 80-30, ¶ 79 (citing Barry Inf. Rep., ¶¶ 95, 155, and Exhibits 5-7 and 8A-C of that report).  Barry also provides opinions as to whether the alleged prior art cited by Defendants teach or disclose each and every limitation of the patents-in-suit and/or whether it would have been obvious to a person of ordinary skilled in the art to combine those alleged prior art references to create the subject matter of the patents-in-suit.  Barry Inv. Rep., DI 80-30.  Barry further defined a person of ordinary skill in the art in this case to be a person who (1) had at least a Bachelor's degree in engineering specializing in naval architecture and had substantial experience with naval architecture including experience with high speed watercraft, aircraft, or hydrofoil craft, or (2) had a Bachelor's degree in engineering or physics with experience in fluid dynamics and substantial experience with high speed watercraft, aircraft, or hydrofoil craft.  Barry Inf. Rep., DI 80-23, ¶ 86.  Barry confirmed that a person of ordinary skill in the art would have the necessary information from the patents-in-suit to practice the claimed invention.  Barry Inv. Rep., DI 80-30, ¶ 59-61.

Through their *Daubert* motion, Defendants challenge Barry's opinions and analysis related to the issue of stability as it pertains to the patents-in-suit, the Commercial Embodiments of the patents, and the Accused Products.  Defendants seek to exclude the entirety of Barry's testimony

16

on stability under Federal Rules of Evidence 702 and 403.  As grounds for their motion, Defendants claim that Barry's opinions are unreliable because (a) he incorporated inconsistent definitions and constructions of the terms "stability", "static stability", and "dynamic stability" that contradict the Court's claim construction ruling – as well as the plain and ordinary meaning of those terms and the claims of the patents-in-suit; (b) he can't rely solely upon a review of videos of the watercraft to determine stability; (c) the computer software he used to verify his stability opinions is "ill-suited" for assessing watercraft stability; (d) his opinions on stability are otherwise confusing; and (e) his opinions on stabilizing factors are conclusory, unsupported and apply an incorrect legal standard.  *See* generally, Def. Op. Brief, DI 83, pp. 1-2.  Defendants' arguments to exclude Barry can be distilled to the mistaken belief that Defendants' expert is right and Barry is wrong.  But, a difference of expert opinion alone does not provide a legitimate basis to exclude Barry's testimony since there are valid and supported grounds for his opinions.  Defendants are free to challenge the basis of Barry's conclusions and their differences of opinion through cross-examination. Total exclusion through *Daubert* is not warranted.  Defendants' arguments are addressed below.

### a. Barry's Opinions on the "Stability", Including Both "Static" and "Dynamic" Stability, Are Proper and Reliable

#### i. The Court's Claim Construction

Since Defendants believe that Barry's opinions are contradictory to the Court's claim construction, the starting point for the analysis here is that opinion. *See* DI 66.  First, the Court construed "***designed to provide passive static stability***" from Claim 1 of the '044 Patent to mean "***designed such that the hydrofoil has an initial tendency to return to its original condition when disturbed without the hydrofoil having any moveable components***."  DI 66, p. 8 (Page ID# 2208) (emphasis added).  In rejecting the Defendants' argument that this term was indefinite, the Court held that the "concept of stability appears to be well-known in the art."  *Id*.  The court further held

17

that "stability in the field of aerodynamics has two categories: static and dynamic. Static stability deals with the initial tendency of a vehicle to return to equilibrium after being disturbed.  It says nothing about whether it ever reaches its equilibrium position or how it gets there. Such matters are the realm of dynamic stability." *Id*., pp. 8-9.

Next, the Court was asked to construe the following language of Claim 1 of the '659 Patent: "***A passively stable, weight shift controlled personal hydrofoil watercraft***."  Instead of adopting either party's proposed construction, the Court held that the term would be interpreted according to its plain and ordinary meaning.  *Id*. at 9. As the Court recognized, this claim term does not contain the term "static" – i.e. "passive static stability" – and instead claims that the watercraft is "passively stable."  Plaintiff argued that the terms "passively stable" and "passive static stability" could be used interchangeably.  The Court rejected this position during claim construction, held the plain and ordinary meaning should apply, but left it open for the parties to readdress the issue through their dispositive motions.  *Id*.

### ii.  Barry Does Not Offer Opinions That are Contrary to the Court's Claim Construction

Defendants claim that Barry is offering opinions that "contravene" the Court's claim construction but fail to articulate any part of the Court's construction that Barry "contravenes." Instead, Defendants just repeat their argument that Barry incorrectly interprets the terms "stability" and "static stability" as being interchangeable.

To be clear, Barry recognizes in his opinions that, as both an expert and a person of ordinary skill in the art, the terms "stable" and "static stability" are "commonly used interchangeably with respect to aircraft and hydrofoil stability."  *See* Expert Reply Report of Christopher Barry ("Barry Reply"), DI 80-31, ¶ 12. According to Barry, this is because "static stability" is a necessary prerequisite to achieving "dynamic stability".  In other words, according to Barry's analysis,

18

overall "stability" is first determined by the craft's initial tendency to return to its original condition when disturbed. *Id., see also* Barry Inf. Rep., DI 80-23, ¶ 94. Despite this opinion, Barry, in no uncertain terms, conducted his analysis in this case construing "static stability" to mean "an initial tendency to return to its original condition when disturbed" – which is identical to the Court's construction of "static stability" in the context of the claim term "passive static stability" set forth in claim 1 of the '044 Patent (with "passive" meaning without moveable controls). *Id.*, ¶ 14; and DI 66, p. 9. Barry also separately analyzes "dynamic stability" as a component of overall "stability". Barry Inf. Rep., ¶ 96; Barry Reply, ¶ 14.[5] There is no confusion. Barry's opinions do not in any way reflect a departure from the Court's claim construction ruling.

To the extent Defendants rely solely on Barry's belief that a person of ordinary skill in the art commonly uses the terms "stability" and "static stability" interchangeably as a basis to exclude the entirety of Barry's testimony on stability, such reliance is misplaced. The Court expressly left open the possibility of the parties addressing this issue again through the present motions. DI 66, p. 9. This falls in line with the general notion that (1) courts may revise claim construction rulings at any time before judgment (*Pressure Products Medical Supplies, Inc. v. Greatbatch Ltd.*, 599 F.3d 1308, 1316 (Fed. Cir. 2010)); and (2) experts are free to offer interpretations of the plain and ordinary meaning of claim terms (*M2M Sols. LLC v. Sierra Wireless Am., Inc.*, No. CV 14-1102-RGA, 2020 WL 7767639, at *6 (D. Del. Dec. 4, 2020)). It is Barry's opinion that it would be proper for the Court to construe the term "passively stable" the same as "passive static stability" because he believes that, in this context, the patents use those terms interchangeably. Along the lines of what is discussed above, Barry reasoned that the real question of stability in this case is

---

[5] Barry ultimately concluded that the Accused Products provide "passive stability" in that they are both statically <u>and</u> dynamically stable. Barry Inf. Rep., DI 80-23, ¶¶ 89, 94-96; 153-156.

static stability, in that you cannot have dynamic stability without static stability and that in his experience it is unlikely for a marine craft to be dynamically unstable. *See* Deposition of Christopher Barry dated October 7, 2022 ("Barry Dep."), 416:22-417:11, excerpts attached as **Exhibit 8**. Moreover, Barry reasoned that the specification goes back and forth referring to passively stable and passive static stability without differentiation and the term "dynamic" doesn't show up in the patents at all. Barry Dep., Ex. 8, 417:12-418:2. Therefore, Barry concluded that dynamic stability is not a requirement of the patents-in-suit. This does not end Barry's stability analysis, however, in that Barry accepted that the Court has, and still may, construe claim 1 of the '659 Patent to require both static and dynamic stability.

Indeed, **Barry's belief that those terms can be used interchangeably is ultimately immaterial to his analysis and conclusions on overall stability** since his analysis did not depend upon his opinion that that "stability" and/or "passive stability" could mean the same as "static stability" or "passive static stability".[6] He conducted substantial analysis of static and dynamic stability separately to determine whether the eFoils at issue here were stable. Barry Inf. Rep., DI 80-23, ¶¶ 89, 94-96; 153-156; Barry Reply, DI 80-31, ¶¶ 12-52. His conclusions are based on his analysis of both the initial tendency of the eFoil to return to its original condition when disturbed (static stability) and the eFoil settling down at the equilibrium position following a disturbance (dynamic stability).[7] *Id.* Barry's opinions on stability fall squarely within Plaintiff's proposed

---

[6] Defendants take issue with Barry's opinion that static stability and dynamic stability are not technically separate components of overall stability. As discussed herein, Barry provides his reasoning for this position. *See* Barry Dep., Ex. 8, 50:9-57:20. Still though, Barry admits that static and dynamic stability are components of overall stability. *Id.*, 74:5-17. Barry recognized that his interpretation is immaterial in that "whether you want to call it two types of stability or one type in a specific division is a second question, and it's not of engineering interest." *Id.*, 54:24-55:14.

[7] There is no dispute in this case that both the Accused Products and the Commercial Embodiments have an initial tendency to return to their original condition following a disturbance. In other words, both show passive static stability. The issue in the context of these motions is whether

definition of dynamic stability. Barry's stability analysis is also consistent with the view of Defendants that a composite definition of a stable craft is one that initially tends to return to its equilibrium position after being disturbed and, on its own, eventually returns to and remains in its equilibrium position over time. *See* DI 83, p. 7. Barry's opinion that "stability" and "static stability" can be used interchangeably is based on his significant experience and education indicating that the term "stability" is used loosely in the art.  Barry Dep., <u>Ex. 8</u>, 102:21-103:21. That opinion has no bearing on his conclusion that the Accused Products and the Commercial Embodiments are statically <u>and</u> dynamically stable – thus, stable.  His opinions are reliable and not inconsistent with the Court's claim construction. It is Defendants who have created the confusion over stability in order to manufacture a *Daubert* argument.

### iii.     Barry Properly Provides Opinion as to the Plain and Ordinary Meaning of "Stability" and "Passively Stable"

Defendants argue that Barry's interpretations of stability – including the terms "stability", and "passively stable" – are irreconcilable with their plain and ordinary meanings. Stated differently, Defendants seek to exclude the entirety of Barry's stability opinions because Defendants do not agree with his interpretation of the plain and ordinary meaning of stability in the context of the patents-in-suit.  However, disagreement with expert opinion is not the standard for excluding testimony under *Daubert*.  Barry should not be precluded from offering opinions as to the plain and ordinary meaning of those terms. He is permitted and qualified to provide such testimony if it does not exceed the bounds of appropriate expert testimony and/or otherwise contradict the court's claim construction.  *See M2M Sols.*, 2020 WL 7767639, at *6 (holding that where the parties' experts do not agree on the plain and ordinary meaning of the term then there is

---

Claim 1 of the '044 Patent also requires dynamic stability. If the Court agrees that it does not, then there is no material dispute that Defendants infringe the '044 Patent.  *See* Pl. Op. Brief, DI 80.

a genuine issue of material fact not properly resolved on summary judgment); and *EMC Corp. v. Pure Storage, Inc.,* 154 F. Supp. 3d 81, 109 (D. Del. 2016) ("Expert testimony regarding whether an accused device falls within the scope of a court's claim construction is appropriate and raises a factual issue for the jury to resolve.").

While the Court previously cast doubt on Barry's interpretation of "stability" and "passively stable" as meaning the same as "static stability" or "passive static stability", the Court did not close the door on the construction completely – allowing the parties the opportunity to "readdress" the issue through their dispositive motions.  DI 66, p. 9. The Plaintiff is readdressing the issue now.  If the Court determines conclusively that stability in the context of the patents-in-suit must include both static and dynamic stability, then the claim construction question is answered for trial and Barry should be free to offer the remainder of his substantive stability opinions.  Those remaining opinions, including his opinions on static and dynamic stability, are not inconsistent with the Court's construction of "passive static stability" or the court's interpretation of the plain and ordinary meaning of the terms "passively stable" or "stability" should it reject Barry's interpretation here.  Either way, however, the entirety of Barry's stability opinions should not be excluded.

### iv.     Barry's Stability Analysis is Consistent with the Asserted Patents

Defendants further argue that Barry's standard for assessing stability is not supported and conflicts with the specification of the patents-in-suit because the patents-in-suit require the following stability conditions to be true: "$C_{m0}>0, C_{m\alpha}<0, C_{mQ}<0$" and Barry did not apply identical conditions in analyzing stability in this case.

However, Barry addressed this argument during his deposition and confirmed that his conditions were not contradictory.  Barry Dep., Ex. 8, 426:17-428:13; *see also* Barry Reply, DI

80-31, ¶ 31.  Barry explained that he did not include the condition "$C_{m0}$>0" as named/identified in the patents-in-suit because the software he used to generate his stability analysis, AVL (discussed below), did not have the ability to include Greek letters or subscripts as part of the naming convention for his conditions.  *Id*.  Therefore, Barry used the condition "(CL)=0", and stated that Cm0 is by definition CMTOT at a condition of coefficient lift (CL)=0.  Barry Reply, DI 80-31, ¶ 31.  Barry used the condition (CL)=0 throughout his initial report and supporting exhibits, as opposed to Cm0, because they mean the same thing and that is what he had to do based on script limitations in the software.  *Id*.  Barry used the same conditions, the same standard set forth in the patents-in-suit, he just had to rename one of the conditions.  This is not a legitimate basis to exclude the entirety of his opinions.

### v.   Barry Does Not Misunderstand Stability

Defendants allege that Barry's opinions are not reliable because, in their view, Barry "misunderstands" stability.  Def. Op. Brief, DI 83, pp. 10-13.  Defendants attempt to support this assertion by claiming that Barry is confused about "oscillations" and delta wings.  *Id.*  Defendants then, incorrectly, assert that Barry attempts to discredit various textbooks.  Defendants are merely attempting to create further confusion regarding these issues where none exists.

Oscillations.  Defendants assert, based solely on attorney argument regarding the technical text *Anderson*, that Barry is somehow "confused" about oscillations.[8]  Notably, the section of Barry's report at issue is a *single sentence* – "[a] dynamically stable craft oscillates around the equilibrium position before 'settling down' at the equilibrium position."  Barry Inv. Rep., DI 80-30, ¶ 19.[9]  This statement is consistent with the teachings of *Anderson*.  Defendants then rely on

---

[8] Notably, neither the sections of *Anderson* nor the figures included in Defendants' motion were discussed by Triantafyllou in any of his four reports.

[9] This is the only reference to "oscillate", "oscillations", "oscillating", etc. in Barry's Report.

snippets of Barry's deposition testimony in order to make their point, while ignoring Barry's additional comments regarding *Anderson*, including the following statement by Barry:

> Q      […] Are you saying – are you agreeing with what I am reading from Mr. Anderson [regarding static vs. dynamic stability], or do you think he is incorrect?
>
> A      No, I don't think he is incorrect.  I think it's – again it's a matter of applicability to the particular discussion.
> Now he's discussing it from a highly academic point of view, and I agree with him that issues such as all of the mathematics and so on that follows in that chapter pertains to static stability.

Barry Dep, Ex. 8, 69:18-70:13.

The crux of the disagreement here between Barry and Defendants is that Mr. Barry, in his capacity as an expert, believes that static stability and dynamic stability are components of stability, not necessarily completely separate concepts (*see* Barry Dep., Ex. 8, 70:7-23); whereas Defendants, without support of their expert,[10] have attempted to create confusion regarding static stability and dynamic stability with respect to the oscillations seen in *Anderson*.

Defendants wish to pick apart Barry's application and interpretation of *Anderson's* academic and theorical concepts to the real world.  Defendants may certainly attempt to do so on cross-examination, in trial.  But these quibbles do not support the wholesale exclusion of Barry's testimony, particularly where the point of contention is a *single sentence* in Barry's report that is not even contradictory to *Anderson*.  The challenges Defendants would like to make to Barry's testimony regarding the real-world application of academic principles are more properly suited to weight rather than admissibility.

---

[10] There is not a single reference to Triantafyllou's opinions regarding this subject.

24

Delta Wings.   Next, Defendants argue that Barry is somehow confused about delta wings. Def. Op. Brief, DI 83, pp. 12-13.  Defendants allege that "Mr. Barry admitted at his deposition that the figures cited in his rebuttal report do not represent delta wings" and this "validates Dr. Triantafyllou's distinction between flat plates and delta wings." Once again Defendants are attempting to create confusion where none exists.  Barry has opined consistently throughout this litigation that an airfoil design is "a geometry of a cross-section of the hydrofoil" and that a planform design is "a shape of the hydrofoil as viewed from above." *See* Barry Claim Const. Rep., attached as **Exhibit 9**.  Despite Defendants' statements, what Barry actually opined was that "[t]he final prototype in the *Evolo* Report (along with the other prototypes) is a *flat plate airfoil*."  Barry Inv. Rep. DI 80-30, ¶ 104 (emphasis added).  He further states that "[t]he designs described in the *Evolo* Report (the various prototypes and the final design) have *a hydrofoil planform comprising an extreme delta* with short extensions on the aft end."  *Id.* at ¶ 107 (emphasis added).  This is consistent with the sections of Barry's deposition cited by Defendants, where he states that "[a] delta plan form [*sic*] can be a flat plate.  In this case it is."  Barry Dep., Ex. 8, 367:10-12.  There is no confusion regarding the type of wing used by the *Evolo* team, or the effect such a wing type would have.  Barry further elaborates that while a delta wing, including the example provided by Triantafyllou, can provide lift but that is not the same design used by the *Evolo* team.  *See* Barry Dep., Ex. 8, 394:4-395:25 ("I think my opinion is that the culmination of delta and – well, the flat plate in general, produces relatively easy separation.  Now delta wings can, in fact, provide lift, but it is my opinion that *the combination of a delta plan form [*sic*] and a flat plate* is not a very good idea.").  Once again Defendants are attempting to pick apart Barry's opinions with respect to delta wings, which defendants are certainly able to attempt to do on cross-examination, in trial.

Textbooks. Defendants go so far as to claim that Barry discredits textbooks rather than admit his "mistaken views" on stability.   Def. Op. Brief, DI 83, pp. 13-14.   Defendants' additionally falsely claim that "the parties agree that flight principles apply to this case (i.e., involving hydrofoils) and the parties agree that *Anderson* is an authoritative text."  *Id.* at 13. While Triantafyllou does cite to *Anderson* in his reports, he also explicitly states that "there is a fundamental difference between aircraft stability and hydrofoil craft stability." Tri. Rep. ¶182; *see also* Tri Rep. ¶¶ 143-144.  Triantafyllou and Defendants do not agree that flight principles apply to this case, particularly with respect to stability.  *See id.*

Furthermore, what Defendants allege as being "discrediting" is merely Barry pointing out that different documents serve different purposes, and accordingly utilize varying degrees of precision.   As even lay people understand, different written works are directed to different audiences.  Barry explains: "if you present textbooks as authoritative, you have to understand the context of the textbook" and further elaborates that "[t]hey [the textbooks] don't have to be very precise, because the person understands, the people who are reading the textbook understand the context that it is discussed." Barry Dep., Ex. 8, 87:13-22.  Contrary to Defendants assertion, the simplest explanation is not that Barry misunderstands stability, but rather that Barry understands the intricacies of stability in a way that Defendants' counsel does not appreciate.

Defendants' allegation that Barry's opinions are somehow not reliable because, in their view, Barry "misunderstands" stability (*see* Def. Op. Brief, DI 83, pp. 10-13) is really an attempt by Defendants to pick apart Barry's analysis, which they may certainly attempt to do so on cross-examination, in trial.  None of what Defendants allege as Barry "misunderstanding" stability supports the exclusion of Barry's testimony, as the challenges Defendants would like to make to Barry's testimony are more properly suited to weight rather than admissibility.

**b. Barry's Stability Analysis, Consisting of His Review of Engineering Drawings, Review of Videos, and Computer Analysis Using the AVL Software, is Based on Sound Methodology**

In addition to objecting to his interpretations of the term "stability", Defendants take issue with the analysis Barry performed to formulate and verify his stability opinions. Defendants manufacture an argument that Barry's entire testimony is unreliable because he believes that stability of watercraft can be assessed by "inspection alone" – i.e. through the review of engineering drawings and videos of the crafts in use. Def. Op. Brief, DI 83, pp. 14-15. Then, after ignoring the fact that Barry's analysis was <u>not</u> based solely on inspection alone, and instead based on a combination of inspection combined with verification using a computer program which measures stability, Defendants argue that the software Barry used to assess stability is unreliable and can't be used in evaluating eFoils. Both of these arguments fail.

**i. Barry's Stability Analysis is Not Based on "Inspection Alone"**

While Barry does opine that a stability determination can be made by a review of 3D engineering drawings and videos of the craft in operation[11], it cannot reasonably be disputed that Barry's stability analysis is <u>not</u> based solely on "inspection alone". Defendants misconstrue Barry's position in an attempt to set up a strawman argument that it can try to tear down. What Barry actually did to test stability consisted of a three-step process. <u>First</u>, he reviewed the 3D engineering diagrams and from there he formed an initial guess as to whether the craft was stable. *See* Barry Dep., <u>Ex. 8</u>, 219:17-21. From those drawings, Barry could see whether there was a reasonable configuration and determine whether there was an achievable center of gravity. *Id*.,

---

[11] *See* Barry Dep., <u>Ex. 8</u>, 230:11-17; *see also* Barry Reply, <u>DI 80-31</u>, ¶ 17 (stability determinations can be made from review of 3D STEP files and videos of the craft in operation).

220:11-18.  He could also see the geometry and determine whether everything was appropriate and reasonable.  *Id.*, 228:10-229:3; *see also* Barry Reply, DI 80-31, ¶ 19.

Second, he reviewed videos of the craft in operation and could make a determination as to whether the Accused Products were stable or unstable.  *See e.g.*, Barry Dep., Ex. 8, 221:10-21. From viewing the videos, he observed whether the craft exhibited controls fixed stability – i.e. whether there is movement needed from the rider to control the craft or was needed to maintain the craft's equilibrium position.  *Id.*, 222:2-226:19, 404:5-405:9.  Barry engaged in these two steps in this case and made an initial determination that the Accused Products demonstrated stability. Barry Inf. Rep., DI 80-23, ¶¶ 94, 154. Instead of relying solely on his review of the 3D drawings and videos, Barry engaged in further computer analysis to verify his initial stability opinion.

That is, third, he engaged in computer-based, stability computations using basic physics and a software program.  As set forth in his initial report, Barry used the standard Athena Vortex Lattice (AVL) code for analyzing aircraft and similar bodies operating in fluid to determine stability derivates (more on AVL, below). Barry Inf. Rep., DI 80-23, ¶¶ 95-96, 153-156.  The results of Barry's computer-based analysis confirmed his initial opinion that the Accused Products were statically and dynamically stable. *Id.*, ¶ 96; *see also* Barry Dep., Ex. 8, 19:22.  As Barry testified, he used AVL as a way of independently analyzing the stability of the craft and to "cross-check" his prior analysis of the engineering drawings and the videos.  *Id.*, 405:10-409:25 ("The video validates the program, the program validates the video.").

Incredibly, Defendants argue that there is no evidence that a person of ordinary skill in the art, or any other related expert, would support the position that the stability of a watercraft may be determined from inspection alone, when in fact their own technical expert, Dr. Triantafyllou, assessed the stability of the alleged *Evolo* prior art through inspection alone. Triantafyllou only

reviewed videos of the *Evolo* device, along with the two-dimensional diagrams contained in the *Evolo* Report, and did not conduct an analysis involving the speed and center of gravity of the vehicle and rider (as he claims Barry did not do and should have done). *See* Deposition of Michael Triantafyllou dated October 5, 2022 ("Tri. Dep."), 143:10-13, 145:12-148:11 (reliance on videos), 151:25-152:16 (no analysis), excerpts attached as **Exhibit 10**. Nor did he conduct any mathematical analysis of stability. *Id.*, 151:16-20; *see also* Expert Report of Michael Triantafyllou ("Tri. Rep."), DI 80-15, ¶¶ 104-130. The only difference between what Triantafyllou did and what Barry did was that Barry independently ran a scientific check on his "inspection" analysis. With this in mind, contrary to Defendants' assertion, there is at least one other expert in the field – Triantafyllou – who believes that a stability analysis can be performed based on inspection alone (at least when it suits his opinions).

In any event, Barry's opinion that stability can be determined through review of 3D engineering drawings and videos is supported with reasoned analysis and its reliability was confirmed through scientific testing. There is no basis to exclude his testimony as being unreliable or "confusing" as argued by Defendants.[12] In the least, should Barry be precluded from opining that "inspection alone" can form the basis for opinions on watercraft stability (he shouldn't), this finding should not serve to render the rest of his stability analysis unreliable or confusing

### ii.   Barry Properly Relied Upon and Used the AVL Software

Defendants' final aspect of their "everything but the kitchen sink" arguments challenging Barry's stability opinions is their position that Barry's use of the AVL software was conclusory, flawed, and unreliable. Defendants argue that it was improper for Barry to use AVL at all since it

---

[12] Should the Court agree with Defendants' position then Triantafyllou's analysis based on "inspection alone" must likewise be excluded as being "unclear, unfounded and unreliable."

is a software designed for analyzing aircraft stability and therefore, cannot apply to analyzing stability in eFoils.  Def. Op. Brief, DI 83, p. 17.  Defendants then argue that Barry's use of AVL was flawed – rendering his opinions unreliable – because he: (a) made mistakes in inputting values and a wrong air-foil cross section in his initial analysis; (b) placed a reference point in his initial analysis that got moved in his reply analysis; (c) shifted the center of gravity used in his analysis to a different location in his reply analysis than what was in his initial analysis; and (d) changed wing reference values for two of the Accused Products in his reply analysis but not for the third – the Flyer One (Patroller Wing).  These are all issues that are more appropriate to raise during cross examination, not issues which form the basis for proper exclusion under *Daubert*.

As to Defendants' argument that Barry's use of the AVL software was unreliable because it is designed for aircraft stability analysis, such argument contradicts both parties' (and the inventor's) reliance upon aviation principals and design to study and/or design wings used in connection with hydrofoils and eFoils.  There is no dispute that "hydrofoil technology employs the same basic principles as aircraft wing design", as Defendants articulated earlier in their opening brief. Def. Op. Brief, DI 83, p. 4. As further agreed by Defendants, the patents-in-suit apply aeronautical design concepts to the claimed hydrofoil; concepts such as "airfoil design", "planform design", and "span-wise twist distribution."  *Id., see also* the '044 Patent, DI 80-9, and Barry Inv. Rep., DI 80-30, ¶¶ 57-60.  The inventor of the patents-in-suit, Jacob Langelaan, holds a M.S. and Ph.D in aeronautics and astronautics and is a professor of aerospace engineering at Penn State.  DI 83, p. 5, fn 1. Langelaan actually **used the AVL software** to analyze stability when he designed the patented inventions.  *See* Deposition of Jacob Langelaan dated June 14, 2022 ("Langelaan Dep."), 71:3-6, 98:22-100:23, excerpts attached as **<u>Exhibit 11</u>**.  It was Langelaan who suggested to Barry that he use AVL in connection with his stability analysis. Barry Dep., <u>Ex. 8</u>, 30:19-32:25.

Barry was presented with Defendants' criticisms of the use of AVL software and did not waiver in his conclusion that "AVL is an appropriate and accurate method of analyzing the aspects of the stability of the watercraft."  Barry Reply, DI 80-31, ¶ 30.

Barry further addressed Defendants' contention that the AVL software does not account for a number a phenomenon existent with respect to watercraft but not aircraft. *Id.*, ¶¶ 22-35. Broadly speaking, Barry opined that the differences between airplanes and hydrofoils are minimal and those differences which are not accounted for in AVL are stabilizing in nature. *Id.*, ¶ 22.  This makes Barry's analysis and use of AVL a more conservative indicator or analysis of stability. Barry Dep., Ex. 8, 405:10-407:23.  By way of primary example, since AVL is modeled for aircraft it does not take into account free surface.  The presence of a free surface – in this case the top of the water – is generally stabilizing in nature.  Barry Reply, DI 80-31, ¶ 23.  As a result, Barry concluded that any watercraft that is determined to be stable using AVL would in practice be more stable because the water surface is a factor which increases stability.  *Id.*, ¶¶ 23-24.  This is just one of a number of stabilizing factors that are not taken into account in AVL that if considered would actually increase the amount of stability seen in the craft.  *See Id.*, ¶¶ 25-35. The fact that AVL does not account for theses stabilizing factors does not render its use unreliable in the watercraft context.

As for Defendants' other complaints, Defendants' overall position is basically that Barry's opinions cannot be considered here because he made some negligible "errors" in his initial analysis (that were ultimately addressed) and/or because Triantafyllou criticized the ways in which Barry approached that initial analysis.  However, Barry stood by the results of his initial AVL analysis as showing static and dynamic stability (Barry Reply, DI 80-31, ¶¶ 42-45), but re-ran some of the analysis to address the "problems" that were raised by Defendants.  In other words, in order to

31

avoid any appearance of unreliability, Barry attacked Triantafyllou's concerns head on, and the results were largely the same and his opinions remained unchanged. *Id*., *see also* Barry Dep., <u>Ex. 8</u>, 433:23-434:17. For example, Barry admitted that he mistakenly used an uncambered wing as opposed to a cambered one (like the Accused Products) in his initial AVL analysis. Barry Reply, ¶¶ 44-45. However, when he ran the analysis to include a cambered wing the results showed more dynamic stability than was previously shown. *Id*., ¶ 45 (noting that the effect of these changes was "negligible"). Similarly, Barry admitted that he used lift values, or $C_L$, in some of his initial analysis that reflected a hypothetical weight of a rider that was twice as heavy as that of an average person. Nonetheless, Barry concluded that the results were still physically reasonable and demonstrated dynamic stability, "just at a different weight." Barry Reply, DI 80-31, ¶¶ 44, 52. When Barry entered the lift values proposed by Triantafyllou, the level of dynamic stability again increased, albeit just somewhat. *Id*., ¶ 45.

Defendants also criticize the fact that Barry twice had a notation in his wireframe drawings generated from the AVL analysis which read "AVL origin." Defendants' nit here seems to relate more to their own, or Triantafyllou's, confusion over the notation in the drawing as opposed to some flaw in Barry's methodology. In fact, when asked during his deposition, Barry confirmed that in the drawing at issue containing the notation "ACL origin", that notation did not represent the origin from which he made the center of gravity measurements. Instead, the origin point in the diagram were two brown lines. Barry Dep., <u>Ex. 8</u>, 325:5-327:19, 341:6-27.[13] Barry confirmed that he used the point of origin that was identified in Defendants' own 3D STEP files as the point of origin in his analysis, regardless of what his notations said on different diagrams. *Id*., 393:11-

---

[13] Barry also admitted that in later drawings, the term "AVL Origin" did accurately reflect the measurement origin point in the diagram. Barry Dep., <u>Ex. 8</u>, 335:13-20.

394:4.  It is unclear how this labeling could support a finding that Barry's opinions are unreliable. To the extent there was any uncertainty, it was dispelled during Barry's deposition.

Defendants further criticize Barry for "shifting the center of gravity" used in his AVL analysis.  Barry testified that he did change the center of gravity in his rerun analysis from the hip point (as was used in his original analysis) to the ankle.  Barry Dep., Ex. 8, 337:9-15.  His reasoning for the change was that he did not believe the height of the hip point was a realistic center of gravity.  Nonetheless, in the end, his changes did not result in any significant differences in the values or affect his conclusions. *Id*., 337:15-338:24, 428:19-434:17 ("the stability derivatives themselves aren't informed by either the weight or the center of gravity").  In fact, the re-run analysis showed that the Accused Products were slightly more stable.[14]  *Id*., 430:19-22.

Finally, Defendants criticize Barry for using the same "reference values" for each different type of wing on the Accused Products with respect to the analysis in his opening report but changed those values for two (but not all) of those wing types in his re-run analysis.  As to the values Barry used in his initial analysis, Barry believed that his analysis was reasonable and showed that the Accused Products were dynamically stable – just at a higher weight.  Barry Reply, DI 80-31, ¶ 44; Barry Dep., Ex. 8, 305:2-306:11. Because of Defendants' criticisms, and in order to verify that small variations in the center of gravity did not strongly affect the stability analysis, Barry re-ran his analysis using new values for mass, centers of gravity, coefficient of lift, and a different alpha. Barry Reply, DI 80-31, ¶¶ 45-52; Barry Dep., Ex. 8, 307:9-309:22.  The results of his new analysis showed that "the craft is also somewhat more dynamically stable than in the original analyzed

---

[14] Triantafyllou disagrees that either result showed stability but offered no alternative calculations to support his conclusion – he just criticized Barry. Disagreement does not form the basis for exclusion.  Defendants are free to cross examine Barry on this disagreement at trial.

condition." Barry Reply, DI 80-31, ¶ 45.[15]  None of Defendants' arguments support the exclusion

of Barry's stability opinions under *Daubert*, Rule 702 or Rule 403.  Barry's opinions on stability

will be helpful to the Jury.

### 3.   BARRY'S OPINIONS ON STABILIZING FACTORS SHOULD NOT BE EXCLUDED

Defendants criticize Barry's eigenvalue analysis and seek to exclude all of his testimony

related to the stabilizing factors that he considered in that analysis to conclude: (a) that the AVL

software represents a conservative approach to measuring stability since those factors are not taken

into account by the computer in the analysis and/or (b) that despite there being a single, "slightly"

positive sigma value, the Accused Products and the commercial embodiments demonstrated

dynamic stability.  Defendants argue that Barry's opinions are conclusory and unreliable.

Defendants place great emphasis on the fact that Barry's initial eigenvalue analysis showed

at least one positive sigma value. According to Defendants, this fact "conclusively" establishes

that the Accused Products and the commercial embodiments were, and are, dynamically <u>unstable</u>.

While Defendants claim that Barry somehow agreed that this showed dynamic instability,

Defendants are wrong.  That was not Barry's conclusion.  He concluded that dynamic <u>stability</u> was

established.  *See* Barry Inf. Rep., DI 80-23, ¶¶ 89, 96, 156; Barry Reply, DI 80-31, ¶¶ 22-29, 33-

35, 42, 45, 54-55.  Further, when asked during his deposition, Barry confirmed that he did not

believe that the initial analysis showed dynamic instability.  Barry Dep., <u>Ex. 8</u>, 402:12-21. Barry

reasoned that the AVL software only represented an "approximation to reality", or a mathematical

baseline, in that the stabilizing factors that exist once water is added to the equation (*e.g.* damping,

---

[15] As to the different models of the Accused Products, Barry discusses the differences in the analysis in his deposition. *See* Barry Dep., <u>Ex. 8</u>, 315:2-318:18.  In the end, he testified that it did not matter whether it was a "explorer wing" or a "patroller wing" because the analysis confirms that all the wings would be stable and that their stability would be quite similar and that their eigenvalues "are all largely on the negative side". *Id.*, 408:3-409:25.

free surface, added mass, and viscosity), are not considered by the computer program. This was not a bare conclusion without support. Barry's conclusion was based on his significant experience and education in naval architecture and based on his review of the engineering drawings and videos – in other words, the reality check on the computer's approximation of reality. *Id.*, 402:22-408:11. In Barry's own words, the original eigenvalues already showed that the crafts were mathematically "very, very close to dynamically stable" and being able to view the craft operate in their real world setting conclusively confirmed dynamic stability. *Id.*[16] Barry's discussions with the product manufacturers and those that have ridden the craft also contributed to his conclusions. Barry Reply, DI 80-31, ¶ 34.

Defendants further object to Barry's consideration of the other stabilizing factors by arguing that his statements are not supported and conclusory. However, Barry does not simply offer a vague conclusion that these other stabilizing factors apply. Barry explains in detail what each factor is and how it applies. *See* Barry Reply, DI 80-31, ¶ 13 (damping effect in waterborne craft); ¶ 19 (discussing the concept of damping the pitch motion); ¶ ¶ 22-27 (discussing concept of "free water surface"); ¶¶ 29,33 (discussing separation of flow); ¶ 55 (discussing damping effect and forces on positive eigenvalue results for "sway/roll" motions). His reasoned conclusions were derived from his nearly 50-years of experience in naval architecture and engineering and over 20 years of designing watercraft for the U.S. Coast Guard. His extensive experience and qualifications have not been questioned. Barry's testimony will be helpful to the Jury.

---

[16] When Barry re-ran the analysis using updated eigenvalues for, *inter alia*, mass and center of gravity, one of the prior positive values moved to zero and the other just short of zero – showing that the dynamic stability increased. Barry Dep., Ex. 8, 410:2-22.

#### 4. BARRY'S SECONDARY CONSIDERATIONS SHOULD NOT BE EXCLUDED

Defendants argue that Barry's secondary considerations as to non-obviousness should be excluded because they are either conclusory, "not based on probative evidence", or apply a wrong legal standard. These arguments also fail. Barry secondary considerations are all based on facts of record and the correct legal standard. His testimony should not be excluded.

Defendants contend that Barry relies upon an incorrect legal standard for "evidence of copying" in connection with his secondary consideration. Barry does not rely upon an incorrect legal standard. Citing to his opening report on infringement, he concludes that the "Defendants replicated the patented persona watercraft's novel features…." Barry Inv. Rep., DI 80-30, ¶ 244. Replication is the standard for copying. *See Cot'n Wash, Inc. v. Henkel Corp.*, 56 F. Supp. 3d 626, 651–52 (D. Del. 2014) (holding "copying requires the replication of a specific product" which can be illustrated by internal documents, direct evidence such as disassembling a patented protype, photographing features and using photographs as a design blueprint, or establishing access to, and substantial similarity to, the patented product). Barry doesn't simply conclude that there was copying because there was infringement, his view is based on the substantial similarity in the products rather than an infringement analysis. *See e.g.*, Barry Dep., Ex. 8, 369:17-370:5 ("if you set the two next to each other, it's not easy to tell the difference.").

Barry's views on commercial success are likewise supported by the testimony of record (*see* Wagner Dep., Ex. 2, 140:4-141:16 (discussing large company growth as well volume of sales orders and sales for the first half of 2021)) and Stec's expert witness report. Barry Inv. Rep., DI 80-30, ¶ 245. It is Defendants' attempt to confine Barry's commercial success argument to only the sale of Plaintiff's first generation *Lift1* brand products that is improper. Barry considered all the Plaintiff's sales and financial data for all of its *Lift* models, as articulated in the Stec Report, to

36

formulate his opinion as to commercial success.  *See* Barry Dep., Ex. 8, 370:9-371:7.  It can hardly be disputed that the sale of the patented products, and the patented features, have been a commercial success based on the numbers.  There is no legal justification for Defendants' attempt to limit the analysis to a single product model.

Barry's views on praise and recognition of the patented technology, as well as his views on the failure of others and other licenses, are likewise adequately supported by record evidence. For the praise and recognition factor, Barry relied on corporate testimony related to viral videos of the patented Lift efoils which garnered over 100 million views (and a great deal of online discussion) (Leason Dep., 353:11-355:12, attached as **Exhibit 12**) and a number of examples of articles (*see e.g.*, MHL_100360-61, attached as **Exhibit 13**, MHL_100362-63, attached as **Exhibit 14**, MHL_100376-78, attached as **Exhibit 15**, MHL_100379-81, attached as **Exhibit 16**, and MHL_100431-33, attached as **Exhibit 17**).[17]  This evidence is probative of praise and recognition with a direct nexus to the patented technology.   For the failure of others consideration, Barry considered *Evolo's* failure to create a stable watercraft.  Barry Inv. Rep., DI 80-30, ¶ 247. This is probative and reliable, and Barry spends a great deal of time discussing the failures of the *Evolo* project throughout his reports.  And finally, for the licenses consideration, Defendants repeat their incorrect argument discussed above about consideration of offers or negotiations. The evidence relied upon by Barry as to licenses is probative.  *Id.*, ¶ 248. Barry's opinions on the secondary considerations of non-obviousness are reliable.

---

[17] There are over 500 additional pages of similar articles Barry cites as having relied on to formulate his opinion on praise and recognition. *See* Barry Inv. Rep., DI 80-30, ¶ 246. These records speak for themselves and consistently tout the patented technology.

**B. <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY AND
NO INFRINGMENT SHOULD BE DENIED</u>**

Defendants assert two grounds to enter summary judgment in its favor: (1) that Claims 16-20 of the '659 Patent are invalid for lack of a written description; and (2) that there is no infringement of the patents-in-suit because the Accused Products are dynamically unstable. For the reasons discussed below, the '659 Patent is not invalid for lack of a written description and Defendants' non-infringement argument fails because (a) there is a dispute as to whether the patents-in-suit require dynamic stability; and (b) there is a dispute as to whether the Accused Products are dynamically unstable as alleged by Defendants.

**1. DEFENDANTS CANNOT SHOW BY CLEAR AND CONVINCING EVIDENCE THAT CLAIMS 16-20 OF THE '659 PATENT ARE INVALID FOR LACK OF A WRITTEN DESCRIPTION**

Defendants allege that claims 16-20 of the '659 Patent are invalid for lack of written description. The basis of this assertation is that claims 16-20 of the '659 Patent do not include any stability limitation. Def. Op. Brief, DI 83, p. 27. Specifically, Defendants rely on *ICU Medical, Inc. v. Alaris Medical System, Inc.*, 558 F. 3d 1368 (Fed. Cir. 2009), which as will be discussed herein, can and should be distinguished from the present case.

It is well established that "particular embodiments appearing in the written description will not be used to limit claim language that has broader effect." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004) (citing *Electro Sci. Indus., Inc. v. Dynamic Details, Inc.*, 307 F.3d 1343, 1349 (Fed. Cir. 2002). Accordingly, "even where a patent describes only a single embodiment, claims will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Id.* (internal quotation marks and citations omitted). Furthermore, "a specification's focus on one particular embodiment or purpose cannot limit the described invention

where that specification expressly contemplates other embodiments or purposes." *ScriptPro LLC v. Innovation Assocs., Inc.*, 833 F.3d 1336, 1341 (Fed. Cir. 2016).

In *ScriptPro, LLC*, the Federal Circuit distinguishes *ICU Medical* because the patent at issue in *ScriptPro* expressly discloses that the subject matter at issue (sorting and storing) may be done in a number of ways.  833 F.3d at 1341.  The district court granted summary judgment on invalidity for lack of written description, and *ScriptPro* argued on appeal that the district court erred by interpreting the specification as limited to sorting by patient-identifying information.  *Id.* at 1340.  The Federal Circuit agreed with *ScriptPro* that the specification does not limit the claimed invention to sorting by patient-identifying information, and in making this determination, the Federal Circuit examined the "multiple problems that the invention solves."  *Id.*  Specifically, the court held that "[a]nd while some, indeed many, of these solved problems involve sorting prescription containers by patient-identifying information, not all of them do."  *Id.*

*ScriptPro* is the more analogous case here because, as in *ScriptPro* and as the Federal Circuit distinguished from *ICU Medical*, the '659 Patent provides several goals of the invention. For example, the "Field of the Invention" of the '659 Patent states "[t]he present invention relates to personal watercraft; specifically, an electrically powered hydrofoil surfboard that is controlled by weight shift."  '659 Patent, Col. 1, ln. 14-16., DI 83-10.  The '659 Patent further outlines the needs in the art that the patent seeks to provide, stating "[a] need therefore exists for a personal watercraft that provides improved control and performance while providing a 'surfing feel.' In addition, this personal watercraft should be mechanically simple, easy to transport, and easy to maintain."  '695 Patent, Col. 1, ln. 57-61, DI 80-10.  The "Summary of the Invention" section of the patent further outlines that:

> Embodiments of the present invention improve upon the powered
> surfboard by incorporating a hydrofoil. The hydrofoil greatly

> reduces the power required to travel at "fun" speeds (ranging from twenty to thirty miles per hour, but can be higher or lower depending on the user), so that a battery-powered electric motor (rather than an internal combustion engine) can be used to power the propulsion system. This results in reduced noise and vibration as well as reduced environmental impact.

*Id.*, Col. 1, ln. 65 – col. 2, ln. 6. Defendants ignore these sections of the specification when making their arguments, none of which mention stability as a requirement or otherwise provide a clear intention to limit the claim scope as including stability.

Most of Defendants' arguments focus on the '044 Patent (to which the '659 Patent claims priority) and the statements made during prosecution of the '044 Patent. *See* Def. Op. Brief, DI 83, pp. 26-28. However, Defendants ignore that claims 16-20 of the '659 Patent include additional and different structural limitations from those of the '044 Patent that they highlight. Moreover, the Examiner's "Reasons for Allowance" in the Notice of Allowance for the application issued as the '659 Patent mentions nothing regarding stability, instead stating that "[t]he following is an examiner's statement of reasons for allowance: prior art search did not reveal the limitations of the surfboard with the hydrofoil and propulsion system configuration." *See* '659 Notice of Allowance, attached as **Exhibit 18**.

While Plaintiff believes Defendants cannot possibly establish invalidity for lack of a written description by clear and convincing evidence, as set forth above, there is at least a triable issue of fact regarding whether the claims 16-20 of the '659 Patent are invalid. Accordingly, Defendants' summary judgment motion as to invalidity should be denied on this ground.

## 2. DEFENDANTS FAIL TO MEET THEIR BURDEN TO SHOW THAT NO REASONABLE JURY COULD FIND THAT THE ACCUSED PRODUCTS INFRINGE THE PATENTS-IN-SUIT

Defendants argue that the Court should grant summary judgment of non-infringement with respect to claims 1-22 of the '044 Patent and claims 1-15 of the '659 Patent, because each recite a

"stable" watercraft and the Accused Products[18] are dynamically unstable.  Def. Op. Brief, DI 83, p. 29.  Plaintiff disagrees since there is at least a triable issue with respect to dynamic stability in that: (1) there is a question as to whether the '044 Patent requires dynamic stability; and (2) there is a question as to whether the Accused Products are dynamically stable.  A Jury could decide in Plaintiff's favor on either, <u>or both</u>, of these questions.

### a.  The '044 Patent Does Not Require Dynamic Stability

In arguing that Claim 1 of the '044 Patent requires dynamic stability, Defendants state that the parties agree the preamble of the '659 is limiting (and they do), and then argue that the preamble of the '044 Patent must also then be limiting.  *Id.* at 30.  Defendants argue that MHL "offers no technical or legal justification for why identical preambles should be treated differently."  *Id.* However, Defendants also fail to offer an explanation for why the preamble of claim 1 of the '044 Patent, which includes different structural limitations than claim 1 of the '659 Patent, should differ from the general <u>presumption</u> that a preamble is it not limiting.  *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) ("Generally, the preamble does not limit the claims.").  While a preamble may be limiting, it is only limiting if: "it recites essential structure or steps"; the claim(s) "depend[ ] on a particular disputed preamble phrase for antecedent basis"; the preamble "is essential to understand limitations or terms in the claim body"; the preamble "recit[es] additional structure or steps underscored as important by the specification"; or there was "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art."  *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002)

---

[18] Defendants claim that there is no evidence that the *Flyer One Plus* model infringes – but Defendants' own testimony establishes that the only differences in the Plus model and prior models are (1) a redesigned propellor; (2) a redesigned wireless controller; and (3) a changed material making up the board.  *See* Deposition of Tao Zhao dated July 15, 2022 ("Zhao Dep."), 28:10-29:4, excerpts attached as **Exhibit 19**.

(citations omitted).   Furthermore, where "the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention" the preamble is not limiting.  *Id.* at 809.  Similarly, where "the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention", then the preamble is not limiting.  *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434–35 (Fed. Cir. 2000).

The preamble of claim 1 of the '044 Patent is not limiting.  The preamble does not: (1) recite essential structure; (2) provide antecedent basis to the claim term at issue; and (3) is not essential to understand limitations or terms in the claim body.  *Catalina Mktg.*, 289 F.3d 801 at 808.  The entire preamble of claim 1 of the '044 Patent is "A passively stable, weight-shift controlled personal hydrofoil watercraft, comprising [,,,]".   While the preamble may provide antecedent basis for "watercraft" as used within the body of the claim, this is not the portion of the preamble that Defendants argue is limiting, and this does not mean the preamble is limiting.  *See e.g., Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1355 (Fed. Cir. 2020).  In *Cochlear*, the court held that the preamble was not limiting, even though it provided antecedent basis to a claim term, because "[t]he bodies of the claims contain the only descriptions of the structure for [claimed invention], with no additional structure furnished by the preamble phrase at issue."  *Id.*   The court further stated regarding the phrase as issue in *Cochlear*, that it "is not necessary to provide antecedent basis for the body of the claims.  Although the preamble term 'a patient' may provide antecedent basis for claim 1's later recitation of 'the patient,' that is not the preamble language [Patent Owner] argues is limiting."   The court ultimately held that "a conclusion that some preamble language is limiting does not imply that other preamble language, or the entire preamble, is limiting."  *Id.*  In addition, the body of claim 1 of the '044 Patent describes

a structurally complete invention, such that deletion of the preamble would not affect the structure of the claimed invention.  *See e.g.*, *IMS Tech.*, 206 F.3d at 1434–35.

Moreover, the preamble, including the phrase "passively stable", was present in the original claim as filed.  *See* '044 Patent Prosecution History, 10/08/2014 Claims, attached as **Exhibit 20**. There was no "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art" that would result in the preamble being limiting.  *See Catalina Mktg.*, 289 F.3d at 808.  The limitation that the hydrofoil be "designed to provide passive static stability" *in the body* of the claim was, however, added during prosecution, but this has no effect on the status of the preamble.

As is clear from the above, the preamble of claim 1 of the '044 Patent is not limiting and only requires "passive static stability" as recited within the body of the claim.  Accordingly, there is at least a triable issue of fact and summary judgment should be denied as to Defendants' claim for non-infringement of Claims 1-22 of the '044 Patent.

### b.  The Accused Products are Dynamically Stable

As Defendants state, "the parties agree that an eigenvalue analysis can be used to assess dynamic stability."  Defendants' argument for summary judgment on the issue of the Accused Products being dynamically unstable focuses entirely on the fact that Barry's eigenvalue analysis (both his initial analysis and he re-run analysis) showed at least one positive sigma value.  Def. Op. Brief, DI 83, pp. 31-32.  According to Defendants, Barry's testimony "is the only evidence MHL has that is probative of dynamic stability" and his testimony "conclusively" shows that the Accused Products are dynamically unstable.  Defendants are wrong.

Defendants completely ignore Barry's opinions and analysis that the Accused Products are dynamically <u>stable</u>.  *See* Barry Inf. Rep., DI 80-23, ¶¶ 89, 96, 156; Barry Reply, DI 80-31, ¶¶ 22-

29, 33-35, 42, 45, 54-55.  Defendants further ignore that when questioned during his deposition regarding the results of his eigenvalue analysis, Barry confirmed that he did not believe that either of his analyses showed dynamic instability.  Barry Dep., Ex. 8, 402:12-21.  Instability is not "inconclusive" as alleged by Defendants.

As to his initial eigenvalue analysis, Barry states that it demonstrated the crafts to be mathematically "very, very close to dynamically stable" and that "we know there are effects that occur in marine vehicles that do not occur in aircraft".  Barry Dep., Ex. 8, 406:8-14.  Barry further states that viewing the operation of the craft in their real world setting conclusively confirmed the dynamic stability of the crafts.  *Id.* at 406:8-410:22. This is where Barry combined his computer-based, "basic physics" analysis with his real-world view of the watercraft in operation, to conclude that the craft demonstrated stability – both static and dynamic.  *See* discussion, *supra*, pp. 27-29.

With respect to Barry's AVL analysis, Defendants focus entirely on the sigma values shown from both his initial analysis and the re-run analysis, without any consideration of stabilizing factors not accounted for by the computer program or the effect of a "real world" application of the mathematics.  Barry articulated that AVL only represents an "approximation to reality", or in other words a mathematical baseline for dynamic stability.  *See* Barry Reply, DI 80-31, ¶ 28.  Barry further states that "the limitations of AVL may only *understate* the stability of the craft (both statically and dynamically)."  *Id.* (emphasis added).  Accordingly, additional stabilizing factors exist once the effect of the water in which the hydrofoil is operating is considered (*e.g.*, damping, free surface, added mass, and viscosity – none of which are considered by AVL).  As discussed above (*see supra* p. 31, 34-35), this conclusion was based on Barry's significant experience and education in naval architecture, as well as on his review of the engineering drawings and videos.  Defendants improperly ignore and discount Barry's opinions and analysis.

Finally, Defendants would have this Court believe that they have successfully sold thousands of products and generated millions in revenues from the sale of eFoil products that are unstable, and effectively useless.  That defies common sense and logic.  As Professor Langelaan testified, an eFoil that did not meet the desired levels of stability as set forth in the patents-in-suit "would not be something you could ride."  Langelaan Dep., Ex. 11, 157:25-159:5.  According to Langelaan, an unstable eFoil would be "useless."  *Id*., 160:7-13.  The common-sense conclusion that Defendants were, and are, successfully selling a stable eFoil which infringes the claims of the patents-in-suit is supported by the testimony of Plaintiff's technical expert, who concludes that the Accused Products are stable – both statically and dynamically stable.  His testimony is supported by scientific analysis combined with real world experience and common sense.  While Plaintiff believes this evidence is sufficient to warrant summary judgment entering in its favor on Defendants' claim for non-infringement of the '044 Patent (as further discussed in its Opening Brief), in the least, this evidence is more than sufficient for any reasonable Jury to find in Plaintiff's favor on its infringement claims. As a result, Defendants' motion for summary judgment on non-infringement of Claims 1-22 of the '044 Patent and Claims 16-20 of the '659 Patent.

## V. CONCLUSION

For the reasons discussed in this Answering Brief, the Court should deny Defendants' motion to exclude the testimony of Plaintiff's experts, Christopher Barry and Jeffery Stec, under Daubert and Federal Rules of Evidence 702 and 403.

In addition, the Court should deny Defendants' motion for summary judgment on its counterclaim and defense that Claims 16-20 of the '659 Patent are invalid for lack of a written description. The Court should also deny Defendants' motion for summary judgment of no infringement on the issue of stability.

Dated: November 7, 2022

Respectfully submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
bbennett@coochtaylor.com
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3889

-and-

Dennis D. Murrell (KY 84017, *pro hac vice*)
dmurrell@middletonlaw.com
Robert J. Theuerkauf (KY 89068, *pro hac vice*)
rjt@middletonlaw.com
Brian P. McGraw (KY 90447, *pro hac vice*)
bmcgraw@middletonlaw.com
Megan E. Gibson (KY 97237, *pro hac vice*)
mgibson@middletonlaw.com
MIDDLETON REUTLINGER
401 S. Fourth Street, Suite 2600
Louisville, Kentucky 40202-3410
Telephone: (502) 584-1135
Facsimile: (502) 561-0442

*COUNSEL FOR PLAINTIFF*
*MHL CUSTOM, INC.*

46