# EXHIBIT 1

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF DELAWARE

 3

 4    MHL CUSTOM, INC.,                 )
                                        ) Volume III
 5                   Plaintiff,         )
                                        ) C.A. No. 21-91-RGA
 6    v.                                )
                                        )
 7    WAYDOO USA, INC. and SHENZEN      )
      WAYDOO INTELLIGENCE TECHNOLOGY    )
 8    CO., LTD.,                        )
                                        )
 9                   Defendants.        )

10
                                        J. Caleb Boggs Courthouse
11                                      844 North King Street
                                        Wilmington, Delaware
12
                                        Tuesday, March 28, 2023
13                                      9:04 a.m.
                                        Jury Trial
14

15    BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

16    APPEARANCES:

17              COOCH & TAYLOR, P.A.
                BY:  ANDREW A. RALLI, ESQUIRE
18
                          -and-
19
                GRAY ICE & HIGDON, PLLC
20              BY:  ROBERT THEUERKAUF, ESQUIRE
                BY:  DENNIS MURRELL, ESQUIRE
21              BY:  BRIAN McGRAW, ESQUIRE

22                                      For the Plaintiff

23

24

25
```

```
 1   APPEARANCES CONTINUED:

 2
             RICHARDS LAYTON & FINGER, P.A.
 3           BY:  KELLY E. FARNAN, ESQUIRE
             BY:  DORRONDA R. BORDLEY, ESQUIRE
 4
                      -and-
 5
             HAUG PARTNERS LLP
 6           BY:  ROBERT E. COLLETTI, ESQUIRE
             BY:  JASON KANTER, ESQUIRE
 7           BY:  MARK BASANTA, ESQUIRE
             BY:  PATRICK LAVERY, ESQUIRE
 8
                                 For the Defendants
 9
```

08:53:11
08:53:11

```
10                    ***  PROCEEDINGS  ***
```

08:45:22
08:45:22

```
11           DDEPUTY CLERK:  All rise.  Court is now in

12   session.  The Honorable Richard G. Andrews presiding.

13           THE COURT:  All right.  Good morning, everyone.

14   Have a seat.

15           What can I do for you?

16           MR. THEUERKAUF:  Your Honor, we had just a

17   couple of issues to raise.

18           One, our witness Dr. Jack Langelaan, we're

19   contemplating calling him in rebuttal and I don't know that

20   it was real clear in the final Pretrial Order, but we assume

21   that Dr. Langelaan would be still separated and not able to

22   watch any of the witnesses.

23           THE COURT:  Well, if you're contemplating

24   calling him again, yes, that's true.  I saw him sitting in

25   the Court after testifying.  I don't know why you can
```

09:04:51  1    possibly -- he's a peripheral witness so why you could

09:04:57  2    possibly have to be contemplating calling him in rebuttal,

09:04:59  3    maybe that's an issue for tomorrow.

09:05:01  4              But, yeah.  If you're thinking about it and you

09:05:05  5    want to keep that right, he's got to be sequestered.

09:05:08  6              MR. THEUERKAUF:  Okay.  And then the other issue

09:05:09  7    that we have is we were going to play the deposition

09:05:12  8    testimony of Kevin Wade as part of our case, but we have

09:05:17  9    agreed with the opposing counsel that we'd question him

09:05:21 10    during their case.

09:05:23 11              THE COURT:  Okay.

09:05:24 12              MR. THEUERKAUF:  And so we would request that,

09:05:26 13    you know, we not -- that the Plaintiff not close its case

09:05:29 14    until after we question Mr. Wade.

09:05:30 15              THE COURT:  Sure.  That's fine.

09:05:33 16              MR. MURRELL:  And there's one other thing,

09:05:34 17    Your Honor, and it deals with the testimony of Dr. Stec.

09:05:37 18              THE COURT:  Uh-huh.  Yeah.

09:05:38 19              MR. McGRAW:  We sent over our demonstratives

09:05:40 20    last night.  If I can approach.

09:05:51 21              MR. KANTER:  They're the same.

09:05:53 22              MR. MURRELL:  Yeah.

09:06:00 23              THE COURT:  All right.

09:06:01 24              MR. MURRELL:  I think if we generally look at

09:06:03 25    Slide 11 in the deck, Your Honor.

09:06:05  1                    THE COURT:  Okay.  I got 11.

09:06:07  2                    MR. MURRELL:  So, at the Pretrial Order -- final

09:06:10  3      pretrial conference you ruled that -- that he could rely

09:06:15  4      upon the community -- MHL's state of mind as to wanting the

09:06:23  5      price per board in a hypothetical negotiation since the

09:06:26  6      license agreement negotiations with Fliteboard were actually

09:06:30  7      ongoing at the time of that hypothetical negotiation.

09:06:33  8                    THE COURT:  And I'm sorry.  They -- they could

09:06:35  9      rely on what?

09:06:36 10                    MR. MURRELL:  MHL -- our client's state of mind

09:06:39 11      in the Fliteboard negotiations because they wanted and

09:06:42 12      structured this deal around a price per board.

09:06:45 13                    THE COURT:  Okay.

09:06:46 14                    MR. MURRELL:  Yesterday during the testimony of

09:06:49 15      Mr. Leason, you told Mr. Colletti he couldn't ask about

09:06:56 16      Fliteboard's state of mind in those negotiations.

09:07:00 17                    THE COURT:  Well, because it was presented in a

09:07:02 18      hearsay fashion.

09:07:04 19                    MR. MURRELL:  Exactly.  But their position has

09:07:06 20      been since you made that ruling yesterday that Dr. Stec now

09:07:09 21      can't rely upon MHL's state of mind.

09:07:12 22                    THE COURT:  Right.  Well, those are two

09:07:14 23      different things.

09:07:20 24                    MR. KANTER:  I think there are some --

09:07:21 25                    THE COURT:  But, Mr. Kanter, yes.  What do you

09:07:24  1    want to say?

09:07:24  2               MR. KANTER:  My apologies.  I didn't mean to --

09:07:26  3               THE COURT:  No.  No.  No.  That's all right.

09:07:28  4    It's not a problem.

09:07:29  5               MR. KANTER:  I think there are some additional

09:07:30  6    issues with these documents.  I understand why counsel wants

09:07:34  7    to direct you to Slide 11.  Slides 14 and 15 contain the

09:07:41  8    documents that are not on the trial exhibit list and not

09:07:43  9    cited in Dr. Stec's reports.

09:07:46 10               Slide 12 and -- both of those concern

09:07:51 11    Fliteboard's statements, not -- not MHL's.  So, to the

09:07:57 12    extent they're arguing --

09:07:58 13               THE COURT:  Wait, wait.  Hold on a second,

09:08:01 14    Mr. Kanter.

09:08:01 15               So I'm looking at Slide 14.  I'm looking at

09:08:03 16    Slide 15.  They both have the same two pages of the email.

09:08:11 17               Is your problem -- what is your problem -- issue

09:08:13 18    here?

09:08:14 19               MR. KANTER:  It's not a trial exhibit and it's

09:08:16 20    also not a document cited by Dr. Stec --

09:08:21 21               THE COURT:  Okay.

09:08:22 22               MR. KANTER:  -- in his reports.

09:08:23 23               THE COURT:  All right.  So what about that,

09:08:25 24    Mr. Murrell?

09:08:25 25               MR. MURRELL:  I don't think they told me that

09:08:27  1     last night.  They just objected on the state of mind.  I

09:08:31  2     thought that they were in his -- that he relied upon them.

09:08:35  3     We will confirm that before we put him on the stand.  If he

09:08:38  4     didn't, we'll remove them.

09:08:40  5            THE COURT:  Okay.  Well, so that's seems to take

09:08:42  6     care of that.  So, maybe rather than -- Mr. Murrell, maybe

09:08:46  7     it's good to have Mr. Kanter say whatever his other

09:08:49  8     objections are.

09:08:51  9            MR. KANTER:  In addition to that, Your Honor,

09:08:53 10     the Slides 14 and 15 also are statements by Fliteboard, not

09:09:01 11     MHL.  It goes directly to what they were saying, statements

09:09:06 12     by Fliteboard shouldn't be relevant while these are both

09:09:09 13     statements by Fliteboard.  And they aren't --

09:09:13 14            MR. MURRELL:  As --

09:09:14 15            MR. KANTER:  And they aren't subject to hearsay

09:09:17 16     exception because they're not state of mind.  They're

09:09:19 17     talking about what they've invested in marketing, their

09:09:24 18     average net revenue.  This is not --

09:09:28 19            THE COURT:  Well, I think the difference here is

09:09:30 20     whether or not this is the sort of thing that economics

09:09:33 21     experts relied upon when making decisions.  It doesn't

09:09:37 22     necessarily have to be admissible.

09:09:43 23            MR. KANTER:  Your Honor, I would agree with

09:09:44 24     that.  I think the issue is displaying it to the jury.

09:09:48 25            MR. MURRELL:  And, Your Honor, right.  We're not

09:09:49 1    moving to admit it.  We are saying because this is part of

09:09:52 2    how they get to the price per board that they ultimately

09:09:55 3    entered into the royalty rate.

09:09:56 4              THE COURT:  So what is -- so you're not -- so,

09:10:01 5    we're still talking about the thing that we have to decide,

09:10:03 6    whether Dr. Stec even actually cited; right?

09:10:06 7              MR. MURRELL:  Right.

09:10:07 8              THE COURT:  Okay.  But assuming that he cited

09:10:09 9    it, you're not going to offer these, so what is it that --

09:10:17 10             MR. MURRELL:  It's to illustrate his testimony

09:10:18 11   as to what he relied upon in coming to his conclusion.

09:10:21 12             THE COURT:  Right.  So, in other words, you want

09:10:23 13   to show it to the jury without admitting it?

09:10:27 14             MR. MURRELL:  Yes, Your Honor.

09:10:30 15             MR. KANTER:  Okay.  I believe showing it to the

09:10:32 16   jury would risk the jury using it for hearsay purposes.

09:10:38 17             THE COURT:  This is a hearsay purpose of

09:10:44 18   Fliteboard about things like they expect their sales would

09:10:49 19   be direct and they've done a lot of investment.  They don't

09:10:53 20   normally offer discounts.

09:10:55 21             MR. MURRELL:  Yes, Your Honor, and that all goes

09:10:57 22   to why MHL, who is looking for a price per board, was

09:11:00 23   comfortable with Fliteboard undoing the royalty rate because

09:11:04 24   Fliteboard represented and then subsequently sold it at a

09:11:07 25   high price and sold it without a discount.  And that

09:11:12 1    affected what royalty rate they were rolling because they

09:11:15 2    had said they wanted a certain price per board and this is

09:11:17 3    all relevant to that conversation.

09:11:19 4              THE COURT:  Well, so, it seems to me that it's

09:11:25 5    not much it -- it seems to me that probably that Dr. Stec

09:12:11 6    disclosing them to the jury, that their probative value in

09:12:16 7    helping the jury evaluate his opinion substantially

09:12:22 8    outweighs their prejudicial effect.  I don't really think

09:12:25 9    there is much prejudicial effect because whether or not they

09:12:31 10   actually invest a lot of money or they actually -- I just

09:12:39 11   don't think there's much prejudice, so assuming that that

09:12:47 12   that's disclosed, I'm going to let him show it to the jury

09:12:56 13   or discuss it in front of the jury because I think it's

09:13:03 14   probably helpful as I've just said to his opinion.

09:13:07 15             All right.  What else?

09:13:09 16             MR. KANTER:  Besides that and it being

09:13:11 17   Fliteboard's state of mind, Your Honor, nothing else.

09:13:14 18             MR. MURRELL:  I don't think there are any other

09:13:16 19   issues, Your Honor.

09:13:16 20             THE COURT:  Okay.  No other issues?  Anybody?

09:13:19 21             MR. MURRELL:  No, Your Honor.

09:13:20 22             THE COURT:  Okay.  All right.  Well, thank you.

09:13:22 23   I guess we'll be back hopefully at 9:30.  All right?

09:13:29 24             DEPUTY CLERK:  All rise.

09:13:32 25             (Recess was taken.)

Barry - Direct

09:24:08  1          DEPUTY CLERK:  All rise.

09:29:34  2          THE COURT:  All right.  The jury is all here so

09:29:36  3  we're ready to go.

09:29:38  4          All right.  Let's get the jury.

09:30:00  5          (Jury entering the courtroom.)

09:30:40  6          THE COURT:  All right.  Good morning, members of

09:30:50  7  the jury.  Welcome back.  Thank you for all being here on

09:30:55  8  time and we're ready to start.  So everyone can be seated

09:30:58  9  and can you call a witness, Mr. Theuerkauf?

09:31:00 10          MR. THEUERKAUF:  Yes, plaintiffs would like to

09:31:01 11  call Mr. Christopher Barry.

09:31:21 12          DEPUTY CLERK:  Please state and spell your full

09:31:31 13  name for the record.

09:31:32 14          THE WITNESS:  Christopher,

09:31:35 15  C-H-R-I-S-T-O-P-H-E-R, David, D-A-V-I -- D-A-V-I-D, and

09:31:39 16  Barry, B-A-R-R-Y.

09:31:40 17          DEPUTY CLERK:  Do you affirm the testimony you

        18  are about to give to the court and the jury in this matter

        19  will be the truth, the whole truth and nothing but the

        20  truth?

        21          THE WITNESS:  I do.

        22          CHRISTOPHER DAVID BARRY, the witness herein,

        23  after having been duly sworn under oath, was examined and

09:31:51 24  testified as follows:

09:31:51 25          MR. THEUERKAUF:  Your Honor, may I approach?

Barry - Direct

09:31:52  1              THE COURT:  Sure.

09:32:09  2              THE WITNESS:  Your Honor, may I?

09:32:11  3              THE COURT:  You may.

09:32:13  4              Did we put fresh water in there?

09:32:15  5              Yes, okay.  It's fresh.

09:32:16  6              THE WITNESS:  Okay.  Great.

09:32:18  7              Okay.

09:31:54  8                      DIRECT EXAMINATION

09:31:55  9  BY MR. THEUERKAUF:

09:32:22 10  Q.     Good morning, Mr. Barry.

09:32:23 11  A.     Good morning, counselor.

09:32:24 12  Q.     Would you please introduce yourself to the jury.

09:32:27 13  A.     I am Christopher Barry, Chris, and I'm a naval

09:32:33 14  architect of some age.

09:32:36 15  Q.     Where do you live.  Mr. Barry?

09:32:37 16  A.     I live in 17 Pennsylvania Avenue in Edgewater,

09:32:43 17  Maryland, just south of Annapolis.

09:32:44 18  Q.     Okay.  And who are you currently employed by?

09:32:46 19  A.     Currently employed by the United States Coast Guard.

09:32:52 20  Surface Forces Logistics Center.

09:32:53 21  Q.     And just to be clear, are you here representing the

09:32:56 22  Coast Guard today?

09:32:56 23  A.     I am not representing the Coast Guard nor do my

09:33:01 24  opinions or statements reflect policy or the official

09:33:05 25  opinions of the Commandant of the Coast Guard or the

Barry - Direct

09:33:08  1    Secretary of Homeland Security.

09:33:10  2    Q.      Okay.  And are you taking personal leave from your

09:33:13  3    job at the Coast Guard to be here today?

09:33:14  4    A.      I am.

09:33:15  5    Q.      Okay.  And can you briefly describe what you do for

09:33:18  6    the Coast Guard?

09:33:19  7    A.      Basically I am in the -- I am a senior naval

09:33:25  8    architect involved in maintenance of -- supporting the fleet

09:33:31  9    of the Coast Guard vessels in both maintaining existing

09:33:35 10    vessels and acquiring new ones.  And in the course of that,

09:33:40 11    we do some design of new ships, we fix problems, investigate

09:33:45 12    accidents and so on whatever is needed to keep the fleet

09:33:51 13    afloat.

09:33:52 14    Q.      Great.  And are you currently engaged in any other

09:33:56 15    types of employment outside of the Coast Guard?

09:33:57 16    A.      I do a certain amount of expert witness work that's

09:34:03 17    which is, of course, why I'm here and other consulting

09:34:07 18    relating to high-speed craft mainly.

09:34:10 19    Q.      Okay.  And so, Mr. Barry, I'd like to show you your

09:34:19 20    CV, if we could.  And could you and while we're getting that

09:34:24 21    up, could you describe your educational background since

09:34:28 22    high school for us?

09:34:28 23    A.      Yeah, I have a bachelor's in science, specialty in --

09:34:33 24    from the Bell College of Engineering in mechanical

09:34:37 25    engineering with a naval architecture and ocean engineering

Barry - Direct

09:34:40 1   option.

09:34:41 2   Q.     Okay.  And are you a professional registered

09:34:45 3   engineer?

09:34:45 4   A.     I'm registered -- I'm a professional engineer at --

09:34:51 5   in Maryland.  I'm a professional mechanical engineer in

09:34:53 6   California.  I'm a professional, mechanical engineer and

09:34:57 7   naval architect and marine engineer in the state of

09:35:00 8   Washington.

09:35:05 9   Q.     So then I'd like to ask you a little bit about your

09:35:07 10  work history.  So, out of college, we -- and I think we see

09:35:12 11  here toward the bottom -- who were you first employed by out

09:35:16 12  of college?

09:35:16 13  A.     Morris Guralnick Associates was a naval architecture

09:35:21 14  ship designing firm in San Francisco.  Mr. Guralnick had

09:35:25 15  founded it in the '50s.  And we did all sorts of naval

09:35:32 16  architecture and marine engineering, supporting the new

09:35:33 17  shipbuilding, the Navy, Chevron, some interesting -- well,

09:35:42 18  I'm sorry, we did some alternative energy, whatever came

09:35:46 19  down in the door, we did, and so, I was involved in design

09:35:51 20  of special platforms of search vessels, commercial tankers.

09:35:55 21  Did some work on Navy combatants and a lot of work on Navy

09:35:59 22  fleet support ships, and we did cable layers and liquid gas

09:36:05 23  carriers --

09:36:06 24  Q.     Okay.

09:36:07 25  A.     -- tugs, motor yachts on occasion and one sailing

Barry - Direct

09:36:11 1    yacht.

09:36:11 2    Q.    Okay.  So if we look at your next -- next job there,

09:36:12 3    so when you left that job, where did you go?

09:36:12 4    A.    I went to Earl & Wright, which is a civil engineer

09:36:12 5    firm in San Francisco that does primarily offshore oil

09:36:28 6    for -- and it was a subdivision of SEDCO, southeast drilling

09:36:29 7    company at the time.  We did floating drill -- various kinds

09:36:39 8    of floating drilling for SEDCO and fixed platforms for the

09:36:41 9    oil majors.

09:36:42 10   Q.    Okay.

09:36:43 11   A.    In the course of that, I was sent to London for a

09:36:46 12   couple of years to support their British joint venture with

09:36:51 13   a firm called John Brown Engineering.

09:36:53 14   Q.    All right.  Very good.  So after you left that firm,

09:36:56 15   where did you go?

09:36:57 16   A.    I went -- I came back from Woking, England and went

09:37:07 17   to work for Frank Lee, Lee Engineering Company.  That's the

09:37:13 18   wrong -- the next one up.

09:37:15 19   Q.    Oh, sorry.

09:37:16 20   A.    The whole -- the whole thing starting at Lee.  Or

09:37:20 21   actually above that.  Well, not that.  Okay.  Well, that's

09:37:23 22   good enough.

09:37:24 23        I worked for Lee Engineering which is a small,

09:37:29 24   another small naval architecture firm founded by Mr. Lee in

09:37:36 25   the San Francisco area.  We did a variety of -- of naval

277

Barry - Direct

09:37:41  1    architecture and marine engineering tasks.  We -- one of the

09:37:44  2    ones was we did testing of recreational boats for Coast

09:37:48  3    Guard safety certification.  We designed a 42-foot aluminum

09:37:54  4    rescue boat, a catamaran vessels, some yachts, working on

09:38:00  5    tugs and boats for the Army Corps of Engineering, some other

09:38:04  6    modifications for a container ship, and what's called Navy

09:38:10  7    ship selective records maintenance which is paperwork.

09:38:15  8    Q.    All right.  After you left Lee Engineering, where did

09:38:17  9    you go?

09:38:18 10    A.    Well, Lee Engineering was purchased by Harborside

09:38:21 11    Marine which is a small shipyard in San Diego.  So I went to

09:38:24 12    San Diego, and I was their chief engineer -- chief -- I was

09:38:28 13    a chief engineer, and we did both design and repair work

09:38:34 14    on -- and new constructions of some recreational vessels,

09:38:40 15    fiber glass mostly and a lot of repair and support work for

09:38:43 16    the Navy, the Coast Guard, similar types of vessels.  And

09:38:50 17    the transit, the people that run the trolley in San Diego,

09:38:56 18    we built some fiber glass equipment for them.

09:38:58 19    Q.    So after Harborside, where did you go to work?

09:39:03 20    A.    A friend of mine asked if I could come up and work

09:39:06 21    for Arneson Marine which makes high-speed surface piercing

09:39:12 22    drives for racing boats and fast military craft and fast

09:39:16 23    ferries.  And there I did mostly propeller and -- propeller

09:39:21 24    design and analysis.  And worked with the -- with the

09:39:25 25    various organizations to certify the products.

Barry - Direct

09:39:30  1    Q.     Okay.  And then after that, where did you go?

09:39:33  2    A.     FMC Corporation builds armored vehicles or at least

09:39:40  3    that division does so I was hired as their naval architect

09:39:43  4    to support the slow-speed vehicles, which are the Bradley

09:39:48  5    and the LAD, the various amphibious vehicles that cross

09:39:54  6    rivers and so forth, but our major project was the design of

09:39:57  7    a high-speed armored personnel carrier for the United States

09:40:02  8    Marine Corps which was dropped off a ship, went ashore

09:40:07  9    quickly, and so that the ship could be far enough out at sea

09:40:10 10    so it wasn't a target for missles from shore.

09:40:14 11            And so, it had to go at least 25 miles an hour

09:40:18 12    to get from the ship to the shore.  Our -- our design

09:40:23 13    concept for it had hydrofoils which partially supported it.

09:40:28 14    Obviously armored vehicles are enormously heavy.  So the

09:40:32 15    only way to get enough energy -- you've probably heard this

09:40:36 16    before -- get enough, have enough energy to make the range

09:40:39 17    was to support some of the weight with the hydrofoil.

09:40:43 18    Q.     Okay.  And so after FMC, where did you go?

09:40:46 19    A.     I went to Elliott Bay Design Group, which was another

09:40:50 20    small engineering firm in Seattle, Washington, formerly it's

09:41:00 21    Nickum and Spaulding.  A fellow naval architect from

09:41:01 22    Berkeley had -- was running it.  And it was classical

09:41:05 23    standard naval architecture, ferry design, stability.  We

09:41:09 24    did some work for Washington State ferries and for Tacoma

09:41:13 25    ferries.  A lot of stability work for fishing vessels, tugs,

Barry - Direct

09:41:18  1   freighters, excursion passenger vessels.  We did some

09:41:22  2   contract designs of new vessels that supported subtanker

09:41:26  3   construction and miscellaneous other vessels.  One of the

09:41:32  4   projects that was -- that is of interest to this -- this

09:41:38  5   case is that, of course, hydrofoils are just -- are the

09:41:43  6   thing that provides lift.  In a ship, you get -- hydrofoils

09:41:47  7   of most interest are rudders.

09:41:50  8            So one of the jobs, aside from in the normal

09:41:53  9   course of design, designing the rudders and the material,

09:41:56 10   any forces that are required to turn it, one of the

09:42:01 11   hydrofoil-oriented jobs was the design of a new rudders for

09:42:06 12   a pilot boat, Grace Harbor pilot boat that was having a hard

09:42:10 13   time getting away from the ship once they took embarked the

09:42:15 14   pilot.  The rudder wasn't proper.  And so, pilots redesigned

09:42:20 15   the rudder using the principles of hydrofoil design so that

09:42:23 16   they could break away from the ship safely.

09:42:27 17            DEPUTY CLERK:  Mr. Barry, do you mind speaking

09:42:31 18   up as best you can?

09:42:32 19            THE WITNESS:  I'm sorry.

09:42:33 20            THE CLERK:  Do you mind speaking up as best you

09:42:35 21   can?  The microphone is right there.

09:42:37 22            THE WITNESS:  Okay.  I'm sorry.  I'm talking to

09:42:39 23   here.  Okay.

09:42:40 24   BY MR. THEUERKAUF:

09:42:40 25   Q.    All right.  So, after -- so, then I think you went to

Barry - Direct

09:42:46  1    Munson; is that --

09:42:47  2    A.      I did.

09:42:47  3    Q.      Okay.  Can you describe that -- your work there

09:42:49  4    briefly for us?

09:42:50  5    A.      Yeah, I was in charge of -- Munson is a firm that

09:42:56  6    builds aluminum utility boats of various kinds.  If you've

09:42:59  7    seen -- what is it, Salmon Wars, I think is on CN -- or on

09:43:04  8    one of the televisions -- we designed those kind of aluminum

09:43:08  9    boats that are used for salmon fishing.  We design and build

09:43:11 10    them.

09:43:12 11            We built all kinds of aluminum vessels of

09:43:15 12    various sorts, ranging from slow oil recovery vessels that

09:43:21 13    puts -- put -- put the skim booms out.  I think there's one

09:43:24 14    here in the harbor.  And fast ferries.  Pilot -- a lot of

09:43:31 15    our pilot boats.  Just a wide range.  And we would -- we

09:43:35 16    built them fast.  So in the year I was there, I designed

09:43:39 17    about 16 boats, of which about 14 were built.

09:43:42 18    Q.      Okay.  And so, then you went to the Coast Guard after

09:43:45 19    Munson; is that correct?

09:43:46 20    A.      Then I went to the Coast Guard.

09:43:47 21    Q.      All right.  So, can you briefly describe for us

09:43:52 22    through all that work history your experience with -- with

09:43:55 23    hydrofoils -- hydrofoil technology?

09:43:58 24    A.      Well, as I said, hydrofoils are -- can -- are used

09:44:02 25    for any time when lift is needed for a ship or some sort of

Barry - Direct

09:44:08 1  marine vehicle.  In one case -- of course, I designed a

09:44:15 2  number of rudders and did the various calculations relating

09:44:17 3  to the rudder, motors, the things that turn the rudder,

09:44:25 4  which are, of course, you know, require getting the rudder,

09:44:28 5  you have to do hydrodynamic calculations to figure out the

09:44:31 6  rudder gear.

09:44:34 7          One of the more interesting cases of this was

09:44:38 8  the 110-foot patrol boat sailing, fins sticking out the

09:44:43 9  side.  They're stabilizing fins to minimize the roll when

09:44:46 10 it's operating in the waves.  And I initiated a project to

09:44:53 11 redesign the fins because the old one were rusting out a lot

09:44:58 12 and we redesigned, developed a composite fin and built a few

09:45:02 13 of them, built a couple of them.  I don't remember one or

09:45:07 14 two ship sets.  And they put them out, they tested them.

09:45:10 15 But the Coast Guard said we're going to get rid of these

09:45:13 16 ships in a couple years, so it's not worth spending the

09:45:16 17 money.

09:45:17 18          So, I also led the -- or was -- yeah, led the

09:45:23 19 Coast Guard side of the design effort to develop new

09:45:25 20 propellers for the same ships.  We added an appendage that

09:45:32 21 greatly reduced -- that reduced drag of the vessel, so it

09:45:35 22 would have benefited from new propeller.  But, again, same

09:45:37 23 story, the budget folks said we're not going to give keep

09:45:41 24 the ships that long so we don't want to spend another

09:45:45 25 $30,000 per propeller with two each and 49 ships at this

Barry - Direct

09:45:52 1   time.  So, that was -- then I did some other propeller

09:45:57 2   evaluation work on the ship -- on the patrol boat that

09:46:01 3   replaced that one.

09:46:03 4   Q.    Just real quick, Mr. Barry, are propellers -- you're

09:46:07 5   mentioning the design and doing work with propellers.  How

09:46:09 6   does that relate to hydrofoils?

09:46:10 7   A.    Well, a propeller -- a propeller is a hydrofoil

09:46:13 8   sticking outside of the shaft going round and round instead

09:46:16 9   of forward.  It's exactly the same thing and many of the

09:46:20 10  techniques that are used for -- like, for example, vortex

09:46:26 11  lattice analysis, I believe, was mentioned.  And propellers

09:46:31 12  are -- some propeller design codes use vortex lattice

09:46:36 13  analysis to -- but in a -- spinning around instead of going

09:46:40 14  straight.

09:46:41 15  Q.    And so, how -- what about your experience with

09:46:44 16  hydrofoil watercraft?

09:46:45 17  A.    Well, principally the one -- the principal job was

09:46:49 18  the -- the hybrid plane hydrofoil for the Marine Corp, which

09:46:55 19  of course had a big hydrofoil aft and the vehicle was on

09:47:02 20  the -- at the front.  And it took up little more than half

09:47:06 21  the weight at less than half of the drag of the -- that

09:47:11 22  would have been from the planing hull.  So, we -- we reduced

09:47:15 23  the drag from one to about three-quarters or five-eights,

09:47:18 24  which is a big difference when you're talking about 80,000

09:47:21 25  pounds.  So, that was a so-called hybrid hydrofoil.

Barry - Direct

09:47:29 1        At the same time in order to publicize the

09:47:33 2    concept, the company funded a project to win the DuPont

09:47:40 3    prize, which is the first human powered vehicle to go 20

09:47:45 4    knots through a 100-meter course.  So it has to clear the

09:47:48 5    course in about ten seconds.  And we had some -- we had a

09:47:52 6    number of bicycle enthusiasts in the company.  So that was a

09:47:57 7    similar concept, except the planing hull was much smaller,

09:48:00 8    much farther forward.  The hydrofoils would be much further

09:48:04 9    back.

09:48:04 10        So we worked on that until Gorbachev torn down

09:48:09 11   that wall, at which point the company said we're not --

09:48:12 12   we're going to -- our business is going to go down, we don't

09:48:15 13   want to deal with this anymore.  And in addition, a lot of

09:48:18 14   people got -- a lot of people saw the writing on the wall

09:48:21 15   and left.

09:48:23 16   Q.    Sir, are you a member of any professional

09:48:25 17   organizations?

09:48:26 18   A.    I'm a fellow with SNAME, Naval Architectural

09:48:30 19   Engineers.  I am a member of the American Boat and Yacht

09:48:32 20   Counsel which sets regulations and standards for

09:48:34 21   recreational boats.  I am a member of the -- what is now the

09:48:41 22   association for AM -- it's the association -- it just --

09:48:48 23   they just changed their name, sorry.  I know I couldn't

09:48:51 24   remember that one.  It's the Association For Materials

09:48:54 25   Protection and Performance.  It used -- it was a combination

284

Barry - Direct

09:48:58  1    of the National Association of Corrosion Engineers, which I

09:49:02  2    was a member of, and the Society for Protective Coatings,

09:49:04  3    which is paint, they merged and joined and formed AMPP,

09:49:11  4    A-M-P-P.  So, I'm a member of that.

09:49:15  5           I have been a member of the International

09:49:17  6    Hydrofoil Society.  They no longer charge dues so I think

09:49:21  7    I'm still a member, but I haven't paid the dues in a long

09:49:25  8    time because I don't have any -- because I think I'm still a

09:49:27  9    member.  I still get the emails.

09:49:28 10    Q.    All right.  Have you authored any publications or

09:49:32 11    articles related to marine craft or hydrofoil craft?

09:49:35 12    A.    Probably about 30.  Something like that.

09:49:39 13    Q.    Okay.

09:49:40 14    A.    The next page of the resume has all of that.

09:49:43 15    Q.    Okay.

09:49:44 16    A.    This is the other -- the business in there is all

09:49:46 17    governmental stuff.

09:49:48 18           Okay.  So, yes, I have.  That is the list going

09:49:50 19    back to -- you know, most of them -- most of them are on

09:49:55 20    there.  There's a few that are earlier.

09:49:57 21    Q.    Okay.  And do you lecture or speak at any

09:50:00 22    conferences?

09:50:00 23    A.    I do.  Usually I -- as part of the society -- I'm

09:50:04 24    chair of the Society of Naval Architectures, Small Craft

09:50:08 25    Technical and Research Committee and one thing that that

Barry - Direct

09:50:12 1    Society does is sponsor is a one-day course in something at

09:50:17 2    the International Boat Builders Exhibition, which is --

09:50:22 3    which is recreational boat builders mainly.  I've done two

09:50:26 4    presentation -- three presentations at that one on stability

09:50:29 5    and propellers.  And each year we try to get a new

09:50:32 6    presentation of some technical aspect that recreational boat

09:50:39 7    builders need to learn.  So it's a one-day course in the

09:50:43 8    international rules for stability for small craft or how to

09:50:47 9    pick a propeller.  Something of that nature.

09:50:50 10   Q.    Okay.  And how about any teaching or mentoring

09:50:53 11   experience?

09:50:53 12   A.    Well, I frequently mentor at the Naval Academy in

09:50:58 13   Annapolis.  Close to the Naval Academy.  Of course I

09:51:02 14   frequently mentor or lecture at the Naval Academy as part of

09:51:05 15   their senior class.  They have a naval architecture major

09:51:11 16   and their senior class goes into teams and each one designs

09:51:15 17   a ship of some kind.

09:51:18 18   Q.    Okay.

09:51:18 19   A.    This year I didn't because all of the -- all the

09:51:22 20   ships were military.  I'm usually involved in either

09:51:27 21   Coast Guard type vessels or commercial -- small commercial

09:51:32 22   vessels, but I know very little about nuclear submarines.

09:51:36 23   Q.    All right.

09:51:37 24   A.    And if I did, I would have to kill you.  If I told

09:51:39 25   you, I'd have to kill you.

Barry - Direct

09:51:40  1    Q.     All right.  Are you the inventor on any patents?

09:51:42  2    A.     I am.  I have -- I am named on three patents.

09:51:46  3    Q.     Okay.  And do any of those relate to hydrofoils?

09:51:49  4    A.     Two of the three do.

09:51:51  5    Q.     Okay.  And can you describe those to us?

09:51:52  6    A.     Well, one of them is the patent on the armored

09:51:56  7    amphibian craft.  And another one is a patent related to the

09:52:03  8    type of hydrofoils and certain aspects of that that are more

09:52:08  9    broadly applicable to small craft and to a limited extent

09:52:12 10    larger ships.  So, those are the two -- those are two of

09:52:15 11    them.  And then my third patent is in -- is a device for

09:52:20 12    converting waves into useful energy.

09:52:23 13    Q.     Okay.  So, in preparing your opinions in this case,

09:52:41 14    did you study MHL's '044 and '659 patents?

09:52:45 15    A.     I did.

09:52:47 16    Q.     And can you generally just describe -- obviously

09:52:50 17    we'll get into more detail about those here in a little bit,

09:52:53 18    but can you just generally describe to us what the -- what

09:52:56 19    the inventions are or what is disclosed in those patents?

09:52:59 20    A.     Well, the person -- they're personal watercraft, one

09:53:03 21    or two people.  They're electrically propelled and they --

09:53:09 22    when you gets on them, they are supported by hydrofoils to

09:53:12 23    be a stable, pleasant ride.  They have no steering or other

09:53:18 24    controls, so they're controlled solely by weight shift.  No

09:53:23 25    gadgets other than the throttle and no gadgets to break or

Barry - Direct

09:53:27 1    corrode.  You know, in the marine industry rust never

09:53:31 2    sleeps, so everything corrodes.

09:53:34 3           And they have -- and they're sufficiently small

09:53:40 4    that you can carry them.  So, you know, I guess like a

09:53:44 5    personal pizza, it's for one person or maybe two.  And they

09:53:49 6    are -- because of their stability and their speed, which

09:53:54 7    comes from being supported by the hydrofoil, they provide a

09:53:58 8    pleasant and interesting ride.

09:54:04 9           MR. THEUERKAUF:  I don't think -- Your Honor,

09:54:06 10   I'd like to approach with his reports, if that's okay.

09:54:08 11          THE COURT:  Sure.

09:54:15 12          THE WITNESS:  Thank you, counselor.

09:54:31 13   BY MR. THEUERKAUF:

09:54:35 14   Q.    So, Mr. Barry, I believe you had given an opinion in

09:54:39 15   this case about who you believe to be the person of ordinary

09:54:45 16   skill in the art with respect to these patents.  Is that

09:54:47 17   correct?

09:54:47 18   A.    Yes, I have.

09:54:50 19   Q.    Okay.  And I believe -- if you turn to Page 26 in

09:55:03 20   your expert report of Chris Barry.

09:55:05 21          Do you see that tab?

09:55:06 22   A.    Yes.

09:55:07 23   Q.    Okay.

09:55:07 24   A.    Paragraph 9, I believe.

09:55:09 25   Q.    It should be paragraph 20 --

Barry - Direct

09:55:13  1    A.      Well, heading 9.

09:55:15  2    Q.      Yes.

09:55:16  3    A.      Okay.  Great.

09:55:17  4    Q.      All right.  Can you describe to us what your opinion

09:55:20  5    is as to the person that would be ordinarily skilled in the

09:55:25  6    art of these patents?

09:55:27  7    A.      Well, what it says is a person of ordinary skill.

09:55:30  8    And, of course, I was the one who wrote this.  A person of

09:55:33  9    ordinary skill in the art would have at least a bachelor's

09:55:36 10    degree in the area of -- in the field of engineering,

09:55:40 11    specializing in naval architecture.  Substantial experience

09:55:42 12    in naval architecture, including some experience of high

09:55:46 13    speed watercraft, aircraft or hydrofoil craft.  Or a

09:55:49 14    bachelor's degree in engineering or physics, with experience

09:55:53 15    in fluid dynamics and substantial experience with high speed

09:55:58 16    watercraft, aircraft or hydrofoil craft.

09:56:01 17    Q.      Okay.  Thank you.

09:56:02 18            And so, with that in mind, do you consider

09:56:07 19    your -- do you consider yourself a person of ordinary skill

09:56:11 20    in the art with respect to these patents?

09:56:12 21    A.      I do.

09:56:13 22    Q.      Okay.  And why were you retained by MHL in this

09:56:20 23    matter?

09:56:20 24    A.      Well, I was retained as a person of ordinary skill in

09:56:25 25    the art to render my opinions as to whether the Waydoo

Barry - Direct

09:56:35  1    craft -- the three various models of the Waydoo craft

09:56:38  2    incorporated all of the elements of the claims at issue --

09:56:42  3    I'm sorry -- the claims in the -- yes.  All of the elements

09:56:45  4    of the claims at issue.  Give a similar opinion regarding

09:56:53  5    whether the MHL crafts incorporated all the elements of the

09:56:59  6    claims at issue.  And to give an opinion whether or not the

09:57:05  7    material in the patent enabled a person of ordinary skill,

09:57:10  8    like myself, to be able to work, to be able to -- to be able

09:57:15  9    to implement the patent and to discuss other aspects of the

09:57:25 10    prior art in the field of hydrofoils.

09:57:27 11    Q.    Okay.  And we'll get into -- and today you're here

09:57:31 12    with respect to your opinions with -- whether or not the

09:57:36 13    Waydoo products and the MHL products are covered by the

09:57:38 14    patents.

09:57:39 15          With respect to those other issues, that's

09:57:42 16    actually going to be later in the trial, --

09:57:45 17    A.    Yes, sir.

09:57:46 18    Q.    -- so you'll be coming back to us.

09:57:47 19    A.    Yes, I understand.

09:57:49 20    Q.    Okay.  So with respect to the Defendants' products

09:57:54 21    and the claims of the patents, which products did you

09:57:58 22    analyze?

09:57:59 23    A.    I looked at the original Flyer, the Flyer ONE, and

09:58:07 24    the Flyer ONE Plus.  And the Flyer ONE and the ONE Plus that

09:58:12 25    I examined come with attachments that -- various wings and

Barry - Direct

09:58:17  1   so forth that convert them to -- from a patroller to an

09:58:21  2   explorer configuration.

09:58:22  3   Q.     Okay.  And did the -- did those different

09:58:26  4   configurations have any impact on your final conclusions in

09:58:31  5   this case?

09:58:31  6   A.     No, they were just different -- slightly different

09:58:33  7   sizes of wings and lengths of struts.

09:58:36  8   Q.     Okay.  So, which claims of the '044 patent did you

09:58:47  9   analyze with respect to the Defendants' accused products?

09:58:51 10   A.     1, 2, 5 and 6.

09:58:53 11   Q.     Okay.  And with respect to the '659 patent, which

09:58:57 12   claims did you analyze with respect to the --

09:58:59 13   A.     1 and 2.

09:58:59 14   Q.     -- accused products?  Okay.

09:59:02 15          And based on your expertise, have you reached an

09:59:07 16   opinion as to whether the Defendants' accused products

09:59:10 17   contain all the elements of those claims that you just

09:59:13 18   mentioned?

09:59:13 19   A.     Yes, sir.

09:59:14 20   Q.     Okay.  And what's opinion?

09:59:16 21   A.     They do.

09:59:19 22   Q.     Okay.  And with respect to MHL's products, which ones

09:59:25 23   did you analyze?

09:59:26 24   A.     The same -- the same claims.  Oh, and which --

09:59:30 25   Q.     I'm sorry.  Yeah.  Which products of MHL did you --

Barry - Direct

09:59:33  1    A.      Yes, I analyzed -- I analyzed the -- principally the

09:59:37  2    LIFT one product.

09:59:37  3    Q.      Okay.  And then I think you just answered this, but

09:59:42  4    which did you -- which claims did you analyze for with the

09:59:46  5    patents with respect to MHL's products?

09:59:47  6    A.      The LIFT one.

09:59:48  7    Q.      No, which claims of the patent?

09:59:49  8    A.      Oh, which claims --

09:59:51  9    Q.      Yeah.  I changed it on you.

09:59:53 10    A.      No, that's all right.  I'm old.

09:59:57 11            Yes, I analyzed the claims, the same claims, 1,

09:59:59 12    2, 5 and 6 of '044.  And 1 and 2 of '659.

10:00:05 13    Q.      All right.  Thank you.

10:00:06 14            And so, based upon your expertise, have you

10:00:10 15    reached an opinion as to whether the MHL products are

10:00:12 16    covered or -- I'm sorry, are covered by or contain all the

10:00:16 17    elements of those claims that you just --

10:00:18 18    A.      I have.

10:00:19 19    Q.      And what's that opinion?

10:00:20 20    A.      That they do.

10:00:22 21    Q.      Okay.

10:00:23 22    A.      That they do include it, that they have included it.

10:00:26 23    I'm not sure what tense you put that in.

10:00:30 24    Q.      That's all right.  All right.

10:00:35 25            And so, with respect to -- and we'll get into a

Barry - Direct

10:00:38  1    little bit more detail, but with respect to your analysis of

10:00:41  2    the Defendants' products, can you generally describe for us

10:00:45  3    how you went about that?

10:00:46  4    A.    Well, I was given what we call now an engineering

10:00:51  5    product model.  It's a 3D combination essentially of all the

10:00:55  6    drawings so that it looks like -- it looks like the object,

10:01:00  7    you don't have to do regular -- you know, look at this view,

10:01:04  8    that view.  And it incorporates all of the technical

10:01:08  9    information for the -- for the -- for building the object,

10:01:12  10   but it's essentially all the drawings of the ship, sorry,

10:01:16  11   all the drawings.  I'm going say that all the drawings of

10:01:19  12   the ship mushed into one -- combined into one big file.

10:01:22  13   Q.    Okay.  And so, what else did you consider in your

10:01:26  14   analysis with respect --

10:01:30  15   A.    Okay.  I used those subsequently used some of the

10:01:33  16   aspects, some of the information in that product model to do

10:01:36  17   some computer analysis.  I also looked at the manual for one

10:01:42  18   of the Waydoo craft.  I looked at various videos.  I read

10:01:49  19   Mr. Tao and Mr. Wade's depositions.  I had a -- and looked

10:01:55  20   at a couple of their websites, a couple of -- that is,

10:01:58  21   Waydoo's websites.

10:02:00  22   Q.    Okay.  And then with respect to MHL's products, what

10:02:08  23   kind of material did you consider in your analysis of those?

10:02:10  24   A.    I had a similar product model, a combination of

10:02:14  25   drawings essentially.  The modern way they do drawings.  I

Barry - Direct

10:02:18  1    had a product model of the LIFT one I had which I analyzed

10:02:25  2    and in an identical way.  I had videos, still photographs.

10:02:32  3    The manual.  And I had a conversation with Mr. Leason.

10:02:35  4    Q.      Okay.  So, I'd like to show you, first, if we could

10:02:50  5    pull up PTX 153.  And do you recognize this?

10:02:59  6    A.      I do.

10:03:01  7    Q.      Okay.  Can you tell us what it is?

10:03:02  8    A.      This is the Waydoo LIFT.  I'm sorry, the Waydoo

10:03:08  9    Flyer.

10:03:08 10    Q.      Okay.  And I believe this is essentially a still

10:03:13 11    shot, but is this a still shot from the -- the

10:03:15 12    three-dimensional product model engineering drawings that

10:03:19 13    you were mentioning?

10:03:20 14    A.      It is.  That's the polar setting of a Rhino, if

10:03:27 15    that's what they're using, but there's -- this is shaded in

10:03:31 16    a particular way to make it easily visible, but not

10:03:38 17    computationally too intense so you can spin it around.

10:03:42 18    Q.      So this actual -- this actual program or what we're

10:03:49 19    seeing here, when you had that information, you were able to

10:03:53 20    manipulate it and take dimensions and, I mean, it was a 3D

10:03:57 21    model that you could work with?

10:03:58 22    A.      Yeah, absolutely.  If you change a couple of

10:04:01 23    settings, you can see it in water frame all the insides and

10:04:04 24    everything.  Each little battery in there is in the model.

10:04:08 25    So -- and you can turn each -- you can turn the batteries

Barry - Direct

10:04:12  1   off and on.  You can turn the board off and on and so forth.

10:04:16  2   This is just -- this just has basically the skin turned on.

10:04:19  3   Q.    Okay.  And the dimensions for the craft, including

10:04:23  4   the hydrofoil, are provided within this program?

10:04:25  5   A.    They're available from the program in most -- in most

10:04:28  6   cases, they're available from this program.  There are

10:04:31  7   some -- there are some explicit dimensions given.

10:04:35  8   Q.    All right.  And so, if we could look at PTX 154.  And

10:04:43  9   can you tell us what this is?

10:04:45 10   A.    That would be a LIFT ONE or ONE Plus.

10:04:52 11   Q.    I'm sorry, you mean the Flyer ONE or?

10:04:54 12   A.    Sorry, yes.  I'm very sorry.  Flyer ONE or Flyer ONE

10:04:58 13   Plus.

10:04:58 14   Q.    Okay.  And is this the similar 3D product model that

10:05:01 15   we saw for the other Waydoo product?

10:05:03 16   A.    Yes.  I'm sorry -- yes, it is.  It's just they turned

10:05:07 17   the shade.  It's just the same product model with the shade

10:05:10 18   button pressed.

10:05:10 19   Q.    Okay.  And I should have ask asked you this earlier,

10:05:13 20   but PTX 153 and now this one, PTX 154, were these materials

10:05:19 21   that you considered in your opinions?

10:05:21 22   A.    The product model as a whole, yes.

10:05:24 23   Q.    Okay.  And then if we could pull up PTX 165.  And do

10:05:30 24   you recognize this?

10:05:30 25   A.    Yes.  Some of the individual parts were also

Barry - Direct

10:05:34  1    separated out in separate files, and this is a wing from the

10:05:40  2    Waydoo -- from the Waydoo product.

10:05:44  3    Q.     Okay.  And you considered this in your analysis as

10:05:47  4    well?

10:05:47  5    A.     Yes, well, I had this 3D model, and this 3D model is

10:05:54  6    also in the 3D model of the whole craft.

10:05:57  7    Q.     And if we could look at PTX 164.  And can you tell us

10:06:07  8    what this is?

10:06:08  9    A.     That's the tail of one of the Waydoo products.

10:06:11  10   Q.     Okay.  And was this something you also considered in

10:06:15  11   your analysis?

10:06:15  12   A.     Well, this is included in the same product model.

10:06:20  13   Q.     Okay.  And then if we could look at PTX 121.  And do

10:06:31  14   you recognize this?

10:06:32  15   A.     Yes.  This is a -- this is a LIFT one.

10:06:35  16   Q.     Okay.  And is this the same type product model, 3D

10:06:39  17   product model that you utilized in the Waydoo analysis?

10:06:42  18   A.     Yes, the particular file type is slightly different,

10:06:47  19   but, yes, it is.

10:06:49  20   Q.     Okay.  So, I'd like to -- I think it might be easier

10:07:13  21   if I put the claims up here.  Over here.

10:07:29  22            MR. THEUERKAUF:  Over here?

10:07:30  23            THE COURT:  Some place where the jury can see

10:07:32  24   it.  And I guess Mr. Barry.

10:07:34  25   BY MR. THEUERKAUF:

Barry - Direct

10:07:39  1    Q.    Okay.  Can you see that Mr. Barry?

10:07:40  2    A.    I can now.

10:07:46  3          THE COURT:  Mr. Colletti, if you or someone on

10:07:48  4    your team wants to reposition yourself so you can actually

10:07:51  5    see it, feel free.

10:07:55  6          MR. COLLETTI:  Thank you, Your Honor.

10:07:57  7    BY MR. THEUERKAUF:

10:07:58  8    Q.    So, Mr. Barry, can you tell us what this is?

10:08:00  9    A.    Yeah, this is the Claim 1 of the patent.

10:08:06 10    Q.    And which patent is that?

10:08:07 11    A.    That's '044.

10:08:09 12    Q.    Okay.

10:08:12 13          THE COURT:  And let me just ask, the juror at

10:08:14 14    the end there, can you actually see this?

10:08:16 15          Okay.

10:08:20 16    BY MR. THEUERKAUF:

10:08:42 17    Q.    All right.  And so, I believe you had testified

10:08:45 18    earlier this is one of the claims that you analyzed with

10:08:48 19    respect to the Waydoo products; is that correct?

10:08:51 20    A.    Yes, it is.

10:08:52 21    Q.    Okay.  And all of those models and configurations of

10:08:56 22    the Waydoo products were analyzed with respect to this

10:08:58 23    claim; right?

10:08:59 24    A.    Yes.

10:09:00 25    Q.    And so, I understand that you analyzed the entire

Barry - Direct

10:09:07 1    claim; is that correct?

10:09:08 2    A.    Yes, sir.

10:09:09 3    Q.    Okay.  Now, as you've probably heard during this

10:09:14 4    trial already, that there's been some of these elements that

10:09:18 5    have been stipulated to?

10:09:19 6    A.    Yes, sir.

10:09:20 7    Q.    Okay.  And is it your understanding that this element

10:09:24 8    has been stipulated to with respect to the --

10:09:27 9    A.    Yes, sir.

10:09:28 10   Q.    Is it your understanding that this element has been

10:09:32 11   stipulated to?

10:09:32 12   A.    Yes, sir.

10:09:34 13           THE COURT:  Hold on a second, Mr. Theuerkauf.

10:09:36 14           Yes, Mr. Colletti.

10:09:37 15           MR. COLLETTI:  Just when we say "this element,"

10:09:39 16   because I'm having difficulty seeing this board, I have a

10:09:43 17   little --

10:09:43 18           THE COURT:  Yeah, yeah.

10:09:44 19           MR. COLLETTI:  I can move myself or we can move

10:09:46 20   ourselves, but maybe we can move the board back just so we

10:09:49 21   can see which element or you can tell us.

10:09:52 22           THE COURT:  So, Mr. Colletti, you have a

10:09:53 23   perfectly valid objection there.  I think maybe the best

10:10:00 24   thing to do would be, Mr. Theuerkauf, if you tried to move

10:10:03 25   it back --

Barry - Direct

10:10:04  1          MR. THEUERKAUF:  Sure.

10:10:05  2          THE COURT:  -- so that only a modest amount of

10:10:07  3   movement -- at least somebody on Mr. Colletti's side can see

10:10:11  4   what you're doing.

10:10:13  5          MR. COLLETTI:  I'll come over here.

10:10:14  6          THE WITNESS:  Your Honor, may I go out there?

10:10:17  7   My glasses aren't as good as they should be.

10:10:19  8          THE COURT:  All right.

10:10:20  9          MR. THEUERKAUF:  Can you see this, Mr. Barry?

10:10:22 10          THE COURT:  So I don't think Mr. Barry can see

10:10:24 11   it from there.

10:10:25 12          THE WITNESS:  I can get up if you like.

10:10:29 13          THE COURT:  Well, I don't know.  You can either

10:10:31 14   see it or you can't see it.  You were just saying you can't.

10:10:35 15          THE WITNESS:  It's blurred.

10:10:36 16          THE COURT:  Okay.  Then you should get up and

10:10:38 17   move on out there somewhere where you can see it.

10:10:42 18          THE WITNESS:  Thank you.

10:10:44 19          THE COURT:  And let me just mention something to

10:10:46 20   the jury here.  Mr. Barry, you can keep going.

10:10:51 21          Mr. Theuerkauf is talking about stipulations.

10:10:56 22   Something that lawyers and parties do before -- usually

10:11:01 23   before a trial starts is sometimes they agree to various

10:11:05 24   things in order to save time.  And so they have in this

10:11:11 25   case, as is usual, stipulated to various things.  And so

299

Barry - Direct

10:11:16 1    when Mr. Theuerkauf refers to they've stipulated to this or

10:11:20 2    they've stipulated to that or later on if Mr. Colletti does

10:11:23 3    the same thing, that's referring to an agreement.

10:11:28 4            And so, when they have stipulated to something,

10:11:33 5    you should take that as true or proved or, you know,

10:11:38 6    whatever the context is.  Okay?

10:11:40 7            And, of course, if -- so, go ahead.

10:11:44 8            MR. THEUERKAUF:  All right.

10:11:48 9    BY MR. THEUERKAUF:

10:11:50 10   Q.    So we're going to skip that one.  All right.  Save

10:11:53 11   that.  And then is it your understanding that this element

10:11:56 12   of the claim has been stipulated to?

10:11:58 13   A.    Yes, it is.

10:12:01 14   Q.    And is it your understanding that this --

10:12:05 15   A.    Yes, sir.

10:12:06 16   Q.    -- element has been stipulated to?

10:12:07 17   A.    Yes, sir.

10:12:08 18   Q.    All right.  And we'll skip that one.

10:12:13 19           And what's your understanding of this one?

10:12:14 20   A.    I believe that's been stipulated to.

10:12:16 21   Q.    All right.  And this last one?

10:12:18 22   A.    And I believe that has been stipulated to.

10:12:23 23   Q.    And so, Mr. Barry, I would like, you know, today for

10:12:26 24   our focus to be on these two -- these two elements.  All

10:12:32 25   right?

Barry - Direct

| | | |
|---|---|---|
| 10:12:33 | 1 | A.     Yes, sir. |
| 10:12:34 | 2 | Q.     Okay.  I think you can probably take a seat now. |
| 10:12:37 | 3 | A.     Thank you, counselor. |
| 10:12:53 | 4 | MR. THEUERKAUF:  So if we could pull up PTX 13. |
| 10:12:53 | 5 | BY MR. THEUERKAUF: |
| 10:13:02 | 6 | Q.     And, Mr. Barry, do you recognize this document? |
| 10:13:04 | 7 | A.     I do, sir. |
| 10:13:05 | 8 | Q.     Okay.  And can you tell us what it is? |
| 10:13:07 | 9 | A.     It's the patent of -- Dr. Langelaan's patent on the |
| 10:13:12 | 10 | initial patent on the crafted -- of the -- at issue. |
| 10:13:17 | 11 | Q.     Okay. |
| 10:13:17 | 12 | A.     But it's -- we're referring to it as the '044 patent. |
| 10:13:20 | 13 | MR. THEUERKAUF:  Okay.  And if we'll take a look |
| 10:13:22 | 14 | at what we call Claim 1 in that one.  The whole thing.  The |
| 10:13:39 | 15 | whole thing. |
| 10:13:39 | 16 | BY MR. THEUERKAUF: |
| 10:13:41 | 17 | Q.     And what you see here in the patent as Claim 1, is |
| 10:13:44 | 18 | that what we have up on the board here -- |
| 10:13:46 | 19 | A.     Yes. |
| 10:13:46 | 20 | Q.     -- except for, I will say, that -- do you see what's |
| 10:13:50 | 21 | in brackets here? |
| 10:13:58 | 22 | THE WITNESS:  Your Honor, may I -- |
| 10:13:59 | 23 | BY MR. THEUERKAUF: |
| 10:14:00 | 24 | Q.     I sat you back up and I should have asked you this |
| 10:14:04 | 25 | question first. |

301

Barry - Direct

10:14:04 1    A.      Okay.  What's in brackets?

10:14:10 2            I see -- yes, what's in brackets.  Yes, sir.

10:14:13 3    Q.      Okay.  And aside from what's in the brackets, what we

10:14:17 4    see here is what is Claim 1 in the '044; is that correct?

10:14:20 5    A.      Yes.

10:14:22 6    Q.      Okay.  And then what we have in brackets there, can

10:14:26 7    you tell us what that is?

10:14:27 8    A.      Well, in the initial portion of this trial, the Court

10:14:33 9    has interpreted certain words and phrases in the claims to

10:14:38 10   have a more have a specific meaning and this is the specific

10:14:41 11   meaning that they have assigned to the static -- the term

10:14:49 12   passive static stability.

10:14:50 13   Q.      Okay.  And can you tell us what that meaning is?

10:14:52 14   A.      Well, the meaning is -- it says that it has an

10:14:54 15   initial -- initial condition -- initial tendency to return

10:14:58 16   to its original condition when it's disturbed.  And passive

10:15:02 17   part of it means without any movable components.

10:15:10 18   Q.      Okay.  Thank you.

10:15:14 19           And so, I failed to mention this one, we should

10:15:27 20   because it's different than the '659, but what's your

10:15:32 21   understanding of this preamble here in the '044?

10:15:35 22   A.      Well, the preamble is -- I forget the word exactly.

10:15:40 23   I'm tempted to say not dispositive, but I know that's wrong.

10:15:43 24   Q.      Not limiting maybe?

10:15:44 25   A.      It's not limiting, yes, because the specific language

Barry - Direct

10:15:47 1   is recited further down in the claim.

10:15:52 2   Q.     So that one is not applicable to your analysis; is

10:15:55 3   that fair?

10:15:56 4   A.     Essentially, yeah.  I mean, it's -- the rest of the

10:15:58 5   claim describes what is in the preamble.

10:16:01 6   Q.     Okay.  So, before we get into more detail, can you

10:16:12 7   generally describe for us what a hydrofoil is?

10:16:15 8   A.     Well, the way we're -- a hydrofoil can be one of two

10:16:22 9   things, either the whole craft which is probably

10:16:26 10  inappropriate.  Hydrofoil watercraft would be better -- is a

10:16:30 11  preferred term.  Or the lifting components, the wing, the

10:16:36 12  front wing, the back wing, or the wing and the tail, or

10:16:38 13  whatever -- whatever is shaped to provide the lift.

10:16:43 14  Q.     Okay.  And then with respect to this patent, if we

10:16:51 15  look at -- just generally, what is being referred to as the

10:16:55 16  floatation device?

10:16:56 17  A.     The floatation device is the upper board that -- and

10:17:02 18  that floats.

10:17:04 19  Q.     Okay.

10:17:05 20  A.     The item shown as -- yes, Item 11 is the floatation

10:17:12 21  device.

10:17:13 22  Q.     Okay.  Is that the elongated board there; is that

10:17:16 23  right?

10:17:16 24  A.     Yes.  Yes, it is.  The elongated -- the elongated

10:17:20 25  float -- floating board.

Barry - Direct

10:17:23  1  Q.     And we'll hear other terms like strut.  Can you point

10:17:29  2  out to us what -- where the strut is and what a strut is?

10:17:33  3  A.     I can if I -- well, I can -- I don't know how to get

10:17:39  4  this to work.  Yeah.

10:17:41  5         If you see the item numbered 103.

10:17:45  6  Q.     Yeah.

10:17:45  7  A.     It is the strut.  And the strut connects the

10:17:50  8  floatation device to the hydrofoil and the propulsion

10:17:55  9  system.

10:17:55 10  Q.     Okay.  And here you just mentioned propulsion system.

10:18:00 11  Can you explain that to us?  What is that?

10:18:01 12  A.     Well, the object is electrically propelled so the

10:18:06 13  propulsion system comprises an energy source, the battery in

10:18:10 14  this case, whatever equipment is needed to control the

10:18:13 15  energy source, a motor, a propeller, and some -- in some

10:18:18 16  cases a duct, which is the ring thing.

10:18:25 17  Q.     Okay.  A couple other terms that will come up is

10:18:30 18  weight-shift controlled or controlled via weight shift of

10:18:34 19  the user.

10:18:35 20         What does that mean?

10:18:35 21  A.     That means there's no movable components that can

10:18:38 22  control it or anything else and that it is steered and the

10:18:49 23  side is controlled by moving the weight forward and back or

10:18:53 24  side to side.

10:18:55 25  Q.     Okay.

Barry - Direct

10:18:57  1    A.      That is the person's weight.

10:18:59  2    Q.      Yeah.

10:18:59  3    A.      Forward and back, side to side.

10:19:03  4    Q.      And so I think you might have mentioned this just a

10:19:07  5    minute ago, but what -- what does it mean by passive?

10:19:13  6    A.      Passive means that there's no moving components or

10:19:16  7    anything else that provides stability.  It doesn't have a

10:19:21  8    gyroscope or something of that nature inside it.

10:19:27  9    Q.      Okay.  So let's look at -- I understand that you have

10:19:31 10    some slides for us today.

10:19:34 11    A.      Yes, sir.

10:19:34 12    Q.      Okay.  So, if we're focused on this first element

10:19:44 13    that I've -- we left open for discussion, the floatation

10:19:49 14    device being controlled via weight shift of the user.  Can

10:19:54 15    you tell us what this -- what this slide is showing us?

10:19:58 16    A.      Well, this is part of one of the manuals -- one of

10:20:02 17    the Waydoo manuals.  And it says to lift from the water,

10:20:06 18    accelerate to a certain speed.  In other words, squeeze the

10:20:09 19    controller.  And then lean backwards, shift your weight on

10:20:15 20    your back -- or shift your weight to your back feet, if

10:20:17 21    you're riding it snowboard style, then the board gradually

10:20:24 22    rises.  It tips back a little bit and gradually rises.  Once

10:20:27 23    you're at the appropriate height, move your weight back to

10:20:31 24    the level position and continue.

10:20:35 25    Q.      And so, did you -- and did you do anything else to

305

Barry - Direct

10:20:39  1    determine whether or not the Defendants' products are

10:20:43  2    controlled via weight shift?

10:20:45  3    A.     Yes.  Well, of course we have this figure next to it

10:20:49  4    that is from the manual for the subsequent model and it

10:20:53  5    shows a person controlling the thing -- it shows a

10:20:57  6    caricature of a person controlling the thing and it

10:21:03  7    specifically says adjust the heights and direction by

10:21:05  8    shifting your weight.  So it's weight-shift controlled.

10:21:08  9    Q.     All right.

10:21:09 10    A.     I also did an analysis -- a computer analysis to

10:21:13 11    determine some of the parameters weight shift -- of the

10:21:16 12    weight-shift control.  I looked at the videos and still

10:21:19 13    photographs available, looked at their website, read Mr. Tao

10:21:25 14    and Mr. Wade's deposition.

10:21:27 15    Q.     Okay.  And after reviewing all that material and

10:21:31 16    conducting that analysis, what was your conclusion with

10:21:33 17    respect to the Defendants' products and whether or not the

10:21:37 18    floatation device was controlled via weight shift of the

10:21:41 19    user?

10:21:42 20    A.     Well, the machine as a whole is controlled via weight

10:21:46 21    shift.  Not only does -- not only did the analysis say so

10:21:48 22    and give a range of the weight shift required, but

10:21:57 23    the manufacturer says it does.

10:22:06 24    Q.     So, before we get to that, I'd like to show you what

10:22:09 25    is PTX 200.

Barry - Direct

10:22:17 1          And do you recognize this document?

10:22:19 2     A.     I do.

10:22:21 3     Q.     Okay.  Can you tell us what it is?

10:22:23 4     A.     It's the manual for the original first -- the first

10:22:27 5     U.S. available Waydoo product, the Flyer.

10:22:31 6     Q.     Okay.  And I think there in the left-hand side --

10:22:36 7          MR. THEUERKAUF:  If you could blow that up for

10:22:37 8     us, Mel.

10:22:37 9     BY MR. THEUERKAUF:

10:22:41 10    Q.     And can you tell us what that says there, whose

10:22:43 11    manual this is?

10:22:44 12    A.     Oh, it has a contact number.  I don't know what

10:22:48 13    the -- the contee are, but it has a contact number.  It has

10:22:52 14    a name Waydoo Shenzhen, Waydoo Intelligence Technology

10:22:56 15    Limited and gives their website and an email.

10:23:00 16    Q.     Okay.  And what is the email there?

10:23:02 17    A.     Info@waydoo.io.

10:23:06 18    Q.     Okay.  So I'd like to show you -- and is this the

10:23:13 19    manual that you considered in your analysis of the

10:23:16 20    Defendants' products, in addition to the other things that

10:23:17 21    you mentioned?

10:23:18 22    A.     It's the one I have a copy of, yes, sir.

10:23:22 23         MR. THEUERKAUF:  Okay.  And if we could look at

10:23:24 24    PTX 118.

10:23:24 25    BY MR. THEUERKAUF:

Barry - Direct

10:23:31 1    Q.      And do you recognize this document?

10:23:33 2    A.      I do.

10:23:34 3    Q.      Okay.  And can you tell us what it is?

10:23:36 4    A.       It's a manual primarily of the power -- of the power

10:23:40 5    kit.  It mainly covers the power kit because this is the

10:23:43 6    more complicated part of the device for the subsequent

10:23:48 7    models.

10:23:49 8    Q.      Okay.

10:23:49 9    A.      Of the -- and the ultimate patroller -- the ultimate

10:23:54 10   Flyer Plus -- Flyer ONE Plus.

10:23:58 11   Q.      And was this a manual that you considered in your

10:24:01 12   analysis?

10:24:01 13   A.      This is.  I have a copy of this one, yes, sir.

10:24:10 14   Q.      And so let's move forward here.

10:24:16 15           Now, this next slide, I take it is with respect

10:24:20 16   to this element down here that was left open for discussion;

10:24:25 17   is that correct?

10:24:29 18              THE WITNESS:  Excuse me.  Your Honor?

10:24:30 19              THE COURT:  Yes.

10:24:33 20              THE WITNESS:  Yes, sir.  It is.

10:24:38 21   BY MR. THEUERKAUF:

10:24:39 22   Q.      Thank you.

10:24:40 23           All right.  Can you tell us what -- I'm sorry.

10:24:45 24           Can you tell us what this slide is showing us?

10:24:47 25   A.      Well, passive static stability means an initial

Barry - Direct

10:24:51  1    tendency to return to the original condition.  That is

10:24:56  2    expressed by what are called stability derivatives.  They

10:25:00  3    are the tendency -- they are a measure of the tendency to

10:25:04  4    return at the -- as far as -- yeah.  Well, the initial

10:25:10  5    tendency to return.  They don't measure the tendency to

10:25:13  6    return when it's disturbed greatly.

10:25:18  7          And these three derivatives measure the tendency

10:25:26  8    in pitch, which is this, roll, which is this, and yaw, which

10:25:32  9    is this.

10:25:36 10          So in the case of pitch, if we go -- if we

10:25:40 11    disturbed backwards, we want a force that pushes us

10:25:43 12    forwards.  In other words, it's opposite to the disturbance.

10:25:48 13    So that -- those coefficents always have to be negative.

10:25:52 14    And in this case, they are negative as you can see.  And the

10:25:56 15    fact that they are negative indicates a passive static

10:26:02 16    stability in pitch.

10:26:06 17          The directional stability one -- well, let's

10:26:09 18    consider roll stability first.  The roll stability is

10:26:12 19    similar.  If you are disturbed in roll, there's a pass --

10:26:16 20    there's a force that has a tendency to oppose the roll,

10:26:20 21    hence it has to be negative.  All of those coefficients are

10:26:25 22    negative.

10:26:25 23          In the case of directional stability that occurs

10:26:27 24    because the wind, the current changes, and we want the craft

10:26:32 25    to turn into the current so that it is, again, riding level

Barry - Direct

10:26:37  1    with respect to the current.  Level and straight with

10:26:40  2    respect to current or wind, or whatever it is.  So, that one

10:26:44  3    has to be positive.  It has to produce a moment that turns

10:26:47  4    into the wind.  This is sometimes called weather cock

10:26:51  5    stability because if you have a duck on your roof -- a

10:26:55  6    bronze duck on your roof like I do, the wind blows, the duck

10:26:58  7    turns into the wind.

10:27:00  8    Q.    Okay.  So, what was your conclusion with respect to

10:27:05  9    the Defendants' products and this claim element?

10:27:10 10    A.    They clearly provide passive static stability.

10:27:14 11    Q.    Okay.  And is that true for all of the Defendants'

10:27:17 12    products analyzed?

10:27:18 13    A.    Yes, sir.

10:27:19 14    Q.    Okay.  And so, can you describe for us how you went

10:27:25 15    about making this determination here?

10:27:30 16    A.    Yes.

10:27:33 17    Q.    Okay.  Would you do that for us, please?

10:27:35 18    A.    I was given the product models in what's called a

10:27:41 19    exchange format.  They're -- they are basically computer

10:27:46 20    programs that do develop these models right through a common

10:27:51 21    database that other computer programs can read.  They're

10:27:54 22    called inter -- interchanged.  And one -- I received one in

10:28:00 23    a format called Step.  And I took the Step model into my own

10:28:05 24    3D product model, called Rhino and took dimensions out of

10:28:13 25    it, took a section through the various airfoils, put the

310

Barry - Direct

10:28:18  1    data from -- that I -- that came from those sections into

10:28:22  2    the computer program called AVL, Athena Vortex Lattice,

10:28:27  3    which then does the necessary computations to do these -- to

10:28:32  4    calculate these coefficients.

10:28:34  5    Q.     Okay.  And you mentioned Athena Vortex Lattice, and I

10:28:40  6    believe that -- is that the same program that Dr. Langelaan

10:28:42  7    mentioned yesterday?

10:28:43  8    A.     It is.  AVL.  It's very commonly used --

10:28:46  9    Q.     Okay.

10:28:46 10    A.     -- in flight dynamics.  Unfortunately, I can't use it

10:28:52 11    in naval architecture because when we do maneuvering,

10:28:57 12    same -- all the same principles, but sideways.  And ships --

10:29:01 13    the ship hull is important and the program can't handle

10:29:04 14    that.

10:29:04 15    Q.     But it can handle a hydrofoil watercraft?

10:29:06 16    A.     It can handle anything that is, as it describes, thin

10:29:11 17    wings and thin wings without too much sweep, yes.

10:29:17 18    Q.     Okay.  And so, what else did you do with respect to

10:29:21 19    this analysis for this element other than the computer

10:29:26 20    analysis that you just described?

10:29:28 21    A.     I observed the videos.  And I listened to or I read

10:29:35 22    the deposition of Mr. Wade and Mr. Tao, looked at their

10:29:40 23    website.

10:29:41 24    Q.     Okay.  And so, why did you do -- if you did the

10:29:46 25    computer analysis, why would you have to watch videos and

Barry - Direct

10:29:49  1   why did you read their deposition transcripts, if the

10:29:52  2   computer analysis told you that they were statically stable?

10:29:55  3   A.    The computer analysis is a good conservative

10:30:00  4   estimate.  So it cross-checks the videos and the other

10:30:05  5   information.  The videos say one thing.  The computer

10:30:09  6   analysis says the same thing.  And I also was -- wanted to

10:30:16  7   make sure that using this well-known program, someone could

10:30:20  8   calculate the necessary stability derivatives to make the

10:30:26  9   craft stable because Dr. Langelaan teaches this process,

10:30:31 10   teaches it, teaches these stability derivatives and how they

10:30:34 11   must be in his patent.

10:30:35 12          So, I showed, I demonstrated, I tried to

10:30:39 13   demonstrate that a person of ordinary skill could go use a

10:30:44 14   well-known program and meet the criteria put in the patent.

10:31:04 15          THE WITNESS:  Am I too fast for you?

10:31:08 16   BY MR. THEUERKAUF:

10:31:09 17   Q.    So, you may have already answered this, but so

10:31:11 18   ultimately your conclusion with respect to Claim 1 and the

10:31:18 19   Defendants' products is what?

10:31:19 20   A.    My conclusion is in addition to the one stipulated

10:31:24 21   to, that the floatation device, in fact, is weight-shift

10:31:29 22   controlled, which is, I believe, the third element and it

10:31:34 23   is, in fact, passively stable, passively statically stable.

10:31:39 24   Q.    Okay.  And is that true for all of the Defendants'

10:31:42 25   products you analyzed?

Barry - Direct

10:31:43  1    A.    Yes, for example, we have in this particular one the

10:31:46  2    sets of coefficients for all three of them, and you can see

10:31:49  3    not only are they of the appropriate size, but they're also

10:31:52  4    very close to each other plus or minus one or so.  And so,

10:31:57  5    yes, all of the -- all of the Defendants' products are --

10:32:01  6    meet the criteria of the patent --

10:32:04  7    Q.    Okay.

10:32:04  8    A.    -- and are calculated to do so and appear to be so

10:32:09  9    from the videos.

10:32:10 10    Q.    Okay.  So, now did you also consider the weight and

10:32:18 11    center of gravity of these devices when doing your

10:32:21 12    calculations?

10:32:22 13    A.    The weight and center of gravity of the devices

10:32:26 14    actually comes out of the calculations.  You decide what

10:32:29 15    LIFT coefficient you need, which is determined by how much

10:32:35 16    you need to LIFT and at how fast.  But you put a LIFT

10:32:37 17    coefficient in there, that that's what you regard as a

10:32:40 18    practical range, and then the program tells you that that

10:32:44 19    left coefficient is achieved by having the craft at a

10:32:47 20    certain pitch angle.  And that pitch angle is achieved by

10:32:52 21    having the center of gravity of the craft at a certain

10:32:55 22    point.

10:32:55 23          So we determined the point that the person has

10:32:57 24    to stand from the necessary LIFT.  We could do it the other

10:33:02 25    way, but it's more convenient to say, how much do we need to

Barry - Direct

10:33:07  1   LIFT, and then it tells us where we have to stand.

10:33:11  2   Q.     And I understand that you ran multiple calculations

10:33:16  3   for each craft; is that correct?

10:33:18  4   A.     Yes, sir.

10:33:19  5   Q.     And why did you do that?

10:33:20  6   A.     Well, we wanted to make sure that the craft is stable

10:33:25  7   over the entire flight range.  So, I ran it at a high LIFT

10:33:32  8   coefficient which corresponds to takeoff.  I ran it at

10:33:37  9   intermediate LIFT coefficient which corresponds to core

10:33:41 10   speed and a low LIFT coefficient that corresponds to high

10:33:45 11   speed.  And it was stable in all three speed -- in all

10:33:51 12   speed -- all speed -- excuse me, all three LIFT

10:33:54 13   coefficients, hence basically covered the range of speed of

10:33:59 14   operation.

10:34:00 15   Q.     And was that -- did you do that for each of the

10:34:03 16   Defendants' accused products?

10:34:05 17   A.     I did.

10:34:05 18   Q.     And what were your conclusions with respect to what

10:34:09 19   you just described and the Defendants' products?

10:34:13 20   A.     The craft is stable -- is -- it has passive static

10:34:18 21   stability through a practical range of LIFT.

10:34:27 22   Q.     So in doing your calculations, were there any

10:34:30 23   analyses that you reran?

10:34:33 24   A.     There were.

10:34:34 25   Q.     Okay.  And can you describe those for us?

314

Barry - Direct

10:34:37  1    A.      Yes, the first set of points I took out of the model

10:34:42  2    of the Flyer caused the program to default to a planform

10:34:49  3    analysis rather than including the wing.  And so I -- I put

10:34:55  4    in a sparser set of points and it handled it properly.

10:34:58  5    Q.      Okay.  And then when you reran that, what did it

10:35:02  6    show?

10:35:02  7    A.      It showed -- well, both of them actually showed that

10:35:04  8    it had both -- the planform element and the other showed it

10:35:12  9    was stable.  Passively statically stable.

10:35:16 10    Q.      Okay.  And was there any other analysis that you

10:35:20 11    reran?

10:35:20 12    A.      Well, I picked a LIFT coefficient that actually

10:35:24 13    corresponded to what was -- I picked -- I assumed a LIFT

10:35:30 14    coefficient that I was guessing would be a mid-range case.

10:35:34 15    And it actually -- and it corresponded -- I didn't pick the

10:35:37 16    LIFT coefficient small enough.  And it corresponded to a

10:35:41 17    takeoff condition instead.  So, I reran that at a lower LIFT

10:35:45 18    coefficient, of course, to get a better middle -- middle

10:35:48 19    speed range.

10:35:48 20    Q.      Okay.  And when you did that -- what did you

10:35:51 21    conclude?  What did you see?

10:35:52 22    A.      It was still passively statically stable.

10:35:56 23    Q.      Okay.  So, Mr. Barry, can you tell us what this is

10:36:12 24    showing us, this slide?

10:36:20 25               And if you want to just look at the slide, Mr.

Barry - Direct

10:36:22 1    Barry, you can --

10:36:23 2    A.      No, I'll come down.

10:36:25 3    Q.      You can do that if you like.

10:36:27 4    A.      I'll come down.

10:36:29 5            Get the court reporter to shift her headphones.

10:36:33 6    Thank you.

10:36:34 7    Q.      So is this Claim 2 of the '044?

10:36:38 8    A.      It is.

10:36:39 9    Q.      Okay.  And is it also -- is Claim 2 of '659

10:36:44 10   identical?

10:36:45 11   A.      It is.

10:36:46 12   Q.      Okay.  And have you analyzed this Claim 2?

10:36:50 13   A.      Yes, I have.

10:36:51 14   Q.      Okay.  And so, what -- what are your conclusions with

10:36:54 15   respect to the Defendants' products in this claim?

10:36:57 16   A.      The watercraft.

10:37:01 17   Q.      And you -- maybe take a seat just so we can be sure

10:37:04 18   to hear you.

10:37:05 19   A.      Mm-hmm.

10:37:07 20   Q.      Because we have the slide up there, too, if that's

10:37:12 21   easier to look at.

10:37:12 22   A.      Okay.  The watercraft has a propulsion system which

10:37:17 23   comprises a battery, an electric motor, a motor speed

10:37:21 24   controller and a propeller, in this case, a ducted

10:37:25 25   propeller.

Barry - Direct

10:37:25  1    Q.      And how did you make those conclusions?

10:37:28  2    A.      The components listed in the claim are shown in the

10:37:32  3    engineering drawings.  Of course, they are also shown in the

10:37:36  4    various pictures of the craft and the manuals.  There's

10:37:40  5    extensive discussion in both manuals about the electric

10:37:47  6    propulsion system.

10:37:48  7    Q.      Okay.  And so, your conclusions with respect to Claim

10:37:53  8    2, are they the same with respect to all the Defendants'

10:37:57  9    products that you analyzed?

10:37:58 10    A.      They are.

10:37:59 11    Q.      Okay.  So, Mr. Barry, can you tell us what this slide

10:38:11 12    is showing us?

10:38:12 13    A.      This slide is showing us the airfoil -- the airfoil

10:38:17 14    design and tailoring a span-wise twist which is discussed in

10:38:22 15    Claim 5 of the '044 patent.

10:38:24 16    Q.      Okay.  And what was your conclusion, or what is your

10:38:28 17    conclusion with respect to Claim 5 in the Defendants'

10:38:32 18    accused products?

10:38:33 19    A.      It includes all of these -- all of these elements.

10:38:37 20    Q.      Okay.  And so, can you describe for us, please, what

10:38:41 21    airfoil design is?

10:38:42 22    A.      Well, if we can imagine for a moment, let's talk

10:38:46 23    about -- well, since it's more familiar to us, let's talk

10:38:48 24    about a banana.  If you put the banana on the table and you

10:38:52 25    take a slice through it, you'll get kind of a circular

Barry - Direct

10:38:56  1   thing.  The peel of the banana.  If you were to squish it

10:39:02  2   first and take a slice of it, you'd get something that looks

10:39:04  3   like this, which is based very much like the kind of

10:39:08  4   airfoils we have.

10:39:10  5          Interestingly enough, one way of analyzing these

10:39:12  6   things is to take a circle and squish it mathematically, and

10:39:15  7   you can calculate -- if you can calculate it for flow on the

10:39:19  8   circle, you can calculate the flow on a squished circle.

10:39:21  9   Q.    Okay.

10:39:22 10   A.    So, that is the airfoil design.  What this cut

10:39:25 11   through the banana looks like, what the -- where the wing is

10:39:30 12   the banana.  If we stand up and look down on the banana,

10:39:34 13   then that's the planform design.  The -- if the banana were

10:39:39 14   twisted, which would kind of make a bit of a mess, but you

10:39:42 15   could do it.  If the banana would be twisted, then it would

10:39:46 16   have span-wise twist.  But bananas are tailored to have no

10:39:50 17   span-wise twist.

10:39:51 18          And then, finally -- and then if you looked at

10:39:54 19   the banana, the curve of the front of the portion -- let's

10:40:00 20   assume the banana is away from you.  The curve of the

10:40:03 21   forward side of the banana is the sweep.  I think that is --

10:40:10 22   whether that's mentioned or not, I'm not sure, but this is

10:40:12 23   the sweep.  And then the there is a front edge and a back

10:40:19 24   edge that are in the case of the banana are rearwardly

10:40:23 25   curved.

318

Barry - Direct

10:40:23  1    Q.     Okay.  And so, what were your conclusions with

10:40:28  2    respect to the Defendants' products and their whether or not

10:40:33  3    they had these elements, the airfoil design, planform design

10:40:38  4    and tailoring of span-wise which is distribution?

10:40:42  5    A.     All of these elements are between in the Defendants'

10:40:47  6    watercraft.

10:40:48  7    Q.     And then, what was your conclusion with respect to

10:40:52  8    those elements and whether or not they provide for the

10:40:55  9    passive static stability?

10:40:57 10    A.     Yes, they do.

10:40:59 11    Q.     And how did you make that conclusion?

10:41:01 12    A.     Well, this is one of the reasons for analyzing the

10:41:06 13    computer analysis.  The computer analysis shows us that when

10:41:10 14    we put these elements and just these elements, the computer

10:41:15 15    analysis only consists of the lifting portion of the -- of a

10:41:18 16    craft and the strut, that those elements produce the

10:41:22 17    coefficients that give us passive static stability.

10:41:26 18            So, there's -- the computer analysis doesn't

10:41:29 19    include anything that could possibly affect anything other

10:41:33 20    than the wings, wing design.  And the strut that could

10:41:37 21    possibly affect it.

10:41:38 22    Q.     Okay.  All right.  Can you tell us what this slide is

10:41:54 23    showing us?

10:41:55 24    A.     Well, back to the banana again, that we -- if we

10:41:59 25    were -- had the banana curving towards us, the edge away

Barry - Direct

10:42:04  1    from us, we call that the front edge of the banana

10:42:05  2    rearwardly curved, and so the back edge of the banana.  This

10:42:09  3    is the -- in this case, the hydrofoil's front edge is curved

10:42:13  4    toward the rear or the aft as we say in naval architecture

10:42:17  5    terms as is the rear end, rear edge.  So, the hydrofoil --

10:42:23  6    where the hydrofoil is wing-shaped with a front edge and a

10:42:26  7    rear edge that both curve rearwardly.

10:42:28  8    Q.    Okay.  And is that true for all of Defendants'

10:42:32  9    products that you analyzed?

10:42:33 10    A.    It is.

10:42:34 11    Q.    Okay.  And so, is it fair to put a check next to each

10:42:39 12    one of these?

10:42:40 13    A.    Yes, sir.

10:42:55 14    Q.    So, if we could pull up PTX 14.  Mr. Barry, do you

10:43:08 15    recognize this document?

10:43:12 16    A.    I do.

10:43:14 17    Q.    And can you tell us what it is?

10:43:15 18    A.    It's the -- it's Dr. Langelaan's second patent on

10:43:19 19    this -- on this type of craft.  It's called the '659 patent

10:43:22 20    for short.

10:43:24 21    Q.    And can you generally tell us what the difference is

10:43:35 22    between Claim 11 of the '659 patent and Claim 1 of the '044?

10:43:42 23    A.    Well, the Claim 1 includes in the preamble -- well,

10:43:48 24    it has passively stable in the preamble.  And so, rather

10:43:55 25    than passively statically stable.

Barry - Direct

10:43:57  1    Q.    Okay.  And so what's your understanding, then, of

10:44:01  2    passively stable as compared to static stability?

10:44:07  3    A.    The term "passively stable" has been -- has been

10:44:14  4    interpreted to mean that in addition to being statically

10:44:18  5    stable, having an initial tendency to return to the original

10:44:21  6    position, it also has -- will ultimately return to the

10:44:27  7    initial condition.

10:44:27  8    Q.    Okay.  So, no need to get up, Mr. Barry, I'm just

10:44:36  9    going to -- these are the other elements in the claim that

10:44:41 10    have been -- let me just double-check.  Yeah.

10:44:53 11           So, what did you do with respect to that claim

10:44:59 12    element of the '659 in your analysis?

10:45:02 13    A.    Well, of course, I looked at the videos.  I looked at

10:45:07 14    the manuals.  I read the -- read the various depositions.

10:45:12 15    And the videos, especially, clearly show the craft to be

10:45:15 16    stable once -- nobody rides a bicycle the first time they

10:45:23 17    get on it.  After a few minutes, you are starting to get the

10:45:26 18    hang of it, so...

10:45:29 19           But the craft is -- is both statically and

10:45:32 20    passively stable because ultimately it's rideable.  If it

10:45:37 21    wasn't statically and passively stable, you couldn't ride it

10:45:41 22    for any length of time, even -- no matter how skilled you

10:45:44 23    are.

10:45:45 24    Q.    Okay.

10:45:47 25    A.    So -- well, looking at the various videos especially,

Barry - Direct

10:45:51  1    I was able to determine that.  We can also do a more -- a

10:45:55  2    more extensive calculation with the software that was used.

10:46:00  3    The coefficients themselves provide the capability of doing

10:46:04  4    these calculations without any -- without this.  And

10:46:08  5    Dr. Langelaan can do them, but it's quite a job.

10:46:14  6         So, the program provides a useful method of

10:46:17  7    visualizing graphically the static -- the dynamic stability

10:46:22  8    called and eigenvalue solution.  And what that does is it

10:46:26  9    plots on a graft the so-called sigma, which is the tendency

10:46:30 10    to diverge, and the omega, which is the rate it oscillates.

10:46:37 11    Q.    Okay.  And so, I guess if you could just briefly

10:46:45 12    describe for us, before we get into a little more detail,

10:46:54 13    when it says that it's -- has an initial tendency to return

10:46:57 14    to its original condition and then eventually returns to

10:47:00 15    that original condition, can you describe for us what --

10:47:04 16    what that -- I mean how that happens and what that means?

10:47:07 17    A.    Yeah, there's two -- there's two -- basically, two

10:47:12 18    ways of doing this.  First off, what we -- if the system is

10:47:16 19    what we call critically or over damped, then it -- after

10:47:23 20    being disturbed, it returns to the original condition

10:47:28 21    without oscillating.  It just goes.

10:47:33 22         If it is insufficiently damped, then it will

10:47:37 23    have some speed as it goes through the initial condition,

10:47:40 24    which will carry it a little past the initial condition, and

10:47:43 25    then it will go back because there's an opposing force here,

Barry - Direct

10:47:47  1    pushes it back, pushes it back, pushes it back and it stops

10:47:52  2    eventually.

10:47:53  3    Q.     Okay.  And in both of those scenarios, it's stable?

10:47:57  4    A.     It's regarded as stable, yes.

10:48:00  5    Q.     Okay.  And when you -- you mentioned the term

10:48:06  6    "critically damped," what do you mean by that?

10:48:08  7    A.     Well, by critical damping, it means that there's

10:48:11  8    enough drag force.  This is related to the rate at which it

10:48:18  9    moves.  There's enough drag force that it stops it from

10:48:24 10    bouncing.  And anyone who's gotten in a car and pushed down

10:48:30 11    on it, the car bounces a little bit.  The guy says give me

10:48:31 12    800 bucks and I'll fix that and he put in new struts.  And

10:48:35 13    when you do it, he goes hmm.

10:48:38 14             So, we have a demonstration of this.  Ready for

10:48:41 15    the --

10:48:42 16    Q.     Sure?

10:48:42 17    A.     Okay.

10:48:43 18             THE WITNESS:  Your Honor?

10:48:44 19             THE COURT:  Sure.

10:48:45 20             THE WITNESS:  Okay.

10:49:01 21    BY MR. THEUERKAUF:

10:49:01 22    Q.     Can you sit up here with it?

10:49:03 23    A.     I don't care.  Just -- well, let's look at this.  I

10:49:18 24    think -- I think counsel has already shown the basic

10:49:23 25    element.

Barry - Direct

10:49:23  1              Here it is.  And initial tendency to return, but

10:49:31  2      it oscillates to the final position.  Because there's a

10:49:37  3      coefficient friction here, two hard surfaces.

10:49:41  4              So this to provide -- but ultimately it --

10:49:41  5              THE REPORTER:  I'm sorry.  It's hard to hear

10:49:48  6      with the --

10:49:48  7              THE WITNESS:  I'm sorry.  You have that here.

10:50:02  8              DEPUTY CLERK:  I can mute the witness mic, if

10:50:05  9      you just -- if want to talk a little louder, you can put it

10:50:07 10      back there.

10:50:08 11              THE WITNESS:  Well, she's having hard time

10:50:10 12      hearing it.

10:50:11 13              DEPUTY CLERK:  If I mute it she'll be okay, if

10:50:13 14      that's easier.

10:50:14 15              THE WITNESS:  No, no.  This is fine.  If she can

10:50:16 16      hear me here.

10:50:17 17              So once again, the initial condition, a

10:50:21 18      disturbance, it's pushing me -- pushing against my hand to

10:50:25 19      provide an initial force to return it to the initial

10:50:27 20      condition.  If we let this marble go because there's very

10:50:32 21      little damping in the system, it oscillates back and forth

10:50:36 22      for quite a while.  So, we need some damping and it

10:50:41 23      actually -- in the real case, water is an extremely good

10:50:45 24      damping material because water is heavy.  It's sticky, we

10:50:49 25      call that viscosity.  And water is -- water is viscus.

Barry - Direct

10:50:54 1    Maple syrup is very viscus.  And so, we can add damping --

10:51:01 2    actual water damping, this includes a couple of the effects

10:51:05 3    of the water on the whole system.  And we can go -- it

10:51:11 4    settles rapidly because it's damped.  If I put enough water

10:51:15 5    in there, it would be critically damped and then stop

10:51:19 6    initially.

10:51:20 7    BY MR. THEUERKAUF:

10:51:20 8    Q.    All right.  Thank you, Mr. Barry.

10:51:22 9    A.    Okay.  Thank you.

10:51:39 10   Q.    So then what does this slide show us?

10:51:39 11   A.    This shows -- this recites a passively stable

10:51:44 12   weight-shift control watercraft comprising and then our --

10:51:49 13   the definition of pitch, a passively statically stable

10:51:55 14   recited in Dr. Langelaan's teachings and in the sixth column

10:51:59 15   of the patent.

10:51:59 16   Q.    Okay.  So these values, like the other one -- other

10:52:05 17   one we were looking at, the '044 patent, are showing the

10:52:08 18   initial tendency with respect to the Defendants' products;

10:52:11 19   is a that correct?

10:52:12 20   A.    That's correct.  And they're the same numbers and

10:52:14 21   same -- results of the same analysis.

10:52:15 22   Q.    Okay.  So then what is -- what is this showing us?

10:52:18 23   A.    Well, of course in order to be stable at all, we have

10:52:21 24   to be passively statically stable.

10:52:24 25          But the question is:  Does it settle down or

Barry - Direct

10:52:27  1   grow?  And this is what's called an eigenvalue analysis and,

10:52:33  2   you know, it can sound cleaver and tell your friends it's

10:52:36  3   like supercalifragilisticexpialidocious.

10:52:39  4          So, the lateral movement, it's labeled with a

10:52:44  5   Greek letter sigma, which is a zero with a tail on it, shows

10:52:48  6   the tendency to diverge or converge.  If it's negative, it's

10:52:52  7   converging.  Again, something is opposing the -- a force of

10:52:58  8   a motion, so it's negative.  Negative opposite.

10:53:02  9          So, and then the vertical axis, which is --

10:53:05 10   which we call omega, is the -- in this case it's omega over

10:53:09 11   two pi, which means that's how many cycles per second the

10:53:12 12   oscillation occurs.

10:53:14 13          So, the oscillation converges at a rate of one

10:53:19 14   cycle per second.

10:53:22 15   Q.    Okay.  And so ultimately, what is -- what is this

10:53:26 16   graph illustrating to you?

10:53:26 17   A.    Well, this graph illustrates that is it's passively

10:53:31 18   stable.  There's no -- no highly divergent modes.  The one

10:53:36 19   mode that is divert is slightly positive.  You can see that

10:53:41 20   just over 0.0.  It's very slightly divergent.  But in water

10:53:48 21   we have damping.  We have damping, we have added mass, we

10:53:53 22   have weight making, we also have the object geometry

10:53:57 23   changing in some cases.  In other words, more of -- more of

10:53:59 24   the strut is in the water.

10:54:03 25   Q.    Okay.  So what did you conclude then with respect to

Barry - Direct

10:54:04  1    the product and whether or not it has an initial tendency to

10:54:10  2    return to its original condition and eventually returns to

10:54:12  3    its original condition?

10:54:13  4    A.    The previous slide shows its initial tendency and

10:54:17  5    this slide shows that it ultimately returns to it.

10:54:20  6    Q.    Okay.  And then it is this the same analysis for the

10:54:24  7    other products?

10:54:25  8    A.    Yes.

10:54:26  9    Q.    Okay.  And so, can you tell us what your conclusions

10:54:29 10    were with respect to these products?

10:54:32 11    A.    Well, it's the same -- the same conclusion.  Again,

10:54:36 12    the initial coefficients show that it's initially statically

10:54:41 13    stable, or it's statically stable and it initially has a

10:54:46 14    tendency to return and that it ultimately returns and that

10:54:51 15    even though there is one that is slightly positive, the

10:54:55 16    damping and other effects of being in the water result in it

10:54:58 17    being nondivergent.

10:55:01 18    Q.    Okay.  So, with respect to all of the different

10:55:11 19    Defendants' products that you've analyzed in Claim 1 of the

10:55:15 20    '659, what was your conclusion?

10:55:17 21    A.    That it meets all of the elements of Claim 1 of the

10:55:21 22    '659.

10:55:21 23    Q.    And that's true for all of the products?

10:55:24 24    A.    That is true for all of them.

10:55:33 25    Q.    Oh, and I apologize.  I missed one, but there was two

Barry - Direct

10:55:39  1    different wings; right, with respect to the products that

10:55:42  2    you analyzed?

10:55:43  3    A.      Two different wings and strut lengths.

10:55:47  4    Q.      Yeah, okay.

10:55:47  5            And was it the same conclusion in both?

10:55:49  6    A.      It's the same conclusion in both cases.  For both

10:55:55  7    wings, both strut lengths.

10:55:57  8    Q.      Okay.  And then we've seen this claim before.  It was

10:55:59  9    the same as what was in the '044; correct?

10:56:01 10    A.      Yes, sir.

10:56:03 11    Q.      All right.

10:56:03 12    A.      It has a battery, an electric motor comprising -- and

10:56:08 13    a motor speed controller and in this case a ducted propeller

10:56:12 14    which comprises the propulsion system.

10:56:15 15    Q.      Okay.  So, I'd like to run through real quick -- I

10:56:21 16    know you also looked at MHL's product; correct?

10:56:23 17    A.      I did.

10:56:45 18    Q.      All right.  Mr. Barry, so, is this the slides for the

10:56:55 19    MHL products in Claim 1 of the '044?

10:56:59 20    A.      It is.

10:56:59 21    Q.      Okay.  And so, can you tell us what this slide is

10:57:03 22    showing us?

10:57:03 23    A.      This slide shows us a floatation device.  It has a

10:57:07 24    fore-aft length greater than its -- beam-wise level than

10:57:14 25    lateral width.  And it has a top surface and bottom surface

Barry - Direct

10:57:18  1    wherein a user can be -- can sit on the surface and be

10:57:21  2    disposed on the surface in a prone, kneeling or standing

10:57:24  3    surface position.

10:57:27  4    Q.    And so the LIFT products contain this element?

10:57:30  5    A.    The LIFT product contains this element.

10:57:33  6    Q.    And what is this slide showing us?

10:57:35  7    A.    This slide shows the floatation device has a forward

10:57:39  8    section, a middle section and a rear section.  And it is

10:57:44  9    controlled by weight shift of the user, which we've

10:57:47 10    discussed already.

10:57:48 11    Q.    Okay.  And did you do a similar analysis with the MHL

10:57:51 12    product to determine --

10:57:52 13    A.    I did.  I did exactly the same analysis.

10:57:54 14    Q.    Okay.  And then with respect to this slide, can you

10:57:59 15    tell us what it's showing us?

10:58:00 16    A.    This shows that there's a strut.  The -- there's a

10:58:06 17    strut with an upper and lower end and the upper end is

10:58:09 18    fixed -- connected to the floatation device between the

10:58:14 19    middle end -- the middle section and the rear section.  And

10:58:19 20    of course, it is -- this is the same configuration as --

10:58:23 21    this is the configuration that's shown and that the MHL

10:58:27 22    device has.

10:58:28 23    Q.    Okay.  And then what does this slide show us?

10:58:32 24    A.    This shows us that the hydrofoil is fixedly

10:58:34 25    interconnected with the lower end of the strut and it has no

10:58:37 1    movable surface.  And as before, it's designed to provide

10:58:41 2    passive static stability controlled solely by the weight of

10:58:43 3    the user.

10:58:45 4    Q.    Okay.  And so how did you determine the MHL product

10:58:47 5    had -- were designed to provide passive static stability?

10:58:50 6    A.    Same numbers -- well, the same analysis, a

10:58:54 7    conversation with Mr. Leason, videos, manual.

10:58:58 8    Q.    Okay.  And so you ran the same analysis that you

10:59:01 9    explained earlier with respect to --

10:59:02 10   A.    Correct.

10:59:03 11   Q.    -- the Waydoo products?

10:59:05 12   A.    Correct.

10:59:06 13         Sorry, sir.

10:59:09 14   Q.    And I assume -- I don't know if we mentioned it, but

10:59:12 15   you determined that the MHL products were also solely

10:59:15 16   controlled by weight shift?

10:59:16 17   A.    Yes, sir.

10:59:18 18   Q.    Okay.  And what is this slide showing us?

10:59:22 19   A.    This shows the propulsion system of -- the portion of

10:59:26 20   the propulsion system under water, which comprises -- which

10:59:31 21   is connected to the hydrofoil.

10:59:33 22   Q.    Okay.  And what's your conclusion here?

10:59:35 23   A.    That the MHL product contains that element.

10:59:39 24   Q.    Okay.  And what is this slide showing us?

10:59:45 25   A.    This shows no movable steering system.

Barry - Direct

10:59:48  1    Q.     Okay.  And what was your conclusion here?

10:59:50  2    A.     The MHL product includes this -- this element.

10:59:55  3    Q.     Okay.  And so with respect to the '659 patent and the

11:00:03  4    MHL product, can you tell us what this slide is showing us?

11:00:07  5    A.     This slide this slide shows us that it is passively

11:00:12  6    statically stable, which is a necessary condition for any

11:00:14  7    type of stability.  And that then the rest -- remainder of

11:00:18  8    the analysis shows it's weight controlled.  And this shows

11:00:23  9    that it's stable.

11:00:25 10    Q.     Okay.  And so, this is the same type of analysis that

11:00:28 11    you did for the Waydoo products?

11:00:30 12    A.     Exactly.

11:00:31 13    Q.     Okay.  And so, what was your conclusion with respect

11:00:33 14    to this claim element of the '659 and the MHL products?

11:00:40 15    A.     That the MHL product includes this, all elements of

11:00:43 16    this claim.

11:00:44 17    Q.     Okay.  And then can you briefly describe for us what

11:00:50 18    this is?

11:00:50 19    A.     This is a claim of the -- Claim 1 of the '659 patent.

11:00:57 20    Q.     Okay.  And what does it show?

11:00:58 21    A.     It shows the floatation device having fore-aft length

11:01:03 22    greater than a lateral width, having a top surface, a bottom

11:01:07 23    surface wherein the user can be disposed on the top surface

11:01:11 24    of the floatation device in a prone, kneeling or standing

11:01:14 25    position.

Barry - Direct

11:01:14  1    Q.      Okay.  And is it your conclusion that the MHL

11:01:18  2    products contain this?

11:01:19  3    A.      Yes, they do.  Yes it is.

11:01:22  4    Q.      And what about this slide?

11:01:23  5    A.      This slide shows that there's a forward, middle and

11:01:27  6    rear section.  And the MHL product contains this.

11:01:33  7    Q.      And how about this slide?

11:01:35  8    A.      And there is a strut, this says it has this -- excuse

11:01:41  9    me.  This element discloses a strut having an upper end and

11:01:46 10    a lower end.  The upper end is fixedly connected to the

11:01:49 11    floatation device between the middle and rear end, and it

11:01:53 12    is -- it is contained in the MHL product.

11:01:59 13    Q.      Okay.  And then this one?

11:02:00 14    A.      This one shows that the -- this one discloses a

11:02:04 15    hydrofoil fixedly interconnected with the lower end of the

11:02:07 16    strut, and the hydrofoil has no moving surface.

11:02:10 17    Q.      Okay.  And the MHL products?

11:02:12 18    A.      And the MHL product includes this -- this element.

11:02:17 19    Q.      And we're getting close to the end here, but this

11:02:19 20    one?

11:02:19 21    A.      This discloses a propulsion system, and that is

11:02:26 22    connected in this case to the hydrofoil via the strut and --

11:02:33 23    well, it discloses a propulsion system for propelling the

11:02:37 24    watercraft in a body of water wherein the propulsion system

11:02:39 25    is connected to the hydrofoil.

Barry - Direct

11:02:40  1    Q.      And what was your conclusion here?

11:02:41  2    A.      I'm sorry?

11:02:43  3    Q.      What was your conclusion here?

11:02:44  4    A.      That there is, in fact -- that the product, in fact,

11:02:47  5    has a propulsion system connected to the hydrofoil.

11:02:52  6    Q.      All right.  And I think we're on the last one here.

11:02:54  7    What does this show you?

11:02:55  8    A.      This -- this discloses that the -- this element

11:02:58  9    discloses that the watercraft has no movable steering system

11:03:02 10    and the MHL LIFT one has no movable steering system.

11:03:07 11    Q.      Okay.

11:03:53 12            MR. THEUERKAUF:  All right.  No further

11:03:54 13    questions.

11:03:54 14            THE COURT:  All right.  Thank you,

11:03:55 15    Mr. Theuerkauf.

11:03:56 16            All right.  So, members of the jury, we'll take

11:03:58 17    a morning break here of 15 minutes.

11:04:01 18            Can we take the jury out, please?

11:04:03 19            (Jury leaving the courtroom.)

11:04:27 20            THE COURT:  All right.  So, we'll take a morning

11:04:32 21    break.

11:04:35 22            Mr. Colletti, just generally speaking, what do

11:04:38 23    you imagine the range of time for your cross-examination

11:04:42 24    might be?

11:04:43 25            MR. COLLETTI:  Yeah, it will be Mr. Basanta, but

333

Barry - Cross

11:04:46 1    I'm thinking 90 minutes, 60 to 90 minutes.

11:04:49 2              THE COURT:  Okay.  All right.  See you all in

11:04:52 3    15 minutes.

11:04:53 4              DEPUTY CLERK:  All rise.

11:05:11 5              (Recess was taken.)

11:19:39 6              DEPUTY CLERK:  All rise.

11:19:40 7              THE COURT:  All right.  Shall we sit down or --

11:19:43 8    let's get the jury.

11:19:45 9              (Jury entering the courtroom.)

11:20:38 10             THE COURT:  All right.  Members of the jury,

11:20:40 11   welcome back.  Everyone, you can be seated.

11:20:43 12             Mr. Basanta.

11:20:45 13             MR. BASANTA:  Good morning, may I approach?

11:20:52 14             THE COURT:  Sure.

11:21:16 15                      CROSS-EXAMINATION

11:21:18 16   BY MR. BASANTA:

11:21:19 17   Q.    Good morning, Mr. Barry.  It's good to see you again.

11:21:21 18   A.    Yes.  Good to see you, too, sir.

11:21:23 19   Q.    You provided Waydoo with a number of reports in this

11:21:26 20   case; is that right?

11:21:27 21   A.    I'm sorry.  I couldn't quite hear you.

11:21:28 22   Q.    You provided Waydoo with a number of reports in his

11:21:30 23   this case; is that right?

11:21:31 24   A.    I did, sir.

11:21:32 25   Q.    And those reports contain the opinions that you're

Barry - Cross

| | |
|---|---|
| 11:21:34 1 | offering in Court today? |
| 11:21:35 2 | A.    I'm sorry.  You're going have to speak a little more |
| 11:21:38 3 | clearly. |
| 11:21:38 4 | Q.    Those reports contain the opinions that you're |
| 11:21:41 5 | offering in Court today? |
| 11:21:41 6 | A.    Yes, they do. |
| 11:21:42 7 | Q.    Okay.  And you also sat through two depositions, is |
| 11:21:45 8 | that right? |
| 11:21:45 9 | A.    Yes, sir. |
| 11:21:46 10 | Q.    And you recall that those -- the transcripts were |
| 11:21:49 11 | made of those depositions? |
| 11:21:50 12 | A.    Yes. |
| 11:21:51 13 | Q.    And -- |
| 11:21:51 14 | A.    Are these the transcripts in question, sir? |
| 11:21:54 15 | Q.    I believe there's copies in there, yes. |
| 11:21:56 16 | A.    Yes. |
| 11:21:57 17 | Q.    And you recall that those depositions were video |
| 11:21:59 18 | recorded as well; right? |
| 11:22:01 19 | A.    I'm sorry.  One more time. |
| 11:22:03 20 | Q.    Do you recall that those depositions were also video |
| 11:22:06 21 | recorded? |
| 11:22:06 22 | A.    Yes, sir. |
| 11:22:07 23 | Q.    Okay.  And as an expert in this case, you formed |
| 11:22:10 24 | opinions about infringement of various claim elements that |
| 11:22:13 25 | we've been talking about; right? |

Barry - Cross

11:22:15  1    A.      Yes, sir.

11:22:15  2    Q.      And part of that task was to use the definitions that

11:22:19  3    the Court provided for those claim terms; is that your

11:22:22  4    understanding?

11:22:23  5    A.      Yes, sir.

11:22:23  6    Q.      Okay.  And you remember, as we just talked about, one

11:22:26  7    of those claim terms was stability; correct?

11:22:27  8    A.      Yes, sir.

11:22:28  9    Q.      And one of those claim terms was static stability?

11:22:30 10    A.      Yes, sir.

11:22:31 11    Q.      Okay.  And back when you started your work in this

11:22:33 12    case, your opinion was that the patents used the phrases

11:22:36 13    "passive static stability" and "passive stability"

11:22:39 14    interchangeably, wasn't it?

11:22:40 15    A.      I don't believe my opinion was the patents used it.

11:22:43 16    I tend -- engineers tend to use them.  I tend to use them.

11:22:46 17                    MR. BASANTA:  Okay.  Can we bring up DTX 059,

11:22:49 18    please, Page 36?

11:22:51 19                    I'm sorry.  Could you bring up Page 1, first?

11:22:51 20    BY MR. BASANTA:

11:23:01 21    Q.      Do you recall this document, Mr. Barry?

11:23:03 22    A.      Yes, sir.

11:23:05 23                    MR. BASANTA:  This -- can you go to the

11:23:06 24    signature page, please?

11:23:08 25                    THE WITNESS:  I'm sorry?

Barry - Cross

11:23:09  1          MR. BASANTA:  I'm sorry.  I was talking to my

11:23:11  2    colleague.

11:23:12  3          THE WITNESS:  Oh, okay.

11:23:14  4    BY MR. BASANTA:

11:23:14  5    Q.    Mr. Barry, do you recognize this signature?  Is that

11:23:16  6    yours?

11:23:17  7    A.    I do.

11:23:17  8    Q.    And you wrote these words, "I declare under penalty

11:23:20  9    of perjury that the foregoing is true and correct"?

11:23:22 10    A.    Yes, sir.

11:23:23 11          MR. BASANTA:  Can you go to Page 36, please?

11:23:29 12          THE WITNESS:  Which one is this one, again, sir.

11:23:30 13    BY MR. BASANTA:

11:23:30 14    Q.    It will be up on the screen.

11:23:31 15    A.    Okay.

11:23:38 16          MR. BASANTA:  Dot 36, please.  Dot 36.

11:23:48 17          Okay.  Can you expand paragraphs 98 and 99,

11:23:53 18    please?

11:23:54 19          THE WITNESS:  I'm sorry?  Okay.  I'm sorry

11:23:56 20    you're speaking to your person.

11:23:57 21    BY MR. BASANTA:

11:23:57 22    Q.    Talking to my colleague, Mr. Barry.

11:24:03 23          You see here, Mr. Barry, how paragraph 98 is

11:24:06 24    talking about passive static stability and passive

11:24:10 25    stability?

Barry - Cross

11:24:10  1   A.     Yes, sir.

11:24:11  2   Q.     And then in paragraph 99 you say, "However the common

11:24:14  3   specification of the patents make clear that both phrases

11:24:16  4   are referring to the hydrofoils' initial tendency to return

11:24:19  5   to its original condition."

11:24:20  6          Do you see that?

11:24:21  7   A.     Yes, sir.

11:24:22  8   Q.     And so what you're saying here is that the patents

11:24:24  9   are using the terms interchangeably, right, Mr. Barry?

11:24:26 10   A.     No, sir.

11:24:27 11   Q.     What was your answer, sir?

11:24:28 12   A.     No, sir.

11:24:29 13   Q.     Are you saying yes or no?

11:24:30 14   A.     No.

11:24:31 15   Q.     So --

11:24:32 16   A.     I'm sorry.  I got my hand on the mike.  No.

11:24:35 17   Q.     So, when you say the common specification makes clear

11:24:37 18   that both phrases refer to the same thing, you're not saying

11:24:40 19   that they're interchangeable?

11:24:41 20   A.     No.

11:24:42 21   Q.     Okay.

11:24:42 22   A.     Passive static stability -- passive stability

11:24:47 23   requires passive static stability.  That is my meaning in

11:24:50 24   this.

11:24:54 25   Q.     Okay.  So you're saying, then, that you have not

Barry - Cross

| | |
|---|---|
| 11:24:57 | 1 |

1    opined that the term's interchangable?

2    A.    No, not interchangeable.  That one is a subclass of

3    the other.

4              MR. BASANTA:  Okay.  Can we please bring up

5    Slide 1?  Actually, Carol, could we go to PTX 108, the first

6    page, please?

7    BY MR. BASANTA:

8    Q.    Do you recognize this document, Mr. Barry?

9    A.    Yes.  Yes, sir.

10   Q.    And this is one of the reports that you submitted to

11   us in this case; isn't that right?

12   A.    It is.

13             MR. BASANTA:  Can we go to the signature page,

14   Carol?

15   BY MR. BASANTA:

16   Q.    Mr. Barry, is that your signature there?

17   A.    Yes, it is.

18   Q.    And did you write the words, "I declare under penalty

19   of perjury that all statements made herein are of my own

20   knowledge and are true and correct"?

21   A.    Yes.

22             MR. BASANTA:  Can you go to slide 1 now, Carol,

23   please?

24   BY MR. BASANTA:

25   Q.    Mr. Barry, so you just told me that you never said

Barry - Cross

11:25:53 1    that these two terms are interchangeable; is that right?

11:25:56 2    A.    Well, I remember -- I believe that they are elements.

11:25:59 3    One is an element of the other.  And I have used them

11:26:04 4    interchangeably.  Dr.  Triantafyllou commented on that.

11:26:09 5    Q.    Okay.  So my question is just is it your view that

11:26:12 6    these two terms are interchangeable?

11:26:14 7    A.    Not really.  Yes.  That's what I stated here.  And I

11:26:18 8    am somewhat -- I recall -- acknowledge that that's not

11:26:23 9    within the -- within the Court's interpretation of it.

11:26:26 10   Q.    Okay.  So your view is that the patents use the terms

11:26:29 11   interchangeably, but you agree that that's not within the

11:26:32 12   Court's construction of these terms?

11:26:34 13   A.    Yes, sir.

11:26:35 14   Q.    Okay.  Let's move on to something related.  Mr.

11:26:43 15   Barry, it's your view, isn't that for a hydrofoil watercraft

11:26:46 16   stability is determined by initial tendency to return to its

11:26:50 17   original condition?  Now just to be clear, I said stability,

11:26:53 18   not static stability, is determined by initial tendency to

11:26:56 19   return?

11:26:56 20   A.    It has to -- it has to have an initial tendency to

11:26:59 21   return.

11:27:00 22   Q.    But it has to have more?

11:27:01 23   A.    It does have to have further conditions.

11:27:04 24   Q.    Okay.  But that's not always been your opinion, has

11:27:07 25   it, Mr. Barry?

Barry - Cross

11:27:07  1    A.      Well, the point is, is that there's some

11:27:11  2    difficulties -- some issues were with regard to initial

11:27:15  3    tendency and to -- and to return.  If -- most of the time an

11:27:22  4    object that's statically stable, the initial condition is

11:27:26  5    not just a position.  It's a rate of pitch, a rate of roll

11:27:32  6    and so on.  Initial condition means at a certain angle,

11:27:37  7    developing a certain amount of LIFT, operating a certain

11:27:40  8    speed, with no rate of pitch, no rate of roll and a certain

11:27:51  9    rate of yaw.

11:27:53 10             In other words, it could be a steady turn.  So

11:27:55 11    the initial condition includes no rate of certain -- of

11:28:01 12    pitch and roll.  The -- so, one way of interpreting this is

11:28:08 13    the initial tendency includes return to a stable steady

11:28:15 14    position.  That's why engineers use the mathematics rather

11:28:19 15    than words.  I know exactly what $C_{mq}$ greater than zero means.

11:28:24 16    And I don't have to get into some complicated arguments with

11:28:29 17    Dr. Langelaan about the meaning of that because we -- the

11:28:31 18    mathematics is clear.

11:28:34 19    Q.    Okay.  I mean, Mr. Barry, that was a very long

11:28:36 20    answer.  I was just asking you if stability is determined by

11:28:39 21    initial tendency to return to the original condition.

11:28:41 22             Have you ever committed that statement to one of

11:28:43 23    your reports?

11:28:44 24    A.    It is required for stability.  It is the first

11:28:47 25    requirement for stability.

Barry - Cross

11:28:48  1          MR. BASANTA:  Can we put up Slide 3, please?

11:28:52  2   BY MR. BASANTA:

11:28:52  3   Q.     So you wrote -- you wrote this -- this sentence

11:28:55  4   right, Mr. Barry?  This is paragraph 9 of your opening

11:28:57  5   report.

11:28:58  6   A.     Yes.

11:28:58  7   Q.     The one that's highlighted, you wrote that sentence?

11:29:00  8   A.     Yes, sir.

11:29:01  9   Q.     And it says, "Simply, stability is determined by an

11:29:03 10   initial tendency to return to its original condition";

11:29:06 11   right?

11:29:06 12   A.     That's correct.

11:29:08 13   Q.     But that's not how the Court defines stability, is

11:29:10 14   it?

11:29:10 15   A.     No, the Court has determined that the word stability

11:29:13 16   includes dynamic stability.

11:29:16 17   Q.     And that's not your opinion?

11:29:18 18   A.     No.  Like I say, engineers use certain words,

11:29:23 19   mathematics means something else.  I don't believe the Court

11:29:26 20   has rendered an opinion on coefficients.

11:29:31 21   Q.     Okay.  Well, let's just bring up, I guess, the

11:29:33 22   definition that the Court gave.

11:29:34 23          MR. BASANTA:  Can you bring up Slide 44, please?

11:29:34 24   BY MR. BASANTA:

11:29:40 25   Q.     So here we have a few terms highlighted.

Barry - Cross

11:29:43  1          Do you see those, Mr. Barry?

11:29:44  2   A.    Yes, sir.

11:29:45  3   Q.    So, the statement that we've just looked from your

11:29:47  4   report was about stability.  And that's the first term on

11:29:49  5   the upper left.

11:29:50  6          Do you see where it says stable?

11:29:52  7   A.    Yes.

11:29:52  8   Q.    And we can see the highlighted part in the Court's

11:29:55  9   construction.  It includes the initial tendency, which is

11:29:57 10   what you had in your report but it includes this other

11:29:59 11   piece, as well, about eventually returning.

11:30:01 12          Do you see that?

11:30:02 13   A.    That's precisely correct, sir.

11:30:04 14   Q.    Okay.  But the statement that we saw in your report

11:30:06 15   doesn't have anything about eventually returning?

11:30:08 16   A.    No, it -- it first -- it says you have to have --

11:30:12 17   static stability is a condition for stability.

11:30:15 18          MR. BASANTA:  Okay.  Let's go back to Slide 3.

11:30:15 19   BY MR. BASANTA:

11:30:17 20   Q.    So look at your report again.  This sentence stops

11:30:22 21   after the initial tendencies statement; right?

11:30:24 22   A.    That's correct.  But the -- whether the -- whether

11:30:30 23   the object has any stability at all is determined by whether

11:30:34 24   initially it has static stability.

11:30:36 25   Q.    Okay.  But this sentence doesn't say anything about

Barry - Cross

11:30:38  1    eventually returning; right?

11:30:39  2    A.      No.

11:30:39  3    Q.      Okay.  Let's talk a little bit about dynamic

11:30:52  4    stability.  Okay?

11:30:53  5    A.      Okay.

11:30:55  6    Q.      When you defined dynamic stability in this case, you

11:30:57  7    said that dynamic stability -- that a dynamically stable

11:31:03  8    craft oscillates before finally settling down at the

11:31:04  9    equilibrium position.

11:31:04 10            Do you recall that?

11:31:05 11    A.      That's -- that's one -- one view of the term, yes.

11:31:08 12    Q.      Well, I'm interested in what your view of the term

11:31:10 13    is.

11:31:11 14    A.      It's -- it is my view of the term, yes.

11:31:12 15    Q.      Okay.  And when you made that statement you didn't

11:31:16 16    cite to any textbooks or any authoritative sources that

11:31:19 17    provided you with that definition.  Did you, Mr. Barry?

11:31:21 18    A.      No.  I don't think so.

11:31:25 19    Q.      And when Waydoo asked you about it at one of your

11:31:29 20    depositions, you confirmed that oscillating was indeed a

11:31:31 21    criteria for dynamic stability; right?

11:31:33 22    A.      No.  No, it's -- well --

11:31:35 23    Q.      Your answer was no?

11:31:37 24    A.      May I explain, sir?

11:31:39 25    Q.      You may, I just want to make sure I heard you.

Barry - Cross

| 11:31:41 | 1 | A. | Well, heard me what? |

11:31:41 1   A.      Well, heard me what?

11:31:41 2   Q.      Did you say yes or no?

11:31:43 3   A.      To what?

11:31:45 4           Please repeat the question.  I'm sorry.  I've

11:31:46 5   lost the question.

11:31:47 6   Q.      Let me try it again.  Okay.

11:31:49 7           The question was about the deposition that we

11:31:52 8   had.

11:31:52 9           Do you recall that?

11:31:52 10  A.      Mm-hmm.

11:31:53 11  Q.      Okay.

11:31:53 12  A.      Yes, I do.

11:31:54 13  Q.      And you confirmed in that -- in that deposition that

11:31:58 14  oscillating was indeed a criteria for dynamic stability.

11:32:02 15          Do you recall that?

11:32:03 16  A.      Decreasing oscillation is a -- is a -- is needed for

11:32:08 17  dynamic stability.

11:32:10 18          MR. BASANTA:  Okay.  Can we please bring up

11:32:13 19  Slide 9?

11:32:18 20  BY MR. BASANTA:

11:32:18 21  Q.      So this is a transcript from the second deposition.

11:32:21 22  A.      Yes.

11:32:22 23  Q.      Do you see that?  Do you remember being asked this

11:32:23 24  question, "And then how about -- what's the criteria for

11:32:26 25  dynamic stability?"

Barry - Cross

11:32:27 1    A.    Yes.

11:32:28 2    Q.    And do you remember answering that, "Eventually it

11:32:30 3    returns to its initial position after oscillating through

11:32:35 4    the equilibrium position"?

11:32:35 5    A.    Yes.

11:32:35 6    Q.    And then you said -- and then the question was, "Does

11:32:37 7    it have to oscillate?"

11:32:39 8          And you said, "Well, if it doesn't oscillate,

11:32:42 9    then it would be static."

11:32:43 10         Do you see that?

11:32:43 11   A.    Yes, sir.

11:32:44 12   Q.    Okay.  But the Court's definition for dynamic

11:32:49 13   stability, it doesn't say anything about oscillations at

11:32:52 14   all, did it, Mr. Barry?

11:32:53 15   A.    No, but the -- if it had an initial tendency to

11:32:55 16   return, then that -- if it had an initial tendency to return

11:33:00 17   to the position without oscillation, it would have -- be

11:33:06 18   statically -- it would be statically stable.

11:33:09 19   Q.    So, you're saying that if it doesn't oscillate, it's

11:33:14 20   statically stable?

11:33:14 21   A.    That -- that's -- that's -- that's one common use of

11:33:18 22   the term.  If you look at aeronautics training texts and so

11:33:22 23   on, the -- if it returns without oscillation, they say it's

11:33:25 24   statically stable.  If it returns with oscillation and

11:33:30 25   dies -- and eventually gets there, it's dynamically stable.

Barry - Cross

11:33:34  1          There's a couple of different uses of the term

11:33:36  2   in the -- in the -- in the area of flight.

11:33:40  3   Q.    But --

11:33:40  4   A.    Naval architecture, as well.

11:33:42  5   Q.    Okay.  But you recognize that the Court's definition

11:33:45  6   for dynamic stability, it says nothing about oscillation;

11:33:48  7   right?

11:33:48  8   A.    No, that's correct.

11:33:49  9   Q.    Okay.  So, let's set aside those definitions and

11:33:58 10   let's talk a little bit more about how you checked to see

11:34:02 11   whether these eFoils -- any of these eFoils you analyzed

11:34:06 12   were actually stable.  Okay?

11:34:07 13   A.    Yes, sir.

11:34:08 14   Q.    All right.  So -- and I think you walked through this

11:34:11 15   but I just want to confirm.

11:34:14 16          So, to prove infringement, MHL has to show that

11:34:18 17   Waydoo's eFoils are both statically stable and dynamically

11:34:19 18   stable; right?

11:34:21 19   A.    No, sir.

11:34:21 20   Q.    You said no?

11:34:23 21   A.    No.

11:34:25 22   Q.    Well, explain.

11:34:25 23   A.    The' '044 patent specifies static stability.  Only

11:34:31 24   the '044 patent doesn't discuss dynamic stability -- or

11:34:35 25   doesn't discuss anything that the Court has interpreted as

Barry - Cross

11:34:39  1    involving dynamic stability.

11:34:40  2    Q.    Okay.  So to prove infringement of the '044, MHL has

11:34:43  3    to prove static stability; correct?

11:34:45  4    A.    That's correct.

11:34:47  5    Q.    And to prove infringement of the '659, MHL has to

11:34:51  6    prove static and dynamic stability; correct?

11:34:53  7    A.    Yes.

11:34:57  8    Q.    And in doing your calculations, I think you spoke

11:35:00  9    about this, you used a software program called AVL; correct?

11:35:03 10    A.    Yes, sir.

11:35:04 11    Q.    But using AVL in this case, that wasn't your idea,

11:35:06 12    was it?

11:35:07 13    A.    No, sir.  I was -- I was planning on using a program

11:35:10 14    called SeaMark or PMark.  I had -- I had the codes for

11:35:14 15    both -- I had both codes somewhere in my library of computer

11:35:20 16    discs and I would go -- I was planning on putting it into my

11:35:24 17    computer or else I was thinking of trying -- of doing it

11:35:28 18    directly with Excel.  Doing the calculations directly with

11:35:31 19    Excel.

11:35:33 20    Q.    Okay.  So just to recap, you used AVL?

11:35:35 21    A.    I did use AVL.

11:35:37 22    Q.    And it was actually Professor Langelaan who suggested

11:35:39 23    to you that you use AVL in this case; right?

11:35:42 24    A.    It was.  I discussed the various options and he

11:35:46 25    suggested that AVL would be a good one.

Barry - Cross

11:35:48  1    Q.      And you took that suggestion?

11:35:48  2    A.      I took that suggestion.

11:35:50  3    Q.      But before this -- before your work in this case, you

11:35:53  4    had never used AVL before, have you?

11:35:55  5    A.      No.

11:35:58  6    Q.      And in using AVL for the first time in this case, you

11:36:00  7    made a bunch of mistakes, didn't you, Mr. Barry?

11:36:03  8    A.      It took a little while for me to get used to the

11:36:05  9    program.  Yes, sir.

11:36:06 10    Q.      Right.  And if you recall, one of the reports that

11:36:10 11    you provided to Waydoo, the first report, that's where you

11:36:16 12    set forth your stability analysis for the Waydoo products?

11:36:20 13    A.      Of one -- yeah.  Of three Waydoo products.

11:36:23 14    Q.      Correct.  But my question is that's where you first

11:36:26 15    set out your stability analysis, was in your opening report?

11:36:28 16    A.      Of the three Waydoo products, yes.  The three Waydoo

11:36:31 17    products.

11:36:31 18    Q.      And that opening report includes all of your initial

11:36:36 19    AVL analyses for those three Waydoo products?

11:36:38 20    A.      That's correct.

11:36:38 21    Q.      And then Waydoo's expert had a chance to review your

11:36:42 22    opening report and he submitted a rebuttal report to you.

11:36:45 23            Do you recall that?

11:36:46 24    A.      Yes, sir.

11:36:46 25    Q.      And then you had a chance to do a reply report that

Barry - Cross

11:36:52  1    addressed some of Dr. Triantafyllou's -- or Waydoo's experts

11:36:54  2    address some of these criticisms; right?

11:36:57  3    A.     Yes, sir.

11:36:57  4    Q.     And one of -- one of Dr. Triantafyllou's criticisms

11:37:01  5    was that you got your lift coefficents wrong.

11:37:03  6           Do you recall that?

11:37:03  7    A.     I got one of the lift coefficents for one product

11:37:07  8    wrong.  Yes, sir.

11:37:07  9    Q.     Right.  And in response, he said that there was an

11:37:10 10    error and AVL defaulted to a flat plate airfoil?

11:37:14 11    A.     Did he say that?

11:37:15 12    Q.     Excuse me?

11:37:16 13    A.     Did he say that?

11:37:16 14    Q.     I'm suggesting that your response to

11:37:19 15    Dr. Triantafyllou was that AVL defaulted to a flat plate

11:37:23 16    airfoil?

11:37:24 17    A.     No.

11:37:25 18    Q.     That's not true?

11:37:26 19    A.     That was not the response to that -- to that element

11:37:28 20    of Dr. Triantafyllou's discussion.  My response to it was,

11:37:33 21    "Correct, here's the corrected version."

11:37:38 22    Q.     Okay.  So, you had to make the -- you had to make the

11:37:41 23    correction and the error that you encountered was for

11:37:44 24    reasons that you couldn't explain; right, Mr. Barry?

11:37:47 25    A.     Which, the planform?  Or which one are you speaking

Barry - Cross

11:37:50  1    of.

11:37:51  2    Q.    We're talking about the defaulting to the flat plate

11:37:54  3    airfoil.

11:37:55  4    A.    I don't -- I haven't examined the code of the program

11:37:59  5    in detail to figure out why that happened.

11:38:02  6    Q.    Okay.  So then I'm correct then, that you didn't --

11:38:04  7    you can't explain why that happened?

11:38:05  8    A.    I -- I know generally why it happened by experiment.

11:38:09  9    I put 300 points in the first -- the first element in order

11:38:12 10    to -- I took the points directly out of the Waydoo product

11:38:16 11    model.  I put those points directly into AVL.  I had done

11:38:21 12    the same thing -- I did the same thing for all the other AVL

11:38:25 13    products and the MHL products.

11:38:27 14            As it happened, the initial model that the --

11:38:30 15    that AVL submitted was -- for whatever reason, had 300 and

11:38:36 16    some odd points in the airfoil.  The 100 and some odd points

11:38:43 17    from the other two -- from the other models and 45 points

11:38:46 18    from the MHL model ran -- ran perfectly.  There's no

11:38:53 19    discussion in the manual about how many points you're

11:38:56 20    allowed to have in -- in the model and there's no discussion

11:38:59 21    in the -- I forget the name of the program that does

11:39:07 22    airfoil that can feed into AVL.  Dr. Triantafyllou's

11:39:11 23    mentioned it and I -- I've been involved in it a long, long

11:39:15 24    time ago.

11:39:16 25            But there's no mention of an overrun and the

Barry - Cross

11:39:20  1    overrun is an artifact of the computer architecture.  It may

11:39:25  2    be it would only overrun on my machine.  But what it

11:39:28  3    indicates is that there is a matrix in there -- a

11:39:30  4    calculational matrix in there somewhere that is the

11:39:34  5    dimensions somewhere between 150 and 350.  And when you try

11:39:38  6    to put 300 points in a matrix previously dimensioned for

11:39:42  7    200, something happened.

11:39:44  8    Q.    Okay.  That was a very lengthy explanation.

11:39:46  9              MR. BASANTA:  Can you bring up Slide 13?

11:39:47 10              THE WITNESS:  Well, I put too many points in

11:39:49 11    because -- but the points came directly from the product

11:39:52 12    model.

11:39:52 13    BY MR. BASANTA:

11:39:54 14    Q.    So, this is talking about that error and you say you

11:39:57 15    were asked, well, CL was different here, right?  And you

11:39:59 16    answered, "Well, I'm not sure why that is.  The first one,

11:40:02 17    as I've said in my report, what happened is the program for

11:40:04 18    some reason or another defaulted to a flat plane airfoil."

11:40:06 19    Those were your words; correct?

11:40:08 20    A.    Yes, sir.

11:40:08 21    Q.    And if you had more experience with AVL, would you

11:40:12 22    have made this mistake?

11:40:13 23    A.    No, probably -- I probably would have, if I had the

11:40:16 24    occasion to put in 300 points.  There's nothing in the

11:40:20 25    manual that indicates a limit on the number of points in an

Barry - Cross

11:40:25 1    airfoil description.  In common use, you wouldn't put in

11:40:31 2    that many points just because it -- it's -- it takes an

11:40:35 3    effort to generate them.  But taking the points directly

11:40:39 4    from the initial Waydoo model and putting them directly into

11:40:44 5    the -- into the -- the thing generated a large number of

11:40:48 6    points, mainly as a percent of the product model software.

11:40:51 7    Q.    And if you had ever done that before, taking a model

11:40:54 8    and moving it into AVL --

11:40:55 9    A.    No, normally -- normally you're designing the airfoil

11:40:57 10   yourself.  So, you put in the points you think are important

11:41:01 11   to the -- the points that describe the profile directly.

11:41:05 12   And you typically only put in 45, 50 -- you know, when I

11:41:11 13   design, we specify rudders typically with some 20 points and

11:41:17 14   a nose radius.  The node radius would add another 5 or

11:41:21 15   6 points so we'd have 20 points on each side -- 25 points

11:41:24 16   each side, a total of 50 to define the profile of a rudder.

11:41:29 17   Q.    All right.  Mr. Barry, that wasn't really my

11:41:31 18   question.  Let me just get it out fully and then you can

11:41:33 19   respond.

11:41:33 20   A.    Sure.

11:41:33 21   Q.    So, what I was asking was if you had ever gone

11:41:36 22   through the process of taking a model and putting it into

11:41:39 23   AVL in the past, you would have encountered the error then

11:41:43 24   and you would not have made that same error here; right?

11:41:46 25   A.    No.  Because the -- two of the three -- two of the

353

Barry - Cross

11:41:51  1    three Waydoo models and the MHL model ran successfully by

11:41:57  2    the same process.  Because of whatever the developer of the

11:42:05  3    first model did in the course of defining the surface, it

11:42:09  4    generated an arbitrarily large number of points.

11:42:12  5            I think probably what happened when it was --

11:42:14  6    when he set a variable in his software that determined the

11:42:20  7    panel size, he set it very small to get a nice-looking

11:42:26  8    rendering, and as a result, many, many, many points were

11:42:29  9    generated.  Because the program generates a point each time

11:42:33 10    its cross-section crosses a panel, so in order to have a

11:42:37 11    smooth model, a smooth-looking model, you put many, many,

11:42:42 12    many, many, teeny, teeny, teeny surfaces on a model.

11:42:47 13            That generates a lot of points when you take the

11:42:49 14    cross-section, and I can't imagine they were putting

11:42:54 15    350 points in if I were designing an airfoil, a section.

11:42:59 16    Q.    You also remember that you put the eFoil center of

11:43:01 17    gravity in different spots for the different analyses you

11:43:04 18    did for the different boards?

11:43:05 19    A.    No, no, they -- yes, that's correct.  But I didn't

11:43:08 20    put it there.  The program does.

11:43:13 21    Q.    But you recall Dr. Triantafyllou criticized you for

11:43:15 22    that in your report -- in his report?

11:43:17 23    A.    Well, that -- I recall Dr. Triantafyllou criticizing

11:43:20 24    it, but I don't -- I assume it's because he hasn't read the

11:43:23 25    manual.

Barry - Cross

11:43:24 1   Q.      I'm not asking if you agree with him.  I'm just

11:43:27 2   asking if you --

11:43:27 3   A.      I recall that he did so.

11:43:28 4   Q.      Okay.  And so for the -- just talking about the Flyer

11:43:30 5   the Waydoo Flyer, you put the center of gravity about 2 and

11:43:34 6   a half feet above your -- above your reference point.

11:43:36 7          Do you remember that?

11:43:37 8   A.      Yes.  The problem with the -- when we do -- do the --

11:43:46 9   the eigenvalue -- that's a great value.  You've got to use

11:43:4910   that.  The eigenvalue analysis.  Yes, we put the center of

11:43:5311   gravity at various heights, and the problem is, the main

11:43:5912   problem with that is, is a human being's center of gravity

11:44:0213   is not well defined.  If you look at ISO 1 to 217-1 -- yeah

11:44:1014   -1, which is the international standard for small craft

11:44:1415   stability, a person's center of gravity is defined as being

11:44:1716   at the ankle joint.

11:44:1817          If you look at the various -- some of the

11:44:2218   various flight manuals, you'll see it's defined as being at

11:44:2519   their hip joint roughly, and there's a nice table for it

11:44:2820   that says for a person of a certain weight, the 5th

11:44:3121   percentile person has their center of gravity here and 95th

11:44:3422   percent and so on, and you use those values.

11:44:3723          But the problem is, is that this is a watercraft

11:44:4224   and watercrafts -- and so, we don't know exactly where the

11:44:4725   center of gravity is.  Normally when I analyze watercraft in

Barry - Cross

11:44:52 1   accordance with ISO 1 to 217-1, I put the center of gravity

11:44:57 2   at the ankle joint or alternatively, if they're sitting

11:45:01 3   down, the hip joint.  That's rule.

11:45:04 4          If I am analyzing it with -- analyzing, doing

11:45:07 5   the same analysis in accordance with DDS 079, they always

11:45:12 6   consistently put the joint at the hip joint.  So, I put it

11:45:17 7   in a couple places to see what would happen.

11:45:23 8   Q.    Okay.  So, in your original report, we're talking

11:45:26 9   about now -- and I'm sorry, Mr. Barry.  We don't have a lot

11:45:28 10  of time.  So I'm going ask you to maybe keep your answers a

11:45:31 11  little bit shorter.  Is that okay?

11:45:33 12  A.    Okay.

11:45:34 13  Q.    So, where I was going with this is for the Waydoo

11:45:39 14  Flyer, in your -- and this is your -- just your opening

11:45:42 15  report for one of the boards, you put the Waydoo Flyer

11:45:45 16  center of gravity about 2 and a half feet above your

11:45:47 17  reference point.

11:45:47 18         Do you recall that?

11:45:48 19  A.    That's correct, yes.

11:45:50 20  Q.    Okay.  And for the Waydoo Flyer ONE Explorer, you are

11:45:53 21  put your center of gravity only about 4 inches above your

11:45:57 22  reference point.

11:45:58 23  A.    I -- 4 inches?  I don't think so, but maybe.

11:46:00 24  Q.    Okay.

11:46:00 25         MR. BASANTA:  Can we bring up Slide 41, please?

Barry - Cross

11:46:09  1    BY MR. BASANTA:

11:46:09  2    Q.     So, Mr. Barry, do you recognize this document?

11:46:12  3    A.     Yes.

11:46:12  4    Q.     This is from your opening report, Exhibit 8B.

11:46:17  5    A.     Yes.

11:46:17  6    Q.     It's an analysis of the Flyer ONE Explorer.  We can

11:46:20  7    see that on the left; right?

11:46:21  8    A.     Sure.  Yes.

11:46:22  9    Q.     And you see here that ZGC which is -- CG is center of

11:46:25 10    gravity; right?

11:46:26 11    A.     Yes.

11:46:26 12    Q.     And the Z is direction up from the floor up, for

11:46:31 13    example; right?

11:46:31 14    A.     Yes.

11:46:31 15    Q.     And it says .1.

11:46:33 16    A.     Yes.

11:46:33 17    Q.     Do you see that?

11:46:34 18    A.     Yes.

11:46:34 19    Q.     And that's in meters; right?

11:46:35 20    A.     That's roughly 4 inches.

11:46:38 21    Q.     Right.  So my question then was:  For -- so this is

11:46:41 22    the Flyer ONE Explorer.  We see that you put it at 4 inches

11:46:43 23    above the reference point.

11:46:44 24    A.     Okay.

11:46:45 25    Q.     Okay.  So we've got -- one of the boards is at 2 and

Barry - Cross

| 11:46:47 | 1 | a half feet.  The other board is at 4 inches; right? |

11:46:47  1    a half feet.  The other board is at 4 inches; right?

11:46:49  2    A.    Yes, sir.

11:46:52  3    Q.    And before I forget, you included a model of the

11:46:54  4    Flyer ONE Explorer in your analysis; right?

11:46:56  5    A.    Yes, sir.

11:46:57  6    Q.    I think it's important that we look at that.

11:46:58  7              MR. BASANTA:  So can we bring up Slide 15?

11:46:58  8    BY MR. BASANTA:

11:47:04  9    Q.    Do recognize this image from your opening report,

11:47:07 10    Mr. Barry?

11:47:07 11    A.    Yes, I do.

11:47:08 12    Q.    I'm sorry.  Your answer, sir?

11:47:09 13    A.    Yes, sir.

11:47:10 14    Q.    Okay.  And we see that this is for the Flyer ONE

11:47:13 15    Explorer, correct?

11:47:14 16    A.    Yes.

11:47:15 17    Q.    And do you see the text that says, "AVL origin"?

11:47:18 18    A.    Yes.

11:47:19 19              MR. BASANTA:  Can we go to Slide 16?  We get a

11:47:22 20    better view of that, I think.

11:47:22 21    BY MR. BASANTA:

11:47:26 22    Q.    Do you see the text that says "AVL origin," Mr.

11:47:28 23    Barry?

11:47:29 24    A.    Yes.

11:47:30 25    Q.    That would be the point that you're measuring center

Barry - Cross

11:47:32  1    of gravity from; right?

11:47:33  2    A.    Not necessarily.  That's the point I'm dimensioning.

11:47:37  3    I'm usually going to put the wings in there.  There's an

11:47:39  4    option in the AVL program to shift these centers around.

11:47:42  5              MR. BASANTA:  Can we play clip A, please?

11:47:48  6              THE WITNESS:  One of the models --

11:47:48  7    BY MR. BASANTA:

11:47:48  8    Q.    We're about to play a Clip A.  Mr. Barry, this is

11:47:51  9    from one of your depositions?

11:47:52 10              (Video playing.)

11:47:53 11    Q.    That is Exhibit 8 of your report.

11:47:56 12    A.    Yes, okay.

11:48:01 13    Q.    And now, I want to talk about the Flyer ONE Explorer,

11:48:05 14    which is Exhibit 8B, right?

11:48:09 15    A.    Right.

11:48:14 16    Q.    Okay.  And the first two pages of Exhibit 8B are,

11:48:25 17    again -- we have the board and its dimensions, right?

11:48:28 18    A.    Right.

11:48:29 19    Q.    Okay.  Now, this one actually identifies -- it says

11:48:33 20    AVL origin, right?

11:48:34 21    A.    Right.

11:48:35 22    Q.    And that's -- that would be the point where you're --

11:48:39 23    you're measuring a center of gravity from, right?

11:48:42 24    A.    Right.

11:48:43 25    Q.    Okay.

Barry - Cross

11:48:46  1          (Conclusion of video.)

11:48:47  2     BY MR. BASANTA:

11:48:47  3     Q.     Do you remember getting that question at your

11:48:49  4     deposition, and do you are remember answering it that way?

11:48:51  5     A.     Yes.  Yes.

11:48:51  6     Q.     Okay.  Mr. Barry, but the Flyer, the Waydoo Flyer,

11:48:58  7     which you put the center of gravity at 2 and a half feet, is

11:49:01  8     not 2 feet taller than the Flyer ONE, is it?

11:49:03  9     A.     No.

11:49:05 10     Q.     And you don't explain anywhere in your reports and,

11:49:08 11     again, this is the opening report analysis that we're

11:49:10 12     talking about.  You don't explain anywhere in that report

11:49:13 13     why the essential center of gravity is over 2 feet apart, do

11:49:16 14     you Mr. Barry?

11:49:16 15     A.     It depends on what the -- no.

11:49:19 16     Q.     The question is:  Do you explain it in your reports

11:49:21 17     why the center of gravities are over 2 feet apart centers?

11:49:24 18     A.     No.

11:49:27 19     Q.     And for the Waydoo Flyer ONE Explorer, 4 inches up

11:49:31 20     from the reference point, which is the front of the wing, 4

11:49:33 21     inches up from that reference point would be under water,

11:49:35 22     wouldn't it, Mr. Barry, when the board is operating?

11:49:37 23     A.     Yes, sir.  Yes, sir.

11:49:41 24     Q.     And so after you received Dr. -- one of

11:49:43 25     Dr. Triantafyllou's reports, you redid some of your analyses

Barry - Cross

| | | |
|---|---|---|
| 11:49:46 | 1 | in AVL; right? |
| 11:49:47 | 2 | A.    I did. |
| 11:49:49 | 3 | Q.    But your redo analysis confused things even more, |
| 11:49:52 | 4 | didn't it, Mr. Barry? |
| 11:49:53 | 5 | A.    Well, not to you perhaps, not to me. |
| 11:50:00 | 6 | Q.    One of the other -- one of the things that you |
| 11:50:00 | 7 | changed between your opening report and your redo report is |
| 11:50:08 | 8 | you moved the AVL origin that we just saw; right? |
| 11:50:11 | 9 | A.    Yes. |
| 11:50:11 | 10 | Q.    And -- but you didn't bother to explain that to |
| 11:50:13 | 11 | Waydoo, did you? |
| 11:50:14 | 12 | A.    No.  It's on the drawing. |
| 11:50:18 | 13 |           MR. BASANTA:  Can we play Clip B, please? |
| 11:50:22 | 14 |           (Video playing.) |
| 11:50:27 | 15 | Q.    And when you redid it, to make my confusion even |
| 11:50:31 | 16 | more, was you moved the -- the AVL origin in the redo that |
| 11:50:39 | 17 | you -- |
| 11:50:39 | 18 | A.    Yeah -- |
| 11:50:39 | 19 | Q.    -- in your rebuttal report? |
| 11:50:41 | 20 | A.    Yeah, that is correct. |
| 11:50:42 | 21 | Q.    Did you explain that? |
| 11:50:43 | 22 | A.    Because -- no.  No, I didn't. |
| 11:50:48 | 23 | Q.    Do you remember giving those questions and giving |
| 11:50:50 | 24 | those answers, Mr. Barry? |
| 11:50:52 | 25 | A.    I do. |

Barry - Cross

11:50:52 1    Q.    And you also changed the rider; right?  You sort of

11:50:55 2    alluded to that just a moment ago.

11:50:56 3                In your opening report you put their center of

11:50:58 4    gravity at their hip?

11:50:59 5    A.    That's right.

11:51:00 6    Q.    And in your later report, you put the center of

11:51:02 7    gravity all the way down at their ankles?

11:51:05 8    A.    That's right.

11:51:06 9    Q.    And you didn't bother explain that to Waydoo either

11:51:08 10   in your reports, did you?

11:51:09 11   A.    No.

11:51:13 12   Q.    So Dr. Triantafyllou's review of your work --

11:51:16 13   Dr. Triantafyllou, again, is our expert.

11:51:17 14                His review of your work was based on the

11:51:20 15   information that you provided to Waydoo, wasn't it?

11:51:21 16   A.    Yes.

11:51:24 17   Q.    But you never sent Waydoo the input files that you

11:51:27 18   used in your AVL analysis, did you, Mr. Barry?

11:51:30 19   A.    No.

11:51:32 20   Q.    And we specifically asked you for those files and you

11:51:34 21   still didn't give them to us, did you?

11:51:35 22   A.    I think I remember you asking for it.  I don't know

11:51:38 23   if it was given.

11:51:39 24   Q.    Okay.

11:51:39 25                MR. BASANTA:  Let's play clip D, please.

Barry - Cross

11:51:41  1          (Video playing.)

11:51:43  2   A.     I remember supplying it to.

11:51:47  3   Q.     You said I didn't have the input files.  What are you

11:51:51  4   referring to?

11:51:52  5   A.     Just like I -- like I say, the geometry.  There's a

11:52:01  6   file that says this is what the lengths are and that's --

11:52:03  7   that's what -- you know, the wings are like this and their

11:52:07  8   location and so on.

11:52:08  9   Q.     Yeah.  But that's information that you inputted into

11:52:10 10   the -- into the program regarding the craft; right?

11:52:14 11   A.     Yes.

11:52:16 12   Q.     Okay.  So, do you still have those files?

11:52:20 13   A.     Yes.

11:52:23 14   Q.     Okay.  Is that something you can provide to us?

11:52:25 15   A.     Possibly.  It's up to -- up to counsel.

11:52:32 16          (Video concludes.)

11:52:32 17   BY MR. BASANTA:

11:52:32 18   Q.     Do remember that conversation?

11:52:34 19   A.     Sure.

11:52:35 20   Q.     Do you have any idea whether Waydoo received your

11:52:37 21   input files, Mr. Barry?

11:52:38 22   A.     I do not.

11:52:39 23   Q.     All right.  So setting aside the mistakes that we

11:52:41 24   just saw with AVL software, you still concluded that the

11:52:45 25   Waydoo and LIFT eFoil are statically stable; right?

Barry - Cross

11:52:48  1  A.      Statically stability doesn't involve center of

11:52:55  2  gravity -- the center of gravity of weight.  It's

11:52:55  3  coefficient based.

11:52:56  4  Q.      Right.  So I'm changing gears on you now, Mr. Barry.

11:52:59  5  A.      Yes, I know.

11:53:00  6  Q.      Okay.  It doesn't involve center of gravity any

11:53:02  7  longer?

11:53:02  8  A.      No.

11:53:03  9  Q.      Okay.  So, the question again then is:  You used this

11:53:11 10  AVL software to analyze static stability for both the Waydoo

11:53:14 11  products and the LIFT products?

11:53:16 12  A.      Yes, sir.

11:53:17 13  Q.      And, again, this is the same software you've never

11:53:19 14  used before this litigation?

11:53:21 15  A.      That's correct.

11:53:22 16  Q.      And in your view, when you're using the AVL software,

11:53:26 17  I guess any software to analyze stability, you need to

11:53:29 18  calculate certain values, and you alluded to this earlier,

11:53:31 19  and those values are called stability derivatives?

11:53:34 20  A.      Yes.

11:53:35 21  Q.      Okay.  And the stability derivatives that you need to

11:53:41 22  check are $C_{m0}$, $C_{m-alpha}$  --

11:53:46 23  A.      Mm-hmm.

11:53:46 24  Q.      -- and $C_{mq}$; correct?

11:53:48 25  A.      Correct.  And -- yes.  That's the ones, yes, sir.

Barry - Cross

11:53:51  1    Q.    Those are the ones you have to check; right?

11:53:53  2    A.    Yes.  Those are the ones we've reported.

11:53:54  3    Q.    And you get -- and you get those three values -- the

11:53:57  4    selection of those three values, you get that from the

11:54:00  5    patent itself?

11:54:01  6    A.    Yeah, it gets assigned from the patent.

11:54:06  7    Q.    Those three values are identified in the patent as

11:54:09  8    being the three that you need to check; correct?

11:54:11  9    A.    Yes.

11:54:12 10    Q.    Okay.  But you also give a different standard for

11:54:20 11    stability in your reports in which you need to check a

11:54:23 12    different group of three stability derivatives.

11:54:26 13          Do you remember that?

11:54:26 14    A.    You'd have to refresh my memory, sir.

11:54:30 15    Q.    Okay.  Let's walk through it.

11:54:31 16          MR. BASANTA:  So, can we bring up Slide 42?

11:54:31 17    BY MR. BASANTA:

11:54:35 18    Q.    So, this is -- so, this sentence is where we get $C_{m0}$,

11:54:44 19    $C_{m-alpha}$ , and $C_{mq}$.

11:54:47 20          Do you see them?

11:54:47 21    A.    Yes, sir.

11:54:48 22    Q.    And at the end of that very long sentence --

11:54:50 23          MR. BASANTA:  If we could highlight this,

11:54:51 24    please, Carol.

11:54:51 25    BY MR. BASANTA:

Barry - Cross

11:54:52  1   Q.     At the end of that very long sentence you cite the

11:54:55  2   patent.

11:54:56  3           Do you see that?  It says '044, Column 5,

11:54:59  4   Line 67.

11:55:00  5   A.     Yes, sir.

11:55:00  6   Q.     You wrote a very lengthy thing.

11:55:03  7           So you're citing the patent for the selection of

11:55:05  8   these three variables?

11:55:06  9   A.     Yes.

11:55:09  10  Q.     But then you give a different stability standard in

11:55:14  11  paragraph 95 of your opening report.

11:55:15  12          MR. BASANTA:  Can you bring up Slide 21?

11:55:15  13  BY MR. BASANTA:

11:55:22  14  Q.     Here you say that a stable craft, you have to check

11:55:25  15  $C_{m-alpha}$ , $C_{m-beta}$  and $C_{lp}$ .

11:55:31  16          Do you see that?

11:55:32  17  A.     Yes, sir.

11:55:33  18  Q.     And those three -- that group of three is different

11:55:37  19  than the other group of three that we found in the patent?

11:55:40  20  A.     No, the patent -- the group of three that you -- that

11:55:43  21  you discussed was the pitch stability derivatives.  These

11:55:47  22  are the pitch stability -- the initial pitch stability, that

11:55:53  23  is the tendency for it to return to its initial position

11:55:56  24  pitch.  That's $C_{m-alpha}$ .

11:56:00  25          And the $C_{m-beta}$  is a positive stability

Barry - Cross

11:56:05  1    derivative, that's a different plane than pitch, and a

11:56:08  2    negative roll stability derivative.  So, we are talking here

11:56:13  3    about the craft being stable in -- in -- in -- initially

11:56:18  4    statically stable in pitch, yaw and roll.

11:56:23  5    Q.    And my question is --

11:56:24  6    A.    So that's why they're different, sir, because these

11:56:27  7    three are the static stability derivatives in all three

11:56:34  8    planes of motion.

11:56:36  9    Q.    Okay.  But this sentence doesn't say statically

11:56:39 10    stable craft, does it?  It says a stable craft.

11:56:42 11    A.    Yes, it does.  And a stable craft will have those.

11:56:46 12    It -- in order to be any kind of stable, it has to have

11:56:49 13    these.

11:56:50 14    Q.    All right.  Let me be more simple then.

11:56:53 15          So this just says a stable craft at the

11:56:55 16    beginning of the sentence.

11:56:56 17          Do you see that?

11:56:57 18    A.    Yes, sir.

11:56:57 19    Q.    And at the end of the sentence you don't cite to any

11:57:00 20    sort of textbooks or engineering articles or anything that

11:57:04 21    you're using to rely on to pick these three?

11:57:07 22    A.    No, the patent picks these three.  And in addition,

11:57:10 23    the authoritative texts you discussed -- you've discussed at

11:57:16 24    one point or another --

11:57:17 25    Q.    Okay.

Barry - Cross

11:57:18  1   A.      -- also --

11:57:19  2               MR. BASANTA:  Go to Slide 20.

11:57:23  3               THE WITNESS:  -- use those.

11:57:23  4   BY MR. BASANTA:

11:57:24  5   Q.      So, this is from the patent.  It's out of Column 6.

11:57:28  6               Do you recognize this language?

11:57:29  7   A.      Yes, I do.

11:57:29  8   Q.      You see $C_{m0}$, $C_{m-alpha}$, $C_{mq}$?

11:57:33  9   A.      Uh-huh.

11:57:34 10               MR. BASANTA:  Can we go to Slide 2?

11:57:34 11   BY MR. BASANTA:

11:57:36 12   Q.      And that's what you copied into your report?

11:57:38 13   A.      Okay.  Let's see.

11:57:42 14   Q.      You want to see where you copy that into your report?

11:57:44 15   A.      Yes.  Yes, I did.

11:57:45 16   Q.      Okay.  So all I'm pointing out to you, Mr. Barry, is

11:57:48 17   that you have two different sets of three derivatives.  One

11:57:52 18   of them --

11:57:52 19   A.      No, no.  One of them is the same in both tables.

11:57:56 20   Q.      Granted.  So you have $C_{m0}$, $C_{m-alpha}$  and $C_{mq}$ in one part

11:58:01 21   of your report, a different part of your report you have $C_{1p}$,

11:58:04 22   which is not in the first group.  You have $C_{m-alpha}$, which is

11:58:07 23   in the first group and you've got $C_{m-beta}$, which is not in the

11:58:11 24   first group.

11:58:11 25               Do you see that, Mr. Barry?

Barry - Cross

11:58:12  1    A.      I do.

11:58:17  2            May I explain?

11:58:19  3    Q.      If you do have an explanation, you can ask -- you can

11:58:22  4    get that through Mr. Theuerkauf when he's --

11:58:24  5    A.      Could you -- I'm sorry.  Do you -- can I say it or --

11:58:29  6    I'm not a member of the bar.  What does that mean?

11:58:31  7    Q.      What I'm saying is my time with you is limited.  I

11:58:35  8    have a lot of questions I still have to get through.  If you

11:58:36  9    have further explanations, Mr. Theuerkauf will get up and

11:58:38 10    he'll ask you additional questions.

11:58:39 11            You can do it then.  Okay?

11:58:40 12    A.      Very well, sir.

11:58:43 13    Q.      All right.  So, changing gears again.  We're talking

11:58:46 14    about dynamic stability now.

11:58:47 15    A.      Yes, sir.

11:58:49 16    Q.      And you perform what's known as an eigenvalue

11:58:51 17    analysis?

11:58:51 18    A.      Yes.

11:58:52 19    Q.      And you talked about that a little bit.  And you

11:58:53 20    used -- and you used a software program to do it?

11:58:56 21    A.      Yes, sir.

11:58:56 22    Q.      And, again, that's the same AVL software that you

11:58:58 23    used for static stability?

11:58:59 24    A.      Right.

11:59:00 25    Q.      And the same AVL software you never used before this

Barry - Cross

11:59:02  1    litigation?

11:59:03  2    A.      That's correct.

11:59:04  3    Q.      So let's talk general about eigenvalue themselves.

11:59:08  4    A.      Okay.

11:59:09  5    Q.      Just a little bit.  I'm going do my best not to get

11:59:11  6    too into the weeds on this.

11:59:12  7    A.      It's easy.

11:59:14  8    Q.      So, an eigenvalue is actually a pair of numbers;

11:59:18  9    right?

11:59:19 10    A.      It is.

11:59:19 11    Q.      And engineers use the Greek letters sigma and omega

11:59:23 12    to represent those two numbers?

11:59:24 13    A.      That's correct.

11:59:25 14    Q.      Okay.  And to understand whether a watercraft is

11:59:29 15    stable from the eigenvalue, all you have to do is look at

11:59:32 16    each sigma and if the values are negative that this means

11:59:37 17    they are dynamically stable; right?

11:59:40 18    A.      Yes.

11:59:43 19    Q.      Okay.  And in order for an eFoil to be stable, all of

11:59:47 20    the values need to be negative for sigma; right?

11:59:49 21    A.      Yes.

11:59:52 22    Q.      And that's pretty straight forward.

11:59:53 23            So, in other words, to assess stability from an

11:59:56 24    eigenvalue, you just have to make sure that sigma is a

11:59:59 25    negative number?

Barry - Cross

12:00:00  1    A.      Yes.

12:00:01  2    Q.      Okay.  And conversely if any of the sigma values are

12:00:05  3    positive, that means the craft is dynamically unstable?

12:00:07  4    A.      Yes.

12:00:09  5    Q.      And if the sigma is positive again, the resulting

12:00:12  6    motion grows exponentially, also indicating dynamic

12:00:17  7    instability?

12:00:17  8    A.      Not necessarily exponentially.  No, sir.

12:00:18  9    Q.      Okay.  You wrote an article about -- you wrote an

12:00:26 10    article once about the dynamic stability of a hydrofoil

12:00:29 11    watercraft.

12:00:29 12            Do you remember that?

12:00:30 13    A.      Yes, sir.

12:00:32 14    Q.      Let's take a look --

12:00:33 15    A.      It was actually a technical paper for the FAST

12:00:36 16    conference.  Is that the one you're discussing?

12:00:37 17    Q.      You will see it.

12:00:38 18            MR. BASANTA:  Can you please bring up DTX 316?

12:00:46 19            THE WITNESS:  Oh, yes.

12:00:46 20    BY MR. BASANTA:

12:00:46 21    Q.      Do you recall this paper, Mr. Barry?

12:00:48 22    A.      I do.

12:00:48 23    Q.      And that Christopher D. Barry, that's you?

12:00:51 24    A.      Yes.

12:00:51 25    Q.      And you wrote --

Barry - Cross

12:00:52  1    A.      Brian Duffty, he's actually the lead author.

12:00:55  2    Q.      Okay.  Are you saying you didn't write this paper,

12:00:57  3    Mr. Barry?

12:00:57  4    A.      I did.  Reverend Duffty and I wrote this paper

12:01:00  5    together.

12:01:00  6    Q.      Co-authors.  Got it.

12:01:02  7    A.      Yes.  He's the lead author, I think, on this one.

12:01:05  8    Q.      Okay.

12:01:07  9            MR. BASANTA:  Can you please bring up Slide 43.

12:01:07 10    BY MR. BASANTA:

12:01:12 11    Q.      You see here there's a section for dynamic stability?

12:01:15 12    You see that?

12:01:15 13    A.      Yes, sir.

12:01:16 14    Q.      And this paper is talking about hydrofoil watercraft,

12:01:19 15    is it not?

12:01:20 16    A.      Correct.  Yes, sir.

12:01:21 17    Q.      Okay.  So we see the heading for "Dynamic Stability."

12:01:25 18    And under the heading for "Dynamic Stability" you say, if

12:01:28 19    the real part is positive, meaning if sigma is positive --

12:01:32 20    A.      Mm-hmm.

12:01:32 21    Q.      -- the resulting motion grows exponentially,

12:01:35 22    indicating dynamic instability.

12:01:35 23            Do you see that?

12:01:38 24    A.      Yes, sir.

12:01:38 25    Q.      Those are your words; correct?  Yes?

Barry - Cross

12:01:40 1    A.      Yes, yes.

12:01:40 2    Q.      And I got that right?  If I want to say the real

12:01:42 3    part, you're talking about sigma?

12:01:43 4    A.      Yes.

12:01:45 5    Q.      And if the motion grows exponentially, that means

12:01:47 6    even --

12:01:47 7    A.      Yeah, yeah, that's right, sigma.  Yes, sir.

12:01:51 8    Q.      Okay.  And if the motion grows exponentially, as you

12:01:54 9    say in this paper, that means that even small positive sigma

12:01:58 10   values are going to result in big motions; right?

12:02:00 11   A.      Not necessarily, but yeah -- well, yes.

12:02:07 12   Q.      Okay.

12:02:07 13   A.      Ultimately it's possible.

12:02:08 14   Q.      Okay.  All right.  So we just got through the basics

12:02:13 15   of eigenvalues and what the jury is looking for is whether

12:02:15 16   all values of sigma are less than 0.

12:02:18 17   A.      Yes.

12:02:19 18   Q.      So you created a series of graphs from your

12:02:21 19   eigenvalue analyses.  And we looked at one with

12:02:23 20   Mr. Theuerkauf; right?

12:02:23 21   A.      Yes, I think we looked at three of them.

12:02:25 22   Q.      Okay.  So let's look at another one, or maybe the

12:02:27 23   same one again.

12:02:29 24          MR. BASANTA:  Can you bring up Slide 25?

12:02:29 25   BY MR. BASANTA:

Barry - Cross

12:02:35  1    Q.    And this is from your opening report?  Does it look

12:02:37  2    familiar to you?

12:02:37  3    A.    Yes, sir.

12:02:38  4    Q.    And this is the result from one of your eigenvalue

12:02:40  5    analysis for the Flyer One Explorer.  Do you see that?

12:02:42  6    A.    Yes, sir.

12:02:42  7    Q.    Do you see that on the upper left --

12:02:44  8    A.    Yes.

12:02:44  9    Q.    -- part of the screen?

12:02:47 10          And we see that the horizontal axis at the

12:02:50 11    bottom is labeled with the Greek letter sigma that we've

12:02:52 12    been discussing; right?

12:02:53 13    A.    That's correct.

12:02:55 14    Q.    And when you say that a positive sigma value, you

12:02:58 15    mean -- you're talking about to the right of that 0 line?

12:03:01 16    Do you see that 0 line?

12:03:02 17    A.    Correct.

12:03:04 18    Q.    And that indicates a craft that is dynamically

12:03:07 19    unstable; isn't it?

12:03:08 20    A.    Well, if the -- if the -- if the -- if the sigma

12:03:11 21    value is in the -- in reality, positive, it indicates

12:03:17 22    dynamic stability -- dynamic instability.

12:03:20 23    Q.    Okay.

12:03:20 24          MR. BASANTA:  Can you go to Slide 26.

12:03:20 25    BY MR. BASANTA:

374

Barry - Cross

12:03:26  1   Q.      So what we see here is that that red dot indicates

12:03:32  2   instability; right, Mr. Barry?

12:03:33  3   A.      It indicates instability in the context of the AVL

12:03:38  4   software.

12:03:38  5   Q.      Okay.  And every single one of the eigenvalue

12:03:44  6   analysis that you conducted on the Waydoo eFoils have at

12:03:47  7   least one positive sigma value; right, Mr. Barry?

12:03:50  8   A.      Yes, I think so.

12:03:52  9   Q.      All right.  And, therefore, every one of the Waydoo

12:03:54 10   eFoils that you analyzed is dynamically unstable?

12:03:58 11   A.      No.

12:04:00 12   Q.      Based on the eigenvalue analysis, Mr. Barry?

12:04:02 13   A.      No.  No.  Based on the eigenvalue analysis from AVL,

12:04:07 14   which is operated in infinite air.

12:04:11 15   Q.      Did you pick the AVL software, Mr. Barry, to use?

12:04:14 16   A.      The -- the problem of analyzing hydrofoils in water

12:04:20 17   with a free surface is currently intractable.  I went to a

12:04:25 18   conference in June in which a paper on the -- that involved

12:04:31 19   this -- some of one of the effects of that was presented by

12:04:35 20   a Ph.D. student.  The effects of water are very complicated

12:04:42 21   and generally -- generally reduce these values.

12:04:48 22   Q.      Generally or always?

12:04:49 23   A.      But the -- but there is no -- there is no really good

12:04:53 24   way of doing this, even perhaps not very sophisticated CFD

12:05:00 25   programs, and I do not have that size of a computer.

Barry - Cross

12:05:02  1    Q.    Okay.  So there is no very good way of doing it and

12:05:04  2    you don't have the equipment to do it?

12:05:06  3    A.    Well, we can't predict it exactly in water, but water

12:05:10  4    is -- this involves a damping coefficient, and water has a

12:05:15  5    number of effects that will all reduce the real eigenvalue.

12:05:20  6    AVL produces conservative eigenvalue, not necessarily one in

12:05:27  7    water, because AVL does not understand whether it's in air

12:05:31  8    or water, helium, carbon dioxide, or what.  And it certainly

12:05:35  9    doesn't understand that there is a free surface above it.

12:05:38 10    Both of those produce significant effects.

12:05:40 11    Q.    Sorry, Mr. Barry.  I understand your damping

12:05:43 12    argument.  And you're getting ahead of me.  We're not quite

12:05:46 13    at your damping argument yet.  We're still just talking

12:05:47 14    about the eigenvalues that you conducted analysis of.  Okay?

12:05:49 15    A.    Bear in mind, this is what --

12:05:52 16    Q.    So coming back --

12:05:53 17    A.    This is a conservative estimate of the --

12:05:56 18    conservative estimate of the eigenvalue values.  It isn't

12:05:57 19    the eigenvalues in reality.

12:05:59 20    Q.    Okay.  So this does not reflect reality?

12:06:01 21    A.    No.  This reflects -- this is a conservative estimate

12:06:04 22    of reality.

12:06:05 23    Q.    Okay.  So -- but, again, just to repeat all of the

12:06:08 24    eigenvalue analysis work that you did in your opening

12:06:10 25    report, all of it shows at least one positive value for

376

Barry - Cross

12:06:15  1    sigma indicating instability?

12:06:18  2    A.     Yes, sir.

12:06:19  3    Q.     So you sort of got ahead of me with your damping

12:06:22  4    argument and we can talk about that now.

12:06:24  5           Actually, before we talk about damping, the

12:06:29  6    eigenvalue analyses that you did for the MHL eFoil, that

12:06:33  7    also indicates instability; right?

12:06:35  8    A.     Yes, sir.

12:06:35  9    Q.     All right.  So let's talk about the damping argument

12:06:38 10    that you've got.  So, you think that the motion of an eFoil

12:06:46 11    is damped by effects that are not considered by AVL, as

12:06:50 12    we've just said?

12:06:50 13    A.     Yes.

12:06:51 14    Q.     And you think that the sigma becomes more negative as

12:06:53 15    a result of these damping effects?

12:06:55 16    A.     Yes.  Damping, damping effects, added mass effects,

12:07:06 17    fugar (phonetic) level effects, and the effect of the -- and

12:07:08 18    in the location of the free surface.

12:07:09 19    Q.     We'll talk about some of those.  So, even though

12:07:14 20    your -- in your opening report, every single one of the --

12:07:17 21    the eFoils were indicated to be unstable, you didn't include

12:07:22 22    anything about damping in your opening report, Mr. Barry,

12:07:25 23    did you?

12:07:25 24    A.     Yeah, AVL doesn't have any way of doing damping.

12:07:32 25    Q.     My question, though, is --

377

Barry - Cross

12:07:34  1   A.      No.

12:07:34  2   Q.      -- in your opening report you didn't say anything

12:07:36  3   about these damping effects to Waydoo?

12:07:39  4   A.      No.

12:07:42  5   Q.      And it was only after Waydoo pointed out the

12:07:46  6   instability that you demonstrated that you even bothered to

12:07:49  7   mention raising damping?

12:07:50  8   A.      No.  That's right.

12:07:53  9   Q.      I'm sorry.  What was your answer?

12:07:55 10   A.      I'm sorry.  Could you repeat the question so I can

12:07:57 11   get the answer right?

12:07:57 12   Q.      Sure.  It was only after Waydoo pointed out the

12:08:01 13   instability in your original analysis that you bothered to

12:08:04 14   mention this damping argument for the first time?

12:08:06 15   A.      That's correct.

12:08:08 16   Q.      Your opening report doesn't even acknowledge the

12:08:10 17   positive sigma values in your eigenvalue analysis?

12:08:13 18   A.      It just shows them.  You can see them if you like.

12:08:16 19   Q.      What I'm saying is you didn't comment on the positive

12:08:18 20   values?

12:08:19 21   A.      No.

12:08:22 22   Q.      And then when doing -- when doing your eigenvalues

12:08:28 23   analysis, you calculated -- you calculated actual numbers in

12:08:32 24   your opening report --

12:08:33 25   A.      Yes.

Barry - Cross

12:08:33 1    Q.      -- right?  Those are numbers?

12:08:35 2    A.      Yes.

12:08:35 3    Q.      And then when you redid it in your second time you

12:08:37 4    calculated numbers there again?

12:08:38 5    A.      Yes, sir.

12:08:41 6    Q.      But when you talk about these damping effects in your

12:08:43 7    report, you never thought to quantify them at all, did you,

12:08:45 8    Mr. Barry?

12:08:46 9    A.      I can't quantify them.  It's not -- it's not a

12:08:49 10   tractable problem.  I don't have the -- the computational

12:08:55 11   view doesn't -- doesn't currently exist, as far as I know.

12:08:59 12   Q.      Okay.  So, you did not calculate any quantities for

12:09:03 13   these damping effects?

12:09:04 14   A.      No.

12:09:05 15   Q.      Okay.  So, if you didn't calculate quantities for

12:09:24 16   these damping effects, then you can't really be sure if

12:09:30 17   they're big enough to compensate for the instability that

12:09:33 18   your eigenvalue analysis shows?

12:09:35 19   A.      Well, even damping effects by themselves are very

12:09:37 20   large.  A person of ordinary skill in watercraft understands

12:09:42 21   that all of those effects of water -- water is 800 times as

12:09:47 22   dense as air.  So, the damping effects of water are quite

12:09:53 23   large.  If you take a bucket of air and move it back and

12:09:56 24   forth, it's very easy.  If you take a bucket of water and

12:10:00 25   move it back and forth, it's difficult.  And then there's

379

Barry - Cross

12:10:04  1   fugar love effects from the water waving in the bucket.

12:10:07  2   Q.     And the bowl that you had out before with the water

12:10:10  3   in it, that was an example of that?

12:10:11  4   A.     That's an example of damping.  I don't know if that's

12:10:15  5   fugar -- yeah, that's an example of some of the effects,

12:10:17  6   yes.

12:10:17  7   Q.     And the ball that you used to demonstrate damping, is

12:10:21  8   there anything on the -- any of the eFoils that are shaped

12:10:23  9   like a ball?

12:10:23 10   A.     The -- no, it's worse.

12:10:27 11   Q.     It's worse.  But, just to be clear, nothing on the

12:10:29 12   eFoil was shaped like a ball?

12:10:31 13   A.     No.

12:10:31 14   Q.     And you understand that the eFoil -- when they're

12:10:33 15   moving and you're trying to understand stability and you're

12:10:35 16   trying to calculate damping --

12:10:36 17   A.     Yes.

12:10:37 18   Q.     -- you understand the eFoils are moving at fairly

12:10:39 19   high rates of speed?

12:10:40 20   A.     I understand that.

12:10:42 21   Q.     Back to your damping argument.  When you mentioned it

12:10:46 22   for the first time in the second report that we got of

12:10:49 23   yours, you don't cite to anything there.  You don't cite

12:10:52 24   engineering textbooks, any engineering articles.  You don't

12:10:55 25   cite anything that support and agree with you about this

380

Barry - Cross

12:10:59  1   damping theory that you have; right?

12:11:00  2   A.      No.  Well, no.  But the -- any person of -- any

12:11:04  3   person of ordinary skill in the art is familiar in

12:11:07  4   watercraft is familiar with the issue of damping in the

12:11:11  5   course of ship stability because the damping effect and

12:11:15  6   the -- there are higher -- there are -- in a ship -- in ship

12:11:19  7   stability we have to take into account the added mass.  And

12:11:23  8   that is a large number, a large coefficient that operates

12:11:27  9   against the -- that operates against dynamic instability.

12:11:36 10   Q.      My question was very simply:  Did you provide Waydoo

12:11:39 11   with what you're relying on for your damping theory, in

12:11:42 12   terms of engineering textbooks, engineering articles?

12:11:45 13           Did you do anything like that?

12:11:46 14   A.      Well, we cited principles of naval architecture in

12:11:49 15   the remaining paragraphs which includes -- which discusses

12:11:53 16   the common added mass or -- added the outcome of added mass

12:12:00 17   and damping and the effects on a rudder.

12:12:03 18           MR. BASANTA:  Actually, could we bring up PTX 10

12:12:06 19   first, please?

12:12:09 20   BY MR. BASANTA:

12:12:09 21   Q.      Do you recognize this document, Mr. Barry?

12:12:12 22   A.      I do.

12:12:13 23           MR. BASANTA:  Can you go to the signature page,

12:12:14 24   please?

12:12:14 25   BY MR. BASANTA:

Barry - Cross

12:12:17 1    Q.      This is your reply expert report.  This is the

12:12:20 2    report --

12:12:20 3    A.      Yes.

12:12:20 4    Q.      -- in which you redid your AVL analyses --

12:12:23 5    A.      Uh-huh.

12:12:23 6    Q.      -- and you redid your stability analyses.

12:12:26 7            Is that your signature, Mr. Barry?

12:12:31 8    A.      Yes, sir.

12:12:32 9    Q.      Did you write these words, I did under penalty of

12:12:35 10   perjury --

12:12:35 11   A.      Yes, sir.

12:12:35 12   Q.      -- that all statements made herein are of my own

12:12:38 13   knowledge and are true and correct?

12:12:39 14   A.      Yes, sir.

12:12:40 15   Q.      Okay.

12:12:41 16           MR. BASANTA:  Can you go to Slide 29?

12:12:44 17   BY MR. BASANTA:

12:12:44 18   Q.      We scoured this report, Mr. Barry, and we found all

12:12:47 19   the mentions that you made of this damping theory that you

12:12:50 20   have.  One of them is paragraph 13.

12:12:53 21           Do you see it on the screen?

12:12:54 22   A.      Yes, sir.

12:12:54 23   Q.      Do you cite to any engineering articles or any

12:12:57 24   textbooks or anything that supports your view about this

12:12:59 25   damping theory?

Barry - Cross

12:13:00  1    A.      Yes.  I mean, I did not cite them here, no.

12:13:03  2              MR. BASANTA:  Okay.  Can you go to Slide 30?

12:13:03  3    BY MR. BASANTA:

12:13:06  4    Q.    Here's another paragraph where you talk about your

12:13:08  5    damping theory.  This is again your reply report.

12:13:11  6              There's couple of documents that start with WD,

12:13:13  7    those are case documents, those are Waydoo documents.  You

12:13:16  8    cite some documents for MHL, that's an MHL document.

12:13:19  9              Do you cite any articles, textbooks, anything

12:13:22 10    here that an engineer would understand that you're relying

12:13:25 11    on in this damping theory?

12:13:26 12    A.      No.

12:13:27 13              MR. BASANTA:  Can you bring up Slide 31A?

12:13:27 14    BY MR. BASANTA:

12:13:32 15    Q.    This is also from your reply report, paragraph 54.

12:13:36 16              Again same question:  Do you cite any

12:13:38 17    engineering textbooks, any engineering articles or anything

12:13:41 18    of a scientific nature that supports your damping theory?

12:13:44 19    A.      No.

12:13:47 20              MR. BASANTA:  Slide 31B.

12:13:47 21    BY MR. BASANTA:

12:13:47 22    Q.    This is the last mention that we could find in your

12:13:51 23    report about this damping theory.  And again, no textbooks,

12:13:56 24    no engineering articles, no scientific papers of any kind;

12:13:59 25    right, Mr. Barry?

383

Barry - Cross

12:14:00 1    A.      No.

12:14:02 2    Q.      So, is it possible -- and I'm hoping for the short

12:14:07 3    vision of this answer, Mr. Barry, respectfully.

12:14:09 4            Is it possible that the supposed damping effects

12:14:12 5    can actually worsen stability?

12:14:14 6    A.      No.  Absolutely not.

12:14:15 7    Q.      Okay.  Okay.  You also say one of these damping -- as

12:14:20 8    part of your damping theory that if the watercraft rolls

12:14:23 9    enough, that one tip of the wing will emerge and that side

12:14:26 10   will lose substantial lift, which will provide a restoring

12:14:30 11   moment to the craft; right, Mr. Barry?

12:14:32 12   A.      Yes.

12:14:33 13   Q.      And what you mean is that if the wings -- if the

12:14:36 14   eFoil's wing comes out of the water, it will absolutely,

12:14:39 15   without any question, help stabilize the craft.  That's what

12:14:43 16   you're saying?

12:14:43 17   A.      That's correct.

12:14:44 18   Q.      Okay.  And what if the propeller comes out of the

12:14:47 19   water, will that enhance stability?

12:14:49 20   A.      No.  Probably not.

12:14:51 21   Q.      Okay.

12:14:51 22   A.      I don't know -- I didn't evaluate the effect of the

12:14:56 23   propulsion system.

12:14:57 24   Q.      Okay.  All right.  Changing gears again.

12:14:59 25           You've got another set of opinions about

Barry - Cross

12:15:01  1   assessing the stability of an eFoil.  And I believe that you

12:15:06  2   said that you can make -- what you said is a positive

12:15:08  3   determination about whether an eFoil is stable just from

12:15:11  4   seeing a video of it being ridden.

12:15:14  5              Do you remember that?

12:15:14  6   A.    Yes, sir.

12:15:14  7   Q.    You stand by that opinion?

12:15:16  8   A.    I'm sorry?

12:15:17  9   Q.    Do you stand by that opinion?

12:15:18 10   A.    Yes, sir.

12:15:19 11   Q.    Okay.  And you also believe that if you have just a

12:15:23 12   video, you don't need to do any mathematical calculations in

12:15:26 13   order to determine stability?

12:15:27 14   A.    That's correct.

12:15:29 15   Q.    And when you first -- I'm sorry?

12:15:30 16   A.    That is my opinion.

12:15:31 17   Q.    Okay.  And when you first shared that opinion about

12:15:34 18   the determining stability from a video alone, you didn't

12:15:37 19   cite anything again, no textbooks, no engineering articles,

12:15:41 20   no scientific papers.  You cited nothing; right?

12:15:44 21   A.    Right.

12:15:55 22   Q.    And when you're trying to determine stability from

12:15:57 23   watching a video alone, you're looking for whether the

12:16:00 24   operator is standing essentially still and not needing to

12:16:04 25   make any control inputs; right?

Barry - Cross

12:16:05 1    A.      That's correct.

12:16:06 2    Q.      Okay.  And in doing that, you're not looking for

12:16:08 3    anything other than what you would call necessary operator

12:16:11 4    movement; right?

12:16:12 5    A.      That's right.

12:16:13 6    Q.      Okay.  And just to be clear, that's the only thing

12:16:16 7    you're looking for?

12:16:16 8    A.      Yes.

12:16:17 9    Q.      Okay.  And you could tell necessary movements from

12:16:20 10   unnecessary movements by seeing if a rider is able to

12:16:23 11   operate for a small period of time without any movement at

12:16:27 12   all?

12:16:27 13   A.      Yes.  I believe that's Dr. Triantafyllou's argument.

12:16:31 14   He introduces a sack of potatoes.

12:16:33 15   Q.      So you're saying that's not your argument?

12:16:36 16   A.      It may be, but I am responding to his comment.

12:16:40 17           MR. BASANTA:  Clip.

12:16:40 18           THE COURT:  Excuse me?

12:16:41 19           MR. BASANTA:  Clip.

12:16:42 20           (Video playing.)

12:16:48 21   Q.      Well, let's say it's going in a straight line and

12:16:51 22   there's movement.  The person moves, it's going in a

12:16:55 23   straight line, is that -- that means, in your opinion, that

12:17:01 24   it's not stable?

12:17:02 25   A.      Is the movement necessary?  If he's waving his hands,

386

Barry - Cross

12:17:06  1    ,that's not a control -- a control input, is it.

12:17:10  2    Q.    But that's -- that's -- yeah.  I'm asking you,

12:17:13  3    Mr. Barry, whether or not the movement -- how do you make a

12:17:16  4    determination as to whether or not that movement was

12:17:18  5    necessary?

12:17:19  6    A.    Because if they -- if they have been able to operate

12:17:25  7    for -- for a small period of time without any movement at

12:17:31  8    all, then -- then it's stable.

12:17:34  9          (Conclusion of video.)

12:17:36 10    BY MR. BASANTA:

12:17:37 11    Q.    Do you remember giving that answer, Mr. Barry?

12:17:38 12    A.    Yes, sir.

12:17:38 13    Q.    If they're able to operate for a small period of time

12:17:41 14    that means it's stable?

12:17:41 15    A.    Yes, sir.

12:17:42 16    Q.    But a small period of time, that doesn't have any

12:17:46 17    particular meaning to you.  Does it, Mr. Barry?

12:17:48 18    A.    It doesn't, no.  It's a small period of time.

12:17:52 19    Various numbers have come up in the course of this.

12:17:54 20    Q.    Okay.  Let's take a listen to those various numbers?

12:17:57 21          MR. BASANTA:  Can you play Clip J?

12:17:58 22          (Video playing.)

12:18:01 23    Q.    You when you say a small period of time --

12:18:04 24    A.    Well, because at some point -- a human being can't

12:18:08 25    stay completely stationary.

387

Barry - Cross

12:18:11 1   Q.    Okay.  But you say operate for a small period of

12:18:13 2   time.  So what is your -- how do you quantify a small period

12:18:17 3   of time?

12:18:17 4   A.    Perhaps a few minutes or -- it -- it all depends.

12:18:28 5   It's the -- no, it doesn't depend on anything.  It depends

12:18:31 6   on the rider.

12:18:32 7        A rider can't -- a person can't remain

12:18:36 8   motionless.  But if they can remain essentially motionless

12:18:44 9   for a -- for a reasonable period of time, minutes maybe,

12:18:48 10  then the craft is as -- the question is:  Are the controls

12:18:55 11  fixed?  Does it maintain a stable -- an equilibrium position

12:19:02 12  for a reasonable period of time, even -- even 20 or

12:19:05 13  30 seconds?

12:19:06 14  Q.    Okay.  So you're telling me that you can look at the

12:19:11 15  video and if the rider moves, then you have to make a

12:19:18 16  determination as to whether that was necessary movement or

12:19:20 17  not; right?

12:19:21 18  A.    No, sir.  If the -- if the rider doesn't have to

12:19:27 19  move, if the rider remains stationary for a little while, he

12:19:29 20  can wave his arms in the air and he can do a variety of

12:19:33 21  different things, but if he -- if he does not have to --

12:19:38 22  have to make a control input, which is to say move his body

12:19:41 23  so as to shift his weight for -- for a reasonable period of

12:19:48 24  time, a few -- any -- perhaps a minute, something like that,

12:19:51 25  then the thing has control fixed stability.  It's not that

Barry - Cross

12:19:55 1  complicated, counsel.

12:19:56 2              (Conclusion of the video.)

12:19:57 3  BY MR. BASANTA:

12:19:57 4  Q.     Do you recall giving that answer, Mr. Barry?

12:19:59 5  A.     What?

12:19:59 6  Q.     Do you recall giving that answer, Mr. Barry?

12:20:02 7  A.     Yes, I do.

12:20:02 8  Q.     And just to recap.  The phrases that I heard in that

12:20:06 9  clip were perhaps a few minutes, then it all depends, then

12:20:11 10 for a reasonable period of time, then you went back to

12:20:14 11 minutes maybe, then back to for a reasonable period of time,

12:20:18 12 then you said even 20 or 30 seconds and then you went back

12:20:22 13 again to a reasonable period of time, and you said a little

12:20:25 14 while, and then, I think, finally you said perhaps a minute,

12:20:28 15 something like that.

12:20:28 16             Do you remember -- did you hear all those?

12:20:29 17 A.     I did.

12:20:30 18 Q.     Okay.  This method that we've been -- you've been

12:20:37 19 telling me about is it scientific in your view?

12:20:39 20 A.     Actually, there is a -- a method which is very

12:20:44 21 similar to this that is regarded as accurate for predicting

12:20:49 22 ship stability and it essentially is very similar.

12:20:53 23 Q.     But whatever support you have for what you just told

12:20:56 24 me now is not anywhere in your report?

12:20:58 25 A.     No.

Barry - Cross

12:20:59 1    Q.      Okay.

12:21:00 2    A.      It's known among persons of skill in the art.

12:21:04 3    Q.      Right.  But again, you didn't find any engineering

12:21:07 4    textbooks, scientific papers that support what you're

12:21:11 5    claiming is the view of the person of ordinary skill; right?

12:21:14 6    A.      I don't cite any.

12:21:15 7    Q.      Correct.  So, the smallest period of time that we

12:21:18 8    heard in that answer was 20 or 30 seconds.

12:21:21 9            Do you remember that?

12:21:22 10   A.      Perhaps, yeah.  Yeah, I believe that was what you

12:21:25 11   said.

12:21:25 12   Q.      Okay.  So, also in your reporting, you purport to --

12:21:33 13   you actually say that you looked at videos of a Waydoo eFoil

12:21:37 14   in motion --

12:21:38 15   A.      Yes.

12:21:38 16   Q.      -- and that you determined from those videos that the

12:21:41 17   Waydoo eFoils are stable.

12:21:42 18           Do you remember that?

12:21:43 19   A.      Yes, sir.

12:21:43 20   Q.      Okay.  And I'm going to play clips from the video

12:21:48 21   that you cited.

12:21:49 22   A.      Mm-hmm.

12:21:50 23   Q.      You said you can determine if they're stable or not

12:21:53 24   from the video alone.

12:21:55 25           MR. BASANTA:  Can we play Clip K, please?

Barry - Cross

| | | |
|---|---|---|
| 12:21:57 | 1 | This is the video, it's excerpts. |
| 12:22:01 | 2 | (Video playing.) |
| 12:22:50 | 3 | BY MR. BASANTA: |
| 12:22:51 | 4 | Q.    Do you recall having seen that video, Mr. Barry? |
| 12:22:52 | 5 | A.    Yes, sir. |
| 12:22:53 | 6 | Q.    This is the video you relied on to make a positive |
| 12:22:56 | 7 | determination of stability of the Waydoo products; yes? |
| 12:22:59 | 8 | A.    Yes, sir.  One of them. |
| 12:23:00 | 9 | Q.    I'm sorry? |
| 12:23:00 | 10 | A.    One of them.  I watched many Waydoo videos. |
| 12:23:05 | 11 | MR. BASANTA:  Okay.  Can we please bring up |
| 12:23:07 | 12 | PTX 102? |
| 12:23:07 | 13 | BY MR. BASANTA: |
| 12:23:14 | 14 | Q.    This is the opening report that we saw before. |
| 12:23:15 | 15 | MR. BASANTA:  Can you go to page 30, looking for |
| 12:23:18 | 16 | paragraph 94.  Can you blow up paragraph 94, please? |
| 12:23:28 | 17 | THE WITNESS:  Yes. |
| 12:23:29 | 18 | MR. BASANTA:  I'm sorry, Mr. Barry.  I was -- |
| 12:23:30 | 19 | THE WITNESS:  Sorry. |
| 12:23:31 | 20 | MR. BASANTA:  -- talking to my team. |
| 12:23:31 | 21 | BY MR. BASANTA: |
| 12:23:32 | 22 | Q.    So, this is the paragraph that you cite the video. |
| 12:23:35 | 23 | A.    Okay. |
| 12:23:36 | 24 | Q.    You see the first thing is called Waydoo's YouTube |
| 12:23:39 | 25 | Channel. |

Barry - Cross

12:23:39 1           Do you see that?

12:23:40 2    A.     Yes, sir.

12:23:40 3    Q.     The next thing is the video that we watched.  So all

12:23:43 4    I see here is a single video that you cite, Mr. Barry.

12:23:48 5    A.     Yes.

12:23:49 6    Q.     Okay.  So going back to the -- talking about the clip

12:23:52 7    again, we didn't see anyone riding a board for more than two

12:23:56 8    or three seconds, did we?

12:23:57 9    A.     That's -- the clip was only what, 45 seconds long.

12:24:01 10   Q.     But it was a clip you chose?

12:24:03 11   A.     Yes.

12:24:03 12   Q.     It was a clip from which you determined -- positive

12:24:06 13   determination as to stability from that clip.

12:24:08 14   A.     I believe you've cut that back.  The actual -- I

12:24:12 15   recall the actual website ran longer than that.

12:24:15 16   Q.     The video ran longer.  We took excerpts to remove the

12:24:20 17   interview segments.  There were interview segments

12:24:23 18   interspersed with clips of people riding boards.

12:24:26 19           Do you remember that?

12:24:26 20   A.     Yes.

12:24:28 21   Q.     So we isolated all of the clips of a person riding a

12:24:31 22   board.  Do you have any reason to doubt me?

12:24:32 23   A.     I'm not going to comment on your -- on whether I

12:24:39 24   can -- whether I doubt you or not.

12:24:40 25   Q.     Okay.  Well, I will represent to you, Mr. Barry, as

Barry - Cross

12:24:42  1    an officer of the Court, as a lawyer in the state of New

12:24:46  2    Jersey and New York --

12:24:46  3                    THE COURT:  All right.  So, Mr. Basanta, you're

12:24:48  4    not supposed to be testifying.  So...

12:24:51  5                    MR. BASANTA:  Fair enough.

12:24:52  6                    THE COURT:  Move along.

12:24:53  7                    MR. BASANTA:  Fair enough.

12:24:54  8    BY MR. BASANTA:

12:24:54  9    Q.    So, Mr. Barry, we looked at that video.  Did you see

12:24:56 10    a clip that ran for more than two or three seconds?

12:24:59 11    A.    No.  Probably -- probably I think I counted out 20.

12:25:04 12    Q.    You counted 20 seconds?

12:25:05 13    A.    I might have, yeah.  I think I did.

12:25:07 14                    MR. BASANTA:  Okay.  Can we play the clip --

12:25:08 15                    THE WITNESS:  I'll have -- I mean, I'll -- I

12:25:10 16    will -- I will stipulate that it was.  Can I say that?

12:25:14 17                    THE COURT:  That's not --

12:25:15 18                    THE WITNESS:  I'm sorry.

12:25:16 19                    THE COURT:  You can agree.

12:25:16 20                    THE WITNESS:  I haven't passed the bar exam yet.

12:25:20 21    Yes, I'll agree with you that none of the videos ran for a

12:25:24 22    significant length of time.

12:25:25 23    BY MR. BASANTA:

12:25:26 24    Q.    Okay.  But my question was none of them ran for more

12:25:28 25    than two or three seconds; right?

Barry - Cross

12:25:31  1   A.      I think it's longer than that, but I'll agree with

12:25:34  2   you.

12:25:34  3   Q.      I can play the clip again, Mr. Barry, and you can

12:25:37  4   count.

12:25:37  5   A.      No, I'll agree with you for now.  Yeah.

12:25:40  6   Q.      So when you said 20 seconds, you were incorrect?

12:25:42  7   A.      Oh, I am not -- I don't know for sure.  I  -- I was

12:25:47  8   counting it out and I'm not sure and I'll agree with you --

12:25:50  9               MR. BASANTA:  Play it again, please.

12:25:51 10               THE WITNESS:  -- that it might have been two or

12:25:52 11   three seconds.

12:25:52 12   BY MR. BASANTA:

12:25:52 13   Q.      We're going to play the clip again.  Just pay

12:25:54 14   attention to the length of each scene.

12:25:57 15   A.      You have a timer on it?

12:26:00 16   Q.      Just count, Mr. Barry.

12:26:01 17               (Video playing.)

12:26:22 18               THE WITNESS:  Could you go back to the beginning

12:26:24 19   of this, I guess?

12:26:31 20               The beginning of where the -- where the guy

12:26:33 21   was -- the bald guy starts out.

12:26:36 22               MR. BASANTA:  We've done that.

12:26:37 23               (Video playing.)

12:26:55 24               THE WITNESS:  That's -- okay.

12:27:16 25   BY MR. BASANTA:

394

Barry - Cross

12:27:18  1    Q.    Okay.  So we didn't see anyone riding for more than

12:27:21  2    two or three seconds, did we?

12:27:22  3    A.    Yeah, yeah, I counted out eight seconds, a change

12:27:26  4    of -- change of views and then same rider for another four

12:27:29  5    seconds.

12:27:29  6    Q.    So each scene was not more than two or three seconds;

12:27:32  7    right, Mr. Barry?

12:27:33  8    A.    No, one scene was eight seconds where the bald -- the

12:27:36  9    bald rider ran about eight seconds, cut away for a second,

12:27:40 10    and then we saw him continuing for another four seconds.

12:27:43 11    Q.    So you can assess stability from eight-second clips

12:27:48 12    all strung together?

12:27:49 13    A.    Well, if you look at the way it's running, he's not

12:27:53 14    moving at all.  He's not moving at all, so...

12:27:56 15    Q.    Not moving at all.  Okay.  Some of the clips we saw

12:27:59 16    were in slow motion, weren't they?

12:28:01 17    A.    Well, some of the clips were.

12:28:02 18    Q.    And the standard that you had mentioned, we had

12:28:04 19    talked about the amount of time that you needed to assess

12:28:06 20    stability.  The minimum time --

12:28:07 21    A.    Yes, I did -- I said that was -- I didn't include the

12:28:10 22    small -- the slow motion portion of the clip.  I stopped at

12:28:13 23    eight seconds.  It cut to the slow motion.

12:28:16 24    Q.    Eight seconds?

12:28:17 25    A.    It restarted, and I got -- I counted four seconds

Barry - Cross

12:28:21   1   further.  They cut to something else and then cut back to

12:28:25   2   the same rider at a later time.

12:28:28   3   Q.     Okay.  But the -- when you define what a small period

12:28:30   4   of time was, the smallest period of time you mentioned was

12:28:33   5   20 seconds, wasn't it?

12:28:34   6   A.     Yes.

12:28:36   7   Q.     Okay.  So -- so even after this discussion that we're

12:28:39   8   having right now, you still think that you can determine

12:28:42   9   whether an eFoil is stable just from watching a video of it;

12:28:45  10   right?

12:28:45  11   A.     Yes.

12:28:45  12   Q.     So let's watch another few clips, I guess.

12:28:49  13             MR. BASANTA:  Clip L, please.

12:28:51  14             (Video playing.)

12:28:51  15   BY MR. BASANTA:

12:29:34  16   Q.     None of those riders could maintain equilibriium,

12:29:37  17   could they?

12:29:38  18   A.     Did you cut the sound out, I believe?

12:29:38  19   Q.     Yes.

12:29:39  20   A.     This was a training video and discussed exactly how

12:29:42  21   to learn to ride.  Didn't I -- didn't this -- wasn't this a

12:29:44  22   training video that discussed how you learn to ride?

12:29:47  23   Q.     Mr. Barry, the question is:  Are the eFoils that you

12:29:51  24   see in that video, are they stable?

12:29:53  25   A.     They are.

Barry - Cross

| | | |
|---|---|---|
| 12:29:55 | 1 | Q.    They are? |
| 12:29:55 | 2 | A.    Yes, they are. |
| 12:29:56 | 3 | Q.    Okay.  But I saw a lot of sea crashes.  I saw a lot |
| 12:30:00 | 4 | of people not able to maintain their equilibrium.  I saw a |
| 12:30:04 | 5 | lot of people falling in the water. |
| 12:30:06 | 6 | A.    Yes. |
| 12:30:06 | 7 | Q.    Okay.  Do you know who's eFoil that is? |
| 12:30:08 | 8 | A.    No, I don't. |
| 12:30:09 | 9 |       MR. BASANTA:  Okay.  Can we play clip M, please? |
| 12:30:12 | 10 |       (Video playing.) |
| 12:30:19 | 11 |       THE WITNESS:  Yeah, I'm not sure. |
| 12:30:40 | 12 | BY MR. BASANTA: |
| 12:30:41 | 13 | Q.    Again, a number of sea crashes in that video, |
| 12:30:43 | 14 | Mr. Barry.  Did you see those? |
| 12:30:44 | 15 | A.    Those are technically -- most of those aren't |
| 12:30:47 | 16 | technically sea crashes, sir. |
| 12:30:48 | 17 | Q.    But the person crashed into the water; right? |
| 12:30:50 | 18 | A.    The person fell into the water, yes. |
| 12:30:52 | 19 | Q.    Okay. |
| 12:30:52 | 20 | A.    The sea crash is something quite different. |
| 12:30:54 | 21 | Q.    Okay.  And based on just this video alone without any |
| 12:30:57 | 22 | other evidence, is that board stable, or is that board not |
| 12:31:00 | 23 | stable? |
| 12:31:00 | 24 | A.    That's not the only evidence we're looking at, sir. |
| 12:31:03 | 25 | Q.    My question though, is -- |

Barry - Cross

12:31:04 1    A.    We're talking about a preponderance of the evidence,

12:31:06 2    I believe.

12:31:06 3    Q.    I'm not asking you about anything about infringement,

12:31:10 4    Mr. Barry.

12:31:10 5    A.    No.  I'm just saying you've asked me whether or not

12:31:12 6    that video alone shows it.  And we are talking about a

12:31:20 7    preponderance of evidence, not one video, meaning several

12:31:24 8    videos, the manual, and various -- various other

12:31:29 9    discussions.

12:31:29 10   Q.    Okay.  I understand what you -- the collection of

12:31:32 11   evidence that you think you have for infringement.  And I'm

12:31:34 12   not asking you about that.

12:31:35 13   A.    Well, I'm not talking about infringement.  I'm -- so,

12:31:37 14   we're sticking on stability right now.

12:31:39 15   Q.    Mr. Barry, you testified earlier that you can

12:31:42 16   determine -- make a positive determination as to stability

12:31:45 17   from just looking at a video.  That is your view, sir.

12:31:49 18   That's what you've explained to the jury.

12:31:51 19         Now I'm asking you, based on this video alone,

12:31:54 20   whether that board is stable or unstable.

12:31:56 21   A.    I believe it still shows it's stable.  The person is

12:32:00 22   overcontrolling the board because they're not used to it

12:32:02 23   initially.  When you see the rider initially start with

12:32:06 24   that -- one of the last riders, he moves back too far.  He

12:32:11 25   only moves -- it's only necessary to move an inch or two.

Barry - Cross

12:32:14  1   He moves back too far.  Then he moves forward too far.

12:32:19  2   Q.     So --

12:32:19  3   A.     So, he is not -- when I first got my bicycle

12:32:25  4   Christmas morning, I got on the bicycle and went downhill.

12:32:27  5   I overcorrected, and I ended up in the rose bushes in front

12:32:30  6   of the Lutheran church.  That was not because the bicycle

12:32:33  7   was unstable.  It was because I had never ridden a bicycle

12:32:36  8   before.

12:32:37  9   Q.     So the skill of the rider is an important component

12:32:39 10   when you're assessing these videos?

12:32:41 11   A.     The rider can make the vessel unstable by improperly

12:32:46 12   controlling the vessel -- the vehicle.  Actually if you put

12:32:49 13   a bicycle -- if you put a weight on the bicycle and shove

12:32:52 14   it, it usually is stable.

12:32:54 15   Q.     Okay.  So what we're saying is if this rider was more

12:32:57 16   experienced and was more skilled at riding that thing, it

12:33:01 17   would have looked more stable on the video?

12:33:03 18   A.     No.  I'm saying that if the rider were not accidently

12:33:08 19   on -- accidently through lack of his skill overcontrolling

12:33:13 20   the vehicle, he would -- it would be stable.  If he were --

12:33:18 21   if he got up on flight and became a sack of potatoes, then

12:33:24 22   it would be stable.  He is overcontrolling the thing because

12:33:28 23   he's not steady on his feet.

12:33:31 24   Q.     I think we're saying the same thing, Mr. Barry.  His

12:33:34 25   skill level --

Barry - Cross

12:33:34  1    A.      No, his skill -- you're talking about the skill level

12:33:36  2    to prevent the craft from being -- from going unstable.

12:33:41  3             I'm talking about skill level to intentionally,

12:33:44  4    to not control the craft so it becomes unstable.  If you are

12:33:49  5    driving a car, it's stable.  If you suddenly turn the wheel

12:33:53  6    hard, you'll run into the ditch.  That turning the wheel

12:33:56  7    hard didn't make the car unstable.  It's your fault.

12:34:07  8             MR. BASANTA:  Okay.  Let's look at two more

12:34:10  9    clips, please.  Clip O.

12:34:10 10    BY MR. BASANTA:

12:34:16 11    Q.      So, again, Mr. Barry, the question is going to be:

12:34:19 12    Based on this video alone, is this craft stable?

12:34:23 13             (Video playing.)

12:34:31 14             THE WITNESS:  There he goes.  He's -- there you

12:34:34 15    had a couple -- a fraction, a few minutes.  Not bad.  He's

12:34:48 16    doing nicely there.  He's doing nicely there.  You cut away

12:34:52 17    from it to -- you cut away from any -- any further -- any

12:34:57 18    further him riding, or someone did.  Here he goes again.

12:35:02 19    He's riding along there.

12:35:03 20             Okay.  He's still -- he's -- he hasn't quite

12:35:06 21    gotten used to where he needs to be, but there he is.  He's

12:35:09 22    pretty much got it.  He's -- he's pretty much on the bubble.

12:35:13 23    BY MR. BASANTA:

12:35:13 24    Q.      So did we see any clip that lasted for more than two

12:35:17 25    or three seconds?

Barry - Cross

12:35:18  1    A.      Well, actually it looks like some of them were cuts

12:35:21  2    from one angle to another of the same ride.

12:35:25  3    Q.      Okay.  Let's --

12:35:28  4    A.      If it lasts more than -- for more than two seconds,

12:35:32  5    we call the artistic decisions and -- the artistic decisions

12:35:35  6    of the person who is the videographer.  Someone thought he

12:35:38  7    was a big deal film maker.

12:35:42  8    Q.      So -- but that's not enough time for you to really

12:35:45  9    assess stability if the clips are too short; right?

12:35:49 10    A.      I don't -- I think if you look at the clips, the clip

12:35:51 11    in its entirety you can see that the craft is reasonably

12:35:54 12    stable even though the individual in question is just

12:35:56 13    learning how to ride.

12:36:02 14    Q.      Let's talk now about weight-shift control.  Okay?

12:36:06 15    A.      Okay.

12:36:08 16    Q.      So, weight-shift control -- controlled means the same

12:36:11 17    thing as no movable components or steering systems; right?

12:36:14 18    A.      I'm sorry.  No -- no input from the steering system?

12:36:18 19    Is that what you said?

12:36:19 20    Q.      Weight-shift controlled means the same thing as no

12:36:21 21    movable components and no movable -- no steering systems;

12:36:24 22    right?

12:36:25 23    A.      That's correct.  Well, no.  It means that the control

12:36:30 24    is by weight shift.  It implies no movable -- it also

12:36:33 25    would -- or imply no movable components.

Barry - Cross

12:36:38 1   Q.      So, does weight-shift control mean the same thing as

12:36:40 2   no movable components or steering systems?

12:36:42 3   A.      Yes, it does.

12:36:44 4   Q.      Okay.  And in your opinion, the Waydoo eFoils are

12:36:50 5   weight-shift controlled; right?

12:36:51 6   A.      Yes.

12:36:53 7   Q.      And, again, just to get a little more detail on this.

12:36:55 8   So when the user shifts their weight, the center of gravity

12:36:58 9   of the device moves, which would result in the floatation

12:37:01 10  device moving; right?

12:37:02 11  A.      Yes.

12:37:03 12  Q.      Okay.  So, as I understand it, when the user shifts

12:37:07 13  their weight, it's the same as the person moving their

12:37:10 14  center of gravity such that the board moves?

12:37:12 15  A.      Most likely, yes.

12:37:14 16  Q.      Okay.  So when the person -- when the rider moves

12:37:17 17  their weight, the whole system, meaning the board and the

12:37:20 18  rider, it's all going to move?

12:37:21 19  A.      The center of gravity of the whole system moves, yes,

12:37:25 20  sir.

12:37:25 21  Q.      Okay.  So before we move on, I just want to show you

12:37:28 22  a still image from the video that you relied on to determine

12:37:32 23  stability.

12:37:32 24          MR. BASANTA:  Can we go to Slide 36, please?

12:37:32 25  BY MR. BASANTA:

Barry - Cross

12:37:37 1   Q.     So this image is from the video that you relied on

12:37:40 2   to -- to make a positive determination as to stability of

12:37:42 3   the Waydoo products.

12:37:43 4          Do you remember that?

12:37:44 5   A.     Yes, sir.

12:37:44 6   Q.     So, this still image is from about three minutes and

12:37:48 7   40 seconds into the video.

12:37:49 8          We see the rider leaning quite a bit, don't we?

12:37:52 9   A.     Yes.

12:37:52 10  Q.     But just to confirm, the Waydoo eFoil is weight-shift

12:37:55 11  controlled, in your view?

12:37:56 12  A.     Yes, sir.

12:37:57 13  Q.     Okay.  So, one of the patent claims requires that the

12:38:02 14  device be controlled solely by weight shift of the user.

12:38:05 15         Do you recall that?

12:38:05 16  A.     Yes, sir.

12:38:06 17         MR. BASANTA:  Can we bring up Slide 37?

12:38:06 18  BY MR. BASANTA:

12:38:08 19  Q.     So, this is Claim 1 of the '044 patent.  And I've

12:38:12 20  highlighted "controlled solely" and then it goes on

12:38:15 21  "controlled solely by weight shift of the user."

12:38:17 22         And using the world solely means that you have

12:38:20 23  to shift your weight because there are no control surfaces

12:38:23 24  and the like, which we just talked about?

12:38:25 25  A.     Yes, sir.

Barry - Cross

12:38:26 1    Q.    An example of control surface would be like a boat

12:38:28 2    rudder or something along those lines?

12:38:30 3    A.    Yes, sir.

12:38:32 4    Q.    Okay.  That's all I have to ask you about Claim 1 of

12:38:35 5    each patent.  So, let's talk now about Claim 2.

12:38:40 6          Claim 2 requires a few things, one of which is a

12:38:42 7    motor speed controller.

12:38:43 8          Do you recall that?

12:38:43 9    A.    Yes, sir.

12:38:44 10         MR. BASANTA:  And can we have Slide 38 real

12:38:47 11   quick?

12:38:47 12   BY MR. BASANTA:

12:38:48 13   Q.    And your opinion is that the Waydoo eFoils have a

12:38:50 14   motor speed controller; right?

12:38:52 15   A.    Yes.

12:38:53 16   Q.    And motor speed controls were known to persons of

12:38:55 17   ordinary skill before October 2013?

12:38:57 18   A.    I'm sorry.  I didn't catch the last.

12:38:59 19   Q.    Sure.  Motor speed --

12:39:01 20   A.    My wife keeps bugging me to get a hearing aid.

12:39:04 21   Q.    I will repeat my question.  No worries, Mr. Barry.

12:39:06 22         So, motor speed controls were known to persons

12:39:09 23   of ordinary skill before October 2013, were they not?

12:39:11 24   A.    Yes.

12:39:12 25   Q.    Okay.  So, there's nothing new then in Claim 2, is

Barry - Cross

12:39:14  1   there?

12:39:14  2   A.    I don't -- I'm not going to -- I don't know whether

12:39:21  3   that means that -- I don't know.  I'm not -- I'm not a

12:39:25  4   lawyer.  I don't really know what that means exactly.

12:39:27  5   Q.    What did I say that you don't understand, Mr. Barry?

12:39:31  6   A.    Well, the motor speed controllers exist.  Is that

12:39:33  7   what you're asking?

12:39:34  8   Q.    Well, I'm asking you about all these items here;

12:39:36  9   right?

12:39:36 10   A.    You switched from motor speed controller to all these

12:39:36 11   items?

12:39:36 12   Q.    Yes.

12:39:40 13   A.    Each individual item exists.

12:39:42 14   Q.    All right.  So, each of these individual items

12:39:44 15   existed in -- existed in the world before October 2013?

12:39:47 16   A.    That's correct.

12:39:47 17   Q.    What about -- what about the collection of these

12:39:50 18   items, did they exist in the world together before

12:39:53 19   October 2013?

12:39:56 20   A.    They -- yes, I think they might have.

12:39:58 21   Q.    Okay.  In just a few words, Mr. Barry, what does a

12:40:03 22   motor speed controller do?

12:40:05 23   A.    There are two parts to it.  One of them develops --

12:40:08 24   well, three parts.  One of them translates the squeeze on

12:40:11 25   the trigger into an electrical signal.  Another -- and sends

Barry - Cross

12:40:17  1   an electric -- a wireless Bluetooth signal to another

12:40:21  2   device.  That device produces further electrical signals,

12:40:25  3   which then turn and rotate -- do what's called electrical

12:40:30  4   commutation, which means that it changes the direct current

12:40:33  5   from the battery into an oscillating current that oscillates

12:40:37  6   at the speed required to drive the motor.  And then the

12:40:40  7   magnets react to the oscillating current and drive.

12:40:43  8   Q.    Okay.  Just a quick technical question.

12:40:45  9         Are the motors and the Waydoo eFoils synchronous

12:40:48 10   or asynchronous?

12:40:50 11   A.    I believe -- synchronous or asynchronous, they're a

12:40:56 12   rearward magnet.

12:40:56 13   Q.    I didn't understand that.

12:40:56 14   A.    They're a rearward magnet, sir.

12:40:59 15   Q.    Okay.  So, my question, though, is:  Are they

12:41:02 16   synchronous motors or are they asynchronous motors?

12:41:06 17   A.    They're -- well, AC motors.  They're not really

12:41:08 18   synchronous motors, but they're AC.  They're AC motors, so

12:41:11 19   they are operated at approximately the frequency of the

12:41:15 20   electric -- of the commutation.

12:41:18 21   Q.    Okay.  So, let's move on to Claim 5 of the '044

12:41:22 22   patent.

12:41:23 23         Can you --

12:41:23 24   A.    That's not my patent.

12:41:25 25   Q.    I'm sorry?

406

Barry - Cross

12:41:25 1    A.       It's not my patent.

12:41:27 2    Q.       Right.

12:41:28 3               MR. BASANTA:  Can we please bring up Slide 39?

12:41:28 4    BY MR. BASANTA:

12:41:31 5    Q.       So, this is the Claim 5 from the '044 patent.  And

12:41:34 6    you can see that we've highlighted the terms airfoil design,

12:41:39 7    planform design and tailoring of the span-wise twist.

12:41:42 8               Do you see that?

12:41:43 9    A.       Yes, sir.

12:41:44 10   Q.       Okay.  So, this Claim 5 requires that the high

12:41:46 11   foil -- hydrofoils passive static stability be achieved by a

12:41:49 12   combination of those three things.

12:41:51 13   A.       That's correct.

12:41:51 14   Q.       All right.  So, airfoil design, planform design and

12:41:57 15   tailoring of a span-wise twist distribution, those all --

12:41:57 16   all three of those were known to a person of ordinary skill

12:41:59 17   before 2013, weren't they?

12:42:01 18   A.       Yes, sir.

12:42:02 19   Q.       And they were all well-known, in fact, by 2013,

12:42:06 20   weren't they?

12:42:06 21   A.       They're well known, yes, sir.

12:42:07 22   Q.       Okay.  So, airfoil design, in your view, and I think

12:42:10 23   you explained this a little bit, is just the geometry of the

12:42:13 24   cross-sectional shape of the hydrofoil wing; right?

12:42:15 25   A.       Yes.

407

Barry - Cross

12:42:16 1    Q.     It's not a particular cross-sectional shape; right,

12:42:19 2    Mr. Barry?

12:42:19 3    A.     No.

12:42:20 4    Q.     It's just a cross-sectional shape?

12:42:22 5    A.     Well, it's a cross-sectional shape that a person

12:42:24 6    is -- determines that provides passive static stability.

12:42:27 7    Q.     Okay.  So, every wing then has an airfoil design?

12:42:30 8    A.     Everything has -- every wing has an airfoil design,

12:42:34 9    yes.

12:42:40 10   Q.     And you think that the words planform and the term

12:42:44 11   planform design mean the same thing; right?

12:42:46 12   A.     Yes.

12:42:47 13   Q.     Okay.  And a planform design, in your view, is

12:42:50 14   just -- I think you explained this already.

12:42:52 15          A planform design, in your view, is just the

12:42:54 16   shape of the hydrofoil as viewed from above?

12:42:55 17   A.     That's correct.

12:42:57 18   Q.     Like a silhouette?

12:42:58 19   A.     Like what?

12:43:00 20   Q.     Kind of like a silhouette?

12:43:02 21   A.     Well, the word plan means something very specific in

12:43:06 22   engineering.  Always means from above or below.

12:43:08 23   Q.     And it's not a particular shape from above, it just

12:43:10 24   has to have a shape from above; right?

12:43:12 25   A.     It has to have a shape that's designed to provide

Barry - Cross

12:43:16 1   static -- passive static stability.

12:43:18 2   Q.      Okay.  So, every wing then has a planform design?

12:43:21 3   A.      It has a planform design.

12:43:22 4   Q.      Okay.  And, lastly, you think that span-wise twist

12:43:29 5   distribution and tailoring of span-wise twist distribution

12:43:33 6   all mean the same thing?

12:43:34 7   A.      What do you mean?  I'm sorry.

12:43:37 8   Q.      You think the two different terms, that span-wise

12:43:42 9   twist -- excuse me, span-wise twist distribution and the

12:43:46 10  longer term, tailoring of the span-wise twist distribution,

12:43:49 11  you think both those terms mean the same thing?

12:43:51 12  A.      No, span-wise twist distribution is the result of

12:43:55 13  tailoring of the twist -- of span-wise twist.  It's --

12:44:00 14  tailoring the span-wise twist distribution, this is what you

12:44:04 15  do to have a span-wise twist distribution.  It's similar to

12:44:11 16  cutting a board.

12:44:13 17  Q.      So, it's an action, tailoring is an action?

12:44:15 18  A.      No, no.  It's -- it is -- it is descriptive of -- to

12:44:20 19  a person of ordinary skill in the art, it's a descriptive of

12:44:24 20  one way of something that may be required.

12:44:27 21  Q.      Okay.  So, tailoring -- so the span-wise twist

12:44:30 22  distribution is just a measure of rotation for the hydrofoil

12:44:32 23  along the span; right?

12:44:33 24  A.      I'm sorry.  It's --we defined it.  It's the

12:44:37 25  relative -- the relative angle from one point to another --

Barry - Cross

| | | |
|---|---|---|
| 12:44:40 | 1 | Q.    Okay. |
| 12:44:41 | 2 | A.    -- along the span. |
| 12:44:42 | 3 | Q.    And it doesn't mean any particular degree of |
| 12:44:45 | 4 | twisting; right? |
| 12:44:45 | 5 | A.    No, it means a degree of twist that provides passive |
| 12:44:50 | 6 | static stability. |
| 12:44:51 | 7 | Q.    And in your view, even if there is no twist, that's |
| 12:44:55 | 8 | still tailoring of the span-wise twist -- |
| 12:44:57 | 9 | A.    Well -- |
| 12:44:58 | 10 | Q.    I'm sorry.  I didn't get my question out.  Can I try |
| 12:45:00 | 11 | again? |
| 12:45:00 | 12 | A.    Sorry. |
| 12:45:01 | 13 | Q.    Okay.  So, in your view, even if there is no twist, |
| 12:45:05 | 14 | that's still a tailoring of the span-wise twist distribution |
| 12:45:08 | 15 | as Claim 5 requires; right? |
| 12:45:09 | 16 | A.    That's right.  The designer selected a span-wise |
| 12:45:13 | 17 | twist distribution appropriate to the design of the aircraft |
| 12:45:16 | 18 | to provide passive static stability. |
| 12:45:18 | 19 | Q.    Okay.  So, you've even said that the amount of |
| 12:45:21 | 20 | span-wise twist is moot, meaning that it doesn't matter? |
| 12:45:24 | 21 | A.    No, I've said that -- I did not say that exactly. |
| 12:45:27 | 22 | Q.    Okay. |
| 12:45:27 | 23 | A.    That exactly. |
| 12:45:28 | 24 | MR. BASANTA:  Okay.  So, can we please bring |
| 12:45:30 | 25 | up -- |

410

Barry - Cross

12:45:30  1            THE WITNESS:  Let's bring up what I said.

12:45:34  2            MR. BASANTA:  -- Page 21 to 22.

12:45:34  3     BY MR. BASANTA:

12:45:36  4     Q.    This is your reply report, which we've seen.

12:45:40  5            MR. BASANTA:  Paragraph 56, please.

12:45:40  6     BY MR. BASANTA:

12:45:46  7     Q.    All right.  So, it's really on the next page.  And

12:45:51  8     you -- can you just enlarge that, the first full sentence on

12:45:56  9     Page 22, the second line?

12:45:58 10            It says, "But the amount of span-wise twist is

12:46:00 11     moot."  Second line from the top on the right.

12:46:03 12     A.    Yes, I see that.

12:46:04 13     Q.    The amount of span-wise twist is moot.

12:46:06 14            You see where you wrote those words?

12:46:09 15     A.    Yes, I did.

12:46:09 16     Q.    Okay.  So, let's move on to Claim 6 of the '044

12:46:13 17     patent.  So, this claim requires that a hydrofoil be

12:46:15 18     wing-shaped with a front edge and a rear edge that both

12:46:18 19     curve rearwardly.

12:46:19 20            Do you see that?

12:46:20 21     A.    Yes, sir.

12:46:23 22     Q.    And wing-shaped hydrofoils that had curved front and

12:46:26 23     rear edges were known to persons of skill before 2013,

12:46:30 24     weren't they?

12:46:30 25     A.    Yes, they were.

Barry - Cross

12:46:31  1    Q.     Okay.  So, there's nothing new in Claim 6 then, is

12:46:33  2    there?

12:46:34  3    A.     That particular portion of it, no.

12:46:40  4    Q.     Okay.  Can we please bring up the patent and go to

12:46:43  5    Claim 6.

12:46:58  6           Okay.  So, wing-shaped hydrofoils with a front

12:47:01  7    edge and a rear edge that both curve rearwardly.  That was

12:47:04  8    known?

12:47:05  9    A.     Yes.

12:47:06 10    Q.     Okay.  And I believe when you were testifying before,

12:47:17 11    you said that you -- when you were assessing the stability

12:47:21 12    of the lift, that you had a conversation with Mr. Leason?

12:47:25 13    A.     Yes, sir.

12:47:26 14    Q.     And what did Mr. Leason tell you that was relevant to

12:47:28 15    your assessment of stability for the lift?

12:47:30 16    A.     Mr. Leason described how to -- how to ride the

12:47:33 17    vehicle and the resulting ride qualities.

12:47:37 18    Q.     Did he provide you any quantification for stability

12:47:40 19    or anything along those lines?

12:47:40 20    A.     Not numerically, no.

12:47:45 21           MR. BASANTA:  Okay.  No further questions at

12:47:46 22    this time, Your Honor.

12:47:47 23           THE COURT:  All right.  Thank you, Mr. Basanta.

12:47:48 24           Mr. Theuerkauf.

12:47:55 25                    REDIRECT EXAMINATION

412

Barry - Redirect

12:47:55  1    BY MR. THEUERKAUF:

12:48:00  2    Q.     Mr. Barry, so there were a few questions at the

12:48:04  3    beginning of Mr. Basanta's questioning of you about the

12:48:08  4    patents and the language in the patents.  Do you recall

12:48:12  5    that?

12:48:12  6    A.     I -- I'd have to be refreshed, but I remember some --

12:48:16  7    some questions along those lines.  But the specifics, I

12:48:19  8    don't recall offhand.

12:48:19  9    Q.     And I think some of the questions were with respect

12:48:22 10    to the term "static stability" and then just the term

12:48:26 11    "stability"; correct?

12:48:27 12    A.     Yes, sir.

12:48:28 13    Q.     Okay.  And there was some additional questions

12:48:31 14    regarding the Court's claim construction with respect to

12:48:34 15    those terms; do you remember that?

12:48:36 16    A.     Yes, sir.

12:48:36 17    Q.     If -- okay.  And so, in your infringement analysis of

12:48:41 18    the Waydoo products and in your analysis of the MHL

12:48:44 19    products, was your analysis consistent with the Court's

12:48:49 20    claim construction?

12:48:49 21    A.     Yes, sir.  It was in two parts.  Static stability and

12:48:58 22    dynamic or all stability, yes, sir.

12:48:59 23    Q.     Okay.  And what -- what is the -- what is the meaning

12:49:04 24    then, again, of "static stability"?

12:49:05 25    A.     Static stability is a tendency to return to the

Barry - Redirect

12:49:11 1    original condition when disturbed.

12:49:13 2    Q.    Okay.  And then under the '659 patent, when

12:49:15 3    addressing stability, what was the meaning applied?

12:49:19 4    A.    That would have to include that it eventually returns

12:49:23 5    to the original condition.

12:49:25 6    Q.    Okay.  And the accused products do that; correct?

12:49:28 7    A.    They do.

12:49:30 8    Q.    And so, the implication there was that, at least what

12:49:38 9    I took from it, was that there was something wrong with your

12:49:44 10   statement.  They showed you a statement regarding static

12:49:49 11   stability and then a statement regarding stability, and

12:49:53 12   "stability" being defined as having the initial tendency to

12:49:56 13   return to its original condition.

12:49:59 14   A.    I'm not sure I recall exactly that exchange, but --

12:50:02 15   Q.    Sure.  Okay.  So, why -- well, maybe we can back up.

12:50:09 16   Explain to us why "stability" and "static stability" at

12:50:16 17   times can be used the same.

12:50:19 18   A.    Well, "stability" always requires -- the general

12:50:23 19   stability can -- always requires static stability.  In

12:50:28 20   frequent aeronautical and ship stability, if you go to a --

12:50:33 21   if you go to a flight school, if you look at some of the

12:50:37 22   standard books about flying -- Sticks and Rudders is my

12:50:43 23   favorite.  I still have a copy of that from years gone by

12:50:46 24   when I was flying gliders.  Sticks and Rudders describes

12:50:51 25   stability as being -- as the tendency to return to level

Barry - Redirect

12:50:58 1    flight and initially -- and then describes how it occurs.

12:51:04 2    Q.      Okay.

12:51:04 3    A.      As -- and so, if you look at aeronautical training

12:51:10 4    videos, they will say, if it returns without oscillating,

12:51:15 5    it's statically stable.  If it returns while oscillating,

12:51:19 6    it's dynamically stable.  So, there's some sloppiness in the

12:51:21 7    use of the term, which is presumably why the Court decided

12:51:25 8    to clarify that.

12:51:29 9    Q.      Okay.  And then in the Court's clarification, do you

12:51:34 10   agree with, then, how the Court or the Court has defined

12:51:38 11   those terms?

12:51:39 12   A.      I do.

12:51:40 13   Q.      Okay.

12:51:40 14   A.      I do.  It's -- you know, there's a lot of use of the

12:51:44 15   term in every art, and that is a little sloppy.  And we are

12:51:52 16   dealing with precision here.

12:51:54 17   Q.      Okay.  And just to reiterate, then, in applying the

12:51:57 18   Court's claim construction for those two different terms,

12:52:02 19   what was your conclusion with respect to infringement?

12:52:04 20   A.      Well, the -- my conclusion with respect to

12:52:08 21   infringement is that all -- all of the Defendants' products

12:52:12 22   include static stability.  And all of the Defendants'

12:52:17 23   products include dynamic stability.

12:52:20 24   Q.      Okay.  And the dynamic stability is that it

12:52:23 25   eventually returns to that original condition?

415

Barry - Redirect

12:52:25 1    A.      That's correct.  Either -- yeah, it either directly

12:52:27 2    or possibly with a minor oscillation.

12:52:30 3    Q.      Okay.  And so, there was some discussion about that,

12:52:33 4    too, about the oscillations; right?

12:52:35 5    A.      Yes.

12:52:36 6    Q.      And so, in the -- in the '659 patent, when the claim

12:52:43 7    phrase says that it eventually returns to that original

12:52:46 8    condition, is that true with respect to the craft if they

12:52:51 9    oscillate?

12:52:52 10   A.      Yes, sir.

12:52:52 11   Q.      Okay.  And so, the oscillations eventually die down

12:52:56 12   to return to that original condition; is that true?

12:52:59 13   A.      Correct.

12:52:59 14   Q.      Okay.  All right.  Can we pull up the '044 patent?

12:53:16 15   If you go to Column 6.  So, right there at Line 15,

12:53:31 16   Column 6.

12:53:34 17   A.      Yes, sir.

12:53:35 18   Q.      Do you recall counsel's questions regarding these

12:53:40 19   coefficients?

12:53:41 20   A.      I do.

12:53:42 21   Q.      Okay.  And he was implying that you used different

12:53:46 22   coefficients in your analysis; do you recall that?

12:53:48 23   A.      Yes, sir.

12:53:49 24   Q.      Okay.  Can you explain -- and I think you wanted to

12:53:51 25   further explain, and he told you I would ask you so you

Barry - Redirect

12:53:54  1    could explain.

12:53:54  2    A.    Yes.  If you look at the whole sentence, which that

12:53:58  3    is -- in it, it says to ensure a trimmable, stable

12:54:01  4    hydrofoil, the following conditions must be true.  "Trim" is

12:54:05  5    the -- is the static condition of pitch.  This is pitching,

12:54:10  6    what we were trying to assert, an angle.  So, in order to be

12:54:14  7    stable in pitch, he is referring to a trimmable -- they

12:54:19  8    sometimes call that trim stability.  And they're just

12:54:23  9    referring to the pitch plane.  They're just referring to it

12:54:29 10    can be put at this angle and stay there, or -- and we can

12:54:34 11    change it to a different angle by weight shift.

12:54:37 12    Q.    Okay.  And so -- and so, what -- I guess what I'm

12:54:40 13    curious, then, about is:  How -- the implication was that

12:54:45 14    you use different coefficients than what is shown here in

12:54:47 15    the patent; is that true?

12:54:49 16    A.    In -- in the report, we discussed three coefficients.

12:54:55 17    Q.    Right.

12:54:55 18    A.    The vessel has to be stable in trim, in roll, and in

12:55:01 19    yaw.  This here talks about trimmable, only trim.  So, these

12:55:06 20    are the three coefficients.   These are three of the

12:55:08 21    coefficients involved in trim.

12:55:11 22    Q.    Okay.

12:55:11 23    A.    There are a another set that are involved in roll and

12:55:15 24    another set in yaw.  The craft has to be stable in all three

12:55:18 25    directions.  If it's trimmable but falls over sideways all

Barry - Redirect

12:55:22  1    the time, it's not stable.

12:55:24  2    Q.    Okay.  So, this is just -- what you see here

12:55:26  3    highlighted was just one part of your analysis?

12:55:29  4    A.    Yes.  In the -- in the sentence, it begins "To ensure

12:55:33  5    trimmable."

12:55:34  6    Q.    Okay.

12:55:34  7    A.    So, this -- these coefficients only refer to trim.

12:55:37  8    Q.    If -- okay.  And so your analysis has included this

12:55:40  9    and has gone beyond what is seen just here?

12:55:43 10    A.    That's correct.  And I believe the other coefficients

12:55:46 11    are discussed further down.

12:55:47 12    Q.    Further down in the patent?

12:55:48 13    A.    That's correct.

12:55:49 14    Q.    Correct.  So, there was a lot of discussion about the

12:56:01 15    analysis that you ran with AVL?

12:56:03 16    A.    Yes, sir.

12:56:09 17    Q.    And the data that you put into AVL came from Waydoo;

12:56:19 18    correct?

12:56:19 19    A.    Yes.

12:56:20 20    Q.    Okay.  And Waydoo could have run their own analysis

12:56:25 21    on it; correct?

12:56:26 22    A.    Yes, they could have.

12:56:28 23    Q.    Did you see any analysis from their expert on

12:56:31 24    Waydoo's products?

12:56:32 25    A.    No, I didn't.

418

Barry - Redirect

12:56:33 1    Q.    Okay.  And he very easily could have gotten the

12:56:38 2    dimensions or the reference points for the drawings that you

12:56:43 3    used in your analysis; correct?

12:56:44 4    A.    I'm sorry.  Who?  What?

12:56:46 5    Q.    Waydoo's expert could have very easily gotten the

12:56:50 6    reference points for the model, product models that you used

12:56:55 7    in your analysis?

12:56:56 8    A.    Absolutely.

12:56:57 9    Q.    Okay.  And he didn't do that, did he?

12:57:01 10   A.    I didn't see any calculations of anything.

12:57:04 11   Q.    All right.  And so, there was some discussions about

12:57:08 12   the reference point in the center of gravity from the

12:57:11 13   reference point that you used.  Do you recall that?

12:57:13 14   A.    Yes.

12:57:13 15   Q.    Okay.  And can you further explain to the jury what

12:57:18 16   that means and where those reference points were and how you

12:57:21 17   determined what to do there?

12:57:23 18   A.    Well, all three of the Waydoo models had a different

12:57:26 19   0 point in the model itself, or at least two of them did.

12:57:30 20   One had a 0 point couple of inches above the top of the --

12:57:35 21   of the board.  And most of the others had the 0 point --

12:57:40 22   well, I think the other two LIFT products -- and I don't

12:57:42 23   remember because that was very confusing when I was doing

12:57:45 24   the analysis.  And some of them had the -- the origin of the

12:57:50 25   model.  In other words, when you draw a line from 0 to 0 to

Barry - Redirect

12:57:55  1   somewhere, the line started here.  They had the origin of

12:57:58  2   the model at the tip of the foiled foil, and some of had the

12:58:04  3   origin of the model a couple inches above the board about

12:58:08  4   halfway back.  I don't know why they did that.  But that's

12:58:11  5   the way the designer designed it.  That's the way the

12:58:14  6   designer put it in -- put the drawing into the model.

12:58:17  7   Q.     Okay.  And so, your distances are -- that you

12:58:23  8   included in that report were measured off of that origin;

12:58:27  9   right?

12:58:27 10   A.     It -- yes.  And then I became so confused about the

12:58:31 11   whole thing, I moved my AVL models to the -- whichever one

12:58:34 12   was the funny bunny, I moved it to the consistent point.

12:58:38 13   Q.     And it was confusing because the Waydoo information

12:58:41 14   that had been provided to you had different origins for the

12:58:46 15   different products?

12:58:47 16   A.     That's correct.

12:58:48 17   Q.     And so, the origin wasn't consistent, so you made

12:58:51 18   them consistent?

12:58:52 19   A.     Well, no, I originally tried to use them, and then I

12:58:56 20   realized I was getting terribly confused, and so I moved --

12:59:00 21   I took their model and I moved them all to 00 at the tip.

12:59:03 22   Q.     Okay.

12:59:04 23   A.     And worked again or did some more work.

12:59:07 24   Q.     Right.  And so, when you run those analysis at the

12:59:11 25   end of the day -- and the ones that you re-ran, what did

Barry - Redirect

12:59:15 1   they show?

12:59:16 2   A.      They showed again, the eigenvalue plots that we saw.

12:59:23 3   The position and center of gravity and all of that does not

12:59:27 4   go into initial static stability.  That doesn't -- it

12:59:32 5   doesn't matter.  The model doesn't care.  It's only when we

12:59:35 6   do an eigenvalue that that matters.  And that only matters

12:59:38 7   in terms of developing the frequencies of oscillation.  It

12:59:46 8   doesn't really address -- it only addresses omega, not

12:59:51 9   sigma.  So it doesn't address divergence.  It only addresses

12:59:54 10  the frequencies.

12:59:54 11  Q.      Okay.  So those issues that counsel was asking you

12:59:57 12  about, they had no impact on the static stability analysis?

01:00:00 13  A.      They had -- they do not even go into the model.

01:00:04 14  Q.      Okay.  And then with respect to the eigenvalue, it's

01:00:08 15  only impacting the oscillation and not whether or not that

01:00:11 16  sigma value is positive or negative?

01:00:13 17  A.      That's correct.

01:00:14 18  Q.      But despite that, in redoing those -- or not redoing

01:00:18 19  but doing the further analysis, the conclusion was that they

01:00:26 20  were still stable; is that correct?

01:00:28 21  A.      That's correct.  The differences between the various

01:00:31 22  models and runs were -- if you laid out all the eigenvalue

01:00:34 23  analysis, you wouldn't be able to tell which is which.

01:00:37 24  Q.      And so, then there was a lot of questioning about the

01:00:41 25  videos in -- in addition to your work with AVL.

421

Barry - Redirect

01:00:46 1    A.      Yes, sir.

01:00:50 2    Q.      So, why -- why use AVL?

01:00:53 3    A.      Well, the point of AVL was two-fold.  First off,

01:00:58 4    to -- in view of the videos, to see if the theory confirm

01:01:04 5    what was seen on the videos, to make -- to get an

01:01:07 6    approximate estimate -- or a conservative estimate because

01:01:11 7    of air versus water, so it's conservative.

01:01:15 8             A conservative estimate of the static stability

01:01:19 9    which -- which actually isn't affected by the fluid, and the

01:01:23 10   dynamic or stability of the craft and see if there was a

01:01:29 11   correspondence between the two videos, did the math tell us

01:01:32 12   the same thing that the videos did and did the manuals tell

01:01:36 13   us the same things the videos did.

01:01:38 14   Q.      All right.  So, the AVL analysis is a crosscheck or

01:01:45 15   confirms with what you see with your eyes?

01:01:47 16   A.      Yes.  Yes, it's -- it's a conservative estimate.  AVL

01:01:52 17   tells me that it's going to be -- that there's a reasonable

01:01:56 18   possibility it will be -- it wouldn't be stable if it was

01:01:59 19   flying in the air.  Maybe -- it's very, very possibly a

01:02:02 20   small instability, if we're flying the thing in the air.

01:02:06 21   But it can't fly in air.

01:02:10 22   Q.      And you're referring to the -- the dynamic stability?

01:02:12 23   A.      The dynamic stability.  It's stable if we flew it in

01:02:15 24   the air.

01:02:16 25   Q.      Yeah.

Barry - Redirect

01:02:17  1    A.      But when we get into water, a person of skill in the

01:02:20  2    art knows that when we do these kind of calculations in

01:02:27  3    water, ships or submarines and all the other watercraft,

01:02:34  4    torpedoes, missiles and so on, all add another term relating

01:02:40  5    to added mass and some more damping terms.  And stability

01:02:48  6    always requires -- instability.  Oscillates that are going

01:02:53  7    in stability requires energy.  You have to input energy to

01:02:56  8    make it move more and more and more.  Damping only stills

01:03:00  9    energy.  Added mass only slows it.

01:03:07 10           So, if there's -- if it's statically stable and

01:03:11 11    the other coefficients are good and you put it in water, it

01:03:16 12    only gets stabler.  Water stills energy from the -- from the

01:03:23 13    object.

01:03:24 14    Q.      Okay.  And so I want to visit that just for a couple

01:03:27 15    of more questions.  Let's see.

01:03:30 16                 THE COURT:  Mr. Theuerkauf?

01:03:32 17                 MR. THEUERKAUF:  Yes.

01:03:33 18                 THE COURT:  Couple more questions and you're

01:03:34 19    going to be done?

01:03:35 20                 MR. THEUERKAUF:  Yes.

01:03:35 21                 THE COURT:  All right.

01:03:39 22    BY MR. THEUERKAUF:

01:03:51 23    Q.      So first of all -- well, let's go to the '659 -- I'm

01:03:56 24    sorry.

01:03:56 25           Because the '044 doesn't deal with the dynamic

423

Barry - Redirect

1   stability; correct?

2   A.     No, sir.

3   Q.     So, '659, this is what's showing the static

4   stability; correct?

5   A.     This shows the static stability -- the static

6   stability, yes, sir.

7   Q.     And that's true and it has nothing to do with these

8   eigenvalue analysis or anything?

9   A.     It's -- they are the -- these all -- all of these

10  coefficients, plus others, go into calculating the

11  eigenvalue.

12         But, yes, the particular chart we have here that

13  shows the signs does not -- does not by itself affect

14  that -- that eigenvalue analysis.

15  Q.     Right.  Right.

16         And so if we're looking at the eigenvalue

17  analysis, this red point down here around zero that was

18  being shown or referred to.  So what damping effects -- or

19  how does that -- well, first of all, I believe you had

20  testified during direct that that did not indicate

21  instability to you; correct?

22  A.     That's right.  In a practical sense when it's in

23  water, the naval architect has done steering, which is the

24  same thing as we're doing here except sideways, all of the

25  same calculations are done except in a different cohort

Barry - Redirect

01:05:14 1    system, which is confusing to me.  But the -- all of these

01:05:21 2    coefficients are done in ship stability and because it's

01:05:25 3    only in one plane there's a simpler equation that you solve

01:05:29 4    to get this.

01:05:29 5            But what this tells me is that this one point

01:05:33 6    that's ever so slightly over is going to be damp because I

01:05:38 7    don't recall whether it's a sway motion, which means this

01:05:43 8    way, or whether it's another motion, there's -- it might be

01:05:48 9    what's called a fugar motion, which is this.  But all of

01:05:53 10   these are damp by water effects.

01:05:56 11           It's hard to take something in water and slap it

01:05:58 12   back and forth sideways.  It's easy -- I can do this with an

01:06:02 13   empty cup of water, but if I fill it with water it's -- I

01:06:05 14   have to do a lot more.  So, added -- that's added mass.  And

01:06:09 15   then if this water -- if this cup is in water, it's even

01:06:14 16   harder to move it sideways and back and forth.

01:06:16 17           So, that -- the -- these motions in surge -- I'm

01:06:22 18   sorry -- in sway are heavily damped.  If a motion were to be

01:06:25 19   what they call a fugar, which is a slow motion like this, it

01:06:32 20   also is stopped by the water.

01:06:35 21           Because as a hydrofoil gets to the surface, it

01:06:38 22   loses lift.  So, it runs into the wall as it starts going

01:06:43 23   up.  Well, actually it runs into a pillow as it starts going

01:06:48 24   up.

01:06:48 25           So, all of the motions are known to be heavily

Barry - Redirect

01:06:55 1   affected by the free surface and by the heaviness and the

01:07:00 2   stickiness of water.  And the free surface means two things.

01:07:03 3   You lose lift as you come up to it.  And moving of an object

01:07:08 4   back and forth makes waves.  So when the strut penetrating

01:07:11 5   the water, which AVL doesn't model, the strut makes waves.

01:07:17 6   It moves back and forth.  And that stills energy again.

01:07:21 7   Q.     And is it -- all these effects that you just talked

01:07:24 8   about, are they knowledge -- or is -- is that within the

01:07:28 9   knowledge of a person of ordinary skill in the art?

01:07:30 10  A.     Absolutely.

01:07:31 11  Q.     Okay.  And so, are you telling -- are you saying that

01:07:36 12  the AVL doesn't account for those effects?

01:07:39 13  A.     No, it doesn't.  It strictly looks at flight force.

01:07:43 14  Flight force is generated by the body's model.

01:07:46 15  Q.     Okay.  By flight forces, you mean in air?

01:07:49 16  A.     Well, in whatever medium, but it only -- what it does

01:07:54 17  is it puts little thingies on it that produce lift and sums

01:07:58 18  all the thingies up and so it only -- it only is involved

01:08:02 19  with basically lift forces.

01:08:04 20  Q.     Okay.  So it's not accounting for the effects that

01:08:07 21  those skilled in the art would know would occur in the

01:08:09 22  water?

01:08:09 23  A.     That's correct.  If you look at the -- I mean, you

01:08:11 24  would get a couple hints.  If you know the theory, you know

01:08:15 25  it doesn't -- it is -- it is an inviscate code.  If you look

426

Barry - Redirect

01:08:18  1  at the input, you don't put viscosity in.  And finally, the

01:08:22  2  manual says program does not account for viscosity.  So

01:08:27  3  that's a big hint that it probably does not account for

01:08:31  4  viscosity.

01:08:31  5  Q.    Okay.  And I believe you testified earlier that

01:08:33  6  that -- and you used AVL as a conservative crosscheck on

01:08:36  7  what you've essentially had seen with your own eyes; right?

01:08:39  8  A.    That's right.

01:08:40  9  Q.    All right.  And so if we go to DTX 309.

01:08:48 10         And I believe this was the video that they were

01:08:51 11  showing you earlier.

01:08:55 12  A.    This is a -- this is a -- that first little thing he

01:08:58 13  showed was a -- interestingly was a water -- water

01:09:00 14  hydrofoil.  Eagles fly in water to get their fish, so...

01:09:10 15         MR. THEUERKAUF:  So, yeah.  I think it was its

01:09:12 16  120.

01:09:12 17  BY MR. THEUERKAUF:

01:09:13 18  Q.    So, this is the same video that counselor was showing

01:09:17 19  you earlier that seemed to indicate that the person -- that

01:09:21 20  the craft was unstable.

01:09:24 21  A.    Yes, I  -- I recognize -- this is the one I think I

01:09:27 22  saw, not the one that counsel showed.

01:09:29 23  Q.    Yeah.  So, even a first time rider pretty quickly --

01:09:36 24  does that look stable to you?

01:09:37 25  A.    Absolutely.  It's running for as long as he wants to,

427

Barry - Redirect

01:09:41  1    it appears.

01:09:42  2    Q.    Yeah.  So, it's -- it's the craft -- it's the person

01:09:49  3    that's unstable in some of those videos you see --

01:09:51  4    A.    That is right.

01:09:51  5    Q.    -- not the craft; is that correct?

01:09:53  6    A.    That's right.  That's right.

01:09:54  7          If we put my weight on a stand-up paddle board,

01:09:59  8    it would not flip over.  If we put me on a stand-up paddle

01:10:02  9    board, I would certainly step in the wrong place and flip it

01:10:06 10    over.  But once I'm used to how to ride a stand-up paddle

01:10:11 11    board, no problem.

01:10:13 12    Q.    So, how many videos do you think you've watched of

01:10:16 13    the Waydoo products?

01:10:17 14    A.    I don't recall.  Many, many videos.  I remember

01:10:21 15    one -- no, that was a still picture of him sitting there --

01:10:24 16    of someone sitting there in a lotus position riding the

01:10:28 17    craft.  I remember a fair number with sometimes two people,

01:10:33 18    two young women aboard it.

01:10:35 19    Q.    Mm-hmm.

01:10:35 20    A.    I don't remember which one was -- which -- I don't

01:10:40 21    know if it was a Waydoo video that had somebody carving

01:10:43 22    turns, which, you know, shows that even in heavy turn it was

01:10:46 23    nice and stable.  I'm not sure that that was Waydoo or MHL.

01:10:51 24          But there have been all kinds of videos that

01:10:54 25    show it carving turns and running around with two or -- two

Barry - Redirect

01:10:58  1    people or with -- I don't think anyone had a dog on it, but,

01:11:03  2    you know.  But, you know, all kinds of -- throughout the

01:11:07  3    campaign that Waydoo -- throughout their -- their website

01:11:13  4    and other sources, all kinds of videos show that people were

01:11:18  5    riding it nicely.

01:11:21  6    Q.    And those went into your analysis?

01:11:23  7    A.    Those -- I looked at all of those.  And, again, each

01:11:27  8    one showed the same thing.  And so, I picked one, which is I

01:11:31  9    believe the one that you just showed, to say, look, even a

01:11:34 10    kind of a fat guy who's never been -- and I am allowed to

01:11:38 11    say fat okay.

01:11:38 12          Even a fat guy who's never been on this thing

01:11:40 13    before can get to the position where he's riding

01:11:44 14    comfortably.  Reasonably quickly.

01:11:47 15    Q.    And is that because the craft is stable?

01:11:48 16    A.    And that is because the craft is stable.  The craft

01:11:52 17    must be stable to be reasonably rideable.

01:11:57 18          MR. THEUERKAUF:  No further questions.

01:11:59 19          THE COURT:  All right.  Thank you.

01:12:00 20          So, Mr. Barry, you can step down but why don't

01:12:05 21    you just stay there for a minute.

01:12:07 22          Members of the jury, we'll take our lunch break

01:12:09 23    and it will be for -- until five after two.  Okay?

01:12:14 24          Can we take the jury out, please?

01:12:16 25          (Jury leaving the courtroom.)

Barry - Redirect

01:12:49  1            THE COURT:  All right.  So we'll take our lunch
01:12:51  2    break.
01:12:52  3            What is next when we come back?
01:12:58  4            MR. THEUERKAUF:  Yeah.  The Ping video.
01:13:00  5            THE COURT:  How long is it now.
01:13:01  6            MR. THEUERKAUF:  Very short, I believe.
01:13:02  7            MR. McGRAW:  Well, we cut it down to 20 minutes.
01:13:04  8    Cut it in half at least.
01:13:06  9            THE COURT:  Thirty to 20 is half?
01:13:08 10            MR. McGRAW:  It was actually 40 minutes when we
01:13:11 11    checked it.
01:13:11 12            THE COURT:  All right.
01:13:14 13            MR. McGRAW:  And then it will be Dr. Stec.
01:13:16 14            THE COURT:  Yeah, I got that.
01:13:18 15            MR. MURRELL:  Yeah.
01:13:18 16            THE COURT:  I was just wondering -- I think from
01:13:21 17    the looks on the faces of the jury, they're running out of
01:13:23 18    patience with some of the redundancy.  But I don't know who
01:13:30 19    that might hurt, that will be for you all to figure out.
01:13:35 20            All right.  We'll be in recess.
01:13:38 21            DEPUTY CLERK:  All rise.
02:03:56 22            (Recess was taken.)
02:03:56 23            DEPUTY CLERK:  All rise.
02:03:56 24            THE COURT:  All right.  Are we ready to begin?
02:03:59 25            All right.  Let's get the jury.

Barry - Redirect

02:04:00  1          Is the first 20 minutes going to be this

02:04:02  2   exciting deposition?

02:04:04  3          MR. THEUERKAUF:  Correct, Your Honor.

02:04:06  4          MR. BASANTA:  We would like to move a few things

02:04:08  5   into evidence.

02:04:08  6          THE COURT:  Okay.  Why don't you say what they

02:04:11  7   are.

02:04:13  8          MR. BASANTA:  Sure.  DTX 308, 309, and 310.

02:04:21  9          MR. THEUERKAUF:  No objection.  And we've got a

02:04:22 10   few of our own, if we could.

02:04:25 11          THE COURT:  Okay.

02:04:25 12          MR. THEUERKAUF:  PTX 183, PTX 234, PTX 121, and

02:04:32 13   then we were going to do DTX 309, but you just did that,

02:04:35 14   correct?

02:04:36 15          MR. BASANTA:  Yeah.

02:04:36 16          THE COURT:  He did.

02:04:37 17          MR. THEUERKAUF:  All right.

02:05:00 18          Yeah, I'm sorry.  They were PTX 183, PTX 234,

02:05:08 19   and PTX 121.

02:05:11 20          MR. COLLETTI:  Thank you.

02:05:16 21          MR. THEUERKAUF:  Yeah.

02:05:25 22          (Jury entering the courtroom.)

02:05:28 23          MR. THEUERKAUF:  I know it's admitted.  I don't

02:05:29 24   think they had any objections.

02:05:31 25          THE COURT:  They're admitted then.

02:05:34  1            (Exhibit Nos. DTX 308, DTX 309, DTX 310, PTX

02:05:39  2    121, PTX 183, and PTX 234 were admitted into evidence.)

02:05:39  3            THE COURT:  All right.  Welcome back, members of

02:05:44  4    the jury.  Everyone you may be seated.

02:05:46  5            Mr. Theuerkauf.

02:05:50  6            MR. THEUERKAUF:  Yes, Your Honor.  We'd like to

02:05:51  7    call Mr. Ping by videotape deposition.

02:05:56  8            THE COURT:  All right.

02:05:56  9            (Video playing.)

02:05:58 10            MR. THEUERKAUF:  May I approach and --

02:05:59 11            THE COURT:  Sure.

02:06:01 12            MR. THEUERKAUF:  -- give you the transcripts?

02:06:08 13            (Video playing.)

02:06:13 14    Q.     Okay.  Can you give us your full name for the record,

02:06:23 15    please?

02:06:23 16    A.     Wang Ping.

02:06:27 17    Q.     Mr. Ping, are you employed by Shenzhen Waydoo

02:06:29 18    Intelligence Technology Company, Limited?

02:06:31 19    A.     Yes.

02:06:35 20    Q.     And can you tell me when Shenzhen Waydoo was formed?

02:06:37 21    A.     Shenzhen Waydoo was established in May 2018.

02:06:44 22    Q.     And, Mr. Ping, what is your position or title with

02:06:48 23    Shenzhen Waydoo?

02:06:49 24    A.     Director of operation.

02:06:54 25    Q.     And can you please describe your job duties as

02:06:57 1    director of operations for Shenzhen Waydoo.

02:07:00 2    A.     My job is mainly deal with the management and in

02:07:06 3    operation.  That includes -- that also includes a Government

02:07:11 4    relationship and then intellectual property registration,

02:07:16 5    and also the routine management work.  For example, public

02:07:22 6    relations, but mainly market -- market operation.

02:07:27 7    Q.     Mr. Ping, are you also involved in the accounting or

02:07:33 8    financial departments?

02:07:34 9    A.     I don't directly involved in accounting or finance.

02:07:38 10   We have our -- we have our independent CFO.

02:07:43 11   Q.     Okay.  Mr. Ping, when did you first learn about this

02:07:46 12   lawsuit filed by MHL against the Waydoo entities?

02:07:50 13   A.     Last March, the first month that after I joined the

02:07:57 14   company.

02:07:58 15   Q.     And did you have a conversation with somebody within

02:08:00 16   the company regarding the lawsuit?

02:08:02 17   A.     I'm also in charge of the legal -- legal department,

02:08:08 18   and then there's -- there's an employee who's working for

02:08:14 19   me, has did -- he briefed the situation, and then I learned

02:08:18 20   details from that colleague.

02:08:22 21   Q.     Okay.  And what did that colleague tell you about

02:08:25 22   this lawsuit?

02:08:27 23            THE WITNESS:  So that's one of my -- that was

02:08:30 24   one of my employee, and my employee mentioned that there's a

02:08:39 25   -- there's an agency -- there was a company who's -- who's

02:08:45  1    -- who's selling our product, receive a document, receive a

02:08:49  2    legal document.  So that's how I learned in and out of this

02:08:56  3    lawsuit, and then that's how I get to -- get to know all --

02:09:04  4    most of the documents related to this case.

02:09:08  5    BY MR. THEUERKAUF:

02:09:09  6    Q.    So let's -- did a -- so this employee of yours

02:09:15  7    provided you a legal document that had been received; is

02:09:18  8    that correct?

02:09:18  9              THE WITNESS:  So actually, it's like we have

02:09:22 10    received an email from Peyton Healey.  This -- this is --

02:09:31 11    the email was from our -- one of our distributor called Best

02:09:37 12    Kite Pro -- Best Kite Boarding.  Kite Boarding.  Best Kite

02:09:53 13    Boarding.  That's one of our secondary distributors, and

02:09:57 14    saying that they receive a document.  And then also, after

02:10:02 15    that, through my work, I get -- I get to -- I get access to

02:10:10 16    all the legal documents later on.

02:10:12 17    BY MR. THEUERKAUF:

02:10:13 18    Q.    So I believe what you're saying, Mr. Ping, is that

02:10:16 19    you -- or that Shenzhen Waydoo had received a document from

02:10:22 20    Best Pro Kite Boarding that it had received from Peyton

02:10:28 21    Healey; is that correct?

02:10:29 22    A.    So I would like to say that one more time.  I got to

02:10:33 23    know this case.  I got to know that there -- there is a case

02:10:37 24    through this email.  So I don't remember clearly how I

02:10:42 25    receive -- have access to all this legal documents.  It's --

02:10:49  1    this is the start, this email.  From the email, I got to
02:10:53  2    know that there's a case, so that's -- that's from my plea.
02:10:57  3    And then this very important -- this is very important in my
02:11:03  4    -- to my -- in my job.  So -- but I do not know where and
02:11:09  5    how I got -- got access to those legal documents, because
02:11:15  6    that has been a long time ago.  Has been a long time.
02:11:21  7    Q.     And so the email that you received that you're
02:11:24  8    referring to, Mr. Ping, was that from your employee, was it
02:11:28  9    from Peyton Healey, or was it from Best Pro Kite?
02:11:33 10    A.     So I'd like to state that one more time.  This email
02:11:37 11    was from Peyton Healey and was sent to one of our
02:11:43 12    distributor called Best Pro Kite Boarding.  And then this --
02:11:49 13    and this -- this email was reported to me by one of my
02:11:53 14    employees.  And this is how things -- how report has been
02:11:58 15    done in China.  So they -- they -- usually they will hand it
02:12:04 16    out, and then to bring the manager's attention to it, and
02:12:08 17    then to get manager's help.
02:12:11 18    Q.     So when this email was brought to your attention, was
02:12:17 19    that the first time that Shenzhen Waydoo was alerted to
02:12:24 20    these issues, or was that just the first time that you had
02:12:28 21    learned of the issues?
02:12:30 22    A.     This is the first time for me to learn about this
02:12:33 23    issue, not Waydoo.
02:12:35 24    Q.     When did Shenzhen Waydoo first learn of the legal
02:12:43 25    issues in this case?

02:12:44 1    A.      In August 2019, after the Best Pro Kite Boarding

02:12:51 2    received that email, the -- Waydoo learned -- learned about

02:12:56 3    this legal issue.

02:12:58 4    Q.    Mr. Ping, you had mentioned earlier that Shenzhen

02:13:02 5    Waydoo was formed in May of 2018.  What was its primary

02:13:08 6    business purpose to be when it was formed?

02:13:11 7            THE WITNESS:   Okay.  Before Waydoo was formed,

02:13:16 8    the founder of that company was -- was -- was doing

02:13:22 9    agricultural job.

02:13:25 10   BY MR. THEUERKAUF:

02:13:26 11   Q.    Okay.  And -- and the founder you mentioned, who --

02:13:30 12   who is that?

02:13:30 13   A.      Mr. Zhu Qiuyang and his English name is Dennis.

02:13:37 14   Q.      Okay.  And so he was the founder of Shenzhen Waydoo;

02:13:41 15   is that correct?

02:13:41 16   A.      Yes.

02:13:42 17   Q.      And can you tell me, who was the original designer of

02:13:49 18   the Waydoo eFoil?

02:13:50 19   A.      So the information I have, it was Mr. Ju Cho Yung and

02:13:57 20   Mr. Zhu Wei Jie, Dennis and Lewis.

02:14:00 21   Q.      And do you know when Dennis and Lewis first designed

02:14:05 22   eFoil?

02:14:05 23   A.      As far as -- as I know, it's around the time when the

02:14:11 24   company was formed, May 2018.

02:14:16 25   Q.      Mr. Ping, if you'd open up Exhibit 8 for me, please.

02:14:20  1    A.      Okay.   Open.

02:14:23  2    Q.      Okay.   And this one is Bates label W D006864.

02:14:28  3            Mr. Ping, do you recognize this document?

02:14:30  4    A.      Yes.

02:14:31  5    Q.      Okay.   Can you tell me what it is.

02:14:36  6    A.      So this is a timeline posted on a Kickstarter

02:14:42  7    website, so that shows the -- the timeline of our campaign.

02:14:54  8    Q.      Okay.   Can you tell me what the difference is between

02:14:56  9    the Flyer and Flyer ONE?

02:14:59  10           THE WITNESS:   Okay.   The Flyer ONE is our

02:15:03  11   second-generation product.   It's a revolutionary renovation,

02:15:08  12   and then include that we -- we -- we did not -- we were --

02:15:14  13   we used cordless battery, and then we also used EPP material

02:15:19  14   for the -- for the body of the board.   And then -- and then

02:15:25  15   it's a new -- it's a brand-new innovation, and then we used

02:15:30  16   the aviation aluminum for the strut, and then basically it's

02:15:37  17   a whole new innovation, a whole new product -- product --

02:15:42  18   production line.   Product line, line of product.

02:15:46  19   BY MR. THEUERKAUF:

02:15:46  20   Q.      Is it accurate that, with respect to the Flyer ONE,

02:15:50  21   that there are two variations:   One that has what is called

02:15:57  22   an Explorer package, and another one having what is called a

02:16:01  23   Patroller package?

02:16:03  24   A.      Correct.   Correct.

02:16:06  25   Q.      Okay.   And so did the Flyer also -- was the Flyer

02:16:13 1    also sold with those two different packages?

02:16:15 2    A.    Yes.

02:16:16 3    Q.    And can you tell me what the difference is between

02:16:20 4    the -- and specifically referring to the Flyer ONE, what the

02:16:25 5    difference is between the Explorer package and the Patroller

02:16:29 6    package?

02:16:29 7    A.    So it's -- the difference is the hydrofoil, the foil.

02:16:34 8    The -- the Explorer one is bigger, so it's better -- it's

02:16:39 9    good for the beginners, and then the Patroller one is

02:16:44 10   smaller.  It's good for the experienced players.

02:16:50 11   Q.    In respect to that, those answers, what -- what is

02:16:55 12   the profit margin that Shenzhen Waydoo wants to see for its

02:17:01 13   distributor?

02:17:02 14   A.    So we can do it in a simple way.  So if we based --

02:17:09 15   based on the suggested retail price, and we hope that our

02:17:12 16   distributor can have 50 percent profit margin.

02:17:17 17   Q.    Was that 50 percent, 5-0?

02:17:20 18   A.    Yes.

02:17:22 19   Q.    Okay.  And -- and is that true for all models and

02:17:26 20   variations of the eFoil product?

02:17:29 21   A.    So our main stream product is actually Flyer ONE and

02:17:32 22   the modified version, Flyer ONE Plus, so our discussion

02:17:36 23   about the price is mainly referred to the second-generation

02:17:42 24   product.  So it's about -- it's about the Flyer ONE and

02:17:48 25   Flyer ONE Plus.

02:17:50 1    Q.    And then with respect to the profit margin that

02:17:54 2    Shenzhen Waydoo -- what is the profit margin that Shenzhen

02:18:01 3    Waydoo --

02:18:02 4              Well, let me back up.  Hold on.  So let me ask

02:18:06 5    it this way first:  What is the profit margin that Shenzhen

02:18:09 6    Waydoo attempts to make on the -- on the eFoil products, the

02:18:16 7    Flyer ONE and the Flyer ONE Plus?

02:18:16 8    A.    This is actually very confidential, so I need to

02:18:20 9    consult my attorney to see if I -- I can answer this

02:18:24 10   question.

02:18:24 11             THE WITNESS:  So the manufacturing -- the

02:18:28 12   manufacturing and the profit margin of air -- of Flyer and

02:18:34 13   Flyer ONE is 35 percent.

02:18:37 14   BY MR. THEUERKAUF:

02:18:37 15   Q.    And I'm sorry.  You said the -- can you repeat that,

02:18:40 16   please.

02:18:41 17   A.    So from manufacturing to delivery to distributor, the

02:18:45 18   manufacturing and the profit margin is 35 percent.

02:18:53 19   Q.    Okay.  And -- and so -- okay.  So that profit margin

02:18:58 20   takes into consideration the actual manufacturing of the

02:19:04 21   product and delivery, and I think there was one other item

02:19:09 22   that you mentioned.

02:19:10 23   A.    So this profit margin is only the manufacturing end

02:19:15 24   of profit margin.  As for shipping, shipping cost is not

02:19:20 25   included.  But shipping cost is usually covered by the

02:19:24  1    distributor, so what we do, we just need to send the product

02:19:29  2    to the customs, to the nearby port.  Shipping costs is only

02:19:37  3    take -- is only a small portion of this -- of total cost.

02:19:40  4    Q.     And so the costs associated with that profit margin

02:19:46  5    are the manufacturing costs.  What -- what do you include in

02:19:52  6    the manufacturing costs?

02:19:53  7    A.     So it -- it includes the raw materials, the purchase

02:19:58  8    -- the cost of the purchasing, and then the factory's -- the

02:20:03  9    cost of the factory, the human resources, the -- the

02:20:08 10    manufacturing, and then the -- the rent of the factory, and

02:20:12 11    the other related-to-factory expenses.  Particularly is the

02:20:20 12    -- the assembled, the -- the material and assembling cost.

02:20:27 13    Q.     Did you say it was primarily the material and

02:20:30 14    assembly cost?

02:20:31 15    A.     Yes.

02:20:33 16    Q.     So, do you know what the operating margin is for the

02:20:37 17    eFoil Flyer ONE and Flyer ONE Plus?

02:20:43 18              THE WITNESS:  So based on the price, we gave it

02:20:46 19    -- we sell it to the distributor.  Also depends on how you

02:20:50 20    define the operating -- operation cost.  The cost -- the

02:20:55 21    manufacturing cost, and plus the operating cost is, like,

02:21:00 22    50 percent.

02:21:01 23    BY MR. THEUERKAUF:

02:21:02 24    Q.     I'm sorry.  I don't think I understood you.  What is

02:21:05 25    50 percent?

02:21:05  1   A.      So like what I said, when we sell the product to the

02:21:09  2   distributor, the manufacturing profit margin is 35 percent,

02:21:14  3   and then -- and then our operating cost is 15 percent.  So

02:21:22  4   add them together is 50 percent.

02:21:25  5   Q.      So is it accurate that you're -- is what you're

02:21:29  6   saying is that your operating profit margin is 15 percent?

02:21:33  7   A.      So can you define what operating profit margin is?

02:21:41  8   Because different company may have definition of -- of

02:21:46  9   operating profit margin.

02:21:49 10   Q.      Yeah.  And I guess really I want to know what you --

02:21:52 11   how you define it.

02:21:54 12           But what was -- how are you defining what you

02:21:56 13   attributed the 15 percent to?

02:22:00 14   A.      So the operating profit margin is after we deduct the

02:22:06 15   sales cost and the marketing cost, basically network or

02:22:13 16   channel cost.

02:22:16 17   Q.      And that profit margin is 15 percent; is that

02:22:20 18   accurate?

02:22:20 19   A.      If -- if this is how you define the profit -- the

02:22:24 20   operating profit margin, yes.

02:22:27 21   Q.      Just prior to the break we were talking about the

02:22:30 22   profit margins and that the distributor has a 50 percent

02:22:35 23   profit margin.  And my question is:  Is there a reason why

02:22:40 24   Shenzhen Waydoo wants such a high profit margin for the

02:22:45 25   distributor?

02:22:46 1    A.      So because Waydoo is a new -- a brands new company

02:22:51 2    and also a -- a -- a very innovative company, we are far

02:22:55 3    from our main -- main market.  We are located in China.

02:23:00 4            So initially the -- Waydoo will -- will --

02:23:04 5    depends highly upon the distributors, especially our

02:23:08 6    exclusive distributor.  And also those profit margins have

02:23:17 7    been reached through the communications about the U.S. and

02:23:22 8    Europe market.  So that's the -- this profit margin was

02:23:27 9    mutually satisfied before we put it in the contract.

02:23:32 10   Q.      Okay.  So it -- I believe your testimony is -- so

02:23:36 11   with respect to the distributor, Action Sports and Kevin

02:23:40 12   Wade, you all had agreed that he would have a profit margin

02:23:45 13   of 50 percent?

02:23:46 14   A.      That's not accurate.  First of all, that retail price

02:23:52 15   is the suggested retail price.  And second of all, Kevin

02:23:57 16   Wade didn't -- is only -- strike that.

02:24:03 17           Kevin Wade didn't sell those products to the end

02:24:06 18   user, so mostly he will send the -- sell the product to the

02:24:12 19   second tier or third tier distributors.  If they have a --

02:24:17 20   if Kevin Wade have the chance to set -- to sell the product

02:24:20 21   to the end user for the suggested retail price, yes, he will

02:24:27 22   be able to make -- his profit margin is -- will be

02:24:32 23   50 percent.  But he -- most -- but most of the time, he will

02:24:35 24   sell this product to the -- to other distributors.  So the

02:24:40 25   only thing he make is the differences between him and the

02:24:46  1    second distributors.  So that's why he is not able to make

02:24:53  2    50 percent -- he's not have 50 percent of profit margin

02:24:57  3    every transaction.

02:24:59  4    Q.    And do you know does this document accurately reflect

02:25:02  5    Waydoo's sales of its eFoils?

02:25:05  6    A.    I am not sure, because there's so many numbers.  I

02:25:12  7    need time to make my own judgment.

02:25:12  8    Q.    Okay.  Well, let me ask you this.  So would this be

02:25:16  9    the most reliable source for the sales of Waydoo's eFoils?

02:25:26 10    A.    No.  I -- I'm not sure.  I need time to verify.

02:25:31 11              Yes.  I have reviewed it.  The numbers are

02:25:33 12    accurate.

02:25:36 13    Q.    Do you know how many complete eFoil units were sold

02:25:39 14    to the United States in 2021?

02:25:47 15    A.    The current number is 1500.

02:25:50 16    Q.    And do you know what the total revenue for those

02:25:54 17    sales in 2021 were to Shenzhen Waydoo?

02:25:58 18    A.    So the total revenue here, do you refer to U.S. only

02:26:02 19    or whole worldwide?

02:26:06 20    Q.    U.S. only.

02:26:08 21    A.    I'm checking.  5 million U.S. dollars.

02:26:12 22    Q.    And that was for 1500 units; correct?

02:26:15 23    A.    Correct.

02:26:18 24    Q.    Okay.  And -- and what did you look at to determine

02:26:19 25    that?

02:26:19  1    A.      Work doc -- my work document.

02:26:22  2    Q.      Okay.  So your work document has support for that

02:26:25  3    answer?

02:26:25  4    A.      Yes.

02:26:28  5    Q.      Has Shenzhen Waydoo ever done any market share

02:26:31  6    analysis?

02:26:31  7    A.      No.  Nothing official and nothing paid.

02:26:39  8    Q.      Has it done any informal market share analysis?

02:26:42  9    A.      There's only an internal -- a very simple guess.

02:26:50 10    Q.      Okay.  And the internal simple guess, has -- have you

02:26:58 11    done that for the market in the United States?

02:27:00 12    A.      That's only a guess to the worldwide market and also

02:27:06 13    the market where we can sell the water foil to.

02:27:12 14    Q.      So your -- your internal estimation of the market

02:27:16 15    share has just only been worldwide; is that correct?

02:27:19 16    A.      Yes.

02:27:20 17    Q.      Okay.  And is this internal estimation for market

02:27:25 18    share worldwide related to eFoils?

02:27:28 19    A.      Yes.

02:27:33 20    Q.      And what did you estimate Shenzhen Waydoo's market

02:27:37 21    share to be for eFoils worldwide?

02:27:41 22    A.      We estimate that the -- quantity-wise, we -- it takes

02:27:46 23    about ten -- 10 to 20 percent.

02:27:51 24    Q.      Do you know the other companies or manufacturers that

02:27:55 25    account for the rest of that percentage worldwide?

02:28:00  1    A.      Would you please repeat that question?

02:28:03  2    Q.      Yeah.  Of that percentage you just estimated for

02:28:10  3    Shenzhen Waydoo, do you have an understanding of the

02:28:15  4    companies that make up the other percentage of that market

02:28:19  5    share?

02:28:19  6    A.      Generally, yes.

02:28:24  7    Q.      Okay.  Can you tell me who those companies are,

02:28:27  8    please?

02:28:27  9    A.      That's the main four -- main -- the four -- the main

02:28:32 10    four brand names.

02:28:34 11    Q.      Okay.  And what were those?

02:28:36 12    A.      LIFT eFoil, Fliteboard, E-Takuma, GetFoil.

02:28:44 13    Q.      And have you estimated what LIFT eFoil's market share

02:28:49 14    is?

02:28:49 15    A.      Impossible.  No.

02:28:54 16    Q.      Okay.  Have you estimated what Fliteboard's market

02:28:58 17    share is?

02:28:58 18    A.      No.

02:28:59 19    Q.      Have you estimated what GetFoil's market share is?

02:29:03 20    A.      No.

02:29:05 21    Q.      All right.  Do you know when Shenzhen Waydoo first

02:29:11 22    became aware of the -- either one of the patents at issue in

02:29:17 23    this lawsuit?

02:29:17 24    A.      I have answered this question.

02:29:20 25    Q.      Is that when you were -- when Shenzhen Waydoo

Stec - Direct

02:29:25 1    received an email from Best Pro Kite?

02:29:28 2    A.    Yes.

02:29:30 3    Q.    Okay.  And I don't know -- did you -- you may have

02:29:33 4    testified to this.  If you did, I'm sorry.

02:29:35 5          But do you know the date that Shenzhen Waydoo

02:29:37 6    received that email?

02:29:38 7    A.    I remember -- if my recollection is correct, it's on

02:29:44 8    August 29, 2019, if I'm not mistaken.

02:29:50 9          (Conclusion of video.)

02:30:00 10         MR. MURRELL:  Yes, Your Honor.  We call Dr. Stec

02:30:03 11   to the stand.

02:30:03 12         THE COURT:  All right.

02:30:23 13         DEPUTY CLERK:  Please states and spell your full

02:30:27 14   name for the record.

02:30:28 15         THE WITNESS:  Jeffrey, J-E-F-F-R-E-Y.  Alan,

02:30:32 16   A-L-A-N.  Stec, S-T-E-C.

02:30:32 17         JEFFREY STEC, the witness herein, after having

02:30:32 18   been duly sworn under oath, was examined and testified as

02:30:36 19   follows: (Affirm).

02:30:50 20                    DIRECT EXAMINATION

02:30:51 21   BY MR. MURRELL:

02:30:57 22   Q.    Good afternoon.

02:30:57 23   A.    Good afternoon.

02:30:59 24   Q.    Can you introduce yourself to the jury, please?

02:31:01 25   A.    Yes.  My name is Jeffrey Alan Stec.

Stec - Direct

02:31:04  1   Q.      And, Mr. Stec, what do you do for a living?

02:31:07  2   A.      So, I'm an economist.  I do a lot of economic

02:31:11  3   consulting which consists of things like doing damages work

02:31:16  4   for the purposes of figuring out, in the context of some

02:31:20  5   type of wrongdoing, what the damages associated with that

02:31:23  6   wrongdoing might be.

02:31:25  7   Q.      And before -- and were you asked to reach opinions in

02:31:29  8   this case?

02:31:29  9   A.      Yes.  I was.

02:31:31 10   Q.      And before we get to those opinions, I'd like to go

02:31:33 11   over some of your background that leads you to that?

02:31:36 12   A.      Okay.

02:31:36 13   Q.      Can you tell the jury your educational background as

02:31:38 14   it relates to your -- being here today to provide testimony?

02:31:42 15   A.      Yes, I can.  So I've earned bachelor's degrees from

02:31:45 16   Cornell University in psychology and philosophy.  I've also

02:31:51 17   earned a bachelor's degree in economics with a minor in math

02:31:55 18   from the University of Illinois in Chicago.  And then

02:31:58 19   lastly, I've earned a master's degree and a Ph.D. degree

02:32:01 20   from the Ohio State University in economics.

02:32:04 21   Q.      And could -- what's your current position?

02:32:08 22   A.      So currently, I'm a managing director at a company

02:32:11 23   called Berkeley Research Group.  I also lead their

02:32:15 24   intellectual property practice and I'm coleader of their

02:32:19 25   economic and damages community.

Stec - Direct

02:32:21 1    Q.      And where is that?

02:32:23 2    A.      So Berkeley Research Group is an international

02:32:26 3    company.  Our headquarters is in Emeryville, California.  My

02:32:29 4    office is actually in Chicago, Illinois.

02:32:31 5              We have offices around the country, including

02:32:34 6    locally.  New York City, for example, as well as

02:32:38 7    international places like London and Dubai and places like

02:32:42 8    that.

02:32:43 9    Q.      And, again, if you could then tell the jury your

02:32:45 10   professional employment background that leads you here

02:32:48 11   today.

02:32:48 12   A.      Sure.  So, immediately after starting -- or finishing

02:32:52 13   graduate school, I started with a company called InteCap.

02:32:55 14   That was about 22, almost 23 years ago now.  That company

02:33:00 15   specialized in intellectual property and a lot of what I did

02:33:03 16   focused on intellectual property there.

02:33:05 17             About four years with that company, it was

02:33:08 18   purchased by another company called Charles River

02:33:11 19   Associates.  That became my new firm.  I stayed with the

02:33:13 20   firm for another 13 years doing very similar work.  Economic

02:33:17 21   damages in the context of litigation for example.

02:33:20 22             About five years ago -- a little more than five

02:33:23 23   years or so ago, I moved from Charles River Associates to my

02:33:27 24   current firm, Berkeley Research Group.

02:33:30 25   Q.      And so -- and we can see it on the slide.  About how

Stec - Direct

02:33:33  1   many years have you been doing the type much work --

02:33:34  2   A.     It sometimes makes me feel a little older than I

02:33:38  3   should.  It's been 22, almost 23 years now.

02:33:40  4   Q.     And how many courts like this have you appeared to

02:33:43  5   testify in?

02:33:43  6   A.     I've testified in a number of courts, both District

02:33:47  7   Courts like this, as well as in front of regulatory bodies,

02:33:51  8   like the International Trade Commission, the Copyright

02:33:54  9   Royalty Board, as well as doing things for arbitrations of

02:33:57 10   the formal legal system in the United States.

02:34:01 11   Q.     And in those courts, have you been recognized as an

02:34:03 12   expert?

02:34:04 13   A.     Yes, I have.  In many of those courts I have been

02:34:07 14   recognized as an expert in economics and damages.

02:34:11 15   Q.     So, what were you tasked with in this case?

02:34:14 16   A.     So, I was tasked with two things in general.  The

02:34:19 17   first was under the assumption that the patents-in-suit here

02:34:22 18   are valid and infringed, I was asked to address whether

02:34:26 19   damages would be appropriate.

02:34:28 20          If damages were appropriate, then my task was to

02:34:32 21   quantify those damages.  In other words, to try to make the

02:34:35 22   Plaintiff whole due to the alleged wrongdoing.

02:34:38 23          The other thing I was tasked with was a -- the

02:34:42 24   Defendant put forth a damages expert who put together his

02:34:45 25   own report and I was asked to review that report and comment

Stec - Direct

02:34:49  1    on that report.

02:34:50  2    Q.     And in -- I'm sorry.

02:34:54  3               In evaluating those potential opinions in this

02:34:57  4    matter, did you review some materials?

02:34:59  5    A.     I did.  I reviewed a whole host of materials, as you

02:35:02  6    can see from this slide.  I had to write all this down.  I'm

02:35:04  7    not sure could have come up with all of these off the top of

02:35:07  8    my head.

02:35:08  9               So a number of things were produced in this

02:35:09  10   case, both from the Plaintiff and the Defendant.  They came

02:35:13  11   in the form of financial documents, license agreements,

02:35:16  12   correspondence with various players in the marketplace,

02:35:20  13   things like that.  So I reviewed that type of information.

02:35:23  14              There were also depositions that were taken of

02:35:26  15   certain executives or certain parts -- employees that were

02:35:29  16   part of this litigation, so I reviewed that information.  I

02:35:33  17   also looked at court filings, so these would be documents

02:35:36  18   that were filed with this Court related to this particular

02:35:39  19   litigation.

02:35:40  20              I looked at expert reports.  Philip Kline is the

02:35:44  21   opposing expert, the Defendants' damages expert.  So I

02:35:47  22   looked at that report, like I said a moment ago.  And then

02:35:50  23   there were technical experts.  We heard from Mr. Barry

02:35:53  24   earlier today, that was one of the experts whose reports I

02:35:56  25   looked at.

Stec - Direct

02:35:56  1            There was also publicly available information

02:35:59  2    that I reviewed.  That was information that I went out and

02:36:02  3    did my own remember research to find out more about the

02:36:04  4    industry, more about the marketplace, more about the parties

02:36:07  5    involved, as well as the products and financial information

02:36:10  6    as well.

02:36:11  7            And then lastly, I had some discussions with

02:36:14  8    Mr. Wagner, who's an MHL employee, a Plaintiff employee, as

02:36:18  9    well as Mr. Barry who we heard from earlier today.

02:36:23 10    Q.    And based upon that review that you just described to

02:36:26 11    us, can you first provide us a summary of your opinions?

02:36:28 12    A.    Sure.  Like I said, there were two main tasks that I

02:36:32 13    was asked to do here.  The first was to determine under the

02:36:34 14    assumption that if the patents-in-suit are valid and

02:36:37 15    infringed, how much damage would be due to the Plaintiff due

02:36:41 16    to the alleged wrongdoing.

02:36:43 17            So, that was what you see here.  I have

02:36:45 18    estimated approximately one point -- almost $1.5 million for

02:36:49 19    sales from the date of what was alleged to be the first

02:36:53 20    infringement so the first sale of the Defendants' accused

02:36:56 21    product through December of 2022, which is for as long as I

02:36:59 22    had data.

02:37:00 23            And then the second thing I was asked to do here

02:37:03 24    was, as I said a moment ago, evaluate what Mr. Kline did in

02:37:06 25    the context of his expert report and comment on that.

02:37:10  1   Q.      And what was your opinion on that?

02:37:11  2   A.      Well, I put it here, and we'll get into this, I

02:37:15  3   think, a little bit.  I viewed Mr. Kline's report after my

02:37:19  4   critical evaluation of it as being unreliable.  He makes, I

02:37:23  5   think, unreasonable assumptions, unsupported assumptions and

02:37:26  6   comes up with a damages number that I, frankly, think

02:37:30  7   understates the damages that have occurred to the Plaintiff.

02:37:32  8   Q.      Well, let's take these opinions one by one and

02:37:35  9   understand how we got there.  First of all, I think the jury

02:37:39 10   has heard a little bit about royalties, but if you could

02:37:41 11   explain to them what a royalty is.

02:37:43 12   A.      Sure.  And I thought this slide might be helpful.

02:37:46 13   Most of us are used to renting or buying a home.  So that's

02:37:50 14   the analogy I'm going to use here.  That's what I call real

02:37:53 15   property on this slide.  So you have some type of property,

02:37:56 16   whether it be an apartment, a house, what have you.  And you

02:37:59 17   want to rent it.

02:38:01 18          So, there's a landlord typically that's involved

02:38:03 19   in that process, and you and the landlord would come to an

02:38:06 20   agreement, typically some type of lease agreement, where you

02:38:09 21   would pay rent.  In exchange, the landlord would allow you

02:38:12 22   to use that property for some term.

02:38:14 23          That's very analagous to how to think about a

02:38:16 24   royalty in the intellectual property, and in particular the

02:38:19 25   patents usually involved in that type of transaction where

Stec - Direct

02:38:23  1    essentially the patent is the property and you'd like to use

02:38:26  2    the property or a company that would like to manufacture

02:38:32  3    something using its patent so at the end of the day you go

02:38:33  4    to the license or the patentholder and ask them for a

02:38:36  5    license.

02:38:37  6              And in that context then, what's called a

02:38:39  7    royalty is determined.  It's basically the price you would

02:38:42  8    pay to use that intellectual property, that particular

02:38:45  9    patent.  And then you come to an agreement.  You pay that

02:38:48 10    royalty.  And you're allowed then to use that intellectual

02:38:51 11    property, that patent to manufacture whatever you choose to

02:38:54 12    manufacture.

02:38:55 13    Q.    And how do you calculate a royalty in a case like

02:38:58 14    this?

02:38:58 15    A.    So, it's two components that go into the calculation

02:39:01 16    of what that overall payment would be, what's called a

02:39:04 17    reasonable royalty.  First, you have to come up with a

02:39:07 18    royalty rate.  So you can look at that sort of as monthly

02:39:11 19    rent, how much you would pay for one month's rent.  This is

02:39:13 20    how much you would pay ==per unit== to actually use the patent

02:39:16 21    to manufacture a product.

02:39:18 22              So, that you can see there is multiplied by

02:39:21 23    what's called the royalty base.  That's how many products

02:39:23 24    you actually made using that patent.  So it's a fairly

02:39:27 25    simple formula.  You take how much it costs in terms of the

Stec - Direct

02:39:30  1    royalty per product times how many products you've actually

02:39:34  2    manufactured.  And that gives you the royalty rate.  Or, I'm

02:39:38  3    sorry, the reasonable royalty.

02:39:40  4          And as you can see there, I've put in some

02:39:42  5    numbers.  This is -- I'm going to describe how we get to

02:39:45  6    these numbers in a little bit, but this particular instance,

02:39:47  7    I came up with a reasonable royalty rate of $560 per

02:39:53  8    product.  That's the rent, so to speak.

02:39:55  9          And then ultimately there were 2,668 eFoils that

02:40:00 10    were accused of infringement, and I took the $560 times the

02:40:05 11    2,668 eFoils to get the almost $1.5 million in reasonable

02:40:10 12    royalty damages.

02:40:13 13    Q.    Let's talk about how you got there.  So this slide,

02:40:17 14    it says a hypothetical negotiation.  What are we talking

02:40:19 15    about here?

02:40:19 16    A.    So, this is actually a construct that's oftentimes

02:40:22 17    used in patent infringement matters.  It goes way back to

02:40:26 18    the '70s, the seminal case that Georgia Pacific versus U.S.

02:40:29 19    Plywood, Georgia-Pacific.

02:40:30 20          In that case this construct was put forth by the

02:40:33 21    Court as a way to think about how you come to a reasonable

02:40:36 22    royalty.  And what this hypothetical negotiation is meant to

02:40:40 23    represent is the two parties in the litigation, the

02:40:43 24    Defendant and the Plaintiff, come together.  So in this case

02:40:46 25    MHL and Waydoo come together and meet at a jupothetical

Stec - Direct

02:40:50  1    table like this, and they hammer out an agreement.  This is

02:40:53  2    very much the way it works in the real world, but in this

02:40:55  3    particular instance it's hypothetical because the two

02:40:58  4    parties didn't come together.

02:40:59  5              So, as a damages expert, I'm tasked,

02:41:02  6    nonetheless, to come up with that reasonable royalty in this

02:41:05  7    hypothetical negotiation is how we do it.  We bring the two

02:41:08  8    parties together.

02:41:09  9              And then we make a number of assumptions in

02:41:11 10    terms of what the parties know at the time they're

02:41:14 11    negotiating and those are in the bullet points below.  The

02:41:17 12    first assumption is that this negotiation, the actual time

02:41:20 13    period when it occurs is right before the infringing

02:41:23 14    products are sold.  So, on the eve of first infringement is

02:41:26 15    what that means.

02:41:27 16              The patents are assumed to be valid and

02:41:30 17    infringed because obviously if they're not, then there's no

02:41:32 18    reason to come to the table.  Each party has full

02:41:35 19    information.

02:41:36 20              What that means is what -- whatever Waydoo

02:41:39 21    knows, MHL knows and whatever MHL knows, Waydoo knows.  So

02:41:43 22    they both have equal information when they come to the

02:41:45 23    negotiating table.  Nobody has something that they know and

02:41:48 24    the other party doesn't.

02:41:49 25              And then lastly, the parties must reach an

02:41:52  1    agreement.  So in other words, this is a hypothetical

02:41:54  2    negotiation and unlike a real negotiation, where the parties

02:41:57  3    could walk away if they don't come to an agreement in the

02:42:01  4    hypothetical negotiation, they're required to come to an

02:42:03  5    agreement.

02:42:05  6    Q.    So, you mentioned Georgia-Pacific.  That provides for

02:42:08  7    several factors to be considered?

02:42:10  8    A.    It does.  Going back to the case I just mentioned a

02:42:13  9    moment ago, the Court put forth 15 different factors.  And

02:42:16 10    there's a lot of information here.  I don't expect you to

02:42:20 11    absorb it all so what I tried to do is break it out into

02:42:23 12    three sort of areas that are most helpful, I think, in terms

02:42:26 13    of thinking about this.

02:42:27 14            Some of the Georgia-Pacific factors deal with

02:42:30 15    what are called the technical benefits of the

02:42:32 16    patents-in-suit, in other words, the technical aspects or

02:42:35 17    advantages that the patents have or that they teach for

02:42:38 18    making a product.  The other are licensing factors.  So,

02:42:41 19    these are factors that relate to how much somebody might

02:42:44 20    have been willing to license this particular technology for

02:42:48 21    in the context of real world instances, real world

02:42:52 22    negotiations.

02:42:52 23            And then lastly there's a whole set of economic

02:42:55 24    factors that have to do with who the parties are that are

02:42:59 25    meeting at the hypothetical negotiating table.  Are they

Stec - Direct

1    inventors?  Are they manufacturers?  Are they a mix of

2    something?  How does the marketplace look?  Is it a

3    brand-new marketplace?  Is it an established marketplace?  A

4    number of other factors that are considered under this

5    economics factors set or this category.

6    Q.    And you looked at those factors in this matter?

7    A.    I did.

8    Q.    And did -- what considerations did you take when you

9    looked at them?

10   A.    So, the factors, as you might imagine, some may

11   apply.  Some may not apply depending on the situation.  So,

12   as part of the damages work that I did, I went through those

13   Georgia-Pacific factors and determined, okay, well what

14   would MHL be thinking when it comes to the table?  In other

15   words, what is its mindset when it comes to the table?

16         And in that particular context, I listed out the

17   factors that I thought were relevant for that purpose.  One

18   of them -- and this has to do with the technical benefit of

19   the patents-in-suit, the advantages that it has, those

20   patents have over whatever the prior art might be or

21   whatever other ways of doing these things are.

22         And we've heard about some of those benefits

23   with Mr. Barry's testimony and some of the other information

24   that we've heard already.  That's related to the technical

25   benefits.  Related to the licensing factors, there is

Stec - Direct

02:44:13  1    actually executed license agreements for these patents.

02:44:17  2    That means in the real world, somebody agreed to license

02:44:20  3    these patents from MHL, or MHL agreed to license the patents

02:44:24  4    from somebody else.  So, we have that information which is

02:44:27  5    what are sometimes called comparable licenses that we can

02:44:31  6    use to try and figure out what MHL and Waydoo would agree to

02:44:35  7    if they came to this hypothetical negotiation.

02:44:37  8            And then the last couple factors deal with the

02:44:40  9    economic factors.  We're going to see that MHL -- or maybe

02:44:44 10    you already knew this.  MHL actually pioneered the eFoil

02:44:48 11    marketplace.  They were the first ones into the market,

02:44:50 12    sometimes what economists call first movers into a market.

02:44:54 13    So they basically created a market from nothing, and then

02:44:58 14    grew that market.  And as you can see here, they had

02:45:00 15    revenues of about $62.4 million from February 2020 through

02:45:06 16    June of 2022.

02:45:07 17            And then, lastly, a little bit about competition

02:45:10 18    in the marketplace.  Waydoo and MHL compete in that eFoil

02:45:15 19    marketplace, Waydoo with its products, MHL with its

02:45:18 20    products, and that's relevant.  That's important in the

02:45:21 21    hypothetical negotiation because a license between MHL and

02:45:25 22    Waydoo is essentially allowing a new competitor into the

02:45:28 23    marketplace.

02:45:31 24    Q.    And you mentioned actual licenses.  Can -- could you

02:45:35 25    explain that to the jury and what you looked at?

Stec - Direct

02:45:37 1    A.      Sure.  And this is relevant because when you're an

02:45:40 2    economist thinking about royalty damages, one of the things

02:45:44 3    you look for, what are called comparable licenses.  These

02:45:47 4    are licenses that essentially you can use to give yourself

02:45:50 5    some guidance in terms of what the parties of the

02:45:53 6    hypothetical negotiation would come up with.  So, what do

02:45:56 7    you look for with comparable licenses?  Well, ideally they

02:46:00 8    license the intellectual property at issue.

02:46:02 9           And, in fact, this particular license with

02:46:04 10   Fliteboard licensed the actual patents that are in this

02:46:07 11   case.  So that was a checkmark in terms of why this would be

02:46:11 12   a relevant license.

02:46:13 13          Moreover, this license was between two

02:46:15 14   competitors.  So, we've already heard, I think, some

02:46:18 15   testimony that Fliteboard's in the marketplace.  MHL's

02:46:22 16   obviously in the marketplace, and they compete to sell

02:46:24 17   eFoils.  So, it's a competitor/competitor type license which

02:46:28 18   is going to be very comparable to the hypothetical license.

02:46:32 19          We also know that it was a non-exclusive

02:46:34 20   license, and I'll explain as -- a little built later, but in

02:46:38 21   a general sense, it just simply means that MHL doesn't

02:46:40 22   exclusively license to just Fliteboard.  It has the right to

02:46:43 23   to license to others.

02:46:44 24          And then as part of this agreement, it specified

02:46:48 25   a royalty rate.  That's sort of the payment that occurs when

Stec - Direct

02:46:52  1    you're licensing a patent.  In this particular instance

02:46:55  2    though -- and this is important -- in the context of the

02:46:58  3    negotiations between MHL and Fliteboard for this particular

02:47:02  4    license, it was important for them to understand what the

02:47:05  5    manufactured suggested retail price is of these particular

02:47:09  6    eFoils and then what the dollar amount would be associated

02:47:12  7    with the payment for the patents-in-suit on each of those

02:47:16  8    license -- or each of those products.

02:47:18  9            So, at the end of the day, it translated into a

02:47:21 10    percentage rate but really what drove the negotiations was:

02:47:25 11    How much in a ==dollar's terms per unit== per Fliteboard would

02:47:29 12    the two parties be willing to agree to?

02:47:31 13    Q.    And did you review some of those negotiations and

02:47:34 14    communications?

02:47:34 15    A.    I did.

02:47:36 16    Q.    Could you show the jury what we're looking at here?

02:47:39 17    A.    Yes.  So this is -- I mentioned I reviewed a lot of

02:47:41 18    correspondence and so on between parties.  This is actually

02:47:45 19    an email exchange between an executive at Fliteboard and an

02:47:49 20    executive of MHL prior to them agreeing to a license.  So,

02:47:53 21    this is the back and forth you typically see when two

02:47:56 22    parties are trying to agree to a license in the real world.

02:47:59 23    And the back and forth essentially is we believe it's worth

02:48:02 24    this or the other company believes it's worth that, and they

02:48:05 25    come to some agreement after talking about it.

460

Stec - Direct

02:48:07 1          What you can see here is what the structure of

02:48:10 2     the agreement is or the conversation is, is there they're

02:48:14 3     assuming a certain price for the eFoil package.  That's what

02:48:17 4     they're referring to in that second part of the quote there.

02:48:20 5          And given a $10,000 eFoil package, they were

02:48:24 6     looking for about a $550 royalty rate per eFoil, or if it

02:48:29 7     was going -- and that was on a direct sale.  If it was going

02:48:33 8     through a distributor, then they would give a discount

02:48:35 9     because obviously the distributor marks the eFoil up before

02:48:39 10    the distributor sells it to the end customer.  And that

02:48:41 11    would be about a $440 royalty on an eFoil sale.  That

02:48:46 12    amounted to about a 5, 5-and-a-half percent royalty rate

02:48:51 13    given the $10,000 price of the eFoil package.

02:48:54 14    Q.    Okay.  And before we move forward, the date of this

02:48:57 15    email was July 24th, 2019?

02:48:59 16    A.    That's correct.

02:49:00 17    Q.    The date of this hypothetical negotiation, when was

02:49:03 18    that?

02:49:03 19    A.    That would have been March -- I believe March 25th,

02:49:07 20    to be exact -- 2019.  So just a few months, a couple months

02:49:11 21    before the actual email you see here.

02:49:16 22    Q.    And continuing, can you explain.  Was this another

02:49:19 23    piece of correspondence you reviewed?

02:49:20 24    A.    Yes, so that first correspondence that we just looked

02:49:23 25    at was an email from MHL to Fliteboard.  As I said a moment

02:49:28 1    ago, the negotiation in a real-world context is back and

02:49:32 2    forth.  It's just not one email and everybody agrees.  So,

02:49:35 3    this is actually an email back from a Fliteboard executive

02:49:39 4    back to the MHL executive who sent the email.  And as you

02:49:42 5    can see, Fliteboard was thinking about the context of this

02:49:45 6    negotiation in the same way.  They were looking at it from

02:49:48 7    the perspective of how much per unit would they be willing

02:49:51 8    to pay for a license to the patents, the patents-in-suit

02:49:55 9    actually.  And you can see here that they were thinking $539

02:50:00 10   for a direct sale or $489 for a sale that comes through

02:50:04 11   retailer, but at the end of the day, you're still in that 5

02:50:08 12   to 5-and-a-half percent ballpark.

02:50:10 13   Q.    And then have you looked at that since, as to what

02:50:15 14   they've actually paid in royalties?

02:50:16 15   A.    Yes, I have.  So, as part of the agreement,

02:50:20 16   Fliteboard was required to send MHL information about the

02:50:24 17   number of units, the number of eFoils that it sold, how much

02:50:28 18   it sold them for, and then, ultimately, the size of the

02:50:31 19   royalty payment.  You know how much the check was going to

02:50:34 20   be to pay for the use of the patents-in-suit.  And as you

02:50:37 21   can see here, Fliteboard reported these things on a regular

02:50:42 22   basis, roughly every six months or so, for a six-month

02:50:45 23   period.

02:50:46 24        So the first period that you see there,

02:50:47 25   September of 2019 to June 30th of 2020, basically covered

Stec - Direct

02:50:52 1   almost the first year of the license.  As you can see,

02:50:55 2   Fliteboard sold 209 eFoils with a royalty payment of a

02:51:01 3   $116,000, almost a hundred $117,000, so that averages out to

02:51:05 4   be a $560 royalty per eFoil.  And you can see that amount

02:51:11 5   changes over time.  It goes up; it goes down.  But it's

02:51:14 6   roughly the same amount over that period of time.

02:51:17 7          Now, importantly, and the reason I focused on

02:51:20 8   that first row there, this is the royalty payment or the

02:51:25 9   per-unit royalty that occurred right around the time of the

02:51:2810   hypothetical negotiation.  This is occurring almost right

02:51:3111   after the hypothetical negotiation.  That $560 will be

02:51:3612   meaningful in the context of how to calculate damages.

02:51:3813   Q.    And I noticed this only goes through June 30th of

02:51:4214   2022.

02:51:4315          Do you see that?

02:51:4316   A.    Yes, I see that.

02:51:4417   Q.    We're here now in March of 2023.  It gives the source

02:51:4718   of your report.  What was the date of your report in this

02:51:4919   case?

02:51:4920   A.    So as you can see in the bottom there, I know it's

02:51:5221   sort of a little harder to read, at least on my screen it

02:51:5422   is, but August 5th of 2022 is when my report was filed.  So,

02:51:5823   obviously, this is data that bumps right up to when that

02:52:0224   deadline was.

02:52:0325   Q.    And you've seen data since then?

Stec - Direct

02:52:05  1    A.      I have, yes.

02:52:06  2    Q.      And is this -- these numbers continue to be

02:52:09  3    consistent?

02:52:09  4    A.      That's correct.

02:52:13  5    Q.      Now, in addition to their negotiations on price, what

02:52:19  6    else did you see that was relevant to you?

02:52:21  7    A.      So, as I mentioned a moment ago, sometimes eFoil

02:52:25  8    manufacturers give discounts.  One of the discounts that

02:52:27  9    they give is to distributors because distributors,

02:52:31 10    obviously, have to mark up the product in other to make

02:52:34 11    money for distributing the product.  So, the markup,

02:52:39 12    sometimes, that the distributors give is due to the discount

02:52:43 13    they receive from the manufacturer to sell the eFoil

02:52:46 14    products.

02:52:47 15            Here, there are other discounts that, frankly,

02:52:51 16    MHL was worried about in the context of its business.

02:52:53 17    Remember, it's thinking about how to come up with a royalty.

02:52:57 18    It thinks, as does Fliteboard, that a per-unit royalty is

02:53:01 19    really what drives the discussions.  But they're going to

02:53:05 20    use a percentage to come up with that.  That percentage is

02:53:07 21    going to be applied to the sales price.  So, as the sales

02:53:11 22    price goes down, the per-unit amount is going to go down

02:53:14 23    because the percentage stays the same.  So, MHL was really

02:53:18 24    worried about discounts.

02:53:19 25            If Fliteboard starts giving big discounts, then

Stec - Direct

02:53:22  1    that's going to affect the royalty payment, and if it

02:53:24  2    affects the royalty payment, it affects the value that MHL

02:53:28  3    feels it should be deriving from that particular license

02:53:30  4    agreement.  So, in this context, what Fliteboard is telling

02:53:35  5    MHL is we're not going to have deep discounts.  We're going

02:53:38  6    to, essentially, hold the line on price so you can count on

02:53:41  7    a fairly steady per-unit royalty, which is what MHL was

02:53:45  8    looking for.

02:53:48  9    Q.     And then we've also heard about Professor Langelaan's

02:53:53 10    agreement with MHL.  Did you look at that as well?

02:53:55 11    A.     I did.  That was another agreement that was provided

02:53:58 12    in this case for the patents-in-suit.  So, at least

02:54:02 13    initially, that was an important agreement to look at.  But

02:54:05 14    as I look through that agreement, and I'll explain how, in

02:54:08 15    just a couple minutes, I started to see dissimilarities

02:54:12 16    between that agreement and what the agreement in the

02:54:14 17    hypothetical negotiation would be.

02:54:16 18           So, one of the things that I noticed right away

02:54:19 19    is that this agreement occurred prior to the hypothetical

02:54:24 20    negotiation.  Remember, I said a moment ago the hypothetical

02:54:28 21    negotiation would occur, basically, in March of 2019.  This

02:54:32 22    particular agreement occurred, actually, three years

02:54:35 23    earlier, a little more than three years earlier.  So, it was

02:54:39 24    not contemporaneous.  It was sort of out of the time period

02:54:43 25    that I would be looking for ideally.

465

Stec - Direct

02:54:45   1          There were also some other differences with this
02:54:49   2   particular agreement.  Another difference was in the
02:54:50   3   Fliteboard agreements, what was being licensed were patents,
02:54:53   4   the patents-in-suit.  Here, the patents hadn't been awarded
02:54:57   5   yet.  So these were patent applications.  And there's a
02:54:59   6   difference.  When you apply for a patent, that doesn't mean
02:55:02   7   you're guaranteed to get it.  And so there's some
02:55:05   8   uncertainty there about, you know, if I'm licensing a patent
02:55:08   9   application, does it actually lead to a patent somewhere
02:55:11  10   down the road that I could actually assert to protect my
02:55:14  11   rights under this intellectual property?  Because if it
02:55:18  12   doesn't, then the license really isn't very valuable.
02:55:20  13   You're not really licensing anything because it's not a
02:55:22  14   patent.  And that was another difference between this
02:55:24  15   agreement, what was being licensed, versus the Fliteboard
02:55:27  16   agreement that I mentioned a moment ago.
02:55:29  17          And then you can see there were different
02:55:32  18   royalties terms.  Some of these terms make it very
02:55:34  19   difficult, if not impossible, to actually take the royalty
02:55:37  20   rate from this agreement and use it.  One of the terms was
02:55:41  21   there were actually upfront payments made as part of the
02:55:44  22   license.  What that means is additional compensation, but
02:55:48  23   it's not represented in the royalty rate.  So, if you just
02:55:51  24   simply take the royalty rate from this agreement, you're
02:55:54  25   underestimating the amount of royalties that would occur.

466

Stec - Direct

1    Moreover, there were a couple clauses in this

2  agreement which made it difficult to use as well.  The total

3  royalty payments were capped at $1 million.  What that means

4  is when MHL paid a million dollars on this particular

5  agreement, it was done paying royalties.  In fact, in this

6  agreement, the patents in this agreement would be assigned

7  back to MHL.  So, no longer would Professor Langelaan own

8  the patents.  MHL would take them over after paying that

9  amount of royalties.

10    In fact, what ended up happening was an

11  agreement was made between Professor Langelaan and MHL some

12  time thereafter -- I think it was June or, no, July of 2020.

13  And in that particular context, Professor Langelaan agreed

14  to waive the million dollar cap and basically said, pay

15  $225,000 plus the royalties they had paid already up to that

16  point.  And you'll receive the patents.  In other words, he

17  assigned them to MHL after that date.

18  Q.    And did you look at the reasons for that early

19  buyout?

20  A.    I did.  It's important to try to understand, well,

21  what was Professor Langelaan thinking, to the best you could

22  tell, when he made that that particular assignment?  Because

23  originally, it was a cap that was at a million dollars and

24  Professor Langelaan basically drew that back to half a

25  million dollars.  The 225 plus the royalties that are

Stec - Direct

02:57:16  1    already been paid were about 275.

02:57:18  2         So, what ended up happening was Nick Leason, one

02:57:22  3    of the principals at MHL, had gone up to Professor Langelaan

02:57:26  4    and asked him, "Well, we have this litigation. We're trying

02:57:29  5    to assert our patent rights here. It's expensive. Can you

02:57:32  6    help us out here by, basically, giving us a break in terms

02:57:36  7    of how much we have to pay under the license."

02:57:38  8         Now, why that's important, it really doesn't get

02:57:41  9    to what we're trying to get from a license. That is, the

02:57:43 10    value of the intellectual property that's being licensed.

02:57:46 11    It's a secondary consideration. And importantly, it's not a

02:57:49 12    consideration that would have been relevant in the

02:57:52 13    hypothetical negotiation. And the reason that's important

02:57:55 14    is because, remember, we're trying to use licenses as

02:57:58 15    comparables. If this license isn't comparable to the one in

02:58:01 16    the hypothetical negotiation, it's not very useful for

02:58:05 17    giving us information about what the royalty rate would be

02:58:07 18    in that hypothetical negotiation.

02:58:08 19         There were other reasons that

02:58:11 20    Professor Langelaan gave that lower payment as well, and I

02:58:14 21    listed some of them here. Another one was he's a full-time

02:58:18 22    professor, as I understand it, at Penn State University.

02:58:21 23    And that takes a lot of time. Obviously, he didn't want to

02:58:23 24    mess around with trying to litigate patents or prosecute

02:58:26 25    patents. That's not his day job, so to speak. So he didn't

02:58:30  1    want that responsibility.  And so, with that particular

02:58:33  2    buyout, essentially, he passed on that responsibility as

02:58:36  3    well.

02:58:36  4            And then lastly, and I'll talk about this a

02:58:39  5    little bit more in a second, he really felt that this was

02:58:42  6    sort of seminal, a seminal piece of the MHL company, and so

02:58:48  7    he thought that MHL should have the patent so they could

02:58:50  8    properly monetize them, properly use them.

02:58:55  9    Q.     And what specific testimony did you look at?

02:58:58 10    A.     Well, there was testimony that Professor Langelaan

02:59:01 11    gave not only with respect to why he had the buyout be what

02:59:06 12    it was but also how he came up with the two-and-a-half

02:59:09 13    percent royalty rate.  And that's something I wanted to

02:59:11 14    understand because that two-and-a-half percent, at least at

02:59:15 15    first blush, might be a royalty that would be relevant for

02:59:17 16    the hypothetical negotiation.

02:59:20 17            But as you delved into what Professor

02:59:23 18    Langelaan's motivation was here, and he testified to this in

02:59:25 19    his deposition -- I prepared the information there -- it's

02:59:29 20    basically he was coming up with that two-and-a-half percent,

02:59:32 21    not based on the value of the technology, which is really

02:59:34 22    what you're trying to do, he was coming up with it simply

02:59:38 23    saying, "Look.  This is the start of a market that doesn't

02:59:42 24    exist yet, so if I charge you a high royalty rate, that may

02:59:45 25    really impede you to starting the market because, obviously,

Stec - Direct

02:59:48 1   not only are you starting a company, but you're starting a

02:59:50 2   market."  So what Professor Langelaan decided was to,

02:59:53 3   basically, give a lower royalty to give MHL the ability, as

02:59:57 4   much ability as he could, to start their company and start

03:00:00 5   this market.

03:00:06 6   Q.    And when -- after you completed that, did you then

03:00:08 7   compare the licenses in doing your analysis?

03:00:11 8   A.    I did.  And I've tried to collect for the jury's

03:00:14 9   benefit, sort of, some of the things I've gone through and

03:00:16 10  put it in a summary slide.  So we've already talked about

03:00:19 11  the data of the agreement.

03:00:21 12          So in the green column there, that's the

03:00:23 13  characteristics of the hypothetical license.  So the date of

03:00:26 14  that agreement would be March 25th, 2019.  That's the eve of

03:00:29 15  first infringement.  As I mentioned, the hypothetical

03:00:33 16  negotiation is assumed to occur there.  And you can see with

03:00:37 17  the Fliteboard license, the August 30th, 2019, date is very

03:00:41 18  close it's less than six months away.  The Langelaan-MHL

03:00:44 19  license, however, as I mentioned a moment ago, is more than

03:00:46 20  three years prior to that hypothetical license.  That means

03:00:50 21  that from a time perspective, things change over a

03:00:53 22  three-year period, and back when the Langelaan license was

03:00:56 23  agreed to, the market for this product didn't even exist.

03:00:59 24          Now, with respect to the patents that have been

03:01:02 25  licensed, I already mentioned this as well, that in the

Stec - Direct

1    Langelaan license, these were applications, while in the

2    hypothetical negotiation, we're talking about patents.  And

3    in the Fliteboard license, those are patents that were

4    licensed.

5            The licensees are different.  Some of them are

6    Waydoo's in the hypothetical negotiation, Fliteboard's in

7    the Fliteboard license.  Importantly, though, Waydoo and

8    Fliteboard are producers in this marketplace.  They produce

9    eFoils and they sell eFoils, so they're commonly situated in

10   that -- from that perspective.  Professor Langelaan is not.

11   He's a licensor, but he's also not a competitor in the

12   marketplace, and I'll talk about why that matters in a

13   little bit.

14           The competitive relationship there is between

15   Fliteboard and MHL and Waydoo, there isn't with

16   Professor Langelaan.

17           And then I mentioned sort of at the outset the

18   importance of sort of the type of license, whether it's

19   non-exclusive or exclusive.  In the Langelaan license, it

20   was an exclusive license.  What that means is that MHL had

21   the exclusive rights to use the patents, no one else did.

22   So, Professor Langelaan couldn't have licensed those to

23   other companies.

24           In the hypothetical negotiation, by definition,

25   the license has to be a non-exclusive license.  So, again,

Stec - Direct

03:02:17  1   looking at the Fliteboard license, that was a ==non-exclusive==

03:02:20  2   ==license==.  So that's another reason why it's more comparable.

03:02:25  3   Q.    And then, did you look at the competitive

03:02:27  4   relationship between MHL and Waydoo?

03:02:28  5   A.    I did.  Just like I said a moment ago, that was one

03:02:31  6   of the things I looked at in particular.  And there were

03:02:34  7   certain facts that I saw in the context of this case that

03:02:38  8   gave me the ability to conclude that MHL and Waydoo are

03:02:42  9   competitors, just like Flightboard and MHL, and Waydoo for

03:02:47 10   that matter, are competitors.

03:02:48 11         So, for example, Mr. Wagner had testified that

03:02:50 12   MHL had lost its biggest partner, MACkite to Waydoo.  So in

03:02:55 13   other words, what happened was MACkite started selling

03:02:59 14   Waydoo boards, Waydoo eFoils.  And MHL basically said, well,

03:03:04 15   that's -- that's not right, that's not proper, we think that

03:03:08 16   our patents are being infringed here.  So they actually

03:03:11 17   pulled their boards from MACkite as a distributor.

03:03:16 18         What I took from that, essentially, was that

03:03:18 19   shows there's competition in the marketplace between MHL and

03:03:21 20   Waydoo.  They're actually being sold by, at least for some

03:03:24 21   period of time, the same distributor until MHL figured out

03:03:28 22   what was going on.

03:03:28 23         I also personally spoke to a retailer myself,

03:03:33 24   Mr. Tamayo, Electric Surf Sport in Florida.  He sells MHL

03:03:38 25   eFoils, this is his business.  And ultimately, he's seen

Stec - Direct

03:03:43  1    competition in the marketplace where he's actually lost

03:03:45  2    sales of eFoils -- MHL eFoils to Waydoo.

03:03:50  3            And then another piece of information that I

03:03:52  4    noted was an MHL investor presentation that looked at the

03:03:56  5    different competitors in the marketplace and they compared

03:04:00  6    in that presentation four competitors, much like Mr. Ping

03:04:04  7    did in what we just saw in his testimony.  Waydoo and

03:04:07  8    Fliteboard, along with obviously MHL, were those

03:04:10  9    competitors.

03:04:12 10    Q.    And then what -- you walked -- I'm sorry.

03:04:14 11            You walked us through the factors from MHL's

03:04:17 12    consideration.  What about from Waydoo's side in that

03:04:20 13    hypothetical negotiation?

03:04:20 14    A.    And that's important to consider Waydoo's perspective

03:04:24 15    as well.  Remember, it's a negotiation so both parties have

03:04:27 16    to meet at the negotiating table and agree to whatever the

03:04:31 17    royalty might be.  So, there will be factors that would be

03:04:34 18    relevant or important for Waydoo.

03:04:36 19            One of those factors is, frankly, how much in

03:04:39 20    sales Waydoo has already had using from -- at least alleged

03:04:43 21    using the patents-in-suit.  And in that particular context,

03:04:45 22    they've had approximately $8.8 million in sales through July

03:04:49 23    of last year.  That's a significant amount of sales and

03:04:53 24    without the use of the patents, that would not be able to

03:04:56 25    continue.

Stec - Direct

03:04:56   1    They also in the context -- in the context of

03:05:00   2    eFoils in general, but certainly with respect to Waydoo's

03:05:02   3    products as well, as you might imagine the battery

03:05:06   4    eventually runs down and you might have to replace it.  You

03:05:09   5    lose the remote control that powers the board, so you have

03:05:11   6    to replace that.  Those various accessories are additional

03:05:14   7    sales, accessory sales that a company like Waydoo would

03:05:18   8    make.

03:05:18   9    And, in fact, Waydoo's made almost 600 -- well,

03:05:22  10    more than $650,000.  Those accessories sale without a

03:05:26  11    license couldn't continue because they couldn't sell the

03:05:28  12    eFoils.  So all those accessory sales would go away.

03:05:31  13    It's also important to note that when Waydoo

03:05:34  14    comes to the table, what it's receiving as part of this

03:05:38  15    negotiation is just a license to the patents-in-suit,

03:05:40  16    sometimes what's called a naked patent license, and all that

03:05:43  17    means is that they have no other rights.  It's not like MHL

03:05:47  18    is going to teach them how to use the patents-in-suit.  It's

03:05:52  19    not like MHL is putting up money to try to establish a

03:05:53  20    market for them or a product for them.  They really just

03:05:56  21    take the rights to use the patents away and then they have

03:05:59  22    to do everything else.

03:06:00  23    So that's an important consideration as well.

03:06:02  24    It means that MHL and Waydoo will understand that Waydoo is

03:06:06  25    basically taking on additional risk to bring a product to

Stec - Direct

03:06:09 1    market.  They're only getting the rights to use the patents

03:06:12 2    in this particular negotiation.

03:06:13 3    Q.    The accessories that you're talking about in your

03:06:17 4    hypothetical negotiation you've constructed, is Waydoo

03:06:20 5    paying royalties on those?

03:06:22 6    A.    No.  In this particular instance, we're only counting

03:06:26 7    the eFoil sales and not the accessory sales.

03:06:29 8    Q.    So those are not included in your calculations?

03:06:32 9    A.    It does make my calculation conservative to not

03:06:37 10   include those in some form.  But, yes, they're not being

03:06:38 11   included.

03:06:41 12   Q.    Now, I want to go back.  I think you were just here

03:06:42 13   during Mr. Ping's videotape testimony?

03:06:45 14   A.    I was, yes.

03:06:46 15   Q.    Would another factor -- I believe he told us what the

03:06:49 16   profit -- manufacturing profit margin is for Waydoo?

03:06:51 17   A.    Yes.  That would be something you would consider.  It

03:06:54 18   doesn't lead you to a royalty, but it's one of the things

03:06:57 19   you can consider.

03:06:58 20   Q.    And that was what percentage?

03:06:59 21   A.    I believe he said it was a 35 percent manufacturing

03:07:02 22   profit.

03:07:05 23   Q.    Now, after you factor in all those, did you come to

03:07:09 24   an outcome?

03:07:09 25   A.    I did.  So, at this -- in this particular slide,

Stec - Direct

03:07:14  1   after a lengthy and hardy negotiation, both parties come to

03:07:17  2   an agreement in my opinion.  And in that opinion, it's a

03:07:22  3   $560 per unit or per eFoil rate as far as a royalty goes.

03:07:28  4   Q.    And then what does that do in terms of damages?

03:07:31  5   A.    So, hopefully it puts this slide that you've already

03:07:33  6   seen once in a little bit better context.

03:07:36  7        So we've determined the royalty rate based on

03:07:39  8   the analyses that I just went through and that's $560 per

03:07:44  9   union.  The royalty base, it's just simply counting up how

03:07:47 10   many sales Waydoo made of the eFoils, and that was 2,668

03:07:52 11   eFoils.  And multiplying the 560 by that 2,668 eFoils gives

03:07:59 12   you exactly $1,494,080.

03:08:04 13   Q.    And one thing I don't think we talked about, that

03:08:07 14   2,668 accused Waydoo eFoils, there's a difference between

03:08:12 15   you and Mr. Kline on that; correct?

03:08:13 16   A.    So, there -- this sort of goes into, I think, some of

03:08:19 17   the data issues that occurred over the span of this

03:08:23 18   particular case.  There were different data files that were

03:08:27 19   produced and testimony that Mr. Ping had given.  So, I

03:08:32 20   gave -- so I believe the data that we're currently using is

03:08:35 21   on the same page.  But at least over time, it took some time

03:08:38 22   to get there.

03:08:39 23   Q.    Okay.  And then you were also asked to look at

03:08:43 24   Mr. Kline's analysis.  I think we'll hear from Mr. Kline

03:08:46 25   later in this trial but you won't be back.

Stec - Direct

03:08:48  1          So, could you tell us your analysis on that?

03:08:50  2     A.     Yes.  And I thought it was important to talk about

03:08:54  3     sort of what Mr. Kline had done, why I disagree with it.

03:08:58  4          Mr. Kline, in a nutshell, is relying on the

03:09:02  5     Langelaan license agreement, the one -- the second license

03:09:04  6     agreement that I talked about, and I believe that would be

03:09:07  7     an inappropriate agreement to use.  The reason I believe

03:09:10  8     that is because I don't believe it's a comparable license

03:09:12  9     agreement.  I went through many of the reasons why already,

03:09:15 10     but I tried to sort of summarize some of these things here.

03:09:18 11          So, the first bullet point that I have directly

03:09:22 12     relates to that license agreement.  I think there are just

03:09:25 13     too many differences between that agreement and what the

03:09:28 14     hypothetical agreement should look like so that I didn't

03:09:31 15     think the Langelaan license agreement was a good comparable.

03:09:35 16          He also doesn't rely upon the Fliteboard

03:09:37 17     agreement at all.  He looks at it.  He recognizes, I

03:09:42 18     believe, that it's licensing the same patents, but he

03:09:45 19     doesn't really use it in the context of his reasonable

03:09:48 20     royalty analysis.  I think that's inappropriate.  I think

03:09:51 21     that is a comparable agreement, something that should have

03:09:54 22     been considered.

03:09:55 23          He also specifies and we've seen some of this, I

03:09:59 24     think, already, at least some pictures perhaps of what are

03:10:02 25     called non-infringing alternatives and I'll explain in a

Stec - Direct

1    little bit what a non-infringing alternative is.

2          But I believe the non-infringing alternatives

3    that he's using aren't appropriate.  They aren't, in fact,

4    non-infringing alternatives.  They aren't acceptable and

5    they aren't non-infringing alternatives any way such that

6    you could use them to guide you as to what a royalty should

7    be.

8          He has some erroneous, I believe, assumptions

9    about what a royalty rate can be, given a firm's profit

10   margin.  And I'll talk a little bit about what that means.

11         And then lastly, because of these unreliable or

12   unsupported assumptions that he's making, he comes up with

13   what I believe is a flawed reasonable royalty calculation.

14   Q.    So, you began with the Langelaan MHL agreement flaws.

15   Can you explain that?

16   A.    Yes,, and I apologize for how busy this slide looks.

17   There are a number of flaws in my opinion.  So I'll try to

18   go through these at a high level.

19         So, one of the things that Mr. Kline believes is

20   that Professor Langelaan and MHL competed.  In other words,

21   what I believe he means by that is they're competitors in

22   the marketplace.  Now, Professor Langelaan never produced an

23   eFoil, never sold an eFoil, never introduced an eFoil to the

24   market whether it's sold or not.  That's very different than

25   what Fliteboard did -- does or did.  They manufacture an

478

Stec - Direct

03:11:28  1   eFoil, they sell it to the marketplace, they continue to do

03:11:31  2   so to this very day.  That, I think, is an important

03:11:34  3   distinction between what Professor Langelaan didn't do and

03:11:37  4   what Fliteboard actually is doing.

03:11:39  5          None the less, Mr. Kline believes that

03:11:43  6   Professor Langelaan and MHL compete.  I disagree with that

03:11:47  7   and that's another reason why I think the Langelaan

03:11:48  8   agreement is inappropriate.

03:11:49  9          Mr. Kline does what are called calculating

03:11:54 10   effective royalty rates.  So that's what those numbers, the

03:11:57 11   .8 percent and the 1.6 percent represent.  It's a

03:12:01 12   calculation that Mr. Kline did where he simply took the

03:12:04 13   royalties that were paid by MHL and divided it by the number

03:12:08 14   of boards that MHL sold.

03:12:10 15          Now, the difficulty with that is nowhere in the

03:12:14 16   Langelaan agreement is there any specification for an

03:12:16 17   effective royalty.  As I showed you a moment ago the royalty

03:12:19 18   rate that's stipulated there is 2.5 percent.  So, these

03:12:22 19   royalty rates, I think, are at best misleading.  But I also

03:12:26 20   believe they're inaccurate because part of the data that

03:12:30 21   Mr. Kline used -- remember I said July 2020 is when

03:12:34 22   Professor Langelaan assigned his patents to MHL.  Well,

03:12:38 23   Mr. Kline is still using data after that date, essentially,

03:12:42 24   even though MHL owns the patents at that point, suggesting

03:12:45 25   that those sales somehow go into determining a royalty rate.

Stec - Direct

1      Well, at that point, to use my renting analogy,

2  you've purchased the house.  You've purchased the apartment

3  that you were renting.  So, you no longer pay rent, you own

4  it.  That's the same thing here.

5      He also draws illogical and inaccurate

6  conclusions regarding the significance of amendments that

7  were in the agreement.  The assignment of the patents after

8  paying $500,000, rather than a million dollars, Mr. Kline

9  puts some weight on that.  But as I explained earlier, there

10 were good reasons why Professor Langelaan did that.  It was

11 to help MHL in a number of different ways to make this

12 marketplace and prosecute its patents.  So that was an

13 important consideration that Mr. Kline doesn't appear to

14 take into account.

15      And then lastly, he identifies additional rights

16 that are in the Langelaan agreement, but he doesn't identify

17 the impact of those rights.  And that's important because

18 that will have an effect on the royalty.  Remember, I said

19 that in the hypothetical negotiation what you're getting is

20 a license to a naked patent or set of patents.  That just

21 means you get the right to use the patents, nothing else.

22      If in one of these comparable agreements there's

23 more rights than just a naked patent license, you have to

24 take those rights into account before you can try to use

25 that agreement as a comparable agreement.  And frankly,

Stec - Direct

03:14:06  1    that's not something Mr. Kline did.

03:14:09  2    Q.     And what do we have here?

03:14:11  3    A.     So, this is what I was saying a moment ago about the

03:14:15  4    level of competition in the marketplace.  Mr. Kline in the

03:14:22  5    context of Fliteboard basically believes there's

03:14:26  6    competition, believes there's competition between

03:14:29  7    Professor Langelaan in the marketplace, but he doesn't

03:14:32  8    believe there's competition between Waydoo and MHL.

03:14:35  9            And frankly, it might be hard to understand

03:14:38 10    exactly where he's coming from there.  So I'll try to

03:14:41 11    explain his position and why I think it's wrong.  But what

03:14:44 12    he's basically saying is because of a price difference that

03:14:48 13    he observes between how much Fliteboard and how much MHL

03:14:52 14    sells their product for and a price difference between what

03:14:56 15    Waydoo sells its product for, that that somehow segments the

03:14:59 16    market, that the people who are buying Waydoo Fliteboards --

03:15:02 17    I'm sorry, Waydoo eFoils are not buying Fliteboard or MHL

03:15:07 18    Fliteboards, not even considering them.

03:15:09 19            And we know from some of the evidence I've

03:15:11 20    already discussed that's not true.  I've talked to a

03:15:13 21    retailer that says that's not true.

03:15:16 22            But at the end of the day, that's Mr. Kline's

03:15:18 23    position, that he believes there's two separate segments of

03:15:21 24    this market.  MHL and Fliteboard compete in one.  Waydoo

03:15:25 25    competes in another, and there's not overlap.  I just

Stec - Direct

03:15:28   1    believe that's incorrect, but that's the position that

03:15:32   2    Mr. Kline is talking.  He also mistakenly assumes that MHL

03:15:36   3    did not expect specific dollars per units in royalties, but

03:15:41   4    I showed you, I think, the email correspondence, and there

03:15:43   5    were others as well that suggest that's exactly what was

03:15:46   6    driving the marketplace.

03:15:48   7         So, getting a per unit royalty is important

03:15:50   8    because that's what the two parties, the Fliteboard and MHL

03:15:54   9    parties, were looking for in that particular agreement.

03:15:57  10         And then, lastly, Mr. Kline believes that

03:16:01  11    somehow the Fliteboard agreement was entered into under the

03:16:05  12    threat of litigation.  What I think he means there is that

03:16:09  13    essentially MHL was holding a stick over Fliteboard saying,

03:16:13  14    if you don't take this patent or this license, we will sue

03:16:16  15    you.  I didn't see any evidence of that.

03:16:18  16         Now, of course, whenever you're dealing in

03:16:20  17    negotiation and you're the patentholder, you can certainly

03:16:23  18    say, "We're going to exercise our patent rights here."  And

03:16:27  19    if you don't take a license, you may see a litigation.

03:16:30  20         But that's going to occur, and that's part of

03:16:33  21    what you have available to you when you do a license, sort

03:16:36  22    of like when you -- when you rent an apartment.  The

03:16:39  23    landlord has the right to kick you out if you don't pay your

03:16:42  24    rent.  And it's very comparable in that regard that you have

03:16:46  25    at least this threat.  Otherwise, why would you come to an

Stec - Direct

03:16:48 1   agreement at all if the other side knew they could live in

03:16:51 2   the apartment for free or, you know, use the intellectual

03:16:54 3   property for free.

03:16:57 4   Q.     And then you talked earlier about some noninfringing

03:17:01 5   alternatives considered.  Could you explain that?

03:17:02 6   A.     Yes, so I think I need to explain a little bit about

03:17:05 7   what a non-infringing alternative is and then I can get into

03:17:08 8   what I think Mr. Kline's proposing as a non-infringing

03:17:12 9   alternative.  So a non-infringing alternative, what that

03:17:14 10  basically means is another way to get the same features and

03:17:19 11  benefits that the patents-in-suit teach without using the

03:17:22 12  teachings of the patents-in-suit, and there can be ways to

03:17:27 13  do alternatives that don't infringe the patents-in-suit.

03:17:30 14          But it's important that that they're

03:17:33 15  non-infringing.  It's also important that those different

03:17:36 16  ways are acceptable.  So, for example, if you design a board

03:17:39 17  and it doesn't allow you to use the board, it's not much of

03:17:42 18  an alternative even if it's not using the patents-in-suit

03:17:45 19  because it wouldn't be acceptable to consumers, the people

03:17:48 20  who are actually buying these boards and using them.  So

03:17:51 21  it's important when you're thinking about non-infringing

03:17:53 22  alternatives, one, they're non-infringing and, two, they're

03:17:56 23  acceptable.

03:17:56 24          Now, what Mr. Kline proposes is two different

03:18:00 25  alternatives.  These are actually pictures -- the two

Stec - Direct

03:18:02 1    pictures you see here coming from his report.  And what he

03:18:05 2    basically says is that an alternative would be to have some

03:18:08 3    type of movable steering mechanism, so that could be like a

03:18:12 4    leash or a handle bar.  That's what's I think is represented

03:18:15 5    in those two pictures.  And that would make it

03:18:18 6    non-infringing.

03:18:19 7            But based on what Mr. Barry said in this regard,

03:18:22 8    based on conversations I had with him as well as I believe

03:18:25 9    things that he's testified to, those wouldn't be

03:18:28 10   non-infringing alternatives because they wouldn't work.  You

03:18:31 11   would -- well, if they worked, you  would still be using the

03:18:33 12   features of the patent-in-suit, and if you weren't using the

03:18:36 13   features of the patents-in-suit, they wouldn't work.

03:18:38 14           So, either it's a not -- it's not a

03:18:41 15   non-infringing alternative or if it is a non-infringing

03:18:43 16   alternative, it's one that's not acceptable.

03:18:45 17           Then he also -- he also claims that

03:18:49 18   Professor Langelaan had some type of prototype that looked

03:18:51 19   much like this, had sort of a leash to it.  But

03:18:54 20   Professor Langelaan actually testified at his deposition the

03:18:57 21   leash wasn't for controlling the board at all.  It was

03:19:00 22   actually for trying to keep -- at that time it was a wired

03:19:04 23   controller, the throttle, to the board without it getting

03:19:07 24   pulled out in the course of using the board.

03:19:09 25           And then I think as another as another

484

Stec - Direct

03:19:12  1    alternative, Mr. Kline basically suggests that you could

03:19:16  2    make a product that would be very different than an eFoil.

03:19:19  3    It would have essentially a controller and all types of

03:19:23  4    different configurations to the board that would add an

03:19:25  5    additional cost.

03:19:27  6            Part of the problem I don't -- as I understand

03:19:29  7    it, is that would be a totally different product.  It

03:19:33  8    wouldn't work the same way here.  And there would be

03:19:35  9    additional costs to it that, frankly, Mr. Kline didn't

03:19:38 10    quantify in the context of coming up with a reasonable

03:19:41 11    royalty.

03:19:43 12    Q.    And the final conclusions on that --

03:19:45 13    A.    So this --

03:19:46 14    Q.    -- on this?

03:19:47 15    A.    So this summarizes why I think Mr. Kline's analysis

03:19:50 16    is unreasonable and the royalty he came to is unreasonable.

03:19:53 17    I mentioned fairly early in my testimony that there were

03:19:57 18    things that were part of the MHL-Langelaan agreement that

03:20:01 19    Mr. Kline didn't consider and would have an impact on the

03:20:04 20    2.5 percent royalty that he has there.  He also, I think,

03:20:10 21    underestimates, in fact, basically ignores the competition

03:20:15 22    between MHL and Waydoo, but says that, you know, MHL and

03:20:21 23    Professor Langelaan compete in some sense.

03:20:23 24            So, I don't believe that MHL and

03:20:26 25    Professor Langelaan compete.  Professor Langelaan never

485

Stec - Direct

03:20:29  1    produced an eFoil, never sold an eFoil.  But certainly MHL

03:20:32  2    and Waydoo do because they both sell eFoils and to the same

03:20:36  3    market.

03:20:37  4            And then, lastly, Mr. Kline came up with a

03:20:39  5    royalty rate of 2 and a half percent.  That's coming

03:20:42  6    straight from the Langelaan agreement, no adjustment to it.

03:20:45  7    And what that implies is if you just simply apply the

03:20:49  8    2.5 percent royalty to the Waydoo cost of a board, at least

03:20:54  9    at the time the data that I had was available, you'd have a

03:20:59 10    $77 royalty.  That's very different than the per unit

03:21:02 11    amount, the per eFoil amount that came from the Fliteboard

03:21:06 12    agreement.

03:21:06 13            So, you can see there's a big discrepancy

03:21:09 14    between what, I believe, Mr. Kline thinks would be an

03:21:11 15    appropriate royalty and frankly, has that what was being

03:21:14 16    paid in the marketplace by Fliteboard.  And I just don't

03:21:16 17    think in the hypothetical negotiation that the parties could

03:21:18 18    possibly agree to that big a discrepancy.

03:21:21 19  Q.    You just said something that might be confusing.

03:21:25 20    Average sales price for the Waydoo Flyer 3,000.  We've heard

03:21:30 21    the average retail price is about 8,000.  What's that $3,000

03:21:33 22    number?

03:21:34 23  A.    So, that $3,000 is basically the price coming from

03:21:38 24    the foreign manufacturer to the U.S. subsidiary or, I think,

03:21:44 25    it's not a U.S. subsidiary.  It's Mr. Wade's group.

Stec - Cross

03:21:49  1    Ultimately that is what's called a wholesale price.  The

03:21:53  2    retail price would be significantly higher.  In fact, Mr.

03:21:57  3    Ping, I believe, testified to that just prior to me taking

03:22:00  4    the stand where he said there's a 50 percent markup that the

03:22:04  5    distributor and the retailer will enjoy.  At the end of the

03:22:07  6    day that 50 percent would be added to that $3,000 making it

03:22:11  7    significantly higher.

03:22:13  8    Q.    All right.  And have you provided us your opinions in

03:22:16  9    this matter?

03:22:17  10   A.    Yes, I have.

03:22:22  11              MR. MURRELL:  Thank you, sir.

03:22:52  12              MR. KANTER:  Your Honor, may I approach?

03:22:52  13              THE COURT:  Yes.

03:23:23  14                    CROSS-EXAMINATION

03:23:23  15   BY MR. KANTER:

03:23:24  16   Q.    Good afternoon, Dr. Stec.

03:23:24  17   A.    Good afternoon.

03:23:26  18   Q.    I'd like to get something important out of the way.

03:23:29  19   In this case if there's no infringement, there's no damages;

03:23:32  20   right?

03:23:32  21   A.    That's my understanding.  If there's not a finding of

03:23:36  22   liability, than damages would not result.

03:23:38  23   Q.    And if the patents are found invalid, there's no

03:23:41  24   damages?

03:23:41  25   A.    That's my understanding.  I'm not -- just to be clear

Stec - Cross

03:23:45 1    I'm not an attorney, but my understanding as a damages

03:23:48 2    expert, that would be the case as --

03:23:50 3    Q.    Okay.  I'd like to ask you a clarification on

03:23:53 4    something you were talking about earlier.  Can we look at

03:23:55 5    Slide 23?

03:24:03 6          I think I heard you testify that the number of

03:24:06 7    units -- or maybe my numbers are wrong, 24?  There we are.

03:24:13 8    I thought I heard you testify that this was the number of

03:24:17 9    accused Waydoo eFoils minus the erroneous extra units, was

03:24:22 10   that correct?

03:24:22 11   A.    I'm not sure I testified to that.  This --

03:24:27 12   Q.    Mr. Ping's --

03:24:28 13   A.    I'm sorry.  Go ahead.

03:24:29 14   Q.    Mr. Ping's additional units?

03:24:31 15   A.    So if you're talking about the units that Mr. Ping

03:24:34 16   had testified to in his deposition, I think that's what I

03:24:36 17   was getting at, that there had been sort of iterations of

03:24:39 18   the sales.  This does not include those.  These are the

03:24:42 19   actual sales as I understand it.

03:24:43 20   Q.    Are you sure this is the number of without those?

03:24:45 21   A.    I would have to double-check.  I believe it's in my

03:24:49 22   exhibits.

03:24:50 23   Q.    Let's look at your supplemental report.

03:24:51 24   A.    Sure.

03:24:53 25   Q.    Look, you should have it in your binder.

Stec - Cross

03:25:19  1    A.      Okay.  Can you direct me to where it might be?

03:25:21  2    Q.      Hmm.

03:25:21  3    A.      Can you direct me to where it might be?

03:25:23  4    Q.      Sure.  I believe Footnote 7?

03:25:25  5    A.      Which exhibit?

03:25:26  6    Q.      I believe to your conclusion.  Oh, it's labeled at

03:25:33  7    the very back of the binder, "Supplemental Report."  I think

03:25:36  8    it's in the smaller binder.

03:25:47  9    Q.      It should be the last document in that binder.

03:25:56 10    A.      Okay.  I'm there.  Sorry.

03:25:57 11    Q.      And your Footnote 7.

03:26:00 12    A.      Yes.  I see that.

03:26:10 13    Q.      And so the number of units actually should have been

03:26:12 14    2080; right?

03:26:14 15    A.      So, this particular footnote says that "I've provided

03:26:21 16    an alternative analysis of royalty damages, assuming

03:26:26 17    Mr. Kline's claim regarding Mr. Ping's deposition testimony

03:26:30 18    was accurate.  So, in that particular context, it shows

03:26:34 19    another royalty amount because I think there's still some

03:26:38 20    question as to Mr. Ping's accuracy.

03:26:41 21    Q.      So you are including those extra units.  You haven't

03:26:43 22    subtracted them?

03:26:44 23    A.      So in this particular instance, the number that we're

03:26:47 24    looking at there includes those units.  In my report,

03:26:50 25    there's a another calculation that's done that excludes

Stec - Cross

03:26:54  1    those particular units, if Mr. Ping's testimony is

03:26:58  2    incorrect.

03:26:58  3    Q.    Earlier you testified you had removed them from this,

03:27:01  4    so I'm just curious, which number are you presenting to the

03:27:04  5    jury?

03:27:04  6    A.    So, I'm presenting the number that's up there right

03:27:07  7    now.  This includes those units that Mr. Ping testified to.

03:27:10  8    Q.    It includes those units?  Okay.

03:27:12  9          We'll come back to that units.

03:27:15 10          Can you pull up PTX 11?  You recognize this?

03:27:28 11    A.    I do.

03:27:31 12    Q.    And this is the agreement between Professor Langelaan

03:27:35 13    and MHL; right?

03:27:36 14    A.    It doesn't say it on that front page, but I believe

03:27:40 15    that this is that agreement.

03:27:42 16    Q.    I'll call this the Langelaan agreement if that's okay

03:27:44 17    with you.

03:27:44 18    A.    I understand what you mean.

03:27:46 19    Q.    Okay.  And the Langelaan agreement had a royalty rate

03:27:49 20    of 2.5 percent; right?

03:27:51 21    A.    That's correct.

03:27:52 22    Q.    Then it had a cap on those royalties of $1 million,

03:27:55 23    correct?

03:27:56 24    A.    That's correct.

03:27:56 25    Q.    And after that $1 million, there would be no further

payments under the agreement; right?
A. That's my understanding, yes.
Q. Okay. And that means any sales after that $1 million royalty was reached, those were royalty free?
A. No royalty would have to be paid on them, so whether you call it royalty free or something else, I think the concept is the same.
Q. Okay. At it's your position that this agreement it's not relevant to the hypothetical negotiation; right?
A. I don't believe this is a comparable agreement for the purposes of the hypothetical negotiation.
BY MR. KANTER:
Q. And that means you excluded it from your hypothetical negotiation?
A. No, it would be something that would be considered by the parties, but in my opinion, the parties wouldn't rely on it as a comparable agreement.
Q. Can we look at Page 23 of your opening report, which is PTX 101.
This was your report; correct?
A. It appears to be. I can't tell from this page which. I filed two reports.
Q. I apologize for talking over you.
Does that help?
A. Yes, it does.

Stec - Cross

03:29:25 1    Q.      Page 23, that middle paragraph there, the very last

03:29:28 2    sentence, reads "For these reasons, I do not consider this

03:29:32 3    agreement to be instructive to the hypothetical negotiation

03:29:36 4    between MHL and Waydoo"; right?

03:29:38 5    A.      That's what it says.

03:29:39 6    Q.      And that's referring to the Langelaan license?

03:29:41 7    A.      It doesn't.

03:29:45 8    Q.      It might help --

03:29:46 9    A.      It doesn't say it in the sentence you just

03:29:48 10   highlighted, but I believe you can infer that from the --

03:29:53 11   Q.      Two --

03:29:53 12   A.      -- the two sentences under there.  It looks like

03:29:55 13   that's the agreement that's being discussed.

03:29:57 14   Q.      Thank you.  One of the reasons you give for this,

03:30:02 15   three lines down from the top, it says, "In fact, this

03:30:06 16   agreement was executed before MHL first began developing the

03:30:10 17   eFoil in 2015, and several years before the first eFoil was

03:30:14 18   sold in the market, in May 2018."

03:30:17 19          Did I read that correctly?

03:30:18 20   A.      Yes, you did.

03:30:20 21   Q.      And you now know that that's an incorrect statement;

03:30:23 22   right?

03:30:23 23   A.      Yes, I believe I discussed this at my deposition,

03:30:27 24   that there was a typo in my report and have since, you know,

03:30:31 25   essentially, said that there should be a correction.

Stec - Cross

03:30:33  1    Q.      It wasn't a typo; right?  It was actually executed

03:30:36  2    after MHL first began developing.

03:30:39  3    A.      Sorry.  I'm not sure what your question is.

03:30:47  4    Q.      It wasn't a typo; right?  You were just wrong about

03:30:49  5    that statement?

03:30:50  6    A.      No, it -- so, I think I understood at the time that I

03:30:54  7    did this report what the timing was, but it had been,

03:30:57  8    essentially, entered into incorrectly in a sentence there.

03:31:00  9    Q.      You know that it was executed in 2016 after MHL first

03:31:03 10    began developing the first eFoil?

03:31:06 11    A.      Correct.  I believe a couple of my slides actually

03:31:09 12    referenced that date exactly.

03:31:11 13    Q.      Okay.  And Professor Langelaan and MHL, they entered

03:31:16 14    into an amendment to this license; right?

03:31:18 15    A.      Correctly speaking, I think there were two

03:31:22 16    amendments, in fact.

03:31:23 17    Q.      Thank you.

03:31:24 18            Let's look at PTX 24.  Do you recognize this as

03:31:33 19    the first amended license?

03:31:34 20    A.      I definitely recognize it.  I'm just looking for the

03:31:39 21    reference to the first amendment.  It's probably -- yes, I

03:31:44 22    see that.  Yes.

03:31:46 23    Q.      And can we look at page ending in Bates Number 27.  I

03:31:50 24    believe it's actually the next page.

03:31:53 25            This was dated April 7th, 2019?

Stec - Cross

03:31:55  1    A.      Yes.

03:31:56  2    Q.      So they entered into this amended license just days

03:31:59  3    after the hypothetical negotiation in March 2019; right?

03:32:03  4    A.      I guess it depends how you define "days."  I believe

03:32:08  5    the hypothetical negotiation was March 25th, so roughly a

03:32:12  6    week and a half, two weeks.

03:32:13  7    Q.      So, it's very close to the hypothetical negotiation?

03:32:15  8    A.      It's within a couple weeks of that, yes.

03:32:19  9    Q.      Much closer than the Fliteboard agreement is;

03:32:22 10    correct?

03:32:22 11    A.      I'm not sure I would use the adjective "much" there.

03:32:26 12    It's closer, but perhaps by a few months.

03:32:30 13    Q.      Okay.  Not outside the range of the date range of the

03:32:34 14    hypothetical negotiation?

03:32:34 15    A.      I'm not sure what you mean by "the date range."

03:32:39 16    Q.      Not so far away from -- never mind.  And you

03:32:46 17    mentioned that there was a second agreement?

03:32:48 18    A.      A second amendment, yes.

03:32:51 19    Q.      Right.  And that second amendment reduced the royalty

03:32:54 20    cap from 1 million to 500,000; right?

03:32:56 21    A.      So, it wasn't a royalty cap in that second amendment.

03:33:02 22    It was simply a lump-sum payment that would be made.  So, in

03:33:07 23    that particular context, I don't think it was defined as a

03:33:11 24    cap at that point.

03:33:12 25    Q.      Fair enough.  That lump-sum payment, in addition to

Stec - Cross

03:33:15  1   the royalties that had been paid at the time, would have

03:33:19  2   reached about a million dollars; right?

03:33:21  3   A.     I don't think that's right.

03:33:23  4   Q.     Right.  Sorry.  I misspoke.  About a half a million

03:33:26  5   dollars?

03:33:27  6   A.     I think that's right, yes.

03:33:29  7   Q.     Okay.  So, in July of 2020, the patents themselves,

03:33:44  8   not just the license, but the ownership of the patents was

03:33:49  9   bought for only $500,000?

03:33:51 10   A.     I  -- I wouldn't put it that way, no.

03:33:55 11   Q.     They bought out the patents for an additional

03:33:57 12   $225,000, right?

03:34:00 13   A.     So, that was the lump sum that occurred around that

03:34:02 14   date, yes.

03:34:04 15   Q.     Purchased the patents for $225,000 in 2020?

03:34:09 16   A.     Again, I don't think that's right.  I think it's a

03:34:14 17   little more complicated than that.

03:34:17 18   Q.     They paid $225,000 and had paid additional royalties

03:34:22 19   to hit about $500,000, and that buyout occurred in July of

03:34:28 20   2020; correct?

03:34:29 21   A.     So, that lump-sum payment of $225,000 occurred in

03:34:34 22   July of 2020.  And up to that point, I believe $275,000 in

03:34:38 23   royalties had been paid.

03:34:39 24   Q.     And that was after the market for eFoils had been

03:34:42 25   established?

495

Stec - Cross

03:34:42  1    A.      Yes.  The market for eFoils would have been

03:34:45  2    established.  Well, at least started by then.

03:34:48  3    Q.      Okay.  Can we turn back to Page 23 of your opening

03:34:51  4    report, PTX 101.

03:34:56  5            Actually, I think you said it in your testimony.

03:35:09  6    Another reason that you discount the Langelaan license is

03:35:12  7    because it only granted rights to patent applications;

03:35:16  8    correct?

03:35:16  9    A.      Yes, I believe I did testify to that.

03:35:19 10    Q.      I think that was on your Slide 19.

03:35:21 11    A.      I don't remember the slide number, but it was one of

03:35:25 12    my slides.

03:35:25 13    Q.      Okay.  Were you here yesterday when

03:35:28 14    Professor Langelaan testified?

03:35:29 15    A.      I was not.

03:35:32 16    Q.      Did you review the transcript from yesterday?

03:35:34 17    A.      I --

03:35:34 18    Q.      Trial transcript?

03:35:36 19    A.      I did not, no.

03:35:37 20    Q.      Okay.  So, you weren't aware that Professor Langelaan

03:35:40 21    testified that MHL actually waited to make sure they knew

03:35:43 22    the patents were going to issue before they entered into the

03:35:46 23    agreement?

03:35:46 24    A.      So, you're going to have to, I think, spell that out

03:35:53 25    a little bit more.

Stec - Cross

03:35:53 1    Q.      I'd be happy to.  Can we pull up the trial

03:35:56 2    transcript, Page 299, beginning at Line 12.

03:36:11 3              It reads:

03:36:12 4              "QUESTION:   Why was there a few months -- a

03:36:18 5    few-month period between when you first met Mr. Leason by

03:36:21 6    email in June of 2015 to when you entered this agreement in

03:36:25 7    March of 2016?

03:36:27 8              "ANSWER:   Well, probably because Nick was

03:36:29 9    waiting to see if my patent would be allowed or not."

03:36:35 10   A.      I see that.

03:36:36 11   Q.      Did you know about that when you came to your

03:36:38 12   opinions?

03:36:40 13   A.      Well, I think, first off, there are two patents

03:36:43 14   involved, and this appears to only be referring to one of

03:36:46 15   them.  My understanding is that one of the patents was not a

03:36:51 16   patent at that point in time.  And based on what I

03:36:54 17   understand to be the file history for the other patent, it,

03:36:58 18   at least at the time the agreement was signed, was not a

03:37:02 19   patent that had actually been withdrawn.  And it had

03:37:04 20   reissued some time after that.

03:37:06 21   Q.      I'm glad you mentioned that.  It was actually

03:37:09 22   granted; right?  It had been granted by the Patent Office?

03:37:12 23   A.      So --

03:37:13 24   Q.      Sorry.  It had been applied for at the Patent Office?

03:37:16 25   A.      I don't think that's exactly right.  So notice had

Stec - Cross

03:37:18  1    been given that it would be granted, I believe, originally

03:37:22  2    on March 8th of 2019.  But then I think some prior art was

03:37:27  3    submitted on March 3rd, and so that pushed back the granting

03:37:32  4    of that patent for, I want to say, two or three months.

03:37:37  5    Q.    Let's look up on the screen, same page that we were

03:37:39  6    at, Page 299 of the trial transcript.  But beginning at

03:37:43  7    Line 21.

03:37:46  8            "QUESTION:   So, had the '044 patent issued at

03:37:51  9    the time you executed this agreement?

03:37:53 10            "ANSWER:   It was allowed, but to my

03:37:55 11    understanding, it was not actually issued as a patent."

03:37:58 12            So, they knew that it was going to issue; right?

03:38:01 13    A.    Sorry.  I'm not sure I can improve on my last answer.

03:38:05 14    My understanding is that they were given notice -- "they"

03:38:10 15    being Professor Langelaan and MHL -- that a patent would be

03:38:13 16    granted.  My understanding or my best recollection is that

03:38:18 17    that granting of the patent would actually occur on

03:38:21 18    March 8th of this of that year.

03:38:23 19            The agreement was entered into on March 4th of

03:38:27 20    that year.  So it was before that patent would have been

03:38:30 21    granted even under that original notice.  But that notice

03:38:36 22    got pushed back, I want to say, two or three months to, I

03:38:38 23    think, June because ultimately, some additional prior art

03:38:43 24    was submitted to the USPTO, and that was done on March 3rd,

03:38:48 25    I believe, the day before this agreement was signed.

Stec - Cross

03:38:51 1    Q.    That's right.  They withdraw it on March 3rd, the day

03:38:54 2    before the agreement; right?

03:38:55 3    A.    They submitted the prior art, I believe, on

03:38:59 4    March 3rd, but on March 3rd it's not like the patent had

03:39:02 5    already been granted.  I think the best you could say is

03:39:05 6    that notice was given that it would be granted.  But it

03:39:08 7    hadn't been granted yet.

03:39:10 8    Q.    Notice had been -- notice had been given that it

03:39:13 9    would be granted.  They withdrew it the day before the

03:39:16 10   agreement.  And you're aware that it was withdrawn at MHL's

03:39:19 11   request; right?

03:39:19 12   A.    Yes, that's my understanding.

03:39:21 13   Q.    All right.  So there was no risk to MHL.  This was

03:39:23 14   something they wanted; right?

03:39:25 15   A.    Well, I -- I think it's hard to say there's no risk.

03:39:28 16   Any time you submit additional prior art, you don't know

03:39:31 17   exactly what the USPTO may say.  So, while you may say that

03:39:35 18   it was likely that they were still going to be issued the

03:39:39 19   patent, I don't think you could say it was riskless.

03:39:41 20   Q.    Okay.  But it was something that MHL had wanted;

03:39:44 21   right?  It's a risk they had wanted to take?

03:39:46 22   A.    I believe it was something that MHL had done.

03:39:49 23   Q.    Okay.  And you mentioned that only -- this concerned

03:39:51 24   only one of the applications.  The other application, you

03:39:54 25   understand that that has the same specification?

Stec - Cross

03:39:56  1    A.      So, I'm not a technical expert, so if you're starting

03:40:01  2    to get into the claims of the patents and how they may

03:40:04  3    different differ or not differ, I'm not sure I can address

03:40:06  4    that.

03:40:07  5    Q.      Do you believe that the value of the -- of that

03:40:10  6    license would be different if only the '044 patent had been

03:40:14  7    granted?

03:40:14  8    A.      That's not something that I investigated.  In other

03:40:17  9    words, I looked at that time from the perspective of both

03:40:20 10    patents.

03:40:20 11    Q.      Okay.  In this case, if the jury were to invalidate

03:40:25 12    one of the two patents, would that affect your damages

03:40:27 13    number?

03:40:27 14    A.      That would be something I would have to think about.

03:40:31 15    It's not something that I've done in the context of my

03:40:33 16    report.

03:40:34 17    Q.      Okay.  I'd like to talk about the Fliteboard

03:40:42 18    agreement on which you base your royalty.  Can we turn to

03:40:45 19    PTX 033.

03:40:51 20              And do you recognize this as the Fliteboard

03:40:55 21    license?

03:40:55 22    A.      Yes, I see that reference.

03:41:02 23    Q.      And you haven't cited to or relied on any amendments

03:41:06 24    to this license; right?

03:41:07 25    A.      I don't have a perfect recollection of what I did in

Stec - Cross

03:41:12 1  my report.  I'm happy to look, if you like.

03:41:14 2  Q.     Do you recall there being an amendment to the

03:41:16 3  license?

03:41:17 4  A.     I -- I don't recall as I sit here, but I'll be

03:41:20 5  honest.  I don't try to memorize everything.

03:41:23 6  Q.     As it's written, the Fliteboard agreement has a

03:41:26 7  percentage royalty; right?

03:41:28 8  A.     It does as part of the agreement, yes.

03:41:31 9  Q.     And there's no mention of a per-unit royalty?

03:41:33 10 A.     In the context of this particular agreement, I don't

03:41:36 11 remember seeing that particular number.

03:41:39 12 Q.     And by structuring the license as a percentage

03:41:42 13 royalty, that means that if Fliteboard's pricing changes the

03:41:46 14 royalty also changes; right?

03:41:47 15 A.     In a general sense, yes.  The -- and just to be clear

03:41:53 16 what you mean by royalty, that would be a per unit royalty

03:41:57 17 or a total royalty.

03:42:00 18 Q.     The total royalty?

03:42:02 19 A.     The total amount paid, that would change.

03:42:06 20 Q.     It would also change on a per unit basis; right?

03:42:08 21 A.     That's correct.

03:42:10 22 Q.     Okay.  Can we look at your --

03:42:18 23           MR. KANTER:  Slide 11 from Dr. Stec's

03:42:22 24 presentation?

03:42:22 25 BY MR. KANTER:

Stec - Cross

03:42:28  1    Q.      And you cited an email here.  And this email

03:42:34  2    recognizes that when there's a 20 percent discount to a

03:42:39  3    distributor reseller, the royalty paid would also go down by

03:42:44  4    20 percent; right?

03:42:47  5    A.      I'm sorry.  I'm not sure what you mean by royalty.

03:42:49  6            Are you talking about the per unit amount?  Is

03:42:51  7    that what you're saying?

03:42:52  8    Q.      Either per unit or total royalty.

03:42:55  9    A.      That's where it gets a little complicated because if

03:42:59 10    it's total royalty, if they sell more then perhaps it

03:43:02 11    doesn't from a total perspective.

03:43:04 12    Q.      That's fair.  Because when prices are lower, you

03:43:06 13    might sell more units?

03:43:07 14    A.      That's the way I would think about it as an

03:43:09 15    economist, potentially.

03:43:10 16    Q.      Okay.  In this case, let's talk about just one board.

03:43:13 17    A.      Okay.

03:43:14 18    Q.      All right.  If they sold one board, $10,000 package

03:43:17 19    at 5.5 percent, that's how they arrive at the 550?

03:43:22 20    A.      I believe that's right.

03:43:23 21    Q.      And if it was sold to a distributor at 20 percent

03:43:28 22    discount, that would be 440, which is 20 percent of 550;

03:43:32 23    right?

03:43:32 24    A.      Yes.  That's correct.

03:43:34 25    Q.      So, in essence, if there's a 20 percent discount to a

Stec - Cross

03:43:38 1    distributor, the royalty is also 20 percent discounted?

03:43:41 2    A.    In a general sense on a per unit basis, that would be

03:43:46 3    correct.

03:43:47 4    Q.    Okay.  And unlike the Fliteboard license, your

03:43:50 5    proposed royalty is flat; right?  It never changes?

03:43:54 6    A.    So it's $560 per eFoil.  And I tried to explain when

03:43:58 7    I talked about discounting in my presentation why I don't

03:44:01 8    think that's a concern.

03:44:02 9    Q.    Okay.  Again, my question is:  Your royalty is flat

03:44:07 10   and does not change with any discounts; right?

03:44:09 11   A.    That's correct.

03:44:10 12   Q.    Unlike the Fliteboard license?

03:44:11 13   A.    Well, again, I tried to explain that in the context

03:44:15 14   of my analysis or my testimony.  I'm happy to explain it

03:44:20 15   again, if you'd like, but it's a little more complicated

03:44:23 16   than that.

03:44:24 17   Q.    We just discussed the Fliteboard license does change

03:44:26 18   with discounts; right?  The amount paid per unit?

03:44:31 19   A.    If the per -- if the price of the particular unit

03:44:37 20   changes, then that could change the royalty.  The per unit

03:44:40 21   royalty.

03:44:40 22   Q.    But that's not true for your royalty in this case;

03:44:43 23   right?

03:44:43 24   A.    So my royalty was the flat $560 and I explained why

03:44:50 25   that's the case when it comes to discounting.  So I'm happy

Stec - Cross

| | | |
|---|---|---|
| 03:44:53 | 1 | to go into that again. |
| 03:44:54 | 2 | Q.    Is that a yes? |
| 03:44:55 | 3 | A.    I'm not sure what you're asking. |
| 03:44:56 | 4 | Q.    I'm just not sure if you're answering my question. |
| 03:45:00 | 5 | Your royalty does not change with pricing |
| 03:45:02 | 6 | changes? |
| 03:45:03 | 7 | A.    It's not a simple yes or no because I've tried to |
| 03:45:06 | 8 | explain at least twice now why that occurs. |
| 03:45:10 | 9 | Q.    Does your royalty amount per board ever change under |
| 03:45:13 | 10 | your proposed royalty? |
| 03:45:14 | 11 | A.    The $560 is what would be applied to the sales of |
| 03:45:18 | 12 | those boards. |
| 03:45:19 | 13 | Q.    Okay.  So it never changes? |
| 03:45:20 | 14 | A.    It's $560 per board. |
| 03:45:23 | 15 | Q.    Thank you. |
| 03:45:23 | 16 | You don't dispute that Waydoo sells its boards |
| 03:45:26 | 17 | for -- I think you testified $3,088 per board? |
| 03:45:30 | 18 | A.    That's one of the prices that I've seen.  I think it |
| 03:45:35 | 19 | ranges -- there's a price range depending on the time period |
| 03:45:39 | 20 | that you're looking at. |
| 03:45:41 | 21 | MR. KANTER:  Could we look at Slide 29? |
| 03:45:50 | 22 | Actually, let's look at the opening report, |
| 03:45:54 | 23 | PTX 101 at Page 29. |
| 03:45:54 | 24 | BY MR. KANTER: |
| 03:46:13 | 25 | Q.    All right.  Looking eight lines up from the bottom, |

Stec - Cross

03:46:20  1    on the right, it says "Waydoo sold its eFoils to

03:46:23  2    distributors at prices averaging $3,001 through July 2021,

03:46:28  3    and averaging 3,170 in the first half of 2022."

03:46:33  4             Did I read has correctly?

03:46:34  5    A.    Yes, I believe you did.

03:46:37  6    Q.    And so, Waydoo was selling their boards for roughly

03:46:40  7    $3,000?

03:46:41  8    A.    Again, it's a range.  I think it's, at least earlier

03:46:47  9    in the period, $3,000.  But the prices are going up as you

03:46:51 10    can see later in the period there by at least 200 -- well,

03:46:55 11    almost $200.

03:46:57 12    Q.    Okay.  What's 5.25 percent of $3,000?

03:47:02 13    A.    So now you're making me do math in my head.

03:47:06 14             I can try to come up with an approximate number,

03:47:08 15    but if you want I can use my calculator or perhaps you have

03:47:11 16    a calculator.

03:47:12 17    Q.    I'd be happy to provide you with a calculator.

03:47:17 18    A.    Okay.  I just don't want to testify to something

03:47:18 19    that's inaccurate.  Thank you.

03:47:21 20             So could you as -- could you repeat your

03:47:21 21    question, please?

03:47:22 22    Q.    Yes.  That's 5.25 percent of $3,000?

03:47:28 23    A.    Okay.  Assuming this calculator is accurate, and I

03:47:41 24    have no reason to believe it isn't, $157.50.

03:47:45 25    Q.    So under the Fliteboard agreement, if Fliteboard sold

Stec - Cross

03:47:47  1    to a distributor for $3,000 they would pay $157 in

03:47:54  2    royalties; right?

03:47:55  3    A.    So, the assumption you're asking me to make is if the

03:48:00  4    royalty rate is 5.25 percent and they sell for $3,000,

03:48:04  5    what's the per unit amount?  It's $157.50.

03:48:08  6    Q.    Okay.  And that's what Fliteboard would pay if it

03:48:11  7    paid -- if it sold to a distributor under the Fliteboard

03:48:14  8    agreement for $3,000?

03:48:15  9    A.    If it was working under that particular agreement for

03:48:19 10    that particular royalty and that was the sales price, then

03:48:23 11    at least that agreement seems to suggest that would be the

03:48:26 12    per unit amount.

03:48:26 13    Q.    Okay.

03:48:27 14              THE COURT:  All right.  So why don't we take an

03:48:29 15    afternoon break here until 4 o'clock.

03:48:31 16              Can we take the jury out, please?

03:48:33 17              (Jury leaving the courtroom.)

03:49:01 18              THE COURT:  All right.  So we'll be in recess

03:49:03 19    until 4 o'clock.

03:49:04 20              DEPUTY CLERK:  All rise.

03:49:06 21              (Recess was taken.)

04:01:03 22              THE CLERK:  All rise.

04:01:03 23              THE COURT:  All right.  I guess we're ready to

04:01:05 24    continue.  Let's get the jury.

04:01:39 25              MR. KANTER:  Apologies, Your Honor.

Stec - Cross

04:01:41  1        THE COURT:  It's okay.

04:01:59  2        (Jury entering the courtroom.)

04:02:06  3        THE COURT:  All right.  Members of the jury,

04:02:08  4  welcome back.

04:02:10  5        Everyone, you may be seated.

04:02:11  6        Mr. Kanter, you may continue.

04:02:15  7        MR. KANTER:  Thank you, Your Honor.

04:02:15  8        Welcome back.

04:02:15  9  BY MR. KANTER:

04:02:19 10  Q.    I believe we were just doing some calculations.

04:02:21 11        Do you still have the calculator with you?

04:02:23 12  A.    I do.

04:02:25 13  Q.    So out of curiosity, what percentage of $3,000 is

04:02:29 14  your proposed royalty?

04:02:30 15  A.    So if you just simply do the math, $560 divided by

04:02:45 16  3,000, I'm getting a number here, it's a repeated decimal.

04:02:51 17  18.666 repeated.  So 18.67 percent.

04:02:57 18  Q.    Okay.  There's nothing in the Fliteboard agreement

04:03:00 19  preventing Fliteboard from selling boards to a distributor

04:03:03 20  at $3,000; right?

04:03:05 21  A.    So I think I've discussed this earlier, there's

04:03:10 22  nothing in the agreement.  But the negotiations behind that

04:03:14 23  agreement certainly indicate Fliteboard --

04:03:17 24  Q.    I'm just asking about the agreement.

04:03:19 25        There's nothing there; right?

Stec - Cross

04:03:20  1    A.      There's nothing in the agreement.  But that ignores

04:03:23  2    the negotiations that led up to that agreement.

04:03:26  3    Q.      And there's nothing in the agreement to provide to

04:03:29  4    prevent Flightboard from creating a <mark>lesser priced</mark> version of

04:03:32  5    their boards; right?

04:03:33  6    A.      I don't recall that being part of the agreement.

04:03:39  7    Q.      And it doesn't set any minimum pricing?

04:03:42  8    A.      I don't remember seeing that either.

04:03:46  9            MR. KANTER:  Okay.  Could we look at Slide 14 of

04:03:49 10    Dr. Stec's slides?

04:03:49 11    BY MR. KANTER:

04:03:59 12    Q.      I believe you cited this for the --

04:04:05 13            MR. KANTER:  Could you bring that down?  It's

04:04:07 14    the wrong version of the slides.  There you go.

04:04:07 15    BY MR. KANTER:

04:04:21 16    Q.      You relied on this to talk about the idea that there

04:04:24 17    wouldn't be <mark>discounts</mark>; right?

04:04:26 18    A.      That's part of what the reference is here.  It also

04:04:31 19    deals with direct sales, which as I was testifying to in my

04:04:37 20    direct testimony, are sales that go directly to the end

04:04:40 21    consumer, not to a retailer.  So, there isn't <mark>discounting</mark>

04:04:45 22    for that reason, as well.

04:04:46 23    Q.      Okay.  Only at the very top of the right-hand

04:04:49 24    document --

04:04:50 25            MR. KANTER:  Could you highlight just that top

Stec - Cross

04:04:51  1    paragraph and blow it up?

04:04:51  2    BY MR. KANTER:

04:04:58  3    Q.    And right here he's saying, the very top line, "Maybe

04:05:01  4    it feels now that we need to offer big discounts to attract

04:05:05  5    resellers for the first time"; right?

04:05:08  6    A.    That's what's highlighted.

04:05:11  7    Q.    They were expecting to offer big discounts at that

04:05:13  8    time; right?

04:05:14  9    A.    I don't think that's what I would infer from that.

04:05:19 10         MR. KANTER:  Let's go to Slide 12.

04:05:31 11         Maybe it's 13.  Go back two.  There we are.

04:05:31 12    BY MR. KANTER:

04:05:43 13    Q.    This is another quote that you highlighted for the

04:05:47 14    jury?

04:05:47 15    A.    This was another email correspondence that I

04:05:52 16    discussed, yes.

04:05:52 17    Q.    And it talks about a 20 -- a typical 20-plus

04:05:56 18    discount -- 20-plus percent discount; right?

04:05:59 19    A.    You're looking at the last part of that blown up

04:06:04 20    statement?

04:06:05 21    Q.    Yes.

04:06:06 22    A.    It says a typical 20 percent plus discount.

04:06:10 23    Q.    Right.  And these are the Fliteboard communications

04:06:14 24    that you believe show that they would not be offering

04:06:17 25    discounts; right?

509

Stec - Cross

04:06:18  1    A.      So, we just looked at an email that indicated that

04:06:26  2    their sales are direct sales, not sales to distributors and

04:06:31  3    resellers.  So, I take it from that additional information

04:06:36  4    that there wouldn't be a quote/unquote typical 20 percent

04:06:40  5    discount because they don't sell many boards to distributors

04:06:44  6    or resellers.

04:06:45  7    Q.      That's in the document that you highlighted; right?

04:06:47  8    A.      I guess -- so, we just moved from one document that

04:06:52  9    said what I just said to another document and so you're

04:06:55 10    trying to cherry pick context out of certain documents.  I'm

04:06:59 11    trying to look at this and understand it from a broad sense.

04:07:02 12    Q.      These are the two documents that you chose to present

04:07:04 13    to the Court and to the jury?

04:07:06 14    A.      I did.

04:07:07 15    Q.      And you reference a need for big discounts and a

04:07:11 16    typical 20 percent discount; right?

04:07:12 17    A.      So, I tried to explain that with my last answer, in

04:07:16 18    fact, the last email correspondence that was looked at where

04:07:20 19    most of their sales they didn't expect to be to retailers or

04:07:23 20    wholesalers.  They're looking at it from the perspective of

04:07:26 21    direct sales where there aren't discounts.

04:07:28 22    Q.      So you believe MHL and Fliteboard have a silent

04:07:32 23    agreement to keep prices high?

04:07:34 24    A.      I don't think I said that.

04:07:36 25    Q.      Or an agreement not to do discounts?

Stec - Cross

04:07:40  1    A.      I don't think I said that, either.

04:07:43  2    Q.      Do they have an agreement not to do large discounts?

04:07:47  3    A.      I'm not aware of any agreement like that.

04:07:51  4                    MR. KANTER:  Okay.  And, actually, can we look

04:07:54  5    at PTX 33?  And this is the Fliteboard agreement.

04:08:05  6                    Can we look at page ending in Bates Number 46?

04:08:20  7                    Actually, let's turn back a page.  One more.

04:08:31  8    There we are.

04:08:31  9    BY MR. KANTER:

04:08:32 10    Q.      Paragraph 39 of that agreement it says:  "Entire

04:08:37 11    agreement.  This agreement and the exhibits attached hereto

04:08:42 12    constitute the entire final complete and exclusive agreement

04:08:46 13    between the parties and supersede all previous agreements or

04:08:49 14    representations, written or oral, with respect to the

04:08:52 15    subject matter of this agreement.  This agreement may not be

04:08:56 16    modified or amended except in a writing signed by a dually

04:09:00 17    authorized representative of each party."

04:09:02 18                    Did I read that correctly?

04:09:04 19    A.      Yes, I believe you did.

04:09:05 20    Q.      So all of those prior "representations" were

04:09:11 21    superceded by this actual agreement; right?

04:09:13 22    A.      I'm not sure what you're -- what you're prior

04:09:17 23    representations that you're referring to?

04:09:18 24    Q.      Perhaps the negotiation documents that you were

04:09:21 25    relying on.

Stec - Cross

04:09:22 1  A.     So, that, in my opinion, gives the mindset of the

04:09:27 2  parties when they're coming up with this agreement.  It

04:09:30 3  gives you insight into how this agreement was arrived at.

04:09:34 4  So, while this is the final agreement, as you just said, all

04:09:38 5  of that information, I think, is relevant to figure out how

04:09:41 6  the parties got there.

04:09:43 7  Q.     And the final agreement is a ==5.25 percent== royalty?

04:09:47 8  A.     That's my understanding, yes.

04:09:52 9  Q.     Can we look at Slide 13 of Dr. Stec's presentation?

04:09:56 10         Fliteboard doesn't pay ==$560== per board, does it?

04:10:09 11 A.     In this particular context from September 1st through

04:10:15 12 June 30th, it did.  ==$560== per board, that's the math of it.

04:10:20 13 Q.     Really?  Oh, you mean the very first entry?

04:10:24 14 A.     Correct.

04:10:24 15 Q.     And in the next entry, it's less, and it's also less

04:10:29 16 in every other entry; right?

04:10:31 17 A.     Relative to the first, so, it goes down in the next

04:10:36 18 period, but then it goes back up again the subsequent period

04:10:39 19 and then down again the next two periods, so that's just the

04:10:43 20 math that's here.

04:10:45 21 Q.     Right.  And so on average Fliteboard has not paid

04:10:48 22 ==$560== per board; right?

04:10:51 23 A.     Over what period of time?

04:10:53 24 Q.     The period of time that you analyzed.

04:10:55 25 A.     So this entire period of time?

512

Stec - Cross

04:10:59   1   Q.      Yes.

04:11:00   2   A.      It looks like it would be less than that.

04:11:03   3   Q.      Substantially less than that; right?

04:11:05   4   A.      I'm not sure how you define substantially.  It's

04:11:09   5   within probably 20 or $30 of that 560.  I'm trying to do the

04:11:15   6   math in my head, but it's -- I don't know if you consider

04:11:19   7   that substantial or not.

04:11:20   8   Q.      Okay.  And Fliteboard has sold thousands of

04:11:24   9   dollars -- or, sorry, thousands of units; right?

04:11:27  10   A.      I -- well, it's on that chart there.  It looks like

04:11:32  11   it's approximately 2500 units.

04:11:35  12   Q.      Right.  And you based your royalty off of the very

04:11:38  13   first 209 of those boards; right?

04:11:41  14   A.      That's correct.  And I explained why I did that.

04:11:45  15   That corresponds to as close as I could get to the date of

04:11:49  16   the hypothetical negotiation.

04:11:50  17   Q.      And at that date, they knew that that price was going

04:11:52  18   to drop or that amount of profit per unit was actually going

04:11:56  19   to drop over time; right?

04:11:57  20   A.      I don't think you can say that.  No.  In fact,

04:12:00  21   inflation would suggest it would go up.

04:12:03  22   Q.      Could we look at --

04:12:04  23   A.      In fact -- I'm sorry, I wasn't done.  In fact, in the

04:12:07  24   current period, we know inflation the last year or so has

04:12:09  25   been going up quite substantially.

Stec - Cross

1    MR. KANTER:  Could we look at the opening report

2    of Dr. Stec?  I think that's PTX 101 at Page 24.

3    BY MR. KANTER:

4    Q.    Inflation also cost -- raised the price to

5    manufacture boards, wasn't it?

6    A.    So inflation works differently for different inputs.

7    I guess you could make that assumption.  It seems like a

8    reasonable assumption, but that's not something I'm hooked

9    into.

10   Q.    And you haven't looked at the effect of inflation on

11   the pricing of the boards either; right?

12   A.    I haven't looked at how inflation has affected the

13   boards recently.

14   Q.    Okay.  Could we look eight lines down from the very

15   top?  There's a quote about a 10K round number in modeling,

16   talking about an email between MHL and Fliteboard; right?

17   A.    Yes.  I believe that was the email.  In fact, I

18   presented in my testimony, if I remember correctly.

19   Q.    Right.  And right after the 10K round number in

20   modeling, you write, "With the expectation that this price

21   would reduce over time."  Right?

22   A.    In this particular context it says, with the

23   expectation that this price would reduce over time."

24   Q.    Okay.  One of your opinions is that in the

25   hypothetical negotiation, Waydoo would have expected to earn

Stec - Cross

04:13:56  1   substantial revenues and profits from sales of the accused

04:13:59  2   products; right?

04:14:00  3   A.     I think that was -- I referenced it in terms of

04:14:06  4   revenues in my testimony.  I don't remember talking

04:14:08  5   specifically about profits, but that would follow if they

04:14:12  6   have a positive profit margin.

04:14:15  7              MR. KANTER:  Could we scroll down to the section

04:14:18  8   labeled hypothetical negotiation?  Page 37.

04:14:51  9              Second bullet from the bottom.

04:14:51 10   BY MR. KANTER:

04:15:03 11   Q.     And this concerns Waydoo's position in the

04:15:05 12   hypothetical negotiation; right.

04:15:06 13   A.     Yes, that was the $8.8 million that I referenced in

04:15:11 14   my testimony, and then that profit margin, I think I had

04:15:14 15   also said.

04:15:15 16   Q.     And it says, "Waydoo would have expected to earn

04:15:17 17   substantial revenues and profits from sales of the accused

04:15:20 18   products."

04:15:22 19              Right?

04:15:22 20   A.     Yes, that's what it says.

04:15:24 21              MR. KANTER:  Okay.  You can take that down.

04:15:24 22   BY MR. KANTER:

04:15:29 23   Q.     You don't dispute that Waydoo's operating profit

04:15:32 24   margin is 15 percent; right?

04:15:33 25   A.     I believe that's something that Mr. Ping had

Stec - Cross

04:15:37   1    testified to.  I think I've said -- or at least it's my

04:15:43   2    opinion that's not the necessarily right profit margin to

04:15:47   3    look at, but that's at least what he testified to.

04:15:49   4    Q.    And you don't have any evidence to suggest that that

04:15:51   5    is not the case; right?

04:15:52   6    A.    That the operating profit margin isn't 15 percent?

04:15:57   7    Q.    Correct.

04:15:57   8    A.    Is that what you're asking.

04:15:59   9    Q.    Right.

04:15:59  10    A.    I haven't seen evidence to the contrary.

04:16:02  11    Q.    And you don't dispute Mr. Kline's calculation that

04:16:06  12    the 15 percent, the profit that Waydoo earns per board is

04:16:12  13    actually less than your $560 number?

04:16:15  14    A.    So, I believe his calculation came up with -- and,

04:16:22  15    again, I'm trying to do this from memory -- roughly $450 or

04:16:26  16    so.  And obviously my per unit amount was 560, so 450 was

04:16:33  17    less than 560.

04:16:36  18    Q.    And you said that you don't think that the right

04:16:38  19    number is operating profit.  Why is that?

04:16:41  20    A.    Well, we heard from Mr. Ping, for example, when he

04:16:43  21    testified that Waydoo sells a lot of products, sells a lot

04:16:49  22    of products across the entire globe.  In that particular

04:16:54  23    context there's all kinds of fixed costs that go into

04:16:56  24    producing those products.  And that's something that's going

04:16:59  25    to be counted when you calculate an operating profit margin.

Stec - Cross

04:17:03 1  Why that's not the appropriate operating -- or why operating

04:17:06 2  profit margin isn't appropriate is because a lot of those

04:17:09 3  costs Waydoo would still incur even if it was no longer

04:17:15 4  selling nil of its products in the United States.  So what's

04:17:18 5  important to consider is the incremental costs that Waydoo

04:17:22 6  incurs in the context of its operations.

04:17:25 7         And those incremental costs are much more likely

04:17:28 8  to be the manufacturing margin or the operating -- or the

04:17:31 9  margin related to the manufacturing profit.

04:17:35 10 Q.    Manufacturing profits just include manufacturing

04:17:38 11 costs; right?  That doesn't include any other costs?

04:17:42 12 A.    Well, I'm not sure what you mean by "any other

04:17:46 13 costs."  I think Mr. Ping defined sort of what was in

04:17:49 14 manufacturing profits, and he said it was all the factor

04:17:52 15 related things, even the rent related to the factory and so

04:17:55 16 on.  So, it seems like quite a few costs were included in

04:17:59 17 there.

04:17:59 18 Q.    You opined that the manufacturing profit margin was

04:18:04 19 35 percent; right?

04:18:05 20 A.    Profit.  I don't think I opined to that.  I think Mr.

04:18:10 21 Ping testified to that.

04:18:11 22 Q.    Did he?

04:18:11 23 A.    I believe that was in the testimony we just saw

04:18:15 24 before I testified.

04:18:16 25 Q.    Let's pull up -- you relied on Ping's deposition

517

Stec - Cross

04:18:19 1    testimony in your report; right?

04:18:20 2    A.    Yes, among other things.

04:18:22 3              MR. KANTER:  Could we pull up Ping's deposition

04:18:23 4    testimony at Page 135?  Looking at Line 8 through 12.

04:18:45 5              "QUESTION:  Okay.  I just want to make sure I

04:18:48 6    understand.  So the manufacturing profit margin for sales to

04:18:51 7    the United States of the eFoil is 10 percent or around 10

04:18:54 8    percent?

04:18:55 9              "ANSWER:  Less than 10 percent."

04:18:59 10             And then looking down from Line 16 to 24.

04:19:03 11             "QUESTION:   Okay.  So why -- companywide or

04:19:05 12   worldwide, is it accurate that the manufacturing profit

04:19:08 13   margin for the eFoils is 35 percent?"

04:19:11 14             And he answers:  "So the 35 percent is a goal we

04:19:15 15   set up."

04:19:15 16   BY MR. KANTER:

04:19:16 17   Q.    So that's not actually a real number; right?  It's a

04:19:19 18   goal, an aspiration?

04:19:22 19   A.    Well, I believe he testified in what we just saw

04:19:25 20   before that it was 35 percent.  So, it appears that he's

04:19:30 21   saying here that it's still manufacturing a profit margin,

04:19:34 22   but there may be some type of other things that are taken

04:19:37 23   out of that.

04:19:38 24   Q.    He says above the manufacturing profit margin was

04:19:41 25   less than 10 percent; right?

Stec - Cross

04:19:42  1    A.    Okay.  So I guess that -- that's inconsistent to me

04:19:49  2    because he's arguing that the manufacturing profit is 10

04:19:53  3    percent, but the operating profit is 15 percent which

04:19:57  4    includes additional costs that you'd take away from

04:20:00  5    manufacturing profit margin.

04:20:02  6            So, to me, there's an inconsistency here.  You

04:20:06  7    can't have a market -- you can't have a manufacturing profit

04:20:08  8    margin of 10 percent and then an operating profit margin of

04:20:12  9    15 percent because the operating margin -- profit margin

04:20:14 10    takes up more cost to get to the operating profit margin.

04:20:19 11    Q.    Mr. Ping told you in his deposition that the

04:20:19 12    35 percent, that was just a goal, not a real number; right?

04:20:23 13    A.    So he says it's a goal here.

04:20:25 14    Q.    Okay.  The Fliteboard license that you rely on --

04:20:32 15            MR. KANTER:  Actually, can we pull that back up,

04:20:33 16    PTX 33?

04:20:33 17    BY MR. KANTER:

04:20:36 18    Q.    That ==5.25 percent== in that license, that's for the two

04:20:40 19    patents-in-suit, and also two additional patents; right?

04:20:43 20    A.    You would have to refresh my recollection to that, if

04:20:49 21    you could pull that up.

04:20:50 22    Q.    Sure.

04:20:50 23            MR. KANTER:  If we could go to page ending in

04:20:53 24    Bates Number 47.

04:20:53 25    BY MR. KANTER:

519

Stec - Cross

04:20:56 1  Q.    While that's being pulled up, you understand that

04:20:58 2  Waydoo is not accused of infringing any patents other than

04:21:03 3  the two patents-in-suit in this case; right?

04:21:05 4  A.    That's my understanding.  The '044, and the '659, I

04:21:14 5  believe.

04:21:14 6  Q.    Right.  And that's Item 1 and Item 2 to the license

04:21:15 7  here?

04:21:15 8  A.    That's correct.

04:21:16 9  Q.    There's also an '870 patent to a wireless controller;

04:21:21 10 right?

04:21:21 11 A.    Yes.

04:21:22 12 Q.    And an international application, also to a wireless

04:21:26 13 controller?

04:21:26 14 A.    Yes, that -- that appears to be an international

04:21:30 15 patent that hasn't -- well, an application for an

04:21:34 16 international patent.

04:21:35 17 Q.    You understand that Waydoo is not accused of

04:21:37 18 infringing those wireless controller patents; right?

04:21:39 19 A.    That's my understanding.

04:21:40 20 Q.    Okay.  And you also understand that damages can't be

04:21:44 21 based on any value attributed to the wireless controller

04:21:47 22 patents; right?

04:21:48 23 A.    Yes, I realize that, and I accounted for that in my

04:21:51 24 report and in the context of coming up with a royalty.

04:21:55 25 Q.    And by accounting for that, you mean you gave zero

520

Stec - Cross

04:21:58  1    value to the '870 patent; right?

04:22:00  2    A.    I specifically talked to Mr. Wagner, I believe.  I

04:22:04  3    might have talked to Mr. Leason as well, to understand what

04:22:07  4    the thinking was in terms of this license and that

04:22:10  5    particular patent.  And what they had told me was

04:22:13  6    essentially that patent was thrown in as part of the

04:22:16  7    license.  It didn't guide the license in any way, shape or

04:22:19  8    form, nor did they attribute any value to that particular

04:22:22  9    patent.

04:22:23 10    Q.    Okay.  You talked with Mr. Wagner to find out what

04:22:27 11    value was attributed to the wireless controller patent?

04:22:29 12    A.    No, I talked to Mr. Wagner to understand the

04:22:32 13    negotiation that went on between MHL and Fliteboard, and at

04:22:37 14    least from MHL's perspective, since they are the owners of

04:22:40 15    this patent, what they were thinking in the context of that

04:22:43 16    negotiation.

04:22:45 17    Q.    You throughout your reports cite repeatedly to

04:22:49 18    Mr. Wagner's deposition; right?

04:22:50 19    A.    I don't know what you mean by "repeatedly."  I

04:22:54 20    certainly cite to his deposition.

04:22:55 21    Q.    Over 40 times.

04:22:57 22    A.    I haven't counted that.  I'm happy to do that if you

04:23:00 23    like, or you can.  I don't represent that.

04:23:04 24    Q.    Let's look at Mr. Wagner's deposition at DTX 335 at

04:23:07 25    Page 40, Line 13 to 15.

Stec - Cross

04:23:21 1          Mr. Wagner's testimony:

04:23:22 2          "QUESTION:   And you said before you've never

04:23:24 3   valued a patent?

04:23:26 4          "ANSWER:   Correct."

04:23:29 5          Did I read that correctly?

04:23:30 6   A.    Yes, did you.

04:23:31 7   Q.    Can we go back to PTX 33 and this time go to page

04:23:35 8   ending in Bates number 48.

04:23:36 9          You mentioned that the patent was thrown in for

04:23:41 10  completeness?

04:23:42 11  A.    I didn't put it that way.  I think the patent was

04:23:46 12  included, but it wasn't part of what precipitated the deal

04:23:51 13  or closed the deal.  It was, perhaps, what I would call a

04:23:54 14  "throw-in" patent.

04:23:55 15  Q.    A "throw-in."  Schedule B in the license, you're

04:24:00 16  familiar with this.  This lists the other IP that MHL has

04:24:06 17  that's not part of the license?

04:24:07 18  A.    I -- I can't read some of what's written here.  It's

04:24:12 19  a little blurry.  Could you -- there, that helps.

04:24:16 20         Could you scroll back up?  I'm sorry.  I just

04:24:19 21  want to see the headers there.

04:24:21 22         Okay.  I see it.

04:24:22 23  Q.    Yeah.  Those weren't thrown in to Schedule A, which

04:24:25 24  is the grant of license in this agreement; right?

04:24:28 25  A.    I don't believe they were, no.

Stec - Cross

04:24:30 1    Q.      All right.  And do you know he whether Fliteboard has

04:24:33 2    a wireless controller?

04:24:34 3    A.      You're testing my memory.  I don't remember as I sit

04:24:43 4    here.

04:24:43 5    Q.      It does, doesn't it?

04:24:44 6    A.      I would think it probably has to, but I wasn't sure.

04:24:48 7    Q.      Okay.  Let's talk about the hypothetical negotiation.

04:24:57 8    Am I correct that in coming up with your royalty number, it

04:24:59 9    was your opinion that at the hypothetical negotiation, MHL

04:25:04 10   would be cognizant of the fact that it could lose some or

04:25:07 11   all of its sales and associated profits if it licensed to a

04:25:11 12   competitor such as Waydoo selling products at a much lower

04:25:14 13   price point compared to MHL?

04:25:15 14   A.      That seems possible.

04:25:20 15   Q.      That's a quote from your opening report; right?

04:25:23 16   A.      I, again, didn't memorize my report.  It's possible

04:25:26 17   that's said there.  I don't remember.

04:25:28 18   Q.      Fair enough.  Let's turn to PTX 101 at Page 37.

04:25:33 19           Second bullet point, bottom line.  Do you see

04:26:02 20   there "MHL would be cognizant of the fact that it could lose

04:26:05 21   some or all of its sales"?

04:26:07 22   A.      I see the portion of that sentence that you read.

04:26:09 23   Q.      Yeah.  That's not actually the case, though; right?

04:26:12 24   A.      I'm not sure what you mean by that.

04:26:17 25   Q.      Well, again, you weren't here -- you still haven't

Stec - Cross

04:26:21  1    reviewed the trial transcript?  You didn't do that during

04:26:23  2    the break; right?

04:26:24  3    A.    I was standing right here during the break.

04:26:26  4    Q.    Okay.  So yesterday, you weren't here when Mr. Wagner

04:26:29  5    testified about his views in 2019 about Waydoo?

04:26:34  6    A.    I was not here for that testimony.

04:26:38  7    Q.    Okay.  Let's pull up the trial transcript at 346.

04:26:57  8    Looking from Line 5 to 15.

04:27:02  9              346.  Lines 5 to 15.

04:27:31 10              "QUESTION:   Okay.  Counsel talked a little bit

04:27:36 11    about a hypothetical negotiation in 2019.  I'm sure we'll

04:27:40 12    hear more about that later in this trial.

04:27:43 13              "But in 2019, MHL has taken the position that it

04:27:46 14    already believed Waydoo infringed the patents-in-suits;

04:27:50 15    correct?

04:27:50 16              "ANSWER:   Correct.

04:27:52 17              "QUESTION:   But you waited two years to file

04:27:54 18    the lawsuit; right?

04:27:55 19              "ANSWER:   Correct.

04:27:57 20              "QUESTION:   And that's because you didn't even

04:27:59 21    think that Waydoo was going to make it in the market?

04:28:02 22              "ANSWER:   That is correct."

04:28:05 23              Did I read that correctly.

04:28:08 24    A.    I believe you did.

04:28:09 25    Q.    That was Mr. Wagner's testimony.

Stec - Cross

04:28:14  1  A.      It doesn't say exactly whose testimony it is but if

04:28:16  2  you're representing it was, then I'm willing to take that

04:28:20  3  representation.

04:28:22  4  Q.      Mr. Wagner made the same statement in his deposition;

04:28:24  5  right?

04:28:25  6  A.      I don't remember.  I'm happy to look at it, if you

04:28:31  7  like.

04:28:31  8  Q.      You reviewed his deposition; right?

04:28:32  9  A.      I did.

04:28:33 10  Q.      Okay.  Let's pull up his deposition, 335 at 177.

04:28:39 11          Actually, let's go to the next page.  You see

04:28:54 12  there Line 5, "Frankly, I didn't think you -- I didn't think

04:28:58 13  Waydoo was going to make it.  They had so many problems."

04:29:02 14          Right?

04:29:03 15  A.      I  -- I don't know what question he's answering

04:29:07 16  there, but I at least saw the answer.

04:29:12 17  Q.      Above that, it says before January 2019 that Waydoo

04:29:14 18  is an infringer, and yet it still took you two years to file

04:29:17 19  a lawsuit?

04:29:19 20  A.      That's not the full question.  I'm not sure if

04:29:22 21  there's more context than that.

04:29:24 22  A.      Sorry.

04:29:24 23  A.      Okay.

04:29:24 24  Q.      The full question is "So you've reached the

04:29:27 25  conclusion before January 2019 that Waydoo is an infringer,

Stec - Cross

04:29:30 1    and yet it still took you two years to file a lawsuit?"

04:29:32 2            "ANSWER:   Frankly, I didn't think you -- I

04:29:35 3    didn't think Waydoo was going to make it."

04:29:40 4            Let's pull up Slide 9 from Dr. Stec's

04:29:43 5    presentation.

04:29:55 6            On this slide, you talk at the bottom about

04:29:58 7    concerns over a low-cost competitor entering the market.

04:30:03 8    A.    Yes, I see that part.

04:30:04 9    Q.    And you recall in your reports you cite to and rely

04:30:07 10   on Mr. Leason's deposition transcript?

04:30:08 11   A.    I believe I have, yes.

04:30:11 12   Q.    Let's look at DTX 334 at Line 197.

04:30:16 13           Discussing the Waydoo product, Mr. Leason says

04:30:30 14   in Line 24, "QUESTION:   But it's significantly less than

04:30:36 15   the price of LIFT; right?

04:30:38 16           "ANSWER:   That is correct.

04:30:40 17           "QUESTION:   And as a competitor of yours,

04:30:43 18   that's got to be a concern for MHL; right?

04:30:46 19           "ANSWER:   Not particularly."

04:30:50 20           Did I read that correctly?

04:30:53 21   A.    You read that portion of the answer correctly, yes.

04:30:55 22   Q.    Okay.  And let's look at Slide 21 from your deck.

04:31:12 23           Here, you discuss the competitive relationship

04:31:14 24   between MHL and Waydoo.

04:31:17 25   A.    That's what the title of the slide says.

Stec - Cross

04:31:20  1    Q.    Okay let's look at the bottom, bottom bullet first.

04:31:23  2    It says, "MHL investor presentation analyzes market share."

04:31:30  3              Can we pull up PTX 183.  We are going to come

04:31:38  4    back this slide a few times, Carol.

04:31:41  5              And can we look at the page -- and is this the

04:31:50  6    investor slide deck you were referring to?

04:31:51  7    A.    I believe so, yes.  I'd have to double-check the

04:31:56  8    date, but I think that's right.

04:31:58  9    Q.    If we look at the page ending in Bates Number 102.

04:32:04 10    It's difficult to see.  That was it, the previous page.

04:32:13 11              Sorry.  That's 101.

04:32:17 12              We saw this yesterday in Court, but Waydoo,

04:32:21 13    that's the little blue sliver in that left chart,

04:32:26 14    Competitor C; right?

04:32:27 15    A.    It doesn't say "Waydoo" there.  If you're making a

04:32:36 16    representation that Competitor C is representing Waydoo,

04:32:38 17    then I'm willing to take that representation.

04:32:41 18    Q.    And gray was Fliteboard; right?

04:32:44 19    A.    Again, it doesn't say that there, so if that's what

04:32:50 20    you're representing, I'm willing to take that

04:32:52 21    representation.

04:32:52 22    Q.    Assume that blue is Waydoo and gray is Fliteboard.

04:32:56 23    Waydoo is a much smaller competitor; right?

04:32:58 24    A.    Relative to Fliteboard, the area of the light blue

04:33:09 25    bar is smaller than the gray bar, but the light blue bar is

Stec - Cross

04:33:15  1   growing by whatever that percentage is over time.

04:33:19  2   Q.    Right.  Let's look at the next slide, to the next

04:33:22  3   page of this document.

04:33:25  4         And here, Fliteboard is anticipating quite a lot

04:33:29  5   of growth despite Waydoo being on the market; right?

04:33:35  6   A.    Sorry.  I want to make sure I'm looking at what you

04:33:41  7   want me to.  So you're talking about year-over-year growth?

04:33:46  8   Is that the --

04:33:46  9   Q.    MHL wasn't actually afraid of losing some or all of

04:33:50 10   its sales; right?

04:33:51 11   A.    I don't think that's right.

04:33:58 12   Q.    Okay.

04:33:58 13   A.    Not based on what I've reviewed.

04:34:00 14   Q.    We can go back to the slide deck.  Slide 21.

04:34:14 15         The top bullet here talks about Mr. Wagner

04:34:16 16   testified that MHL had lost its biggest partner?

04:34:20 17   A.    Yes, I see that.

04:34:21 18   Q.    Am I correct that MHL didn't actually lose its

04:34:23 19   partner, it chose to drop that partner?

04:34:27 20   A.    I thought that was something that I explained in my

04:34:30 21   direct testimony, that basically as I understand it, MACkite

04:34:36 22   started carrying the Waydoo Fliteboard -- I'm sorry the

04:34:40 23   Waydoo eFoils.  And at the point, I'm not sure how soon

04:34:44 24   thereafter, Mr. Wagner realized that, he basically said,

04:34:47 25   well, we're -- they're competing in the same marketplace.

Stec - Cross

04:34:52 1   We believe that Waydoo is infringing, so we're going to pull

04:34:55 2   our product from this particular --

04:34:56 3   Q.     In fact, they pulled their product from any

04:34:58 4   distributor who sells any eFoil product; right?  Other than

04:35:05 5   theirs?

04:35:06 6   A.     I -- I don't remember that being the case.  I'm

04:35:09 7   familiar with this particular instance, but I don't remember

04:35:11 8   that being the case.

04:35:11 9   Q.     Can we pull up DTX 334 at 283.

04:35:15 10         Is this is Mr. Leason's testimony?  Line 16 to

04:35:24 11  22.

04:35:28 12         And you reviewed this testimony; right?

04:35:30 13  A.     I would have at some time, yes.

04:35:33 14  Q.     And it says here "But it sounds like your -- it's

04:35:37 15  your company policy to drop that dealer if, in fact, they

04:35:41 16  sell another product; is that right?

04:35:43 17         "ANSWER:   Yes, we do not support those dealers

04:35:46 18  if they're selling what we feel is competitive product."

04:35:50 19         Right?

04:35:51 20  A.     That's what he said, and it seems to underline that

04:35:54 21  he believes Waydoo is a competitive product; otherwise, he

04:35:57 22  wouldn't have required or he wouldn't have pulled it from

04:36:00 23  MACkite, for example.

04:36:02 24  Q.     Let's go back to the slide.  And one point, it says

04:36:20 25  Erik Tamayo.  You talked about that during your testimony?

Stec - Cross

04:36:24  1   A.     I did.

04:36:24  2   Q.     You had spoken with Erik; right?

04:36:29  3   A.     Yes, I said.  I said I did, yes.

04:36:31  4   Q.     And Mr. Tamayo didn't provide you with any actual

04:36:34  5   evidence that he lost sales to Waydoo; right?  Just his

04:36:37  6   personal experience?

04:36:38  7   A.     This was based on his personal experience interacting

04:36:42  8   with customers.

04:36:43  9   Q.     Right.  And he didn't give you any specifics, either,

04:36:46 10   just his beliefs; right?

04:36:47 11   A.     I'm not sure what you mean by "specifics."

04:36:50 12   Q.     Let's look at your deposition testimony at 192.  I

04:36:56 13   believe that's DTX 339.

04:37:08 14          192.  Sorry, Carol.

04:37:20 15          Do you recall you were deposed in this case?

04:37:22 16   A.     I was.

04:37:23 17   Q.     And you testified under oath?

04:37:24 18   A.     I did.

04:37:25 19   Q.     And at Line 10, reading, "Yeah, but you don't know

04:37:33 20   why.  You don't know if that was a cost issue, a quality

04:37:36 21   issue; is that right?

04:37:37 22          "ANSWER:   Mr. Tamayo didn't.  He simply told me

04:37:41 23   that he believes he lost sales to Waydoo of the MHL product.

04:37:45 24   He didn't go into specific details regarding customers or

04:37:47 25   the reasons customers have given him."

Stec - Cross

04:37:50 1          Right?

04:37:50 2   A.     That's what it says.

04:37:51 3   Q.     So, you're basically going off just his belief and

04:37:57 4   say-so?

04:37:57 5   A.     I'm going off what he told me.

04:37:59 6   Q.     Okay.  With respect to the Fliteboard license, you've

04:38:24 7   relied on the Fliteboard negotiations for your position that

04:38:27 8   Fliteboard wanted a per-unit royalty.  We've discussed that;

04:38:30 9   right?

04:38:31 10  A.     Not only did Fliteboard negotiate from that

04:38:35 11  perspective, but I think I showed evidence that MHL did as

04:38:38 12  well.

04:38:39 13  Q.     Sorry.  That's what I meant to say.  MHL wanted a per

04:38:42 14  unit royalty.

04:38:44 15         You didn't look at whether MHL's threats of

04:38:48 16  litigation in those same communications drove up the price

04:38:51 17  of that license, did you?

04:38:53 18  A.     I don't think that's accurate.  I certainly looked at

04:38:59 19  those communications and would have read whatever you might

04:39:02 20  be referring to.

04:39:03 21  Q.     In fact, you assumed that there were no threats of

04:39:06 22  litigation; right?

04:39:07 23  A.     I didn't see evidence that there was.

04:39:11 24         MR. KANTER:  Let's look at PTX 107 at 19.

04:39:11 25  BY MR. KANTER:

531

Stec - Cross

04:39:19  1    Q.     This is your reply report; correct?

04:39:20  2    A.     This is my reply report, yes.

04:39:27  3    Q.     In the bottom paragraph it says, in the middle

04:39:38  4    towards the right, "in fact."

04:39:39  5           "In fact, it is my understanding that MHL did

04:39:42  6    not 'threaten' litigation but had simply stated to

04:39:45  7    Fliteboard that MHL was willing to defends its patents."

04:39:49  8           It cites 119.

04:39:50  9           MR. KANTER:  Can we look down at 119."

04:39:58 10    BY MR. KANTER:

04:39:58 11    Q.     And that's based on the word of Nick Leason and

04:40:01 12    Mr. Wagner; right?

04:40:02 13    A.     That's part of what it's based on.  Like I said a

04:40:08 14    moment ago, I also read the communications that I think

04:40:10 15    you're referencing.

04:40:11 16    Q.     You don't cite any specific communications here;

04:40:13 17    right?  You say based on discussions with Nick Leason and

04:40:17 18    Steward Wagner?

04:40:17 19    A.     That's part of what's referenced there, but I have a

04:40:21 20    whole list of documents that I reviewed in the context of

04:40:25 21    this report and I would have reviewed those communications.

04:40:28 22    Q.     And are you aware that Mr. Leason testified yesterday

04:40:31 23    that there were intimidations tactics during those

04:40:33 24    negotiations?

04:40:34 25    A.     I was not here for that testimony.

Stec - Cross

04:40:37  1    Q.     Okay.  Would that surprise you?

04:40:38  2    A.     I guess I would have to see the testimony.  I'm not

04:40:43  3    sure.

04:40:57  4              MR. KANTER:  Okay.  Let's look at PTX 33 at

04:40:59  5    Page 42.

04:40:59  6    BY MR. KANTER:

04:41:05  7    Q.     It's because of those intimidation tactics, right,

04:41:09  8    that Fliteboard insisted on having a three-year termination

04:41:12  9    clause in the agreement?

04:41:13 10    A.     I don't recall seeing evidence of that, no.

04:41:20 11    Q.     You agree that there's a three-year termination

04:41:22 12    clause in the agreement?

04:41:23 13    A.     I believe there is a three-year termination clause.

04:41:25 14    Q.     Okay.  And that's also why Fliteboard placed a

04:41:29 15    statement into this agreement about not admitting

04:41:33 16    infringement; right?

04:41:34 17    A.     I'm sorry.  Not admitting what?

04:41:36 18    Q.     Infringement.

04:41:37 19    A.     You're asking me if the reason was because they were

04:41:41 20    intimidated?  I'm not aware of any evidence in that regard.

04:41:45 21    Q.     Because they didn't believe they infringed the

04:41:47 22    patents; right?  They took this license for other reasons?

04:41:50 23    A.     I don't know what their -- what their thinking was in

04:41:55 24    terms of infringement or not.  I don't recall seeing that.

04:41:58 25              MR. KANTER:  Let's look at page ending Bates

Stec - Cross

04:42:02 1    Number 45, Section 55.

04:42:02 2    BY MR. KANTER:

04:42:16 3    Q.     Here it says that the sublicensee, that's Fliteboard

04:42:19 4    here; right?

04:42:19 5    A.     Yes.  That would be Fliteboard.

04:42:23 6    Q.     They agree to mark their -- their products; right?

04:42:27 7    A.     Yes, it appears to say that.

04:42:30 8    Q.     And the last sentence it says, ==**"Sublicensor and**==

04:42:33 9    ==**Langelaan acknowledge that any such marking does not**==

04:42:36 10   ==**constitute an admission of infringement by any of the**==

04:42:39 11   ==**licensed intellectual property"**==; right?

04:42:41 12   A.     That's what it says.

04:42:46 13   Q.     Am I correct that you haven't attempted to quantify

04:42:48 14   any lost sales to MHL in this case?

04:42:53 15   A.     I have not attempted to quantify lost sales.

04:43:07 16   Q.     At the very beginning we talked about additional

04:43:12 17   sales numbers in your -- sorry -- additional units in your

04:43:17 18   opinion, you had testified that you had removed them, it

04:43:20 19   turns out that they were still there.

04:43:22 20   A.     So, there was a scenario in which I did remove them.

04:43:26 21   In this particular scenario, I did not.

04:43:28 22   Q.     Right.  So you're not removing them in this scenario

04:43:31 23   in front of the jury; right?

04:43:32 24   A.     In what I presented to the jury, I relied on

04:43:35 25   Mr. Ping's testimony as to what his sales were.

Stec - Cross

04:43:37  1              MR. KANTER:  Okay.  Can we pull up PTX 101,

04:43:42  2    Exhibit 6.0?  That's on the 86th page of the PDF.

04:43:42  3    BY MR. KANTER:

04:44:01  4    Q.     Okay.  Do you see in the fourth time period over,

04:44:10  5    July 30th, 2021, through December 30th, 2021?

04:44:14  6    A.     Yes.

04:44:14  7    Q.     You write EST under that; right?

04:44:17  8    A.     Yes, that's -- I see that.

04:44:19  9    Q.     And that's because you added to the actual sales

04:44:22 10    data.  You added additional sales there; right?

04:44:24 11    A.     Yes, if you look at Footnote Number 3, it explains

04:44:30 12    what I did there.

04:44:31 13    Q.     All right.  So, for every other number in here you

04:44:34 14    used Waydoo's sales data; right?  It was produced to you?

04:44:38 15    A.     So you could look at the other footnotes, they would

04:44:43 16    indicate what I used and that, I believe, is correct.

04:44:46 17    Q.     Okay.  But in this period from July through December,

04:44:53 18    you relied on Mr. Ping's testimony to add a large number of

04:44:58 19    additional units; correct?

04:44:58 20    A.     So there was inconsistency with the sales information

04:45:04 21    that was produced by Waydoo.

04:45:07 22    Q.     Right.  So --

04:45:08 23    A.     I'm sorry.  I wasn't done.

04:45:09 24    Q.     Apologies.

04:45:10 25    A.     That inconsistency had to be resolved in some way.

535

Stec - Cross

04:45:14  1   Mr. Ping testified under oath that these were the sales.

04:45:18  2   So, I relied on Mr. Ping's sworn testimony that these were,

04:45:21  3   in fact, reduced sales.

04:45:23  4   Q.     And it was conveyed to you that Mr. Ping made a

04:45:25  5   mistake at his deposition; right?

04:45:27  6   A.     So, that was what was conveyed to me.  However, when

04:45:33  7   you do a deposition you typically have the opportunity to

04:45:37  8   correct any mistakes that you made during the deposition.

04:45:40  9   It's called an errata sheet.

04:45:42 10          And as far as I know, Mr. Ping didn't file an

04:45:46 11   errata sheet.  In other words, he didn't recognize that he

04:45:48 12   made a mistake and tried to correct it.

04:45:50 13   Q.     So, you assigned 730 sales to wintertime for a water

04:45:57 14   sport; right?

04:45:57 15   A.     So, in that particular context there was 730 sales.

04:46:03 16   I wouldn't say it's wintertime.  It's July 30th of 2021,

04:46:07 17   which is, at least on my calendar, the midst of summer.

04:46:11 18   Q.     That's not really the big time to be buying boards;

04:46:13 19   right, from July through December 31st?

04:46:16 20   A.     Well, we don't know how those sales are spread out

04:46:20 21   over that time period.  They could have been centered in

04:46:23 22   July and August, which are typically warm weather months,

04:46:27 23   with fewer sales at the end of the year.

04:46:30 24          But you could also look at those sales as being

04:46:33 25   Christmas gifts, for example.

Stec - Cross

04:46:35  1    Q.      Let's?

04:46:35  2              MR. KANTER:   Look at the same period in 2022.

04:46:39  3    Let's go to your supplemental expert report at Page 35 of

04:46:44  4    the PDF.

04:46:44  5    BY MR. KANTER:

04:46:48  6    Q.      This is your supplemental report; correct?

04:46:50  7    A.      Yes, it appears to be.

04:47:07  8              MR. KANTER:   Looking for Exhibit 4.0.

04:47:10  9              There it is.

04:47:10 10    BY MR. KANTER:

04:47:18 11    Q.      And here you've recognized that in August through

04:47:22 12    December of 2022 there were 100 sales; right?

04:47:26 13    A.      That was what was reported by Waydoo.  As you can

04:47:34 14    see, it's -- there's a bit of a disconnect with those sales

04:47:38 15    because that appears to be a five-month time period where

04:47:45 16    even, I guess, going back 2020, they were selling more than

04:47:52 17    20 units a month.  But for some reason, their volume has

04:47:58 18    gone way down the last five months of 2022.  That raises a

04:48:03 19    red flag to me about the reliability of the data, but that's

04:48:07 20    what was produced so that's what I relied upon.

04:48:09 21    Q.      Well, this is your data that you added to; right?

04:48:12 22    And that's why it goes way down, because you added 730 sales

04:48:18 23    to your 2021 numbers?

04:48:20 24    A.      I don't think that's accurate.  This was a

04:48:26 25    supplemental production of sales information from Waydoo.

Stec - Cross

04:48:30 1    In other words, Waydoo said this is how much we sold during

04:48:34 2    this period.

04:48:36 3    Q.      This is not a document presented by Waydoo.  This is

04:48:39 4    a document from your report.

04:48:41 5            You prepared this slide; right?

04:48:42 6    A.      I did prepare this slide.

04:48:45 7    Q.      All right.

04:48:46 8    A.      But I'm using inputs from Waydoo saying basically how

04:48:51 9    many units it sold during that period of time.

04:48:53 10   Q.      Plus your additional 730; right?

04:48:55 11   A.      That has nothing to do with what you've highlighted

04:48:58 12   there.

04:48:58 13   Q.      The additional the 1,300 under 2021, that's your

04:49:03 14   additional?

04:49:04 15   A.      The additional sales are there.  But you were asking

04:49:06 16   me about 2022 and the hundred that you highlighted, that has

04:49:11 17   nothing to do with that.

04:49:12 18   Q.      Right.  The sudden decline, that's because you added

04:49:15 19   a bunch of numbers to 2021 that shouldn't have been there;

04:49:19 20   right?

04:49:19 21   A.      No.  That's not right.

04:49:33 22           MR. KANTER:  Okay.  I have no further questions

04:49:34 23   at this time.

04:49:35 24           THE COURT:  Mr. Murrell?

04:49:37 25           MR. MURRELL:  I have a few, Your Honor.

Stec - Redirect

REDIRECT EXAMINATION

BY MR. MURRELL:

Q.     So, Mr. Stec -- Dr. Stec, I apologize.

A.     No problem.

Q.     The -- let's begin where he left off, the number of sales in 2021.

       You remember those questions you were just asked and you relied upon Mr. Ping's sworn testimony on that?

A.     I did.

       MR. MURRELL:  And if we could put up Page 139, I believe, of his deposition.

BY MR. MURRELL:

Q.     And I think we just watched this play, but I just want to confirm the numbers he used.

       MR. MURRELL:  If you can go up a page to 139. There you go.  Perfect.

BY MR. MURRELL:

Q.     And so this was Mr. Ping's sworn testimony?

A.     So, collectively this was all his sworn testimony.  I think the information related to the sales appears in lines 11 Through 13 there where he testifies that the current amount of Waydoo sales in the United States in 2021.

       And just to be specific, these are eFoil sales is 1,300 units.

Q.     1,300.  And then the next question he was asked, if

Stec - Redirect

04:51:08 1   we look at that, and maybe that helps us.  He was then asked

04:51:11 2   what the total number of revenue in the U.S. for those

04:51:15 3   sales.

04:51:15 4           Do you see that?

04:51:16 5   A.     Yes, I see that.

04:51:18 6   Q.     It's $5 million?

04:51:19 7   A.     That's what it says.

04:51:22 8   Q.     Okay.  And that was for -- actually, it said

04:51:29 9   1500 units?

04:51:29 10  A.     I don't know if that was a typo or not, but I took

04:51:32 11  his answer as being 100.

04:51:34 12  Q.     And that's the number you used?

04:51:35 13  A.     Correct.

04:51:36 14  Q.     And if we step back out, Mr. Theuerkauf asked you

04:51:41 15  because -- have you actually -- you just saw the video?

04:51:44 16  A.     I believe that was what was played before I

04:51:46 17  testified, yes.

04:51:47 18  Q.     And watching the video you saw him actually look down

04:51:49 19  at his computer to answer the question?

04:51:51 20  A.     My impression was that he had some type of worksheet

04:51:54 21  or something that he was looking at.

04:51:55 22  Q.     And Mr. Theuerkauf asked him what did you look at to

04:51:58 23  determine that; right?

04:52:01 24  A.     Yes.  That's what it says.

04:52:02 25  Q.     And he answered my work document.

Stec - Redirect

04:52:05  1    A.    Yes.  Some type of worksheet or Excel spreadsheet.  I
04:52:08  2    don't know exactly what it was.
04:52:12  3    Q.    And you used that sworn testimony; correct?
04:52:14  4    A.    I did, yes.
04:52:17  5    Q.    And you just talked about a red flag.  You were just
04:52:20  6    asked:  "Waydoo had supplemented its financial data just
04:52:24  7    recently; yes"?
04:52:25  8    A.    Yes.  So the data stopped in July of 2022, that was
04:52:31  9    prior to my -- I filed my report, if you recall, August 5th
04:52:34 10    of 2022.  So, we had data going, basically, up to the date
04:52:38 11    of my report.
04:52:40 12               Subsequently, there was an update to the data
04:52:42 13    where Waydoo was asked to produce, essentially, the last
04:52:46 14    five months of that calendar year, which hadn't been
04:52:49 15    produced up to that point.
04:52:50 16    Q.    And those additional five months were how many
04:52:53 17    additional eFoil units sold in the U.S.?
04:52:55 18    A.    It was a total of 100 units over that five-month
04:52:57 19    period.
04:52:58 20    Q.    An even number?
04:52:59 21    A.    That seems a little, I guess, out of the ordinary to
04:53:05 22    sell exactly 100 units over a five-month period, but that's
04:53:09 23    what Waydoo said it did.
04:53:10 24    Q.    And I think you already told the jury that 100 wasn't
04:53:13 25    consistent with their prior sales history?

Stec - Redirect

04:53:15 1   A.      Right.  It suggests if you just take a simple

04:53:18 2   average, 100 units over a five-month period suggests 20

04:53:21 3   boards a month, which seems way out of whack given the data

04:53:26 4   that they had produced up to that point.

04:53:28 5   Q.      And in preparing your opinions in this case, you

04:53:31 6   reviewed the other financial data that Waydoo produced?

04:53:34 7   A.      I did.  Yes.

04:53:35 8   Q.      And how consistent and accurate did you find that

04:53:38 9   data?

04:53:38 10   A.      I found it to be inconsistent.  So there were, I

04:53:44 11   believe, two iterations of data.  I had actually filed my

04:53:47 12   initial report and then Mr. Kline, who I mentioned earlier,

04:53:51 13   filed a rebuttal report and produced different data, used

04:53:54 14   different sales information.  So, even the sales information

04:53:56 15   that I relied on in my original report seems to be

04:54:02 16   supplanted by what Mr. Kline used.  And then, obviously,

04:54:04 17   there's this other data as well.

04:54:06 18   Q.      And you said when you saw that hundred number, it was

04:54:08 19   a red flag for you?

04:54:09 20   A.      It certainly appeared to be.

04:54:12 21   Q.      Let's talk -- you were asked a series of questions

04:54:14 22   about your price not going down.

04:54:17 23           You remember those questions?

04:54:19 24   A.      That's right.  You mean my royalty rate?

04:54:21 25   Q.      Your royalty rate.

Stec - Redirect

04:54:23 1    A.      Yes.

04:54:25 2    Q.      You also heard Mr. Ping's testimony and you read it

04:54:28 3    previously, that they make the decision to sell to the

04:54:35 4    distributor at a 50 percent net; yes?

04:54:39 5    A.      Well, basically to give the distributor a

04:54:41 6    50 percent -- the ability to make a 50-percent profit.

04:54:46 7    Q.      That's Waydoo's decision?

04:54:47 8    A.      That's correct, as I understand it.

04:54:50 9    Q.      If they need to pay more -- if they need to pay a

04:54:53 10   royalty, that's something within their control to change;

04:54:56 11   yes?

04:54:56 12   A.      Yes.  They could certainly change how much profit

04:55:00 13   they're basically associating with the distributor.

04:55:02 14   Q.      And how much did that 50 percent compare to what MHL

04:55:06 15   and Fliteboard pay as a percentage to their distributors or

04:55:10 16   resellers?

04:55:11 17   A.      I think it's much lower.  You saw some reference to a

04:55:17 18   20 percent discount.  And that is a discount, it's not a

04:55:21 19   profit margin.

04:55:22 20           So, the distributor is going to have costs that

04:55:25 21   it has to basically defer with whatever revenues it earns

04:55:29 22   from selling the boards.  So, if you give the distributor a

04:55:33 23   20 percent discount, that's meant to cover not only the

04:55:36 24   cost, but the profits.  So, the profits are going to be

04:55:39 25   something less than 20 percent because the distributor has

543

Stec - Redirect

04:55:42 1    some costs that it's going to incur to sell the product,

04:55:45 2    whether they be rent costs, or salesperson costs, whatever,

04:55:50 3    that would have to come out of the 20 percent.

04:55:53 4    Q.    And the date of this hypothetical negotiation was

04:55:56 5    when?

04:55:57 6    A.    The date of the hypothetical negotiation was

04:55:59 7    March 25th of 2019.

04:56:01 8    Q.    And I think you already testified, but a lot of us

04:56:03 9    experienced the pressures of inflation over the recent time

04:56:07 10   period?

04:56:08 11   A.    Yes.   I think we've all experienced inflation in the

04:56:11 12   United States over the last year, year and a half.  Prices

04:56:14 13   seem to have gone up for just about everything.

04:56:16 14   Q.    With your royalty rate, would it go up with

04:56:18 15   inflation?

04:56:20 16            MR. KANTER:  Objection, Your Honor.  Not in his

04:56:21 17   report.

04:56:21 18            THE COURT:  I'm sorry.  What did you say after,

04:56:24 19   "Objection, Your Honor"?

04:56:25 20            MR. KANTER:  He testified that he didn't do an

04:56:27 21   analysis regarding inflation and its impact on his royalty.

04:56:31 22            THE COURT:  All right.  I'll sustain the

04:56:32 23   objection.

04:56:33 24   BY MR. MURRELL:

04:56:33 25   Q.    All right.  You were asked -- you heard questions

Stec - Redirect

04:56:37  1    about Mr. Ping's profit margin he testified to?

04:56:40  2    A.    Yes.

04:56:42  3              MR. MURRELL:  Can we pull up page --

04:56:42  4    BY MR. MURRELL:

04:56:44  5    Q.    You reviewed his deposition?

04:56:45  6    A.    I did.

04:56:45  7    Q.    And you listened to his testimony in the courtroom?

04:56:47  8    A.    Yes, I was here.

04:56:49  9              MR. MURRELL:  If we can go to Page 101.

04:56:49 10    BY MR. MURRELL:

04:56:59 11    Q.    And you see the question where he was asked:  "What

04:57:04 12    is the profit margin that Shenzhen Waydoo attempts to make

04:57:08 13    on the eFoil products?"

04:57:10 14              Do you see that?

04:57:10 15    A.    Yes, I see that now.  I think you're blowing it up.

04:57:16 16    Q.    Yes.  And then there's a colloquy between counsel.

04:57:21 17              MR. MURRELL:  If we go to the next page, you'll

04:57:23 18    see his answer.

04:57:23 19    BY MR. MURRELL:

04:57:29 20    Q.    And at the top, what did he say the profit margin was

04:57:35 21    for the Flyer and Flyer ONE?

04:57:36 22    A.    He said it was 35 percent.

04:57:40 23    Q.    When he gave that sworn answer in his deposition, was

04:57:43 24    it qualified as a goal?

04:57:44 25    A.    It doesn't say that, no.

545

Stec - Redirect

04:57:48  1   Q.      In fact, if we could look at the next question and

04:57:50  2   answer, he was asked by Mr. Theuerkauf:  "I'm sorry.  You

04:57:53  3   said -- can you we repeat that, please?"

04:57:57  4           And the answer was, "Again, so from

04:57:59  5   manufacturing to delivery to distributor, the manufacturing

04:58:01  6   and profit margin is 35 percent."

04:58:05  7           That was his sworn testimony?

04:58:06  8   A.      Yes, that was his sworn testimony as I understand it.

04:58:10  9   Q.      And you relied upon that sworn testimony?

04:58:12 10   A.      I did.

04:58:16 11   Q.      What did you say your royalty rate would calculate as

04:58:19 12   a percentage, if you did it as a percentage of the numbers,

04:58:24 13   ==18 percent?==

04:58:25 14   A.      I think it was ==18.67.==  That was just a $3,000 sale

04:58:30 15   price.

04:58:30 16   Q.      If Mr. Ping was right in his sworn testimony that

04:58:33 17   profit margin is 35 percent, what type of profit margin

04:58:37 18   would that leave him as a manufacturing margin?

04:58:39 19   A.      So, I'm going to pull out the calculator again.

04:58:46 20           So, if Waydoo sold the board for $3,000 and it

04:58:51 21   has a 35-percent profit margin, then it would earn $1,050

04:58:57 22   per board.

04:59:00 23   Q.      And after the royalty?

04:59:01 24   A.      After the royalty, they would have ==$490== left in

04:59:09 25   profits.

Stec - Redirect

04:59:10  1   Q.      That's about 17 percent?

04:59:11  2   A.      You're making me do a lot of math here.

04:59:15  3   Q.      I'm so sorry.

04:59:16  4   A.      About 16.3 percent.

04:59:24  5   Q.      You were asked questions about Mr. Wagner's

04:59:27  6   testimony?

04:59:28  7   A.      Yes, I was.

04:59:29  8   Q.      One of those questions was about whether he thought

04:59:34  9   Waydoo was going to be a good competitor at first.  Remember

04:59:39 10   that?

04:59:39 11   A.      Whether they were going to make it, I think, was the

04:59:42 12   way it was put.

04:59:43 13   Q.      Yes.  The hypothetical negotiation occurs March 25th

04:59:48 14   of 2019, the date of the first unit being sold in the U.S.

04:59:52 15   A.      On the eve of that first unit being sold, yes.

04:59:55 16   Q.      And his testimony that you read, I think they showed

04:59:58 17   it to you and you read it from his deposition was that his

05:00:01 18   concern was based upon the quality issues they were having

05:00:04 19   with their first product?

05:00:05 20   A.      So, I -- that's not what was highlighted and put on

05:00:10 21   the screen for me, but I saw that as part of the context,

05:00:12 22   yes.

05:00:13 23   Q.      I don't think counsel asked you about that part of

05:00:15 24   the deposition they put up, but you saw that; right?

05:00:17 25   A.      I did see that, yes.

Stec - Redirect

05:00:21 1   Q.     Any way the day of the first sale of the first unit

05:00:23 2   in the U.S. Mr. Wagner could have known about those quality

05:00:26 3   issues?

05:00:28 4   A.     I don't think so, no.

05:00:31 5   Q.     And prior to that date, to your knowledge, had the

05:00:34 6   cease and desist letter already been sent by MHL to Waydoo,

05:00:39 7   to your knowledge?

05:00:40 8   A.     I -- I don't know as I sit here.

05:00:42 9   Q.     Okay.  If the evidence -- if the testimony in the

05:00:44 10  case says that it was sent in January of 2019, the first

05:00:49 11  cease and desist letter, would that indicate to you that MHL

05:00:53 12  would have been concerned about Waydoo as a competitor?

05:00:57 13  A.     It seems to me that could be conclusion that you

05:01:01 14  would draw.

05:01:02 15  Q.     You were asked questions about the threat of

05:01:05 16  litigation.

05:01:06 17         Do you remember those?

05:01:06 18  A.     I do.

05:01:07 19  Q.     Is that implied in every hypothetical negotiation

05:01:11 20  involving a patent license or in a patent licensee?

05:01:15 21  A.     So, that's one of the avenues that any patent holder

05:01:18 22  can choose to go down.  If they want to basically let the

05:01:22 23  licensee know that they're serious, then they can certainly

05:01:25 24  bring up that as a possible outcome.  That doesn't mean it's

05:01:28 25  a threat of litigation, it just means it's a possible

548

Stec - Redirect

05:01:31 1    outcome.

05:01:32 2    Q.    Same example you gave earlier.  If you -- why pay

05:01:35 3    rent if there's not a threat of being evicted; right?

05:01:38 4    A.    Sure.  I don't think a landlord is going to come up

05:01:40 5    to you when you're signing a lease agreement and tell you

05:01:43 6    I'm going to throw you out if you don't pay, but you

05:01:45 7    certainly understand that as one of the possible

05:01:48 8    consequences.

05:01:50 9    Q.    And all the questions that were asked of you on your

05:01:54 10   cross-examination, have they changed your opinion as to the

05:01:58 11   reasonable royalty and the damages in this matter?

05:02:03 12   A.    No, they have not.

05:02:07 13           MR. MURRELL:  Can you put that up?  There you

05:02:23 14   go.

05:02:23 15   BY MR. MURRELL:

05:02:25 16   Q.    And after the cross-examination by counsel, is this

05:02:29 17   still your opinion?

05:02:29 18   A.    Yes, it is.

05:02:31 19           MR. MURRELL:  Thank you.

05:02:34 20           THE COURT:  All right.  Dr. Stec, thank you.

05:02:36 21   You may step down -- oh, actually, why don't you just sit

05:02:39 22   there for a minute.

05:02:40 23           So, members of the jury, we're done for the day.

05:02:45 24   We're going to start again tomorrow at 9:30.

05:02:51 25           And so, you were all here and ready to go this

Stec - Redirect

05:02:53  1    morning, and I appreciate that, as does everybody.

05:02:57  2    Fortunately, today we were ready to go at 9:30, also.  We're

05:03:00  3    going to try to do that for tomorrow.  And so, I'd like you

05:03:04  4    all to do your part and be here and ready to go.

05:03:07  5         And I do want to remind you of two things.  One

05:03:10  6    of which is not to talk to anyone about the case, not to

05:03:13  7    talk to each other about the case, not to, you know, do this

05:03:17  8    electronically, by telephone, in person, by a blog.  You

05:03:25  9    know, keep your opinions to yourself and make sure nobody

05:03:29 10    else shares their opinions with you.  So -- and this all

05:03:34 11    leads to keeping an open mind until you've heard the entire

05:03:37 12    evidence in the case.

05:03:38 13         And the second thing is don't do any research on

05:03:42 14    your own.  Don't look stuff up.  It's important to the

05:03:48 15    fairness of the process that everything that you learn about

05:03:52 16    the case and take into eventually consideration when you're

05:03:56 17    deliberating are things that you learn here in the courtroom

05:04:00 18    in the presence of your fellow jurors and the parties.

05:04:03 19         So, thank you very much.  Can we take the jury

05:04:05 20    out?  And have a good evening.

05:04:07 21              (Jury leaving the courtroom.)

05:04:30 22              THE COURT:  All right.  Everyone can be seated.

05:04:32 23         Dr. Stec, you can head on back.

05:04:34 24              THE WITNESS:  Thank you, Your Honor.

05:04:35 25              THE COURT:  All right.  So, basically, other

550

Stec - Redirect

05:04:41 1    than Mr. Wade, you're finished with your case.  So, tomorrow

05:04:45 2    morning at 9:30 they're going to be starting with their

05:04:47 3    case; right?

05:04:49 4                MR. THEUERKAUF:  Right.

05:04:49 5                THE COURT:  Okay.  And, Mr. Colletti, what do

05:04:52 6    you expect to do in your case tomorrow?

05:04:55 7                MR. COLLETTI:  Mr. Wade and Mr. Ping.

05:04:59 8                Mr. Ping is testifying remotely, so I'm going to

05:05:04 9    check tonight whether that will be at 9:30 or whether we put

05:05:08 10   Mr. Wade on first and do him at 10:30.

05:05:11 11               THE COURT:  You got all the things -- the

05:05:13 12   electronics somehow or another -- I don't see them -- and I

05:05:18 13   guess, Mandarin interpreter, all that stuff lined up so

05:05:30 14   that, within the limits of human capacity, it's all ready to

05:05:33 15   go as smoothly as we can make it?

05:05:35 16               MR. COLLETTI:  That's the plan, Your Honor.  And

05:05:37 17   we have Mr. Lanterman here as well if that doesn't work.  So

05:05:42 18   we'll have -- we're not going to waste any time.

05:05:44 19               THE COURT:  Okay.

05:05:45 20               MR. COLLETTI:  We're ready to go forward.

05:05:46 21               THE COURT:  And so, presumably, the order of

05:05:52 22   your experts is going to be Mr. Lanterman,

05:05:55 23   Dr. Triantafyllou, and Mr. Kline?

05:05:59 24               MR. COLLETTI:  Correct.

05:05:59 25               THE COURT:  Okay.  All right.  And so, the

Stec - Redirect

05:06:04  1    parties are on tap to submit the proposed final jury

05:06:10  2    instructions tonight by 8 o'clock?

05:06:13  3              MR. COLLETTI:  That's correct.

05:06:15  4              MR. THEUERKAUF:  Yes.

05:06:16  5              THE COURT:  Okay.  All right.

05:06:18  6              And I would appreciate it if, when they are

05:06:23  7    filed with the -- I would appreciate it that you send a copy

05:06:29  8    directly to my email address when you get them.

05:06:34  9              I'd also appreciate it if you send it as both a

05:06:37 10    Word document and as a PDF because 8 o'clock at night, Word

05:06:45 11    documents don't work so well with me.  But the PDF -- but

05:06:50 12    I'll need that eventually.

05:06:52 13              Depending on how things go, we may try to do a

05:06:55 14    jury conference after the close of testimony tomorrow since

05:07:02 15    I have a minor scheduling issue towards the end of the day

05:07:07 16    on Thursday that -- so in any event, is there anything else

05:07:18 17    you want to talk about?

05:07:19 18              Mr. Theuerkauf.

05:07:20 19              MR. THEUERKAUF:  Just one other item.  We have

05:07:22 20    an exhibit here we'd like to move into evidence.

05:07:24 21              THE COURT:  Okay.

05:07:25 22              MR. THEUERKAUF:  And it's PTX 168.  I'm sorry.

05:07:31 23    It was 168.  Yeah, from the deposition of Mr. Ping.

05:07:36 24              MR. COLLETTI:  No objection, Your Honor.

05:07:38 25              THE COURT:  All right.  That's admitted without

Stec - Redirect

05:07:40 1   objection.

05:07:41 2                    (PTX Exhibit No. 168 was admitted into

05:07:41 3   evidence.)

05:07:41 4                    THE COURT:  Mr. Colletti, anything you want to

05:07:42 5   bring up?

05:07:43 6                    MR. COLLETTI:  One other.  With closing

05:07:44 7   arguments, Your Honor, do you expect that to be Friday

05:07:48 8   morning?

05:07:48 9                    THE COURT:  Yes.

05:07:49 10                   MR. COLLETTI:  Thank you.

05:07:54 11                   THE COURT:  I mean, yes, they're going to be

05:07:57 12  Friday morning, unless -- they're not going to be any

05:08:02 13  earlier than Friday morning, if that's really the question.

05:08:07 14  I was just wondering, you know, at one point, I guess,

05:08:13 15  before today, I was thinking, yeah, we're going to finish

05:08:16 16  this case Thursday morning.  I'm not quite too optimistic

05:08:20 17  about that anymore.

05:08:21 18                   What's your estimate when you think we're -- I

05:08:24 19  mean, just for making me happy, tell me when you think we're

05:08:30 20  going to finish this case.

05:08:31 21                   MR. COLLETTI:  Professor Triantafyllou is here,

05:08:34 22  and I hope to get him on the stand tomorrow so that we can

05:08:36 23  finish -- you know, subject to cross-examination -- that we

05:08:40 24  finish Thursday, sooner rather than later in the day.

05:08:44 25                   THE COURT:  Okay.  Well, that's optimistic.

553

Stec - Redirect

05:08:47 1    Hopefully not unnecessarily so.

05:08:50 2              Okay.  Is there anything else you want to bring

05:08:53 3    up?

05:08:55 4              MR. COLLETTI:  No, Your Honor.

05:08:56 5              THE COURT:  Okay.  Well, thank you.  So, we'll

05:08:59 6    be in recess.  It will take me a moment or two to collect my

05:09:05 7    things.  Don't wait around for me.

05:09:06 8              DEPUTY CLERK:  All rise.

05:12:57 9              (Court was recessed at 5:12 p.m.)

      10              I hereby certify the foregoing is a true and

      11    accurate transcript from my stenographic notes in the

      12    proceeding.

      13              /s/ Heather M. Triozzi
                      Certified Merit and Real-Time Reporter
      14              U.S. District Court

      15

      16

      17

      18

      19

      20

      21

      22

      23

      24

      25

## $

**$1,050** [1] - 545:21
**$1,494,080** [1] - 475:12
**$10,000** [3] - 460:5, 460:13, 501:18
**$116,000** [1] - 462:3
**$117,000** [1] - 462:3
**$157** [1] - 505:1
**$157.50** [2] - 504:24, 505:5
**$200** [1] - 504:11
**$225,000** [5] - 466:15, 494:12, 494:15, 494:18, 494:21
**$275,000** [1] - 494:22
**$3,000** [14] - 485:21, 485:23, 486:6, 504:7, 504:9, 504:12, 504:22, 505:1, 505:4, 505:8, 506:13, 506:20, 545:14, 545:20
**$3,001** [1] - 504:2
**$3,088** [1] - 503:17
**$30** [1] - 512:5
**$30,000** [1] - 281:25
**$440** [1] - 460:11
**$450** [1] - 515:15
**$489** [1] - 461:10
**$490** [1] - 545:24
**$500,000** [3] - 479:8, 494:9, 494:19
**$539** [1] - 461:9
**$550** [1] - 460:6
**$560** [15] - 453:7, 453:10, 462:4, 462:11, 475:3, 475:8, 502:6, 502:24, 503:11, 503:14, 506:15, 511:10, 511:12, 511:22, 515:13
**$650,000** [1] - 473:10
**$77** [1] - 485:10

## '

**'044** [26] - 286:14, 290:8, 291:12, 296:11, 300:12, 301:4, 301:21, 315:7, 316:15, 319:22, 324:17, 327:9, 327:19, 346:23, 346:24, 347:2, 365:3, 402:19, 405:21, 406:5, 410:16,

415:14, 422:25, 497:8, 499:6, 519:4
**'50s** [1] - 275:15
**'659** [19] - 286:14, 290:11, 291:12, 301:20, 315:9, 319:19, 319:22, 320:12, 326:20, 326:22, 330:3, 330:14, 330:19, 347:5, 413:2, 415:6, 422:23, 423:3, 519:4
**'70s** [1] - 513:16
**'870** [2] - 519:9, 520:1
**'threaten'** [1] - 531:6

## /

**/s** [1] - 553:13

## 0

**0** [8] - 372:16, 373:15, 373:16, 418:19, 418:20, 418:21, 418:25
**0.0** [1] - 325:20
**00** [1] - 419:21
**033** [1] - 499:19
**059** [1] - 335:17
**079** [1] - 355:5

## 1

**1** [30] - 290:10, 290:13, 291:11, 291:12, 296:9, 300:14, 300:17, 301:4, 311:18, 319:22, 319:23, 326:19, 326:21, 327:19, 330:19, 335:19, 338:5, 338:22, 354:13, 354:14, 355:1, 356:15, 402:19, 403:4, 466:3, 489:22, 489:25, 490:3, 493:20, 519:6
**1,300** [3] - 537:13, 538:24, 538:25
**1.5** [2] - 450:18, 453:11
**1.6** [1] - 478:11
**10** [9] - 380:18, 443:23, 517:7, 517:9, 517:25, 518:2, 518:8, 529:19
**100** [7] - 350:16, 536:12, 539:11,

540:18, 540:22, 540:24, 541:2
**100-meter** [1] - 283:4
**101** [8] - 490:19, 495:4, 503:23, 513:2, 522:18, 526:11, 534:1, 544:9
**102** [2] - 390:12, 526:9
**103** [1] - 303:5
**107** [1] - 530:24
**108** [1] - 338:5
**10:30** [1] - 550:10
**10K** [2] - 513:15, 513:19
**11** [8] - 266:25, 267:1, 268:7, 302:20, 319:22, 489:10, 500:23, 538:21
**110-foot** [1] - 281:8
**118** [1] - 306:24
**119** [2] - 531:8, 531:9
**12** [4] - 268:10, 496:2, 508:10, 517:4
**120** [1] - 426:16
**121** [4] - 295:13, 430:12, 430:19, 431:2
**13** [8] - 300:4, 351:9, 381:20, 447:20, 508:11, 511:9, 520:25, 538:21
**135** [1] - 517:4
**139** [2] - 538:10, 538:15
**14** [6] - 268:7, 268:15, 269:10, 280:17, 319:14, 507:9
**15** [20] - 268:7, 268:16, 269:10, 332:17, 333:3, 357:7, 415:15, 440:3, 440:6, 440:13, 440:17, 455:9, 514:24, 515:6, 515:12, 518:3, 518:9, 520:25, 523:8, 523:9
**150** [1] - 351:5
**1500** [3] - 442:15, 442:22, 539:9
**153** [2] - 293:5, 294:20
**154** [2] - 294:8, 294:20
**16** [4] - 280:17, 357:19, 517:10, 528:10
**16.3** [1] - 546:4
**164** [1] - 295:7
**165** [1] - 294:23
**168** [3] - 551:22, 551:23, 552:2

**17** [2] - 273:16, 546:1
**177** [1] - 524:10
**18** [1] - 545:13
**18.666** [1] - 506:17
**18.67** [2] - 506:17, 545:14
**183** [4] - 430:12, 430:18, 431:2, 526:3
**19** [2] - 495:10, 530:24
**192** [2] - 529:12, 529:14
**197** [1] - 525:12
**1st** [1] - 511:11

## 2

**2** [21] - 290:10, 290:13, 291:12, 315:7, 315:9, 315:12, 316:8, 354:5, 355:16, 356:25, 359:7, 359:8, 359:13, 359:17, 367:10, 403:5, 403:6, 403:25, 485:5, 519:6
**2,668** [5] - 453:9, 453:11, 475:10, 475:11, 475:14
**2.5** [4] - 478:18, 484:20, 485:8, 489:20
**20** [33] - 283:3, 287:25, 352:13, 352:15, 367:2, 387:12, 388:12, 389:8, 392:11, 392:12, 393:6, 395:5, 429:7, 429:9, 430:1, 443:23, 501:2, 501:4, 501:21, 501:22, 501:25, 502:1, 508:17, 508:22, 509:4, 509:16, 512:5, 536:17, 541:2, 542:18, 542:23, 542:25, 543:3
**20-plus** [2] - 508:17, 508:18
**200** [3] - 305:25, 351:7, 504:10
**2013** [7] - 403:17, 403:23, 404:15, 404:19, 406:17, 406:19, 410:23
**2015** [2] - 491:17, 496:6
**2016** [2] - 492:9, 496:7
**2018** [4] - 431:21,

435:5, 435:24, 491:18
**2019** [19] - 435:1, 445:8, 460:15, 460:20, 461:25, 464:21, 469:14, 469:17, 492:25, 493:3, 497:2, 523:5, 523:11, 523:13, 524:17, 524:25, 543:7, 546:14, 547:10
**2020** [9] - 457:15, 461:25, 466:12, 478:21, 494:7, 494:15, 494:20, 494:22, 536:16
**2021** [12] - 442:14, 442:17, 504:2, 534:5, 535:16, 536:23, 537:13, 537:19, 538:6, 538:22
**2022** [11] - 450:21, 457:16, 462:14, 462:22, 504:3, 536:2, 536:12, 536:18, 537:16, 540:8, 540:10
**2023** [2] - 264:12, 462:17
**2080** [1] - 488:14
**209** [2] - 462:2, 512:13
**21** [5] - 365:12, 410:2, 497:7, 525:22, 527:14
**21-91-RGA** [1] - 264:5
**217-1** [2] - 354:13, 355:1
**22** [5] - 410:2, 410:9, 447:14, 448:3, 528:11
**225** [1] - 466:25
**23** [6] - 447:14, 448:3, 487:5, 490:18, 491:1, 495:3
**234** [3] - 430:12, 430:18, 431:2
**24** [5] - 487:7, 492:18, 513:2, 517:10, 525:14
**24th** [1] - 460:15
**25** [3] - 278:11, 352:15, 372:24
**2500** [1] - 512:11
**25th** [5] - 460:19, 469:14, 493:5, 543:7, 546:13
**26** [2] - 287:19, 373:24
**27** [1] - 492:23

**275** [1] - 467:1
**28** [1] - 264:12
**283** [1] - 528:9
**29** [4] - 381:16, 445:8, 503:21, 503:23
**299** [2] - 496:2, 497:6

## 3

**3** [3] - 341:1, 342:18, 534:11
**3,000** [2] - 485:20, 506:16
**3,170** [1] - 504:3
**30** [6] - 284:12, 382:2, 387:13, 388:12, 389:8, 390:15
**300** [4] - 309:2, 350:15, 351:6, 351:24
**308** [2] - 430:8, 431:1
**309** [4] - 426:9, 430:8, 430:13, 431:1
**30th** [7] - 461:25, 462:13, 469:17, 511:12, 534:5, 535:16
**310** [2] - 430:8, 431:1
**316** [1] - 370:18
**31A** [1] - 382:13
**31B** [1] - 382:20
**31st** [1] - 535:19
**33** [4] - 510:5, 518:16, 521:7, 532:4
**334** [2] - 525:12, 528:9
**335** [2] - 520:24, 524:10
**339** [1] - 529:13
**346** [2] - 523:7, 523:9
**35** [13] - 438:13, 438:18, 440:2, 474:21, 516:19, 517:13, 517:14, 517:20, 518:12, 536:3, 544:22, 545:6, 545:17
**35-percent** [1] - 545:21
**350** [2] - 351:5, 353:15
**36** [5] - 335:18, 336:11, 336:16, 401:24
**37** [3] - 402:17, 514:8, 522:18
**38** [1] - 403:10
**39** [2] - 406:3, 510:10
**3D** [8] - 292:5, 293:20, 294:14, 295:5, 295:6, 295:16, 309:24

**3rd** [5] - 497:3, 497:24, 498:1, 498:4

## 4

**4** [9] - 355:21, 355:23, 356:20, 356:22, 357:1, 359:19, 359:20, 505:15, 505:19
**4.0** [1] - 536:8
**40** [4] - 402:7, 429:10, 520:21, 520:25
**41** [1] - 355:25
**42** [2] - 364:16, 532:5
**42-foot** [1] - 277:3
**43** [1] - 371:9
**44** [1] - 341:23
**440** [1] - 501:22
**45** [4] - 350:17, 352:12, 391:9, 533:1
**450** [1] - 515:16
**46** [1] - 510:6
**47** [1] - 518:24
**48** [1] - 521:8
**49** [1] - 281:25
**4th** [1] - 497:19

## 5

**5** [17] - 290:10, 291:12, 316:15, 316:17, 352:14, 365:3, 405:21, 406:5, 406:10, 409:15, 442:21, 460:12, 461:11, 523:8, 523:9, 524:12, 539:6
**5-0** [1] - 437:17
**5-and-a-half** [2] - 460:12, 461:12
**5.25** [5] - 504:12, 504:22, 505:4, 511:7, 518:18
**5.5** [1] - 501:19
**50** [17] - 352:12, 352:16, 437:16, 437:17, 439:22, 439:25, 440:4, 440:22, 441:13, 441:23, 442:2, 486:4, 486:6, 542:4, 542:6, 542:14
**50-percent** [1] - 542:6
**500,000** [1] - 493:20
**54** [1] - 382:15
**55** [1] - 533:1
**550** [2] - 501:19, 501:22
**56** [1] - 410:5

**560** [4] - 475:11, 512:5, 515:16, 515:17
**5:12** [1] - 553:9
**5th** [3] - 354:20, 462:22, 540:9

## 6

**6** [9] - 290:10, 291:12, 352:15, 367:5, 410:16, 411:1, 411:5, 415:15, 415:16
**6.0** [1] - 534:2
**60** [1] - 333:1
**600** [1] - 473:9
**62.4** [1] - 457:15
**67** [1] - 365:4

## 7

**7** [2] - 488:4, 488:11
**730** [4] - 535:13, 535:15, 536:22, 537:10
**7th** [1] - 492:25

## 8

**8** [6] - 358:11, 435:25, 478:11, 517:4, 551:2, 551:10
**8,000** [1] - 485:21
**8.8** [2] - 472:22, 514:13
**80,000** [1] - 282:24
**800** [2] - 322:12, 378:21
**844** [1] - 264:11
**86th** [1] - 534:2
**8B** [3] - 356:4, 358:14, 358:16
**8th** [2] - 497:2, 497:18

## 9

**9** [5] - 287:24, 288:1, 341:4, 344:19, 525:4
**90** [2] - 333:1
**94** [2] - 390:16
**95** [1] - 365:11
**95th** [1] - 354:21
**98** [2] - 336:17, 336:23
**99** [2] - 336:17, 337:2
**9:04** [1] - 264:13
**9:30** [5] - 271:23, 548:24, 549:2, 550:2, 550:9

## A

**A-L-A-N** [1] - 445:16
**A-M-P-P** [1] - 284:4
**a.m** [1] - 264:13
**ability** [4] - 469:3, 469:4, 471:8, 542:6
**able** [14] - 265:21, 289:8, 293:19, 321:1, 385:10, 386:6, 386:13, 396:4, 420:23, 441:22, 442:1, 472:24
**aboard** [1] - 427:18
**absolutely** [6] - 293:22, 383:6, 383:14, 418:8, 425:10, 426:25
**absorb** [1] - 455:11
**AC** [3] - 405:17, 405:18
**Academy** [3] - 285:12, 285:13, 285:14
**accelerate** [1] - 304:18
**acceptable** [5] - 477:4, 482:16, 482:19, 482:23, 483:16
**access** [3] - 433:15, 433:25, 434:5
**accessories** [3] - 473:6, 473:10, 474:3
**accessory** [3] - 473:7, 473:12, 474:7
**accidently** [2] - 398:18, 398:19
**accidents** [1] - 274:12
**accordance** [2] - 355:1, 355:5
**account** [7] - 380:7, 425:12, 426:2, 426:3, 443:25, 479:14, 479:24
**accounted** [1] - 519:23
**accounting** [4] - 425:20, 432:7, 432:9, 519:25
**accuracy** [1] - 488:20
**accurate** [12] - 388:21, 436:20, 440:5, 440:18, 441:14, 442:12, 488:18, 504:23, 517:12, 530:18, 536:24, 541:8, 553:11
**accurately** [1] - 442:4
**accused** [14] - 290:9, 290:14, 290:16,

313:16, 316:18, 413:6, 450:20, 453:10, 475:14, 487:9, 514:1, 514:17, 519:2, 519:17
**achieved** [3] - 312:19, 312:20, 406:11
**acknowledge** [3] - 339:8, 377:16, 533:9
**acquiring** [1] - 274:10
**action** [2] - 408:17
**Action** [1] - 441:11
**actual** [15] - 293:18, 324:2, 377:23, 391:14, 391:15, 438:20, 454:12, 457:24, 458:10, 460:21, 487:19, 510:21, 529:4, 534:9
**add** [6] - 324:1, 352:14, 422:4, 440:4, 484:4, 534:18
**added** [17] - 281:20, 325:21, 376:16, 380:7, 380:16, 422:5, 422:9, 424:14, 486:6, 534:9, 534:10, 536:21, 536:22, 537:18
**addition** [9] - 269:9, 283:13, 306:20, 311:20, 320:4, 366:22, 420:25, 463:5, 493:25
**additional** [27] - 268:5, 368:10, 412:13, 465:22, 473:6, 473:25, 479:15, 484:5, 484:9, 487:14, 494:11, 494:18, 497:23, 498:16, 509:3, 518:4, 518:19, 533:16, 533:17, 534:10, 534:19, 537:10, 537:13, 537:14, 537:15, 540:16, 540:17
**address** [6] - 349:2, 420:8, 420:9, 448:18, 499:3, 551:8
**addressed** [1] - 349:1
**addresses** [2] - 420:8, 420:9
**addressing** [1] - 413:3
**adjective** [1] - 493:11
**adjust** [1] - 305:7

**adjustment** [1] - 485:6
**admissible** [1] - 269:22
**admission** [1] - 533:10
**admit** [1] - 270:1
**admitted** [5] - 430:23, 430:25, 431:2, 551:25, 552:2
**admitting** [3] - 270:13, 532:15, 532:17
**advantages** [2] - 455:17, 456:19
**aeronautical** [2] - 413:20, 414:3
**aeronautics** [1] - 345:22
**affect** [5] - 318:19, 318:21, 423:13, 464:1, 499:12
**affected** [4] - 271:1, 421:9, 425:1, 513:12
**affects** [2] - 464:2
**affirm** [1] - 272:17
**affirm]** [1] - 445:19
**afloat** [2] - 274:13
**afraid** [1] - 527:9
**aft** [4] - 282:19, 319:4, 327:24, 330:21
**afternoon** [5] - 445:22, 445:23, 486:16, 486:17, 505:15
**age** [1] - 273:14
**agency** [1] - 432:25
**ago** [19] - 304:5, 350:24, 361:2, 434:6, 447:14, 447:22, 447:23, 449:22, 450:24, 455:9, 461:1, 463:7, 464:20, 465:16, 469:19, 471:5, 478:17, 480:3, 531:14
**agree** [18] - 269:23, 298:23, 339:11, 354:1, 379:25, 392:19, 392:21, 393:1, 393:5, 393:8, 414:10, 457:6, 459:12, 459:22, 472:16, 485:18, 532:11, 533:6
**agreed** [2] - 266:9, 441:12, 457:2, 457:3, 466:13, 469:23
**agreeing** [1] - 459:20
**agreement** [116] -

267:6, 299:3, 451:20, 452:9, 454:1, 455:1, 455:3, 455:5, 458:24, 459:25, 460:2, 461:15, 464:4, 464:10, 464:11, 464:13, 464:14, 464:16, 464:19, 464:22, 465:2, 465:15, 465:16, 465:20, 465:24, 466:2, 466:5, 466:6, 466:11, 469:11, 469:14, 475:2, 476:5, 476:6, 476:7, 476:9, 476:12, 476:13, 476:14, 476:15, 476:17, 476:21, 477:14, 478:8, 478:16, 479:7, 479:16, 479:25, 481:9, 481:11, 482:1, 484:18, 485:6, 485:12, 489:12, 489:15, 489:16, 489:19, 490:1, 490:8, 490:10, 490:17, 491:3, 491:13, 491:16, 493:9, 493:17, 495:23, 496:6, 496:18, 497:9, 497:19, 497:25, 498:2, 498:10, 499:18, 500:6, 500:8, 500:10, 504:25, 505:8, 505:9, 505:11, 506:18, 506:22, 506:23, 506:24, 507:1, 507:2, 507:3, 507:6, 509:23, 509:25, 510:2, 510:3, 510:5, 510:10, 510:11, 510:12, 510:15, 510:21, 511:2, 511:3, 511:4, 511:7, 521:24, 532:9, 532:12, 532:15, 548:5
**agreements** [5] - 449:11, 457:1, 465:3, 479:22, 510:13
**agrees** [1] - 461:2
**agricultural** [1] - 435:9
**ahead** [4] - 299:7,

375:12, 376:3, 487:13
**aid** [1] - 403:20
**air** [12] - 374:14, 375:7, 378:22, 378:23, 387:20, 421:7, 421:19, 421:20, 421:21, 421:24, 425:15, 438:12
**aircraft** [3] - 288:13, 288:16, 409:17
**airfoil** [19] - 316:13, 316:21, 317:10, 318:3, 349:10, 349:16, 350:3, 350:16, 350:22, 351:18, 352:1, 352:9, 353:15, 406:6, 406:14, 406:22, 407:7, 407:8
**airfoils** [2] - 309:25, 317:4
**Alan** [2] - 445:15, 445:25
**alerted** [1] - 434:19
**alleged** [4] - 448:22, 450:16, 450:19, 472:20
**allow** [2] - 451:21, 482:17
**allowed** [5] - 350:20, 428:10, 452:10, 496:9, 497:10
**allowing** [1] - 457:22
**alluded** [2] - 361:2, 363:18
**almost** [9] - 447:14, 448:3, 450:18, 453:11, 462:1, 462:3, 462:10, 473:9, 504:11
**alone** [7] - 384:18, 384:23, 389:24, 396:21, 397:6, 397:19, 399:12
**alpha** [7] - 363:22, 364:19, 365:15, 365:24, 367:8, 367:20, 367:22
**alternative** [11] - 275:18, 477:1, 482:7, 482:9, 482:18, 483:2, 483:15, 483:16, 484:1, 488:16
**alternatively** [1] - 355:2
**alternatives** [9] - 476:25, 477:2,

477:4, 477:5, 482:5, 482:13, 482:22, 482:25, 483:10
**aluminum** [5] - 277:3, 280:6, 280:8, 280:11, 436:16
**AM** [1] - 283:22
**amended** [2] - 492:19, 493:2, 510:16
**amendment** [6] - 492:14, 492:21, 493:18, 493:19, 493:21, 500:2
**amendments** [3] - 479:6, 492:16, 499:23
**American** [1] - 283:19
**amount** [26] - 274:16, 298:2, 340:7, 394:19, 409:19, 410:10, 410:13, 459:6, 462:4, 462:6, 463:22, 465:25, 466:9, 472:23, 485:11, 488:19, 500:19, 501:6, 502:18, 503:9, 505:5, 505:12, 512:18, 515:16, 538:22
**amounted** [1] - 460:12
**amphibian** [1] - 286:7
**amphibious** [1] - 278:5
**AMPP** [1] - 284:3
**analogous** [1] - 451:23
**analogy** [2] - 451:14, 479:1
**analyses** [9] - 313:23, 348:19, 353:17, 359:25, 372:19, 376:6, 381:4, 381:6, 475:8
**analysis** [90] - 277:24, 282:11, 282:13, 292:1, 292:14, 292:17, 292:23, 295:3, 295:11, 295:17, 302:2, 305:10, 305:16, 305:21, 306:19, 307:12, 310:19, 310:20, 310:25, 311:2, 311:3, 311:6, 314:3, 314:10, 318:13, 318:15, 318:18, 320:12, 324:21, 325:1, 326:6, 328:11,

328:13, 329:6, 329:8, 330:8, 330:10, 348:12, 348:15, 354:10, 355:5, 356:6, 357:4, 359:11, 360:3, 361:18, 368:17, 373:5, 374:6, 374:12, 374:13, 375:14, 375:24, 377:13, 377:17, 377:23, 378:18, 412:17, 412:18, 412:19, 415:22, 417:3, 417:8, 417:15, 417:20, 417:23, 418:3, 418:7, 418:24, 419:24, 420:12, 420:19, 420:23, 421:14, 423:8, 423:14, 423:17, 428:6, 443:6, 443:8, 469:7, 475:24, 476:1, 476:20, 484:15, 488:16, 502:14, 543:21
**analyze** [8] - 289:22, 290:9, 290:12, 290:23, 291:4, 354:25, 363:10, 363:17
**analyzed** [17] - 291:1, 291:11, 293:1, 296:18, 296:22, 296:25, 309:12, 311:25, 315:12, 316:9, 319:9, 326:19, 327:2, 346:11, 374:10, 511:24
**analyzes** [1] - 526:2
**analyzing** [5] - 317:5, 318:12, 355:4, 374:16
**ANDREW** [1] - 264:17
**Andrews** [1] - 265:12
**ANDREWS** [1] - 264:15
**angle** [8] - 312:20, 340:6, 400:2, 408:25, 416:6, 416:10, 416:11
**ankle** [2] - 354:16, 355:2
**ankles** [1] - 361:7
**Annapolis** [2] - 273:17, 285:13
**ANSWER** [12] - 496:8, 497:10, 517:9,

4

521:4, 523:16,
523:19, 523:22,
525:2, 525:16,
525:19, 528:17,
529:22
**answer** [23] - 337:11,
340:20, 343:23,
357:12, 377:9,
377:11, 383:3,
386:11, 388:4,
388:6, 389:8, 438:9,
443:3, 497:13,
509:17, 524:16,
525:21, 539:11,
539:19, 544:18,
544:23, 545:2, 545:4
**answered** [5] - 291:3,
311:17, 351:16,
444:24, 539:25
**answering** [4] - 345:2,
359:4, 503:4, 524:15
**answers** [4] - 355:10,
360:24, 437:11,
517:14
**anticipating** [1] -
527:4
**apart** [2] - 359:13,
359:17
**apartment** [4] -
451:16, 479:2,
481:22, 482:2
**apologies** [3] - 268:2,
505:25, 534:24
**apologize** [4] -
326:25, 477:16,
490:23, 538:3
**appear** [2] - 312:8,
479:13
**APPEARANCES** [2] -
264:16, 265:1
**appeared** [2] - 448:4,
541:20
**appendage** [1] -
281:20
**applicable** [2] - 286:9,
302:2
**application** [4] -
465:9, 498:24,
519:12, 519:15
**applications** [4] -
465:5, 470:1, 495:7,
498:24
**applied** [4] - 413:3,
463:21, 496:24,
503:11
**apply** [4] - 456:11,
465:6, 485:7
**applying** [1] - 414:17
**appreciate** [4] - 549:1,
551:6, 551:7, 551:9

**approach** [6] - 266:20,
272:25, 287:10,
333:13, 431:10,
486:12
**appropriate** [9] -
304:23, 312:3,
409:17, 448:19,
448:20, 477:3,
485:15, 516:1, 516:2
**approximate** [2] -
421:6, 504:14
**April** [1] - 492:25
**arbitrarily** [1] - 353:4
**arbitrations** [1] -
448:9
**architect** [6] - 273:14,
274:8, 275:7, 278:3,
278:21, 423:23
**Architectural** [1] -
283:18
**architecture** [14] -
274:25, 275:13,
275:16, 276:24,
277:1, 278:23,
285:15, 288:11,
288:12, 310:11,
319:4, 346:4, 351:1,
380:14
**Architectures** [1] -
284:24
**area** [4] - 276:25,
288:10, 346:2,
526:24
**areas** [1] - 455:12
**arguing** [2] - 268:12,
518:2
**argument** [8] - 375:12,
375:13, 376:4,
376:9, 377:14,
379:21, 385:13,
385:15
**arguments** [2] -
340:16, 552:7
**armored** [4] - 278:2,
278:7, 278:14, 286:6
**arms** [1] - 387:20
**Army** [1] - 277:5
**Arneson** [1] - 277:21
**arrive** [1] - 501:19
**arrived** [1] - 511:3
**art** [18] - 287:16,
288:6, 288:9,
288:20, 288:25,
289:10, 380:3,
389:2, 408:19,
414:15, 422:2,
425:9, 425:21,
456:20, 497:2,
497:23, 498:3,
498:16

**article** [2] - 370:9,
370:10
**articles** [9] - 284:11,
366:20, 379:24,
380:12, 381:23,
382:9, 382:17,
382:24, 384:19
**artifact** [1] - 351:1
**artistic** [2] - 400:5
**ashore** [1] - 278:8
**aside** [4] - 279:8,
301:3, 346:9, 362:23
**aspect** [1] - 285:6
**aspects** [4] - 286:8,
289:9, 292:16,
455:16
**aspiration** [1] - 517:18
**assembled** [1] -
439:12
**assembling** [1] -
439:12
**assembly** [1] - 439:14
**assert** [3] - 416:6,
465:10, 467:5
**assess** [4] - 369:23,
394:11, 394:19,
400:9
**assessing** [3] - 384:1,
398:10, 411:11
**assessment** [1] -
411:15
**assigned** [6] - 301:11,
364:6, 466:6,
466:17, 478:22,
535:13
**assignment** [2] -
466:22, 479:7
**associated** [4] -
439:4, 446:5, 459:6,
522:11
**Associates** [3] -
275:13, 447:19,
447:23
**associating** [1] -
542:13
**association** [2] -
283:22
**Association** [2] -
283:24, 284:1
**assume** [5] - 265:20,
317:20, 329:14,
353:24, 526:22
**assumed** [4] - 314:13,
454:16, 469:16,
530:21
**assumes** [1] - 481:2
**assuming** [5] - 270:8,
271:11, 460:3,
488:16, 504:23
**assumption** [6] -

448:17, 450:14,
454:12, 505:3,
513:7, 513:8
**assumptions** [5] -
451:5, 454:9, 477:8,
477:12
**asynchronous** [3] -
405:10, 405:11,
405:16
**Athena** [2] - 310:2,
310:5
**attached** [1] - 510:11
**attachments** [1] -
289:25
**attempted** [2] -
533:13, 533:15
**attempts** [2] - 438:6,
544:12
**attention** [3] - 393:14,
434:16, 434:18
**attorney** [2] - 438:9,
487:1
**attract** [1] - 508:4
**attribute** [1] - 520:8
**attributed** [3] -
440:13, 519:21,
520:11
**August** [7] - 435:1,
445:8, 462:22,
469:17, 535:22,
536:11, 540:9
**author** [2] - 371:1,
371:7
**authored** [1] - 284:10
**authoritative** [2] -
343:16, 366:23
**authorized** [1] -
510:17
**authors** [1] - 371:6
**available** [7] - 294:5,
294:6, 305:13,
306:5, 450:1,
481:21, 485:9
**Avenue** [1] - 273:16
**avenues** [1] - 547:21
**average** [5] - 269:18,
485:20, 485:21,
511:21, 541:2
**averages** [1] - 462:3
**averaging** [2] - 504:2,
504:3
**aviation** [1] - 436:16
**AVL** [52] - 310:2,
310:8, 347:9,
347:11, 347:20,
347:21, 347:23,
347:25, 348:4,
348:6, 348:19,
349:10, 349:15,
350:11, 350:12,

350:15, 350:22,
351:21, 352:8,
352:23, 357:17,
357:22, 358:4,
358:20, 360:1,
360:8, 360:16,
361:18, 362:24,
363:10, 363:16,
368:22, 368:25,
374:3, 374:13,
374:15, 375:6,
375:7, 376:11,
376:24, 381:4,
417:15, 417:17,
419:11, 420:25,
421:2, 421:3,
421:14, 421:16,
425:5, 425:12, 426:6
**awarded** [1] - 465:4
**aware** [6] - 444:22,
495:20, 498:10,
510:3, 531:22,
532:20
**axis** [2] - 325:9,
373:10

## B

**B-A-R-R-Y** [1] - 272:16
**bachelor's** [5] -
274:23, 288:9,
288:14, 446:15,
446:17
**background** [4] -
274:21, 446:11,
446:13, 447:10
**backwards** [2] -
304:19, 308:11
**bad** [1] - 399:15
**bald** [3] - 393:21,
394:8, 394:9
**ball** [3] - 379:7, 379:9,
379:12
**ballpark** [1] - 461:12
**banana** [16] - 316:24,
317:1, 317:11,
317:12, 317:13,
317:15, 317:19,
317:20, 317:21,
317:24, 318:24,
318:25, 319:1, 319:2
**bananas** [1] - 317:16
**bar** [6] - 368:6,
392:20, 483:4,
526:25
**Barry** [103] - 272:11,
272:16, 273:10,
273:13, 273:15,
274:19, 279:17,
282:4, 287:14,

287:20, 295:24, 296:1, 296:8, 298:9, 298:10, 298:20, 299:23, 300:6, 314:23, 315:1, 316:11, 319:14, 320:8, 324:8, 327:18, 333:17, 335:21, 336:5, 336:22, 336:23, 337:9, 338:8, 338:16, 338:25, 339:15, 339:25, 340:19, 341:4, 342:1, 343:17, 345:14, 348:7, 349:24, 352:17, 355:9, 356:2, 357:10, 357:23, 358:8, 359:6, 359:14, 359:22, 360:4, 360:24, 361:18, 362:21, 363:4, 367:16, 367:25, 370:21, 370:23, 371:3, 374:2, 374:7, 374:12, 374:15, 375:11, 376:22, 378:8, 380:21, 381:7, 381:18, 382:25, 383:3, 383:11, 386:3, 386:11, 386:17, 388:4, 388:6, 390:4, 390:18, 391:4, 391:25, 392:9, 393:3, 393:16, 394:7, 395:23, 396:14, 397:4, 397:15, 398:24, 399:11, 403:21, 404:5, 404:21, 407:2, 412:2, 428:20, 449:23, 450:9, 483:7
**BARRY** [1] - 272:22
**Barry's** [1] - 456:23
**BASANTA** [116] - 265:7, 333:13, 333:16, 335:17, 335:20, 335:23, 336:1, 336:4, 336:11, 336:13, 336:16, 336:21, 338:4, 338:7, 338:13, 338:15, 338:22, 338:24, 341:1, 341:2, 341:23, 341:24, 342:18, 342:19,

344:18, 344:20, 351:9, 351:13, 355:25, 356:1, 357:7, 357:8, 357:19, 357:21, 358:5, 358:7, 359:2, 360:13, 361:25, 362:17, 364:16, 364:17, 364:23, 364:25, 365:12, 365:13, 367:2, 367:4, 367:10, 367:11, 370:18, 370:20, 371:9, 371:10, 372:24, 372:25, 373:24, 373:25, 380:18, 380:20, 380:23, 380:25, 381:16, 381:17, 382:2, 382:3, 382:13, 382:14, 382:20, 382:21, 385:17, 385:19, 386:10, 386:21, 388:3, 389:25, 390:3, 390:11, 390:13, 390:15, 390:18, 390:20, 390:21, 392:5, 392:7, 392:8, 392:14, 392:23, 393:9, 393:12, 393:22, 393:25, 395:13, 395:15, 396:9, 396:12, 399:8, 399:10, 399:23, 401:24, 401:25, 402:17, 402:18, 403:10, 403:12, 406:3, 406:4, 409:24, 410:2, 410:3, 410:5, 410:6, 411:21, 430:4, 430:8, 430:15
**Basanta** [4] - 332:25, 333:12, 392:3, 411:23
**Basanta's** [1] - 412:3
**base** [3] - 452:23, 475:9, 499:18
**based** [27] - 290:15, 291:14, 317:3, 361:14, 363:3, 374:12, 374:13, 396:21, 397:19, 399:12, 437:14, 437:15, 439:18, 450:10, 468:21, 475:7, 483:7, 483:8, 496:16, 512:12, 519:21, 527:13,

529:7, 531:11, 531:13, 531:17, 546:18
**basic** [1] - 322:24
**basics** [1] - 372:14
**basis** [3] - 461:22, 500:20, 502:2
**Bates** [7] - 436:2, 492:23, 510:6, 518:24, 521:8, 526:9, 532:25
**batteries** [1] - 293:25
**battery** [7] - 293:24, 303:13, 315:23, 327:12, 405:5, 436:13, 473:3
**Bay** [1] - 278:19
**beam** [1] - 327:24
**beam-wise** [1] - 327:24
**Bear** [1] - 375:15
**became** [4] - 398:21, 419:10, 444:22, 447:19
**becomes** [2] - 376:14, 399:4
**BEFORE** [1] - 264:15
**began** [4] - 477:14, 491:16, 492:2, 492:10
**begin** [2] - 429:24, 538:5
**beginners** [1] - 437:9
**beginning** [7] - 366:16, 393:18, 393:20, 412:3, 496:2, 497:6, 533:16
**begins** [1] - 417:4
**behind** [1] - 506:22
**being's** [1] - 354:12
**belief** [1] - 530:3
**beliefs** [1] - 529:10
**believes** [9] - 459:24, 477:19, 478:5, 480:5, 480:6, 480:23, 481:10, 528:21, 529:23
**Bell** [1] - 274:24
**below** [2] - 407:22, 454:11
**benefit** [2] - 456:18, 469:9
**benefited** [1] - 281:22
**benefits** [4] - 455:15, 456:22, 456:25, 482:11
**Berkeley** [4] - 278:22, 446:23, 447:2, 447:24
**Best** [3] - 434:12,

435:1, 445:1
**best** [13] - 279:18, 279:20, 297:23, 369:5, 433:11, 433:12, 433:20, 434:9, 466:21, 478:19, 497:16, 498:5
**beta** [3] - 365:15, 365:25, 367:23
**better** [5] - 302:10, 314:18, 357:20, 437:8, 475:6
**between** [40] - 318:5, 319:22, 328:18, 331:11, 351:5, 360:7, 420:21, 421:11, 436:8, 437:3, 437:5, 441:25, 457:21, 458:13, 459:3, 459:18, 459:19, 464:16, 465:14, 466:11, 470:14, 471:4, 471:19, 475:14, 476:13, 478:3, 480:6, 480:8, 480:13, 480:14, 484:22, 485:14, 489:12, 491:4, 496:5, 510:13, 513:16, 520:13, 525:24, 544:16
**beyond** [1] - 417:9
**bicycle** [8] - 283:6, 320:16, 398:3, 398:4, 398:6, 398:7, 398:13
**big** [14] - 282:19, 282:24, 292:12, 372:10, 378:17, 400:7, 426:3, 463:25, 485:13, 485:18, 508:4, 508:7, 509:15, 535:18
**bigger** [1] - 437:8
**biggest** [2] - 471:12, 527:16
**binder** [4] - 487:25, 488:7, 488:8, 488:9
**bit** [26] - 275:9, 286:17, 292:1, 304:22, 317:14, 322:11, 343:3, 346:10, 355:11, 368:19, 369:5, 402:8, 406:23, 451:3, 451:10, 453:6, 457:17,

468:5, 470:13, 475:6, 477:1, 477:10, 482:6, 495:25, 523:10, 536:14
**blog** [1] - 549:8
**blow** [3] - 306:7, 390:16, 508:1
**blowing** [1] - 544:15
**blown** [1] - 508:19
**blows** [1] - 309:6
**blue** [4] - 526:13, 526:22, 526:24, 526:25
**Bluetooth** [1] - 405:1
**blurred** [1] - 298:15
**blurry** [1] - 521:19
**blush** [1] - 468:15
**board** [50] - 267:5, 267:12, 270:2, 270:22, 271:2, 294:1, 297:16, 297:20, 300:18, 302:17, 302:22, 302:25, 304:21, 357:1, 358:17, 359:22, 391:7, 391:22, 396:22, 397:20, 397:22, 401:14, 401:17, 408:16, 418:21, 419:3, 427:7, 427:9, 427:11, 436:14, 473:5, 482:16, 482:17, 483:21, 483:23, 483:24, 484:4, 485:8, 501:16, 501:18, 503:9, 503:14, 503:17, 511:10, 511:12, 511:22, 515:12, 545:20, 545:22
**Board** [1] - 448:9
**boarding** [4] - 433:12, 433:13, 433:20
**Boarding** [2] - 434:12, 435:1
**boards** [21] - 353:18, 355:15, 356:25, 391:18, 471:14, 471:17, 478:14, 482:20, 503:12, 503:16, 504:6, 506:19, 507:5, 509:5, 512:13, 513:5, 513:11, 513:13, 535:18, 541:3, 542:22
**boat** [8] - 277:4,

279:12, 281:8, 282:2, 285:3, 285:6, 403:1
**Boat** [2] - 283:19, 285:2
**boats** [8] - 277:2, 277:5, 277:22, 280:6, 280:9, 280:15, 280:17, 283:21
**bodies** [1] - 448:7
**body** [3] - 331:24, 387:22, 436:14
**body's** [1] - 425:14
**Boggs** [1] - 264:10
**books** [1] - 413:22
**booms** [1] - 280:13
**BORDLEY** [1] - 265:3
**bother** [2] - 360:10, 361:9
**bothered** [2] - 377:6, 377:13
**bottom** [12] - 275:11, 327:25, 330:22, 373:11, 462:20, 503:25, 514:9, 522:19, 525:6, 526:1, 531:3
**bought** [2] - 494:9, 494:11
**bounces** [1] - 322:11
**bouncing** [1] - 322:10
**bowl** [1] - 379:2
**brackets** [5] - 300:21, 301:1, 301:2, 301:3, 301:6
**Bradley** [1] - 278:4
**brand** [3] - 436:15, 444:10, 456:3
**brand-new** [2] - 436:15, 456:3
**brands** [1] - 441:1
**break** [12] - 279:16, 286:25, 332:17, 332:21, 428:22, 429:2, 440:21, 455:11, 467:6, 505:15, 523:2, 523:3
**Brian** [1] - 371:1
**BRIAN** [1] - 264:21
**briefed** [1] - 432:19
**briefly** [5] - 274:5, 280:4, 280:21, 321:11, 330:17
**bring** [29] - 335:17, 335:19, 338:4, 341:21, 341:23, 344:18, 351:9, 355:25, 357:7, 364:16, 365:12,

370:18, 371:9, 372:24, 380:18, 382:13, 390:11, 402:17, 406:3, 409:24, 410:1, 411:4, 434:16, 454:7, 473:25, 507:13, 547:24, 552:5, 553:2
**British** [1] - 276:12
**broad** [1] - 509:11
**broadly** [1] - 286:9
**bronze** [1] - 309:6
**brought** [1] - 434:18
**Brown** [1] - 276:13
**bubble** [1] - 399:22
**bucket** [3] - 378:23, 378:24, 379:1
**bucks** [1] - 322:12
**budget** [1] - 281:23
**bugging** [1] - 403:20
**build** [1] - 280:9
**Builders** [1] - 285:2
**builders** [2] - 285:3, 285:7
**building** [1] - 292:9
**builds** [2] - 278:2, 280:6
**built** [7] - 277:18, 280:11, 280:16, 280:17, 281:12, 281:13, 458:20
**bullet** [6] - 454:11, 476:11, 514:9, 522:19, 526:1, 527:15
**bumps** [1] - 462:23
**bunch** [2] - 348:7, 537:19
**bunny** [1] - 419:12
**bushes** [1] - 398:5
**business** [5] - 283:12, 284:16, 435:6, 463:16, 471:25
**busy** [1] - 477:16
**button** [1] - 294:18
**buying** [5] - 451:13, 480:16, 480:17, 482:20, 535:18
**buyout** [4] - 466:19, 468:2, 468:11, 494:19
**BY** [120] - 264:17, 264:20, 264:20, 264:21, 265:3, 265:3, 265:6, 265:6, 265:7, 265:7, 273:9, 279:24, 287:13, 295:25, 296:7, 296:16, 299:9,

300:5, 300:16, 300:23, 306:9, 306:25, 307:21, 311:16, 322:21, 324:7, 333:16, 335:20, 336:4, 336:13, 336:21, 338:7, 338:15, 338:24, 341:2, 341:24, 342:19, 344:20, 351:13, 356:1, 357:8, 357:21, 358:7, 359:2, 362:17, 364:17, 364:25, 365:13, 367:4, 367:11, 370:20, 371:10, 372:25, 373:25, 380:20, 380:25, 381:17, 382:3, 382:14, 382:21, 386:10, 388:3, 390:3, 390:13, 390:21, 392:8, 392:23, 393:12, 393:25, 395:15, 396:12, 399:10, 399:23, 401:25, 402:18, 403:12, 406:4, 410:3, 410:6, 412:1, 422:22, 426:17, 433:5, 433:17, 435:10, 436:19, 438:14, 439:23, 445:21, 486:15, 490:12, 500:25, 503:24, 506:9, 507:11, 507:15, 508:2, 508:12, 510:9, 513:3, 514:10, 514:22, 517:16, 518:17, 518:25, 530:25, 531:10, 532:6, 533:2, 534:3, 536:5, 536:10, 538:2, 538:12, 538:17, 543:24, 544:4, 544:10, 544:19, 548:15

---

# C

**C.A** [1] - 264:5
**cable** [1] - 275:22
**calculate** [13] - 310:4, 311:8, 317:7, 317:8, 363:18, 378:12, 378:15, 379:16, 452:13, 462:12,

515:25, 545:11
**calculated** [4] - 312:8, 377:23, 378:4
**calculating** [2] - 423:10, 478:9
**calculation** [8] - 321:2, 452:15, 474:9, 477:13, 478:12, 488:25, 515:11, 515:14
**calculational** [1] - 351:4
**calculations** [15] - 281:2, 281:5, 312:12, 312:14, 313:2, 313:22, 321:4, 347:8, 347:18, 384:12, 418:10, 422:2, 423:25, 474:8, 506:10
**calculator** [6] - 504:15, 504:16, 504:17, 504:23, 506:11, 545:19
**Caleb** [1] - 264:10
**calendar** [2] - 535:17, 540:14
**California** [2] - 275:6, 447:3
**campaign** [2] - 428:3, 436:7
**cap** [6] - 466:14, 466:23, 489:22, 493:20, 493:21, 493:24
**capability** [1] - 321:3
**capacity** [1] - 550:14
**capped** [1] - 466:3
**car** [4] - 322:10, 322:11, 399:5, 399:7
**carbon** [1] - 375:8
**care** [3] - 269:6, 322:23, 420:5
**caricature** [1] - 305:6
**Carol** [6] - 338:5, 338:14, 338:22, 364:24, 526:4, 529:14
**carrier** [1] - 278:7
**carriers** [1] - 275:23
**carry** [2] - 287:4, 321:24
**carrying** [1] - 527:22
**carving** [2] - 427:21, 427:25
**case** [74] - 266:8, 266:10, 266:13, 279:5, 281:1, 286:13, 287:15,

290:5, 298:25, 303:14, 308:10, 308:14, 308:23, 314:14, 315:24, 317:24, 319:3, 323:23, 325:10, 327:13, 331:22, 333:20, 333:23, 334:23, 335:12, 338:11, 343:6, 347:11, 347:23, 348:3, 348:6, 382:7, 433:4, 433:23, 434:2, 434:25, 446:8, 448:15, 449:10, 452:13, 453:18, 453:20, 453:24, 455:8, 458:11, 462:19, 464:12, 471:7, 475:18, 486:19, 487:2, 499:11, 501:16, 502:22, 502:25, 515:5, 519:3, 522:23, 528:6, 528:8, 529:15, 533:14, 541:5, 547:10, 549:6, 549:7, 549:12, 549:16, 550:1, 550:3, 550:6, 552:16, 552:20
**cases** [5] - 281:7, 294:6, 303:16, 325:23, 327:6
**catamaran** [1] - 277:4
**catch** [1] - 403:18
**category** [1] - 456:5
**caused** [1] - 314:2
**cease** [2] - 547:6, 547:11
**center** [29] - 312:11, 312:13, 312:21, 353:16, 354:5, 354:10, 354:12, 354:15, 354:21, 354:25, 355:1, 355:16, 355:21, 356:9, 357:25, 358:23, 359:7, 359:13, 359:17, 361:3, 361:6, 363:1, 363:2, 363:6, 401:8, 401:14, 401:19, 418:12, 420:3
**Center** [1] - 273:20
**centered** [1] - 535:21
**centers** [2] - 358:4, 359:17
**certain** [20] - 271:2,

274:16, 286:8, 301:9, 304:18, 312:20, 312:21, 340:6, 340:7, 340:8, 340:11, 341:18, 354:20, 363:18, 449:15, 460:3, 471:7, 509:10
**certainly** [12] - 375:8, 427:9, 473:2, 481:17, 485:1, 506:23, 520:20, 530:18, 541:20, 542:12, 547:23, 548:7
**certification** [1] - 277:3
**Certified** [1] - 553:13
**certify** [2] - 277:25, 553:10
**CFD** [1] - 374:24
**CFO** [1] - 432:10
**CG** [1] - 356:9
**chair** [1] - 284:24
**chance** [3] - 348:21, 348:25, 441:20
**change** [14] - 293:22, 394:3, 394:4, 416:11, 469:21, 500:19, 500:20, 502:10, 502:17, 502:20, 503:5, 503:9, 542:10, 542:12
**changed** [5] - 283:23, 291:9, 360:7, 361:1, 548:10
**changes** [9] - 308:24, 405:4, 462:5, 500:13, 500:14, 502:5, 502:20, 503:6, 503:13
**changing** [4] - 325:23, 363:4, 368:13, 383:24
**Channel** [1] - 390:25
**channel** [1] - 440:16
**characteristics** [1] - 469:13
**charge** [4] - 280:5, 284:6, 432:17, 468:24
**Charles** [2] - 447:18, 447:23
**chart** [3] - 423:12, 512:10, 526:13
**check** [11] - 319:11, 320:10, 363:22, 364:1, 364:8, 364:11, 365:14,

461:19, 487:21, 526:7, 550:9
**checked** [2] - 346:10, 429:11
**checking** [1] - 442:21
**checkmark** [1] - 458:11
**checks** [1] - 311:4
**cherry** [1] - 509:10
**Chevron** [1] - 275:17
**Chicago** [2] - 446:18, 447:4
**chief** [3] - 277:12, 277:13
**China** [2] - 434:15, 441:3
**Cho** [1] - 435:19
**choose** [2] - 452:11, 547:22
**chose** [3] - 391:10, 509:12, 527:19
**Chris** [2] - 273:13, 287:20
**Christmas** [2] - 398:4, 535:25
**Christopher** [4] - 272:11, 272:14, 273:13, 370:23
**CHRISTOPHER** [2] - 272:15, 272:22
**church** [1] - 398:6
**circle** [3] - 317:6, 317:8
**circular** [1] - 316:25
**cite** [19] - 343:16, 365:1, 366:19, 379:23, 379:25, 381:23, 382:1, 382:8, 382:9, 382:16, 384:19, 389:6, 390:22, 391:4, 520:17, 520:20, 525:9, 531:16
**cited** [10] - 268:9, 268:20, 270:6, 270:8, 380:14, 384:20, 389:21, 499:23, 501:1, 507:12
**cites** [1] - 531:8
**citing** [1] - 365:7
**City** [1] - 447:6
**civil** [1] - 276:4
**CL** [1] - 351:15
**claim** [24] - 296:23, 297:1, 299:12, 302:1, 302:5, 309:9, 315:15, 316:2, 320:9, 320:11,

327:8, 330:14, 330:16, 330:19, 334:24, 335:3, 335:7, 335:9, 410:17, 412:14, 412:20, 414:18, 415:6, 488:17
**Claim** [30] - 296:9, 300:14, 300:17, 301:4, 311:18, 315:7, 315:9, 315:12, 316:7, 316:15, 316:17, 319:22, 319:23, 326:19, 326:21, 327:19, 330:19, 402:19, 403:4, 403:5, 403:6, 403:25, 405:21, 406:5, 406:10, 409:15, 410:16, 411:1, 411:5
**claiming** [1] - 389:5
**claims** [21] - 289:2, 289:3, 289:4, 289:6, 289:21, 290:8, 290:12, 290:17, 290:24, 291:4, 291:7, 291:8, 291:11, 291:17, 295:21, 296:18, 301:9, 402:13, 483:17, 499:2
**clarification** [2] - 414:9, 487:3
**clarify** [1] - 414:8
**class** [2] - 285:15, 285:16
**classical** [1] - 278:22
**clause** [3] - 532:9, 532:12, 532:13
**clauses** [1] - 466:1
**clear** [11] - 265:20, 273:21, 283:4, 337:3, 337:17, 339:17, 340:18, 379:11, 385:6, 486:25, 500:15
**clearly** [4] - 309:10, 320:15, 334:3, 433:24
**cleaver** [1] - 325:2
**CLERK** [17] - 265:11, 271:24, 272:1, 272:12, 272:17, 279:17, 279:20, 323:8, 323:13, 333:4, 333:6, 429:21, 429:23, 445:13, 505:20,

505:22, 553:8
**client's** [1] - 267:10
**clip** [20] - 358:5, 361:25, 385:17, 385:19, 388:9, 391:6, 391:9, 391:10, 391:12, 391:13, 392:10, 392:14, 393:3, 393:13, 394:22, 395:13, 396:9, 399:9, 399:24, 400:10
**Clip** [4] - 358:8, 360:13, 386:21, 389:25
**clips** [10] - 389:20, 391:18, 391:21, 394:11, 394:15, 394:17, 395:12, 399:9, 400:9, 400:10
**close** [8] - 266:13, 285:13, 312:4, 331:19, 469:18, 493:7, 512:15, 551:14
**closed** [1] - 521:13
**closer** [2] - 493:9, 493:12
**closing** [1] - 552:6
**Clp** [2] - 365:15, 367:21
**Cm** [10] - 363:22, 364:19, 365:15, 365:24, 365:25, 367:8, 367:20, 367:22, 367:23
**Cm-alpha** [7] - 363:22, 364:19, 365:15, 365:24, 367:8, 367:20, 367:22
**Cm-beta** [3] - 365:15, 365:25, 367:23
**Cm0** [4] - 363:22, 364:18, 367:8, 367:20
**Cmq** [5] - 340:15, 363:24, 364:19, 367:8, 367:20
**CN** [1] - 280:7
**co** [1] - 371:6
**CO** [1] - 264:8
**co-authors** [1] - 371:6
**Coast** [15] - 273:19, 273:22, 273:23, 273:25, 274:3, 274:6, 274:9, 274:15, 277:2, 277:16, 280:18, 280:20, 281:15,

281:19, 285:21
**Coatings** [1] - 284:2
**cock** [1] - 309:4
**code** [2] - 350:4, 425:25
**codes** [3] - 282:12, 347:14, 347:15
**coefficient** [14] - 312:15, 312:17, 312:19, 313:8, 313:9, 313:10, 314:12, 314:14, 314:16, 314:18, 323:3, 363:3, 375:4, 380:8
**coefficients** [22] - 308:13, 308:21, 310:4, 312:2, 313:13, 318:17, 321:3, 326:12, 341:20, 349:5, 349:7, 415:19, 415:22, 416:14, 416:16, 416:20, 416:21, 417:7, 417:10, 422:11, 423:10, 424:2
**cognizant** [2] - 522:10, 522:20
**cohort** [1] - 423:25
**coleader** [1] - 446:24
**colleague** [4] - 336:2, 336:22, 432:20, 432:21
**collect** [2] - 469:8, 553:6
**collection** [2] - 397:10, 404:17
**collectively** [1] - 538:19
**College** [1] - 274:24
**college** [2] - 275:10, 275:12
**Colletti** [8] - 267:15, 296:3, 297:14, 297:22, 299:2, 332:22, 550:5, 552:4
**COLLETTI** [17] - 265:6, 296:6, 297:15, 297:19, 298:5, 332:25, 430:20, 550:7, 550:16, 550:20, 550:24, 551:3, 551:24, 552:6, 552:10, 552:21, 553:4
**Colletti's** [1] - 298:3
**colloquy** [1] - 544:16
**column** [2] - 324:14,

469:12
**Column** [4] - 365:3, 367:5, 415:15, 415:16
**combatants** [1] - 275:21
**combination** [4] - 283:25, 292:5, 292:24, 406:12
**combined** [1] - 292:12
**comfortable** [1] - 270:23
**comfortably** [1] - 428:14
**coming** [13] - 270:11, 289:18, 375:16, 468:20, 468:22, 480:10, 483:1, 484:10, 485:5, 485:23, 511:2, 519:24, 522:8
**Commandant** [1] - 273:25
**comment** [5] - 377:19, 385:16, 391:23, 448:25, 450:25
**commented** [1] - 339:4
**commercial** [3] - 275:20, 285:21
**Commission** [1] - 448:8
**committed** [1] - 340:22
**Committee** [1] - 284:25
**common** [6] - 309:20, 337:2, 337:17, 345:21, 352:1, 380:16
**commonly** [2] - 310:8, 470:9
**communications** [8] - 441:7, 459:14, 508:23, 530:16, 530:19, 531:14, 531:16, 531:21
**community** [2] - 267:4, 446:25
**commutation** [2] - 405:4, 405:20
**companies** [4] - 443:24, 444:4, 444:7, 470:23
**Company** [1] - 276:17
**company** [26] - 276:7, 283:2, 283:6, 283:11, 431:18, 432:14, 432:16, 432:25, 435:8,

435:24, 440:8, 441:1, 441:2, 446:22, 447:3, 447:13, 447:14, 447:17, 447:18, 452:2, 459:24, 468:6, 469:1, 469:4, 473:7, 528:15
**companywide** [1] - 517:11
**comparable** [14] - 457:5, 458:3, 458:7, 458:18, 467:15, 471:2, 476:8, 476:15, 476:21, 479:22, 479:25, 481:24, 490:10, 490:17
**comparables** [1] - 467:15
**compare** [2] - 469:7, 542:14
**compared** [3] - 320:2, 472:5, 522:13
**compensate** [1] - 378:17
**compensation** [1] - 465:22
**compete** [6] - 457:18, 458:16, 478:6, 480:24, 484:23, 484:25
**competed** [1] - 477:20
**competes** [1] - 480:25
**competing** [1] - 527:25
**competition** [8] - 457:17, 471:19, 472:1, 480:4, 480:6, 480:8, 484:21
**competitive** [5] - 470:14, 471:3, 525:23, 528:18, 528:21
**competitor** [10] - 457:22, 470:11, 522:12, 525:7, 525:17, 526:14, 526:16, 526:23, 546:9, 547:12
**competitor/compe titor** [1] - 458:17
**competitors** [7] - 458:14, 471:9, 471:10, 472:5, 472:6, 472:9, 477:21
**complete** [2] - 442:13, 510:12
**completed** [1] - 469:6
**completely** [1] -

386:25
**completeness** [1] - 521:10
**complicated** [7] - 307:6, 340:16, 374:20, 388:1, 494:17, 501:9, 502:15
**component** [1] - 398:9
**components** [10] - 301:17, 302:11, 303:21, 304:6, 316:2, 400:17, 400:21, 400:25, 401:2, 452:15
**composite** [1] - 281:12
**comprises** [4] - 303:13, 315:23, 327:14, 329:20
**comprising** [2] - 324:12, 327:12
**computational** [1] - 378:10
**computationally** [1] - 293:17
**computations** [1] - 310:3
**computer** [19] - 292:17, 305:10, 309:19, 309:21, 310:2, 310:19, 310:25, 311:2, 311:3, 311:5, 318:13, 318:14, 318:18, 347:15, 347:17, 351:1, 374:25, 539:19
**concept** [4] - 278:13, 283:2, 283:7, 490:7
**concern** [4] - 268:10, 502:8, 525:18, 546:18
**concerned** [2] - 498:23, 547:12
**concerns** [2] - 514:11, 525:7
**conclude** [3] - 314:21, 325:25, 471:8
**concluded** [1] - 362:24
**concludes** [1] - 362:16
**conclusion** [29] - 270:11, 305:16, 309:8, 311:18, 311:20, 316:16, 316:17, 318:7, 318:11, 326:11, 326:20, 327:5,

327:6, 329:22, 330:1, 330:13, 331:1, 332:1, 332:3, 359:1, 386:9, 388:2, 414:19, 414:20, 420:19, 445:9, 488:6, 524:25, 547:13
**conclusions** [9] - 290:4, 313:18, 315:14, 316:1, 316:7, 318:1, 326:9, 479:6, 484:12
**condition** [30] - 301:15, 301:16, 308:1, 314:17, 320:7, 321:14, 321:15, 321:20, 321:23, 321:24, 323:17, 323:20, 326:2, 326:3, 330:6, 337:5, 339:17, 340:4, 340:6, 340:11, 340:21, 341:10, 342:17, 413:1, 413:5, 413:13, 414:25, 415:8, 415:12, 416:5
**conditions** [2] - 339:23, 416:4
**conducted** [2] - 374:6, 375:14
**conducting** [1] - 305:16
**conference** [4] - 267:3, 370:16, 374:18, 551:14
**conferences** [1] - 284:22
**confidential** [1] - 438:8
**configuration** [3] - 290:2, 328:20, 328:21
**configurations** [3] - 290:4, 296:21, 484:4
**confirm** [5] - 269:3, 346:15, 402:10, 421:4, 538:14
**confirmed** [2] - 343:20, 344:13
**confirms** [1] - 421:15
**confused** [3] - 360:3, 419:10, 419:20
**confusing** [4] - 418:23, 419:13, 424:1, 485:19
**confusion** [1] - 360:15
**connected** [6] - 328:18, 329:21,

331:10, 331:22, 331:25, 332:5
**connects** [1] - 303:7
**consequences** [1] - 548:8
**conservative** [11] - 311:3, 375:6, 375:17, 375:18, 375:21, 421:6, 421:7, 421:8, 421:16, 426:6, 474:9
**consider** [13] - 288:18, 288:19, 292:13, 292:23, 308:18, 312:10, 472:14, 474:17, 474:19, 484:19, 491:2, 512:6, 516:5
**consideration** [7] - 438:20, 467:11, 467:12, 472:12, 473:23, 479:13, 549:16
**considerations** [1] - 456:8
**considered** [11] - 294:21, 295:3, 295:10, 306:19, 307:11, 376:11, 455:7, 456:4, 476:22, 482:5, 490:15
**considering** [1] - 480:18
**consistent** [7] - 412:19, 419:12, 419:17, 419:18, 463:3, 540:25, 541:8
**consistently** [1] - 355:6
**consists** [2] - 318:15, 446:3
**constitute** [2] - 510:12, 533:10
**construct** [2] - 453:16, 453:20
**constructed** [1] - 474:4
**construction** [6] - 279:3, 339:12, 342:9, 412:14, 412:20, 414:18
**constructions** [1] - 277:14
**consult** [1] - 438:9
**consulting** [2] - 274:17, 446:3
**consumer** [1] - 507:21
**consumers** [1] - 482:19

**contact** [2] - 306:12, 306:13
**contain** [7] - 268:7, 290:17, 291:16, 328:4, 331:2, 333:25, 334:4
**contained** [1] - 331:12
**container** [1] - 277:6
**contains** [3] - 328:5, 329:23, 331:6
**contee** [1] - 306:13
**contemplating** [3] - 265:19, 265:23, 266:2
**contemporaneous** [1] - 464:24
**context** [39] - 299:6, 374:3, 446:4, 447:21, 450:25, 452:6, 455:21, 456:16, 459:2, 461:1, 461:5, 462:12, 463:16, 464:4, 466:13, 471:7, 472:21, 473:1, 475:6, 476:19, 480:5, 484:10, 488:18, 493:23, 499:15, 500:10, 502:13, 509:10, 511:11, 513:22, 515:23, 516:6, 519:24, 520:15, 524:21, 531:20, 535:15, 546:21
**continue** [7] - 304:24, 463:2, 472:25, 473:11, 478:1, 505:24, 506:6
**CONTINUED** [1] - 265:1
**continuing** [2] - 394:10, 460:22
**contract** [2] - 279:2, 441:9
**contrary** [1] - 515:10
**control** [18] - 303:14, 303:22, 305:12, 324:12, 384:25, 386:1, 387:22, 387:25, 399:4, 400:14, 400:16, 400:23, 401:1, 402:23, 403:1, 473:5, 542:10
**controlled** [21] - 286:24, 303:18, 303:23, 304:14, 305:2, 305:8,

305:18, 305:20, 311:22, 328:9, 329:2, 329:16, 330:8, 400:16, 400:20, 401:5, 402:11, 402:14, 402:20, 402:21
**controller** [15] - 304:19, 315:24, 327:13, 403:7, 403:14, 404:10, 404:22, 483:23, 484:3, 519:9, 519:13, 519:18, 519:21, 520:11, 522:2
**controllers** [1] - 404:6
**controlling** [4] - 305:5, 305:6, 398:12, 483:21
**controls** [4] - 286:24, 387:10, 403:16, 403:22
**convenient** [1] - 312:25
**converge** [1] - 325:6
**converges** [1] - 325:13
**converging** [1] - 325:7
**conversation** [7] - 271:3, 293:3, 329:7, 362:18, 411:12, 432:15, 460:2
**conversations** [1] - 483:8
**conversely** [1] - 370:2
**convert** [1] - 290:1
**converting** [1] - 286:12
**conveyed** [2] - 535:4, 535:6
**COOCH** [1] - 264:17
**copied** [1] - 367:12
**copies** [1] - 334:15
**copy** [5] - 306:22, 307:13, 367:14, 413:23, 551:7
**Copyright** [1] - 448:8
**cordless** [1] - 436:13
**core** [1] - 313:9
**Cornell** [1] - 446:16
**Corp** [1] - 282:18
**Corporation** [1] - 278:2
**Corps** [2] - 277:5, 278:8
**correct** [122] - 280:19, 287:17, 296:19, 297:1, 301:4, 307:17, 313:3,

324:19, 324:20, 327:9, 327:16, 329:10, 329:12, 335:7, 336:9, 338:20, 341:12, 342:13, 342:22, 346:8, 347:3, 347:4, 347:6, 347:9, 348:14, 348:20, 350:6, 351:19, 353:19, 355:19, 357:15, 360:20, 363:15, 363:24, 363:25, 364:8, 369:2, 369:13, 371:16, 371:25, 373:13, 373:17, 377:15, 381:13, 383:17, 384:14, 385:1, 389:7, 400:23, 404:16, 406:13, 407:17, 412:11, 413:6, 415:1, 415:13, 417:10, 417:13, 417:14, 417:18, 417:21, 418:3, 419:16, 420:17, 420:20, 420:21, 423:1, 423:4, 423:21, 425:23, 427:5, 430:3, 430:14, 433:8, 433:21, 435:15, 436:24, 442:22, 442:23, 443:15, 445:7, 460:16, 463:4, 475:15, 487:10, 489:21, 489:23, 489:24, 490:20, 492:11, 493:10, 494:20, 495:8, 500:21, 501:24, 502:3, 502:11, 511:14, 512:14, 515:7, 519:8, 521:4, 522:8, 523:15, 523:16, 523:19, 523:22, 525:16, 527:18, 531:1, 533:13, 534:16, 534:19, 535:8, 535:12, 536:6, 539:13, 540:3, 542:8, 550:24, 551:3
**Correct** [1] - 349:21
**corrected** [1] - 349:21
**correction** [2] - 349:23, 491:25
**correctly** [9] - 491:19,

492:15, 504:4, 510:18, 513:18, 521:5, 523:23, 525:20, 525:21
**corresponded** [3] - 314:13, 314:15, 314:16
**correspondence** [8] - 421:11, 449:12, 459:18, 460:23, 460:24, 481:4, 508:15, 509:18
**corresponds** [4] - 313:8, 313:9, 313:10, 512:15
**corrode** [1] - 287:1
**corrodes** [1] - 287:2
**Corrosion** [1] - 284:1
**cost** [22] - 438:24, 438:25, 439:3, 439:8, 439:9, 439:12, 439:14, 439:20, 439:21, 440:3, 440:15, 440:16, 484:5, 485:8, 513:4, 518:10, 525:7, 529:20, 542:24
**costs** [19] - 439:2, 439:4, 439:5, 439:6, 452:25, 484:9, 515:23, 516:3, 516:5, 516:7, 516:11, 516:13, 516:16, 518:4, 542:20, 543:1, 543:2
**counsel** [11] - 266:9, 268:6, 322:24, 362:15, 388:1, 420:11, 426:22, 523:10, 544:16, 546:23, 548:16
**Counsel** [1] - 283:20
**counsel's** [1] - 415:18
**counselor** [4] - 273:11, 287:12, 300:3, 426:18
**count** [3] - 393:4, 393:16, 464:6
**counted** [6] - 392:11, 392:12, 394:3, 394:25, 515:25, 520:22
**counting** [3] - 393:8, 474:6, 475:9
**country** [1] - 447:5
**couple** [24] - 265:17, 276:12, 281:13, 281:16, 292:20, 293:22, 303:17,

324:2, 346:1, 355:7, 382:6, 399:15, 418:20, 419:3, 422:14, 422:18, 425:24, 457:8, 460:20, 464:15, 466:1, 492:11, 493:8
**course** [26] - 274:10, 274:17, 276:11, 279:5, 279:9, 281:1, 281:4, 282:19, 283:4, 283:5, 285:1, 285:7, 285:13, 288:8, 299:7, 305:3, 314:18, 316:3, 321:3, 324:23, 328:20, 353:3, 380:5, 386:19, 481:16, 483:24
**COURT** [101] - 264:1, 265:13, 265:23, 266:11, 266:15, 266:18, 266:23, 267:1, 267:8, 267:13, 267:17, 267:22, 267:25, 268:3, 268:13, 268:21, 268:23, 269:5, 269:19, 270:4, 270:8, 270:12, 270:17, 271:4, 271:20, 271:22, 272:2, 272:6, 273:1, 273:3, 287:11, 295:23, 296:3, 296:13, 297:13, 297:18, 297:22, 298:2, 298:8, 298:10, 298:13, 298:16, 298:19, 307:19, 322:19, 332:14, 332:20, 333:2, 333:7, 333:10, 333:14, 385:18, 392:3, 392:6, 392:17, 392:19, 411:23, 422:16, 422:18, 422:21, 428:19, 429:1, 429:5, 429:9, 429:12, 429:14, 429:16, 429:24, 430:6, 430:11, 430:16, 430:25, 431:3, 431:8, 431:11, 445:12, 486:13, 505:14, 505:18, 505:23, 506:1, 506:3, 537:24, 543:18,

543:22, 548:20, 549:22, 549:25, 550:5, 550:11, 550:19, 550:21, 550:25, 551:5, 551:21, 551:25, 552:4, 552:9, 552:11, 552:25, 553:5
**court** [3] - 272:18, 315:5, 449:17
**Court** [22] - 265:11, 265:25, 301:8, 334:1, 334:5, 335:3, 341:13, 341:15, 341:19, 341:22, 346:25, 392:1, 414:7, 414:10, 449:18, 453:21, 455:9, 509:13, 526:12, 553:9, 553:14
**Court's** [9] - 339:9, 339:12, 342:8, 345:12, 346:5, 412:14, 412:19, 414:9, 414:18
**Courthouse** [1] - 264:10
**courtroom** [10] - 272:5, 332:19, 333:9, 428:25, 430:22, 505:17, 506:2, 544:7, 549:17, 549:21
**courts** [4] - 448:4, 448:6, 448:11, 448:13
**Courts** [1] - 448:7
**cover** [1] - 542:23
**covered** [6] - 289:13, 291:16, 313:13, 438:25, 461:25
**covers** [1] - 307:5
**Craft** [1] - 284:24
**craft** [55] - 274:18, 277:22, 284:11, 285:8, 286:7, 286:9, 288:13, 288:16, 289:1, 292:18, 294:3, 295:6, 302:9, 308:24, 311:9, 312:19, 312:21, 313:3, 313:6, 313:20, 316:4, 318:16, 319:19, 320:15, 320:19, 343:8, 354:14, 362:10, 365:14, 366:3, 366:10,

366:11, 366:15, 370:3, 373:18, 383:11, 383:15, 387:10, 399:2, 399:4, 399:12, 400:11, 415:8, 416:24, 421:10, 426:20, 427:2, 427:5, 427:17, 428:15, 428:16
**crafted** [1] - 300:10
**crafts** [1] - 289:5
**crash** [1] - 396:20
**crashed** [1] - 396:17
**crashes** [3] - 396:3, 396:13, 396:16
**created** [2] - 372:18, 457:13
**creating** [1] - 507:4
**criteria** [5] - 311:14, 312:6, 343:21, 344:14, 344:24
**critical** [2] - 322:7, 451:4
**critically** [3] - 321:19, 322:6, 324:5
**criticisms** [2] - 349:2, 349:4
**criticized** [1] - 353:21
**criticizing** [1] - 353:23
**CROSS** [2] - 333:15, 486:14
**cross** [11] - 278:5, 311:4, 332:23, 353:10, 353:14, 406:24, 407:1, 407:4, 407:5, 548:10, 548:16, 552:23
**cross-checks** [1] - 311:4
**cross-examination** [4] - 332:23, 548:10, 548:16, 552:23
**CROSS-EXAMINATION** [2] - 333:15, 486:14
**cross-section** [2] - 353:10, 353:14
**cross-sectional** [4] - 406:24, 407:1, 407:4, 407:5
**crosscheck** [2] - 421:14, 426:6
**crosses** [1] - 353:10
**cup** [2] - 424:13, 424:15
**curiosity** [1] - 506:13
**curious** [2] - 416:13, 489:4

**current** [12] - 308:24, 308:25, 309:1, 309:2, 405:4, 405:5, 405:7, 442:15, 446:21, 447:24, 512:24, 538:21
**curve** [5] - 317:19, 317:20, 319:7, 410:19, 411:7
**curved** [4] - 317:25, 319:2, 319:3, 410:22
**curving** [1] - 318:25
**CUSTOM** [1] - 264:4
**customer** [1] - 460:10
**customers** [3] - 529:8, 529:24, 529:25
**customs** [1] - 439:2
**cut** [11] - 317:10, 391:14, 394:9, 394:23, 395:1, 395:18, 399:16, 399:17, 429:7, 429:8
**cuts** [1] - 400:1
**cutting** [1] - 408:16
**CV** [1] - 274:20
**cycle** [1] - 325:14
**cycles** [1] - 325:11

## D

**D006864** [1] - 436:2
**damage** [1] - 450:15
**damages** [26] - 446:3, 446:5, 446:25, 447:21, 448:14, 448:19, 448:20, 448:21, 448:24, 449:21, 451:6, 451:7, 453:12, 454:5, 456:12, 458:2, 462:12, 475:4, 486:19, 486:22, 486:24, 487:1, 488:16, 499:12, 519:20, 548:11
**damp** [2] - 424:6, 424:10
**damped** [7] - 321:19, 321:22, 322:6, 324:4, 324:5, 376:11, 424:18
**damping** [49] - 322:7, 323:21, 323:22, 323:24, 324:1, 324:2, 325:21, 326:16, 375:4, 375:11, 375:13, 376:3, 376:5, 376:9, 376:15, 376:16,

376:22, 376:24, 377:3, 377:7, 377:14, 378:6, 378:13, 378:16, 378:19, 378:22, 379:4, 379:7, 379:16, 379:21, 380:1, 380:4, 380:5, 380:11, 380:17, 381:19, 381:25, 382:5, 382:11, 382:18, 382:23, 383:4, 383:7, 383:8, 422:5, 422:8, 423:18
**data** [26] - 310:1, 417:17, 450:22, 462:23, 462:25, 469:11, 475:17, 475:18, 475:20, 478:20, 478:23, 485:9, 534:10, 534:14, 536:19, 536:21, 540:6, 540:8, 540:10, 540:12, 541:3, 541:6, 541:9, 541:11, 541:13, 541:17
**database** [1] - 309:21
**date** [21] - 445:5, 450:19, 460:14, 460:17, 462:18, 466:17, 469:13, 469:17, 478:23, 492:12, 493:13, 493:15, 494:14, 512:15, 512:17, 526:8, 540:10, 543:4, 543:6, 546:14, 547:5
**dated** [1] - 492:25
**DAVI** [1] - 272:15
**David** [1] - 272:15
**DAVID** [2] - 272:15, 272:22
**days** [2] - 493:2, 493:4
**DDEPUTY** [1] - 265:11
**DDS** [1] - 355:5
**deadline** [1] - 462:24
**deal** [9] - 267:12, 283:13, 400:7, 422:25, 432:2, 455:14, 457:8, 521:12, 521:13
**dealer** [1] - 528:15
**dealers** [1] - 528:17
**dealing** [2] - 414:16, 481:16
**deals** [2] - 266:17, 507:19

**December** [5] - 450:21, 534:5, 534:17, 535:19, 536:12
**decide** [2] - 270:5, 312:14
**decided** [2] - 414:7, 469:2
**decimal** [1] - 506:16
**decision** [2] - 542:3, 542:7
**decisions** [3] - 269:21, 400:5
**deck** [4] - 266:25, 525:22, 526:6, 527:14
**declare** [2] - 336:8, 338:18
**decline** [1] - 537:18
**decreasing** [1] - 344:16
**deduct** [1] - 440:14
**deep** [1] - 464:5
**default** [1] - 314:2
**defaulted** [3] - 349:10, 349:15, 351:18
**defaulting** [1] - 350:2
**Defendant** [3] - 448:24, 449:10, 453:24
**Defendants** [2] - 264:9, 265:8
**Defendants'** [26] - 289:20, 290:9, 290:16, 292:2, 305:1, 305:17, 306:20, 309:9, 309:11, 311:19, 311:24, 312:5, 313:16, 313:19, 315:15, 316:8, 316:17, 318:2, 318:5, 319:8, 324:18, 326:19, 414:21, 414:22, 449:21, 450:20
**defends** [1] - 531:7
**defer** [1] - 542:21
**define** [8] - 352:16, 395:3, 439:20, 440:7, 440:11, 440:19, 493:4, 512:4
**defined** [9] - 343:6, 354:13, 354:15, 354:18, 408:24, 413:12, 414:10, 493:23, 516:13
**defines** [1] - 341:13
**defining** [2] - 353:3, 440:12

**definitely** [1] - 492:20
**definition** [7] - 324:13, 341:22, 343:17, 345:12, 346:5, 440:8, 470:24
**definitions** [2] - 335:2, 346:9
**degree** [7] - 288:10, 288:14, 409:3, 409:5, 446:17, 446:19
**degrees** [1] - 446:15
**DELAWARE** [1] - 264:2
**Delaware** [1] - 264:11
**deliberating** [1] - 549:17
**delivery** [3] - 438:17, 438:21, 545:5
**delved** [1] - 468:17
**demonstrate** [2] - 311:13, 379:7
**demonstrated** [2] - 311:12, 377:6
**demonstration** [1] - 322:14
**demonstratives** [1] - 266:19
**DENNIS** [1] - 264:1
**Dennis** [3] - 435:13, 435:20, 435:21
**dense** [1] - 378:22
**department** [1] - 432:17
**departments** [1] - 432:8
**deposed** [1] - 529:15
**deposition** [35] - 266:7, 305:14, 310:22, 311:1, 344:7, 344:13, 344:21, 359:4, 430:2, 431:7, 468:19, 483:20, 487:16, 488:17, 491:23, 516:25, 517:3, 518:11, 520:18, 520:20, 520:24, 524:4, 524:8, 524:10, 525:10, 529:12, 535:5, 535:7, 535:8, 538:11, 544:5, 544:23, 546:17, 546:24, 551:23
**depositions** [9] - 292:19, 320:14, 334:7, 334:11, 334:17, 334:20, 343:20, 358:9,

449:14
**DEPUTY** [14] - 271:24, 272:1, 272:12, 272:17, 279:17, 323:8, 323:13, 333:4, 333:6, 429:21, 429:23, 445:13, 505:20, 553:8
**derivative** [2] - 366:1, 366:2
**derivatives** [10] - 308:2, 308:7, 311:8, 311:10, 363:19, 363:21, 364:12, 365:21, 366:7, 367:17
**deriving** [1] - 464:3
**describe** [19] - 274:5, 274:21, 280:3, 280:21, 286:5, 286:16, 286:18, 288:4, 292:2, 302:7, 309:14, 313:25, 316:20, 321:12, 321:15, 330:17, 352:11, 431:25, 453:5
**described** [4] - 310:20, 313:19, 411:16, 450:10
**describes** [4] - 302:5, 310:16, 413:24, 414:1
**description** [1] - 352:1
**descriptive** [2] - 408:18, 408:19
**Design** [1] - 278:19
**design** [36] - 274:11, 275:19, 277:13, 277:24, 278:6, 278:12, 278:23, 279:9, 279:11, 279:15, 280:9, 281:19, 282:5, 282:12, 316:14, 316:21, 317:10, 317:13, 318:3, 318:20, 352:13, 406:6, 406:7, 406:14, 406:22, 407:7, 407:8, 407:11, 407:13, 407:15, 408:2, 408:3, 409:17, 482:16
**designed** [9] - 277:3, 280:8, 280:16, 281:1, 329:1, 329:5, 407:25, 419:5,

435:21
**designer** [4] - 409:16, 419:5, 419:6, 435:17
**designing** [4] - 275:14, 279:9, 352:9, 353:15
**designs** [2] - 279:2, 285:16
**desist** [2] - 547:6, 547:11
**despite** [2] - 420:18, 527:5
**detail** [6] - 286:17, 292:1, 302:6, 321:12, 350:5, 401:7
**details** [2] - 432:20, 529:24
**determination** [8] - 309:15, 384:3, 386:4, 387:16, 390:7, 391:13, 397:16, 402:2
**determine** [14] - 305:1, 305:11, 321:1, 328:12, 329:4, 384:13, 384:22, 389:23, 395:8, 397:16, 401:22, 442:24, 450:13, 539:23
**determined** [16] - 312:15, 312:23, 329:15, 339:16, 339:18, 340:20, 341:9, 341:15, 342:23, 353:6, 389:16, 391:12, 418:17, 452:7, 456:13, 475:7
**determines** [1] - 407:6
**determining** [2] - 384:18, 478:25
**develop** [2] - 281:19, 309:20
**developed** [1] - 281:12
**developer** [1] - 353:2
**developing** [5] - 340:7, 420:7, 491:16, 492:2, 492:10
**develops** [1] - 404:23
**device** [21] - 286:11, 302:16, 302:17, 302:21, 303:8, 304:14, 305:18, 307:6, 311:21, 327:23, 328:7, 328:18, 328:22, 330:21, 330:24,

331:11, 401:9, 401:10, 402:14, 405:2
**devices** [2] - 312:11, 312:13
**die** [1] - 415:11
**Diego** [3] - 277:11, 277:12, 277:17
**dies** [1] - 345:25
**differ** [2] - 499:3
**difference** [13] - 269:19, 282:24, 319:21, 436:8, 437:3, 437:5, 437:7, 465:2, 465:6, 465:14, 475:14, 480:12, 480:14
**differences** [4] - 420:21, 441:25, 465:1, 476:13
**different** [53] - 267:23, 290:3, 290:6, 295:18, 301:20, 326:18, 327:1, 327:3, 346:1, 351:15, 353:17, 353:18, 364:10, 364:12, 365:10, 365:18, 366:1, 366:6, 367:17, 367:21, 387:21, 396:20, 408:8, 414:18, 415:21, 416:11, 416:14, 418:18, 419:14, 419:15, 423:25, 437:1, 440:8, 455:9, 465:17, 470:5, 472:5, 475:18, 477:24, 479:11, 482:15, 482:24, 484:2, 484:4, 484:7, 485:10, 499:3, 499:6, 513:6, 541:13, 541:14
**differently** [1] - 513:6
**difficult** [4] - 378:25, 465:19, 466:2, 526:10
**difficulties** [1] - 340:2
**difficulty** [2] - 297:16, 478:15
**dimensional** [1] - 293:12
**dimensioned** [1] - 351:6
**dimensioning** [1] - 358:2
**dimensions** [7] - 293:20, 294:3,

294:7, 309:24, 351:5, 358:17, 418:2
**dioxide** [1] - 375:8
**DIRECT** [2] - 273:8, 445:20
**direct** [13] - 268:7, 270:19, 405:4, 423:20, 460:7, 461:10, 488:1, 488:3, 507:19, 507:20, 509:2, 509:21, 527:21
**direction** [2] - 305:7, 356:12
**directional** [2] - 308:17, 308:23
**directions** [1] - 416:25
**directly** [14] - 269:11, 347:18, 350:10, 350:11, 351:11, 352:3, 352:4, 352:11, 415:1, 432:9, 476:11, 507:20, 551:8
**director** [3] - 431:24, 432:1, 446:22
**disagree** [2] - 476:3, 478:6
**disclosed** [2] - 271:12, 286:19
**discloses** [6] - 331:9, 331:14, 331:21, 331:23, 332:8, 332:9
**disclosing** [1] - 271:6
**disconnect** [1] - 536:14
**discount** [15] - 270:25, 460:8, 463:12, 495:6, 501:2, 501:22, 501:25, 508:18, 508:22, 509:5, 509:16, 542:18, 542:23
**discounted** [1] - 502:1
**discounting** [3] - 502:7, 502:25, 507:21
**discounts** [17] - 270:20, 463:8, 463:15, 463:24, 463:25, 464:5, 502:10, 502:18, 507:17, 508:4, 508:7, 508:25, 509:15, 509:21, 509:25, 510:2
**discrepancy** [2] - 485:13, 485:18
**discs** [1] - 347:16
**discuss** [5] - 271:13,

289:9, 346:24, 346:25, 525:23

**discussed** [17] - 316:14, 328:10, 347:24, 365:21, 366:23, 395:20, 395:22, 416:16, 417:11, 480:20, 491:13, 491:23, 502:17, 506:21, 508:16, 530:8

**discusses** [1] - 380:15

**discussing** [3] - 370:16, 373:12, 525:13

**discussion** [10] - 304:13, 307:16, 316:5, 349:20, 350:19, 350:20, 395:7, 415:3, 417:14, 437:22

**discussions** [5] - 397:9, 418:11, 450:7, 463:19, 531:17

**displaying** [1] - 269:24

**disposed** [2] - 328:2, 330:23

**dispositive** [1] - 301:23

**dispute** [3] - 503:16, 514:23, 515:11

**dissimilarities** [1] - 464:15

**distances** [1] - 419:7

**distinction** [1] - 478:3

**distributing** [1] - 463:11

**distribution** [12] - 318:4, 406:15, 408:5, 408:9, 408:10, 408:12, 408:14, 408:15, 408:22, 409:14, 409:17

**distributor** [32] - 433:11, 434:12, 437:13, 437:16, 438:17, 439:1, 439:19, 440:2, 440:22, 440:25, 441:6, 441:11, 460:8, 460:9, 460:10, 471:17, 471:21, 486:5, 501:3, 501:21, 502:1, 505:1, 505:7, 506:19, 528:4, 542:4, 542:5,

542:13, 542:20, 542:22, 542:25, 545:5

**distributors** [12] - 433:13, 441:5, 441:19, 441:24, 442:1, 463:9, 463:12, 504:2, 509:2, 509:5, 542:15

**District** [2] - 448:6, 553:14

**DISTRICT** [2] - 264:1, 264:2

**disturbance** [2] - 308:12, 323:18

**disturbed** [6] - 301:16, 308:6, 308:11, 308:19, 321:20, 413:1

**ditch** [1] - 399:6

**diverge** [2] - 321:10, 325:6

**divergence** [1] - 420:9

**divergent** [2] - 325:18, 325:20

**divert** [1] - 325:19

**divided** [2] - 478:13, 506:15

**division** [1] - 278:3

**doc** [1] - 443:1

**document** [29] - 268:20, 300:6, 306:1, 307:1, 319:15, 335:21, 338:8, 356:2, 380:21, 382:8, 433:1, 433:2, 433:7, 433:14, 433:19, 436:3, 442:4, 443:1, 443:2, 488:9, 507:24, 509:7, 509:8, 509:9, 527:3, 537:3, 537:4, 539:25, 551:10

**documents** [17] - 268:6, 268:8, 382:6, 382:7, 382:8, 433:4, 433:16, 433:25, 434:5, 449:11, 449:17, 509:10, 509:12, 510:24, 531:20, 551:11

**dog** [1] - 428:1

**dollar** [2] - 459:6, 466:14

**dollar's** [1] - 459:11

**dollars** [9] - 442:21, 466:4, 466:23, 466:25, 479:8, 481:3, 494:2, 494:5,

512:9

**done** [22] - 270:19, 285:3, 350:11, 352:7, 393:22, 422:19, 423:23, 423:25, 424:2, 434:15, 443:5, 443:8, 443:11, 466:5, 476:3, 488:25, 497:24, 498:22, 499:15, 512:23, 534:23, 548:23

**door** [1] - 275:19

**DORRONDA** [1] - 265:3

**dot** [3] - 336:16, 374:1

**double** [2] - 320:10, 487:21, 526:7

**double-check** [3] - 320:10, 487:21, 526:7

**doubt** [2] - 391:22, 391:24

**down** [42] - 275:19, 283:10, 283:12, 302:1, 307:16, 315:2, 315:4, 317:12, 322:10, 324:25, 333:7, 343:8, 355:3, 361:7, 415:11, 417:11, 417:12, 423:17, 428:20, 429:7, 449:6, 462:5, 463:22, 465:10, 473:4, 491:15, 501:3, 507:13, 511:17, 511:19, 513:14, 514:7, 514:21, 517:10, 531:9, 536:18, 536:22, 539:18, 541:22, 547:22, 548:21

**downhill** [1] - 398:4

**Dr** [40] - 265:18, 265:21, 266:17, 267:20, 268:9, 268:20, 270:6, 271:5, 300:9, 310:6, 311:9, 319:18, 321:5, 324:14, 339:4, 340:17, 349:1, 349:4, 349:15, 349:20, 350:22, 353:21, 353:23, 359:24, 359:25, 361:12, 361:13, 385:13,

429:13, 445:10, 486:16, 500:23, 507:10, 511:9, 513:2, 525:4, 538:3, 548:20, 549:23, 550:23

**drag** [5] - 281:21, 282:21, 282:23, 322:8, 322:9

**draw** [2] - 418:25, 547:14

**drawing** [2] - 360:12, 419:6

**drawings** [9] - 292:6, 292:10, 292:11, 292:25, 293:12, 316:3, 418:2

**draws** [1] - 479:5

**drew** [1] - 466:24

**drill** [1] - 276:7

**drilling** [2] - 276:6, 276:8

**drive** [2] - 405:6, 405:7

**drives** [2] - 277:22, 463:19

**driving** [2] - 399:5, 481:6

**drop** [4] - 512:18, 512:19, 527:19, 528:15

**dropped** [1] - 278:8

**drove** [2] - 459:10, 530:16

**DTX** [12] - 335:17, 370:18, 426:9, 430:8, 430:13, 431:1, 520:24, 525:12, 528:9, 529:13

**dually** [1] - 510:16

**Dubai** [1] - 447:7

**duck** [3] - 309:5, 309:6

**duct** [1] - 303:16

**ducted** [2] - 315:24, 327:13

**due** [4] - 448:22, 450:15, 463:12

**dues** [2] - 284:6, 284:7

**Duffty** [2] - 371:1, 371:4

**duly** [2] - 272:23, 445:18

**DuPont** [1] - 283:2

**during** [12] - 266:10, 267:14, 297:3, 423:20, 474:13, 523:1, 523:3, 528:25, 531:23, 535:8, 537:1, 537:9

**duties** [1] - 431:25

**dynamic** [29] - 321:7, 341:16, 343:3, 343:6, 343:7, 343:21, 344:14, 344:17, 344:25, 345:12, 346:6, 346:24, 347:1, 347:6, 368:14, 370:6, 370:10, 371:11, 371:22, 373:22, 380:9, 412:22, 414:23, 414:24, 421:10, 421:22, 421:23, 422:25

**Dynamic** [2] - 371:17, 371:18

**dynamically** [8] - 343:7, 345:25, 346:17, 369:17, 370:3, 373:18, 374:10, 414:6

**dynamics** [2] - 288:15, 310:10

---

## E

**E-Takuma** [1] - 444:12

**eagles** [1] - 426:14

**Earl** [1] - 276:4

**early** [2] - 466:18, 484:17

**earn** [3] - 513:25, 514:16, 545:21

**earned** [3] - 446:15, 446:17, 446:19

**earns** [2] - 515:12, 542:21

**easier** [3] - 295:20, 315:21, 323:14

**easily** [3] - 293:16, 418:1, 418:5

**easy** [3] - 369:7, 378:24, 424:12

**economic** [5] - 446:2, 446:25, 447:20, 455:23, 457:9

**economics** [5] - 269:20, 446:17, 446:20, 448:14, 456:5

**economist** [3] - 446:2, 458:2, 501:15

**economists** [1] - 457:12

**edge** [13] - 317:23, 317:24, 318:25, 319:1, 319:2, 319:3, 319:5, 319:6, 319:7, 410:18, 411:7

**edges** [1] - 410:23
**Edgewater** [1] - 273:16
**educational** [2] - 274:21, 446:13
**effect** [7] - 271:8, 271:9, 376:17, 380:5, 383:22, 479:18, 513:10
**effective** [2] - 478:10, 478:17
**effects** [27] - 324:2, 326:16, 374:19, 374:20, 375:5, 375:10, 376:11, 376:15, 376:16, 376:17, 377:3, 378:6, 378:13, 378:16, 378:19, 378:21, 378:22, 379:1, 379:5, 380:17, 383:4, 423:18, 424:10, 425:7, 425:12, 425:20
**effort** [2] - 281:19, 352:3
**eFoil** [50] - 353:16, 362:25, 369:19, 376:6, 376:10, 379:12, 379:14, 384:1, 384:3, 389:13, 395:9, 396:7, 402:10, 435:18, 435:22, 437:20, 438:6, 439:17, 442:13, 444:12, 457:10, 457:18, 460:3, 460:5, 460:6, 460:9, 460:11, 460:13, 462:4, 463:7, 463:13, 474:7, 475:3, 477:23, 478:1, 484:2, 485:1, 485:11, 491:17, 492:10, 502:6, 517:7, 528:4, 538:23, 540:17, 544:13
**eFoil's** [2] - 383:14, 444:13
**eFoils** [43] - 346:11, 346:17, 374:6, 374:10, 376:21, 379:8, 379:18, 389:17, 395:23, 401:4, 403:13, 405:9, 442:5, 442:9, 443:18, 443:21,

453:9, 453:11, 458:17, 459:6, 461:17, 462:2, 470:9, 471:14, 471:25, 472:2, 473:2, 473:12, 475:10, 475:11, 475:14, 480:17, 485:2, 487:9, 494:24, 495:1, 504:1, 517:13, 527:23
**eigenvalue** [29] - 321:8, 325:1, 354:9, 354:10, 368:16, 369:3, 369:8, 369:15, 369:24, 372:19, 373:4, 374:5, 374:12, 374:13, 375:5, 375:6, 375:18, 375:24, 376:6, 377:17, 378:18, 420:2, 420:6, 420:14, 420:22, 423:8, 423:11, 423:14, 423:16
**eigenvalues** [4] - 372:15, 375:14, 375:19, 377:22
**eight** [8] - 394:3, 394:8, 394:9, 394:11, 394:23, 394:24, 503:25, 513:14
**eight-second** [1] - 394:11
**eights** [1] - 282:23
**either** [13] - 285:20, 298:13, 302:9, 361:9, 415:1, 444:22, 483:14, 501:8, 507:8, 510:1, 513:11, 529:9
**Electric** [1] - 471:24
**electric** [5] - 315:23, 316:5, 327:12, 405:1, 405:20
**electrical** [3] - 404:25, 405:2, 405:3
**electrically** [2] - 286:21, 303:12
**electronically** [1] - 549:8
**electronics** [1] - 550:12
**element** [25] - 297:7, 297:10, 297:15, 297:21, 299:11, 299:16, 304:12,

307:16, 309:9, 310:19, 311:22, 314:8, 320:12, 322:25, 328:4, 328:5, 329:23, 330:2, 330:14, 331:9, 331:18, 332:8, 339:3, 349:19, 350:9
**elements** [19] - 289:2, 289:3, 289:5, 290:17, 291:17, 297:4, 299:24, 316:19, 318:3, 318:5, 318:8, 318:14, 318:16, 320:9, 326:21, 330:15, 334:24, 339:2
**Elliott** [1] - 278:19
**elongated** [3] - 302:22, 302:24
**email** [32] - 268:16, 306:15, 306:16, 433:10, 433:11, 433:24, 434:1, 434:7, 434:10, 434:13, 434:18, 435:2, 445:1, 445:6, 459:19, 460:15, 460:21, 460:25, 461:2, 461:3, 461:4, 481:4, 496:6, 501:1, 508:15, 509:1, 509:18, 513:16, 513:17, 551:8
**emails** [1] - 284:9
**embarked** [1] - 279:13
**emerge** [1] - 383:9
**Emeryville** [1] - 447:3
**employed** [4] - 273:18, 273:19, 275:11, 431:17
**employee** [7] - 432:18, 432:24, 433:6, 434:8, 450:8
**employees** [2] - 434:14, 449:15
**employment** [2] - 274:15, 447:10
**empty** [1] - 424:13
**enabled** [1] - 289:7
**encountered** [2] - 349:23, 352:23
**end** [28] - 296:14, 319:5, 328:17, 328:19, 328:25, 331:9, 331:10, 331:11, 331:15, 331:19, 364:22,

365:1, 366:19, 419:25, 438:23, 441:17, 441:21, 452:3, 459:9, 460:10, 461:11, 480:22, 486:5, 507:20, 535:23, 551:15
**ended** [3] - 398:5, 466:10, 467:2
**ending** [6] - 492:23, 510:6, 518:23, 521:8, 526:9, 532:25
**energy** [11] - 275:18, 278:15, 278:16, 286:12, 303:13, 303:15, 422:7, 422:9, 422:12, 425:6
**engaged** [1] - 274:14
**engineer** [9] - 275:3, 275:4, 275:5, 275:6, 275:7, 276:4, 277:12, 277:13, 382:10
**Engineering** [7] - 274:24, 276:13, 276:17, 276:23, 277:5, 277:8, 277:10
**engineering** [22] - 274:25, 275:16, 277:1, 278:20, 288:10, 288:14, 292:4, 293:12, 316:3, 366:20, 379:24, 380:12, 381:23, 382:17, 382:24, 384:19, 389:3, 407:22
**Engineers** [2] - 283:19, 284:1
**engineers** [4] - 335:16, 340:14, 341:18, 369:11
**England** [1] - 276:16
**English** [1] - 435:13
**enhance** [1] - 383:19
**enjoy** [1] - 486:5
**enlarge** [1] - 410:8
**enormously** [1] - 278:14
**ensure** [2] - 416:3, 417:4
**entered** [8] - 270:3, 481:11, 492:8, 492:13, 493:2, 495:22, 496:6, 497:19
**entering** [5] - 272:5, 333:9, 430:22, 506:2, 525:7

**enthusiasts** [1] - 283:6
**entire** [7] - 296:25, 313:7, 510:10, 510:12, 511:25, 515:22, 549:11
**entirety** [1] - 400:11
**entities** [1] - 432:12
**entry** [3] - 511:13, 511:15, 511:16
**EPP** [1] - 436:13
**equal** [1] - 454:22
**equation** [1] - 424:3
**equilibriium** [1] - 395:16
**equilibrium** [4] - 343:9, 345:4, 387:11, 396:4
**equipment** [3] - 277:18, 303:14, 375:2
**Erik** [2] - 528:25, 529:2
**errata** [2] - 535:9, 535:11
**erroneous** [2] - 477:8, 487:9
**error** [5] - 349:10, 349:23, 351:14, 352:23, 352:24
**especially** [3] - 320:15, 320:25, 441:5
**ESQUIRE** [10] - 264:17, 264:20, 264:20, 264:21, 265:3, 265:3, 265:6, 265:6, 265:7, 265:7
**essence** [1] - 501:25
**essential** [1] - 359:13
**essentially** [23] - 292:5, 292:10, 292:25, 293:10, 302:4, 384:24, 387:8, 388:22, 426:7, 452:1, 457:22, 458:4, 459:23, 464:6, 468:2, 471:18, 478:23, 481:13, 484:3, 491:25, 492:8, 520:6, 540:13
**EST** [1] - 534:7
**establish** [1] - 473:19
**established** [4] - 431:21, 456:3, 494:25, 495:2
**estimate** [11] - 311:4, 375:17, 375:18, 375:21, 421:6,

421:8, 421:16,
443:20, 443:22,
552:18
**estimated** [5] - 444:2,
444:13, 444:16,
444:19, 450:18
**estimation** [2] -
443:14, 443:17
**Europe** [1] - 441:8
**evaluate** [3] - 271:7,
383:22, 450:24
**evaluating** [1] - 449:3
**evaluation** [2] - 282:2,
451:4
**eve** [3] - 454:14,
469:14, 546:15
**evening** [1] - 549:20
**event** [1] - 551:16
**eventually** [14] -
321:14, 322:2,
326:2, 342:11,
342:15, 343:1,
345:25, 413:4,
414:25, 415:7,
415:11, 473:4,
549:16, 551:12
**Eventually** [1] - 345:2
**evicted** [1] - 548:3
**evidence** [20] -
396:22, 396:24,
397:1, 397:7,
397:11, 430:5,
431:2, 480:19,
481:15, 515:4,
515:10, 529:5,
530:11, 530:23,
532:10, 532:20,
547:9, 549:12,
551:20, 552:3
**exact** [1] - 460:20
**exactly** [22] - 267:19,
282:9, 301:22,
328:13, 330:12,
340:15, 354:24,
375:3, 395:20,
404:4, 409:21,
409:23, 413:14,
475:12, 480:10,
481:5, 492:12,
496:25, 498:17,
524:1, 540:2, 540:22
**exam** [1] - 392:20
**examination** [4] -
332:23, 548:10,
548:16, 552:23
**EXAMINATION** [6] -
273:8, 333:15,
411:25, 445:20,
486:14, 538:1
**examined** [4] -

272:23, 289:25,
350:4, 445:18
**example** [16] - 282:10,
312:1, 356:13,
379:3, 379:4, 379:5,
403:1, 432:5, 447:6,
447:21, 471:11,
482:16, 515:20,
528:23, 535:25,
548:2
**Excel** [3] - 347:18,
347:19, 540:1
**except** [5] - 283:7,
300:20, 423:24,
423:25, 510:16
**exception** [1] - 269:16
**excerpts** [2] - 390:1,
391:16
**exchange** [4] -
309:19, 413:14,
451:21, 459:19
**exciting** [1] - 430:2
**excluded** [1] - 490:13
**excludes** [1] - 488:25
**exclusive** [9] - 441:6,
458:19, 470:19,
470:20, 470:21,
470:25, 471:1,
510:12
**exclusively** [1] -
458:22
**excursion** [1] - 279:1
**excuse** [6] - 307:18,
313:12, 331:8,
349:12, 385:18,
408:9
**executed** [5] - 457:1,
491:16, 492:1,
492:9, 497:9
**executive** [4] - 459:19,
459:20, 461:3, 461:4
**executives** [1] -
449:15
**exercise** [1] - 481:18
**exhibit** [4] - 268:8,
268:19, 488:5,
551:20
**Exhibit** [9] - 356:4,
358:11, 358:14,
358:16, 431:1,
435:25, 534:2,
536:8, 552:2
**Exhibition** [1] - 285:2
**exhibits** [2] - 487:22,
510:11
**exist** [5] - 378:11,
404:6, 404:18,
468:24, 469:23
**existed** [2] - 404:15
**existing** [1] - 274:9

**exists** [1] - 404:13
**expand** [1] - 336:17
**expect** [6] - 270:18,
455:10, 481:3,
509:19, 550:6, 552:7
**expectation** [2] -
513:20, 513:23
**expected** [2] - 513:25,
514:16
**expecting** [1] - 508:7
**expenses** [1] - 439:11
**expensive** [1] - 467:5
**experience** [10] -
280:22, 282:15,
285:11, 288:11,
288:12, 288:14,
288:15, 351:21,
529:6, 529:7
**experienced** [4] -
398:16, 437:10,
543:9, 543:11
**experiment** [1] - 350:8
**expert** [19] - 274:16,
287:20, 334:23,
348:21, 361:13,
381:1, 417:23,
418:5, 448:12,
448:14, 448:24,
449:20, 449:21,
450:25, 454:5,
487:2, 499:1, 536:3
**expertise** [2] - 290:15,
291:14
**experts** [5] - 269:21,
349:1, 449:23,
449:24, 550:22
**explain** [32] - 303:11,
343:24, 346:22,
349:24, 350:7,
359:10, 359:12,
359:16, 360:10,
360:21, 361:9,
368:2, 413:16,
415:24, 415:25,
416:1, 418:15,
451:11, 457:25,
458:20, 460:22,
464:14, 476:25,
477:15, 480:11,
482:5, 482:6, 502:6,
502:13, 502:14,
503:8, 509:17
**explained** [8] - 329:9,
397:18, 406:23,
407:14, 479:9,
502:24, 512:14,
527:20
**explains** [1] - 534:11
**explanation** [2] -
351:8, 368:3

**explanations** [1] -
368:9
**explicit** [1] - 294:7
**explorer** [1] - 290:2
**Explorer** [11] - 355:20,
356:6, 356:22,
357:4, 357:15,
358:13, 359:19,
373:5, 436:22,
437:5, 437:8
**exponentially** [5] -
370:6, 370:8,
371:21, 372:5, 372:8
**expressed** [1] - 308:2
**extensive** [2] - 316:5,
321:2
**extent** [2] - 268:12,
286:9
**extra** [2] - 487:9,
488:21
**extremely** [1] - 323:23
**eyes** [2] - 421:15,
426:7

**F**

**faces** [1] - 429:17
**fact** [29] - 308:15,
311:21, 311:23,
332:4, 406:19,
458:9, 466:5,
466:10, 473:9,
477:3, 484:21,
486:2, 491:15,
492:16, 509:18,
512:20, 512:23,
513:17, 522:10,
522:20, 528:3,
528:15, 530:21,
531:4, 531:5, 535:3,
545:1
**factor** [3] - 474:15,
474:23, 516:14
**factors** [18] - 455:7,
455:9, 455:14,
455:18, 455:19,
455:24, 456:4,
456:5, 456:6,
456:10, 456:13,
456:17, 456:25,
457:8, 457:9,
472:11, 472:17,
472:19
**factory** [4] - 439:9,
439:10, 439:11,
516:15
**factory's** [1] - 439:8
**facts** [1] - 471:7
**failed** [1] - 301:19
**fair** [8] - 302:3,

319:11, 392:5,
392:7, 427:17,
493:25, 501:12,
522:18
**fairly** [4] - 379:18,
452:24, 464:7,
484:17
**fairness** [1] - 549:15
**falling** [1] - 396:5
**falls** [1] - 416:25
**familiar** [5] - 316:23,
373:2, 380:3, 380:4,
521:16, 528:7
**far** [11] - 278:9, 308:4,
378:11, 397:24,
398:1, 435:23,
441:2, 475:3,
493:16, 535:10
**FARNAN** [1] - 265:3
**fashion** [1] - 267:18
**fast** [6] - 277:22,
280:14, 280:16,
311:15, 312:16
**FAST** [1] - 370:15
**fat** [3] - 428:10,
428:11, 428:12
**fault** [1] - 399:7
**favorite** [1] - 413:23
**features** [3] - 482:10,
483:12, 483:13
**February** [1] - 457:15
**feed** [1] - 350:22
**feet** [9] - 304:20,
354:6, 355:16,
357:1, 359:7, 359:8,
359:13, 359:17,
398:23
**fell** [1] - 396:18
**fellow** [3] - 278:21,
283:18, 549:18
**felt** [1] - 468:5
**ferries** [4] - 277:23,
278:24, 278:25,
280:14
**ferry** [1] - 278:23
**few** [21] - 281:12,
284:20, 320:17,
341:25, 387:4,
387:24, 388:9,
395:12, 399:15,
403:6, 404:21,
412:2, 430:4,
430:10, 460:20,
493:12, 496:4,
496:5, 516:16,
526:4, 537:25
**few-month** [1] - 496:5
**fewer** [1] - 535:23
**fiber** [2] - 277:15,
277:18

**field** [2] - 288:10, 289:10
**figure** [6] - 281:5, 305:3, 350:5, 429:19, 457:6, 511:5
**figured** [1] - 471:21
**figuring** [1] - 446:4
**file** [8] - 292:12, 295:18, 362:6, 496:17, 523:17, 524:18, 525:1, 535:10
**filed** [8] - 432:12, 449:18, 462:22, 490:22, 540:9, 541:11, 541:13, 551:7
**files** [7] - 295:1, 361:17, 361:20, 362:3, 362:12, 362:21, 475:18
**filings** [1] - 449:17
**fill** [1] - 424:13
**film** [1] - 400:7
**fin** [1] - 281:12
**final** [9] - 265:20, 267:2, 290:4, 323:2, 484:12, 510:12, 511:4, 511:7, 551:1
**finally** [4] - 317:18, 343:8, 388:14, 426:1
**finance** [1] - 432:9
**financial** [5] - 432:8, 449:11, 450:5, 540:6, 541:6
**fine** [2] - 266:15, 323:15
**FINGER** [1] - 265:2
**finish** [4] - 552:15, 552:20, 552:23, 552:24
**finished** [1] - 550:1
**finishing** [1] - 447:12
**fins** [3] - 281:8, 281:9, 281:11
**firm** [10] - 275:14, 276:5, 276:13, 276:14, 276:24, 278:20, 280:5, 447:19, 447:20, 447:24
**firm's** [1] - 477:9
**first** [93] - 275:11, 283:3, 293:4, 300:25, 304:12, 306:4, 308:18, 314:1, 317:2, 320:16, 321:18, 335:19, 338:5, 340:24, 342:4,

342:16, 348:6, 348:11, 348:14, 350:9, 351:16, 353:3, 358:16, 367:22, 367:23, 367:24, 377:14, 379:22, 380:19, 384:15, 384:17, 390:24, 398:3, 410:8, 421:3, 422:23, 423:19, 426:12, 426:23, 430:1, 432:11, 432:13, 434:19, 434:20, 434:22, 434:24, 435:21, 438:5, 441:14, 444:21, 448:17, 450:11, 450:13, 450:19, 450:20, 451:9, 452:17, 454:12, 454:14, 457:11, 457:12, 460:24, 461:24, 462:1, 462:8, 468:15, 469:15, 476:11, 491:16, 491:17, 492:2, 492:9, 492:10, 492:19, 492:21, 496:5, 496:13, 504:3, 508:5, 511:13, 511:17, 512:13, 526:1, 546:9, 546:14, 546:15, 546:19, 547:1, 547:10, 550:10
**fish** [1] - 426:14
**fishing** [2] - 278:25, 280:9
**five** [11] - 282:23, 428:23, 447:22, 536:15, 536:18, 540:14, 540:16, 540:18, 540:22, 541:2
**five-eights** [1] - 282:23
**five-month** [4] - 536:15, 540:18, 540:22, 541:2
**fix** [2] - 274:11, 322:12
**fixed** [5] - 276:8, 328:18, 387:11, 387:25, 515:23
**fixedly** [3] - 328:24, 331:10, 331:15
**flag** [3] - 536:19, 540:5, 541:19

**flat** [1] - 349:10, 349:15, 350:2, 351:18, 502:5, 502:9, 502:24
**flawed** [1] - 477:13
**flaws** [2] - 477:14, 477:17
**fleet** [3] - 274:8, 274:12, 275:22
**flew** [1] - 421:23
**flight** [10] - 310:10, 313:7, 346:2, 354:18, 398:21, 413:21, 414:1, 425:13, 425:14, 425:15
**Flightboard** [2] - 471:9, 507:4
**flip** [2] - 427:8, 427:9
**Fliteboard** [83] - 267:6, 267:11, 269:10, 269:12, 269:13, 270:18, 270:23, 270:24, 444:12, 458:10, 458:22, 459:3, 459:11, 459:19, 460:25, 461:3, 461:5, 461:16, 461:21, 462:2, 463:18, 463:25, 464:4, 465:3, 465:15, 469:17, 470:3, 470:7, 470:8, 470:15, 471:1, 472:8, 476:16, 477:25, 478:4, 480:5, 480:13, 480:17, 480:24, 481:8, 481:11, 481:13, 485:11, 485:16, 493:9, 499:17, 499:20, 500:6, 502:4, 502:12, 502:17, 504:25, 505:6, 505:7, 506:18, 506:19, 506:23, 508:23, 509:22, 510:5, 511:10, 511:21, 512:8, 513:16, 518:14, 520:13, 522:1, 526:18, 526:22, 526:24, 527:4, 527:22, 530:6, 530:7, 530:8, 530:10, 531:7, 532:8, 532:14, 533:3, 533:5, 542:15

**Fliteboard's** [7] - 267:16, 268:11, 271:17, 444:16, 458:15, 470:6, 500:13
**Fliteboards** [2] - 480:16, 480:18
**float** [1] - 302:25
**floatation** [14] - 302:16, 302:17, 302:20, 303:8, 304:13, 305:18, 311:21, 327:23, 328:7, 328:18, 330:21, 330:24, 331:11, 401:9
**floating** [3] - 276:7, 276:8, 302:25
**floats** [1] - 302:18
**floor** [1] - 356:12
**Florida** [1] - 471:24
**flow** [2] - 317:7, 317:8
**fluid** [2] - 288:15, 421:9
**fly** [2] - 421:21, 426:14
**Flyer** [47] - 289:23, 289:24, 293:9, 294:11, 294:12, 306:5, 307:10, 314:2, 354:4, 354:5, 355:14, 355:15, 355:20, 356:6, 356:22, 357:4, 357:14, 358:13, 359:6, 359:8, 359:19, 373:5, 436:9, 436:10, 436:20, 436:25, 437:4, 437:21, 437:22, 437:24, 437:25, 438:7, 438:12, 438:13, 439:17, 485:20, 544:21
**flying** [4] - 413:22, 413:24, 421:19, 421:20
**FMC** [2] - 278:2, 278:18
**focus** [1] - 299:24
**focused** [3] - 304:12, 447:16, 462:7
**foil** [2] - 406:11, 419:2, 437:7, 443:13
**foiled** [1] - 419:2
**fold** [1] - 421:3
**folks** [1] - 281:23
**follow** [1] - 514:5
**following** [1] - 416:4
**follows** [2] - 272:24,

445:19
**Footnote** [3] - 488:4, 488:11, 534:11
**footnote** [1] - 488:15
**footnotes** [1] - 534:15
**FOR** [1] - 264:2
**force** [9] - 308:11, 308:20, 321:25, 322:8, 322:9, 323:19, 325:7, 425:13, 425:14
**forces** [3] - 279:10, 425:15, 425:19
**Forces** [1] - 273:20
**fore** [2] - 327:24, 330:21
**fore-aft** [2] - 327:24, 330:21
**foregoing** [2] - 336:9, 553:10
**foreign** [1] - 485:24
**forget** [3] - 301:22, 350:21, 357:3
**form** [3] - 449:11, 474:10, 520:8
**formal** [1] - 448:10
**format** [2] - 309:19, 309:23
**formed** [7] - 284:3, 334:23, 431:20, 435:5, 435:6, 435:7, 435:24
**formerly** [1] - 278:20
**formula** [1] - 452:25
**forth** [17] - 278:6, 290:1, 294:1, 323:21, 348:12, 378:24, 378:25, 424:12, 424:16, 425:4, 425:6, 448:24, 453:20, 455:9, 459:21, 459:23, 461:2
**fortunately** [1] - 549:2
**forward** [12] - 282:9, 283:8, 303:23, 304:3, 307:14, 317:21, 328:7, 331:5, 369:22, 398:1, 460:14, 550:20
**forwards** [1] - 308:12
**founded** [2] - 275:15, 276:24
**founder** [1] - 435:8, 435:11, 435:14
**four** [8] - 394:4, 394:10, 394:25, 444:9, 444:10, 447:17, 472:6

**fourth** [1] - 534:4
**fraction** [1] - 399:15
**frame** [1] - 293:23
**Francisco** [3] - 275:14, 276:5, 276:25
**Frank** [1] - 276:17
**frankly** [9] - 451:6, 463:15, 472:19, 479:25, 480:9, 484:9, 485:15, 524:12, 525:2
**free** [10] - 296:5, 374:17, 375:9, 376:18, 425:1, 425:2, 482:2, 482:3, 490:4, 490:6
**freighters** [1] - 279:1
**frequencies** [2] - 420:7, 420:10
**frequency** [1] - 405:19
**frequent** [1] - 413:20
**frequently** [2] - 285:12, 285:14
**fresh** [2] - 273:4, 273:5
**friction** [1] - 323:3
**Friday** [3] - 552:7, 552:12, 552:13
**friend** [1] - 277:20
**friends** [1] - 325:2
**front** [16] - 271:13, 282:20, 302:12, 317:19, 317:23, 319:1, 319:3, 319:6, 359:20, 398:5, 410:18, 410:22, 411:6, 448:7, 489:14, 533:23
**fugar** [5] - 376:17, 379:1, 379:5, 424:9, 424:19
**full** [8] - 272:12, 410:8, 431:14, 445:13, 454:18, 467:21, 524:20, 524:24
**full-time** [1] - 467:21
**fully** [1] - 352:18
**funded** [1] - 283:2
**funny** [1] - 419:12

**G**

**gadgets** [2] - 286:25
**gas** [1] - 275:22
**gear** [1] - 281:6
**gears** [3] - 363:4, 368:13, 383:24
**general** [7] - 369:3, 413:18, 448:16,

458:21, 473:2, 500:15, 502:2
**generally** [13] - 266:24, 286:16, 286:18, 292:2, 302:7, 302:15, 319:21, 332:22, 350:8, 374:21, 374:22, 444:6
**generate** [1] - 352:3
**generated** [4] - 352:5, 353:4, 353:9, 425:14
**generates** [2] - 353:9, 353:13
**generation** [2] - 436:11, 437:23
**geometry** [3] - 325:22, 362:5, 406:23
**Georgia** [5] - 453:18, 453:19, 455:6, 455:14, 456:13
**Georgia-Pacific** [4] - 453:19, 455:6, 455:14, 456:13
**GetFoil** [1] - 444:12
**GetFoil's** [1] - 444:19
**gifts** [1] - 535:25
**given** [15] - 287:14, 292:4, 294:7, 309:18, 361:23, 460:5, 460:13, 475:19, 477:9, 497:1, 497:14, 498:6, 498:8, 529:25, 541:3
**glad** [1] - 496:21
**glass** [2] - 277:15, 277:18
**glasses** [1] - 298:7
**gliders** [1] - 413:24
**globe** [1] - 515:22
**goal** [5] - 517:14, 517:18, 518:12, 518:13, 544:24
**Gorbachev** [1] - 283:10
**Government** [1] - 432:3
**governmental** [1] - 284:17
**Grace** [1] - 279:12
**gradually** [2] - 304:21, 304:22
**graduate** [1] - 447:13
**graft** [1] - 321:9
**grant** [1] - 521:24
**granted** [12] - 367:20, 495:7, 496:22, 497:1, 497:16, 497:21, 498:5,

498:6, 498:7, 498:9, 499:7
**granting** [2] - 497:3, 497:17
**graph** [2] - 325:16, 325:17
**graphically** [1] - 321:7
**graphs** [1] - 372:18
**gravities** [1] - 359:17
**gravity** [28] - 312:11, 312:13, 312:21, 353:17, 354:5, 354:11, 354:12, 354:15, 354:21, 354:25, 355:1, 355:16, 355:21, 356:10, 358:1, 358:23, 359:7, 359:13, 361:4, 361:7, 363:2, 363:6, 401:8, 401:14, 401:19, 418:12, 420:3
**gray** [3] - 526:18, 526:22, 526:25
**GRAY** [1] - 264:19
**great** [4] - 273:6, 274:14, 288:3, 354:9
**greater** [3] - 327:24, 330:22, 340:15
**greatly** [2] - 281:21, 308:6
**Greek** [3] - 325:5, 369:11, 373:11
**green** [1] - 469:12
**grew** [1] - 457:14
**Group** [4] - 278:19, 446:23, 447:2, 447:24
**group** [8] - 364:12, 365:18, 365:19, 365:20, 367:22, 367:23, 367:24, 485:25
**grow** [1] - 325:1
**growing** [1] - 527:1
**grows** [4] - 370:6, 371:21, 372:5, 372:8
**growth** [2] - 527:5, 527:7
**guaranteed** [1] - 465:7
**Guard** [15] - 273:19, 273:22, 273:23, 273:25, 274:3, 274:6, 274:9, 274:15, 277:3, 277:16, 280:18, 280:20, 281:15, 281:19, 285:21
**guess** [23] - 271:23,

287:4, 295:24, 321:11, 341:21, 363:17, 393:19, 395:12, 416:12, 440:10, 443:9, 443:10, 443:12, 493:4, 505:23, 509:8, 513:7, 518:1, 532:2, 536:16, 540:21, 550:13, 552:14
**guessing** [1] - 314:14
**guidance** [1] - 458:5
**guide** [2] - 477:6, 520:7
**Guralnick** [2] - 275:13, 275:14
**guy** [5] - 322:11, 393:20, 393:21, 428:10, 428:12
**gyroscope** [1] - 304:8

**H**

**half** [17] - 282:20, 282:21, 354:6, 355:16, 357:1, 359:7, 429:8, 429:9, 466:24, 468:12, 468:14, 468:20, 485:5, 493:6, 494:4, 504:3, 543:12
**halfway** [1] - 419:4
**hammer** [1] - 454:1
**hand** [5] - 306:6, 323:18, 337:16, 434:15, 507:23
**handle** [4] - 310:13, 310:15, 310:16, 483:4
**handled** [1] - 314:4
**hands** [1] - 385:25
**hang** [1] - 320:18
**happy** [4] - 496:1, 500:1, 502:14, 502:25, 504:17, 520:22, 524:6, 552:19
**Harbor** [1] - 279:12
**harbor** [1] - 280:14
**Harborside** [2] - 277:10, 277:19
**hard** [9] - 279:12, 323:3, 323:5, 323:11, 399:6, 399:7, 424:11, 480:9, 498:15
**harder** [2] - 424:16, 462:21
**hardy** [1] - 475:1

**HAUG** [1] - 265:5
**head** [4] - 449:8, 504:13, 512:6, 549:23
**headers** [1] - 521:21
**heading** [3] - 288:1, 371:17, 371:18
**headphones** [1] - 315:5
**headquarters** [1] - 447:3
**Healey** [4] - 433:10, 433:21, 434:9, 434:11
**hear** [8] - 303:1, 315:18, 323:5, 323:16, 333:21, 388:16, 475:24, 523:12
**heard** [20] - 278:15, 297:3, 343:25, 344:1, 388:8, 389:8, 449:23, 450:9, 451:10, 456:22, 456:24, 458:14, 464:9, 485:20, 487:6, 487:8, 515:20, 542:2, 543:25, 549:11
**hearing** [2] - 323:12, 403:20
**hearsay** [4] - 267:18, 269:15, 270:16, 270:17
**Heather** [1] - 553:13
**heavily** [2] - 424:18, 424:25
**heaviness** [1] - 425:1
**heavy** [3] - 278:14, 323:24, 427:22
**height** [1] - 304:23
**heights** [2] - 305:7, 354:11
**helium** [1] - 375:8
**help** [6] - 383:15, 434:17, 467:6, 479:11, 490:24, 491:8
**helpful** [3] - 271:14, 451:12, 455:12
**helping** [1] - 271:7
**helps** [2] - 521:19, 539:1
**hence** [2] - 308:21, 313:13
**hereby** [1] - 553:10
**herein** [4] - 272:22, 338:19, 381:12, 445:17
**hereto** [1] - 510:11

**HIGDON** [1] - 264:19
**high** [15] - 270:25, 274:18, 274:22, 277:21, 278:7, 288:12, 288:15, 313:7, 313:10, 379:19, 406:10, 440:24, 468:24, 477:18, 509:23
**high-speed** [3] - 274:18, 277:21, 278:7
**higher** [3] - 380:6, 486:2, 486:7
**highlight** [2] - 364:23, 507:25
**highlighted** [13] - 341:7, 341:25, 342:8, 402:20, 406:6, 417:3, 491:10, 508:6, 508:13, 509:7, 537:11, 537:16, 546:20
**highly** [2] - 325:18, 441:5
**hint** [1] - 426:3
**hints** [1] - 425:24
**hip** [4] - 354:19, 355:3, 355:6, 361:4
**hired** [1] - 278:3
**history** [4] - 275:10, 280:22, 496:17, 540:25
**hit** [1] - 494:19
**Hmm** [1] - 488:2
**hmm** [7] - 315:19, 322:13, 344:10, 363:23, 371:20, 389:22, 427:19
**hold** [4] - 268:13, 297:13, 438:4, 464:6
**holder** [1] - 547:21
**holding** [1] - 481:13
**home** [1] - 451:13
**Homeland** [1] - 274:1
**honest** [1] - 500:5
**Honor** [34] - 265:16, 266:17, 266:25, 269:9, 269:23, 269:25, 270:14, 270:21, 271:17, 271:19, 271:21, 272:25, 273:2, 287:9, 296:6, 298:6, 300:22, 307:18, 322:18, 411:22, 430:3, 431:6, 445:10, 486:12, 505:25, 506:7,

537:25, 543:16, 543:19, 549:24, 550:16, 551:24, 552:7, 553:4
**HONORABLE** [1] - 264:15
**Honorable** [1] - 265:12
**hooked** [1] - 513:8
**hope** [2] - 437:15, 552:22
**hopefully** [3] - 271:23, 475:5, 553:1
**hoping** [1] - 383:2
**horizontal** [1] - 373:10
**host** [1] - 449:5
**hour** [1] - 278:11
**house** [2] - 451:16, 479:2
**hull** [3] - 282:22, 283:7, 310:13
**human** [5] - 283:3, 354:12, 386:24, 439:9, 550:14
**hundred** [3] - 462:3, 537:16, 541:18
**hurt** [1] - 429:19
**hybrid** [2] - 282:18, 282:25
**hydrodynamic** [1] - 281:5
**Hydrofoil** [1] - 284:6
**hydrofoil** [39] - 278:17, 279:11, 279:15, 280:23, 282:7, 282:16, 282:18, 282:19, 282:25, 284:11, 287:7, 288:13, 288:16, 294:4, 302:7, 302:8, 302:10, 303:8, 310:15, 319:5, 319:6, 328:24, 329:21, 331:15, 331:16, 331:22, 331:25, 332:5, 339:15, 370:10, 371:14, 406:24, 407:16, 408:22, 410:17, 416:4, 424:21, 426:14, 437:7
**hydrofoil's** [1] - 319:3
**hydrofoil-oriented** [1] - 279:11
**hydrofoils** [15] - 278:13, 279:5, 279:6, 280:23, 280:24, 282:6,

283:8, 286:3, 286:8, 286:22, 289:10, 374:16, 406:11, 410:22, 411:6
**hydrofoils'** [1] - 337:4
**hypothetical** [53] - 267:5, 267:7, 453:14, 453:22, 454:3, 454:7, 455:1, 455:4, 455:25, 457:7, 457:21, 458:6, 458:18, 460:17, 462:10, 462:11, 464:17, 464:19, 464:20, 467:13, 467:16, 467:18, 468:16, 469:13, 469:15, 469:20, 470:2, 470:6, 470:24, 472:13, 474:4, 476:14, 479:19, 485:17, 490:9, 490:11, 490:13, 491:3, 493:3, 493:5, 493:7, 493:14, 512:16, 513:25, 514:8, 514:12, 522:7, 522:9, 523:11, 543:4, 543:6, 546:13, 547:19

---

# I

**ICE** [1] - 264:19
**idea** [3] - 347:11, 362:20, 507:16
**ideally** [2] - 458:7, 464:25
**identical** [2] - 293:2, 315:10
**identified** [1] - 364:7
**identifies** [2] - 358:19, 479:15
**identify** [1] - 479:16
**ignores** [2] - 484:21, 507:1
**III** [1] - 264:4
**Illinois** [2] - 446:18, 447:4
**illogical** [1] - 479:5
**illustrate** [1] - 270:10
**illustrates** [1] - 325:17
**illustrating** [1] - 325:16
**image** [4] - 357:9, 401:22, 402:1, 402:6
**imagine** [5] - 316:22, 332:23, 353:14,

456:10, 473:3
**immediately** [1] - 447:12
**impact** [5] - 290:4, 420:12, 479:17, 484:19, 543:21
**impacting** [1] - 420:15
**impede** [1] - 468:25
**implement** [1] - 289:9
**implication** [2] - 413:8, 416:13
**implied** [1] - 547:19
**implies** [2] - 400:24, 485:7
**imply** [1] - 400:25
**implying** [1] - 415:21
**importance** [1] - 470:18
**important** [28] - 310:13, 352:10, 357:6, 398:9, 434:3, 457:20, 459:2, 459:4, 464:13, 466:20, 467:8, 467:13, 472:14, 472:18, 473:13, 473:23, 476:2, 478:2, 479:13, 479:17, 481:7, 482:14, 482:15, 482:21, 486:18, 516:5, 549:14
**importantly** [3] - 462:7, 467:11, 470:7
**impossible** [2] - 444:15, 465:19
**impression** [1] - 539:20
**improperly** [1] - 398:11
**improve** [1] - 497:13
**IN** [1] - 264:1
**inaccurate** [3] - 478:20, 479:5, 504:19
**inappropriate** [4] - 302:10, 476:7, 476:20, 478:8
**INC** [2] - 264:4, 264:7
**inch** [1] - 397:25
**inches** [9] - 355:21, 355:23, 356:20, 356:22, 357:1, 359:19, 359:21, 418:20, 419:3
**include** [13] - 291:22, 318:19, 376:21, 394:21, 413:4, 414:22, 414:23, 436:12, 439:5,

474:10, 487:18, 516:10, 516:11
**included** [10] - 291:22, 295:12, 357:3, 417:8, 419:8, 438:25, 474:8, 474:11, 516:16, 521:12
**includes** [20] - 316:19, 319:23, 324:2, 330:2, 330:15, 331:18, 340:11, 340:13, 341:16, 342:9, 342:10, 348:18, 380:15, 432:3, 439:7, 488:24, 489:7, 489:8, 518:4
**including** [5] - 288:12, 294:3, 314:3, 447:5, 488:21
**inconsistency** [3] - 518:6, 534:20, 534:25
**inconsistent** [2] - 518:1, 541:10
**incorporated** [2] - 289:2, 289:5
**incorporates** [1] - 292:8
**incorrect** [4] - 393:6, 481:1, 489:2, 491:21
**incorrectly** [1] - 492:8
**incremental** [2] - 516:5, 516:7
**incur** [2] - 516:3, 543:1
**incurs** [1] - 516:6
**indeed** [2] - 343:20, 344:14
**independent** [1] - 432:10
**indicate** [5] - 423:20, 426:19, 506:23, 534:16, 547:11
**indicated** [2] - 376:21, 509:1
**indicates** [8] - 308:15, 351:3, 351:25, 373:18, 373:21, 374:1, 374:3, 376:7
**indicating** [3] - 370:6, 371:22, 376:1
**individual** [4] - 294:25, 400:12, 404:13, 404:14
**industry** [2] - 287:1, 450:4
**infer** [1] - 491:10, 508:9

**infinite** [1] - 374:14
**inflation** [10] - 512:21, 512:24, 513:4, 513:6, 513:10, 513:12, 543:9, 543:11, 543:15, 543:21
**info@waydoo.io** [1] - 306:17
**informal** [1] - 443:8
**information** [29] - 292:9, 292:16, 293:19, 311:5, 361:15, 362:9, 419:13, 435:19, 449:13, 449:16, 450:1, 450:2, 450:5, 454:19, 454:22, 455:10, 456:23, 457:4, 461:16, 467:17, 468:19, 472:3, 509:3, 511:5, 534:20, 536:25, 538:20, 541:14
**infringe** [1] - 482:13
**infringed** [6] - 448:18, 450:15, 454:17, 471:16, 523:14, 532:21
**infringement** [20] - 334:24, 346:16, 347:2, 347:5, 397:3, 397:11, 397:13, 412:17, 414:19, 414:21, 450:20, 453:10, 453:17, 454:14, 469:15, 486:19, 532:16, 532:18, 532:24, 533:10
**infringer** [2] - 524:18, 524:25
**infringing** [19] - 454:13, 476:25, 477:1, 477:2, 477:4, 477:5, 482:7, 482:8, 482:9, 482:15, 482:21, 482:22, 483:6, 483:10, 483:15, 519:2, 519:18, 528:1
**initial** [44] - 300:10, 301:8, 301:15, 307:25, 308:4, 320:5, 320:7, 321:13, 321:23, 321:24, 323:1, 323:17, 323:19, 324:18, 326:1, 326:4, 326:12,

337:4, 339:16, 339:18, 339:20, 340:2, 340:4, 340:6, 340:11, 340:13, 340:21, 341:10, 342:9, 342:21, 345:3, 345:15, 345:16, 348:18, 350:14, 352:4, 365:22, 365:23, 413:12, 420:4, 541:12
**initiated** [1] - 281:10
**innovation** [2] - 436:15, 436:17
**innovative** [1] - 441:2
**input** [8] - 361:17, 362:3, 362:21, 386:1, 387:22, 400:18, 422:7, 426:1
**inputs** [1] - 384:25, 513:6, 537:8
**inputted** [1] - 362:9
**inside** [1] - 304:8
**insides** [1] - 293:23
**insight** [1] - 511:3
**insisted** [1] - 532:8
**instability** [14] - 370:7, 371:22, 373:22, 374:2, 374:3, 376:1, 376:7, 377:6, 377:13, 378:17, 380:9, 421:20, 422:6, 423:21
**instance** [6] - 453:6, 454:3, 459:1, 474:6, 488:23, 528:7
**instances** [1] - 455:21
**instead** [3] - 282:8, 282:13, 314:17
**instructions** [1] - 551:2
**instructive** [1] - 491:3
**insufficiently** [1] - 321:22
**InteCap** [1] - 447:13
**intellectual** [12] - 432:4, 446:24, 447:15, 447:16, 451:24, 452:8, 452:10, 458:8, 465:11, 467:10, 482:2, 533:11
**INTELLIGENCE** [1] - 264:7
**intelligence** [1] - 431:18
**Intelligence** [1] - 306:14
**intense** [1] - 293:17

**intentionally** [1] - 399:3
**inter** [1] - 309:22
**interacting** [1] - 529:7
**interchangable** [1] - 338:1
**interchangeable** [4] - 337:19, 338:2, 339:1, 339:6
**interchangeably** [4] - 335:14, 337:9, 339:4, 339:11
**interchanged** [1] - 309:22
**interconnected** [2] - 328:25, 331:15
**interest** [2] - 279:4, 279:7
**interested** [1] - 343:12
**interesting** [3] - 275:17, 281:7, 287:8
**interestingly** [2] - 317:5, 426:13
**intermediate** [1] - 313:9
**internal** [4] - 443:9, 443:10, 443:14, 443:17
**International** [3] - 284:5, 285:2, 448:8
**international** [7] - 285:8, 354:14, 447:2, 447:7, 519:12, 519:14, 519:16
**interpretation** [1] - 339:9
**interpreted** [2] - 301:9, 320:4, 346:25
**interpreter** [1] - 550:13
**interpreting** [1] - 340:12
**interspersed** [1] - 391:18
**interview** [2] - 391:17
**intimidated** [1] - 532:20
**intimidation** [1] - 532:7
**intimidations** [1] - 531:23
**intractable** [1] - 374:17
**introduce** [2] - 273:12, 445:24
**introduced** [1] - 477:23
**introduces** [1] - 385:14

**invalid** [1] - 486:23
**invalidate** [1] - 499:11
**inventions** [1] - 286:19
**inventor** [1] - 286:1
**inventors** [1] - 456:1
**invest** [1] - 271:10
**invested** [1] - 269:17
**investigate** [1] - 274:11
**investigated** [1] - 499:8
**investment** [1] - 270:19
**investor** [3] - 472:4, 526:2, 526:6
**inviscate** [1] - 425:25
**involve** [2] - 363:1, 363:6
**involved** [14] - 274:8, 275:19, 285:20, 350:23, 374:18, 416:21, 416:23, 425:18, 432:7, 432:9, 450:5, 451:18, 451:25, 496:14
**involves** [1] - 375:4
**involving** [2] - 347:1, 547:20
**IP** [1] - 521:16
**ISO** [2] - 354:13, 355:1
**isolated** [1] - 391:21
**issue** [18] - 266:3, 266:6, 268:17, 269:24, 289:2, 289:4, 289:6, 300:10, 380:4, 434:23, 435:3, 444:22, 458:8, 495:22, 497:12, 529:20, 529:21, 551:15
**issued** [3] - 497:8, 497:11, 498:18
**issues** [13] - 265:17, 268:6, 271:19, 271:20, 289:15, 340:2, 420:11, 434:20, 434:21, 434:25, 475:17, 546:18, 547:3
**item** [5] - 302:20, 303:5, 404:13, 438:21, 551:19
**Item** [3] - 302:20, 519:6
**items** [4] - 404:8, 404:11, 404:14, 404:18

**iterations** [2] - 487:17, 541:11
**itself** [3] - 364:5, 418:19, 423:13

## J

**J-E-F-F-R-E-Y** [1] - 445:15
**Jack** [1] - 265:18
**January** [3] - 524:17, 524:25, 547:10
**JASON** [1] - 265:6
**Jeffrey** [2] - 445:15, 445:25
**JEFFREY** [1] - 445:17
**Jersey** [1] - 392:2
**Jie** [1] - 435:20
**job** [10] - 274:3, 276:2, 276:3, 282:17, 321:5, 431:25, 432:2, 434:4, 435:9, 467:25
**jobs** [2] - 279:8, 279:11
**John** [1] - 276:13
**joined** [2] - 284:3, 432:13
**joint** [7] - 276:12, 354:16, 354:19, 355:2, 355:3, 355:6
**Ju** [1] - 435:19
**judgment** [1] - 442:7
**July** [14] - 460:15, 466:12, 472:22, 478:21, 494:7, 494:19, 494:22, 504:2, 534:5, 534:17, 535:16, 535:19, 535:22, 540:8
**June** [8] - 374:18, 457:16, 461:25, 462:13, 466:12, 496:6, 497:23, 511:12
**jupothetical** [1] - 453:25
**juror** [1] - 296:13
**jurors** [1] - 549:18
**jury** [55] - 269:24, 270:13, 270:16, 271:6, 271:7, 271:12, 271:13, 272:2, 272:4, 272:5, 272:7, 272:18, 273:12, 295:23, 298:20, 332:16, 332:18, 332:19, 333:8, 333:9,

333:10, 372:15, 397:18, 418:15, 428:22, 428:24, 428:25, 429:17, 429:25, 430:22, 431:4, 445:24, 446:13, 447:9, 451:9, 457:25, 459:16, 489:5, 499:11, 505:16, 505:17, 505:24, 506:2, 506:3, 508:14, 509:13, 533:23, 533:24, 540:24, 548:23, 549:19, 549:21, 551:1, 551:14
**Jury** [1] - 264:13
**jury's** [1] - 469:8

## K

**Kanter** [4] - 267:25, 268:14, 269:7, 506:6
**KANTER** [61] - 265:6, 266:21, 267:24, 268:2, 268:5, 268:19, 268:22, 269:9, 269:15, 269:23, 270:15, 271:16, 486:12, 486:15, 490:12, 500:23, 500:25, 503:21, 503:24, 505:25, 506:7, 506:9, 507:9, 507:11, 507:13, 507:15, 507:25, 508:2, 508:10, 508:12, 510:4, 510:9, 513:1, 513:3, 514:7, 514:10, 514:21, 514:22, 517:3, 517:16, 518:15, 518:17, 518:23, 518:25, 530:24, 530:25, 531:9, 531:10, 532:4, 532:6, 532:25, 533:2, 534:1, 534:3, 536:2, 536:5, 536:8, 536:10, 537:22, 543:16, 543:20
**keep** [8] - 266:5, 274:12, 281:23, 298:20, 355:10, 483:22, 509:23, 549:9
**keeping** [1] - 549:11
**keeps** [1] - 403:20
**KELLY** [1] - 265:3
**Kevin** [5] - 266:8, 441:11, 441:15, 441:17, 441:20
**kick** [1] - 481:23
**Kickstarter** [1] - 436:6
**kill** [2] - 285:24, 285:25
**kind** [11] - 280:8, 285:17, 292:23, 316:25, 317:3, 317:14, 366:12, 382:24, 407:20, 422:2, 428:10
**kinds** [7] - 276:7, 280:6, 280:11, 427:24, 428:2, 428:4, 515:23
**King** [1] - 264:11
**kit** [2] - 307:5
**kite** [5] - 433:12, 434:9
**Kite** [4] - 433:20, 434:12, 435:1, 445:1
**Kline** [27] - 449:20, 450:24, 475:15, 475:24, 476:3, 476:4, 477:19, 478:5, 478:9, 478:12, 478:21, 478:23, 479:8, 479:13, 480:1, 480:4, 481:2, 481:10, 482:24, 484:1, 484:9, 484:19, 485:4, 485:14, 541:12, 541:16, 550:23
**Kline's** [7] - 451:3, 475:24, 480:22, 482:8, 484:15, 488:17, 515:11
**kneeling** [2] - 328:2, 330:24
**knots** [1] - 283:4
**knowledge** [6] - 338:20, 381:13, 425:8, 425:9, 547:5, 547:7
**known** [13] - 311:7, 311:14, 368:16, 389:2, 403:16, 403:22, 406:16, 406:19, 406:21, 410:23, 411:8, 424:25, 547:2
**knows** [5] - 422:2, 454:21

## L

**label** [1] - 436:2
**labeled** [4] - 325:4, 373:11, 488:6, 514:8
**lack** [1] - 398:19
**LAD** [1] - 278:5
**laid** [1] - 420:22
**landlord** [5] - 451:18, 451:19, 451:21, 481:23, 548:4
**Langelaan** [53] - 265:18, 265:21, 310:6, 311:9, 321:5, 340:17, 347:22, 466:7, 466:11, 466:13, 466:21, 466:24, 467:3, 467:20, 468:10, 469:2, 469:18, 469:22, 470:1, 470:10, 470:16, 470:19, 470:22, 476:5, 476:15, 477:14, 477:20, 477:22, 478:3, 478:6, 478:7, 478:16, 478:22, 479:10, 479:16, 480:7, 483:18, 483:20, 484:18, 484:23, 484:25, 485:6, 489:12, 489:16, 489:19, 491:6, 492:13, 495:6, 495:14, 495:20, 497:15, 533:9
**Langelaan's** [5] - 300:9, 319:18, 324:14, 464:9, 468:18
**Langelaan-MHL** [1] - 469:18
**language** [3] - 301:25, 367:6, 412:4
**Lanterman** [2] - 550:17, 550:22
**large** [8] - 352:5, 353:4, 378:20, 378:23, 380:8, 510:2, 534:18
**larger** [1] - 286:10
**last** [21] - 266:20, 269:1, 299:21, 332:6, 382:22, 397:24, 403:18, 432:13, 457:8, 472:23, 488:9, 491:1, 497:13, 508:19, 509:17, 509:18, 512:24, 533:8, 536:18, 540:13, 543:12
**lasted** [1] - 399:24
**lastly** [11] - 408:4, 446:19, 450:7, 454:25, 455:23, 457:17, 468:4, 477:11, 479:15, 481:10, 485:4
**lasts** [1] - 400:4
**lateral** [3] - 325:4, 327:25, 330:22
**lattice** [2] - 282:11, 282:12
**Lattice** [2] - 310:2, 310:5
**LAVERY** [1] - 265:7
**lawsuit** [8] - 432:12, 432:16, 432:22, 433:3, 444:23, 523:18, 524:19, 525:1
**lawyer** [2] - 392:1, 404:4
**lawyers** [1] - 298:22
**layers** [1] - 275:22
**LAYTON** [1] - 265:2
**lead** [5] - 371:1, 371:7, 446:23, 465:9, 474:18
**leads** [3] - 446:11, 447:10, 549:11
**lean** [1] - 304:19
**leaning** [1] - 402:8
**learn** [8] - 285:7, 395:21, 395:22, 432:11, 434:22, 434:24, 549:15, 549:17
**learned** [5] - 432:19, 433:2, 434:21, 435:2
**learning** [1] - 400:13
**lease** [2] - 451:20, 548:5
**leash** [3] - 483:4, 483:19, 483:21
**Leason** [13] - 267:15, 293:3, 329:7, 411:12, 411:14, 411:16, 467:2, 496:5, 520:3, 525:13, 531:11, 531:17, 531:22
**Leason's** [2] - 525:10, 528:10
**least** [29] - 278:2, 278:11, 288:9, 298:3, 374:7, 375:25, 413:8, 418:19, 429:8, 462:21, 464:12, 468:14, 471:20, 472:20, 475:21, 476:24, 481:25, 485:8, 495:2, 496:18, 503:8, 504:8, 504:10, 505:11, 515:1, 515:3, 520:14, 524:16, 535:17
**leave** [2] - 274:2, 545:18
**leaving** [4] - 332:19, 428:25, 505:17, 549:21
**lecture** [2] - 284:21, 285:14
**led** [3] - 281:18, 507:2
**Lee** [7] - 276:17, 276:20, 276:23, 276:24, 277:8, 277:10
**left** [14] - 276:3, 276:14, 277:8, 283:15, 304:13, 306:6, 307:16, 312:19, 342:5, 356:7, 373:7, 526:13, 538:5, 545:24
**left-hand** [1] - 306:6
**legal** [10] - 432:17, 433:2, 433:7, 433:16, 433:25, 434:5, 434:24, 435:3, 448:10
**length** [5] - 320:22, 327:24, 330:21, 392:22, 393:14
**lengths** [4] - 290:7, 327:3, 327:7, 362:6
**lengthy** [3] - 351:8, 365:6, 475:1
**less** [14] - 282:21, 372:16, 469:18, 478:5, 511:15, 512:2, 512:3, 515:13, 515:17, 517:9, 517:25, 525:14, 542:25
**lesser** [1] - 507:4
**letter** [4] - 325:5, 373:11, 547:6, 547:11
**letters** [1] - 369:11
**level** [11] - 304:24, 308:25, 309:1, 327:24, 376:17,

398:25, 399:1,
399:3, 413:25,
477:18, 480:4
**Lewis** [2] - 435:20,
435:21
**liability** [1] - 486:22
**library** [1] - 347:15
**license** [85] - 267:6,
449:11, 452:4,
452:5, 455:20,
457:1, 457:2, 457:3,
457:21, 458:8,
458:9, 458:12,
458:13, 458:17,
458:18, 458:20,
458:22, 458:23,
459:4, 459:8,
459:20, 459:22,
461:8, 462:1, 464:3,
465:12, 465:22,
467:7, 467:9,
467:15, 469:13,
469:17, 469:19,
469:20, 469:22,
470:1, 470:3, 470:7,
470:18, 470:19,
470:20, 470:25,
471:1, 471:2,
473:11, 473:15,
473:16, 476:5,
476:8, 476:12,
476:15, 479:20,
479:23, 481:14,
481:19, 481:21,
491:6, 492:14,
492:19, 493:2,
494:8, 495:6, 499:6,
499:21, 499:24,
500:3, 500:12,
502:4, 502:12,
502:17, 518:14,
518:18, 519:6,
520:4, 520:7,
521:15, 521:17,
521:24, 530:6,
530:17, 532:22,
547:20
**licensed** [9] - 458:10,
465:3, 465:15,
467:10, 469:25,
470:4, 470:22,
522:11, 533:11
**licensee** [2] - 547:20,
547:23
**licensees** [1] - 470:5
**licenses** [7] - 457:5,
457:24, 458:3,
458:4, 458:7,
467:14, 469:7
**licensing** [6] - 455:18,

456:25, 459:1,
465:8, 465:13,
476:18
**licensor** [1] - 470:11
**lift** [13] - 279:6,
280:25, 302:13,
304:17, 349:5,
349:7, 383:10,
411:12, 411:15,
424:22, 425:3,
425:17, 425:19
**LIFT** [30] - 291:2,
291:6, 293:1, 293:8,
294:10, 295:15,
312:15, 312:16,
312:24, 313:1,
313:7, 313:9,
313:10, 313:12,
313:21, 314:12,
314:13, 314:16,
314:17, 328:4,
328:5, 332:10,
340:7, 362:25,
363:11, 418:22,
444:12, 444:13,
525:15
**lifting** [2] - 302:11,
318:15
**light** [2] - 526:24,
526:25
**likely** [3] - 401:15,
498:18, 516:7
**limit** [1] - 351:25
**limited** [3] - 286:9,
368:7, 431:18
**Limited** [1] - 306:15
**limiting** [2] - 301:24,
301:25
**limits** [1] - 550:14
**line** [16] - 373:15,
373:16, 385:21,
385:23, 410:9,
410:11, 418:25,
419:1, 436:18,
464:6, 508:3,
522:19, 525:12,
525:14
**Line** [11] - 365:4,
415:15, 496:2,
497:7, 517:4,
517:10, 520:25,
523:8, 524:12,
528:10, 529:19
**lined** [1] - 550:13
**lines** [8] - 403:2,
411:19, 412:7,
491:15, 503:25,
513:14, 523:9,
538:20
**liquid** [1] - 275:22

**list** [3] - 268:8, 284:18,
531:20
**listed** [3] - 316:2,
456:16, 467:21
**listen** [1] - 386:20
**listened** [2] - 310:21,
544:7
**lists** [1] - 521:16
**litigate** [1] - 467:24
**litigation** [14] -
363:14, 369:1,
447:21, 449:16,
449:19, 453:23,
467:4, 481:12,
481:19, 530:11,
530:22, 531:6,
547:16, 547:25
**live** [3] - 273:15,
273:16, 482:1
**living** [1] - 446:1
**LLP** [1] - 265:5
**locally** [1] - 447:6
**located** [1] - 441:3
**location** [2] - 362:8,
376:18
**Logistics** [1] - 273:20
**London** [2] - 276:11,
447:7
**look** [91] - 266:24,
276:2, 292:7, 294:8,
295:7, 295:13,
300:13, 302:15,
304:9, 306:23,
314:25, 315:21,
317:12, 322:23,
342:20, 345:22,
354:13, 354:17,
357:6, 369:15,
370:14, 372:22,
373:1, 387:14,
394:13, 399:8,
400:10, 413:21,
414:3, 416:2,
425:23, 425:25,
426:24, 428:9,
442:24, 452:18,
456:2, 458:3, 458:7,
464:10, 464:13,
464:14, 466:18,
468:9, 468:23,
471:3, 475:23,
476:14, 487:4,
487:23, 487:25,
490:18, 492:18,
492:23, 497:5,
500:1, 500:22,
503:21, 503:22,
507:9, 509:11,
510:4, 510:6, 511:9,
512:22, 513:1,

513:14, 515:3,
520:24, 524:6,
525:12, 525:22,
526:1, 526:5, 526:9,
527:2, 529:12,
530:15, 530:24,
531:9, 532:4,
532:25, 534:11,
534:15, 535:24,
536:2, 539:1,
539:18, 539:22,
545:1, 549:14
**looked** [36] - 289:23,
292:17, 292:18,
292:19, 305:12,
305:13, 310:22,
317:18, 320:13,
327:16, 342:3,
372:19, 372:21,
389:13, 392:9,
398:17, 428:7,
449:17, 449:20,
449:22, 449:25,
456:6, 456:9,
457:25, 460:24,
461:13, 471:6,
472:4, 483:18,
499:9, 509:1,
509:18, 513:10,
513:12, 530:18
**looking** [34] - 268:15,
270:22, 320:25,
324:17, 353:7,
353:11, 372:15,
384:23, 385:2,
385:7, 390:15,
396:24, 397:17,
423:16, 459:16,
460:6, 461:6, 464:8,
464:25, 471:1,
481:9, 488:24,
492:20, 503:20,
503:25, 508:19,
509:20, 517:4,
517:10, 523:8,
527:6, 536:8, 539:21
**looks** [12] - 292:6,
317:2, 317:11,
400:1, 425:13,
429:17, 476:17,
477:16, 491:12,
512:2, 512:10
**lose** [6] - 383:10,
425:3, 473:5,
522:10, 522:20,
527:18
**loses** [1] - 424:22
**losing** [1] - 527:9
**lost** [8] - 344:5,
471:12, 472:1,

527:16, 529:5,
529:23, 533:14,
533:15
**lotus** [1] - 427:16
**louder** [1] - 323:9
**love** [1] - 379:1
**low** [2] - 313:10, 525:7
**low-cost** [1] - 525:7
**lower** [10] - 314:17,
328:17, 328:25,
331:10, 331:15,
467:20, 469:3,
501:12, 522:12,
542:17
**LTD** [1] - 264:8
**lump** [4] - 493:22,
493:25, 494:13,
494:21
**lump-sum** [3] -
493:22, 493:25,
494:21
**lunch** [2] - 428:22,
429:1
**Lutheran** [1] - 398:6

## M

**machine** [2] - 305:20,
351:2
**MACkite** [5] - 471:12,
471:13, 471:17,
527:21, 528:23
**magnet** [2] - 405:12,
405:14
**magnets** [1] - 405:7
**main** [8] - 354:11,
437:21, 441:3,
444:9, 450:12
**maintain** [3] - 387:11,
395:16, 396:4
**maintaining** [1] -
274:9
**maintenance** [2] -
274:8, 277:7
**major** [2] - 278:6,
285:15
**majors** [1] - 276:9
**maker** [1] - 400:7
**management** [2] -
432:2, 432:5
**manager's** [2] -
434:16, 434:17
**managing** [1] - 446:22
**Mandarin** [1] - 550:13
**maneuvering** [1] -
310:11
**manipulate** [1] -
293:20
**manual** [14] - 292:17,
293:3, 305:4, 306:4,

306:11, 306:19, 307:4, 307:11, 329:7, 350:19, 351:25, 353:25, 397:8, 426:2

**manuals** [7] - 304:16, 304:17, 316:4, 316:5, 320:14, 354:18, 421:12

**manufacture** [6] - 452:2, 452:11, 452:12, 452:21, 477:25, 513:5

**manufactured** [2] - 453:2, 459:5

**manufacturer** [3] - 305:23, 463:13, 485:24

**manufacturers** [3] - 443:24, 456:1, 463:8

**manufacturing** [29] - 438:11, 438:12, 438:17, 438:18, 438:20, 438:23, 439:5, 439:6, 439:10, 439:21, 440:2, 474:16, 474:21, 516:8, 516:9, 516:10, 516:14, 516:18, 517:6, 517:12, 517:21, 517:24, 518:2, 518:5, 518:7, 545:5, 545:18

**maple** [1] - 324:1

**marble** [1] - 323:20

**March** [20] - 264:12, 432:13, 460:19, 462:17, 464:21, 469:14, 493:3, 493:5, 496:7, 497:2, 497:3, 497:18, 497:19, 497:24, 498:1, 498:4, 543:7, 546:13

**margin** [56] - 437:12, 437:16, 438:1, 438:2, 438:5, 438:12, 438:18, 438:19, 438:23, 438:24, 439:4, 439:16, 440:2, 440:6, 440:7, 440:9, 440:14, 440:17, 440:20, 440:23, 440:24, 441:8, 441:12, 441:22, 442:2, 474:16, 477:10, 514:6, 514:14, 514:24,

515:2, 515:6, 515:25, 516:2, 516:8, 516:9, 516:18, 517:6, 517:13, 517:21, 517:24, 518:5, 518:8, 518:9, 518:10, 542:19, 544:1, 544:12, 544:20, 545:6, 545:17, 545:18, 545:21

**margins** [2] - 440:22, 441:6

**Marine** [4] - 277:11, 277:21, 278:8, 282:18

**marine** [6] - 275:7, 275:16, 277:1, 281:1, 284:11, 287:1

**mark** [2] - 463:10, 533:6

**MARK** [1] - 265:7

**market** [39] - 432:6, 441:3, 441:8, 443:5, 443:8, 443:11, 443:12, 443:13, 443:14, 443:17, 443:20, 444:4, 444:13, 444:16, 444:19, 457:11, 457:12, 457:13, 457:14, 468:23, 468:25, 469:2, 469:5, 469:23, 473:20, 474:1, 477:24, 480:16, 480:24, 485:3, 491:18, 494:24, 495:1, 518:7, 523:21, 525:7, 526:2, 527:5

**marketing** [2] - 269:17, 440:15

**marketplace** [24] - 449:12, 450:4, 456:2, 456:3, 457:11, 457:18, 457:19, 457:23, 458:15, 458:16, 470:8, 470:12, 471:19, 472:1, 472:5, 477:22, 478:1, 479:12, 480:4, 480:7, 481:6, 485:16, 527:25

**marking** [1] - 533:9

**marks** [1] - 460:9

**markup** [2] - 463:11, 486:4

**Maryland** [2] - 273:17, 275:5

**mass** [8] - 325:21, 376:16, 380:7, 380:16, 422:5, 422:9, 424:14

**master's** [1] - 446:19

**material** [8] - 279:9, 289:7, 292:23, 305:15, 323:24, 436:13, 439:12, 439:13

**materials** [4] - 294:20, 439:7, 449:4, 449:5

**Materials** [1] - 283:24

**math** [8] - 421:11, 446:17, 504:13, 506:15, 511:12, 511:20, 512:6, 546:2

**mathematical** [1] - 384:12

**mathematically** [1] - 317:6

**mathematics** [3] - 340:14, 340:18, 341:19

**matrix** [3] - 351:3, 351:4, 351:6

**matter** [11] - 272:18, 288:23, 320:22, 409:20, 420:5, 449:4, 456:6, 471:10, 486:9, 510:15, 548:11

**matters** [4] - 420:6, 453:17, 470:12

**McGRAW** [5] - 264:21, 266:19, 429:7, 429:10, 429:13

**mean** [38] - 268:2, 293:20, 294:11, 302:4, 303:20, 304:5, 320:4, 321:16, 322:6, 340:19, 368:6, 373:15, 382:1, 383:13, 392:15, 401:1, 407:11, 408:6, 408:7, 408:11, 409:3, 425:15, 425:23, 465:6, 489:18, 493:15, 500:16, 501:5, 511:13, 516:12, 519:25, 520:19, 522:24, 529:11, 541:24, 547:24, 552:11, 552:19

**meaning** [13] - 301:10,

301:11, 301:13, 301:14, 337:23, 340:17, 371:19, 386:17, 397:7, 401:17, 409:20, 412:23, 413:3

**meaningful** [1] - 462:12

**means** [48] - 301:17, 303:21, 304:6, 307:25, 321:16, 322:7, 325:11, 340:6, 340:15, 341:19, 369:16, 370:3, 372:5, 372:9, 385:23, 386:14, 400:16, 400:20, 400:23, 402:22, 404:3, 404:4, 405:4, 407:21, 407:22, 409:5, 418:16, 424:7, 425:2, 454:15, 454:20, 457:2, 458:21, 465:22, 466:3, 469:20, 470:20, 473:17, 473:24, 477:10, 477:21, 479:21, 481:12, 482:10, 490:3, 490:13, 500:13, 547:25

**meant** [3] - 453:22, 530:13, 542:23

**measure** [4] - 308:3, 308:5, 308:7, 408:22

**measured** [1] - 419:8

**measuring** [2] - 357:25, 358:23

**mechanical** [3] - 274:24, 275:5, 275:6

**mechanism** [1] - 483:3

**medium** [1] - 425:16

**meet** [4] - 311:14, 312:6, 453:25, 472:16

**meeting** [1] - 455:25

**meets** [1] - 326:21

**Mel** [1] - 306:8

**member** [9] - 283:16, 283:19, 283:21, 284:2, 284:4, 284:5, 284:7, 284:9, 368:6

**members** [7] - 272:6, 332:16, 333:10, 428:22, 431:3, 506:3, 548:23

**memorize** [2] - 500:5, 522:16

**memory** [3] - 364:14, 515:15, 522:3

**mention** [7] - 298:19, 301:19, 350:25, 377:7, 377:14, 382:22, 500:9

**mentioned** [34] - 282:11, 290:18, 303:10, 304:4, 306:21, 310:5, 310:7, 317:22, 322:5, 329:14, 350:23, 379:21, 394:18, 395:4, 432:24, 435:4, 435:11, 438:22, 455:6, 455:8, 457:24, 459:17, 463:7, 465:16, 469:15, 469:19, 469:25, 470:17, 484:17, 493:17, 496:21, 498:23, 521:9, 541:12

**mentioning** [2] - 282:5, 293:13

**mentions** [1] - 381:19

**mentor** [2] - 285:12, 285:14

**mentoring** [1] - 285:10

**merged** [1] - 284:3

**Merit** [1] - 553:13

**mess** [2] - 317:14, 467:24

**met** [1] - 496:5

**meters** [1] - 356:19

**method** [3] - 321:6, 388:18, 388:20

**MHL** [142] - 264:4, 267:10, 269:11, 270:22, 288:22, 289:5, 289:13, 290:25, 291:15, 327:19, 328:11, 328:21, 329:4, 329:15, 329:23, 330:2, 330:4, 330:14, 330:15, 331:1, 331:6, 331:12, 331:17, 331:18, 332:10, 346:16, 347:2, 347:5, 350:13, 350:18, 353:1, 376:6, 382:8, 412:18, 427:23, 432:12, 450:8, 453:25, 454:21, 456:14, 457:3,

457:6, 457:9,
457:10, 457:18,
457:19, 457:21,
458:21, 459:3,
459:20, 460:25,
461:4, 461:16,
463:16, 463:23,
464:2, 464:5, 464:7,
464:10, 466:4,
466:7, 466:8,
466:11, 466:17,
467:3, 468:6, 468:7,
469:3, 469:18,
470:15, 470:20,
471:4, 471:8, 471:9,
471:12, 471:14,
471:19, 471:21,
471:24, 472:2,
472:4, 472:8,
473:17, 473:19,
473:24, 477:14,
477:20, 478:6,
478:13, 478:14,
478:22, 478:24,
479:11, 480:8,
480:13, 480:17,
480:24, 481:2,
481:8, 481:13,
484:18, 484:22,
484:24, 485:1,
489:13, 491:4,
491:16, 492:2,
492:9, 492:13,
495:21, 497:15,
498:13, 498:20,
498:22, 509:22,
513:16, 520:13,
521:16, 522:9,
522:13, 522:20,
523:13, 525:18,
525:24, 526:2,
527:9, 527:16,
527:18, 529:23,
530:11, 530:13,
531:5, 531:7,
533:14, 542:14,
547:6, 547:11
**MHL's** [13] - 267:4,
267:21, 268:11,
286:14, 290:22,
291:5, 292:22,
327:16, 458:15,
472:11, 498:10,
520:14, 530:15
**MHL-Langelaan** [1] -
484:18
**mic** [1] - 323:8
**microphone** [1] -
279:21
**mid** [1] - 314:14

**mid-range** [1] - 314:14
**middle** [9] - 314:18,
328:8, 328:19,
331:5, 331:11,
491:1, 531:3
**midst** [1] - 535:17
**might** [25] - 295:20,
304:4, 332:24,
392:13, 393:10,
404:20, 424:8,
429:19, 446:6,
451:12, 455:19,
456:10, 456:20,
468:15, 472:17,
473:3, 473:4, 480:9,
485:19, 488:1,
488:3, 491:8,
501:13, 520:3,
530:19
**mike** [1] - 337:16
**miles** [1] - 278:11
**military** [2] - 277:22,
285:20
**million** [19] - 442:21,
450:18, 453:11,
457:15, 466:3,
466:4, 466:14,
466:23, 466:25,
472:22, 479:8,
489:22, 489:25,
490:3, 493:20,
494:2, 494:4,
514:13, 539:6
**mind** [13] - 267:4,
267:10, 267:16,
267:21, 269:1,
269:16, 271:17,
279:17, 279:20,
288:18, 375:15,
493:16, 549:17
**mindset** [2] - 456:15,
511:1
**mine** [1] - 277:20
**minimize** [1] - 281:9
**minimum** [2] - 394:20,
507:7
**minor** [3] - 415:2,
446:17, 551:15
**minus** [2] - 312:4,
487:9
**minute** [5] - 304:5,
387:24, 388:14,
428:21, 548:22
**minutes** [15] - 320:17,
332:17, 333:1,
333:3, 387:4, 387:9,
388:9, 388:11,
399:15, 402:6,
429:7, 429:10,
430:1, 464:15

**miscellaneous** [1] -
279:3
**misleading** [1] -
478:19
**missed** [1] - 326:25
**missiles** [1] - 422:4
**missles** [1] - 278:10
**misspoke** [1] - 494:4
**mistake** [3] - 351:22,
535:5, 535:12
**mistaken** [1] - 445:8
**mistakenly** [1] - 481:2
**mistakes** [3] - 348:7,
362:23, 535:8
**mix** [1] - 456:1
**mode** [1] - 325:19
**model** [46] - 292:5,
292:16, 292:24,
293:1, 293:12,
293:21, 293:24,
294:14, 294:17,
294:22, 295:5,
295:6, 295:12,
295:16, 295:17,
305:4, 309:23,
309:24, 314:1,
350:11, 350:14,
350:18, 350:20,
351:12, 352:4,
352:6, 352:7,
352:22, 353:1,
353:3, 353:11,
353:12, 357:3,
418:6, 418:19,
418:25, 419:2,
419:3, 419:6,
419:21, 420:5,
420:13, 425:5,
425:14
**modeling** [2] - 513:15,
513:20
**models** [13] - 289:1,
296:21, 307:7,
309:18, 309:20,
350:17, 353:1,
358:6, 418:6,
418:18, 419:11,
420:22, 437:19
**modern** [1] - 292:25
**modes** [1] - 325:18
**modest** [1] - 298:2
**modifications** [1] -
277:6
**modified** [2] - 437:22,
510:16
**moment** [17] - 309:3,
316:22, 361:2,
383:11, 449:22,
450:24, 455:9,
460:25, 463:7,

464:20, 465:16,
469:19, 471:5,
478:17, 480:3,
531:14, 553:6
**monetize** [1] - 468:8
**money** [4] - 271:10,
281:17, 463:11,
473:19
**month** [9] - 432:13,
461:22, 496:5,
536:15, 536:17,
540:18, 540:22,
541:2, 541:3
**month's** [1] - 452:19
**monthly** [1] - 452:18
**months** [12] - 460:20,
461:22, 469:18,
493:12, 496:4,
497:4, 497:22,
535:22, 536:18,
540:14, 540:16
**moot** [3] - 409:20,
410:11, 410:13
**moreover** [2] - 458:13,
466:1
**morning** [15] - 265:13,
272:6, 273:10,
273:11, 332:17,
332:20, 333:13,
333:17, 398:4,
549:1, 550:2, 552:8,
552:12, 552:13,
552:16
**Morris** [1] - 275:13
**most** [16] - 279:7,
284:19, 294:5,
340:3, 396:15,
401:15, 418:21,
433:4, 441:23,
442:9, 451:13,
455:12, 509:19
**mostly** [3] - 277:15,
277:23, 441:18
**motion** [16] - 325:8,
366:8, 370:6,
371:21, 372:5,
372:8, 376:10,
389:14, 394:16,
394:22, 394:23,
424:7, 424:8, 424:9,
424:18, 424:19
**motionless** [2] - 387:8
**motions** [3] - 372:10,
424:17, 424:25
**motivation** [1] -
468:18
**motor** [15] - 275:25,
303:15, 315:23,
327:12, 327:13,
403:7, 403:14,

403:16, 403:19,
403:22, 404:6,
404:10, 404:22,
405:6
**motors** [7] - 281:3,
405:9, 405:16,
405:17, 405:18
**movable** [2] - 301:17,
303:21, 329:1,
329:25, 332:9,
332:10, 400:17,
400:21, 400:24,
400:25, 401:2, 483:3
**move** [23] - 297:19,
297:20, 297:24,
298:17, 304:23,
307:14, 339:14,
378:23, 378:25,
387:19, 387:22,
392:6, 397:25,
401:18, 401:21,
405:21, 410:16,
422:8, 424:16,
430:4, 460:14,
551:20
**moved** [8] - 360:8,
360:16, 419:11,
419:12, 419:20,
419:21, 447:23,
509:8
**movement** [10] -
298:3, 325:4, 385:4,
385:11, 385:22,
385:25, 386:3,
386:4, 386:7, 387:16
**movements** [2] -
385:9, 385:10
**movers** [1] - 457:12
**moves** [12] - 322:9,
385:22, 387:15,
397:24, 397:25,
398:1, 401:9,
401:14, 401:16,
401:19, 425:6
**moving** [13] - 270:1,
303:23, 304:6,
331:16, 352:8,
379:15, 379:18,
394:14, 394:15,
401:10, 401:13,
425:3
**MR** [290] - 265:16,
266:6, 266:12,
266:16, 266:19,
266:21, 266:22,
266:24, 267:2,
267:10, 267:14,
267:19, 267:24,
268:2, 268:5,
268:19, 268:22,

268:25, 269:9, 269:14, 269:15, 269:23, 269:25, 270:7, 270:10, 270:14, 270:15, 270:21, 271:16, 271:18, 271:21, 272:10, 272:25, 273:9, 279:24, 287:9, 287:13, 295:22, 295:25, 296:6, 296:7, 296:16, 297:15, 297:19, 298:1, 298:5, 298:9, 299:8, 299:9, 300:4, 300:5, 300:13, 300:16, 300:23, 306:7, 306:9, 306:23, 306:25, 307:21, 311:16, 322:21, 324:7, 332:12, 332:25, 333:13, 333:16, 335:17, 335:20, 335:23, 336:1, 336:4, 336:11, 336:13, 336:16, 336:21, 338:4, 338:7, 338:13, 338:15, 338:22, 338:24, 341:1, 341:2, 341:23, 341:24, 342:18, 342:19, 344:18, 344:20, 351:9, 351:13, 355:25, 356:1, 357:7, 357:8, 357:19, 357:21, 358:5, 358:7, 359:2, 360:13, 361:25, 362:17, 364:16, 364:17, 364:23, 364:25, 365:12, 365:13, 367:2, 367:4, 367:10, 367:11, 370:18, 370:20, 371:9, 371:10, 372:24, 372:25, 373:24, 373:25, 380:18, 380:20, 380:23, 380:25, 381:16, 381:17, 382:2, 382:3, 382:13, 382:14, 382:20, 382:21, 385:17, 385:19, 386:10, 386:21, 388:3, 389:25, 390:3, 390:11, 390:13,

390:15, 390:18, 390:20, 390:21, 392:5, 392:7, 392:8, 392:14, 392:23, 393:9, 393:12, 393:22, 393:25, 395:13, 395:15, 396:9, 396:12, 399:8, 399:10, 399:23, 401:24, 401:25, 402:17, 402:18, 403:10, 403:12, 406:3, 406:4, 409:24, 410:2, 410:3, 410:5, 410:6, 411:21, 412:1, 422:17, 422:20, 422:22, 426:15, 426:17, 428:18, 429:4, 429:6, 429:7, 429:10, 429:13, 429:15, 430:3, 430:4, 430:8, 430:9, 430:12, 430:15, 430:17, 430:20, 430:21, 430:23, 431:6, 431:10, 431:12, 433:5, 433:17, 435:10, 436:19, 438:14, 439:23, 445:10, 445:21, 486:11, 486:12, 486:15, 490:12, 500:23, 500:25, 503:21, 503:24, 505:25, 506:7, 506:9, 507:9, 507:11, 507:13, 507:15, 507:25, 508:2, 508:10, 508:12, 510:4, 510:9, 513:1, 513:3, 514:7, 514:10, 514:21, 514:22, 517:3, 517:16, 518:15, 518:17, 518:23, 518:25, 530:24, 530:25, 531:9, 531:10, 532:4, 532:6, 532:25, 533:2, 534:1, 534:3, 536:2, 536:5, 536:8, 536:10, 537:22, 537:25, 538:2, 538:10, 538:12, 538:15, 538:17, 543:16, 543:20, 543:24, 544:3, 544:4, 544:9,

544:10, 544:17, 544:19, 548:13, 548:15, 548:19, 550:4, 550:7, 550:16, 550:20, 550:24, 551:3, 551:4, 551:19, 551:22, 551:24, 552:6, 552:10, 552:21, 553:4
**multiple** [1] - 313:2
**multiplied** [1] - 452:22
**multiplying** [1] - 475:11
**Munson** [3] - 280:1, 280:5, 280:19
**MURRELL** [37] - 264:20, 266:16, 266:22, 266:24, 267:2, 267:10, 267:14, 267:19, 268:25, 269:14, 269:25, 270:7, 270:10, 270:14, 270:21, 271:18, 271:21, 429:15, 445:10, 445:21, 486:11, 537:25, 538:2, 538:10, 538:12, 538:17, 543:24, 544:3, 544:4, 544:9, 544:10, 544:17, 544:19, 548:13, 548:15, 548:19
**Murrell** [3] - 268:24, 269:6, 537:24
**mushed** [1] - 292:12
**must** [4] - 311:11, 416:4, 428:17, 454:25
**mute** [2] - 323:8, 323:13
**mutually** [1] - 441:9

# N

**naked** [3] - 473:16, 479:20, 479:23
**name** [8] - 272:13, 283:23, 306:14, 350:21, 431:14, 435:13, 445:14, 445:25
**named** [1] - 286:2
**names** [1] - 444:10
**National** [1] - 284:1
**nature** [3] - 285:9, 304:8, 382:18
**naval** [19] - 273:13,

274:7, 274:25, 275:7, 275:13, 275:15, 276:24, 276:25, 278:3, 278:21, 278:23, 285:15, 288:11, 288:12, 310:11, 319:4, 346:4, 380:14, 423:23
**Naval** [5] - 283:18, 284:24, 285:12, 285:13, 285:14
**Navy** [5] - 275:17, 275:21, 277:6, 277:16
**nearby** [1] - 439:2
**necessarily** [6] - 269:22, 358:2, 370:8, 372:11, 375:6, 515:2
**necessary** [10] - 310:3, 311:8, 312:24, 330:6, 385:3, 385:9, 385:25, 386:5, 387:16, 397:25
**need** [22] - 285:7, 312:15, 312:16, 312:25, 320:8, 323:22, 363:17, 363:21, 364:8, 364:11, 369:20, 384:12, 438:8, 439:1, 442:7, 442:10, 482:6, 508:4, 509:15, 542:9, 551:12
**needed** [5] - 274:12, 280:25, 303:14, 344:16, 394:19
**needing** [1] - 384:24
**needs** [1] - 399:21
**negative** [14] - 308:13, 308:14, 308:15, 308:21, 308:22, 325:6, 325:8, 366:2, 369:16, 369:20, 369:25, 376:14, 420:16
**negotiate** [1] - 530:10
**negotiating** [4] - 454:11, 454:23, 455:25, 472:16
**negotiation** [59] - 267:5, 267:7, 453:14, 453:22, 454:7, 454:12, 455:2, 455:4, 457:7, 457:21, 458:6, 460:17, 461:1,

461:6, 462:10, 462:11, 464:17, 464:20, 464:21, 467:13, 467:16, 467:18, 468:16, 469:16, 470:2, 470:6, 470:24, 472:13, 472:15, 473:15, 474:2, 474:4, 475:1, 479:19, 481:17, 485:17, 490:9, 490:11, 490:14, 491:3, 493:3, 493:5, 493:7, 493:14, 510:24, 512:16, 513:25, 514:8, 514:12, 520:13, 520:16, 522:7, 522:9, 523:11, 543:4, 543:6, 546:13, 547:19
**negotiations** [12] - 267:6, 267:11, 267:16, 455:22, 459:3, 459:10, 459:13, 463:5, 506:22, 507:2, 530:7, 531:24
**net** [2] - 269:18, 542:4
**network** [1] - 440:15
**never** [19] - 287:1, 338:25, 348:4, 361:17, 363:13, 368:25, 378:7, 398:7, 428:10, 428:12, 477:22, 477:23, 484:25, 485:1, 493:16, 502:5, 503:13, 521:2
**New** [3] - 392:1, 392:2, 447:6
**new** [21] - 274:10, 274:11, 275:16, 277:14, 279:2, 279:11, 281:19, 281:22, 285:5, 322:12, 403:25, 411:1, 436:15, 436:17, 441:1, 447:19, 456:3, 457:22
**next** [20] - 276:2, 276:18, 284:14, 305:3, 307:15, 319:11, 391:3, 410:7, 429:3, 492:24, 511:15, 511:17, 511:19, 524:11, 527:2,

538:25, 544:17, 545:1
**nice** [3] - 353:7, 354:19, 427:23
**nice-looking** [1] - 353:7
**nicely** [3] - 399:16, 428:5
**Nick** [4] - 467:2, 496:8, 531:11, 531:17
**Nickum** [1] - 278:21
**night** [3] - 266:20, 269:1, 551:10
**nil** [1] - 516:4
**nobody** [3] - 320:16, 454:23, 549:9
**node** [1] - 352:14
**non** [19] - 458:19, 470:19, 470:25, 471:1, 476:25, 477:1, 477:2, 477:4, 477:5, 482:7, 482:8, 482:9, 482:15, 482:21, 482:22, 483:6, 483:10, 483:15
**non-exclusive** [4] - 458:19, 470:19, 470:25, 471:1
**non-infringing** [15] - 476:25, 477:1, 477:2, 477:4, 477:5, 482:7, 482:8, 482:9, 482:15, 482:21, 482:22, 483:6, 483:10, 483:15
**nondivergent** [1] - 326:17
**none** [4] - 392:21, 392:24, 395:16, 478:5
**nonetheless** [1] - 454:6
**noninfringing** [1] - 482:4
**normal** [1] - 279:8
**normally** [4] - 270:20, 352:9, 354:25
**North** [1] - 264:11
**Nos** [1] - 431:1
**nose** [1] - 352:14
**note** [1] - 473:13
**noted** [1] - 472:4
**notes** [1] - 553:11
**nothing** [20] - 271:17, 272:19, 346:6, 351:24, 379:11, 384:20, 403:25, 411:1, 423:7, 443:7,

457:13, 479:21, 506:18, 506:22, 506:25, 507:1, 507:3, 537:11, 537:17
**notice** [7] - 496:25, 497:14, 497:21, 498:6, 498:8
**noticed** [2] - 462:13, 464:18
**nowhere** [1] - 478:15
**nuclear** [1] - 285:22
**number** [53] - 281:2, 283:6, 306:12, 306:13, 333:19, 333:22, 351:25, 352:5, 353:4, 369:25, 375:5, 380:8, 396:13, 427:17, 442:15, 448:6, 449:9, 451:6, 454:9, 456:4, 461:17, 477:17, 478:13, 479:11, 485:22, 487:6, 487:8, 487:20, 488:13, 488:23, 489:4, 489:6, 495:11, 499:13, 500:11, 504:14, 506:16, 513:15, 513:19, 515:13, 515:19, 517:17, 518:12, 521:8, 522:8, 534:13, 534:18, 538:5, 539:2, 539:12, 540:20, 541:18
**Number** [6] - 492:23, 510:6, 518:24, 526:9, 533:1, 534:11
**numbered** [1] - 303:5
**numbers** [21] - 324:20, 329:6, 369:8, 369:12, 377:23, 378:1, 378:4, 386:19, 386:20, 442:6, 442:11, 453:5, 453:6, 463:2, 478:10, 487:7, 533:17, 536:23, 537:19, 538:14, 545:12
**numerically** [1] - 411:20
**nutshell** [1] - 476:4

**O**

**o'clock** [4] - 505:15, 505:19, 551:2, 551:10
**oath** [4] - 272:23, 445:18, 529:17, 535:1
**object** [8] - 292:6, 292:9, 303:12, 325:22, 340:4, 342:23, 422:13, 425:3
**objected** [1] - 269:1
**objection** [6] - 297:23, 430:9, 543:16, 543:23, 551:24, 552:1
**Objection** [1] - 543:19
**objections** [2] - 269:8, 430:24
**observed** [1] - 310:21
**observes** [1] - 480:13
**obviously** [12] - 278:14, 286:16, 454:17, 458:16, 460:9, 462:23, 463:10, 467:23, 468:25, 472:8, 515:16, 541:16
**occasion** [2] - 275:25, 351:24
**occur** [6] - 425:21, 464:21, 465:25, 469:16, 481:20, 497:17
**occurred** [8] - 451:7, 462:9, 464:19, 464:22, 475:17, 494:13, 494:19, 494:21
**occurring** [1] - 462:10
**occurs** [7] - 308:23, 325:12, 414:1, 454:13, 458:25, 503:8, 546:13
**ocean** [1] - 274:25
**October** [4] - 403:17, 403:23, 404:15, 404:19
**odd** [2] - 350:16
**OF** [1] - 264:2
**offer** [4] - 270:9, 270:20, 508:4, 508:7
**offering** [3] - 334:1, 334:5, 508:24
**offhand** [1] - 412:8
**Office** [2] - 496:22, 496:24
**office** [1] - 447:4

**officer** [1] - 392:1
**offices** [1] - 447:5
**official** [2] - 273:24, 443:7
**offshore** [1] - 276:5
**oftentimes** [1] - 453:16
**Ohio** [1] - 446:20
**oil** [3] - 276:5, 276:9, 280:12
**old** [2] - 281:11, 291:10
**older** [1] - 448:2
**omega** [5] - 321:10, 325:10, 369:11, 420:8
**once** [7] - 279:13, 304:22, 320:16, 323:17, 370:10, 427:10, 475:6
**One** [1] - 373:5
**one** [209] - 265:18, 266:16, 275:25, 276:18, 277:1, 279:3, 279:8, 279:10, 280:8, 280:13, 281:1, 281:7, 281:11, 281:13, 282:3, 282:17, 282:23, 283:24, 284:25, 285:1, 285:4, 285:7, 285:16, 286:6, 286:7, 286:20, 287:5, 288:8, 291:2, 291:6, 292:12, 292:17, 293:1, 294:20, 295:9, 295:15, 296:18, 299:10, 299:18, 299:19, 299:21, 300:14, 301:19, 302:2, 302:8, 304:16, 306:22, 307:13, 308:17, 309:2, 309:22, 311:5, 311:20, 312:1, 312:4, 317:5, 318:12, 319:12, 324:16, 324:17, 325:13, 325:18, 326:15, 326:25, 331:13, 331:14, 331:20, 332:6, 332:10, 334:19, 335:6, 335:9, 336:12, 338:2, 338:10, 339:3, 340:12, 340:22, 341:7, 343:11,

343:19, 345:21, 347:25, 348:10, 348:13, 349:4, 349:7, 349:25, 351:16, 355:15, 356:25, 358:6, 358:9, 358:19, 359:24, 360:6, 366:24, 367:17, 367:19, 367:20, 370:16, 371:7, 372:19, 372:22, 372:23, 373:4, 374:5, 374:7, 374:9, 374:19, 375:6, 375:25, 376:20, 381:20, 383:7, 383:9, 390:8, 390:10, 394:8, 397:7, 397:24, 400:2, 402:13, 403:6, 404:23, 404:24, 408:20, 408:25, 417:3, 418:20, 419:11, 424:3, 424:5, 426:21, 426:22, 427:15, 427:20, 428:8, 428:9, 432:23, 432:24, 433:11, 433:13, 433:22, 434:10, 434:11, 434:13, 436:2, 436:21, 436:22, 437:8, 437:9, 438:21, 444:22, 449:24, 450:18, 451:8, 452:19, 456:17, 458:2, 461:2, 463:8, 464:18, 465:20, 467:2, 467:15, 467:21, 470:21, 471:5, 472:19, 474:18, 475:13, 476:5, 477:19, 479:22, 480:24, 482:22, 483:16, 491:14, 495:11, 496:14, 496:15, 498:24, 499:12, 501:16, 501:18, 503:18, 509:8, 510:7, 513:24, 528:24, 546:8, 547:21, 548:7, 549:5, 551:19, 552:6, 552:14
**ONE** [32] - 289:23, 289:24, 294:10, 294:11, 294:12,

307:10, 355:20, 356:6, 356:22, 357:4, 357:14, 358:13, 359:8, 359:19, 436:9, 436:10, 436:20, 437:4, 437:21, 437:22, 437:24, 437:25, 438:7, 438:13, 439:17, 544:21
**one-day** [2] - 285:1, 285:7
**ones** [8] - 274:10, 277:2, 290:22, 363:25, 364:1, 364:2, 419:25, 457:11
**ongoing** [1] - 267:7
**open** [5] - 304:13, 307:16, 435:25, 436:1, 549:11
**opening** [24] - 341:4, 348:15, 348:18, 348:22, 355:14, 356:4, 357:9, 359:11, 360:7, 361:3, 365:11, 373:1, 375:24, 376:20, 376:22, 377:2, 377:16, 377:24, 390:14, 490:18, 495:3, 503:22, 513:1, 522:15
**operate** [4] - 385:11, 386:6, 386:13, 387:1
**operated** [2] - 374:14, 405:19
**operates** [2] - 380:8, 380:9
**operating** [23] - 281:10, 340:7, 359:22, 439:16, 439:20, 439:21, 440:3, 440:6, 440:7, 440:9, 440:14, 440:20, 514:23, 515:6, 515:19, 515:25, 516:1, 516:8, 518:3, 518:8, 518:9, 518:10
**operation** [5] - 313:14, 431:24, 432:3, 432:6, 439:20
**operations** [2] - 432:1, 516:6
**operator** [2] - 384:24, 385:3
**opined** [3] - 338:1,

516:18, 516:20
**opinion** [33] - 271:7, 271:14, 287:14, 288:4, 289:4, 289:6, 290:16, 290:20, 291:15, 291:19, 335:12, 335:15, 339:24, 341:17, 341:20, 384:7, 384:9, 384:16, 384:17, 385:23, 401:4, 403:13, 451:1, 475:2, 477:17, 490:16, 511:1, 515:2, 522:9, 533:18, 548:10, 548:17
**opinions** [21] - 273:24, 273:25, 286:13, 288:25, 289:12, 294:21, 333:25, 334:4, 334:24, 383:25, 446:7, 446:10, 449:3, 450:11, 451:8, 486:8, 496:12, 513:24, 541:5, 549:9, 549:10
**opportunity** [1] - 535:7
**oppose** [1] - 308:20
**opposing** [4] - 266:9, 321:25, 325:7, 449:21
**opposite** [2] - 308:12, 325:8
**optimistic** [2] - 552:16, 552:25
**option** [2] - 275:1, 358:4
**options** [1] - 347:24
**oral** [1] - 510:14
**order** [10] - 283:1, 298:24, 324:23, 350:9, 353:10, 366:12, 369:19, 384:13, 416:6, 550:21
**Order** [2] - 265:20, 267:2
**ordinarily** [1] - 288:5
**ordinary** [16] - 287:15, 288:7, 288:9, 288:19, 288:24, 289:7, 311:13, 378:20, 380:3, 389:5, 403:17, 403:23, 406:16, 408:19, 425:9, 540:21

**organizations** [2] - 277:25, 283:17
**oriented** [1] - 279:11
**origin** [10] - 357:17, 357:22, 358:20, 360:8, 360:16, 418:24, 419:1, 419:3, 419:8, 419:17
**original** [25] - 289:23, 301:16, 306:4, 308:1, 320:5, 321:14, 321:15, 321:20, 326:2, 326:3, 337:5, 339:17, 340:21, 341:10, 355:8, 377:13, 413:1, 413:5, 413:13, 414:25, 415:7, 415:12, 435:17, 497:21, 541:15
**originally** [3] - 419:19, 466:23, 497:1
**origins** [1] - 419:14
**oscillate** [4] - 345:7, 345:8, 345:19, 415:9
**oscillates** [6] - 321:10, 323:2, 323:21, 343:8, 405:5, 422:6
**oscillating** [8] - 321:21, 343:20, 344:14, 345:3, 405:5, 405:7, 414:4, 414:5
**oscillation** [10] - 325:12, 325:13, 344:16, 345:17, 345:23, 345:24, 346:6, 415:2, 420:7, 420:15
**oscillations** [3] - 345:13, 415:4, 415:11
**otherwise** [2] - 481:25, 528:21
**ourselves** [1] - 297:20
**outcome** [4] - 380:16, 474:24, 547:24, 548:1
**outset** [1] - 470:17
**outside** [3] - 274:15, 282:8, 493:13
**outweighs** [1] - 271:8
**overall** [1] - 452:16
**overcontrolling** [3] - 397:22, 398:19, 398:22
**overcorrected** [1] - 398:5
**overlap** [1] - 480:25

**overrun** [3] - 350:25, 351:1, 351:2
**own** [12] - 309:23, 338:19, 381:12, 417:20, 426:7, 430:10, 442:7, 448:25, 450:3, 466:7, 479:3, 549:14
**owners** [1] - 520:14
**ownership** [1] - 494:8
**owns** [1] - 478:24

# P

**P.A** [2] - 264:17, 265:2
**p.m** [1] - 553:9
**Pacific** [5] - 453:18, 453:19, 455:6, 455:14, 456:13
**package** [8] - 436:22, 436:23, 437:5, 437:6, 460:3, 460:5, 460:13, 501:18
**packages** [1] - 437:1
**paddle** [3] - 427:7, 427:8, 427:10
**page** [28] - 284:14, 335:24, 338:6, 338:13, 380:23, 390:15, 410:7, 475:21, 489:14, 490:21, 492:23, 492:24, 497:5, 510:6, 510:7, 514:8, 518:23, 521:7, 524:11, 526:5, 526:9, 526:10, 527:3, 532:25, 534:2, 538:15, 544:3, 544:17
**Page** [20] - 287:19, 335:18, 335:19, 336:11, 410:2, 410:9, 490:18, 491:1, 495:3, 496:2, 497:6, 503:23, 513:2, 517:4, 520:25, 522:18, 532:5, 536:3, 538:10, 544:9
**pages** [2] - 268:16, 358:16
**paid** [18] - 284:7, 443:7, 461:14, 466:4, 466:15, 467:1, 478:13, 485:16, 490:5, 494:1, 494:18, 494:23, 500:19, 501:3, 502:18,

505:7, 511:21
**paint** [1] - 284:3
**pair** [1] - 369:8
**panel** [2] - 353:7, 353:10
**paper** [7] - 370:15, 370:21, 371:2, 371:4, 371:14, 372:9, 374:18
**papers** [3] - 382:24, 384:20, 389:4
**paperwork** [1] - 277:7
**paragraph** [17] - 287:24, 287:25, 336:23, 337:2, 341:4, 365:11, 381:20, 382:4, 382:15, 390:16, 390:22, 410:5, 491:1, 508:1, 510:10, 531:3
**paragraphs** [2] - 336:17, 380:15
**parameters** [1] - 305:11
**part** [40] - 266:8, 270:1, 284:23, 285:14, 301:17, 304:16, 307:6, 335:2, 342:8, 367:20, 367:21, 371:19, 372:3, 373:9, 383:8, 417:3, 449:16, 456:12, 458:24, 460:4, 461:15, 465:21, 473:14, 478:20, 481:20, 484:6, 484:18, 500:8, 507:6, 507:18, 508:19, 520:6, 521:12, 521:17, 525:8, 531:13, 531:19, 546:21, 546:23, 549:4
**partially** [1] - 278:13
**particular** [53] - 293:16, 295:18, 312:1, 386:17, 407:1, 407:23, 409:3, 411:3, 423:12, 449:18, 451:24, 452:8, 453:6, 454:3, 455:20, 456:16, 458:9, 459:1, 459:3, 459:5, 464:3, 464:22, 465:2, 466:4, 466:13, 466:22, 468:1,

471:6, 472:21, 474:2, 474:6, 474:25, 475:18, 481:9, 488:15, 488:18, 488:23, 489:1, 493:23, 500:10, 500:11, 502:19, 505:9, 505:10, 511:11, 513:22, 515:22, 520:5, 520:8, 528:2, 528:7, 533:21, 535:15

**particularly** [2] - 439:11, 525:19

**parties** [25] - 298:22, 450:4, 453:23, 454:4, 454:8, 454:10, 454:25, 455:2, 455:24, 458:5, 459:12, 459:18, 459:22, 472:15, 475:1, 481:8, 481:9, 485:17, 490:16, 510:13, 511:2, 511:6, 549:18, 551:1

**partner** [4] - 471:12, 527:16, 527:19

**PARTNERS** [1] - 265:5

**parts** [5] - 294:25, 404:23, 404:24, 412:21, 449:15

**party** [3] - 454:18, 454:24, 510:17

**pass** [1] - 308:19

**passed** [2] - 392:20, 468:2

**passenger** [1] - 279:1

**passive** [24] - 301:12, 301:16, 304:5, 304:6, 307:25, 308:15, 309:10, 313:20, 318:9, 318:17, 329:2, 329:5, 335:13, 336:24, 337:22, 337:23, 406:11, 407:6, 408:1, 409:5, 409:18

**passively** [15] - 311:23, 314:9, 314:22, 319:24, 319:25, 320:2, 320:3, 320:20, 320:21, 324:11, 324:13, 324:24, 325:17, 330:5

**past** [2] - 321:24,

352:23

**Patent** [2] - 496:22, 496:24

**patent** [103] - 286:6, 286:7, 286:11, 289:7, 289:9, 290:8, 290:11, 291:7, 296:9, 296:10, 300:9, 300:10, 300:12, 300:17, 302:14, 311:11, 311:14, 312:6, 316:15, 319:18, 319:19, 319:22, 324:15, 324:17, 330:3, 330:19, 346:23, 346:24, 364:5, 364:6, 364:7, 365:2, 365:7, 365:19, 365:20, 366:22, 367:5, 402:13, 402:19, 403:5, 405:22, 405:24, 406:1, 406:5, 410:17, 411:4, 413:2, 415:6, 415:14, 416:15, 417:12, 452:1, 452:3, 452:9, 452:11, 452:20, 452:24, 453:17, 459:1, 465:5, 465:6, 465:8, 465:9, 465:14, 467:5, 468:7, 473:16, 479:20, 479:23, 481:14, 481:18, 483:12, 495:7, 496:9, 496:16, 496:17, 496:19, 497:4, 497:8, 497:11, 497:15, 497:17, 497:20, 498:4, 498:19, 499:6, 519:9, 519:15, 519:16, 520:1, 520:5, 520:6, 520:9, 520:11, 520:15, 521:3, 521:9, 521:11, 521:14, 547:20, 547:21

**patent-in-suit** [1] - 483:12

**patentholder** [2] - 452:4, 481:17

**patents** [86] - 286:1, 286:2, 286:14, 286:19, 287:16, 288:6, 288:20,

289:14, 289:21, 291:5, 335:12, 335:15, 337:3, 337:8, 339:10, 412:4, 444:22, 448:17, 450:14, 451:25, 454:16, 455:16, 455:17, 456:19, 456:20, 457:1, 457:3, 458:10, 459:7, 461:8, 461:20, 464:12, 465:3, 465:4, 466:6, 466:8, 466:16, 467:24, 467:25, 469:24, 470:2, 470:3, 470:21, 471:16, 472:21, 472:24, 473:15, 473:18, 473:21, 474:1, 476:18, 478:22, 478:24, 479:7, 479:12, 479:20, 479:21, 482:11, 482:12, 482:13, 482:18, 483:13, 486:23, 494:7, 494:8, 494:11, 494:15, 495:22, 496:13, 496:15, 499:2, 499:10, 499:12, 518:19, 519:2, 519:3, 519:18, 519:22, 523:14, 531:7, 532:22

**patents-in-suit** [19] - 448:17, 450:14, 455:16, 456:19, 459:7, 461:8, 461:20, 464:12, 465:4, 472:21, 473:15, 473:18, 482:11, 482:12, 482:13, 482:18, 483:13, 518:19, 519:3

**patents-in-suits** [1] - 523:14

**patience** [1] - 429:18

**PATRICK** [1] - 265:7

**patrol** [2] - 281:8, 282:2

**patroller** [5] - 290:1, 307:9, 436:23, 437:5, 437:9

**pay** [20] - 393:13, 451:21, 452:8, 452:9, 452:19,

452:20, 461:8, 461:20, 466:14, 467:7, 479:3, 481:23, 505:1, 505:6, 511:10, 542:9, 542:15, 548:2, 548:6

**paying** [4] - 466:5, 466:8, 474:5, 479:8

**payment** [12] - 452:16, 458:25, 459:7, 461:19, 462:2, 462:8, 464:1, 464:2, 467:20, 493:22, 493:25, 494:21

**payments** [3] - 465:21, 466:3, 490:1

**PDF** [4] - 534:2, 536:4, 551:10, 551:11

**peel** [1] - 317:1

**penalty** [3] - 336:8, 338:18, 381:9

**penetrating** [1] - 425:4

**Penn** [1] - 467:22

**Pennsylvania** [1] - 273:16

**people** [12] - 277:17, 283:14, 286:21, 391:18, 396:4, 396:5, 427:17, 428:1, 428:4, 480:16, 482:19

**per** [51] - 267:5, 267:12, 270:2, 270:22, 271:2, 281:25, 325:11, 325:14, 452:20, 453:1, 453:7, 459:11, 460:6, 461:7, 462:4, 462:9, 463:18, 463:22, 464:7, 475:3, 475:8, 481:3, 481:7, 485:10, 485:11, 500:9, 500:16, 500:20, 501:6, 501:8, 502:2, 502:6, 502:18, 502:19, 502:20, 503:9, 503:14, 503:17, 505:5, 505:12, 511:10, 511:12, 511:22, 512:18, 515:12, 515:16, 530:8, 530:13, 545:22

**per-unit** [6] - 462:9, 463:18, 463:22, 464:7, 500:9, 530:8

**percent** [81] - 352:6, 354:22, 437:16, 437:17, 438:13, 438:18, 439:22, 439:25, 440:2, 440:3, 440:4, 440:6, 440:13, 440:17, 440:22, 441:13, 441:23, 442:2, 443:23, 460:12, 461:12, 468:13, 468:14, 468:20, 474:21, 478:11, 478:18, 484:20, 485:5, 485:8, 486:4, 486:6, 489:20, 501:2, 501:4, 501:19, 501:21, 501:22, 501:25, 502:1, 504:12, 504:22, 505:4, 506:17, 508:18, 508:22, 509:4, 509:16, 511:7, 514:24, 515:6, 515:12, 516:19, 517:7, 517:8, 517:9, 517:13, 517:14, 517:20, 517:25, 518:3, 518:8, 518:9, 518:12, 518:18, 542:4, 542:6, 542:14, 542:18, 542:23, 542:25, 543:3, 544:22, 545:6, 545:13, 545:17, 546:1, 546:4

**percentage** [15] - 443:25, 444:2, 444:4, 459:10, 463:20, 463:23, 474:20, 500:7, 500:12, 506:13, 527:1, 542:15, 545:12

**percentile** [1] - 354:21

**perfect** [2] - 499:25, 538:16

**perfectly** [2] - 297:23, 350:18

**perform** [1] - 368:16

**Performance** [1] - 283:25

**perhaps** [13] - 360:5, 374:24, 387:4, 387:24, 388:9, 388:14, 389:10, 476:24, 493:12, 501:10, 504:15, 510:24, 521:13

**period** [45] - 385:11, 386:7, 386:13, 386:16, 386:18, 386:23, 387:1, 387:2, 387:9, 387:12, 387:23, 388:10, 388:11, 388:13, 389:7, 395:3, 395:4, 454:13, 461:23, 461:24, 462:6, 464:24, 469:22, 471:21, 496:5, 503:19, 504:9, 504:10, 511:18, 511:23, 511:24, 511:25, 512:24, 534:4, 534:17, 535:21, 536:2, 536:15, 537:2, 537:9, 540:19, 540:22, 541:2, 543:10
**periods** [1] - 511:19
**peripheral** [1] - 266:1
**perjury** [3] - 336:9, 338:19, 381:10
**person** [37] - 286:20, 287:5, 287:15, 288:5, 288:7, 288:8, 288:19, 288:24, 289:7, 305:5, 305:6, 311:13, 312:23, 336:20, 354:20, 354:21, 378:20, 380:2, 380:3, 385:22, 387:7, 389:5, 391:21, 396:17, 396:18, 397:21, 400:6, 401:13, 401:16, 406:16, 407:5, 408:19, 422:1, 425:9, 426:19, 427:2, 549:8
**person's** [2] - 304:1, 354:15
**personal** [5] - 274:2, 286:20, 287:5, 529:6, 529:7
**personally** [1] - 471:23
**personnel** [1] - 278:7
**persons** [4] - 389:2, 403:16, 403:22, 410:23
**perspective** [9] - 461:7, 469:21, 470:10, 472:14, 499:9, 501:11,

509:20, 520:14, 530:11
**Peyton** [4] - 433:10, 433:20, 434:9, 434:11
**Ph.D** [2] - 374:20, 446:19
**Philip** [1] - 449:20
**philosophy** [1] - 446:16
**phonetic** [1] - 376:17
**photographs** [2] - 293:2, 305:13
**phrase** [1] - 415:7
**phrases** [5] - 301:9, 335:12, 337:3, 337:18, 388:8
**physics** [1] - 288:14
**pi** [1] - 325:11
**pick** [5] - 285:9, 314:15, 366:21, 374:15, 509:10
**picked** [3] - 314:12, 314:13, 428:8
**picks** [1] - 366:22
**picture** [1] - 427:15
**pictures** [5] - 316:4, 476:24, 482:25, 483:1, 483:5
**piece** [4] - 342:11, 460:23, 468:6, 472:3
**piercing** [1] - 277:21
**pillow** [1] - 424:23
**pilot** [5] - 279:12, 279:14, 280:14, 280:15
**pilots** [1] - 279:14
**Ping** [29] - 429:4, 431:7, 431:16, 431:17, 431:22, 432:7, 432:11, 433:18, 434:8, 435:4, 435:25, 436:3, 472:6, 475:19, 486:3, 487:15, 489:7, 514:25, 515:20, 516:13, 516:21, 518:11, 535:1, 535:4, 535:10, 545:16, 550:7, 550:8, 551:23
**Ping's** [15] - 474:13, 487:12, 487:14, 488:17, 488:20, 489:1, 516:25, 517:3, 533:25, 534:18, 535:2, 538:8, 538:18, 542:2, 544:1

**pioneered** [1] - 457:10
**pitch** [18] - 308:8, 308:10, 308:16, 312:20, 324:13, 340:5, 340:8, 340:12, 365:21, 365:22, 365:24, 366:1, 366:4, 416:5, 416:7, 416:9
**pitching** [1] - 416:5
**pizza** [1] - 287:5
**place** [2] - 295:23, 427:9
**placed** [1] - 532:14
**places** [3] - 355:7, 447:7
**Plaintiff** [9] - 264:5, 264:22, 266:13, 448:22, 449:10, 450:8, 450:15, 451:7, 453:24
**plaintiffs** [1] - 272:10
**plan** [2] - 407:21, 550:16
**plane** [5] - 282:18, 351:18, 366:1, 416:9, 424:3
**planes** [1] - 366:8
**planform** [13] - 314:2, 314:8, 317:13, 318:3, 349:25, 406:7, 406:14, 407:10, 407:11, 407:13, 407:15, 408:2, 408:3
**planing** [2] - 282:22, 283:7
**planning** [2] - 347:13, 347:16
**plate** [3] - 349:10, 349:15, 350:2
**platforms** [2] - 275:20, 276:8
**play** [14] - 266:7, 358:5, 358:8, 360:13, 361:25, 386:21, 389:20, 389:25, 392:14, 393:3, 393:9, 393:13, 396:9, 538:13
**played** [1] - 539:16
**players** [2] - 437:10, 449:12
**playing** [13] - 358:10, 360:14, 362:1, 385:20, 386:22, 390:2, 393:17, 393:23, 395:14, 396:10, 399:13,

431:9, 431:13
**plea** [1] - 434:2
**pleasant** [2] - 286:23, 287:8
**PLLC** [1] - 264:19
**plots** [2] - 321:9, 420:2
**plus** [7] - 312:4, 423:10, 439:21, 466:15, 466:25, 508:22, 537:10
**Plus** [10] - 289:24, 294:10, 294:13, 307:10, 437:22, 437:25, 438:7, 439:17
**Plywood** [1] - 453:19
**PMark** [1] - 347:14
**point** [42] - 283:11, 303:1, 312:22, 312:23, 340:1, 353:9, 354:6, 355:17, 355:22, 356:23, 357:25, 358:2, 358:22, 359:20, 359:21, 366:24, 386:24, 408:25, 418:12, 418:13, 418:19, 418:20, 418:21, 419:12, 421:3, 423:17, 424:5, 450:18, 466:16, 476:11, 478:24, 479:1, 493:24, 494:22, 496:16, 522:13, 522:19, 527:23, 528:24, 540:15, 541:4, 552:14
**pointed** [2] - 377:5, 377:12
**pointing** [1] - 367:16
**points** [31] - 314:1, 314:4, 350:9, 350:10, 350:11, 350:16, 350:17, 350:19, 351:6, 351:10, 351:11, 351:24, 351:25, 352:2, 352:3, 352:6, 352:10, 352:11, 352:13, 352:15, 353:4, 353:8, 353:13, 353:15, 418:2, 418:6, 418:16, 454:11
**polar** [1] - 293:14
**policy** [2] - 273:24, 528:15

**port** [1] - 439:2
**portion** [9] - 301:8, 317:19, 318:15, 329:19, 394:22, 411:3, 439:3, 522:22, 525:21
**position** [26] - 267:19, 304:24, 320:6, 323:2, 328:3, 330:25, 340:5, 340:14, 343:9, 345:3, 345:4, 345:17, 365:23, 387:11, 420:3, 427:16, 428:13, 431:22, 446:21, 480:11, 480:23, 481:1, 490:8, 514:11, 523:13, 530:7
**positive** [22] - 309:3, 325:19, 326:15, 365:25, 370:3, 370:5, 371:19, 372:9, 373:14, 373:21, 374:7, 375:25, 377:17, 377:19, 384:2, 390:6, 391:12, 397:16, 402:2, 420:16, 514:6
**possibility** [1] - 421:18
**possible** [8] - 372:13, 383:2, 383:4, 522:14, 522:16, 547:24, 547:25, 548:7
**possibly** [8] - 266:1, 266:2, 318:19, 318:21, 362:15, 415:2, 421:19, 485:18
**posted** [1] - 436:6
**potatoes** [2] - 385:14, 398:21
**potential** [1] - 449:3
**potentially** [1] - 501:15
**pounds** [1] - 282:25
**power** [3] - 307:4, 307:5
**powered** [1] - 283:3
**powers** [1] - 473:5
**practical** [3] - 312:18, 313:21, 423:22
**practice** [1] - 446:24
**preamble** [5] - 301:21, 301:22, 302:5, 319:23, 319:24

**precipitated** [1] - 521:12

**precisely** [1] - 342:12

**precision** [1] - 414:16

**predict** [1] - 375:3

**predicting** [1] - 388:21

**preferred** [1] - 302:11

**prejudice** [1] - 271:11

**prejudicial** [2] - 271:8, 271:9

**prepare** [1] - 537:6

**prepared** [2] - 468:19, 537:5

**preparing** [2] - 286:13, 541:5

**preponderance** [2] - 397:1, 397:7

**presence** [1] - 549:18

**present** [1] - 509:12

**presentation** [9] - 285:4, 285:6, 472:4, 472:6, 500:24, 502:7, 511:9, 525:5, 526:2

**presentations** [1] - 285:4

**presented** [5] - 267:17, 374:19, 513:18, 533:24, 537:3

**presenting** [2] - 489:4, 489:6

**presiding** [1] - 265:12

**pressed** [1] - 294:18

**pressures** [1] - 543:9

**presumably** [2] - 414:7, 550:21

**Pretrial** [2] - 265:20, 267:2

**pretrial** [1] - 267:3

**pretty** [4] - 369:22, 399:22, 426:23

**prevent** [2] - 399:2, 507:4

**preventing** [1] - 506:19

**previous** [3] - 326:4, 510:13, 526:10

**previously** [2] - 351:6, 542:3

**price** [39] - 267:5, 267:12, 270:2, 270:22, 270:25, 271:2, 437:15, 437:23, 439:18, 441:14, 441:15, 441:21, 452:7, 459:5, 460:3, 460:13, 463:5, 463:21, 463:22,

464:6, 480:12, 480:14, 485:20, 485:21, 485:23, 486:1, 486:2, 502:19, 503:19, 505:10, 512:17, 513:4, 513:20, 513:23, 522:13, 525:15, 530:16, 541:22, 545:15

**priced** [1] - 507:4

**prices** [6] - 501:12, 503:18, 504:2, 504:9, 509:23, 543:12

**pricing** [4] - 500:13, 503:5, 507:7, 513:11

**primarily** [2] - 276:5, 307:4, 439:13

**primary** [1] - 435:5

**principal** [1] - 282:17

**principally** [2] - 282:17, 291:1

**principals** [1] - 467:3

**principles** [3] - 279:15, 310:12, 380:14

**prize** [1] - 283:3

**Pro** [6] - 433:12, 433:20, 434:9, 434:12, 435:1, 445:1

**probative** [1] - 271:6

**problem** [12] - 268:4, 268:17, 354:8, 354:11, 354:12, 354:23, 374:16, 378:10, 427:11, 484:6, 538:4

**problems** [2] - 274:11, 524:13

**proceeding** [1] - 553:12

**PROCEEDINGS** [1] - 265:10

**process** [5] - 311:9, 352:22, 353:2, 451:19, 549:15

**produce** [6] - 309:3, 318:16, 375:10, 425:17, 470:8, 540:13

**produced** [11] - 449:9, 475:19, 477:22, 485:1, 534:14, 534:21, 536:20, 540:15, 541:4, 541:6, 541:13

**producers** [1] - 470:8

**produces** [2] - 375:6, 405:2

**producing** [1] - 515:24

**product** [74] - 291:2, 292:5, 292:16, 292:24, 293:1, 293:12, 294:14, 294:15, 294:17, 294:22, 295:2, 295:12, 295:16, 295:17, 306:5, 309:18, 309:24, 326:1, 327:16, 328:5, 328:12, 329:4, 329:23, 330:2, 330:4, 330:15, 331:6, 331:12, 331:18, 332:4, 349:7, 350:10, 351:11, 352:6, 418:6, 433:1, 436:11, 436:17, 436:18, 437:20, 437:21, 437:24, 438:21, 439:1, 440:1, 441:18, 441:20, 441:24, 450:21, 452:21, 453:1, 453:8, 455:18, 463:10, 463:11, 469:23, 473:20, 473:25, 480:14, 480:15, 484:2, 484:7, 525:13, 528:2, 528:3, 528:4, 528:16, 528:18, 528:21, 529:23, 543:1, 546:19

**production** [2] - 436:18, 536:25

**products** [86] - 277:25, 289:13, 289:20, 289:21, 290:9, 290:14, 290:16, 290:22, 290:25, 291:5, 291:15, 292:2, 292:22, 295:9, 296:19, 296:22, 305:1, 305:17, 306:20, 309:9, 309:12, 311:19, 311:25, 312:5, 313:16, 313:19, 315:15, 316:9, 316:18, 318:2, 319:9, 324:18, 326:7, 326:10, 326:19, 326:23, 327:1, 327:19, 328:4, 329:11,

329:15, 330:11, 330:14, 331:2, 331:17, 348:12, 348:13, 348:16, 348:17, 348:19, 350:13, 363:11, 390:7, 402:3, 412:18, 412:19, 413:6, 414:21, 414:23, 417:24, 418:22, 419:15, 427:13, 438:6, 441:17, 450:5, 452:23, 453:1, 454:14, 457:19, 457:20, 459:8, 463:14, 473:3, 514:2, 514:18, 515:21, 515:22, 515:24, 516:4, 522:12, 533:6, 544:13

**professional** [6] - 275:2, 275:4, 275:5, 275:6, 283:16, 447:10

**Professor** [33] - 347:22, 464:9, 466:7, 466:11, 466:13, 466:21, 466:24, 467:3, 467:20, 468:10, 468:17, 469:2, 470:10, 470:16, 470:22, 477:20, 477:22, 478:3, 478:6, 478:22, 479:10, 480:7, 483:18, 483:20, 484:23, 484:25, 489:12, 492:13, 495:14, 495:20, 497:15, 552:21

**professor** [1] - 467:22

**profile** [2] - 352:11, 352:16

**profit** [65] - 437:12, 437:16, 438:1, 438:2, 438:5, 438:12, 438:18, 438:19, 438:23, 438:24, 439:4, 440:2, 440:6, 440:7, 440:9, 440:14, 440:17, 440:19, 440:20, 440:22, 440:23, 440:24, 441:6, 441:8, 441:12, 441:22, 442:2, 474:16,

474:22, 477:9, 512:18, 514:6, 514:14, 514:23, 515:2, 515:6, 515:12, 515:19, 515:25, 516:2, 516:9, 516:18, 516:20, 517:6, 517:12, 517:21, 517:24, 518:2, 518:3, 518:5, 518:7, 518:8, 518:9, 518:10, 542:6, 542:12, 542:19, 544:1, 544:12, 544:20, 545:6, 545:17, 545:21

**profits** [9] - 514:1, 514:5, 514:17, 516:10, 516:14, 522:11, 542:24, 545:25

**program** [24] - 293:18, 294:4, 294:5, 294:6, 310:2, 310:6, 310:13, 311:7, 311:14, 312:18, 314:2, 321:6, 347:9, 347:13, 348:9, 350:4, 350:21, 351:17, 353:9, 353:20, 358:4, 362:10, 368:20, 426:2

**programs** [3] - 309:20, 309:21, 374:25

**project** [3] - 278:6, 281:10, 283:2

**projects** [1] - 279:4

**prone** [2] - 328:2, 330:24

**propelled** [2] - 286:21, 303:12

**propeller** [14] - 277:23, 281:22, 281:25, 282:1, 282:7, 282:12, 285:9, 303:15, 315:24, 315:25, 327:13, 383:18

**propellers** [5] - 281:20, 282:4, 282:5, 282:11, 285:5

**propelling** [1] - 331:23

**proper** [2] - 279:14, 471:15

**properly** [3] - 314:4, 468:8

**property** [17] - 432:4, 446:24, 447:15,

447:16, 451:15, 451:22, 451:24, 452:1, 452:2, 452:8, 452:11, 458:8, 465:11, 467:10, 482:3, 533:11
**proposed** [4] - 502:5, 503:10, 506:14, 551:1
**proposes** [1] - 482:24
**proposing** [1] - 482:8
**propulsion** [13] - 303:8, 303:10, 303:13, 315:22, 316:6, 327:14, 329:19, 329:20, 331:21, 331:23, 331:24, 332:5, 383:23
**prosecute** [2] - 467:24, 479:12
**protect** [1] - 465:10
**Protection** [1] - 283:25
**Protective** [1] - 284:2
**prototype** [1] - 483:18
**prove** [5] - 346:16, 347:2, 347:3, 347:5, 347:6
**proved** [1] - 299:5
**provide** [20] - 287:7, 302:13, 309:10, 318:8, 321:3, 323:4, 323:19, 329:1, 329:5, 362:14, 380:10, 383:10, 407:25, 409:18, 411:18, 446:14, 450:11, 504:17, 507:3, 529:4
**provided** [12] - 294:4, 333:19, 333:22, 335:3, 343:17, 348:11, 361:15, 419:14, 433:7, 464:11, 486:8, 488:15
**provides** [6] - 279:6, 304:7, 321:6, 407:6, 409:5, 455:6
**psychology** [1] - 446:16
**PTX** [40] - 293:5, 294:8, 294:20, 294:23, 295:7, 295:13, 300:4, 305:25, 306:24, 319:14, 338:5, 380:18, 390:12, 430:12, 430:18,

430:19, 431:1, 431:2, 489:10, 490:19, 492:18, 495:4, 499:19, 503:23, 510:5, 513:2, 518:16, 521:7, 522:18, 526:3, 530:24, 532:4, 534:1, 551:22, 552:2
**public** [1] - 432:5
**publications** [1] - 284:10
**publicize** [1] - 283:1
**publicly** [1] - 450:1
**pull** [20] - 293:5, 294:23, 300:4, 319:14, 415:14, 489:10, 496:1, 516:25, 517:3, 518:15, 518:21, 523:7, 524:10, 525:4, 526:3, 528:1, 528:9, 534:1, 544:3, 545:19
**pulled** [5] - 471:17, 483:24, 519:1, 528:3, 528:22
**purchase** [1] - 439:7
**purchased** [5] - 277:10, 447:18, 479:2, 494:15
**purchasing** [1] - 439:8
**purport** [1] - 389:12
**purpose** [3] - 270:17, 435:6, 456:17
**purposes** [3] - 270:16, 446:4, 490:11
**pushed** [3] - 322:10, 497:3, 497:22
**pushes** [4] - 308:11, 322:1
**pushing** [2] - 323:18
**put** [67] - 269:3, 273:4, 280:13, 281:14, 291:23, 295:21, 309:25, 311:14, 312:16, 314:3, 316:24, 318:14, 319:11, 322:12, 323:9, 324:4, 341:1, 350:9, 350:11, 351:6, 351:10, 351:24, 352:1, 352:10, 352:12, 353:11, 353:16, 353:20, 354:5, 354:10, 355:1, 355:6, 355:15, 355:21, 356:22,

358:3, 359:7, 361:3, 361:6, 398:12, 398:13, 416:10, 417:17, 419:6, 422:11, 426:1, 427:7, 427:8, 441:9, 448:24, 451:2, 453:4, 453:20, 455:9, 469:10, 494:10, 521:11, 538:10, 546:12, 546:20, 546:24, 548:13, 550:9
**puts** [4] - 280:13, 425:17, 475:5, 479:9
**putting** [5] - 347:16, 352:4, 352:22, 353:14, 473:19

## Q

**Qiuyang** [1] - 435:13
**qualified** [1] - 544:24
**qualities** [1] - 411:17
**quality** [3] - 529:20, 546:18, 547:2
**quantification** [1] - 411:18
**quantify** [7] - 378:7, 378:9, 387:2, 448:21, 484:10, 533:13, 533:15
**quantities** [2] - 378:12, 378:15
**quantity** [1] - 443:22
**quantity-wise** [1] - 443:22
**quarters** [1] - 282:23
**QUESTION** [10] - 496:4, 497:8, 517:5, 517:11, 521:2, 523:10, 523:17, 523:20, 525:14, 525:17
**questioning** [2] - 412:3, 420:24
**questions** [22] - 332:13, 360:23, 368:8, 368:10, 411:21, 412:2, 412:7, 412:9, 412:13, 415:18, 422:15, 422:18, 428:18, 537:22, 538:7, 541:21, 541:23, 543:25, 546:5, 546:8, 547:15, 548:9
**quick** [4] - 282:4, 327:15, 403:11,

405:8
**quickly** [3] - 278:9, 426:23, 428:14
**quite** [12] - 321:5, 323:22, 333:21, 375:12, 378:22, 396:20, 399:20, 402:8, 512:25, 516:16, 527:4, 552:16
**quote** [4] - 460:4, 508:13, 513:15, 522:15
**quote/unquote** [1] - 509:4

## R

**racing** [1] - 277:22
**radius** [2] - 352:14
**raise** [1] - 265:17
**raised** [1] - 513:4
**raises** [1] - 536:18
**raising** [1] - 377:7
**RALLI** [1] - 264:17
**ran** [15] - 313:2, 313:7, 313:8, 329:8, 350:18, 353:1, 391:15, 391:16, 392:10, 392:21, 392:24, 394:9, 417:15, 419:25
**range** [15] - 278:16, 280:15, 305:22, 312:18, 313:7, 313:13, 313:21, 314:14, 314:19, 332:23, 493:13, 493:15, 503:19, 504:8
**ranges** [1] - 503:19
**ranging** [1] - 280:12
**rapidly** [1] - 324:4
**rate** [37] - 270:3, 270:23, 271:1, 321:10, 322:8, 325:13, 340:5, 340:8, 340:9, 340:11, 452:18, 453:2, 453:7, 458:25, 459:10, 460:6, 460:12, 465:20, 465:23, 465:24, 467:17, 468:13, 468:24, 475:3, 475:7, 477:9, 478:18, 478:25, 485:5, 489:19, 505:4, 541:24, 541:25, 543:14,

545:11
**rates** [3] - 379:19, 478:10, 478:19
**rather** [6] - 269:6, 314:3, 319:24, 340:14, 479:8, 552:24
**raw** [1] - 439:7
**re** [1] - 419:25
**re-ran** [1] - 419:25
**reach** [2] - 446:7, 454:25
**reached** [6] - 290:15, 291:15, 441:7, 490:4, 494:2, 524:24
**react** [1] - 405:7
**read** [23] - 292:18, 305:13, 309:21, 310:21, 311:1, 320:14, 353:24, 462:21, 491:19, 504:4, 510:18, 521:5, 521:18, 522:22, 523:23, 525:20, 525:21, 530:19, 531:14, 542:2, 546:16, 546:17
**reading** [1] - 529:19
**reads** [2] - 491:2, 496:3
**ready** [10] - 272:3, 272:8, 322:14, 429:24, 505:23, 548:25, 549:2, 549:4, 550:14, 550:20
**Real** [1] - 553:13
**real** [18] - 265:20, 282:4, 323:23, 327:15, 371:19, 372:2, 375:5, 403:10, 451:14, 454:2, 455:2, 455:21, 457:2, 459:22, 461:1, 517:17, 518:12
**Real-Time** [1] - 553:13
**real-world** [1] - 461:1
**reality** [4] - 373:21, 375:19, 375:20, 375:22
**realize** [1] - 519:23
**realized** [2] - 419:20, 527:24
**really** [25] - 271:8, 339:7, 352:17, 374:23, 378:16, 400:8, 404:4, 405:17, 410:7,

420:8, 440:10,
459:10, 463:19,
463:23, 465:12,
465:13, 467:8,
468:5, 468:21,
468:25, 473:20,
476:19, 511:13,
535:18, 552:13
**rear** [11] - 319:4,
319:5, 319:7, 328:8,
328:19, 331:6,
331:11, 410:18,
410:23, 411:7
**rearward** [2] - 405:12,
405:14
**rearwardly** [5] -
317:24, 319:2,
319:7, 410:19, 411:7
**reason** [15] - 350:15,
351:18, 391:22,
440:23, 454:18,
462:7, 467:13,
471:2, 476:7, 478:7,
495:6, 504:24,
507:22, 532:19,
536:17
**reasonable** [18] -
387:9, 387:12,
387:23, 388:10,
388:11, 388:13,
421:17, 452:17,
453:3, 453:7,
453:11, 453:21,
454:6, 476:19,
477:13, 484:10,
513:8, 548:11
**reasonably** [3] -
400:11, 428:14,
428:17
**reasons** [10] - 318:12,
349:24, 466:18,
467:19, 476:9,
479:10, 491:2,
491:14, 529:25,
532:22
**rebuttal** [5] - 265:19,
266:2, 348:22,
360:19, 541:13
**recap** [2] - 347:20,
388:8
**receive** [6] - 433:1,
433:14, 433:25,
463:13, 466:16
**received** [11] - 309:22,
359:24, 362:20,
433:7, 433:10,
433:19, 433:20,
434:7, 435:2, 445:1,
445:6
**receiving** [1] - 473:14

**recent** [1] - 543:9
**recently** [2] - 513:13,
540:7
**Recess** [4] - 271:25,
333:5, 429:22,
505:21
**recess** [3] - 429:20,
505:18, 553:6
**recessed** [1] - 553:9
**recited** [2] - 302:1,
324:14
**recites** [1] - 324:11
**recognize** [21] - 293:5,
294:24, 295:14,
300:6, 306:1, 307:1,
319:15, 336:5,
338:8, 346:5, 356:2,
357:9, 367:6,
380:21, 426:21,
436:3, 489:10,
492:18, 492:20,
499:20, 535:11
**recognized** [3] -
448:11, 448:14,
536:11
**recognizes** [2] -
476:17, 501:2
**recollection** [4] -
445:7, 497:16,
499:25, 518:20
**record** [3] - 272:13,
431:14, 445:14
**recorded** [2] - 334:18,
334:21
**records** [1] - 277:7
**recovery** [1] - 280:12
**recreational** [5] -
277:2, 277:14,
283:21, 285:3, 285:6
**red** [5] - 374:1,
423:17, 536:19,
540:5, 541:19
**redesign** [1] - 281:11
**redesigned** [2] -
279:14, 281:12
**redid** [5] - 359:25,
360:15, 378:3,
381:4, 381:6
**REDIRECT** [2] -
411:25, 538:1
**redo** [3] - 360:3,
360:7, 360:16
**redoing** [2] - 420:18
**reduce** [4] - 374:21,
375:5, 513:21,
513:23
**reduced** [5] - 281:21,
282:22, 493:19,
535:3
**redundancy** [1] -

429:18
**refer** [3] - 337:18,
417:7, 442:18
**reference** [16] - 354:6,
355:17, 355:22,
356:23, 359:20,
359:21, 418:2,
418:6, 418:12,
418:13, 418:16,
492:21, 499:22,
507:18, 509:15,
542:17
**referenced** [4] -
492:12, 514:3,
514:13, 531:19
**referencing** [1] -
531:15
**referred** [3] - 302:15,
423:18, 437:23
**referring** [16] - 299:3,
300:12, 337:4,
362:4, 416:7, 416:9,
421:22, 434:8,
437:4, 460:4, 491:6,
496:14, 510:23,
526:6, 530:20
**refers** [1] - 299:1
**reflect** [3] - 273:24,
375:20, 442:4
**reflects** [1] - 375:21
**refresh** [2] - 364:14,
518:20
**refreshed** [1] - 412:6
**regard** [5] - 312:17,
340:2, 481:24,
483:7, 532:20
**regarded** [2] - 322:4,
388:21
**regarding** [11] - 289:4,
362:10, 412:14,
413:10, 413:11,
415:18, 432:16,
479:6, 488:17,
529:24, 543:21
**registered** [2] - 275:2,
275:4
**registration** [1] -
432:4
**regular** [2] - 292:7,
461:21
**regulations** [1] -
283:20
**regulatory** [1] - 448:7
**reissued** [1] - 496:20
**reiterate** [1] - 414:17
**relate** [3] - 282:6,
286:3, 455:19
**related** [14] - 284:11,
286:7, 322:8,
339:14, 433:4,

439:11, 443:18,
449:18, 456:24,
456:25, 516:9,
516:15, 538:20
**related-to-factory** [1] -
439:11
**relates** [2] - 446:14,
476:12
**relating** [3] - 274:18,
281:2, 422:4
**relations** [1] - 432:6
**relationship** [4] -
432:4, 470:14,
471:4, 525:23
**relative** [4] - 408:25,
511:17, 526:24
**relevant** [13] - 269:12,
271:3, 411:14,
456:17, 457:20,
458:1, 458:12,
463:6, 467:12,
468:15, 472:18,
490:9, 511:5
**reliability** [1] - 536:19
**reliable** [1] - 442:9
**relied** [17] - 269:2,
269:21, 270:11,
390:6, 401:22,
402:1, 499:23,
507:16, 516:25,
530:7, 533:24,
534:18, 535:2,
536:20, 538:8,
541:15, 545:9
**rely** [8] - 267:3, 267:9,
267:21, 366:21,
476:16, 490:16,
518:14, 525:9
**relying** [4] - 380:11,
382:10, 476:4,
510:25
**remain** [2] - 387:7,
387:8
**remainder** [1] - 330:7
**remaining** [1] - 380:15
**remains** [1] - 387:19
**remember** [52] -
281:13, 283:24,
335:6, 339:2,
344:23, 345:2,
353:16, 354:7,
359:3, 359:4,
360:23, 361:22,
362:2, 362:18,
364:13, 370:12,
384:5, 386:11,
388:16, 389:9,
389:18, 391:19,
402:4, 412:6,
412:15, 418:23,

427:14, 427:17,
427:20, 433:24,
445:7, 450:3,
463:17, 464:20,
467:14, 472:15,
478:21, 479:18,
495:11, 500:11,
507:8, 513:18,
514:4, 522:3,
522:17, 524:6,
528:6, 528:7, 538:7,
541:23, 546:9,
547:17
**remind** [1] - 549:5
**remote** [1] - 473:5
**remotely** [1] - 550:8
**remove** [2] - 269:4,
391:16, 533:20
**removed** [2] - 489:3,
533:18
**removing** [1] - 533:22
**render** [1] - 288:25
**rendered** [1] - 341:20
**rendering** [1] - 353:8
**renovation** [1] -
436:11
**rent** [12] - 439:10,
451:17, 451:21,
452:19, 453:8,
479:3, 481:22,
481:24, 516:15,
543:2, 548:3
**renting** [3] - 451:13,
479:1, 479:3
**repair** [2] - 277:13,
277:15
**repeat** [8] - 344:4,
375:23, 377:10,
403:21, 438:15,
444:1, 504:20, 545:3
**repeated** [2] - 506:16,
506:17
**repeatedly** [2] -
520:17, 520:19
**replace** [2] - 473:4,
473:6
**replaced** [1] - 282:3
**reply** [7] - 348:25,
381:1, 382:5,
382:15, 410:4,
531:1, 531:2
**report** [90] - 287:20,
341:5, 342:4,
342:10, 342:14,
342:20, 348:11,
348:15, 348:18,
348:22, 348:25,
351:17, 353:22,
355:8, 355:15,
356:4, 357:9,

358:11, 359:11, 359:12, 360:7, 360:19, 361:3, 361:6, 365:11, 367:12, 367:14, 367:21, 373:1, 375:25, 376:20, 376:22, 377:2, 377:16, 377:24, 378:7, 379:22, 381:1, 381:2, 381:18, 382:5, 382:15, 382:23, 388:24, 390:14, 410:4, 416:16, 419:8, 434:14, 448:25, 449:1, 449:22, 450:25, 451:3, 462:18, 462:22, 483:1, 487:23, 488:24, 490:18, 490:20, 491:24, 492:7, 495:4, 499:16, 500:1, 503:22, 513:1, 517:1, 519:24, 522:15, 522:16, 531:1, 531:2, 531:21, 536:3, 536:6, 537:4, 540:9, 540:11, 541:12, 541:13, 541:15, 543:17

**Report** [1] - 488:7

**reported** [4] - 364:2, 434:13, 461:21, 536:13

**reporter** [1] - 315:9

**REPORTER** [1] - 323:5

**Reporter** [1] - 553:13

**reporting** [1] - 389:12

**reports** [20] - 268:9, 268:22, 287:10, 333:19, 333:22, 333:25, 334:4, 338:10, 340:23, 348:10, 359:10, 359:16, 359:25, 361:10, 364:11, 449:20, 449:24, 490:22, 520:17, 525:9

**reposition** [1] - 296:4

**represent** [5] - 369:12, 391:25, 453:23, 478:11, 520:23

**representation** [4] - 524:3, 526:16, 526:17, 526:21

**representations** [3] - 510:14, 510:20, 510:23

**representative** [1] - 510:17

**represented** [3] - 270:24, 465:23, 483:4

**representing** [5] - 273:21, 273:23, 524:2, 526:16, 526:20

**request** [2] - 266:12, 498:11

**require** [1] - 281:4

**required** [8] - 279:10, 305:22, 340:24, 405:6, 408:20, 455:4, 461:16, 528:22

**requirement** [1] - 340:25

**requires** [10] - 337:23, 402:13, 403:6, 406:10, 409:15, 410:17, 413:18, 413:19, 422:6, 422:7

**reran** [4] - 313:23, 314:5, 314:11, 314:17

**rescue** [1] - 277:4

**research** [2] - 450:3, 549:13

**Research** [4] - 284:25, 446:23, 447:2, 447:24

**reseller** [1] - 501:3

**resellers** [4] - 508:5, 509:3, 509:6, 542:16

**resolved** [1] - 534:25

**resources** [1] - 439:9

**respect** [57] - 287:16, 288:20, 289:12, 289:15, 289:20, 290:9, 290:11, 290:12, 290:22, 291:5, 291:25, 292:1, 292:14, 292:22, 296:19, 296:22, 297:8, 302:14, 305:17, 307:15, 309:1, 309:2, 309:8, 310:18, 311:18, 313:18, 315:15, 316:7, 316:8, 316:17, 318:2, 318:7, 320:11, 324:18, 325:25, 326:10, 326:18,

327:1, 328:14, 329:9, 330:3, 330:13, 412:9, 412:14, 414:19, 414:20, 415:8, 420:14, 436:20, 437:11, 438:1, 441:11, 468:11, 469:24, 473:2, 510:14, 530:6

**respectfully** [1] - 383:3

**respond** [1] - 352:19

**responding** [1] - 385:16

**response** [4] - 349:9, 349:14, 349:19, 349:20

**responsibility** [2] - 468:1, 468:2

**rest** [3] - 302:4, 330:7, 443:25

**restarted** [1] - 394:25

**restoring** [1] - 383:10

**result** [8] - 326:16, 353:8, 372:10, 373:4, 376:15, 401:9, 408:12, 486:22

**resulting** [3] - 370:5, 371:21, 411:17

**results** [1] - 324:21

**resume** [1] - 284:14

**retail** [7] - 437:15, 441:14, 441:15, 441:21, 459:5, 485:21, 486:2

**retailer** [5] - 461:11, 471:23, 480:21, 486:5, 507:21

**retailers** [1] - 509:19

**retained** [2] - 288:22, 288:24

**return** [27] - 301:15, 308:1, 308:4, 308:5, 308:6, 320:5, 320:6, 321:13, 323:1, 323:19, 326:2, 326:14, 337:4, 339:16, 339:19, 339:21, 340:3, 340:13, 340:21, 341:10, 345:16, 365:23, 412:25, 413:13, 413:25, 415:12

**returning** [3] - 342:11, 342:15, 343:1

**returns** [13] - 321:14, 321:20, 326:2,

326:5, 326:14, 345:3, 345:23, 345:24, 413:4, 414:4, 414:5, 414:25, 415:7

**revenue** [4] - 269:18, 442:16, 442:18, 539:2

**revenues** [5] - 457:15, 514:1, 514:4, 514:17, 542:21

**Reverend** [1] - 371:4

**review** [8] - 348:21, 361:12, 361:14, 448:25, 449:4, 450:10, 459:13, 495:16

**reviewed** [15] - 442:11, 449:5, 449:13, 449:16, 450:2, 459:17, 460:23, 523:1, 524:8, 527:13, 528:12, 531:20, 531:21, 541:6, 544:5

**reviewing** [1] - 305:15

**revolutionary** [1] - 436:11

**Rhino** [2] - 293:14, 309:24

**RICHARD** [1] - 264:15

**Richard** [1] - 265:12

**RICHARDS** [1] - 265:2

**rid** [1] - 281:15

**ridden** [2] - 384:4, 398:7

**ride** [10] - 286:23, 287:8, 320:21, 395:21, 395:22, 400:2, 400:13, 411:16, 411:17, 427:10

**rideable** [2] - 320:20, 428:17

**rider** [19] - 361:1, 385:10, 387:6, 387:7, 387:15, 387:18, 387:19, 394:4, 394:9, 395:2, 397:23, 398:9, 398:11, 398:15, 398:18, 401:16, 401:18, 402:8, 426:23

**riders** [2] - 395:16, 397:24

**rides** [1] - 320:16

**riding** [12] - 304:21, 308:25, 391:7, 391:18, 391:21,

394:1, 398:16, 399:18, 399:19, 427:16, 428:5, 428:13

**right-hand** [1] - 507:23

**rights** [12] - 465:11, 467:5, 470:21, 473:17, 473:21, 474:1, 479:15, 479:17, 479:23, 479:24, 481:18, 495:7

**ring** [1] - 303:16

**rise** [10] - 265:11, 271:24, 272:1, 333:4, 333:6, 429:21, 429:23, 505:20, 505:22, 553:8

**rises** [1] - 304:22

**risk** [5] - 270:16, 473:25, 498:13, 498:15, 498:21

**riskless** [1] - 498:19

**River** [2] - 447:18, 447:23

**rivers** [1] - 278:6

**road** [1] - 465:10

**ROBERT** [2] - 264:20, 265:6

**roll** [13] - 281:9, 308:8, 308:18, 308:19, 308:20, 340:5, 340:8, 340:12, 366:2, 366:4, 416:18, 416:23

**rolling** [1] - 271:1

**rolls** [1] - 383:8

**roof** [2] - 309:5, 309:6

**rose** [1] - 398:5

**rotate** [1] - 405:3

**rotation** [1] - 408:22

**roughly** [7] - 354:19, 356:20, 461:22, 462:6, 493:5, 504:6, 515:15

**round** [4] - 282:8, 513:15, 513:19

**routine** [1] - 432:5

**row** [1] - 462:8

**royalties** [16] - 451:10, 461:14, 465:18, 465:25, 466:5, 466:9, 466:15, 466:25, 474:5, 478:13, 481:3, 489:22, 494:1, 494:18, 494:23, 505:2

**royalty** [115] - 270:3, 270:23, 271:1, 451:11, 451:24, 452:7, 452:10, 452:13, 452:17, 452:18, 452:23, 453:1, 453:2, 453:3, 453:7, 453:12, 453:22, 454:6, 458:2, 458:25, 460:6, 460:11, 460:12, 461:19, 462:2, 462:4, 462:8, 462:9, 463:17, 463:18, 464:1, 464:2, 464:7, 465:19, 465:23, 465:24, 466:3, 467:17, 468:13, 468:15, 468:24, 469:3, 472:17, 474:18, 475:3, 475:7, 475:9, 476:20, 477:6, 477:9, 477:13, 478:10, 478:17, 478:19, 478:25, 479:18, 481:7, 484:11, 484:16, 484:20, 485:5, 485:8, 485:10, 485:15, 488:16, 488:19, 489:19, 490:4, 490:5, 490:6, 493:19, 493:21, 499:18, 500:7, 500:9, 500:13, 500:14, 500:16, 500:17, 500:18, 501:3, 501:5, 501:8, 501:10, 502:1, 502:5, 502:9, 502:20, 502:21, 502:22, 502:24, 503:5, 503:9, 503:10, 505:4, 505:10, 506:14, 511:7, 512:12, 519:24, 522:8, 530:8, 530:14, 541:24, 541:25, 542:10, 543:14, 543:21, 545:11, 545:23, 545:24, 548:11
**Royalty** [1] - 448:9
**rudder** [9] - 279:14, 279:15, 281:3, 281:4, 281:6, 352:16, 380:17, 403:2

**Rudders** [2] - 413:22, 413:24
**rudders** [5] - 279:7, 279:9, 279:11, 281:2, 352:13
**rule** [1] - 355:3
**ruled** [1] - 267:3
**rules** [1] - 285:8
**ruling** [1] - 267:20
**run** [5] - 277:17, 327:15, 399:6, 417:20, 419:24
**running** [5] - 278:22, 394:13, 426:25, 427:25, 429:17
**runs** [4] - 420:22, 424:22, 424:23, 473:4
**rust** [1] - 287:1
**rusting** [1] - 281:11

## S

**S-T-E-C** [1] - 445:16
**sack** [2] - 385:14, 398:21
**safely** [1] - 279:16
**safety** [1] - 277:3
**sailing** [2] - 275:25, 281:8
**sale** [8] - 450:20, 460:7, 460:11, 461:10, 473:10, 545:14, 547:1
**sales** [68] - 270:18, 440:15, 442:5, 442:9, 442:17, 450:19, 463:21, 472:2, 472:20, 472:22, 472:23, 473:7, 473:12, 474:7, 475:10, 478:25, 485:20, 487:18, 487:19, 490:3, 503:11, 505:10, 507:19, 507:20, 509:2, 509:19, 509:21, 514:1, 514:17, 517:6, 522:11, 522:21, 527:10, 529:5, 529:23, 533:14, 533:15, 533:17, 533:25, 534:9, 534:10, 534:14, 534:20, 535:1, 535:3, 535:13, 535:15, 535:20, 535:23, 535:24, 536:12,

536:14, 536:22, 536:25, 537:15, 538:6, 538:20, 538:22, 538:23, 539:3, 540:25, 541:14
**salesperson** [1] - 543:2
**Salmon** [1] - 280:7
**salmon** [1] - 280:9
**San** [6] - 275:14, 276:5, 276:25, 277:11, 277:12, 277:17
**sat** [2] - 300:24, 334:7
**satisfied** [1] - 441:9
**save** [2] - 298:24, 299:10
**saw** [26] - 265:24, 283:14, 294:15, 342:14, 360:8, 362:24, 390:14, 394:10, 394:15, 396:3, 396:4, 420:2, 426:22, 471:7, 472:7, 516:23, 517:19, 524:16, 526:12, 539:15, 539:18, 541:18, 542:17, 546:21, 546:24
**say-so** [1] - 530:4
**scenario** [3] - 533:20, 533:21, 533:22
**scenarios** [1] - 322:3
**scene** [3] - 393:14, 394:6, 394:8
**schedule** [2] - 521:15, 521:23
**scheduling** [1] - 551:15
**school** [3] - 274:22, 413:21, 447:13
**science** [1] - 274:23
**scientific** [5] - 382:18, 382:24, 384:20, 388:19, 389:4
**scoured** [1] - 381:18
**screen** [6] - 336:14, 373:9, 381:21, 462:21, 497:5, 546:21
**scroll** [2] - 514:7, 521:20
**sea** [5] - 278:9, 396:3, 396:13, 396:16, 396:20
**SeaMark** [1] - 347:14
**search** [1] - 275:20
**seat** [3] - 265:14,

300:2, 315:17
**seated** [5] - 272:8, 333:11, 431:4, 506:5, 549:22
**Seattle** [1] - 278:20
**second** [28] - 268:13, 297:13, 319:18, 325:11, 325:14, 344:21, 378:3, 379:22, 394:9, 394:11, 410:9, 410:11, 436:11, 437:23, 441:15, 441:19, 442:1, 450:23, 460:4, 468:5, 476:5, 493:17, 493:18, 493:19, 493:21, 514:9, 522:19, 549:13
**second-generation** [2] - 436:11, 437:23
**secondary** [2] - 433:13, 467:11
**seconds** [25] - 283:5, 387:13, 388:12, 389:8, 391:8, 391:9, 392:10, 392:12, 392:25, 393:6, 393:11, 394:2, 394:3, 394:5, 394:6, 394:8, 394:9, 394:10, 394:23, 394:24, 394:25, 395:5, 399:25, 400:4, 402:7
**Secretary** [1] - 274:1
**Section** [1] - 533:1
**section** [12] - 309:25, 328:8, 328:19, 331:6, 353:10, 353:14, 353:15, 371:11, 514:7
**sectional** [4] - 406:24, 407:1, 407:4, 407:5
**sections** [1] - 310:1
**Security** [1] - 274:1
**SEDCO** [2] - 276:6, 276:8
**see** [145] - 275:10, 287:21, 293:23, 295:23, 296:1, 296:5, 296:14, 297:21, 298:3, 298:9, 298:10, 298:14, 298:17, 300:17, 300:20, 301:2, 301:4, 303:5, 308:14, 312:2, 314:21, 325:19,

333:2, 333:17, 333:18, 336:23, 337:6, 342:1, 342:6, 342:8, 342:12, 344:23, 345:10, 346:10, 354:18, 355:7, 356:7, 356:9, 356:17, 356:22, 357:14, 357:17, 357:22, 364:20, 365:3, 365:16, 366:17, 367:8, 367:13, 367:14, 367:25, 370:17, 371:11, 371:12, 371:17, 371:23, 373:5, 373:7, 373:10, 373:16, 374:1, 377:18, 381:21, 390:24, 391:1, 391:4, 391:7, 392:9, 394:1, 395:24, 396:14, 397:23, 399:24, 400:11, 402:8, 406:6, 406:8, 410:12, 410:14, 410:20, 417:2, 417:23, 418:10, 421:4, 421:10, 421:15, 422:15, 427:3, 437:12, 438:9, 447:25, 449:6, 450:17, 452:22, 453:4, 457:9, 457:14, 459:21, 460:1, 460:21, 461:5, 461:9, 461:21, 461:24, 462:1, 462:4, 462:15, 462:16, 462:20, 463:6, 464:15, 465:17, 469:16, 481:15, 481:19, 483:1, 485:13, 488:12, 492:22, 496:9, 496:10, 499:22, 504:10, 521:21, 521:22, 522:19, 522:22, 524:11, 525:8, 526:10, 527:17, 530:23, 532:2, 534:4, 534:8, 536:14, 539:4, 539:5, 544:11, 544:14, 544:15, 544:18, 546:25, 550:12
**seeing** [8] - 293:19,

297:16, 384:4,
385:10, 500:11,
507:8, 532:10,
532:24
**seem** [1] - 543:13
**segments** [4] -
391:17, 480:15,
480:23
**selected** [1] - 409:16
**selection** [2] - 364:4,
365:7
**selective** [1] - 277:7
**sell** [21] - 439:19,
440:1, 441:17,
441:18, 441:20,
441:24, 443:13,
458:16, 463:13,
470:9, 473:11,
478:1, 485:2,
501:10, 501:13,
505:4, 509:5,
528:16, 540:22,
542:3, 543:1
**selling** [9] - 433:1,
471:13, 504:6,
506:19, 516:4,
522:12, 528:18,
536:16, 542:22
**sells** [8] - 460:10,
471:24, 480:14,
480:15, 503:16,
515:21, 528:4
**seminal** [3] - 453:18,
468:6
**send** [5] - 439:1,
441:18, 461:16,
551:7, 551:9
**sends** [1] - 404:25
**senior** [3] - 274:7,
285:15, 285:16
**sense** [6] - 423:22,
458:21, 484:23,
500:15, 502:2,
509:11
**sent** [7] - 266:19,
276:11, 361:17,
434:11, 461:4,
547:6, 547:10
**sentence** [18] - 341:3,
341:7, 342:20,
342:25, 364:18,
364:22, 365:1,
366:9, 366:16,
366:19, 410:8,
416:2, 417:4, 491:2,
491:9, 492:8,
522:22, 533:8
**sentences** [1] - 491:12
**separate** [2] - 295:1,
480:23

**separated** [2] -
265:21, 295:1
**September** [2] -
461:25, 511:11
**sequestered** [1] -
266:5
**series** [2] - 372:18,
541:21
**serious** [1] - 547:23
**session** [1] - 265:12
**set** [16] - 314:1, 314:4,
346:9, 348:12,
348:15, 353:6,
353:7, 383:25,
416:23, 416:24,
441:20, 455:23,
456:5, 479:20,
507:7, 517:15
**sets** [4] - 281:14,
283:20, 312:2,
367:17
**setting** [2] - 293:14,
362:23
**settings** [1] - 293:23
**settle** [1] - 324:25
**settles** [1] - 324:4
**settling** [1] - 343:8
**several** [3] - 397:7,
455:7, 491:17
**shade** [2] - 294:17
**shaded** [1] - 293:15
**shaft** [1] - 282:8
**shall** [1] - 333:7
**shape** [9] - 406:24,
407:1, 407:4, 407:5,
407:16, 407:23,
407:24, 407:25,
520:7
**shaped** [3] - 302:13,
319:6, 379:8,
379:12, 410:18,
410:22, 411:6
**share** [10] - 443:5,
443:8, 443:15,
443:18, 443:21,
444:5, 444:13,
444:17, 444:19,
462:10
**shared** [1] - 384:17
**shares** [1] - 549:10
**sheet** [2] - 535:9,
535:11
**SHENZEN** [1] - 264:7
**Shenzhen** [24] -
306:14, 431:17,
431:20, 431:21,
431:23, 432:1,
433:19, 434:19,
434:24, 435:4,
435:14, 437:12,

438:2, 438:5,
440:24, 442:17,
443:5, 443:20,
444:3, 444:21,
444:25, 445:5,
544:12
**shift** [31] - 286:24,
303:18, 304:14,
304:19, 304:20,
305:2, 305:8,
305:11, 305:12,
305:18, 305:21,
305:22, 311:21,
315:5, 324:12,
328:9, 329:16,
358:4, 387:23,
400:14, 400:16,
400:20, 400:24,
401:1, 401:5,
402:10, 402:14,
402:21, 402:23,
416:11
**shifting** [1] - 305:8
**shifts** [2] - 401:8,
401:12
**ship** [22] - 275:14,
277:6, 277:7, 278:8,
278:9, 278:12,
279:6, 279:13,
279:16, 280:25,
281:14, 282:2,
285:17, 292:10,
292:12, 310:13,
380:5, 380:6,
388:22, 413:20,
424:2
**shipbuilding** [1] -
275:17
**shipping** [4] - 438:24,
438:25, 439:2
**ships** [10] - 274:11,
275:22, 281:16,
281:20, 281:24,
281:25, 285:20,
286:10, 310:12,
422:3
**shipyard** [1] - 277:11
**shore** [2] - 278:10,
278:12
**short** [4] - 319:20,
383:2, 400:9, 429:6
**shorter** [1] - 355:11
**shot** [2] - 293:11
**shove** [1] - 398:13
**show** [20] - 270:13,
271:12, 274:19,
293:4, 305:24,
306:18, 314:6,
320:15, 324:10,
326:12, 328:23,

330:20, 332:7,
346:16, 401:21,
420:1, 427:25,
428:4, 459:16,
508:24
**showed** [14] - 311:12,
314:7, 314:8,
413:10, 420:2,
426:13, 426:22,
428:8, 428:9,
478:17, 481:4,
530:11, 546:16
**showing** [10] - 270:15,
304:15, 307:24,
314:24, 316:12,
316:13, 318:23,
324:17, 324:22,
327:22, 328:6,
328:15, 329:18,
329:24, 330:4,
423:3, 426:11,
426:18
**shown** [7] - 302:20,
316:2, 316:3,
322:24, 328:21,
416:14, 423:18
**shows** [30] - 305:5,
318:13, 324:11,
325:5, 326:4, 326:5,
327:23, 328:7,
328:16, 328:24,
329:19, 329:25,
330:5, 330:8,
330:21, 331:5,
331:14, 375:25,
377:18, 378:18,
397:6, 397:21,
423:5, 423:13,
427:22, 436:7,
471:19, 488:18
**side** [15] - 281:9,
281:19, 298:3,
303:23, 303:24,
304:3, 306:6,
317:21, 352:15,
352:16, 383:9,
472:12, 482:1
**sideways** [5] - 310:12,
416:25, 423:24,
424:12, 424:16
**sigma** [22] - 321:9,
325:5, 369:11,
369:16, 369:20,
369:24, 370:2,
370:5, 371:19,
372:3, 372:7, 372:9,
372:16, 373:11,
373:14, 373:20,
374:7, 376:1,
376:14, 377:17,

420:9, 420:16
**signal** [2] - 404:25,
405:1
**signals** [1] - 405:2
**signature** [6] - 335:24,
336:5, 338:13,
338:16, 380:23,
381:7
**signed** [3] - 496:18,
497:25, 510:16
**significance** [1] -
479:6
**significant** [3] -
375:10, 392:22,
472:23
**significantly** [3] -
486:2, 486:7, 525:14
**signing** [1] - 548:5
**signs** [1] - 423:13
**silent** [1] - 509:22
**silhouette** [2] -
407:18, 407:20
**similar** [11] - 277:16,
283:7, 289:4,
292:24, 294:14,
308:19, 328:11,
388:21, 388:22,
408:15, 447:20
**simple** [7] - 366:14,
437:14, 443:9,
443:10, 452:25,
503:7, 541:1
**simpler** [1] - 424:3
**Simply** [1] - 341:9
**simply** [11] - 380:10,
458:21, 465:24,
468:22, 475:9,
478:12, 485:7,
493:22, 506:15,
529:22, 531:6
**single** [3] - 374:5,
376:20, 391:4
**sit** [7] - 322:22, 328:1,
333:7, 500:4, 522:3,
547:8, 548:21
**sitting** [4] - 265:24,
355:2, 427:15,
427:16
**situated** [1] - 470:9
**situation** [2] - 432:19,
456:11
**six** [3] - 461:22,
469:18
**six-month** [1] - 461:22
**sixth** [1] - 324:14
**size** [4] - 312:3, 353:7,
374:25, 461:18
**sizes** [1] - 290:7
**skill** [24] - 287:16,
288:7, 288:9,

288:19, 288:24, 289:7, 311:13, 378:20, 380:3, 389:2, 389:5, 398:9, 398:19, 398:25, 399:1, 399:3, 403:17, 403:23, 406:16, 408:19, 410:23, 422:1, 425:9
**skilled** [4] - 288:5, 320:22, 398:16, 425:21
**skim** [1] - 280:13
**skin** [1] - 294:2
**skip** [2] - 299:10, 299:18
**slap** [1] - 424:11
**sleeps** [1] - 287:2
**slice** [2] - 316:25, 317:2
**Slide** [39] - 266:25, 268:7, 268:10, 268:15, 268:16, 338:5, 341:1, 341:23, 342:18, 344:19, 351:9, 355:25, 357:7, 357:19, 364:16, 365:12, 367:2, 367:10, 371:9, 372:24, 373:24, 381:16, 382:2, 382:13, 382:20, 401:24, 402:17, 403:10, 406:3, 487:5, 495:10, 500:23, 503:21, 507:9, 508:10, 511:9, 525:4, 525:22, 527:14
**slide** [46] - 304:15, 307:15, 307:24, 314:24, 314:25, 315:20, 316:11, 316:13, 318:22, 324:10, 326:4, 326:5, 327:21, 327:23, 328:6, 328:7, 328:14, 328:23, 329:18, 329:24, 330:4, 330:5, 331:4, 331:5, 331:7, 338:22, 447:25, 449:6, 451:12, 451:15, 453:13, 469:10, 474:25, 475:5, 477:16, 495:11, 525:6, 525:25, 526:4, 526:6, 527:2,

527:14, 528:24, 537:5, 537:6
**slides** [7] - 268:7, 304:10, 327:18, 492:11, 495:12, 507:10, 507:14
**Slides** [1] - 269:10
**slightly** [6] - 290:6, 295:18, 325:19, 325:20, 326:15, 424:6
**sliver** [1] - 526:13
**sloppiness** [1] - 414:6
**sloppy** [1] - 414:15
**slow** [6] - 278:4, 280:12, 394:16, 394:22, 394:23, 424:19
**slow-speed** [1] - 278:4
**slows** [1] - 422:9
**small** [24] - 276:23, 276:24, 277:11, 278:20, 285:8, 285:21, 286:9, 287:3, 314:16, 353:7, 354:14, 372:9, 385:11, 386:7, 386:13, 386:16, 386:18, 386:23, 387:1, 387:2, 394:22, 395:3, 421:20, 439:3
**Small** [1] - 284:24
**smaller** [5] - 283:7, 437:10, 488:8, 526:23, 526:25
**smallest** [2] - 389:7, 395:4
**smooth** [2] - 353:11
**smooth-looking** [1] - 353:11
**smoothly** [1] - 550:15
**SNAME** [1] - 283:18
**snowboard** [1] - 304:21
**so-called** [2] - 282:25, 321:9
**so..** [4] - 320:18, 392:4, 394:14, 426:14
**society** [1] - 284:23
**Society** [4] - 284:2, 284:6, 284:24, 285:1
**software** [14] - 321:2, 347:9, 352:6, 353:6, 362:24, 363:10, 363:13, 363:16, 363:17, 368:20, 368:22, 368:25,

374:4, 374:15
**sold** [26] - 270:24, 270:25, 437:1, 442:13, 454:14, 461:17, 461:18, 462:2, 471:20, 477:23, 477:24, 478:14, 485:1, 491:18, 501:18, 501:21, 504:1, 504:25, 505:7, 512:8, 537:1, 537:9, 540:17, 545:20, 546:14, 546:15
**solely** [7] - 286:24, 329:2, 329:15, 402:14, 402:20, 402:21, 402:22
**solution** [1] - 321:8
**solve** [1] - 424:3
**someone** [5] - 296:3, 311:7, 399:18, 400:6, 427:16
**sometimes** [10] - 298:23, 309:4, 416:8, 427:17, 448:2, 457:5, 457:12, 463:7, 463:12, 473:16
**somewhat** [1] - 339:8
**somewhere** [6] - 298:17, 347:15, 351:4, 351:5, 419:1, 465:9
**soon** [1] - 527:23
**sooner** [1] - 552:24
**sophisticated** [1] - 374:24
**sorry** [83] - 267:8, 275:18, 276:19, 279:19, 279:22, 283:23, 289:3, 290:25, 291:16, 292:10, 293:8, 294:11, 294:12, 294:16, 307:23, 323:5, 323:7, 329:13, 332:2, 333:21, 334:2, 334:19, 335:19, 335:25, 336:1, 336:19, 337:16, 344:4, 355:9, 357:12, 368:5, 375:11, 377:9, 377:10, 384:8, 384:15, 390:9, 390:18, 390:19, 392:18, 400:18, 403:18, 405:25,

408:7, 408:24, 409:10, 409:12, 418:4, 422:24, 424:18, 430:18, 438:15, 439:24, 445:4, 449:2, 453:3, 472:10, 480:17, 487:13, 488:10, 492:3, 494:4, 496:24, 497:13, 501:5, 512:9, 512:23, 521:20, 524:22, 526:11, 527:6, 527:22, 529:14, 530:13, 532:17, 533:17, 534:23, 543:18, 545:2, 546:3, 551:22
**sort** [21] - 269:20, 280:25, 361:1, 366:20, 376:3, 452:18, 455:12, 458:25, 462:21, 464:24, 468:6, 469:9, 470:17, 470:18, 475:16, 476:3, 476:10, 481:21, 483:19, 487:17, 516:13
**sorts** [2] - 275:15, 280:12
**sound** [2] - 325:2, 395:18
**sounds** [1] - 528:14
**source** [4] - 303:13, 303:15, 442:9, 462:17
**sources** [2] - 343:16, 428:4
**south** [1] - 273:17
**southeast** [1] - 276:6
**span** [25] - 316:14, 317:16, 317:17, 318:4, 406:7, 406:15, 408:4, 408:5, 408:8, 408:9, 408:10, 408:12, 408:13, 408:14, 408:15, 408:21, 408:23, 409:2, 409:8, 409:14, 409:16, 409:20, 410:10, 410:13, 475:17
**span-wise** [22] - 316:14, 317:16, 317:17, 318:4, 406:7, 406:15, 408:4, 408:5, 408:8, 408:9, 408:10,

408:12, 408:13, 408:14, 408:15, 408:21, 409:8, 409:14, 409:16, 409:20, 410:10, 410:13
**sparser** [1] - 314:4
**Spaulding** [1] - 278:21
**speaking** [6] - 279:17, 279:20, 332:22, 336:20, 349:25, 492:15
**special** [1] - 275:20
**specialized** [1] - 447:15
**specializing** [1] - 288:11
**specialty** [1] - 274:23
**specific** [9] - 301:10, 301:25, 407:21, 468:9, 481:3, 529:24, 531:16, 538:23
**specifically** [5] - 305:7, 361:20, 437:4, 514:5, 520:2
**specification** [4] - 337:3, 337:17, 478:16, 498:25
**specifics** [3] - 412:7, 529:9, 529:11
**specified** [1] - 458:24
**specifies** [2] - 346:23, 476:23
**specify** [1] - 352:13
**speed** [29] - 274:18, 277:21, 278:4, 278:7, 287:6, 288:13, 288:15, 304:18, 313:10, 313:11, 313:12, 313:13, 314:19, 315:23, 321:23, 327:13, 340:8, 379:19, 403:7, 403:14, 403:16, 403:19, 403:22, 404:6, 404:10, 404:22, 405:6
**spell** [2] - 272:12, 445:13, 495:24
**spend** [1] - 281:24
**spending** [1] - 281:16
**spin** [1] - 293:17
**spinning** [1] - 282:13
**spoken** [1] - 529:2
**sponsor** [1] - 285:1
**Sport** [1] - 471:24
**sport** [1] - 535:14
**Sports** [1] - 441:11

**spots** [1] - 353:17
**spread** [1] - 535:20
**spreadsheet** [1] - 540:1
**squeeze** [2] - 304:18, 404:24
**squish** [2] - 317:1, 317:6
**squished** [1] - 317:8
**stability** [150] - 278:23, 278:25, 285:4, 285:8, 287:6, 301:12, 304:7, 307:25, 308:2, 308:16, 308:17, 308:18, 308:23, 309:5, 309:10, 311:8, 311:10, 313:21, 318:9, 318:17, 320:2, 321:7, 329:2, 329:5, 330:7, 335:7, 335:9, 335:13, 336:24, 336:25, 337:22, 337:23, 339:16, 339:17, 339:18, 340:20, 340:24, 340:25, 341:9, 341:13, 341:15, 341:16, 342:4, 342:17, 342:23, 342:24, 343:4, 343:6, 343:7, 343:21, 344:14, 344:17, 344:25, 345:13, 346:6, 346:23, 346:24, 347:1, 347:3, 347:6, 348:12, 348:15, 354:15, 363:1, 363:10, 363:17, 363:19, 363:21, 364:11, 364:12, 365:10, 365:21, 365:22, 365:25, 366:2, 366:7, 368:14, 368:23, 369:23, 370:10, 371:11, 373:22, 379:15, 380:5, 380:7, 381:6, 383:5, 383:19, 384:1, 384:13, 384:18, 384:22, 387:25, 388:22, 390:7, 391:13, 394:11, 394:20, 397:14, 397:16, 400:9, 401:23, 402:2, 406:11, 407:6,

408:1, 409:6, 409:18, 411:11, 411:15, 411:18, 412:10, 412:11, 412:21, 412:22, 412:24, 412:25, 413:3, 413:11, 413:12, 413:16, 413:18, 413:19, 413:20, 413:25, 414:22, 414:23, 414:24, 416:8, 420:4, 420:12, 421:8, 421:10, 421:22, 421:23, 422:5, 422:7, 423:1, 423:4, 423:5, 423:6, 424:2
**Stability** [2] - 371:17, 371:18
**stabilize** [1] - 383:15
**stabilizing** [1] - 281:9
**stable** [89] - 286:23, 311:2, 311:9, 311:23, 313:6, 313:11, 313:20, 314:9, 314:22, 319:24, 319:25, 320:2, 320:3, 320:5, 320:16, 320:20, 320:21, 322:3, 322:4, 324:11, 324:13, 324:23, 324:24, 325:18, 326:13, 330:6, 330:9, 340:4, 340:13, 342:6, 343:7, 345:18, 345:20, 345:24, 345:25, 346:12, 346:17, 346:18, 362:25, 365:14, 366:3, 366:4, 366:10, 366:11, 366:12, 366:15, 369:15, 369:17, 369:19, 384:3, 385:24, 386:8, 386:14, 387:11, 389:17, 389:23, 395:9, 395:24, 396:22, 396:23, 397:20, 397:21, 398:14, 398:17, 398:20, 398:22, 399:5, 399:12, 400:12, 414:5, 414:6, 416:3, 416:7, 416:18, 416:24, 417:1, 420:20, 421:18, 421:23,

422:10, 426:24, 427:23, 428:15, 428:16, 428:17
**stabler** [1] - 422:12
**stand** [12] - 269:3, 312:24, 313:1, 317:12, 384:7, 384:9, 427:7, 427:8, 427:10, 445:11, 486:4, 552:22
**stand-up** [3] - 427:7, 427:8, 427:10
**standard** [6] - 278:23, 354:14, 364:10, 365:10, 394:18, 413:22
**standards** [1] - 283:20
**standing** [4] - 328:2, 330:24, 384:24, 523:3
**start** [8] - 272:8, 382:6, 397:23, 434:1, 468:23, 469:4, 548:24
**started** [7] - 335:11, 419:1, 447:13, 464:15, 471:13, 495:2, 527:22
**starting** [8] - 276:20, 320:17, 447:12, 468:25, 469:1, 499:1, 550:2
**starts** [5] - 298:23, 393:21, 424:22, 424:23, 463:25
**State** [3] - 278:24, 446:20, 467:22
**state** [11] - 267:4, 267:10, 267:16, 267:21, 269:1, 269:16, 271:17, 272:12, 275:7, 392:1, 434:10
**statement** [13] - 340:22, 342:3, 342:14, 342:21, 343:15, 413:10, 413:11, 491:21, 492:5, 508:20, 524:4, 532:15
**statements** [7] - 268:11, 269:10, 269:11, 269:13, 273:24, 338:19, 381:12
**STATES** [1] - 264:1
**states** [1] - 445:13
**States** [9] - 273:19, 278:7, 442:14, 443:11, 448:10,

516:4, 517:7, 538:22, 543:12
**static** [48] - 301:11, 301:12, 307:25, 308:15, 309:10, 313:20, 318:9, 318:17, 320:2, 321:7, 329:2, 329:5, 335:9, 335:13, 336:24, 337:22, 337:23, 339:18, 342:17, 342:24, 345:9, 346:23, 347:3, 347:6, 363:10, 366:7, 368:23, 406:11, 407:6, 408:1, 409:6, 409:18, 412:10, 412:11, 412:24, 412:25, 413:10, 413:16, 413:19, 414:22, 416:5, 420:4, 420:12, 421:8, 423:3, 423:5
**statically** [25] - 311:2, 311:23, 314:9, 314:22, 319:25, 320:4, 320:19, 320:21, 324:13, 324:24, 326:12, 326:13, 330:6, 340:4, 345:18, 345:20, 345:24, 346:17, 362:25, 363:1, 366:4, 366:9, 414:5, 422:10
**stationary** [2] - 386:25, 387:19
**stay** [3] - 386:25, 416:10, 428:21
**stayed** [1] - 447:19
**stays** [1] - 463:23
**steady** [4] - 340:10, 340:13, 398:23, 464:7
**Stec** [16] - 266:17, 267:20, 268:20, 270:6, 271:5, 429:13, 445:10, 445:16, 445:25, 446:1, 486:16, 513:2, 538:3, 548:20, 549:23
**STEC** [1] - 445:17
**Stec's** [5] - 268:9, 500:23, 507:10, 511:9, 525:4
**steered** [1] - 303:22
**steering** [10] - 286:23, 329:25, 332:9,

332:10, 400:17, 400:18, 400:21, 401:2, 423:23, 483:3
**stenographic** [1] - 553:11
**Step** [2] - 309:23
**step** [4] - 427:9, 428:20, 539:14, 548:21
**Steward** [1] - 531:18
**stick** [1] - 481:13
**stickiness** [1] - 425:2
**sticking** [3] - 281:8, 282:8, 397:14
**Sticks** [1] - 413:22
**sticks** [1] - 413:24
**sticky** [1] - 323:24
**still** [39] - 265:21, 270:5, 284:7, 284:8, 284:9, 293:2, 293:10, 293:11, 305:12, 314:22, 361:21, 362:12, 362:24, 368:8, 375:13, 384:24, 395:8, 397:21, 399:20, 401:22, 402:6, 409:8, 409:14, 413:23, 420:20, 427:15, 461:11, 478:23, 483:11, 488:19, 498:18, 506:11, 516:3, 517:21, 522:25, 524:18, 525:1, 533:19, 548:17
**stills** [3] - 422:8, 422:12, 425:6
**stipulate** [1] - 392:16
**stipulated** [13] - 297:5, 297:8, 297:11, 298:25, 299:1, 299:2, 299:4, 299:12, 299:16, 299:20, 299:22, 311:20, 478:18
**stipulations** [1] - 298:21
**stop** [1] - 324:5
**stopped** [3] - 394:22, 424:20, 540:8
**stops** [3] - 322:1, 322:9, 342:20
**story** [1] - 281:23
**straight** [6] - 282:14, 309:1, 369:22, 385:21, 385:23, 485:6
**stream** [1] - 437:21

**Street** [1] - 264:11
**strictly** [1] - 425:13
**strike** [1] - 441:16
**structure** [1] - 460:1
**structured** [1] - 267:12
**structuring** [1] - 500:12
**strung** [1] - 394:12
**strut** [20] - 303:1, 303:2, 303:7, 318:16, 318:20, 325:24, 327:3, 327:7, 328:16, 328:17, 328:25, 331:8, 331:9, 331:16, 331:22, 425:4, 425:5, 436:16
**struts** [2] - 290:7, 322:12
**student** [1] - 374:20
**study** [1] - 286:14
**stuff** [3] - 284:17, 549:14, 550:13
**style** [1] - 304:21
**subclass** [1] - 338:2
**subdivision** [1] - 276:6
**subject** [3] - 269:15, 510:15, 552:23
**sublicensee** [1] - 533:3
**Sublicensor** [1] - 533:8
**submarines** [2] - 285:22, 422:3
**submit** [2] - 498:16, 551:1
**submitted** [6] - 338:10, 348:22, 350:15, 497:3, 497:24, 498:3
**subsequent** [3] - 305:4, 307:6, 511:18
**subsequently** [3] - 270:24, 292:15, 540:12
**subsidiary** [2] - 485:24, 485:25
**substantial** [6] - 288:11, 288:15, 383:10, 512:7, 514:1, 514:17
**substantially** [4] - 271:7, 512:3, 512:4, 512:25
**subtanker** [1] - 279:2
**subtracted** [1] - 488:22
**successfully** [1] -

353:1
**sudden** [1] - 537:18
**suddenly** [1] - 399:5
**sue** [1] - 481:14
**sufficiently** [1] - 287:3
**suggest** [4] - 481:5, 505:11, 512:21, 515:4
**suggested** [6] - 347:22, 347:25, 437:15, 441:15, 441:21, 459:5
**suggesting** [2] - 349:14, 478:24
**suggestion** [2] - 348:1, 348:2
**suggests** [3] - 484:1, 541:1, 541:2
**suit** [20] - 448:17, 450:14, 455:16, 456:19, 459:7, 461:8, 461:20, 464:12, 465:4, 472:21, 473:15, 473:18, 482:11, 482:12, 482:13, 482:18, 483:12, 483:13, 518:19, 519:3
**suits** [1] - 523:14
**sum** [4] - 493:22, 493:25, 494:13, 494:21
**summarize** [1] - 476:10
**summarizes** [1] - 484:15
**summary** [2] - 450:11, 469:10
**summer** [1] - 535:17
**sums** [1] - 425:17
**supercalifragilistic xpialidocious** [1] - 325:3
**superceded** [1] - 510:21
**supersede** [1] - 510:13
**supplanted** [1] - 541:16
**supplemental** [4] - 487:23, 536:3, 536:6, 536:25
**Supplemental** [1] - 488:7
**supplemented** [1] - 540:6
**supplying** [1] - 362:2
**support** [10] - 275:22, 276:12, 277:15,

278:4, 278:17, 379:25, 388:23, 389:4, 443:2, 528:17
**supported** [4] - 278:13, 279:2, 286:22, 287:7
**supporting** [2] - 274:8, 275:16
**supports** [2] - 381:24, 382:18
**supposed** [2] - 383:4, 392:4
**Surf** [1] - 471:24
**surface** [20] - 273:20, 277:21, 327:25, 328:1, 328:2, 328:3, 329:1, 330:22, 330:23, 331:16, 353:3, 374:17, 375:9, 376:18, 403:1, 424:21, 425:1, 425:2
**surfaces** [3] - 323:3, 353:12, 402:23
**surge** [1] - 424:17
**surprise** [1] - 424:18
**sustain** [1] - 543:22
**sway** [2] - 424:7, 424:18
**sweep** [3] - 310:17, 317:21, 317:23
**switched** [1] - 404:10
**sworn** [12] - 272:23, 445:18, 535:2, 538:8, 538:18, 538:19, 540:3, 544:23, 545:7, 545:8, 545:9, 545:16
**synchronous** [4] - 405:9, 405:11, 405:16, 405:18
**syrup** [1] - 324:1
**system** [24] - 303:9, 303:10, 303:13, 315:22, 316:6, 321:18, 323:21, 324:3, 327:14, 329:19, 329:20, 329:25, 331:21, 331:23, 331:24, 332:5, 332:9, 332:10, 383:23, 400:18, 401:17, 401:19, 424:1, 448:10
**systems** [3] - 400:17, 400:21, 401:2

**T**

**tab** [1] - 287:21
**table** [10] - 316:24, 354:19, 454:1, 454:18, 454:23, 455:25, 456:14, 456:15, 472:16, 473:14
**tables** [1] - 367:19
**Tacoma** [1] - 278:24
**tactics** [2] - 531:23, 532:7
**tail** [3] - 295:9, 302:12, 325:5
**tailored** [1] - 317:16
**tailoring** [12] - 316:14, 318:4, 406:7, 406:15, 408:5, 408:10, 408:13, 408:14, 408:17, 408:21, 409:8, 409:14
**takeoff** [2] - 313:8, 314:17
**Takuma** [1] - 444:12
**talks** [3] - 416:19, 508:17, 527:15
**taller** [1] - 359:8
**Tamayo** [4] - 471:24, 528:25, 529:4, 529:22
**tankers** [1] - 275:20
**Tao** [3] - 292:19, 305:13, 310:22
**tap** [1] - 551:1
**target** [1] - 278:10
**task** [2] - 335:2, 448:20
**tasked** [4] - 448:15, 448:16, 448:23, 454:5
**tasks** [2] - 277:1, 450:12
**TAYLOR** [1] - 264:17
**teach** [2] - 455:17, 473:18, 482:11
**teaches** [3] - 311:9, 311:10
**teaching** [1] - 285:10
**teachings** [2] - 324:14, 482:12
**team** [2] - 296:4, 390:20
**teams** [1] - 285:16
**Technical** [1] - 284:25
**technical** [10] - 285:6, 292:8, 370:15, 405:8, 449:23, 455:15, 455:16,

456:18, 456:24, 499:1
**technically** [2] - 396:15, 396:16
**techniques** [1] - 282:10
**TECHNOLOGY** [1] - 264:7
**Technology** [1] - 306:14
**technology** [4] - 280:23, 431:18, 455:20, 468:21
**teeny** [3] - 353:12
**telephone** [1] - 549:8
**televisions** [1] - 280:8
**tempted** [1] - 301:23
**ten** [2] - 283:5, 443:23
**tend** [1] - 335:16
**tendencies** [1] - 342:21
**tendency** [32] - 301:15, 308:1, 308:3, 308:5, 308:7, 308:20, 320:5, 321:9, 321:13, 323:1, 324:18, 325:6, 326:1, 326:4, 326:14, 337:4, 339:16, 339:18, 339:20, 340:3, 340:13, 340:21, 341:10, 342:9, 345:15, 345:16, 365:23, 412:25, 413:12, 413:25
**tense** [1] - 291:23
**term** [18] - 301:11, 302:11, 320:3, 322:5, 342:4, 343:11, 343:12, 343:14, 345:22, 346:1, 407:10, 408:10, 412:10, 414:7, 414:15, 422:4, 451:22
**term's** [1] - 338:1
**termination** [3] - 532:8, 532:11, 532:13
**terms** [35] - 303:1, 303:17, 319:5, 335:3, 335:7, 335:9, 337:9, 339:1, 339:6, 339:10, 339:12, 341:25, 380:12, 406:6, 408:8, 408:11, 412:15, 414:11, 414:18, 420:7, 422:5,

452:25, 454:10, 455:12, 458:5, 458:11, 459:11, 465:18, 465:20, 467:6, 475:4, 514:3, 520:4, 532:24
**terribly** [1] - 419:20
**tested** [1] - 281:14
**testified** [36] - 272:24, 296:17, 397:15, 423:20, 426:5, 445:4, 445:18, 448:6, 468:18, 471:11, 483:9, 483:20, 486:3, 487:11, 487:16, 489:3, 489:7, 495:14, 495:21, 503:17, 515:1, 515:3, 515:21, 516:21, 516:24, 517:19, 523:5, 527:16, 529:17, 531:22, 533:18, 535:1, 539:17, 543:8, 543:20, 544:1
**testifies** [1] - 538:21
**testify** [5] - 448:5, 487:6, 487:8, 495:9, 504:18
**testifying** [5] - 265:25, 392:4, 411:10, 507:19, 550:8
**testimony** [54] - 266:8, 266:17, 267:14, 270:10, 272:17, 441:10, 446:14, 456:23, 458:15, 468:9, 468:10, 472:7, 474:13, 475:19, 484:17, 488:17, 489:1, 495:5, 502:14, 507:20, 513:18, 514:4, 514:14, 516:23, 517:1, 517:4, 521:1, 523:6, 523:25, 524:1, 527:21, 528:10, 528:12, 528:25, 529:12, 531:25, 532:2, 533:25, 534:18, 535:2, 538:8, 538:18, 538:19, 540:3, 542:2, 544:7, 545:7, 545:8, 545:9, 545:16, 546:6, 546:16, 547:9, 551:14

**testing** [2] - 277:2, 522:3
**text** [2] - 357:17, 357:22
**textbooks** [10] - 343:16, 366:20, 379:24, 380:12, 381:24, 382:9, 382:17, 382:23, 384:19, 389:4
**texts** [2] - 345:22, 366:23
**THE** [153] - 264:1, 264:2, 264:15, 265:13, 265:23, 266:11, 266:15, 266:18, 266:23, 267:1, 267:8, 267:13, 267:17, 267:22, 267:25, 268:3, 268:13, 268:21, 268:23, 269:5, 269:19, 270:4, 270:8, 270:12, 270:17, 271:4, 271:20, 271:22, 272:2, 272:6, 272:14, 272:21, 273:1, 273:2, 273:3, 273:6, 279:19, 279:20, 279:22, 287:11, 287:12, 295:23, 296:3, 296:13, 297:13, 297:18, 297:22, 298:2, 298:6, 298:8, 298:10, 298:12, 298:13, 298:15, 298:16, 298:18, 298:19, 300:22, 307:18, 307:19, 307:20, 311:15, 322:18, 322:19, 322:20, 323:5, 323:7, 323:11, 323:15, 332:14, 332:20, 333:2, 333:7, 333:10, 333:14, 335:25, 336:3, 336:12, 336:19, 351:10, 358:6, 367:3, 370:19, 385:18, 390:17, 390:19, 392:3, 392:6, 392:15, 392:17, 392:18, 392:19, 392:20, 393:10, 393:18, 393:24,

396:11, 399:14, 410:1, 411:23, 422:16, 422:18, 422:21, 428:19, 429:1, 429:5, 429:9, 429:12, 429:14, 429:16, 429:24, 430:6, 430:11, 430:16, 430:25, 431:3, 431:8, 431:11, 432:23, 433:9, 435:7, 436:10, 438:11, 439:18, 445:12, 445:15, 486:13, 505:14, 505:18, 505:22, 505:23, 506:1, 506:3, 537:24, 543:18, 543:22, 548:20, 549:22, 549:24, 549:25, 550:5, 550:11, 550:19, 550:21, 550:25, 551:5, 551:21, 551:25, 552:4, 552:9, 552:11, 552:25, 553:5
**the'** [1] - 346:23
**theirs** [1] - 528:5
**themselves** [4] - 321:3, 369:3, 378:19, 494:7
**theory** [11] - 380:1, 380:11, 381:19, 381:25, 382:5, 382:11, 382:18, 382:23, 383:8, 421:4, 425:24
**thereafter** [2] - 466:12, 527:24
**therefore** [1] - 374:9
**Theuerkauf** [16] - 272:9, 297:13, 297:24, 298:21, 299:1, 332:15, 368:4, 368:9, 372:20, 411:24, 422:16, 431:5, 539:14, 539:22, 545:2, 551:18
**THEUERKAUF** [60] - 264:20, 265:16, 266:6, 266:12, 272:10, 272:25, 273:9, 279:24, 287:9, 287:13, 295:22, 295:25, 296:7, 296:16, 298:1, 298:9, 298:8,

299:9, 300:4, 300:5, 300:13, 300:16, 300:23, 306:7, 306:9, 306:23, 306:25, 307:21, 311:16, 322:21, 324:7, 332:12, 412:1, 422:17, 422:20, 422:22, 426:15, 426:17, 428:18, 429:4, 429:6, 430:3, 430:9, 430:12, 430:17, 430:21, 430:23, 431:6, 431:10, 431:12, 433:5, 433:17, 435:10, 436:19, 438:14, 439:23, 550:4, 551:4, 551:19, 551:22
**they've** [6] - 269:17, 270:19, 299:1, 299:2, 461:14, 472:22
**thin** [2] - 310:16, 310:17
**thingies** [2] - 425:17, 425:18
**thinking** [15] - 266:4, 333:1, 347:17, 455:13, 456:14, 458:2, 461:5, 461:9, 463:17, 466:21, 482:21, 520:4, 520:15, 532:23, 552:15
**thinks** [2] - 463:18, 485:14
**third** [3] - 286:11, 311:22, 441:19
**thirty** [1] - 429:9
**thousands** [2] - 512:8, 512:9
**threat** [5] - 481:12, 481:25, 547:15, 547:25, 548:3
**threats** [2] - 530:15, 530:21
**three** [59] - 282:23, 285:4, 286:2, 286:4, 289:1, 293:12, 308:7, 312:2, 313:11, 313:12, 348:13, 348:16, 348:19, 352:25, 353:1, 364:3, 364:4, 364:7, 364:8, 364:12, 365:8, 365:18, 365:19,

365:20, 366:7, 366:21, 366:22, 367:17, 372:21, 391:8, 392:10, 392:25, 393:11, 394:2, 394:6, 399:25, 402:6, 404:24, 406:12, 406:16, 416:16, 416:20, 416:24, 418:18, 455:12, 464:22, 464:23, 469:20, 469:22, 491:15, 497:4, 497:22, 532:8, 532:11, 532:13
**three-dimensional** [1] - 293:12
**three-quarters** [1] - 282:23
**three-year** [4] - 469:22, 532:8, 532:11, 532:13
**throttle** [2] - 286:25, 483:23
**throughout** [3] - 428:2, 428:3, 520:17
**throw** [3] - 521:14, 521:15, 548:6
**throw-in** [2] - 521:14, 521:15
**thrown** [3] - 520:6, 521:9, 521:23
**Thursday** [3] - 551:16, 552:16, 552:24
**tier** [2] - 441:19
**timeline** [2] - 436:6, 436:7
**timer** [1] - 393:15
**timing** [1] - 492:7
**tip** [3] - 383:9, 419:2, 419:21
**tips** [1] - 304:22
**title** [2] - 431:22, 525:25
**today** [13] - 273:22, 274:3, 289:11, 299:23, 304:10, 334:1, 334:5, 446:14, 447:11, 449:24, 450:9, 549:2, 552:15
**together** [9] - 371:5, 394:12, 404:18, 440:4, 448:24, 453:24, 453:25, 454:4, 454:8
**tomorrow** [7] - 266:3, 548:24, 549:3, 550:1, 550:6,

551:14, 552:22
**tonight** [2] - 550:9,
551:2
**took** [21] - 279:13,
282:20, 309:23,
309:24, 309:25,
314:1, 348:1, 348:2,
348:8, 350:10,
391:16, 413:9,
419:21, 453:10,
471:18, 475:21,
478:12, 524:18,
525:1, 532:22,
539:10
**top** [13] - 327:25,
330:22, 330:23,
410:11, 418:20,
449:7, 491:15,
507:23, 507:25,
508:3, 513:15,
527:15, 544:20
**torn** [1] - 283:10
**torpedoes** [1] - 422:4
**total** [13] - 352:16,
439:3, 442:16,
442:18, 466:2,
500:17, 500:18,
500:19, 501:8,
501:10, 501:11,
539:2, 540:18
**totally** [1] - 484:7
**toward** [2] - 275:11,
319:4
**towards** [3] - 318:25,
531:4, 551:15
**tractable** [1] - 378:10
**Trade** [1] - 448:8
**training** [4] - 345:22,
395:20, 395:22,
414:3
**transaction** [2] -
442:3, 451:25
**transcript** [9] - 344:21,
495:16, 495:18,
496:2, 497:6, 523:1,
523:7, 525:10,
553:11
**transcripts** [4] - 311:1,
334:10, 334:14,
431:12
**transit** [1] - 277:17
**translated** [1] - 459:9
**translates** [1] - 404:24
**Trial** [1] - 264:13
**trial** [13] - 268:8,
268:19, 289:16,
297:4, 298:23,
301:8, 475:25,
495:18, 496:1,
497:6, 523:1, 523:7,

523:12
**Triantafyllou** [7] -
339:4, 349:15,
353:21, 353:23,
361:13, 550:23,
552:21
**Triantafyllou's** [7] -
349:1, 349:4,
349:20, 350:22,
359:25, 361:12,
385:13
**tried** [11] - 297:24,
311:12, 419:19,
455:11, 469:8,
476:10, 502:6,
502:13, 503:7,
509:17, 535:12
**trigger** [1] - 404:25
**trim** [6] - 416:4, 416:8,
416:18, 416:19,
416:21, 417:7
**trimmable** [5] - 416:3,
416:7, 416:19,
416:25, 417:5
**Triozzi** [1] - 553:13
**trolley** [1] - 277:17
**true** [21] - 265:24,
299:5, 309:11,
311:24, 319:8,
326:23, 326:24,
336:9, 338:20,
349:18, 381:13,
415:8, 415:12,
416:4, 416:15,
423:7, 437:19,
480:20, 480:21,
502:22, 553:10
**truth** [3] - 272:19,
272:20
**try** [15] - 285:5, 344:6,
351:5, 409:10,
448:21, 457:6,
466:20, 473:19,
477:17, 479:24,
480:10, 500:5,
504:14, 549:3,
551:13
**trying** [16] - 347:17,
379:15, 379:16,
384:22, 416:6,
459:22, 467:4,
467:9, 467:14,
467:24, 468:22,
483:22, 509:10,
509:11, 512:5,
515:15
**Tuesday** [1] - 264:12
**tugs** [3] - 275:25,
277:5, 278:25
**turn** [15] - 279:10,

281:3, 287:19,
293:25, 294:1,
308:25, 340:10,
399:5, 405:3,
427:22, 495:3,
499:18, 510:7,
522:18
**turned** [2] - 294:2,
294:16
**turning** [1] - 399:6
**turns** [5] - 309:3,
309:7, 427:22,
427:25, 533:19
**twice** [1] - 503:8
**twist** [25] - 316:14,
317:16, 317:17,
406:7, 406:15,
408:4, 408:5, 408:9,
408:10, 408:12,
408:13, 408:14,
408:15, 408:21,
409:5, 409:7, 409:8,
409:13, 409:14,
409:17, 409:20,
410:10, 410:13
**twisted** [2] - 317:14,
317:15
**twisting** [1] - 409:4
**two** [94] - 267:22,
268:16, 281:14,
281:25, 285:3,
286:4, 286:10,
286:21, 287:5,
299:24, 302:8,
321:17, 323:3,
325:11, 326:25,
327:3, 334:7, 339:1,
339:6, 350:17,
352:25, 358:16,
367:17, 369:12,
391:7, 392:10,
392:25, 393:10,
394:2, 394:6,
397:25, 399:8,
399:24, 400:4,
404:23, 408:8,
412:21, 414:18,
418:19, 418:22,
421:3, 421:11,
425:2, 427:17,
427:18, 427:25,
428:23, 436:21,
437:1, 448:16,
450:12, 452:15,
453:23, 454:3,
454:7, 458:13,
459:12, 459:21,
468:12, 468:14,
468:20, 480:23,
481:8, 482:22,

482:24, 482:25,
483:5, 490:22,
491:11, 491:12,
492:15, 493:6,
496:13, 497:4,
497:22, 499:12,
508:11, 509:12,
511:19, 518:18,
518:19, 519:3,
523:17, 524:18,
525:1, 541:11,
549:5, 553:6
**two-and-a-half** [3] -
468:12, 468:14,
468:20
**two-fold** [1] - 421:3
**type** [21] - 285:21,
286:8, 295:16,
295:18, 319:19,
330:7, 330:10,
446:5, 448:1,
449:13, 451:15,
451:20, 451:25,
458:17, 470:18,
483:3, 483:18,
517:22, 539:20,
540:1, 545:17
**types** [3] - 274:15,
277:16, 484:3
**typical** [4] - 508:17,
508:22, 509:4,
509:16
**typically** [7] - 352:12,
352:13, 451:18,
451:20, 459:21,
535:7, 535:22
**typo** [4] - 491:24,
492:1, 492:4, 539:10

## U

**U.S** [13] - 306:5, 441:7,
442:18, 442:20,
442:21, 453:18,
485:24, 485:25,
539:2, 540:17,
546:14, 547:2,
553:14
**U.S.D.C.J** [1] - 264:15
**ultimate** [2] - 307:9
**ultimately** [14] - 270:2,
311:18, 320:6,
320:20, 323:4,
325:15, 326:5,
326:14, 372:13,
453:9, 461:18,
471:25, 486:1,
497:23
**uncertainty** [1] - 465:8
**under** [26] - 272:23,

329:20, 336:8,
338:18, 359:21,
371:18, 381:9,
413:2, 445:18,
448:17, 450:13,
456:4, 465:11,
467:7, 481:11,
490:1, 491:12,
497:21, 503:9,
504:25, 505:7,
505:9, 529:17,
534:7, 535:1, 537:13
**underestimates** [1] -
484:21
**underestimating** [1] -
465:25
**underline** [1] - 528:20
**understates** [1] -
451:7
**understood** [2] -
439:24, 492:6
**undoing** [1] - 270:23
**unfortunately** [1] -
310:10
**union** [1] - 475:9
**unit** [28] - 452:20,
459:11, 461:7,
462:9, 463:18,
463:22, 464:7,
475:3, 481:7,
485:10, 500:9,
500:16, 500:20,
501:6, 501:8, 502:2,
502:18, 502:19,
502:20, 505:5,
505:12, 512:18,
515:16, 530:8,
530:14, 546:14,
546:15, 547:1
**UNITED** [1] - 264:1
**United** [9] - 273:19,
278:7, 442:14,
443:11, 448:10,
516:4, 517:7,
538:22, 543:12
**units** [28] - 442:13,
442:22, 461:17,
481:3, 487:7, 487:9,
487:14, 487:15,
488:13, 488:21,
488:24, 489:1,
489:7, 489:8, 489:9,
501:13, 512:9,
512:11, 533:17,
534:19, 536:17,
537:9, 538:24,
539:9, 540:17,
540:18, 540:22,
541:2
**University** [4] -

446:16, 446:18, 446:20, 467:22
**unless** [1] - 552:12
**unlike** [3] - 455:2, 502:4, 502:12
**unnecessarily** [1] - 553:1
**unnecessary** [1] - 385:10
**unreasonable** [3] - 451:5, 484:16
**unreliable** [2] - 451:4, 477:11
**unstable** [12] - 370:3, 373:19, 374:10, 376:21, 397:20, 398:7, 398:11, 399:2, 399:4, 399:7, 426:20, 427:3
**unsupported** [2] - 451:5, 477:12
**up** [142] - 274:21, 276:18, 277:20, 279:18, 279:20, 282:20, 293:5, 294:23, 295:21, 298:12, 298:16, 300:4, 300:18, 300:24, 303:17, 306:7, 315:20, 317:12, 319:14, 320:8, 322:22, 335:17, 335:19, 336:14, 338:4, 341:1, 341:21, 341:23, 344:18, 351:9, 355:25, 356:12, 357:7, 359:19, 359:21, 362:15, 364:16, 365:12, 368:9, 370:18, 371:9, 372:24, 380:18, 382:13, 386:19, 390:11, 390:16, 398:5, 398:21, 402:17, 406:3, 409:25, 410:1, 411:4, 413:15, 415:14, 424:23, 424:24, 425:3, 425:18, 427:7, 427:8, 427:10, 435:25, 438:4, 444:4, 449:7, 451:6, 452:17, 453:7, 454:6, 458:6, 460:9, 462:5, 462:23, 463:10, 463:17, 463:20, 466:10,

466:15, 467:2, 467:3, 468:12, 468:20, 468:22, 473:19, 475:9, 477:12, 484:10, 485:4, 489:6, 489:10, 494:22, 496:1, 497:5, 503:25, 504:9, 504:14, 507:2, 508:1, 508:19, 511:2, 511:18, 512:21, 512:25, 515:14, 516:25, 517:3, 517:15, 518:10, 518:15, 518:21, 519:1, 519:24, 521:20, 522:8, 523:7, 524:10, 525:4, 526:3, 528:9, 530:16, 534:1, 538:10, 538:15, 540:10, 540:15, 541:4, 543:13, 543:14, 544:3, 544:15, 546:24, 547:24, 548:4, 548:13, 549:14, 550:13, 552:5, 553:3
**update** [1] - 540:12
**upfront** [1] - 465:21
**upper** [7] - 302:17, 328:17, 331:9, 331:10, 342:5, 373:7
**USA** [1] - 264:7
**useful** [3] - 286:12, 321:6, 467:16
**user** [13] - 303:19, 304:14, 305:19, 328:1, 328:9, 329:3, 330:23, 401:8, 401:12, 402:14, 402:21, 441:18, 441:21
**uses** [1] - 346:1
**USPTO** [2] - 497:24, 498:17
**usual** [1] - 298:25
**utility** [1] - 280:6
**utilized** [1] - 295:17

---

**V**

**valid** [4] - 297:23, 448:18, 450:14, 454:16
**valuable** [1] - 465:12
**value** [15] - 271:6, 354:9, 373:14,

373:21, 374:7, 375:25, 420:16, 464:2, 467:10, 468:21, 499:5, 519:21, 520:1, 520:8, 520:11
**valued** [1] - 521:3
**values** [16] - 324:16, 354:22, 363:18, 363:19, 364:3, 364:4, 364:7, 369:16, 369:20, 370:2, 372:10, 372:16, 374:21, 375:18, 377:17, 377:20
**variable** [1] - 353:6
**variables** [1] - 365:8
**variations** [2] - 436:21, 437:20
**variety** [2] - 276:25, 387:20
**various** [27] - 276:7, 277:25, 278:5, 280:6, 280:12, 281:2, 289:1, 289:25, 292:18, 298:23, 298:25, 309:25, 316:4, 320:14, 320:25, 334:24, 347:24, 354:11, 354:17, 354:18, 386:19, 386:20, 397:8, 420:21, 449:12, 473:6
**vehicle** [6] - 281:1, 282:19, 283:3, 398:12, 398:20, 411:17
**vehicles** [4] - 278:2, 278:4, 278:5, 278:14
**venture** [1] - 276:12
**verify** [1] - 442:10
**version** [4] - 349:21, 437:22, 507:4, 507:14
**versus** [3] - 421:7, 453:18, 465:15
**vertical** [1] - 325:9
**vessel** [4] - 281:21, 398:11, 398:12, 416:18
**vessels** [14] - 274:9, 274:10, 275:20, 277:4, 277:14, 277:16, 278:25, 279:1, 279:2, 279:3, 280:11, 280:12, 285:21, 285:22

**via** [6] - 303:18, 304:14, 305:2, 305:18, 305:20, 331:22
**video** [55] - 334:17, 334:20, 358:10, 359:1, 360:14, 362:1, 384:4, 384:12, 384:18, 384:23, 385:20, 386:9, 386:22, 387:15, 388:2, 389:20, 389:24, 390:1, 390:2, 390:4, 390:6, 390:22, 391:3, 391:4, 391:16, 392:9, 393:17, 393:23, 395:9, 395:14, 395:20, 395:22, 395:24, 396:10, 396:13, 396:21, 397:6, 397:7, 397:17, 397:19, 398:17, 399:12, 399:13, 401:22, 402:1, 402:7, 426:10, 426:18, 427:21, 429:4, 431:9, 431:13, 445:9, 539:15, 539:18
**Video** [1] - 362:16
**videographer** [1] - 400:6
**videos** [30] - 292:18, 293:2, 305:12, 310:21, 310:25, 311:4, 311:5, 312:9, 320:13, 320:15, 320:25, 329:7, 389:13, 389:16, 390:10, 392:21, 397:8, 398:10, 414:4, 420:25, 421:4, 421:5, 421:11, 421:12, 421:13, 427:3, 427:12, 427:14, 427:24, 428:4
**videotape** [2] - 431:7, 474:13
**view** [22] - 292:7, 292:8, 339:5, 339:10, 339:15, 343:11, 343:12, 343:14, 357:20, 363:16, 378:11, 381:24, 388:19, 389:5, 397:17,

402:11, 406:22, 407:13, 407:15, 409:7, 409:13, 421:4
**viewed** [2] - 407:16, 451:3
**views** [2] - 394:4, 523:5
**viscosity** [4] - 323:25, 426:1, 426:2, 426:4
**viscus** [2] - 323:25, 324:1
**visible** [1] - 293:16
**vision** [1] - 383:3
**visit** [1] - 422:14
**visualizing** [1] - 321:7
**Volume** [1] - 264:4
**volume** [1] - 536:17
**vortex** [2] - 282:10, 282:12
**Vortex** [1] - 310:2, 310:5

---

**W**

**Wade** [10] - 266:8, 266:14, 310:22, 441:12, 441:16, 441:17, 441:20, 550:1, 550:7, 550:10
**Wade's** [1] - 292:19, 305:14, 485:25
**Wagner** [12] - 450:8, 471:11, 520:2, 520:10, 520:12, 523:4, 524:4, 527:15, 527:24, 531:12, 531:18, 547:2
**Wagner's** [5] - 520:18, 520:24, 521:1, 523:25, 546:5
**wait** [3] - 268:13, 553:7
**waited** [2] - 495:21, 523:17
**waiting** [1] - 496:9
**waive** [1] - 466:14
**walk** [2] - 364:15, 455:3
**walked** [3] - 346:14, 472:10, 472:11
**wall** [3] - 283:11, 283:14, 424:22
**Wang** [1] - 431:16
**wants** [5] - 268:6, 296:4, 426:25, 437:12, 440:24
**warm** [1] - 535:22
**Wars** [1] - 280:7
**Washington** [3] -

275:8, 278:20, 278:24
**waste** [1] - 550:18
**watch** [3] - 265:22, 310:25, 395:12
**watched** [4] - 390:10, 391:3, 427:12, 538:13
**watching** [3] - 384:23, 395:9, 539:18
**water** [55] - 273:4, 293:23, 304:17, 323:23, 323:24, 323:25, 324:2, 324:3, 324:4, 325:20, 325:24, 326:16, 329:20, 331:24, 359:21, 374:16, 374:20, 375:3, 375:4, 375:7, 375:8, 378:21, 378:22, 378:24, 379:1, 379:2, 383:14, 383:19, 396:5, 396:17, 396:18, 421:7, 422:1, 422:3, 422:11, 422:12, 423:23, 424:10, 424:11, 424:13, 424:15, 424:20, 425:2, 425:5, 425:22, 426:13, 426:14, 443:13, 535:13
**watercraft** [22] - 282:16, 286:20, 288:13, 288:16, 302:10, 310:15, 315:16, 315:22, 318:6, 324:12, 331:24, 332:9, 339:15, 354:23, 354:25, 369:14, 370:11, 371:14, 378:20, 380:4, 383:8, 422:3
**watercrafts** [1] - 354:24
**wave** [1] - 387:20
**waves** [4] - 281:10, 286:12, 425:4, 425:5
**waving** [2] - 379:1, 385:25
**Waydoo** [185] - 288:25, 289:1, 289:13, 292:18, 293:8, 294:15, 295:2, 295:9, 295:17, 296:19,

296:22, 304:17, 306:5, 306:14, 329:11, 330:11, 333:19, 333:22, 343:19, 348:11, 348:12, 348:13, 348:16, 348:19, 350:10, 352:4, 353:1, 354:5, 355:13, 355:15, 355:20, 359:6, 359:19, 360:11, 361:9, 361:15, 361:17, 362:20, 362:25, 363:10, 374:6, 374:9, 377:3, 377:5, 377:12, 380:10, 382:7, 389:13, 389:17, 390:7, 390:10, 401:4, 402:3, 402:10, 403:13, 405:9, 412:18, 417:17, 417:20, 418:18, 419:13, 427:13, 427:21, 427:23, 428:3, 431:17, 431:20, 431:21, 431:23, 432:1, 432:12, 433:19, 434:19, 434:23, 434:24, 435:2, 435:5, 435:7, 435:14, 435:18, 437:12, 438:2, 438:3, 438:6, 440:24, 441:1, 441:4, 442:17, 443:5, 444:3, 444:21, 444:25, 445:5, 453:25, 454:20, 454:21, 457:6, 457:18, 457:19, 457:22, 470:7, 470:15, 471:4, 471:8, 471:9, 471:12, 471:14, 471:20, 472:2, 472:7, 472:18, 472:20, 473:7, 473:13, 473:24, 474:4, 474:16, 475:10, 475:14, 480:8, 480:15, 480:16, 480:17, 480:24, 484:22, 485:2, 485:8, 485:20, 487:9, 491:4, 503:16, 504:1, 504:6, 513:25, 514:16,

515:12, 515:21, 516:3, 516:5, 519:2, 519:17, 522:12, 523:5, 523:14, 523:21, 524:13, 524:17, 524:25, 525:3, 525:13, 525:24, 526:12, 526:15, 526:16, 526:22, 526:23, 527:5, 527:22, 527:23, 528:1, 528:21, 529:5, 529:23, 534:21, 536:13, 536:25, 537:1, 537:3, 537:8, 538:22, 540:6, 540:13, 540:23, 541:6, 544:12, 545:20, 546:9, 547:6, 547:12
**WAYDOO** [2] - 264:7, 264:7
**Waydoo's** [19] - 292:21, 346:17, 348:21, 349:1, 390:24, 417:24, 418:5, 442:5, 442:9, 443:20, 470:6, 472:12, 472:14, 473:2, 473:9, 514:11, 514:23, 534:14, 542:7
**ways** [5] - 321:18, 456:21, 479:11, 482:12, 482:16
**WD** [1] - 382:6
**weather** [2] - 309:4, 535:22
**website** [6] - 305:13, 306:15, 310:23, 391:15, 428:3, 436:7
**websites** [2] - 292:20, 292:21
**weeds** [1] - 369:6
**week** [1] - 493:6
**weeks** [2] - 493:6, 493:8
**Wei** [1] - 435:20
**weight** [48] - 278:17, 282:21, 286:24, 303:18, 303:23, 304:1, 304:14, 304:19, 304:20, 304:23, 305:2, 305:8, 305:11, 305:12, 305:18, 305:20, 305:22, 311:21, 312:10, 312:13, 324:12,

325:22, 328:9, 329:2, 329:16, 330:8, 354:20, 363:2, 387:23, 398:13, 400:14, 400:16, 400:20, 400:24, 401:1, 401:5, 401:8, 401:13, 401:17, 402:10, 402:14, 402:21, 402:23, 416:11, 427:7, 479:9
**weight-shift** [11] - 303:18, 305:8, 305:12, 311:21, 324:12, 400:14, 400:16, 400:20, 401:1, 401:5, 402:10
**welcome** [5] - 272:7, 333:11, 431:3, 506:4, 506:8
**well-known** [3] - 311:7, 311:14, 406:19
**whack** [1] - 541:3
**wheel** [2] - 399:5, 399:6
**wherein** [3] - 328:1, 330:23, 331:24
**whichever** [1] - 419:11
**whole** [21] - 272:19, 276:20, 294:22, 295:6, 300:14, 300:15, 302:9, 305:20, 324:3, 401:17, 401:19, 416:2, 419:11, 436:17, 442:19, 448:22, 449:5, 455:23, 531:20
**wholesale** [1] - 486:1
**wholesalers** [1] - 509:20
**wide** [1] - 280:15
**width** [2] - 327:25, 330:22
**wife** [1] - 403:20
**willing** [7] - 455:20, 459:12, 461:7, 524:2, 526:17, 526:20, 531:7
**Wilmington** [1] - 264:11
**win** [1] - 283:2
**wind** [5] - 308:24, 309:2, 309:4, 309:6, 309:7
**wing** [19] - 295:1, 302:11, 302:12, 314:3, 317:11,

318:20, 319:6, 359:20, 383:9, 383:14, 406:24, 407:7, 407:8, 408:2, 410:18, 410:22, 411:6
**wing-shaped** [4] - 319:6, 410:18, 410:22, 411:6
**wings** [11] - 289:25, 290:7, 310:17, 318:20, 327:1, 327:3, 327:7, 358:3, 362:7, 383:13
**wintertime** [2] - 535:13, 535:16
**wired** [1] - 483:22
**wireless** [7] - 405:1, 519:9, 519:12, 519:18, 519:21, 520:11, 522:2
**wise** [24] - 316:14, 317:16, 317:17, 318:4, 327:24, 406:7, 406:15, 408:4, 408:5, 408:8, 408:9, 408:10, 408:12, 408:13, 408:14, 408:15, 408:18, 409:8, 409:14, 409:16, 409:20, 410:10, 410:13, 443:22
**withdraw** [1] - 498:1
**withdrawn** [2] - 496:19, 498:10
**withdrew** [1] - 498:9
**witness** [7] - 265:18, 266:1, 272:9, 272:22, 274:16, 323:8, 445:17
**WITNESS** [47] - 272:14, 272:21, 273:2, 273:6, 279:19, 279:22, 287:12, 298:6, 298:12, 298:15, 298:18, 300:22, 307:18, 307:20, 311:15, 322:18, 322:20, 323:7, 323:11, 323:15, 335:25, 336:3, 336:12, 336:19, 351:10, 358:6, 367:3, 370:19, 390:17, 390:19, 392:15, 392:18, 392:20, 393:10, 393:18, 393:24,

396:11, 399:14, 410:1, 432:23, 433:9, 435:7, 436:10, 438:11, 439:18, 445:15, 549:24
**witnesses** [1] - 265:22
**Woking** [1] - 276:16
**women** [1] - 427:18
**wondering** [2] - 429:16, 552:14
**word** [4] - 301:22, 341:15, 407:21, 531:11
**Word** [2] - 551:10
**words** [28] - 270:12, 301:9, 304:18, 308:12, 325:23, 336:8, 338:18, 340:10, 340:15, 341:18, 351:19, 369:23, 371:25, 381:9, 404:21, 407:10, 410:14, 418:25, 448:21, 455:1, 455:16, 456:15, 466:16, 471:13, 477:20, 499:9, 535:11, 537:1
**works** [2] - 454:2, 513:6
**worksheet** [2] - 539:20, 540:1
**world** [9] - 402:22, 404:15, 404:18, 454:2, 455:21, 457:2, 459:22, 461:1
**worldwide** [7] - 442:19, 443:12, 443:15, 443:18, 443:21, 443:25, 517:12
**worried** [2] - 463:16, 463:24
**worries** [1] - 403:21
**worse** [2] - 379:10, 379:11
**worsen** [1] - 383:5
**worth** [3] - 281:16, 459:23, 459:24
**Wright** [1] - 276:4
**write** [6] - 338:18, 371:2, 381:9, 449:6, 513:20, 534:7
**writing** [2] - 283:14, 510:16
**written** [3] - 500:6, 510:14, 521:18
**wrongdoing** [4] - 446:5, 446:6,

448:22, 450:16
**wrote** [11] - 288:8, 336:8, 341:3, 341:7, 365:6, 370:9, 370:25, 371:4, 410:14

## Y

**yacht** [1] - 276:1
**Yacht** [1] - 283:19
**yachts** [2] - 275:25, 277:4
**yaw** [5] - 308:8, 340:9, 366:4, 416:19, 416:24
**year** [18] - 280:16, 285:5, 285:19, 462:1, 469:22, 472:23, 497:18, 497:20, 512:24, 527:7, 532:8, 532:11, 532:13, 535:23, 540:14, 543:12
**year-over-year** [1] - 527:7
**years** [17] - 276:12, 281:16, 413:23, 447:14, 447:17, 447:20, 447:22, 447:23, 448:1, 448:3, 464:22, 464:23, 469:20, 491:17, 523:17, 524:18, 525:1
**yesterday** [8] - 267:14, 267:20, 310:7, 495:13, 495:16, 523:4, 526:12, 531:22
**York** [2] - 392:2, 447:6
**young** [1] - 427:18
**yourself** [7] - 273:12, 288:19, 296:4, 352:10, 445:24, 458:4, 549:9
**YouTube** [1] - 390:24
**Yung** [1] - 435:19

## Z

**zero** [4] - 325:5, 340:15, 423:17, 519:25
**ZGC** [1] - 356:9
**Zhu** [2] - 435:13, 435:20