# EXHIBIT 3

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                      FOR THE DISTRICT OF DELAWARE

 3

 4   MHL CUSTOM, INC.,               )
                                     ) Trial Volume V
 5                  Plaintiff,       )
                                     ) C.A. No. 21-91-RGA
 6   v.                              )
                                     )
 7   WAYDOO USA, INC. and SHENZEN    )
     WAYDOO INTELLIGENCE TECHNOLOGY  )
 8   CO., LTD.,                      )
                                     )
 9                  Defendants.      )

10
                                        J. Caleb Boggs Courthouse
11                                      844 North King Street
                                        Wilmington, Delaware
12
                                        Thursday, March 30, 2023
13                                      9:03 a.m.
                                        Jury Trial
14

15   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

16   APPEARANCES:

17             COOCH & TAYLOR, P.A.
               BY:  ANDREW A. RALLI, ESQUIRE
18
                          -and-
19
               GRAY ICE & HIGDON, PLLC
20             BY:  ROBERT THEUERKAUF, ESQUIRE
               BY:  DENNIS MURRELL, ESQUIRE
21             BY:  BRIAN McGRAW, ESQUIRE

22                                      For the Plaintiff

23

24

25
```

1    APPEARANCES CONTINUED:

2
              RICHARDS LAYTON & FINGER, P.A.
3             BY:  KELLY E. FARNAN, ESQUIRE
              BY:  DORRONDA R. BORDLEY, ESQUIRE
4
                        -and-
5
              HAUG PARTNERS LLP
6             BY:  ROBERT E. COLLETTI, ESQUIRE
              BY:  JASON KANTER, ESQUIRE
7             BY:  MARK BASANTA, ESQUIRE
              BY:  PATRICK LAVERY, ESQUIRE
8
                              For the Defendants
08:53:11  9
08:53:11
08:40:23 10              ***  PROCEEDINGS  ***

08:57:48 11         DEPUTY CLERK:  All rise.  Court is now in

09:03:33 12   session.  The Honorable Richard G. Andrews presiding.

09:03:33 13         THE COURT:  All right.  Good morning, everyone.

09:04:49 14   Are there any issues for me to address?

09:04:51 15         MR. COLLETTI:  Two minor issues, I believe, Your

09:04:53 16   Honor.

09:04:53 17         THE COURT:  All right.  Go ahead.

09:04:54 18         MR. COLLETTI:  We'd like to read our admitted

09:04:56 19   facts 5 to 24 at the end of our case.  We gave MHL notice

09:05:04 20   yesterday.  And they're indicating that they also want to be

09:05:08 21   able to read facts, and we believe that's inappropriate.

09:05:12 22   This is our -- their case is closed on infringement.  This

09:05:15 23   is our invalidity case.  It's a decision we made to -- to

09:05:19 24   just put -- it will take three minutes to read.

09:05:21 25         THE COURT:  Well, so you get to read your facts.

800

09:05:23  1    That's not really in dispute, right?

09:05:26  2            MR. COLLETTI:  That's not in dispute.  What's in

09:05:27  3    dispute is them reading.  They want to be able to read their

09:05:30  4    facts with regard to infringement.  And it's our position

09:05:33  5    that their case is closed, and we've made a decision to do

09:05:38  6    this for them to then get up and talk about infringement on

09:05:42  7    our invalidity case.

09:05:44  8            THE COURT:  Well, so, why don't we just cut this

09:05:47  9    short and which is you can read your facts now and, if they

09:05:55 10    want to, when they have their -- when it's their turn, since

09:06:03 11    after all, the part of the stipulations of fact are these

09:06:07 12    are agreed facts, I will let them read that as part of their

09:06:11 13    rebuttal case.

09:06:12 14            MR. COLLETTI:  But it's rebuttal on invalidity,

09:06:15 15    though.

09:06:15 16            THE COURT:  I understand that, but -- and, you

09:06:19 17    know, part of -- but I -- I don't want -- what's the harm --

09:06:28 18    well, first off, what facts do you want to read?

09:06:30 19            MR. McGRAW:  Just the facts that stipulate the

09:06:32 20    claims or -- the claims that have been stipulated to, claim

09:06:36 21    elements.

09:06:36 22            THE COURT:  It seems kind of pointless because

09:06:42 23    the parties already agreed that they're stipulated to, but

09:06:46 24    that -- it's also true that -- but if you want to do it,

09:06:49 25    yeah, go ahead.

09:06:52  1                What's the other dispute?

09:06:54  2                MR. MURRELL:  Your Honor, Mr. Kline, one of the

09:06:56  3      topics is whether these are competing products or competing

09:07:00  4      companies or competitors.

09:07:02  5                THE COURT:  Okay.

09:07:02  6                MR. McGRAW:  And for that purpose I just wanted

09:07:04  7      to bring out our board had confirmed with them that he does

09:07:07  8      not consider them directly competing products' boards.

09:07:10  9                Our board is back here to show that.

09:07:12 10                THE COURT:  Well, he's not an expert on the

09:07:13 11      boards.  All you can do is ask him the question.

09:07:17 12                MR. MURRELL:  Okay.  All right.  Thank you.

09:07:18 13                MR. COLLETTI:  Thank you, Your Honor.

09:07:19 14                THE COURT:  All right.  Anything else?

09:07:20 15                MR. COLLETTI:  I have nothing further.

09:07:23 16                MR. McGRAW:  I think the last thing for our side

09:07:25 17      is just moving to admit one exhibit.

09:07:26 18                THE COURT:  Oh, okay.  Is it disputed.

09:07:29 19                MR. McGRAW:  It's not that I -- one of

09:07:30 20      Defendants' exhibits, so it's 325D.

09:07:33 21                MR. MURRELL:  Well, we didn't finish yesterday.

09:07:35 22                MR. McGRAW:  DTX 325D.

09:07:36 23                MR. COLLETTI:  We're -- I think we're -- we

09:07:37 24      object to that.

09:07:38 25                MR. McGRAW:  Okay.

09:07:38 1                    THE COURT:  What is 325D?  I understand it's

09:07:40 2     some version of the Evolo Report; right?

09:07:42 3                    MR. COLLETTI:  No, it's the -- the boat news

09:07:46 4     article.  It's a translation of it.  I believe it was -- it

09:07:50 5     was put up yesterday during our cross of

09:07:55 6     Professor Triantafyllou, which we don't think it should have

09:07:58 7     been, but I didn't -- I didn't object at the time.

09:08:01 8                    MR. MURRELL:  They put it up with

09:08:04 9     Dr. Triantafyllou in their redirect, I think they did.

09:08:06 10                    MR. McGRAW:  And it was their --

09:08:08 11                    MR. THEUERKAUF:  And it was their exhibit.

09:08:10 12                    THE COURT:  And what is the purpose, Mr. McGraw,

09:08:14 13    that you want to admit it for?

09:08:15 14                    MR. McGRAW:  Well, it was just -- it was

09:08:17 15    admitted during cross to -- from a unicycle comparison.

09:08:23 16                    THE COURT:  And I assume it's not so much the --

09:08:29 17    is that the only thing that you want out of it?

09:08:33 18                    MR. McGRAW:  That's it.

09:08:34 19                    MR. THEUERKAUF:  I mean, it was the -- right, it

09:08:36 20    was -- Dr. Triantafyllou -- excuse me -- Dr. Triantafyllou

09:08:39 21    had testified that unicycles were unstable.  And that was to

09:08:46 22    impeach him with the fact that the Evolo or the description

09:08:50 23    of the Evolo also said it was --

09:08:50 24                    THE COURT:  So did you ask him about it?

09:08:53 25                    MR. COLLETTI:  Yes.

09:08:53   1          MR. THEUERKAUF:  Yes.

09:08:54   2          THE COURT:  And did he say -- what did he say.

09:08:55   3   I don't remember.

09:08:57   4          MR. THEUERKAUF:  I actually don't remember his

09:08:58   5   response as I stand here right now with respect to that.

09:09:01   6          MR. McGRAW:  I think he admitted that a unicycle

09:09:04   7   is unstable, and then we showed him the paragraph in the

09:09:09   8   article that talked about a comparison between the Evolo and

09:09:15   9   unicycles.

09:09:20  10          MR. MURRELL:  Your Honor, this is the article

09:09:22  11   that they introduced with Mr. Lanterman.

09:09:24  12          THE COURT:  Right.  I know what we're talking

09:09:26  13   about here.

09:09:27  14          MR. MURRELL:  Yeah.  And they introduced the

09:09:29  15   Swiss version.  We're just introducing the English version.

09:09:32  16          THE COURT:  Probably the Swedish, but --

09:09:33  17          MR. THEUERKAUF:  Yes, Swedish, sorry.

09:09:36  18          THE COURT:  Well, so they were introducing it, I

09:09:38  19   believe, for the website.  That's the reason why they had it

09:09:43  20   on with Mr. Lanterman.  That's something I dealt with before

09:09:46  21   trial.  You used it to cross-examine

09:09:55  22   Professor Triantafyllou.  And I guess what I'm wondering is

09:09:57  23   you say it impeaches him.  I'm just -- if he -- normally

09:10:04  24   when you're "impeaching someone," you ask them a question

09:10:08  25   and if he agrees with whatever it is you said, then that's

09:10:11 1  the end of it.  That's what I don't really know what -- I

09:10:14 2  don't remember exactly what happened.

09:10:19 3          MR. COLLETTI:  Your Honor, again, we object.

09:10:22 4  It's hearsay, is another basis for keeping this out.

09:10:27 5          THE COURT:  Yeah.  You know -- all right.  Well,

09:10:32 6  I hear that.

09:10:33 7          MR. BASANTA:  Your Honor.

09:10:34 8          THE COURT:  Yes.

09:10:34 9          MR. COLLETTI:  What Dr. Triantafyllou said about

09:10:36 10 that was that --

09:10:37 11         THE COURT:  Right.  I'm sorry.

09:10:38 12         MR. BASANTA:  What he said was that the article

09:10:41 13 that showed it was outside the four corners of the Evolo

09:10:44 14 Report and we are only making an anticipation argument with

09:10:47 15 respect to the Evolo Report.

09:10:48 16         MR. THEUERKAUF:  I'd have to look at the

09:10:50 17 transcript because that's not what I recall, but --

09:10:52 18         THE COURT:  All right.  Well, I'm not going to

09:10:56 19 admit it for the hearsay purpose.  It was used with Dr. --

09:11:02 20 without objection with Dr. Triantafyllou and whatever was

09:11:07 21 said was said.  But I'm not going to put the article into

09:11:14 22 evidence for its hearsay purpose.

09:11:22 23         So, that request is overruled.  Anything else?

09:11:27 24         MR. COLLETTI:  I just need to admit these

09:11:29 25 exhibits I'm trying to admit for Professor Triantafyllou.

09:11:32 1    It's DTX 325B, DTX 73, and DTX 74.

09:11:45 2                MR. MURRELL:  No objection.  Your Honor.

09:11:46 3                THE COURT:  All right.  Well, they're admitted

09:11:47 4    without objection.

09:11:48 5                All right.  So, if that -- so that's it in terms

09:11:54 6    of the disputes this morning; right?

09:11:56 7                MR. COLLETTI:  Yes.

09:11:57 8                MR. THEUERKAUF:  Yes, Your Honor.

09:11:57 9                THE COURT:  Okay.  Can you all do me a favor,

09:12:02 10   which is get somebody on your teams -- right now I have two

09:12:09 11   Proposed Verdict Forms.  One's like 12 pages long.  The

09:12:11 12   other is 11 pages long.  I don't think they've been changed

09:12:14 13   since the pretrial conference when there were a lot more

09:12:19 14   claims.  There were more defenses.

09:12:23 15                And I'd like you, in the first instance, to

09:12:28 16   knock out the parts that are irrelevant.  Anybody who can --

09:12:34 17   most likely I'll go with whoever submits the shorter

09:12:37 18   version, but that's not a promise.  But if you could sort of

09:12:47 19   clean it up and send in Word versions to my deputy clerk or

09:12:55 20   my case manager or both and sooner rather than later,

09:13:00 21   because I'd like to have that -- I'd like to work on that

09:13:06 22   before we actually have the jury instruction conference

09:13:10 23   which will be sometime after we finish the evidence.  I take

09:13:13 24   it, I got a -- both sides did get what I sent out

09:13:18 25   electronically, the proposed jury instructions.

Kline - Cross

09:13:20  1          MS. FARNAN:  Yes, Your Honor.

09:13:24  2          MR. McGRAW:  I haven't seen them.

09:13:25  3          MR. MURRELL:  I don't believe so, Your Honor.

09:13:26  4          THE COURT:  All right.  Well, I sent them.

09:13:29  5          MR. McGRAW:  Okay.  We did get them apparently.

09:13:31  6          THE COURT:  Okay.  Yes.  So, basically there

09:13:33  7  were a few things I highlighted in yellow because they were

09:13:37  8  slightly open topics or they related to testimony we hadn't

09:13:41  9  done yet or something else.  But, in any event, we'll talk.

09:13:48 10  And I did even say that was -- it was in the cover email.

09:13:52 11  But we will talk about them and, hopefully, the Verdict Form

09:13:57 12  sometime after we finish the testimony.

09:13:58 13          Okay.  If there's nothing else, we'll be in

09:14:00 14  recess until the jury is here.

09:14:03 15          DEPUTY CLERK:  All rise.

09:14:05 16          (Recess was taken.)  All rise.

09:30:36 17          THE COURT:  All right.  We're ready to go.

09:30:39 18          MR. MURRELL:  Yes, Your Honor.

09:30:39 19          THE COURT:  Let's get the jury.

09:30:48 20          (Jury entering the courtroom.)

09:31:44 21          THE COURT:  Good morning, members of the jury.

09:31:58 22  Welcome back.  Everyone, you may be seated.  Mr. Kline.

09:32:11 23                    CROSS-EXAMINATION

09:32:13 24  BY MR. MURRELL:

09:32:25 25  Q.    Good morning.

Kline - Cross

09:32:26  1    A.      Good morning.

09:32:28  2    Q.      Let's -- yesterday with your direct testimony with

09:32:31  3    the jury, you remember talking about some of the differences

09:32:35  4    between your opinion and Dr. Stec's opinions?

09:32:38  5    A.      I do.

09:32:39  6    Q.      One of the differences was the level of competition

09:32:45  7    between MHL on one hand and Waydoo on the other?

09:32:51  8    A.      Yes, relative to the level of competition between MHL

09:32:54  9    and Fliteboard.

09:32:55 10    Q.      And that's one of the factors, one of the Georgia

09:32:57 11    Pacific factors; true?

09:32:58 12    A.      That is correct.

09:33:00 13    Q.      And, you determined in your own analysis that while

09:33:04 14    there was some -- some level of competition, you didn't

09:33:08 15    necessarily view them as direct competitors.

09:33:10 16            Do I have that right?

09:33:10 17    A.      Certainly that the level of competition between them

09:33:15 18    was less than that between Fliteboard and MHL.

09:33:17 19    Q.      All right.  And the actual products that are at

09:33:22 20    issue, the actual different eFoils that they each sell,

09:33:25 21    you've seen websites and photographs of them; right?

09:33:28 22    A.      I have.

09:33:30 23    Q.      And you know the jury has seen both sets of products,

09:33:33 24    the actual boards, during this trial; correct?

09:33:36 25    A.      I do not know that, but I accept that.

Kline - Cross

09:33:41  1          THE COURT:  Can I interrupt just a second?

09:33:43  2          Members of the jury, we -- we turned the mic --

09:33:45  3     changed the mic system overnight because -- at my request.

09:33:49  4          But I'm just wondering Mr. Kline, I think that's

09:33:53  5     a flexible thing and you can -- yeah.  So in other words,

09:33:57  6     right now you're -- you're looking at them and then you're

09:34:00  7     leaning over here, and -- and you can move it so you don't

09:34:02  8     have to lean.

09:34:03  9          THE WITNESS:  Thank you, Your Honor.

09:34:04 10          MR. MURRELL:  All right.

09:34:06 11     BY MR. MURRELL:

09:34:06 12     Q.    And when you reached your opinions in this case, one

09:34:09 13     of the things you did was you looked at the performance

09:34:12 14     factors of the MHL boards; yes?

09:34:17 15     A.    That was summarized in the background section of my

09:34:22 16     report.  I don't recall that being a primary input into my

09:34:28 17     analysis of competition.

09:34:29 18     Q.    But it was actually in your report, you actually

09:34:32 19     wrote that into the report; right?

09:34:34 20     A.    I did.

09:34:34 21     Q.    And you actually recognized that those factors, those

09:34:39 22     performance factors can factor into a consumer's decision

09:34:43 23     when purchasing an eFoil; true?

09:34:44 24     A.    Certainly performance is one of the things a consumer

09:34:48 25     may consider when purchasing an eFoil.

09:34:50 1    Q.    But when you were doing that, and considering the

09:34:53 2    degree of competition, while you looked at those performance

09:34:57 3    factors for the MHL board, you didn't look at those same

09:35:00 4    performance factors for the Waydoo; true?

09:35:04 5    A.    I believe that there was a difference in the

09:35:09 6    summaries I provided in my background section in between the

09:35:12 7    descriptions of the boards and what was included, but I do

09:35:15 8    not believe that any of those were discussed in GP Factor 5.

09:35:21 9    Q.    All right.  So let's break that down.

09:35:22 10           You think that you referenced looking at both,

09:35:25 11   but when you actually did the analysis of the degree of

09:35:28 12   competition, Georgia-Pacific Factor 5, you didn't consider

09:35:32 13   both of those when you did that.

09:35:33 14           Is that -- is that what you're telling the jury?

09:35:34 15   A.    So, when I looked at Georgia-Pacific factor 5, my

09:35:38 16   analysis focused not on the performance in -- I believe what

09:35:45 17   is being referred to here as performance is speed primarily

09:35:48 18   of the products.  It focused more on finished quality of

09:35:54 19   materials, pricing, and market segment.

09:35:59 20   Q.    Well, let's look at, if we can, PTX 206, which has

09:36:05 21   been admitted into evidence.  And we'll have it up here on

09:36:08 22   the screen, Mr. Kline.

09:36:09 23           Can you see that?

09:36:13 24   A.    I do see that.

09:36:15 25   Q.    And this is the Waydoo website.  Have you seen this

810

Kline - Cross

09:36:18  1  before?

09:36:18  2  A.      I have seen the Waydoo website.  I'm not sure that

09:36:23  3  it's exactly as of this date.  But.

09:36:27  4  Q.      And the Waydoo website that we're looking at here,

09:36:30  5  when they're trying to market their products to people, the

09:36:35  6  three things they focus on are speed; ride time, which I

09:36:41  7  believe is the battery lifetime for a ride; and price;

09:36:44  8  correct?

09:36:44  9  A.      Yes, they advertise as the best value on the market.

09:36:49 10  Q.      Well, best buy on the market, but what they're

09:36:52 11  selling to you is how fast they go, how long you can ride

09:36:55 12  them, and what they cost; right?  That's what that slide

09:36:58 13  shows us?

09:36:58 14  A.      Among, you know, the other things that are up there,

09:37:03 15  the easy setup, the two-year warrantee, easy to learn, fast

09:37:07 16  delivery.  I agree, those are things that they market.

09:37:10 17  Q.      And we're about to look at the ones that you looked

09:37:12 18  at for the LIFT or the MHL product.  That's in kilometers

09:37:16 19  per hour, this 47 kilometers per hour.

09:37:19 20          Do you know what that is in miles per hour?

09:37:21 21  A.      I -- I do not know how to convert kilometers to

09:37:26 22  miles.

09:37:27 23  Q.      And if I represented to you that that's 29.2 miles

09:37:32 24  per hour when you convert it, would you accept that

09:37:33 25  representation?

09:37:34  1   A.      Sure.

09:37:38  2   Q.      So, when Waydoo is selling their Fliteboard -- I

09:37:42  3   mean, I'm sorry, their Flyer, they say what?  29.2 miles per

09:37:49  4   hour 120-minute ride time.

09:37:51  5           Do you remember what the LIFT products, the

09:37:55  6   current generation, what it promotes as its speed and

09:38:00  7   battery life?

09:38:01  8   A.      Let me just look at my expert report.

09:38:04  9   Q.      Yeah.  I think if you look at Page 6, that may save

09:38:11 10   us some time.

09:38:16 11   A.      30 miles per hour and a 100 -- and 120 minutes.

09:38:19 12   Q.      Pretty similar?

09:38:20 13   A.      Yes, in those -- in those metrics they are similar.

09:38:26 14   Q.      And you knew that Mr. Leason in his deposition that

09:38:29 15   you reviewed in preparing your report described MHL and

09:38:34 16   Waydoo as serious competitors; true?

09:38:36 17   A.      He did.

09:38:40 18   Q.      And in your presentation yesterday, your PowerPoint

09:38:44 19   slide, you showed a comparison between a Honda and a BMW.

09:38:48 20           Do you remember that?

09:38:48 21   A.      I do.

09:38:50 22           MR. MURRELL:  And if we could put up slide 14,

09:38:52 23   Melissa, please.

09:39:10 24   BY MR. MURRELL:

09:39:10 25   Q.      Do you remember showing this slide to the jury

Kline - Cross

09:39:13  1    yesterday?

09:39:13  2    A.     Yes, to illustrate the difference -- the effect of

09:39:16  3    calculating a per-unit rate on one price level product and

09:39:20  4    then applying that to another price level product.

09:39:22  5    Q.     And you used Honda and BMW when you did that

09:39:25  6    yesterday?

09:39:26  7    A.     I did.

09:39:27  8    Q.     And you know in this case there have been suggestions

09:39:30  9    that MHL on one hand is a Ferrari and Waydoo on the other

09:39:36  10   hand is a Honda?

09:39:37  11   A.     I'm unaware of a Ferrari reference.

09:39:42  12   Q.     Okay.  Let's stay with the BMW one.

09:39:45  13          On the example here, you have a BMW costing a

09:39:49  14   hundred thousand dollars.

09:39:49  15          Do you see that?

09:39:50  16   A.     Yes, I did that to make the math easy, for exemplary

09:39:55  17   math.

09:39:56  18   Q.     And you used Honda at $20,000?

09:39:58  19   A.     Again, to make the math easy.

09:40:01  20   Q.     Right.  Because I don't know you've tried to buy a

09:40:03  21   new car recently.  I don't think you can buy a Honda for

09:40:08  22   $20,000.

09:40:09  23          Let's use 35,000.  33,333.33 to keep the math

09:40:16  24   easy, okay?  You with me?

09:40:18  25   A.     I am with your hypothetical.

813

Kline - Cross

09:40:20  1    Q.    All right.  In that instance, the BMW using your

09:40:24  2    analogy here would be three times the cost of the Honda;

09:40:28  3    right?

09:40:29  4    A.    Correct.

09:40:31  5    Q.    Here that price difference is not three times; right?

09:40:35  6    The MHL product doesn't cost three times the price of the

09:40:39  7    Waydoo product; right?

09:40:40  8    A.    It depends on whether we're talking about the

09:40:45  9    wholesale price the retail price.

09:40:46 10    Q.    I'm using retail price.

09:40:48 11          Would a consumer in the marketplace looking at

09:40:50 12    these as potentially competing products to look at, it's not

09:40:53 13    three times, is it?

09:40:54 14    A.    It depends -- well, no, it is not three times.

09:41:03 15    Q.    Right.  Sometimes when you look at the lowest cost

09:41:07 16    MHL Fliteboard or product and you look at the Waydoo

09:41:10 17    product, the Flyer, it's actually just a 1,000, $2,000

09:41:15 18    apart?

09:41:15 19    A.    About $2,000.  If you're looking at the lowest cost

09:41:21 20    MHL product versus the highest price Waydoo product, there's

09:41:24 21    about a $2,000 difference.

09:41:25 22    Q.    And as opposed to a Honda versus BMW comparison,

09:41:30 23    that's puts us more in the Honda versus Volkswagen

09:41:34 24    comparison, doesn't it?

09:41:35 25    A.    Well, there's some pretty expensive Hondas.  You can

Kline - Cross

09:41:40 1  buy an NSX.  But --

09:41:41 2  Q.      Yeah, you can, right?  They -- they have their own

09:41:44 3  Ferrari?

09:41:44 4  A.      Right.  The -- the numbers are what they are.  I

09:41:49 5  mean, there is no overlap in the price ranges of the two

09:41:51 6  products.  All the MHL products are more expensive than all

09:41:55 7  the Waydoo products.  And if you want to compare the

09:41:58 8  cheapest MHL product, the most expensive Waydoo product,

09:42:01 9  there's only about a $2,000-difference there.

09:42:04 10 Q.      Right.  Right.

09:42:05 11 A.      That -- those are facts.

09:42:07 12 Q.      That's right.  I wanted to confirm those facts with

09:42:10 13 you for the jury.

09:42:11 14         Let's talk about the Langelaan license versus

09:42:13 15 the hypothetical negotiation.

09:42:14 16         You remember offering testimony on that

09:42:17 17 yesterday?

09:42:17 18 A.      I do.

09:42:18 19 Q.      And you ultimately -- your ultimate opinion is that

09:42:21 20 the royalty rate in this case should be 2.5 percent?

09:42:24 21 A.      That is correct.

09:42:26 22 Q.      And that is the royalty rate that was between

09:42:29 23 Langelaan on the one hand and MHL on the other when they

09:42:34 24 first did their license agreement; yes?

09:42:36 25 A.      With the important caveat that their license included

815

Kline - Cross

09:42:40 1  a cap on the royalties at a ==million dollars==.

09:42:42 2  Q.     Right.  And also -- right.  And there were some other

09:42:45 3  factors, but the royalty rate was 2.5 percent; correct?

09:42:49 4  A.     The rate that was paid until the cap was arrived at

09:42:54 5  was 2 and a half percent.

09:42:56 6  Q.     Now, when that Langelaan license was done, right,

09:43:00 7  that was in what year?

09:43:02 8  A.     2016.

09:43:04 9  Q.     And this hypothetical negotiation is January to March

09:43:10 10 of 2019?

09:43:11 11 A.     That is correct.

09:43:14 12 Q.     And you used January to March because it's the

09:43:18 13 date -- it's on the eve of the day of first infringement?

09:43:21 14 A.     Yes.  There's also, you know, offer of sale.  It was

09:43:27 15 at the trade show in January.

09:43:28 16 Q.     Right.

09:43:29 17 A.     It's a little unclear.

09:43:30 18 Q.     And just so the jury understands why you had January

09:43:32 19 to March on your slide, January was when Waydoo shows up at

09:43:37 20 the computer -- I'm sorry, consumer electronics show in

09:43:41 21 January of 2019 in the United States.

09:43:44 22         That could have been considered an offer for

09:43:48 23 sale?

09:43:48 24 A.     That's my -- I'm not here to testify on legal

09:43:49 25 matters --

Kline - Cross

09:43:49  1    Q.      Right.

09:43:50  2    A.      -- but that's my understanding.

09:43:51  3    Q.      But March -- I think the date was March 25th.  If I

09:43:54  4    remember correctly, it was the date they actually first sold

09:43:56  5    a product in the U.S.; right?

09:43:58  6    A.      Correct.

09:43:59  7    Q.      And so, that's why you're using that time period for

09:44:01  8    your hypothetical negotiation; right?

09:44:03  9    A.      That is correct.

09:44:05 10    Q.      Now, let's compare and contrast those times.  2016

09:44:12 11    when Langelaan enters into the license agreement with MHL,

09:44:19 12    no eFoil had actually been built by Dr. Langelaan at that

09:44:23 13    point; correct?

09:44:24 14    A.      I wasn't -- I believe there was a prototype eFoil as

09:44:33 15    of that time.

09:44:34 16    Q.      There was a prototype, but there was nothing for

09:44:36 17    sale?

09:44:36 18    A.      Right.  Professor Langelaan, as I testified

09:44:39 19    yesterday, was not commercializing and, as I understand it,

09:44:43 20    never did commercialize an eFoil.

09:44:45 21    Q.      Right.  And that's what I was going to ask you.

09:44:46 22            So if we look at 2016 Langelaan license and we

09:44:51 23    look at the hypothetical negotiation, at the time of the

09:44:54 24    Langelaan negotiation, there was no eFoil that's for sale

09:45:00 25    anywhere in the world, to your knowledge; correct?

817

Kline - Cross

09:45:02 1  A.    That is my understanding.  There was no eFoil on the

09:45:06 2  market in 2016.

09:45:07 3  Q.    There had been no marketing for eFoils at that time?

09:45:15 4  Commercial marketing.

09:45:16 5  A.    There had been no commercial marketing.  There had

09:45:18 6  been fundraising-type market.

09:45:20 7  Q.    And Langelaan himself had not spent a penny on

09:45:25 8  marketing or advertising; true?

09:45:27 9  A.    So my understanding is that the money

09:45:34 10 Professor Langelaan had raised he spent on developing his

09:45:36 11 board, but not on marketing it.

09:45:38 12 Q.    Not on marketing, not on construction, not on getting

09:45:42 13 together a manufacturing location, none -- trying to set up

09:45:46 14 sales channels, none of those things had occurred; right?

09:45:49 15 A.    That's my general understanding.

09:45:52 16 Q.    At the time of this hypothetical negotiation, though,

09:45:56 17 January to March of 2019, in fact, MHL had created a market

09:46:02 18 for eFoils; true?

09:46:03 19 A.    That is true.  MHL had product on the market at the

09:46:08 20 time.

09:46:08 21 Q.    And you've looked at the financial records, they, in

09:46:11 22 fact, already sold over $6 million of them by that time?

09:46:14 23 A.    I'm uncertain if that's the exact number, but they

09:46:23 24 had certainly sold them.

09:46:24 25 Q.    And we asked Mr. Wagner when he was there for those

818

Kline - Cross

09:46:27  1   numbers and the jury has heard them.

09:46:29  2           And they had done advertising; right?

09:46:33  3   A.      Yes.

09:46:36  4   Q.      And MHL had gone out and they had resellers lining up

09:46:42  5   by that time?

09:46:42  6   A.      Presumably.

09:46:46  7   Q.      Right.  That's an entirely different market situation

09:46:50  8   in 2016 when there's no market, no consumer knowledge, no

09:46:56  9   public information versus January of 2019 when you have a

09:47:00 10   product that's being sold, marketed and already financially

09:47:04 11   successful; true?

09:47:05 12   A.      The market had developed substantially between 2016

09:47:10 13   and 2019.  That is true.

09:47:13 14   Q.      And that market had been created by MHL at that

09:47:16 15   point; correct?

09:47:16 16   A.      By 2019, I believe, Fliteboard was already in the

09:47:25 17   market advertising.  So I don't know that MHL would be

09:47:32 18   100 percent credited with development of market.  But

09:47:35 19   certainly MHL played a substantial role in that.

09:47:38 20   Q.      Substantial role.  I mean, they were the first eFoil

09:47:42 21   to market and they were the ones who actually created this

09:47:44 22   market; true?

09:47:45 23   A.      They were the first eFoil on the market is my

09:47:48 24   understanding.

09:47:48 25   Q.      All right.  And what you told the jury, that when you

Kline - Cross

09:47:57 1    look at the Langelaan license, you should consider the

09:48:02 2    possibility that Langelaan would compete with MHL; correct?

09:48:06 3    A.    That is correct.  That is certainly available to them

09:48:12 4    as an option under the agreement.

09:48:14 5    Q.    So, here's what I want to understand.  What you're

09:48:16 6    telling the jury is Waydoo is not a direct competitor to MHL

09:48:24 7    LIFT products, but they should consider Dr. Jack Langelaan

09:48:28 8    as a competitor, or potential competitor, to MHL when

09:48:32 9    looking at these royalty rates?

09:48:33 10   A.    I think what I testified was fairly straightforward,

09:48:37 11   which is that competition exists on a continuum and that

09:48:43 12   Waydoo is certainly more -- was certainly more of a

09:48:45 13   competitor than Professor Langelaan was.  And I, in fact,

09:48:50 14   suggested an upward adjustment to the rates from the

09:48:53 15   Langelaan agreement for competition in the hypothetical

09:48:57 16   negotiation.

09:48:57 17           On the other hand, it's my understanding of the

09:49:01 18   record that MHL -- that Fliteboard was MHL's primary

09:49:07 19   competitor in the market, they sell at similar price points,

09:49:12 20   it's the second biggest player in the market and that

09:49:14 21   Waydoo's position in early 2019 was less of a direct

09:49:20 22   competitor to MHL than Fliteboard was.  And it's not a

09:49:26 23   binary situation.  It's not either a competitor or not a

09:49:29 24   competitor.  It's levels of competition between the three

09:49:33 25   parties.

Kline - Cross

09:49:34  1   Q.      And who was the third competitor in the U.S. market?

09:49:39  2   Third ranked competitor in the market.  We've seen the graph

09:49:41  3   in his this trial.

09:49:44  4              Was it MHL -- I mean was it Waydoo?

09:49:45  5   A.      Well, so at the time of the hypothetical negotiation,

09:49:49  6   Waydoo wasn't on the market.

09:49:50  7   Q.      Right.  By the end of 2019, early 2020, were they the

09:49:57  8   third competitor in the market?

09:49:59  9   A.      I believe so.  Substantially smaller, but...

09:50:02 10   Q.      But third, not 10th, 15th, 20th.  Again, your

09:50:08 11   continuum, they were third in the marketplace pretty

09:50:11 12   quickly; correct?

09:50:11 13   A.      They -- they were third in the marketplace.

09:50:22 14   Q.      Now, you talked to the jury a lot yesterday about

09:50:25 15   Dr. Stec's royalty rate being 18.67 percent.

09:50:31 16              Do you recall that?

09:50:31 17   A.      Yes.

09:50:33 18   Q.      Now, let's be fair.  Dr. Stec did not give a royalty

09:50:37 19   rate, he gave a price per board?

09:50:40 20   A.      That is correct.

09:50:41 21   Q.      And that price per board was how much?

09:50:43 22   A.      $560.

09:50:46 23   Q.      And his -- under his license agreement, let's be

09:50:49 24   clear, he's proposing 560 for the duration of the license

09:50:54 25   agreement; yes?

Kline - Cross

09:50:55  1    A.      Correct.

09:50:57  2    Q.      And the duration of the license agreement you both

09:51:00  3    have used is 15 years?

09:51:03  4    A.      Correct.

09:51:05  5    Q.      And when you did that 18.67 percent, you used a

09:51:08  6    $3,000 selling price from Waydoo to its distributor;

09:51:13  7    correct?

09:51:13  8    A.      Correct.

09:51:15  9    Q.      And you know now that -- I mean, Mr. Wade testified

09:51:19 10    yesterday that price is now up to $3,400?

09:51:21 11    A.      I didn't -- yes.  I'm aware of that.

09:51:27 12    Q.      And you know that prices continue to go up for

09:51:31 13    Waydoo?

09:51:31 14    A.      Well, their prices have actually gone up and down a

09:51:36 15    little bit over time.

09:51:38 16    Q.      Did you know that Mr. Wade testified yesterday that

09:51:40 17    the prices have gone up?

09:51:41 18    A.      Recently.

09:51:44 19    Q.      Right.  So you're aware of that testimony?

09:51:45 20    A.      I -- I am aware of that testimony.  However, their

09:51:50 21    prices have -- for instance were lower in 2021 than they

09:51:54 22    were in 2020, so they've -- you know, it hasn't been like a

09:51:58 23    straight line their prices go up over time.  They've had

09:52:00 24    some variants in the pricing.

09:52:02 25    Q.      If over that 15 years prices continue to go up and

Kline - Cross

09:52:07 1    Waydoo's price goes to, I don't know, $10,000 a board, that

09:52:17 2    price per board of 560 all of a sudden becomes 5.6 percent;

09:52:23 3    correct?  Simple math?

09:52:23 4    A.    Simple math, but that would be a good reason to have

09:52:27 5    a percentage rate not a per unit rate if you think there's

09:52:30 6    going to be substantial price variants.

09:52:31 7    Q.    And that's the point.  Dr. Stec's 560 a board over

09:52:35 8    that 15-year period, assuming price increases, would

09:52:38 9    actually favor Waydoo?

09:52:42 10   A.    If you assume that Waydoo's prices are going to

09:52:45 11   almost double, then per unit rate would be more favorable

09:52:51 12   than the equivalent percentage rate.

09:52:53 13   Q.    And let's talk about that doubling.

09:52:56 14         Fliteboard sells most of its products in the

09:52:59 15   U.S. direct to consumer.  Do you know that?

09:53:04 16   A.    Yes.

09:53:05 17   Q.    So if they're selling -- I'm going to try to stay

09:53:07 18   with simple math.

09:53:08 19   A.    I appreciate it.

09:53:09 20   Q.    All right.  Well, with my degree it's a good idea.

09:53:14 21         So if we use $10,000 as a price for Fliteboard,

09:53:19 22   right, when they sell it to the consumer, they're paying a

09:53:24 23   royalty on that full $10,000 to MHL; correct?

09:53:28 24   A.    Correct.

09:53:30 25   Q.    And if they sell it through a reseller, I think the

823

Kline - Cross

09:53:35 1     testimony has been up to a 20 percent sales price discount,

09:53:40 2     you're aware of that?

09:53:41 3     A.     I think the documents say 20 percent plus, but call

09:53:45 4     it 20 percent.

09:53:46 5     Q.     So, if they sell it at 20 percent discount, using

09:53:51 6     simple math, they sell it at $8,000, then that price per

09:53:55 7     board at 5.2 percent is going to be somewhere around 400,

09:54:03 8     444?

09:54:03 9     A.     Yes.

09:54:03 10    Q.     And that's because Fliteboard has chosen that as

09:54:05 11    their business model, to mostly sell direct or to sell at

09:54:10 12    resellers at not that big of a discount; right?

09:54:13 13    A.     That appears to be their current business model.

09:54:17 14    Q.     And you know MHL also sells theirs to their resellers

09:54:22 15    with also approximately a 20 percent discount?

09:54:24 16    A.     I am uncertain of that.

09:54:26 17    Q.     All right.  Waydoo, on the other has a different

09:54:30 18    business model from both MHL and Fliteboard; right?

09:54:33 19    A.     In the sense that they primarily sell to

09:54:39 20    distributors, yes.

09:54:39 21    Q.     Yes.  Well, in fact, they've chosen to sell to their

09:54:43 22    U.S. distributor at 50 percent of the suggested retail

09:54:48 23    price; right?

09:54:49 24    A.     That is their current plan.

09:54:52 25    Q.     Right.  And that's their choice; right?

Kline - Cross

A.     That is the way that they think that they can best
maximize their business.

Q.     But when you compare Fliteboard, which you've done,
the Fliteboard license agreement to the Waydoo hypothetical
license agreement, right, you would be charging Waydoo
substantially less per board because of the business model
it chooses, as compared to Fliteboard's business model;
right?

A.     Right.  So Fliteboard has decided in its premium
market position to sell direct to customers and to directly
advertise and, you know, run its business in that way.
Waydoo has decided in its sort of affordable market
position, to the extent we can consider these things
affordable, but where it is in the market that it's better
leveraging distributors to get its product out there and on
the market.  Those are sort of different sales channel
decisions, but presumably they are both made because the
companies think that optimizes how much money they are going
to make.  And so, in the end, the royalty is applied to the
money earned by the licensee which reflects their
optimizations of their businesses.

Q.     And again, that's Fliteboard's decision.  And that's
Waydoo's decisions; right?

A.     Correct.

Q.     From MHL's position, in this hypothetical negotiation

825

Kline - Cross

09:56:31 1    that happens in the first three months of 2019, you're

09:56:36 2    saying they should agree to effectively pay Waydoo a lot

09:56:43 3    less per board because of Waydoo's chosen business model?

09:56:50 4    A.    I think you mean for Waydoo to pay them a lot less

09:56:54 5    per board.

09:56:54 6    Q.    Yes.  A lot less, I'm sorry.  Thank you.

09:56:57 7    A.    Yes.  Waydoo has a business model which is dependent

09:57:01 8    upon distributors to promote and distribute their products

09:57:04 9    as the best way for them to reach customers in this

09:57:08 10   affordable market segment.  Presumably they are rationale

09:57:13 11   people and if they try to go direct into the market with

09:57:16 12   their product as it is, they would make less money.  So,

09:57:21 13   presumably the royalty maximizing, not on a per board basis

09:57:25 14   but overall basis, for MHL is to, yeah, get -- get the

09:57:32 15   royalty on those sales by Waydoo.

09:57:35 16   Q.    Right.  And what I'm -- again, the point is:  You're

09:57:38 17   saying MHL, in your view of the hypothetical negotiation,

09:57:42 18   should agree to have to charge Waydoo substantially less per

09:57:50 19   eFoil because of the business model Waydoo has chosen; yes?

09:57:57 20   A.    In the presumable offset in high volume.

09:58:02 21   Q.    And the -- and if they're competitors, that high

09:58:04 22   volume is taking away from MHL sales?

09:58:07 23   A.    I don't think that Dr. Stec, or anyone in this case

09:58:13 24   as I've seen, has proven that any sales have been lost.

09:58:16 25   Q.    Right.  And --

Kline - Cross

09:58:17  1   A.      Or applied lost sales.

09:58:19  2   Q.      Nor have you?

09:58:20  3   A.      Nor have I, but...

09:58:21  4   Q.      You have done no price elasticity study to determine

09:58:25  5   if that would be true or not, have you?

09:58:26  6   A.      No one has performed a price elasticity analysis --

09:58:35  7   specific price elasticity study in this case.  That being

09:58:37  8   said -- so, what he's referring to with price elasticity, if

09:58:41  9   I may clarify for the benefit of the jury, is he is

09:58:44 10   referring to the impact that the pricing of one product has

09:58:49 11   on the sales levels of another.

09:58:50 12          So, if you've got two products and one is priced

09:58:58 13   substantially lower than the other, you -- and they directly

09:59:00 14   compete with each other, you would expect that customers

09:59:02 15   would choose the cheaper product and not the more expensive

09:59:06 16   product.  And this would cause the sales of more expensive

09:59:11 17   product to decline until the pricing came into line.  This

09:59:14 18   is a concept called price elasticity.  It's commonly used to

09:59:20 19   define markets in economics.

09:59:20 20          What we actually see in this case is that Waydoo

09:59:23 21   continues to price itself substantially below at retail

09:59:29 22   MHL's pricing and yet MHL's sales continue to grow

09:59:33 23   substantially.  This would tend to indicate that they are

09:59:36 24   not -- that customers do not view them as being sort of

09:59:41 25   perfect substitutes.  There are reasons people are willing

827

Kline - Cross

09:59:44 1   to pay twice as much for an MHL board when they could just

09:59:50 2   get the Waydoo board for a lot cheaper.

09:59:51 3   Q.     Okay.  I was trying to avoid us going into all these

09:59:54 4   details, but that study, you've not actually done that in

09:59:58 5   this case.  I know you're about to tell me no one has done

10:00:01 6   it, but my question is:  You haven't done it?

10:00:02 7   A.     Well, I'm not sure I agree with that.  I have looked

10:00:06 8   at the pricing on the products and the sales trends.  There

10:00:09 9   is -- there are many ways you could study price elasticity.

10:00:13 10  What I believe is being referenced here is frequently that's

10:00:16 11  done through a survey of customers.  No one has done a

10:00:19 12  survey of customers that I'm aware of in this case to assess

10:00:23 13  price elasticity.

10:00:24 14  Q.     That's right.  So you're telling the jury you can

10:00:27 15  just tell by looking at it?

10:00:28 16  A.     Yeah, you can look at the difference in pricing, and

10:00:31 17  you can see that one is priced substantially higher than the

10:00:34 18  other and continues to make a lot of sales, and that tells

10:00:37 19  you that there are things people value about that product

10:00:39 20  that make them willing to pay more for it rather than just

10:00:45 21  getting the cheaper one.

10:00:47 22  Q.     And to understand what you're also telling the jury,

10:00:50 23  again, that while Fliteboard has been paying royalties in

10:00:53 24  excess of $500 an eFoil in its license agreement, you would

10:00:58 25  propose that when you look at it per board, Waydoo would

Kline - Cross

10:01:03 1 only pay $77 a board?

10:01:06 2 A.      About that.

10:01:09 3 Q.      $76.98 per board if you do the math?

10:01:15 4 A.      That sounds about right.

10:01:19 5 Q.      Okay.  We don't have to go through the math.  I think

10:01:22 6 we're all happy about that.

10:01:23 7          So you're saying in this hypothetical

10:01:27 8 negotiation, my client, MHL, would agree to license it to

10:01:32 9 Waydoo for $77 a board while they're getting it -- just a

10:01:39 10 couple months later they did an agreement with Fliteboard

10:01:42 11 where they get over $500 a board; right?

10:01:45 12 A.      Well, they get five and a quarter percent.

10:01:49 13 Q.      Which you know how much it works out per board, don't

10:01:52 14 you?

10:01:52 15 A.      But it depends on how much Fliteboard charges.  And

10:01:55 16 if we look at the sales correspondence, that clearly

10:02:00 17 indicates that MHL believed that Fliteboard's pricing was

10:02:02 18 going to come down to be competitive in the market.  It also

10:02:06 19 indicates that when Fliteboard sells through distributors,

10:02:09 20 the royalty report paid by Fliteboard is lower.  And it's -

10:02:16 21 that's -- yeah.  That's what it is.

10:02:18 22 Q.      Okay.  And just -- and I appreciate the explanation.

10:02:22 23 QUESTION:  Fliteboard's been paying over $500 a board, and

10:02:27 24 you would tell the jury that MHL would have agreed to a

10:02:30 25 license where Waydoo only pays $77 a board; right?

Kline - Cross

| | | |
|---|---|---|
| 10:02:34 | 1 | A.     Right.  Which is appropriate given Waydoo's position |
| 10:02:38 | 2 | in the market. |
| 10:02:39 | 3 | Q.     Okay.  You think that's appropriate.  And you think |
| 10:02:42 | 4 | my client, in this hypothetical negotiation, would have |
| 10:02:45 | 5 | agreed to that? |
| 10:02:46 | 6 | A.     Yes, I believe that that is the most likely outcome |
| 10:02:50 | 7 | of the hypothetical negotiation. |
| 10:02:54 | 8 | Q.     Have you ever met Mr. Leason or Mr. Wagner? |
| 10:02:57 | 9 | A.     I have not. |
| 10:03:00 | 10 | Q.     You think they're not very smart? |
| 10:03:02 | 11 | A.     I wouldn't say that. |
| 10:03:04 | 12 | Q.     All right.  Let's talk about Mr. Ping's testimony in |
| 10:03:10 | 13 | this case.  One of the other differences between you and Mr. |
| 10:03:14 | 14 | Stec -- or Dr. Stec is this issue on the number of units |
| 10:03:18 | 15 | sold in 2021; yes? |
| 10:03:20 | 16 | A.     That is a difference. |
| 10:03:22 | 17 | Q.     Yes.  And you know that he provided a number under |
| 10:03:27 | 18 | oath in his deposition as to the number of units sold in |
| 10:03:35 | 19 | 2021; yes? |
| 10:03:36 | 20 | A.     Yes, he was asked that question, and he provided an |
| 10:03:40 | 21 | answer. |
| 10:03:41 | 22 | Q.     And then you later -- then the company later |
| 10:03:44 | 23 | provided -- Waydoo provided financial information, a |
| 10:03:48 | 24 | spreadsheet that was different than his testimony? |
| 10:03:52 | 25 | A.     Certain -- yes. |

Kline - Cross

10:03:55 1  Q.      And you chose to rely upon that financial information

10:03:58 2  that was provided for the company instead of Mr. Ping's

10:04:02 3  sworn testimony in his deposition; yes?

10:04:03 4  A.      After discussions with him and reviewing the

10:04:10 5  financial data and also reviewing Mr. Wagner's testimony

10:04:15 6  concerning Waydoo sales, yes.

10:04:18 7  Q.      Okay.  And when you said "reviewing the financial

10:04:20 8  data," you didn't do any way to test the accuracy of

10:04:24 9  Waydoo's financial data, correct?

10:04:26 10  A.      Well, so one of the things I did to test the accuracy

10:04:33 11  of Waydoo's financial data is Mr. Wagner in his

10:04:36 12  deposition -- he's a representative of MHL as I'm sure

10:04:40 13  you're aware -- testified that he thought Waydoo had sold

10:04:43 14  800 boards in 2021.  And that's pretty consistent with the

10:04:48 15  actual sales data.  So, it was another data point against

10:04:52 16  which I compared and produced MHL's sales.

10:04:56 17  Q.      And, you know, Mr. Wagner testified he has no real

10:04:58 18  way of knowing how many units Waydoo is selling in the U.S.

10:05:02 19  at any point in time; right?

10:05:04 20  A.      Correct.  It was an estimate he did based upon his

10:05:10 21  understanding of the market that happens to closely reflect

10:05:13 22  Waydoo's sales data.

10:05:13 23  Q.      And -- but go back to my question.  Sometimes when

10:05:18 24  you're working as a damages expert and a client provides you

10:05:21 25  financial information, you can take what they provide you

Kline - Cross

10:05:24  1   and ask to run it to a general ledger.  You can ask to run

10:05:28  2   it to receipts.  You can take some samples and run it down

10:05:32  3   to test the accuracy of what they're providing to you.  Yes?

10:05:35  4   A.    One could in theory do that, however, I'm honestly --

10:05:41  5   I've been doing this for 16 years.  I don't know that I've

10:05:43  6   ever worked on a case in which audit procedures have been

10:05:46  7   run on produced financial data of the type talking like --

10:05:51  8   Q.    Oh.

10:05:51  9   A.    -- running samples and cross-checking samples of hard

10:05:55 10   copy data versus --

10:05:57 11   Q.    That's your testimony, that you've never done that in

10:06:01 12   16 years?

10:06:01 13   A.    Pulled samples --

10:06:07 14   Q.    Yes.

10:06:07 15   A.    -- of invoices and cross-checked them.

10:06:10 16   Q.    Yes.

10:06:10 17   A.    I have never run audit procedures against produced

10:06:14 18   sales data in a case.

10:06:15 19   Q.    All right.

10:06:16 20   A.    Reviewed procedures maybe so like, for instance, what

10:06:19 21   we did yesterday where we looked at the sales trends and

10:06:22 22   made sure that the data sort of makes sense as behaving in a

10:06:26 23   normal way, those sorts of things, cross-checking it, yes,

10:06:31 24   against testimony, those sorts of things.  But...

10:06:34 25   Q.    But here you did not actually run any of them down

10:06:37  1    through the general ledger or to receipts or anything like

10:06:40  2    that; true?

10:06:40  3    A.      No, I did not pull invoices in this case.

10:06:45  4    Q.      And when you talked to Mr. Ping, he told you that

10:06:49  5    there were problems in their accounting system for several

10:06:53  6    years at Waydoo; correct?

10:06:54  7    A.      Yes.  So in my conversation with Mr. Ping, he

10:06:59  8    indicated that they were uncertain about some of the

10:07:03  9    accuracy of the original sales data they produced.  And they

10:07:07 10    had gone back to the hard copy documents and redone the

10:07:11 11    sales data and they produced updated sales data which added

10:07:15 12    an additional 30 -- 30 units.  So they went from having

10:07:23 13    1,939 units to having 1,969 units.  They identified an

10:07:29 14    additional 30 sales.

10:07:32 15    Q.      So, he told you that they had issue -- I think he

10:07:35 16    told the jury that yesterday, that they had significant

10:07:37 17    issues with their accounting system for several years;

10:07:40 18    right?

10:07:40 19    A.      Yes, there were -- in the early period apparently

10:07:44 20    there were some issues.

10:07:46 21    Q.      Some issues.

10:07:46 22            And then you're relying on his operating margin,

10:07:51 23    the testimony he gave in his deposition.  The same

10:07:54 24    deposition where he gave the 2021 units, he gave an

10:08:00 25    operating profit margin; yes?

833

Kline - Cross

10:08:01 1    A.      He did testify to an operating profit margin.

10:08:05 2    Q.      An even 15 percent; correct?

10:08:08 3    A.      Approximately, yeah.

10:08:11 4    Q.      And again, no audit procedures to check the accuracy

10:08:16 5    of that testimony; correct?

10:08:18 6    A.      That is correct.  I did not run audit procedures in

10:08:21 7    this case.

10:08:21 8    Q.      You know, he also testified that there was a

10:08:24 9    manufacturing product -- profit margin of 35 percent.

10:08:29 10   A.      I believe he testified that was a target margin.

10:08:34 11   Q.      And you know that he also testified from that

10:08:37 12   35 percent that that included -- that was after the cost for

10:08:43 13   raw materials, labor, purchasing, the cost of the factory

10:08:48 14   and other factory expenses; yes?

10:08:51 15   A.      Yes.  That's what we would call gross margin.

10:08:54 16   Q.      The cost of the factory is not usually in gross

10:08:57 17   margin, is it?

10:08:57 18   A.      Allocated manufacturing overhead.

10:08:59 19   Q.      Okay.  And what you told the jury yesterday was,

10:09:03 20   "Well, I had the 35 percent, and I had the 15 percent.  I

10:09:08 21   know Dr. Stec relied on the 35 percent.  I'm relying on the

10:09:12 22   15 percent because it didn't include marketing, R&D,

10:09:18 23   shipping out, all of the other things that come with having

10:09:21 24   a successful product on the market."  Yes?

10:09:23 25   A.      That's correct.

Kline - Cross

10:09:26 1    Q.    You realize that Mr. Wade is responsible for all the

10:09:30 2    marketing and distribution costs in the U.S. market?

10:09:33 3    A.    Yes.

10:09:42 4    Q.    And he's also responsible for the shipping costs.  He

10:09:45 5    pays for the shipping from China, he pays the warehouse

10:09:49 6    expense here, he pays the customs expense, he pays -- and he

10:09:54 7    pays for customer service; right?

10:09:57 8    A.    That fact -- I'm uncertain as I sit here.

10:10:02 9    Q.    What?

10:10:03 10   A.    I'm uncertain as I sit here.

10:10:04 11   Q.    Well, let's look at this trial transcript.

10:10:07 12         MR. MURRELL:  Melissa, if you could pull up

10:10:09 13   Page 595 to 96 from yesterday.

10:10:09 14   BY MR. MURRELL:

10:10:15 15   Q.    And he's talking about the cost of the board and you

10:10:18 16   see here first he says, "So I guess landed cost was

10:10:21 17   different from what I paid them.  I paid them around $3,400

10:10:24 18   a board."

10:10:25 19         That again tells us the price has gone up; yes?

10:10:30 20   A.    Yes, slightly.

10:10:31 21   Q.    And then said -- "You said the price has changed over

10:10:33 22   time.  Was it previously lower?

10:10:35 23         "Yes, it was.  Yes."

10:10:37 24         Again, confirming what we talked about earlier,

10:10:39 25   price was going up; right?

Kline - Cross

10:10:41 1    A.      Correct.

10:10:42 2    Q.      "And could you just explain for some of the -- I

10:10:45 3    think you mentioned that you have to get it from the

10:10:47 4    factories.  Can you mention some of the shipping costs,

10:10:50 5    shipping and other costs that are -- that you pay on top of

10:10:53 6    what you pay to Waydoo?

10:10:54 7            "ANSWER:  Yes.  So, we import -- in most cases

10:10:57 8    we try to bring the boards in via sea, via shipping

10:11:00 9    container, so there's the cost of that.  You know, that

10:11:02 10   price fluctuates anywhere from -- one time it was as low as

10:11:05 11   3 or 4,000, you know, three or four years ago and went as

10:11:10 12   high as, I think, 25,000 over the pandemic, and then it's

10:11:14 13   gradually come down which is fortunate, but like gas prices

10:11:16 14   they'll never go back to what it was unfortunately.

10:11:18 15           "So, there's the transport cost.  There's the

10:11:23 16   importation, which is, you know, customs, duty fees, and

10:11:27 17   then obviously the storage of the boards.

10:11:29 18           "We have to have certifications for shipping

10:11:32 19   them because of lithium ion batteries.  They're considered

10:11:36 20   hazardous material.  So we have continued dedications,

10:11:40 21   certification, emergency contact numbers, things that are

10:11:43 22   all needed for to us handle and distribute these products.

10:11:46 23   And then, obviously, general overhead warehouse expense,

10:11:49 24   customer service, what I call, I guess, the Smith Stoke fee

10:11:53 25   which is, you know, people being an enthusiast, I think,

Kline - Cross

10:11:56 1    it's a very big part of the sport."

10:11:58 2                And I think that's where he ends up taking --

10:12:01 3    describing the expenses in detail.

10:12:02 4                So, not Waydoo, but Mr. Wade is, in fact, paying

10:12:08 5    the shipping, warehouse expense, customs expense,

10:12:12 6    certifications; right?

10:12:15 7    A.    I see that testimony.

10:12:18 8    Q.    But you relied upon the 15 percent because it was

10:12:23 9    going to cover shipping and marketing and advertising and

10:12:27 10   R&D; right?

10:12:29 11   A.    Well, it certainly is the case whatever specifically

10:12:33 12   falls into it that there are expenses incurred by Waydoo

10:12:37 13   that are not manufacturing expenses.  They have

10:12:42 14   administrative employees.  They have management.  They have

10:12:47 15   R&D.  The cost of that product is not fully embodied in the

10:12:51 16   cost of simply making an individual board, in the fact that

10:12:57 17   like every other company they have employees who work in

10:13:01 18   administrative functions.

10:13:02 19   Q.    How many employees?

10:13:04 20   A.    I do not know specifically.

10:13:05 21   Q.    How much is that?  That's usually called general and

10:13:08 22   administrative expense?

10:13:09 23   A.    It can be broken up different ways on different

10:13:12 24   financials, but yes.

10:13:13 25   Q.    And you have no idea how much that is in this case;

837

Kline - Cross

10:13:16 1    right?

10:13:16 2    A.    Well, I know Mr. Ping testified that it was -- their

10:13:19 3    operating margin was 15 percent.

10:13:21 4    Q.    All right.  But that was after taking out the

10:13:23 5    marketing and shipping and everything else we just talked

10:13:26 6    about; right?

10:13:26 7    A.    Well, he didn't specifically identify what came out

10:13:29 8    to get to 15 percent.

10:13:30 9    Q.    You also said R&D, research and development; right,

10:13:36 10   as one of the costs that would not be included?

10:13:38 11   A.    That would not be included -- that would typically

10:13:39 12   fall between manufacturing expense and operating profit.

10:13:43 13   Q.    Do you know how much Waydoo has spent on research and

10:13:45 14   development?

10:13:46 15   A.    I do not know specifically.

10:13:55 16   Q.    Well, let's go back to the hypothetical negotiation.

10:14:00 17   And one of your opinions is that Waydoo wouldn't have agreed

10:14:05 18   to 560 a board because they couldn't make enough money if

10:14:09 19   they did that; right?

10:14:10 20   A.    It would exceed the 15 percent profit margin to which

10:14:14 21   Mr. Ping testified.

10:14:15 22   Q.    If Waydoo simply increased the cost of its board by

10:14:21 23   $560, if they tacked that on, it wouldn't be a cost to them,

10:14:29 24   would it?

10:14:29 25   A.    So, that assumes that their sales wouldn't decline

10:14:34  1   which is, you know -- presumably, if they could just

10:14:38  2   increase the price of their board by $560 and their sales

10:14:42  3   would remain the same, they would do so, right, and just

10:14:44  4   make more profit.

10:14:46  5             Their -- have positioned themselves, as you saw

10:14:49  6   on their own website, as the most affordable player in the

10:14:53  7   market.  And they are trying to sell at the biggest volume

10:14:59  8   and the lowest pricing.  So, I don't agree that that would

10:15:02  9   necessarily be cost-free at all.

10:15:04 10   Q.    And if they priced it an extra $560, they would still

10:15:08 11   be, compared to Fliteboard and MHL, the cheaper alternative?

10:15:14 12   A.    Yes, though there were other competitors on the

10:15:17 13   market.

10:15:18 14   Q.    All right.  But they would still have -- after

10:15:21 15   passing that $560 through, they would still have a price

10:15:25 16   advantage over MHL and they would still have a price

10:15:28 17   advantage over Fliteboard; true?

10:15:29 18   A.    Yes, but there would be a disadvantage versus, for

10:15:36 19   instance, Get Foil, who is another affordable player in the

10:15:38 20   market.

10:15:38 21   Q.    Was Get Foil in the market at the time of this

10:15:41 22   hypothetical negotiation of March 2019?

10:15:43 23   A.    No, it was not.

10:15:45 24   Q.    Oh.  They could also decide to no longer provide

10:15:51 25   their distributor, Mr. Wade, 50 percent of the retail cost.

839

Kline - Cross

10:15:57 1            They could pass some of that cost to him; yes?

10:16:00 2    A.    That would depend upon, you know, their relationship

10:16:06 3    with Mr. Wade.

10:16:08 4    Q.    And you know, we've already talked about it,

10:16:10 5    Fliteboard and MHL sell through their distributors or

10:16:15 6    resellers at around a 20 percent off suggested retail;

10:16:20 7    right?

10:16:20 8    A.    That's what the testimony is in the documents at

10:16:23 9    hand.

10:16:24 10   Q.    All right.  One last topic.  You talked to the jury

10:16:28 11   yesterday about non-infringing alternatives.

10:16:32 12            Do you remember that?

10:16:32 13   A.    I do.

10:16:33 14   Q.    And you showed them a slide on that.

10:16:36 15            MR. MURRELL:  And Melissa, if we could put up

10:16:37 16   slide 17.

10:16:37 17   BY MR. MURRELL:

10:16:46 18   Q.    Remember showing them this slide?

10:16:49 19   A.    I do.

10:16:50 20   Q.    And the top one on the left, the non-infringing

10:16:54 21   alternative is Sea-Doo?

10:16:58 22   A.    Is a picture of a Sea-Doo product.

10:17:02 23   Q.    And Sea-Doo is a well-known water sports

10:17:06 24   manufacturer?

10:17:07 25   A.    That is correct.

Kline - Cross

10:17:08  1    Q.    And what you said here was Dr. -- always get his name

10:17:14  2    wrong, Dr. Triantafyllou.  I don't --

10:17:17  3    A.    I think it's pronounced Triantafyllou.

10:17:20  4    Q.    I've been saying Dr. T myself, but Dr. Triantafyllou

10:17:25  5    told you that using a steering mechanism like that in the

10:17:31  6    Sea-Doo product would be an acceptable non-infringing

10:17:35  7    alternative?

10:17:36  8    A.    That is what he told me.

10:17:38  9    Q.    And your testimony to the jury, based upon your

10:17:41 10    review, is that making that change would cost as little as

10:17:45 11    $50 a board?

10:17:46 12    A.    So, my understanding from Mr. Wade is that a solution

10:17:52 13    such as either that solution or the tether solution could be

10:17:56 14    implemented on the Waydoo boards for between 50 and $75 in a

10:18:01 15    commercially acceptable fashion.

10:18:02 16    Q.    Right.  And he told the jury yesterday, do you know

10:18:05 17    that it could be as low as $10 a board?

10:18:07 18    A.    I was not aware he had told the jury that, but.

10:18:12 19    Q.    All right.  We'll use your $50 a board.

10:18:15 20          So what you're telling the jury is that if

10:18:17 21    Waydoo wanted to use a non-infringing product, they could

10:18:22 22    make an adjustment that would only be $50 a board?

10:18:25 23    A.    In my report, I use the $75 but that is my

10:18:29 24    understanding.

10:18:31 25    Q.    And that's a change they could have made when they

| | | |
|---|---|---|
| 10:18:33 | 1 | first came to market, in March of 2019? |
| 10:18:38 | 2 | A.     Presumably. |
| 10:18:40 | 3 | Q.     It's a change they could have made what they received |
| 10:18:43 | 4 | cease and desist letters? |
| 10:18:44 | 5 | A.     Yes. |
| 10:18:46 | 6 | Q.     It's a change they could have made when this |
| 10:18:48 | 7 | complaint was filed? |
| 10:18:49 | 8 | A.     Yes. |
| 10:18:52 | 9 | Q.     And it's a change, to your knowledge, they have not |
| 10:18:55 | 10 | made? |
| 10:18:55 | 11 | A.     No, they have not made it. |
| 10:18:59 | 12 | Q.     Thank you, sir. |
| 10:19:02 | 13 | THE COURT:  Anything further, Mr. Kanter? |
| 10:19:05 | 14 | MR. KANTER:  A few questions, Your Honor. |
| 10:19:12 | 15 | REDIRECT EXAMINATION |
| 10:19:12 | 16 | BY MR. KANTER: |
| 10:19:15 | 17 | Q.     Hello, Mr. Kline. |
| 10:19:16 | 18 | A.     Hello. |
| 10:19:21 | 19 | Q.     MHL's counsel asked you about a number of costs that |
| 10:19:24 | 20 | Mr. Wade has to pay as part of his distribution business? |
| 10:19:30 | 21 | A.     He did. |
| 10:19:30 | 22 | Q.     And he also asked you about Waydoo's business model; |
| 10:19:35 | 23 | right? |
| 10:19:35 | 24 | A.     He did. |
| 10:19:36 | 25 | Q.     If Waydoo was to adopt a direct consumer model, they |

Kline - Redirect

1  would have to sell -- they'd have to -- they'd have to pay

2  all of those costs themselves; right?

3  A.     They would.  They would lose all the benefits of

4  having Mr. Wade as part of the distribution channel.

5  Q.     And they'd have to invest in distribution

6  infrastructure?

7  A.     They would.

8  Q.     And they'd probably have to higher personnel?

9  A.     They would.

10  Q.     Regarding profit, the 15 percent profit number, did

11  Dr. Stec dispute that Waydoo's operating profit was

12  15 percent?

13  A.     Not to my knowledge.

14  Q.     If Waydoo was to increase its price by $560 to

15  account for the royalty, could that have an impact on

16  Waydoo's sales?

17  A.     Yes.  Generally, when companies increase their

18  prices, if they're, you know, the competition market as

19  there is in this case, sales decline.  That's a normal

20  relationship.

21  Q.     Did Dr. Stec look at what would have happened to

22  Waydoo's sales had they agreed to a $560 royalty?

23  A.     Dr. Stec did no analysis of the impact of Waydoo

24  increasing its pricing on Waydoo sales.

25  Q.     And if Waydoo increased the prices, that would

Kline - Redirect

10:21:02  1    presumably increase the price to consumers?

10:21:04  2    A.    Yes.

10:21:10  3    Q.    You were asked about your Honda versus BMW example.

10:21:15  4    It was intended to teach the jury.

10:21:17  5             If a Honda and a BMW have the same top speed

10:21:21  6    and, say, mileage, does that mean that they are head-to-head

10:21:24  7    competitors?

10:21:25  8    A.    No, they are differentiated on a number of other

10:21:28  9    bases.  Fit and finish, perception of brand value.  I mean,

10:21:34 10    any number of bases, as you're aware.

10:21:37 11    Q.    I think you were asked some questions about retail

10:21:40 12    prices.

10:21:41 13             What does Waydoo itself, not the distributors,

10:21:45 14    but Waydoo itself, actually sell its boards for?

10:21:47 15    A.    A little over $3,000.

10:21:49 16    Q.    And what does MHL sell its boards for?

10:21:51 17    A.    In ex -- $10,000.

10:21:55 18    Q.    Okay.  And does the Fliteboard license prevent

10:21:58 19    Fliteboard from selling boards to distributors or through --

10:22:04 20    through distributors?

10:22:04 21    A.    It does not.

10:22:05 22    Q.    Does it prevent Fliteboard from selling boards to

10:22:08 23    distributors at $3,000?

10:22:09 24    A.    It does not.

10:22:11 25    Q.    He also asked you some questions focusing on 2016 and

Kline - Redirect

10:22:22  1    its market around 2016.

10:22:26  2              Was the Langelaan agreement ever amended?

10:22:28  3    A.      Yes, it was amended twice, as we discussed yesterday.

10:22:32  4    Q.      And when was that first amendment?

10:22:33  5    A.      April 2019.  Right after the hypothetical

10:22:37  6    negotiation.

10:22:39  7    Q.      And just to remind everyone, the hypothetical

10:22:42  8    negotiation was when?

10:22:42  9    A.      Early 2019, January to March, 2019.

10:22:46 10    Q.      January to March, and the amendment was in April?

10:22:48 11    A.      April 7th, yes.

10:22:51 12    Q.      Okay.  So, do those 2016 market conditions matter

10:22:56 13    with respect to the amended license?

10:22:58 14    A.      No, I mean, what we see when we look at the two

10:23:02 15    amendments is that both times Professor Langelaan's

10:23:05 16    compensation under the different agreement was reduced.  In

10:23:08 17    the first amendment, he gives up the right to any

10:23:12 18    sublicensing fees.  And in the second amendment, which was

10:23:15 19    in 2020, he gives up -- well, effectively took a $225,000

10:23:22 20    buyout.  So instead of requiring that MHL would pay a total

10:23:26 21    of million dollars in royalties, MHL ended up paying only

10:23:30 22    $500,000 in royalties.

10:23:31 23              So it appears the compensation

10:23:33 24    Professor Langelaan -- well, it's not that it appears.  The

10:23:35 25    compensation Professor Langelaan declined over time as the

Kline - Redirect

market evolved.

Q.      You were also asked a question about competition in
2019.  And MHL's counsel asked you if Waydoo -- they said
they were third in the market, not 10th or 15th; right?

A.      He did ask that.

Q.      Were there 10 or 15 competitors in the market in
2019?

A.      My understand is there aren't 10 or 15 competitors in
the market now and never have been.

Q.      At the hypothetical negotiation, say, Waydoo entered
the market, how many competitors would there be?

A.      In the U.S. market, three, I think.  Three or maybe
four.

Q.      So they would have been the last competitor?

A.      Yes.

Q.      The lowest?

        I think I have one more question.

        I -- I think that counsel may have implied at
the beginning that you simply took the 2.5 percent in the
Langelaan license and adopted that as your royalty.

        Is that the case?

A.      No.  As we discussed yesterday, I looked at a broad
range of royalty indicators.  I considered all 15 of the
Georgia-Pacific factors.  And based upon those, I concluded
on 2 and a half percent, which, again, is not what was

Kline - Redirect

10:24:49 1    agreed to in the original Langelaan license, because the

10:24:51 2    original Langelaan license has a million-dollar cap.

10:24:54 3          So, that -- MHL would have stopped paying

10:24:58 4    royalties after it paid a million dollars.  The hypothetical

10:25:04 5    license, the royalty -- the reasonable royalty on which I

10:25:06 6    concluded contains no such cap; so, is substantially more

10:25:10 7    favorable to MHL in the terms of the Langelaan license or to

10:25:15 8    Professor Langelaan.

10:25:16 9    Q.    Could you actually -- I believe you have a clicker

10:25:17 10   there.  Would you mind turning to slide 18 of your slide

10:25:20 11   deck?

10:25:30 12         Are these the guideposts that you used in the

10:25:32 13   hypothetical negotiation?

10:25:32 14   A.    They are.

10:25:34 15   Q.    And you considered each and every one of these?

10:25:37 16   A.    I did.

10:25:39 17   Q.    And you mentioned the Georgia-Pacific factors.  Could

10:25:41 18   you go to slide 39?

10:25:50 19         Did you consider each and every one of the

10:25:52 20   Georgia-Pacific factors in coming to your royalty number?

10:25:54 21   A.    I did.

10:25:56 22              MR. KANTER:  Thank you very much.

10:25:58 23              THE COURT:  All right.  Mr. Kline, thank you.

10:25:59 24   You may step down.  Watch your step.

10:26:01 25              THE WITNESS:  Thank you so much.

Kline - Redirect

10:26:08  1          MR. COLLETTI:  Your Honor, we would ask

10:26:11  2   permission to read some statements of fact that are

10:26:12  3   undisputed.

10:26:13  4          THE COURT:  All right.  Go ahead.

10:26:15  5          Just telling me before you start where are

10:26:20  6   you -- are you reading these from the Pretrial Order?

10:26:23  7          MR. COLLETTI:  I'm reading from the Pretrial

10:26:26  8   Order beginning on Page 12.

10:26:27  9          THE COURT:  All right.  Go ahead.

10:26:29 10          MR. COLLETTI:  And I'm going to read Evolo

10:26:32 11   separately from the Woolley and Namanny, so I won't go in

10:26:34 12   order.

10:26:37 13          So, the Evolo Report -- these are statements of

10:26:44 14   fact which are admitted and required and I'll prove.

10:26:47 15          The Evolo Report discloses a floatation device

10:26:50 16   that has a fore aft length greater than a lateral width.

10:26:55 17   The floatation device having a top surface and a bottom

10:26:58 18   surface, as claimed in Claim 1 of the patents-in-suit.

10:27:01 19          Its Evolo Report discloses a floatation device

10:27:06 20   wherein a user can be disposed on the top surface of the

10:27:10 21   floatation device in a prone, kneeling or standing position,

10:27:15 22   as claimed in Claim 1 of the patents-in-suit.

10:27:18 23          The Evolo Report discloses a floatation device

10:27:23 24   having a forward section, a middle section, and a rear

10:27:27 25   section as claimed in Claim 1 of the patents-in-suit.

Kline - Redirect

10:27:31 1        The Evolo Report discloses a strut having an

10:27:37 2   upper end and a lower end.  The upper end fixedly

10:27:41 3   interconnected with the floatation device between the middle

10:27:45 4   section and the rear section of the floatation device as

10:27:49 5   claimed in Claim 1 of the patents-in-suit.

10:27:51 6        The Evolo Report discloses a hydrofoil fixedly

10:27:57 7   interconnected with the lower end of the strut.  The

10:28:01 8   hydrofoil having no movable surface as claimed in Claim 1 of

10:28:05 9   the patents-in-suit.

10:28:07 10       The Evolo Report discloses a propulsion system

10:28:14 11  for propelling the watercraft in a body of water as claimed

10:28:16 12  in Claim 1 of the patents-in-suit.

10:28:19 13       The Evolo Report discloses a propulsion system

10:28:23 14  wherein the propulsion system is connected to the hydrofoil

10:28:28 15  as claimed in Claim 1 of the patents-in-suit.

10:28:31 16       The Evolo Report discloses a watercraft having

10:28:36 17  no movable steering system as claimed in Claim 1 of the

10:28:40 18  patents-in-suit.

10:28:41 19       The Evolo Report discloses a propulsion system

10:28:48 20  wherein the propulsion system comprises a battery, an

10:28:52 21  electric motor and a propulsor.  The propulsor selected from

10:28:56 22  a propeller, a ducted propeller or a pump jet, as claimed in

10:29:03 23  Claim 2 of the patents-in-suit.

10:29:05 24       Woolley and/or Namanny disclose a floatation

10:29:15 25  device that has a fore aft length greater than the lateral

Kline - Redirect

10:29:19  1    width.  The floatation device having a top surface and a

10:29:24  2    bottom surface, as claimed in Claim 1 of the

10:29:27  3    patents-in-suit.

10:29:32  4              Namanny discloses a floatation device wherein a

10:29:35  5    user can be disposed on the top surface of the floatation

10:29:38  6    device in a prone, kneeling or standing position as claimed

10:29:43  7    in Claim 1 of the patents-in-suit.

10:29:45  8              Woolley and/or Namanny disclose a floatation

10:29:49  9    device having a forward section, a middle section and a rear

10:29:53 10    section as claimed in Claim 1 of the patents-in-suit.

10:29:58 11              Woolley discloses a strut having -- having an

10:30:03 12    upper end and a lower end, their upper end fixedly

10:30:07 13    interconnected with the floatation device between the middle

10:30:11 14    section and the rear section of the floatation device as

10:30:15 15    claimed in Claim 1 of the patents-in-suit.

10:30:17 16              Woolley discloses a hydrofoil fixedly

10:30:22 17    interconnected with a lower end of the strut, the hydrofoil

10:30:27 18    having no movable surface, as claimed in Claim 1 of the

10:30:31 19    patents-in-suit.

10:30:32 20              Namanny discloses a propulsion system for

10:30:36 21    propelling the watercraft in a body of water as claimed in

10:30:39 22    Claim 1 of the patents-in-suit.

10:30:41 23              Namanny discloses a watercraft having no movable

10:30:45 24    steering system, as claimed in Claim 1 of the

10:30:49 25    patents-in-suit.

Kline - Redirect

10:30:50 1          Namanny discloses a propulsion system wherein

10:30:55 2     the propulsion system comprises a battery, an electric

10:31:00 3     motor, a motor speed controller and a propulsor.  The

10:31:03 4     propulsor, selected from a propeller, a ducted propeller or

10:31:07 5     a pump jet, as claimed in Claim 2 of the patents-in-suit.

10:31:11 6          Woolley describes a hydrofoil wherein the

10:31:16 7     hydrofoil is wing shaped with the front edge and a rear edge

10:31:20 8     that both curve rearwardly, as claimed in Claim 6 of the

10:31:26 9     '044 patent.

10:31:27 10          Thank you, Your Honor.

10:31:34 11          MR. COLLETTI:  We have no further witnesses,

10:31:35 12    Your Honor.

10:31:36 13          THE COURT:  All right.  So you're resting.

10:31:38 14          MR. COLLETTI:  We are resting.

10:31:39 15          THE COURT:  All right.

10:31:41 16          MR. MURRELL:  We have some motions to make,

10:31:43 17    Your Honor.

10:31:43 18          THE COURT:  All right.  You can do them later.

10:31:44 19          MR. MURRELL:  Yes, Your Honor.

10:31:45 20          MR. COLLETTI:  Just to preserve our right, we

10:31:47 21    would have a motion as part of that as well.

10:31:49 22          THE COURT:  Okay.  You can do it later.

10:31:54 23          MR. THEUERKAUF:  Your Honor, we would like to

10:31:56 24    call Mr. Christopher Barry in rebuttal.

10:31:58 25          THE COURT:  All right.

Barry - Direct

10:32:41  1           All right.  Mr. Barry, you're still sworn from

10:32:43  2   the other day.  All right?

10:32:44  3                THE WITNESS:  Yes, sir.

10:32:45  4                THE COURT:  All right.

10:32:48  5                MR. THEUERKAUF:  Your Honor, may I approach?

10:32:49  6                THE COURT:  Sure.

10:33:15  7                     DIRECT EXAMINATION

10:33:15  8   BY MR. THEUERKAUF:

10:33:15  9   Q.    Good morning, Mr. Barry.

10:33:16 10   A.    Good morning.

10:33:18 11   Q.    So, we've got a few slides here.  We're going to try

10:33:22 12   to walk through this pretty quick.

10:33:24 13           But during your testimony earlier in the week,

10:33:27 14   you had mentioned part of your project or part of your

10:33:31 15   assignment in this case was also to evaluate the different

10:33:35 16   invalidity defenses that Waydoo and Dr. Triantafyllou had

10:33:40 17   come up with; correct?

10:33:41 18   A.    Yes, sir.

10:33:42 19                MR. THEUERKAUF:  Okay.  So, if we go to the

10:33:45 20   PowerPoint.

10:33:45 21   BY MR. THEUERKAUF:

10:33:52 22   Q.    All right.  Do you recognize this, Mr. Barry?

10:33:55 23   A.    Yes, sir.

10:33:56 24   Q.    Okay.  And so, as part of your work, have you

10:34:00 25   analyzed whether or not the Evolo Report anticipates the

852

Barry - Direct

10:34:04 1    claims of the patents at issue here?

10:34:06 2    A.    I have.

10:34:07 3    Q.    Okay.  And we'll get into a little bit more detail in

10:34:10 4    a minute, but what is your -- what's the summary of your

10:34:12 5    opinion with respect to that issue?

10:34:14 6    A.    It does the not.

10:34:15 7    Q.    Okay.  And have you evaluated whether the claimed

10:34:18 8    inventions of the patents at issue are obvious?

10:34:21 9    A.    Yeah, I have.

10:34:22 10   Q.    And what's, generally, your opinion with respect to

10:34:25 11   that issue?

10:34:26 12   A.    They are not.

10:34:27 13   Q.    Okay.  And the last one here, have you analyzed

10:34:31 14   whether the specification or the written description of the

10:34:36 15   patents at issue here enable the claims of those patents?

10:34:41 16   A.    Yes, I have.

10:34:43 17   Q.    Okay.  And what's your opinion?

10:34:45 18   A.    Yes, it does.

10:34:47 19         MR. THEUERKAUF:  Okay.  So if we look at the

10:34:52 20   first issue.  Yeah, there we go.

10:34:52 21   BY MR. THEUERKAUF:

10:35:02 22   Q.    So, let me ask you, in your work in this case have

10:35:07 23   you become familiar with what's been referred to as the

10:35:09 24   Evolo Report?

10:35:10 25   A.    I have.

10:35:11 1    Q.      Okay.  And have you read it?

10:35:13 2    A.      Oh, yes.

10:35:14 3    Q.      Okay.  And have you formed any opinions regarding the

10:35:18 4    Evolo Report?

10:35:18 5    A.      Well, it does not produce a stable weight controlled

10:35:25 6    personal hydrofoil.

10:35:27 7    Q.      Okay.  And what leads you to that conclusion?

10:35:29 8    A.      There are several things regarding stability, mainly

10:35:34 9    that it isn't stable.  It's clearly not stable from the

10:35:38 10   various videos and from the -- from the discussions in the

10:35:42 11   report itself and in other -- other sources.

10:35:50 12           It does not have a reasonable design of

10:35:54 13   hydrofoil.  I've never seen such a hydrofoil in some

10:35:59 14   40 years of being in the high speed craft industry.  There's

10:36:03 15   a number of technical and practical issues with that

10:36:07 16   particular hydrofoil design, but it is really unusual.  It's

10:36:14 17   the only one of its kind ever, that I know of.

10:36:18 18   Q.      And so, the Evolo Report mentions stability at some

10:36:23 19   point in -- in the report; is that right?

10:36:25 20   A.      Well, it mentions stability explicitly as a

10:36:29 21   requirement for the floating stationary board.

10:36:35 22   Q.      And so, by that you mean when it's -- when it's not

10:36:37 23   flying?

10:36:37 24   A.      When it's not only not flying, but just sitting at

10:36:39 25   the dock.

Barry - Direct

10:36:41 1    Q.    Okay.  And with respect to -- well, let me ask you

10:36:46 2    this:  We heard yesterday from Dr. Triantafyllou that

10:36:50 3    equilibrium and stability are two different things; correct?

10:36:54 4    A.    That's correct.

10:36:55 5    Q.    Okay.  And so, what is your understanding with

10:36:58 6    respect to those two issues as discussed in the Evolo

10:37:02 7    Report?

10:37:02 8    A.    I'm not even sure that in some cases the Evolo device

10:37:08 9    achieves equilibrium.  But if it does, it certainly does not

10:37:12 10   achieve stability.

10:37:14 11   Q.    Okay.  And so, you mentioned the wing -- or the

10:37:29 12   hydrofoil wing being odd.

10:37:34 13              MR. THEUERKAUF:  And let's show that real quick,

10:37:37 14   if we could.  It should be DX 192.

10:37:47 15              MR. BASANTA:  Objection, Your Honor.

10:37:51 16              THE COURT:  The objection is overruled.

10:37:56 17   BY MR. THEUERKAUF:

10:37:58 18   Q.    So, is this the wing that you -- the hydrofoil wing

10:38:02 19   that you were just mentioning?

10:38:03 20   A.    Could you point to it, specifically what you're

10:38:08 21   talking about?

10:38:08 22   Q.    Oh, I'm sorry.  Is this not the hydrofoil wing that

10:38:11 23   you were just mentioning in the --

10:38:12 24   A.    Yes, the lower --

10:38:12 25   Q.    -- for the Evolo Report?

855

Barry - Direct

10:38:13  1   A.      Yes, the lower parts of this -- of this drawing.   The

10:38:16  2   upper one is the floating body.

10:38:18  3   Q.      Yeah, okay.

10:38:20  4           And so what -- what -- if you could explain just

10:38:22  5   a little bit why -- what you see here, the wing on the Evolo

10:38:27  6   is so problematic that you were saying it would not be able

10:38:31  7   to achieve or create stability.   Why is that?

10:38:33  8   A.      Well, it's a delta wing and if -- if we look at the

10:38:38  9   literature and existing work in hydrofoils, I -- you don't

10:38:44 10   ever use delta wings.   You never see them.

10:38:47 11           Even if we look at aircraft, delta wings are

10:38:49 12   only used for supersonic aircraft, the Concorde, et cetera.

10:38:56 13   The wings also -- and even those do not have the funny

10:39:00 14   little square ends.   And it is also flat plate.   It's as if

10:39:07 15   you just took a dark torch and cut it out, that little piece

10:39:12 16   of steel.

10:39:13 17           And when we -- flat plate airfoils, people don't

10:39:20 18   do them.   It has no thickness, it has no rounded nose, it

10:39:23 19   has no camber.   And even if we -- again, if we look at most

10:39:28 20   delta winged aircraft, like for example the Concorde, the

10:39:31 21   Concorde has a large, about this big, rounded nose.   And

10:39:39 22   indicating roughly the size of a candle for the record.

10:39:43 23           So, all of those things promote various kinds of

10:39:49 24   instabilities, various kinds of aeronautical changes and --

10:39:53 25   that change the forces suddenly.

Barry - Direct

10:39:56  1  Q.     Okay.  So with respect to what we're seeing here,

10:39:59  2  what is your opinion as to whether or not that could achieve

10:40:03  3  stability?

10:40:04  4  A.     I don't believe it can for a variety of reasons.

10:40:09  5  Once it gets to a certain -- delta wings have to be tilted

10:40:13  6  back farther to start lifting, to develop lift.  The

10:40:19  7  Concorde has a nose that droops so the pilot can see over

10:40:23  8  because he has to fly up -- it has to swing up so high.  The

10:40:27  9  F-8 Crusader has a wing that is -- a deeply swept wing, not

10:40:33 10  a delta but a similar effect.  It has a wing that pops up so

10:40:37 11  as the pilot lands on the aircraft carrier, he hits his --

10:40:41 12  he hits with his landing gear instead of the tail of the

10:40:44 13  aircraft.

10:40:45 14         So, you have to achieve this high angle of

10:40:49 15  attack.  This high angle of attack invites the wing to

10:40:52 16  stall.  And in the water, it also invites the wing to

10:40:55 17  approach the surface of the water, which causes it to lose

10:40:59 18  lift, dropping the nose suddenly.

10:41:01 19  Q.     Okay.  And, Mr. Barry, I'd like to show you a video.

10:41:12 20         MR. THEUERKAUF:  This is PTX 5.

10:41:12 21  BY MR. THEUERKAUF:

10:41:18 22  Q.     And as we play this video, if you wouldn't mind

10:41:22 23  describing for the jury -- when we get to a couple spots

10:41:26 24  here, I think you might be able to describe to the jury

10:41:29 25  what's happening here.

857

Barry - Direct

10:41:31 1          (Video playing.)

10:42:49 2          THE WITNESS:  Okay.  What happened there was he

10:42:51 3  was -- because of the angle attack -- angle it has to lean

10:43:00 4  back at, to achieve enough lift, he is unable to get it out

10:43:05 5  of the water.  Finally, he leans back far enough to get it

10:43:09 6  out of the water and it immediately rises too high, loses

10:43:13 7  lift and sea crashes.

10:43:16 8  Q.    Okay.  And so what's that tell you about the craft?

10:43:18 9  A.    Well, that tells me that, first off, he can't find an

10:43:23 10 equilibrium lift condition very easily.  And once he finds

10:43:25 11 an equilibrium lift condition, it's unstable and it shoots

10:43:28 12 him upwards and he crashes.

10:43:31 13         MR. THEUERKAUF:  Okay.  If we could continue.

10:43:32 14         (Video playing.)

10:43:39 15         THE WITNESS:  There he goes again.  Oops.  And

10:43:41 16 again, similar -- similar effect.

10:43:43 17         Once -- once a wing comes close enough to the

10:43:45 18 water, it loses lift.  It sees the water, essentially, and

10:43:51 19 it pulls -- sucks the water down.  So he loses lift and he

10:43:55 20 dives into the water.

10:44:01 21         MR. THEUERKAUF:  Keep playing.

10:44:02 22         (Video playing.)

10:44:06 23         THE WITNESS:  Again, the same thing.  He -- he

10:44:13 24 gets a little above the water, gets to a proper angle to

10:44:18 25 lift -- to fly, but it's unstable, fires him out of the

10:44:22 1    water and then he drops down.  And he doesn't completely

10:44:25 2    leave the water in this case.  But he gets up too high, the

10:44:30 3    system loses lift and he drops in.  So it can't -- it is not

10:44:35 4    stable.  It doesn't have a tendency to return to an

10:44:42 5    equilibrium static position.  Equilibrium original condition

10:44:45 6    of stable flight.  It's -- any disturbance causes it to move

10:44:52 7    to either a high pitch position or sea crash.

10:45:03 8            That time it was even more dramatic.  You saw it

10:45:06 9    come so far out of the water that the fin -- that the little

10:45:09 10   fin was exposed.  We saw that little fin in the

10:45:11 11   first before -- before it went into the water, it's about

10:45:13 12   this big.

10:45:14 13           So, the foils are basically just under the water

10:45:18 14   and they're not producing any lift because they're so close

10:45:20 15   to the surface.

10:45:20 16   BY MR. THEUERKAUF:

10:45:21 17   Q.    Okay.  And after your --

10:45:23 18           MR. THEUERKAUF:  You can stop it.

10:45:23 19   BY MR. THEUERKAUF:

10:45:24 20   Q.    After your reading of the Evolo Report and having

10:45:28 21   reviewed everything that you've seen about the Evolo Report

10:45:31 22   in this case, where would it have led you?

10:45:35 23   A.    Well, it would have led me, and actually has led

10:45:41 24   other -- has made some suggestions that you need an

10:45:44 25   automatic control system.  You need something that senses

Barry - Direct

10:45:47  1    the surface, either mechanically or in the case was military

10:45:52  2    hydrofoils with sonar or radar, and operates elevators or

10:46:00  3    some sort of other mechanism that controls the height.  So

10:46:04  4    that as it gets too high, the -- the surface is -- he

10:46:10  5    elevators up, gets too low the other way.

10:46:15  6            MR. THEUERKAUF:  So if we could go back to the

10:46:17  7    PowerPoint, please.

10:46:17  8    BY MR. THEUERKAUF:

10:46:28  9    Q.    All right.  So, with respect to this issue, you heard

10:46:33 10    discussion about the Woolley and Namanny references; right?

10:46:37 11    A.    Yes.

10:46:38 12    Q.    Okay.  And have you reviewed both the Woolley and

10:46:41 13    Namanny patents?

10:46:42 14    A.    I have.

10:46:43 15    Q.    Okay.  And can you briefly describe for us --

10:46:46 16            MR. THEUERKAUF:  And we can put it up, which is,

10:46:48 17    I believe, DTX 73.

10:46:48 18    BY MR. THEUERKAUF:

10:46:51 19    Q.    Can you briefly describe to us what the Woolley

10:46:53 20    patent discloses?

10:46:54 21    A.    Yes.  The Woolley patent describes a floatation

10:47:04 22    surfboard sort of thing that is equipped with a chair in

10:47:08 23    which the operator is strapped into.  The operator's feet

10:47:13 24    are also strapped -- essentially fixed.  And it's towed by a

10:47:19 25    motor boat.  So, that -- it's a ski toy.

Barry - Direct

10:47:27  1   Q.    Okay.

10:47:28  2   A.    A water ski toy.

10:47:30  3   Q.    Sorry.

10:47:31  4            MR. THEUERKAUF:  If we could pull up the Namanny

10:47:33  5   reference, which is DTX 74.

10:47:33  6   BY MR. THEUERKAUF:

10:47:36  7   Q.    Can you briefly describe this one for us?

10:47:38  8   A.    Well, this is actually a -- just the -- a detachable

10:47:45  9   component.  It's essentially a detachable/attachable

10:47:50 10   component that you can put on various kinds of watercraft,

10:47:53 11   in this case, they discuss surfboards, and it's controlled

10:47:56 12   by a gadget on your wrist.

10:48:00 13            You can put this -- presumably put this gadget

10:48:02 14   on any sort of a low speed water board.  My wife and I used

10:48:07 15   to canoe to watch birds.  This would have been nice to

10:48:13 16   quietly go and watch, slowly going along instead of

10:48:15 17   paddling.  But it is meant for low speed applications.

10:48:19 18            It particularly mentions surfboards as going out

10:48:23 19   through the break to save your energy, basically.  Or for

10:48:31 20   older fellows like myself who don't have Mr. Leason's

10:48:34 21   shoulders.

10:48:35 22   Q.    So, have you formed any opinions regarding -- well,

10:48:39 23   you heard Dr. Triantafyllou talking about looking at these

10:48:43 24   two patents and essentially somehow combining these to come

10:48:49 25   up with what Dr. Langelaan invented.

Barry - Direct

10:48:51  1            Do you recall that testimony?

10:48:52  2   A.     I recall that.

10:48:52  3   Q.     Okay.  So, you formed -- well, let me ask you this:

10:48:56  4   Do you agree with him?

10:48:56  5   A.     No.

10:48:57  6   Q.     Okay.  And have you formed any opinions regarding

10:48:59  7   whether or not a person of ordinary skill in the art would

10:49:02  8   look at these two patents and try to make that combination?

10:49:05  9   A.     I have.

10:49:06 10   Q.     Okay.  And can you explain or describe those opinions

10:49:11 11   to us, please?

10:49:12 12   A.     They could.  They wouldn't do so.

10:49:15 13   Q.     Okay.  And why is that?

10:49:20 14   A.     Well, first off, the fundamental reasons for each

10:49:21 15   patent is not a general purpose water toy -- a general

10:49:26 16   purpose self-propelled high speed watercraft.  One is a

10:49:32 17   water ski toy and they mention that it's particularly useful

10:49:36 18   for disabled persons.  It's towed.  The towing -- and

10:49:41 19   it's -- and that means that it is not actually weight

10:49:47 20   controlled.  It's difficult to control that one because

10:49:49 21   you're strapped in, but it's primarily controlled by the tow

10:49:55 22   rope.

10:49:55 23            If you've ever water skied you have to be

10:49:58 24   careful about where you hold the tow rope to remain on the

10:50:02 25   water ski.  You can turn it slightly by going one way,

862

Barry - Direct

10:50:07 1    you're moving -- you're shifting your weight.  You can turn

10:50:09 2    it more by putting -- putting the tow up to one side or the

10:50:14 3    other, but if you want it to turn 90 degrees, you got to

10:50:17 4    tell the guy in the boat -- motorboat to do it.  It's a

10:50:21 5    different -- completely different use.

10:50:23 6            The Namanny patent is a thing for going slow.

10:50:31 7    It's a detachable little object that's a thing for going

10:50:35 8    slow and it's controlled by a control on your wrist.  Going

10:50:40 9    slow, not going fast.  It -- a person skilled in the art

10:50:46 10   would probably say, oh, it might be -- I don't know if I can

10:50:49 11   get enough batteries in here to drive this -- to drive a

10:50:53 12   high speed craft.  So the teaching -- the teachings and the

10:51:00 13   pictures would lead you not to have -- not to use that.

10:51:03 14           And then finally, if you take the -- if you have

10:51:06 15   an object that tends to bounce up and you pull it from here,

10:51:12 16   you're resist that tendency.  If you have it and you push it

10:51:15 17   from here, you're increasing that tendency.  So, putting a

10:51:21 18   thruster down low, neither one of sufficient power, would

10:51:25 19   tell a person of ordinary skill in the art that that would

10:51:29 20   destabilize the system.  It would cause it to -- cause it to

10:51:32 21   go up into the air and then sea crash.

10:51:34 22   Q.    Okay.  So similar to what we saw in the Evolo video?

10:51:38 23   A.    Exactly.

10:51:40 24   Q.    Yeah.  Okay.  And with respect to the hydrofoil wing

10:51:44 25   that you saw on Woolley, what are your opinions with respect

Barry - Direct

10:51:49  1    to that and how it would play into this?

10:51:51  2    A.      Could you bring up that?

10:51:57  3    Q.      Yeah.

10:51:58  4                MR. THEUERKAUF:  If we could go back to DTX 73.

10:52:00  5                THE WITNESS:  Okay.  And then if we go to -- can

10:52:02  6    we go to the picture of the hydrofoil itself?

10:52:02  7    BY MR. THEUERKAUF:

10:52:05  8    Q.      Yeah.

10:52:05  9    A.      A couple more figures now.

10:52:10 10                Any way.  Well, that hydrofoil is actually

10:52:15 11    described in several places as being sharp nosed.  And being

10:52:18 12    sharp nosed, in other words it's like this rather than like

10:52:22 13    this.  That being sharp nosed causes a hydrofoil -- a

10:52:25 14    foil -- an airfoil or a hydrofoil to stall.

10:52:30 15                In other words, this is too hard for the air to

10:52:33 16    get around since it's moving up -- going smoothly over the

10:52:36 17    surface, it does this.  It performs a vortex.  That is one

10:52:43 18    ever the reasons you don't see these kinds of wings on

10:52:47 19    airplanes.  If you look at airplanes, you have a nice

10:52:51 20    rounded wing.  A Piper Cub is about -- the curve of the

10:52:55 21    front -- front of the Piper Cub wing is about this big.  And

10:53:00 22    I'm -- here I'm indicating the radius of an orange.

10:53:04 23                And because if it tips back too far with a sharp

10:53:09 24    tip, it will stall.  Only certain supersonic aircraft, the

10:53:14 25    F-104, for example, has a sharp edge on it and that is

Barry - Direct

10:53:19 1   because it has to go very, very fast and the sharp edge

10:53:26 2   requires that -- or the sharp edge allows that.  But it's a

10:53:30 3   devil to fly at low speeds.

10:53:38 4   Q.    So, again, in looking at these two references, what

10:53:42 5   would be -- as a person of ordinary skill in the art, where

10:53:46 6   would looking at these two references have led you?

10:53:50 7   A.    You need an automatic control system.

10:53:57 8           MR. THEUERKAUF:  All right.  And let's go back

10:53:59 9   to the PowerPoint.

10:53:59 10  BY MR. THEUERKAUF:

10:54:05 11  Q.    So I take it from your testimony so far in this case

10:54:09 12  that you are familiar with the specification or the written

10:54:13 13  description of MHL's -- Dr. Langelaan's patents?

10:54:17 14  A.    I am.

10:54:18 15  Q.    Okay.  And as a person of ordinary skill in the art,

10:54:25 16  does the specification of that patent or patents -- can you

10:54:31 17  give us your opinion as to whether or not they enable a

10:54:35 18  person of ordinary skill in the art to make and use the

10:54:38 19  inventions claimed in the patents?

10:54:40 20  A.    They do.

10:54:42 21  Q.    Okay.  And what do you base that on?

10:54:43 22  A.    Well, if we look at the specification itself,

10:54:46 23  beginning at Column 5.

10:54:50 24  Q.    Okay.

10:54:51 25  A.    We have in this section a discussion of several

Barry - Direct

10:55:01  1    different configurations, Foils 102, 103, 104, 105, that

10:55:11  2    include various configurations that a person of ordinary

10:55:14  3    skill might select.  One of them -- I forget which figure it

10:55:17  4    is, is a -- is a flying wing, which if properly designed

10:55:23  5    works -- there's a couple of -- there's a fair -- there's a

10:55:26  6    small number of aircraft that are flying wings.  Another one

10:55:30  7    has various sizes and features that -- and at higher speeds.

10:55:37  8    But it -- as a whole, it offers a series of configurations

10:55:42  9    that a person of ordinary skill might select as a starting

10:55:46 10    point.

10:55:46 11            It then discusses details that could be added,

10:55:50 12    such as winglets, a horizontal tail, a vertical tail, and it

10:55:56 13    talks about the effects of these -- effects of these various

10:56:02 14    modifications on stability and directional stability.

10:56:10 15    Q.    Okay.

10:56:14 16    A.    Subsequently it gives us numerical values that are --

10:56:21 17    that gives us numerical values that assure us stability, in

10:56:24 18    this case atrium.  And then it says -- it says what you need

10:56:29 19    to do, airfoil selection, hydrofoil selection, et cetera, to

10:56:34 20    get them.

10:56:35 21            And it further discusses another -- the effect

10:56:39 22    of yet another configuration in trim.  And then it mentions

10:56:44 23    that the various moment configurations are related to the

10:56:49 24    location of the center of gravity and this is what enables

10:56:53 25    weight shift control.  And it does the same thing at some

Barry - Direct

10:57:01  1   length for lateral motion, roll and pitch.  I'm sorry, roll

10:57:06  2   and yaw.

10:57:09  3   Q.     Okay.  Is there anything else from the specification?

10:57:11  4   A.     Yes.  It -- finally, it provides some guidance as to

10:57:15  5   whatnot to do.

10:57:19  6   Q.     If we could go down to the bottom there, I think, is

10:57:22  7   where you're -- yeah.

10:57:23  8   A.     Okay.  This, unfortunately, goes across a break.  But

10:57:26  9   one example it gives is that sweep angles greater than 60

10:57:30 10   degrees are unlikely to lead to the use of wing design.  So,

10:57:37 11   it gives us a bound there, right there, of the sweep angle

10:57:41 12   of the -- of the wing that would work.

10:57:44 13   Q.     And so earlier, just real quick to clarify, you had

10:57:47 14   mentioned some hydrofoil design parameters that it mentioned

10:57:52 15   here in the specification.

10:57:53 16              What does that mean?

10:57:54 17   A.     Well, the hydrofoil parameters are described in the

10:57:58 18   specification.  Going back to the banana, the -- looking

10:58:04 19   down on it is the -- is the planform.  Part of the planform

10:58:08 20   is the sweep.  This is zero sweep.  This -- let me -- may I

10:58:12 21   stand, sir?

10:58:13 22              THE COURT:  Yes.

10:58:16 23              THE WITNESS:  This is -- this is zero sweep

10:58:18 24   where the wings are full arc.  And imagine I'm in an

10:58:25 25   airplane.  This is zero sweep.  This is about 45 degrees.

Barry - Direct

10:58:27 1    This is about 60 degrees.

10:58:31 2    BY MR. THEUERKAUF:

10:58:31 3    Q.    And so, in here in the specification it's giving you

10:58:36 4    some additional information that that sweep of the wing that

10:58:39 5    you just mentioned, anything greater than 60 degrees are

10:58:43 6    unlikely to lead to useable designs; is that correct?

10:58:46 7    A.    That's correct.

10:58:47 8    Q.    Okay.  And just my -- my final question.  With

10:58:50 9    respect to the Evolo wing and its sweep, did you look at

10:58:53 10   that to see what it was?

10:58:55 11   A.    I did.

10:58:56 12   Q.    Okay.  And what was it?

10:58:57 13   A.    Well, depending on which one of the drawings you

10:59:01 14   measure and you -- the sweep is between 61 and a half

10:59:05 15   degrees and 65 degrees.

10:59:08 16   Q.    And as we just saw in the specification of

10:59:10 17   Dr. Langelaan's patents, that would tell you that it was

10:59:13 18   likely to be an unusable design; correct?

10:59:16 19   A.    That's correct.

10:59:16 20         MR. THEUERKAUF:  No further questions.

10:59:17 21         THE COURT:  All right.  So, we'll take a

10:59:19 22   15-minute break here, start again at ten after 11:00.

10:59:26 23         (Jury leaving the courtroom.)

10:59:53 24         THE COURT:  All right.  So we'll take a

10:59:57 25   15-minute break.

Barry - Direct

| | | |
|---|---|---|
| 10:59:58 | 1 | DEPUTY CLERK:  All rise. |
| 11:00:05 | 2 | (Recess was taken.) |
| 11:17:28 | 3 | THE COURT:  All right.  Are we ready to begin? |
| 11:17:35 | 4 | MR. COLLETTI:  Yes. |
| 11:17:35 | 5 | THE COURT:  All right.  Let's get the jury. |
| 11:18:22 | 6 | (Jury entering the courtroom.) |
| 11:18:29 | 7 | THE COURT:  All right.  Members of the jury, |
| 11:18:32 | 8 | welcome back.  Everyone, you may be seated. |
| 11:18:39 | 9 | Mr. Basanta. |
| 11:18:40 | 10 | MR. BASANTA:  Thank you, Your Honor. |
| 11:18:40 | 11 | BY MR. Basanta: |
| 11:18:41 | 12 | Q.    Good morning, Mr. Barry. |
| 11:18:41 | 13 | A.    Good morning. |
| 11:18:43 | 14 | Q.    You said you read the Evolo Report; right? |
| 11:18:44 | 15 | A.    Yes, I have. |
| 11:18:45 | 16 | Q.    About how many hours did you spend reviewing it? |
| 11:18:48 | 17 | A.    Oh, 10 or 20, maybe.  Something like that. |
| 11:18:51 | 18 | Q.    But in those 10 or 20 hours, you couldn't interpret |
| 11:18:54 | 19 | it with any reasonable degree of clarity, could you? |
| 11:18:56 | 20 | A.    I'm sorry, you'll have to speak up, sir. |
| 11:18:58 | 21 | Q.    Sure.  In those 10 to 20 hours, you couldn't |
| 11:19:00 | 22 | interpret it with any reasonable degree of clarity, could |
| 11:19:03 | 23 | you? |
| 11:19:04 | 24 | A.    What exactly do you mean?  I didn't read it in |
| 11:19:07 | 25 | Swedish. |

Barry - Direct

11:19:08 1    Q.      Did you only have a Swedish copy of it?

11:19:11 2    A.      I had -- no, I didn't.  I never had a Swedish copy.

11:19:14 3    I don't know what you mean by the phrase "interpret."

11:19:18 4              MR. BASANTA:  Can you bring up Slide 1, please?

11:19:18 5    BY MR. BASANTA:

11:19:20 6    Q.      And I'm bringing up the page from your rebuttal

11:19:23 7    report.  Does this look familiar to you, those words?

11:19:26 8    A.      Yes.

11:19:26 9    Q.      Did you write this paragraph?

11:19:27 10   A.      Yes, I did.

11:19:28 11   Q.      The highlighted sentence said the Evolo Report cannot

11:19:30 12   be interpreted with any reasonable degree of clarity.  Those

11:19:33 13   are your words; right?

11:19:34 14   A.      Yes, sir.

11:19:36 15   Q.      And, in fact, you found some of the technical aspects

11:19:38 16   confusing, didn't you?

11:19:39 17   A.      I -- I found them confusing as to technical

11:19:43 18   specifications, yes.

11:19:44 19   Q.      Okay.  So you had trouble interpreting it.  The

11:19:46 20   report said you were confused, but you still concluded that

11:19:48 21   the Evolo Report doesn't anticipate the claims; right?

11:19:50 22   A.      No.  You missed -- you misconstrued the -- my -- my

11:19:57 23   statement here.

11:20:00 24   Q.      So you -- so you concluded that it does anticipate

11:20:03 25   the claims?  I'm sorry, I don't understand.

Barry - Direct

11:20:04 1   A.      I'm sorry, sir.  Please clarify the question.  Or

11:20:09 2   break it into two parts, something of that nature.

11:20:11 3   Q.      So in spite of this statement that you made in your

11:20:14 4   report, you have still concluded that the Evolo Report does

11:20:18 5   not anticipate the claims; right?

11:20:20 6   A.      You still have a compound question.  Two -- two

11:20:27 7   questions, please.

11:20:28 8   Q.      Okay.  You see the statement on the screen, yes?

11:20:31 9   A.      Yes.

11:20:33 10  Q.      That's your statement, yes?

11:20:33 11  A.      Yes.

11:20:34 12  Q.      Okay.  And even though you wrote that statement, you

11:20:37 13  have still concluded that the Evolo Report does not

11:20:41 14  anticipate the claims, yes?

11:20:43 15  A.      I have -- I have concluded that the Evolo Report does

11:20:46 16  not anticipate the claims.

11:20:47 17  Q.      Great.  Thank you.

11:20:48 18          And did you hear Dr. Triantafyllou's testimony

11:20:52 19  the other day?

11:20:53 20  A.      Yes.

11:20:54 21  Q.      So then you heard him say that it was written by

11:20:57 22  students, this report?

11:20:58 23  A.      It was written by students finishing their master's

11:21:03 24  degrees.

11:21:04 25  Q.      And you also heard him say that the concepts in the

Barry - Direct

11:21:06   1    Evolo Report is very plain.

11:21:08   2                 Did you hear Dr. Triantafyllou say that?

11:21:10   3    A.      Yes.

11:21:10   4    Q.      Okay.  And you know that Waydoo is arguing that the

11:21:16   5    Evolo Report discloses a personal hydrofoil watercraft that

11:21:19   6    is weight-shift controlled and just like the claims;

11:21:21   7    correct?

11:21:21   8    A.      I am -- I understand that is Waydoo's argument.

11:21:25   9    Q.      Okay.  And when you were last in the witness box, you

11:21:27  10    agreed that weight-shift control means the same thing as no

11:21:31  11    movable steering system.

11:21:33  12                 Do you remember that?

11:21:34  13    A.      No.  No.  Steering?

11:21:35  14                 No, sir.

11:21:36  15                 MR. BASANTA:  Okay.  Can we please put up Slide

11:21:38  16    3?

11:21:40  17    BY MR. BASANTA:

11:21:40  18    Q.      This is a transcript from your testimony the other

11:21:43  19    day.  Do you remember receiving this question and giving

11:21:46  20    this answer?

11:21:47  21                 The question is:  "So does weight-shift control

11:21:49  22    mean the same thing as no movable components or steering

11:21:51  23    systems?"

11:21:52  24    A.      With -- if it had a weight-shift control, it would

11:21:56  25    require no movable components or steering systems.

Barry - Direct

11:21:59  1    Q.      Mr. Barry, my question is, and it's right on the

11:22:01  2    screen, do you remember me asking you:  "Does weight-shift

11:22:04  3    control mean the same thing as no movable components or

11:22:06  4    steering system?"

11:22:07  5    A.      Yes, it does.  Well, that's what I said, yes, it

11:22:11  6    does.

11:22:11  7    Q.      Thank you.  So this -- so you do remember that

11:22:14  8    question and you do remember giving that answer, yes?

11:22:16  9    A.      Yes, sir.

11:22:16 10    Q.      Okay.  And as you know, Mr. Barry, because my

11:22:21 11    colleague just read it into the record, the parties have

11:22:24 12    stipulated that the Evolo Report discloses a watercraft

11:22:27 13    having no movable steering system as claimed in Claim 1?

11:22:30 14    A.      Yes.

11:22:31 15    Q.      So, therefore, you have to agree that the Evolo

11:22:35 16    Report, having no movable steering system, then the Evolo

11:22:38 17    Report also discloses that it's weight-shift controlled?

11:22:40 18    A.      It discloses that they attempt to make it

11:22:45 19    weight-shift controlled.

11:22:46 20    Q.      Mr. Barry, the parties have stipulated that the Evolo

11:22:51 21    Report discloses no movable steering system as claimed in

11:22:55 22    Claim 1?

11:22:56 23    A.      It does.

11:22:56 24    Q.      And you, sir, according to your words, which are

11:22:58 25    still on the screen, if it doesn't have a movable steering

Barry - Direct

11:23:01  1    system, that means it's weight-shift controlled; right?

11:23:04  2    A.      (Witness nodded yes.)

11:23:10  3    Q.      Thank you.  Also the last time you were in the

11:23:11  4    witness box, you agreed that controlled solely by weight

11:23:14  5    shift of the user means that to have you -- means that you

11:23:19  6    have to shift your weight because there are no control

11:23:22  7    surfaces.

11:23:22  8            Do you remember saying that?

11:23:23  9    A.      Yes.

11:23:25 10    Q.      And, again, as my colleague just read out, the

11:23:27 11    parties have stipulated that the Evolo Report discloses a

11:23:30 12    hydrofoil having no movable surfaces as claimed in Claim 1;

11:23:33 13    do you know that?

11:23:34 14    A.      Yes, I know that.

11:23:35 15    Q.      And then you have to agree that, again, that the

11:23:38 16    Evolo Report has no movable surfaces, and that means that

11:23:42 17    the Evolo Report also discloses that it is weight-shift

11:23:45 18    controlled; do you agree?

11:23:46 19    A.      Yes.  It's weight-shift controlled.

11:23:48 20    Q.      Thank you.

11:23:54 21            And you also know that Waydoo is arguing that

11:23:56 22    the Evolo Report discloses a personal hydrofoil watercraft

11:23:59 23    that is passively stable just like the claims; right,

11:24:02 24    Mr. Barry?

11:24:03 25    A.      I'm sorry, could you repeat that again?

874

Barry - Direct

11:24:05 1    Q.    Sure.

11:24:05 2    A.    You sort of faded in the middle.

11:24:08 3    Q.    I apologize.

11:24:09 4    A.    My wife has been bothering me to get a hearing aid.

11:24:12 5    Q.    Got you.  I'm just reciting what Waydoo is arguing in

11:24:15 6    this case.

11:24:16 7    A.    Yes.

11:24:17 8    Q.    Okay.  So Waydoo's arguing that the Evolo Report

11:24:19 9    discloses a personal hydrofoil watercraft that is passively

11:24:22 10   stable just like the claims?

11:24:24 11   A.    Yes.

11:24:24 12   Q.    Okay.  And you disagree with that?

11:24:26 13   A.    Yes.

11:24:27 14   Q.    You said it's clearly not stable just from the Evolo

11:24:31 15   videos that you've seen?

11:24:32 16   A.    Well, from the Evolo -- the Evolo video confirms that

11:24:37 17   the -- confirms that the examining the craft in terms of a

11:24:43 18   hydrofoil and its tail configuration and the discussion

11:24:49 19   of the analyses done in the report suggest that it was never

11:24:57 20   fully designed to be passively stable.

11:25:01 21   Q.    We were talking yesterday.  We went on at length

11:25:04 22   about it.  I might have to go through some of that again,

11:25:06 23   but you said you made positive determinations of an eFoil's

11:25:10 24   stability from looking just at videos.  Do you recall that?

11:25:13 25   A.    The videos show that it is unstable, yes, sir.

Barry - Direct

11:25:17  1    Q.    Okay.  But just from looking at the videos, you can

11:25:19  2    tell if it's stable, you said?

11:25:21  3    A.    No.  The -- by looking at the -- by looking at --

11:25:25  4    reading the whole report, you can see they didn't ever do

11:25:30  5    the calculations required to produce stability, that they

11:25:36  6    never considered stability in the physical design of the

11:25:40  7    object so that whether it was -- whether the object they

11:25:45  8    designed was stable or was not stable was an open question

11:25:49  9    until they put the boat in the water.

11:25:52 10           And, further, the use of the hydrofoil they

11:25:55 11    selected is unlikely to produce stability.  So, my

11:26:01 12    presumption was the design doesn't look like it's going to

11:26:05 13    be stable.

11:26:06 14    Q.    Okay.  I guess we'll redress the positive

11:26:11 15    determination from the video alone in just a minute.

11:26:13 16           And I think you said on your testimony, direct

11:26:17 17    testimony, that not only do you disagree with Waydoo about

11:26:21 18    the Evolo Report disclosing a passively stable craft, you

11:26:25 19    think that the Evolo team wasn't even trying to make a

11:26:27 20    stable watercraft; is that right?

11:26:29 21    A.    No.  They have tried to make a stable watercraft.

11:26:35 22    They later on characterized their craft as being exciting

11:26:40 23    and challenging.  So...

11:26:44 24    Q.    Can you put up Slide 11, please?

11:26:47 25           So this is a paragraph from your rebuttal

Barry - Direct

| | |
|---|---|
| 11:26:50 | 1 |

report?

11:26:50  2   A.    Mm-hmm.

11:26:51  3   Q.    You remember writing this paragraph, Mr. Barry?

11:26:53  4   A.    Yes, I do.

11:26:53  5   Q.    You say here, "The Evolo Report does not even

11:26:56  6   consider as a goal passive stability."

11:26:58  7         Do you see that?

11:26:59  8   A.    Yes.

11:27:00  9   Q.    So you don't think that they were even trying to make

11:27:02 10   it stable in spite of what you said just now?

11:27:04 11   A.    Whether -- they probably wanted it to be stable, but

11:27:07 12   they did not recite that as a goal in their -- in their

11:27:10 13   statement of requirements.  Sorry, I'm --

11:27:13 14   Q.    So, you just said now they probably wanted to make it

11:27:16 15   stable?

11:27:16 16   A.    They probably wanted to make it stable, but I

11:27:18 17   don't -- not only do I not read Swedish, I can't read

11:27:22 18   Swedish minds.

11:27:23 19   Q.    That's not what you say here?

11:27:24 20   A.    Yes.

11:27:26 21   Q.    Do you agree that in this statement in your report

11:27:29 22   they're not -- you say, "They are not considered as a goal

11:27:32 23   passive stability"?

11:27:33 24   A.    They do not state in their report the issue -- the

11:27:39 25   issue that they wish to have a goal of passive stability.

Barry - Direct

11:27:42  1    Q.    And you said something to the effect of in your

11:27:45  2    opening that they only analyzed it while it was sitting at a

11:27:50  3    dock, something along those lines?

11:27:52  4    A.    That is correct.  If you look at their statement of

11:27:54  5    requirement you will see exactly that, sir.

11:27:56  6    Q.    So, they don't have any analysis of it while it's

11:27:59  7    moving?

11:28:00  8    A.    They don't have any analysis of stability while it's

11:28:02  9    moving.  Their only analysis of their hydrofoil system is

11:28:06 10    regarding lift and the required propulsion thrust.

11:28:11 11    Q.    Okay.  Can we please bring up DTX 325B I think it's

11:28:15 12    Page 62.

11:28:16 13          Back one.  63.  Can you zoom in on that figure,

11:28:31 14    Figure 18?

11:28:31 15          Mr. Barry, you recognize this from the Evolo

11:28:38 16    Report?

11:28:38 17    A.    I do.

11:28:39 18    Q.    And you see in the middle there's an oval shape which

11:28:42 19    represents the wings, are you with me?

11:28:44 20    A.    Yes, sir.

11:28:44 21    Q.    You see there's an arrow pointing up with an L.  Do

11:28:46 22    you see that?

11:28:46 23    A.    I understand that.

11:28:47 24    Q.    What does that L represent?

11:28:49 25    A.    Lift.

878

Barry - Direct

11:28:49 1   Q.     Can you achieve lift with a hydrofoil if you're not

11:28:52 2   moving?

11:28:52 3   A.     No.

11:28:59 4   Q.     Okay.  So you said the team wasn't even trying to

11:29:01 5   establish a stable craft.  Can you please go to Slide 12?

11:29:05 6        Mr. Barry, you recognize this statement from the

11:29:11 7   Evolo Report?

11:29:11 8   A.     Yes.  Yes, it is.

11:29:12 9   Q.     You say that the purpose of this analysis is to

11:29:14 10  establish a configuration of the hydrofoil so that it is

11:29:16 11  stable in pitch.  You see that?

11:29:18 12  A.     Yes.

11:29:20 13  Q.     Okay.  And the Evolo team used the same definition

11:29:33 14  for stability that the patent used, do you remember that?

11:29:35 15  A.     That's correct.  Yes.

11:29:39 16  Q.     Can we go to slide 14, please?

11:29:41 17        This is from the '044 patent.  It says that, "A

11:29:48 18  watercraft will be stable if a disturbance results in

11:29:50 19  restoring moment that returns the hydrofoil to its original

11:29:53 20  condition."

11:29:54 21  A.     Yes.

11:29:55 22  Q.     Can we bring up slide 15?

11:29:56 23        This slide compares the Evolo Report statement

11:29:58 24  about stability with the patents.  On the left we have the

11:30:02 25  Evolo Report.  They say, "By stable is meant that if Evolo

Barry - Direct

11:30:06   1    is exposed to a disturbance it will return to its initial

11:30:09   2    position."  Do you see that?

11:30:09   3    A.      Yes, sir.

11:30:10   4    Q.      And again, we have the patent on the right.  Do you

11:30:12   5    see that?

11:30:12   6    A.      Yes, sir.

11:30:12   7    Q.      Both statements mention a disturbance.  Do you see

11:30:15   8    that?

11:30:15   9    A.      Yes.

11:30:15  10    Q.      And both statements mention returning.  Do you see

11:30:17  11    that?

11:30:17  12    A.      Yes, sir.

11:30:19  13    Q.      Your answer, I'm sorry?

11:30:20  14    A.      Yes, sir.

11:30:21  15    Q.      And the statement on the left says, "initial

11:30:25  16    position."  The statement on the right says, "original

11:30:27  17    condition."  But those are equivalent statements here;

11:30:30  18    aren't they?

11:30:30  19    A.      No.

11:30:33  20    Q.      They're not?  Okay.

11:30:35  21            So I know you said that the Evolo Report?

11:30:37  22    A.      May I explain, counsel?

11:30:39  23    Q.      I'm sorry?

11:30:40  24    A.      Can I explain?

11:30:41  25    Q.      You can explain to Mr. Theuerkauf just like the other

Barry - Direct

11:30:43 1    day?

11:30:43 2    A.      Okay.

11:30:43 3    Q.      You said that the Evolo Report is confusing on this

11:30:46 4    point but you saw that it disclosed numerous designs and

11:30:49 5    prototypes; right?

11:30:50 6    A.      Yes, sir.

11:30:51 7    Q.      All right.  And one of the Evolo prototypes was the

11:30:53 8    X7.  Do you remember that one?

11:30:54 9    A.      Yes.

11:30:56 10   Q.      Can we please go to DTX 325, Page 416?  416, please.

11:31:20 11   Page prior to that, please.  One more.  Okay.

11:31:25 12           So you see this.  Do you recognize this

11:31:26 13   document, this page?

11:31:28 14   A.      I do.

11:31:29 15   Q.      This is appendix 60 which talks about the X7

11:31:31 16   experiment that the Evolo team ran?

11:31:33 17   A.      Right.

11:31:34 18   Q.      Do you recognize it?

11:31:35 19   A.      Yes.

11:31:36 20   Q.      Can you please go to slide 16?

11:31:38 21           You see here I've called out a section within

11:31:55 22   the appendix of the X7 experiment?

11:31:58 23   A.      Yes.

11:31:58 24   Q.      Where it says, "The X7 had much better pitch

11:32:02 25   direction stability."  I'm sorry.  I think we have the wrong

Barry - Direct

11:32:05  1    slide.  Slide 16, please.  That was the wrong slide,

11:32:09  2    Mr. Barry, I'm sorry.

11:32:11  3              So this is -- this now is a page out of the

11:32:14  4    appendix for the X7 prototype.  Do you recognize these

11:32:16  5    words?

11:32:17  6    A.    Yes.

11:32:19  7    Q.    It says here that the X7 had much better pitch

11:32:22  8    direction stability.  Do you see that?

11:32:23  9    A.    Yes, sir.

11:32:24 10    Q.    See the statement says, "The Evolo felt much more

11:32:26 11    stable in the pitch direction with the new configuration?

11:32:28 12    A.    Yes.

11:32:29 13    Q.    You see where it says, "The craft was according to

11:32:31 14    theory self-righting with the center of gravity located in

11:32:34 15    the front of the main wing"?

11:32:36 16    A.    Yes, sir.

11:32:36 17    Q.    You see that?

11:32:37 18    A.    I see that.

11:32:40 19    Q.    Do you see where it says, "Successful test run, the

11:32:43 20    driver quickly gains control of the vehicle and manages 30

11:32:46 21    to 40 seconds in flying mode."  Do you see that?

11:32:48 22    A.    Yes.

11:32:49 23    Q.    You see where it says, "manage 30 to 40 seconds in

11:32:52 24    flying mode"?

11:32:53 25    A.    Yes, I do.

11:32:53 1   Q.     You remember your standard from the other day about

11:32:56 2   assessing stability from a video, you had to watch it for 20

11:32:58 3   seconds?

11:32:59 4   A.     Yes, I do.

11:33:00 5   Q.     And 30 seconds exceeds your 20 second standard,

11:33:03 6   doesn't it?

11:33:03 7   A.     Yes, it does.

11:33:08 8   Q.     What does being completely self-righting mean?

11:33:11 9   A.     Well, it means that it snaps up, snaps right up.

11:33:16 10  Q.     Snaps right up?

11:33:17 11  A.     And goes vertical.

11:33:18 12  Q.     Snaps right up and goes vertical.  Do you remember

11:33:30 13  that the Evolo Report discloses an X8 prototype?

11:33:32 14  A.     Yes.

11:33:34 15  Q.     And can we please go to the first page of the X8

11:33:37 16  prototype appendix, please?  It should be somewhere around

11:33:40 17  416.  Oh, this is 416, so maybe 417.

11:33:46 18          One more.  Go to the higher numbers, please.  A

11:33:59 19  few pages.  There we go.

11:34:05 20          Does this page look familiar to you?

11:34:07 21  A.     Yes.

11:34:07 22  Q.     This is the X8 experiments that the Evolo team ran;

11:34:11 23  yes?

11:34:11 24  A.     Yes.

11:34:12 25  Q.     Can you please go to slide 18, now?  This is from

Barry - Direct

11:34:17  1   page within that appendix that we just talked about.  And

11:34:20  2   you see here where it says, "The wing configuration for the

11:34:27  3   front wing was a unique combination of a delta wing and a

11:34:30  4   regular straight wing plus ten degrees angle of attack."  Do

11:34:34  5   you see that, it's the second highlighted sentence there?

11:34:36  6   A.      Yes.

11:34:37  7   Q.      You see that the wing configuration was for the aft

11:34:43  8   wing -- the first sentence says, "The wing configuration was

11:34:45  9   for the aft wing, a delta wing, with a cut nose and a

11:34:49 10   negative five-degree angle of attack."  Do you see that?

11:34:51 11   A.      Yes, I do.

11:34:52 12   Q.      You know what those terms mean; correct?

11:34:54 13   A.      Well, I've not heard the term cut nose, but I think I

11:34:58 14   know what it means.

11:34:58 15   Q.      You know what negative five-degree angle of attack

11:35:01 16   means, don't you?

11:35:02 17   A.      No, I don't exactly know.  I don't know whether -- I

11:35:06 18   believe they're defining that relative to the arbitrary

11:35:09 19   zero angle of the craft.

11:35:11 20   Q.      Okay.  So the positive angle of attack means that the

11:35:15 21   front wing is providing lift, doesn't it?

11:35:17 22   A.      Yes.

11:35:18 23   Q.      And the negative angle of attack on the tail wing

11:35:22 24   means that it's pushing down?

11:35:24 25   A.      Generally yes, sir.

Barry - Direct

11:35:25  1    Q.    And based on what you just said, the X8's wing

11:35:30  2    configuration, the front wing lifts up and the tail wing

11:35:32  3    pushes down; correct?

11:35:33  4    A.    Correct.

11:35:36  5    Q.    And we heard extensively from Dr. Triantafyllou

11:35:38  6    yesterday that that's the wing configuration that airplanes

11:35:42  7    use?

11:35:42  8    A.    It is.  Most airplanes, yes.

11:35:44  9    Q.    And the X8's wing configuration is, in fact, the

11:35:47 10    normal way of achieving stability, isn't it?

11:35:49 11    A.    It is the basically normal way of stability.

11:35:55 12    Q.    Can we please play clip A?

11:36:00 13          (Video playing.)

11:36:04 14    Q.    What do you mean by normal aircraft configuration?

11:36:07 15    A.    Most aircraft have a wing -- have a wing that lifts

11:36:11 16    up, which is probably what you need, and a tail that pushes

11:36:15 17    down.

11:36:16 18    Q.    Okay and why is that?

11:36:17 19    A.    To balance the motion -- to provide an appropriate

11:36:22 20    pitch motion -- it's to provide an appropriate pitch

11:36:29 21    stability.

11:36:32 22    Q.    Does that arrangement help you get stability?

11:36:34 23    A.    It's the normal way of doing it, yes.

11:36:38 24          (Conclusion of video.)

11:36:40 25    BY MR. BASANTA:

Barry - Direct

11:36:41  1    Q.      Do you remember seeing that at your deposition,

11:36:42  2    Mr. Barry?

11:36:43  3    A.      Yes.

11:36:45  4    Q.      And out of curiosity, the patents don't teach this

11:36:47  5    normal way of getting pitch stability, do they?

11:36:49  6    A.      I'm sorry?

11:36:50  7    Q.      The patents don't teach this normal way of getting

11:36:54  8    pitch stability, do they?

11:36:55  9    A.      The patents, no, because there are other ways of

11:36:58 10    doing the same thing.

11:36:59 11    Q.      Okay.  And the Evolo, so going back to the Evolo

11:37:04 12    Report again for a minute, talking again about the X8?

11:37:07 13    A.      Can I explain that?

11:37:09 14    Q.      Again, you can you can tell Mr. Theuerkauf.

11:37:12 15            So going back again to the X8 appendix and the

11:37:16 16    X8 experiments that the Evolo team ran, they reported

11:37:19 17    success, didn't they?

11:37:20 18    A.      They reported success.

11:37:22 19    Q.      Great.  Let's take a look at a few of the statements

11:37:24 20    in Slide 19, please.

11:37:28 21            So here they say that, "An improvement in

11:37:31 22    rolling stability was experienced by the driver."  Do you

11:37:33 23    see that?

11:37:33 24    A.      Yes, I see it.

11:37:34 25    Q.      It says, "The flight time was consistently longer for

Barry - Direct

11:37:37  1    all the trials and did not stop at a single lucky run."  Do

11:37:40  2    you see that?

11:37:40  3    A.    Yes.

11:37:42  4    Q.    "At the same time, increased pitch and core stability

11:37:44  5    are important factors that made it easier."  Do you see

11:37:47  6    that?

11:37:47  7    A.    Yes.

11:37:52  8    Q.    And these are first-hand accounts of the team

11:37:54  9    building the prototype doing experiments, you agree?

11:37:57 10    A.    Yes.

11:38:00 11    Q.    Okay.  I think you mentioned a moment ago that you've

11:38:05 12    never seen a hydrofoil like the Evolo's hydrofoil before;

11:38:08 13    right?

11:38:08 14    A.    I haven't, no, sir.

11:38:09 15    Q.    You haven't.  But we saw from the videos that you

11:38:13 16    played that it does in fact produce lift?

11:38:15 17    A.    It does.  And the analysis in the report extensively

11:38:21 18    looks at the production of lift.

11:38:23 19    Q.    Right.  I agree.  And Dr. Triantafyllou's analysis,

11:38:27 20    if you recall, it doesn't depend on the shape of the wing,

11:38:29 21    does it?  I mean he did this, he made this hand gesture many

11:38:33 22    times in front of the jury.  He didn't ever once mention the

11:38:36 23    shape of the wing, did he?

11:38:37 24    A.    Of course it does.

11:38:38 25    Q.    My question, Mr. Barry, was:  During

887

Barry - Direct

11:38:40  1    Dr. Triantafyllou's analysis, which you saw, he made this

11:38:43  2    gesture many times, front wing up, back wing down.  He never

11:38:46  3    once mentioned the shape of the wing, did he?

11:38:48  4    A.    He did not mention it, no.

11:39:06  5    Q.    So when we were talking the other day -- let's turn

11:39:10  6    now to some of the videos that we've been looking at.  Okay?

11:39:15  7    A.    I'm sorry.  One more time.

11:39:17  8    Q.    I'm going to be turning to some of the videos that

11:39:19  9    we've been talking about.

11:39:21 10          Okay.  So the other day when we were talking you

11:39:22 11    said you made -- again, you said you made a positive

11:39:24 12    determination that the eFoils in Clip L, which I'm going to

11:39:29 13    show you again, were stable based just on the video.

11:39:31 14          Do you remember saying that?

11:39:32 15    A.    Yes.

11:39:33 16          MR. BASANTA:  Okay.  Can we please play Clip L.

11:39:35 17          (Video playing.)

11:39:43 18    BY MR. BASANTA:

11:40:19 19    Q.    And you recognize that as being an Evolo -- excuse

11:40:21 20    me.

11:40:21 21          You recognize that as being a Waydoo board?

11:40:23 22    A.    I -- you'd have to go back just a little bit for me

11:40:27 23    to be sure.

11:40:27 24    Q.    Are you saying you want me to play the video again?

11:40:31 25    A.    It's hard on tell without looking closely to the nose

888

Barry - Direct

11:40:34  1    detail when the board is not in the water.  I mean, when the

11:40:36  2    board is in water.

11:40:37  3    Q.     So, you were not looking at the video closely just

11:40:40  4    now?

11:40:40  5    A.     I was.  But I -- if you have -- I have to look -- the

11:40:43  6    major -- there are obvious differences in the detail of the

11:40:47  7    nose.  I'll accept, however, your assertion that it's a

11:40:50  8    Waydoo board.

11:40:50  9    Q.     I didn't make any such assertion.

11:40:53 10    A.     So, well, I don't -- I recognize it as one of the

11:41:00 11    two.  One of the two, either the Defendants' or the

11:41:03 12    Plaintiff's board.

11:41:06 13    Q.     I'm sorry, sir.  You're saying that's either a LIFT

11:41:08 14    board or a Waydoo board, you can't tell the difference?

11:41:10 15    A.     It's hard for me to tell, looking at these videos,

11:41:13 16    because I can't quite see the details I'm aware of that make

11:41:16 17    the difference.  If it were out of the water I could tell

11:41:20 18    easily.

11:41:20 19    Q.     Okay.  I understand.

11:41:21 20           So, I'm going to show you one more clip.  It's

11:41:23 21    actually two videos side by side and then I want to take

11:41:25 22    your reaction after you watch this.  Okay.  Please pay

11:41:28 23    attention carefully.

11:41:29 24           MR. BASANTA:  Can you please play Clip V as in

11:41:32 25    Victor?

Barry - Direct

11:41:33  1                (Video playing.)

11:41:38  2      BY MR. BASANTA:

11:41:43  3      Q.      Now Mr. Barry, you've testified that only one of

11:41:47  4      these boards is unstable.

11:41:47  5      A.      Yes.

11:41:49  6      Q.      Do you know which one?

11:41:50  7      A.      Yes, sir.  I did.

11:41:53  8      Q.      Which one?

11:41:53  9      A.      Which?

11:41:55 10      Q.      Which one?

11:41:55 11      A.      The -- the board on the left.

11:42:01 12      Q.      The board on the left.

11:42:02 13      A.      It's on the left.  It's not really a board.

11:42:04 14      Q.      I'm sorry?

11:42:04 15      A.      It's not really a board.  It's more of a boat.  But,

11:42:07 16      yes, the craft on the left.

11:42:08 17      Q.      Okay.  So the video on the left you say is unstable?

11:42:11 18      A.      Yes, sir.

11:42:12 19      Q.      And you've concluded that positively from looking at

11:42:15 20      this video?

11:42:16 21      A.      Looking at the unedited version of this video, yes.

11:42:19 22      Q.      And the board on the right you've concluded what

11:42:21 23      about it?

11:42:22 24      A.      That it is stable.  Looking at the -- again, looking

11:42:26 25      at the unedited version of this -- of this video, yes, it is

890

Barry - Direct

11:42:31 1   stable.

11:42:32 2   Q.     Mr. Barry, this video I checked, is nine seconds

11:42:35 3   long.

11:42:35 4   A.     Yes, sir.

11:42:37 5   Q.     Nine seconds is more than any video that we saw the

11:42:40 6   other day from which you said you made a positive

11:42:43 7   determination of stability.

11:42:44 8          Do you remember that?

11:42:45 9   A.     Well, I believe this is an excerpt -- an excerpt from

11:42:49 10  a longer video which, in fact, shows the first gentleman

11:42:52 11  who's a little heavy and not wearing a shirt, shows him

11:42:59 12  subsequently successfully flying the board in a level

11:43:01 13  condition.

11:43:02 14         So, from this video -- this selectively edited

11:43:06 15  video, I can't tell.  From the full video, you can.

11:43:09 16  Q.     So from this eight second video you cannot tell

11:43:11 17  stability.  But from the two or three second videos we saw

11:43:14 18  yesterday, you can tell stability?

11:43:15 19  A.     Well, actually you can.  Yes.  Bear in mind this also

11:43:20 20  is a selectively edited video from a much longer video.

11:43:24 21  Q.     Mr. Barry, I don't think I quite got what you said

11:43:26 22  there.  I'm still --

11:43:27 23  A.     I'm saying you -- this video here has been edited to

11:43:34 24  cut -- to -- to eliminate -- has been cut selectively.  This

11:43:40 25  video -- the video that you're showing right now has been

Barry - Direct

11:43:44 1    cut.  We're only seeing a certain portion of it.  The other

11:43:47 2    video has been cut, you're only seeing a small portion of

11:43:50 3    it.

11:43:50 4          Based on the video that you're showing right

11:43:52 5    now, it's -- yeah, you can't make a positive determination.

11:43:57 6    Well, you can actually.  But it's more difficult to make a

11:44:01 7    positive determination based on this than the entire video

11:44:06 8    that these are cut from.

11:44:08 9    Q.    So, again, I have no idea if you're telling me that

11:44:10 10   you can or you cannot make a positive determination from an

11:44:14 11   eight or nine second video.

11:44:15 12   A.    The -- the Evolo craft is clearly significantly less

11:44:22 13   stable than the other one, even in this short video.

11:44:27 14   Q.    Okay.  That I understood.

11:44:29 15         So your testimony is that even in these clips,

11:44:32 16   the Evolo is significantly less stable than the Waydoo?

11:44:35 17   A.    Yes.

11:44:38 18   Q.    Let's move on to Claim 2.

11:44:41 19         When you were testifying last, you agreed that

11:44:43 20   motor speed controllers were known before 2013.

11:44:45 21         Do you remember that?

11:44:46 22   A.    Yes.

11:44:49 23   Q.    But you disagreed that the Evolo Report discloses a

11:44:50 24   motor speed controller; right?

11:44:55 25   A.    I don't -- I'm sorry.

892

Barry - Direct

| | | |
|---|---|---|
| 11:44:56 | 1 | Q.      It's not a memory test, Mr. Barry.  I can help you |
| 11:45:00 | 2 | out. |
| 11:45:00 | 3 | MR. BASANTA:  Can you please bring up Slide 65? |
| 11:45:00 | 4 | BY MR. BASANTA: |
| 11:45:06 | 5 | Q.      I think that sets it out pretty clearly.  This is |
| 11:45:09 | 6 | from your rebuttal report. |
| 11:45:10 | 7 | Do you remember writing these words? |
| 11:45:12 | 8 | A.      Yes. |
| 11:45:12 | 9 | Q.      And you say here, "Despite Dr. Triantafyllou's |
| 11:45:14 | 10 | citations to the Evolo Report, it does not disclose the use |
| 11:45:16 | 11 | of a motor speed controller." |
| 11:45:17 | 12 | Do you see that? |
| 11:45:18 | 13 | A.      Well, that's what I have in my report. |
| 11:45:21 | 14 | Q.      Right.  My question was do you see that these are the |
| 11:45:23 | 15 | words you wrote on the screen? |
| 11:45:25 | 16 | A.      I see that that's what I have in my report.  That |
| 11:45:27 | 17 | is -- the question is, is that in the report?  Is that your |
| 11:45:29 | 18 | question? |
| 11:45:30 | 19 | Q.      My question was just:  Do you see the words that are |
| 11:45:33 | 20 | on the screen? |
| 11:45:33 | 21 | A.      I do see the words on the screen. |
| 11:45:36 | 22 | Q.      And my followup question is:  This is the entirety of |
| 11:45:39 | 23 | your argument about the motor speed controller with respect |
| 11:45:42 | 24 | to the Evolo Report; isn't it? |
| 11:45:44 | 25 | A.      It yes.  Yes, I think so. |

Barry - Direct

11:45:46  1   Q.      Just this single sentence?

11:45:48  2   A.      I think so, yes.

11:45:49  3   Q.      Okay.

11:45:49  4   A.      I -- I don't recall the full report.  I haven't

11:45:53  5   memorized it.

11:45:54  6   Q.      Okay.  But given what you wrote here, you must not

11:45:56  7   have seen Appendix 72 of the Evolo Report, have you?

11:45:59  8   A.      Yes, I -- I've seen it.

11:46:03  9   Q.      You have seen it.

11:46:03 10           MR. BASANTA:  Can we please go to DTX 325,

11:46:08 11   Page 496.

11:46:14 12   BY MR. BASANTA:

11:46:14 13   Q.      Have you seen this page before, Mr. Barry?

11:46:17 14   A.      Yes, I have.

11:46:18 15   Q.      Do you see what the name of the appendix is in the

11:46:20 16   upper right?

11:46:21 17   A.      Yes, I do.

11:46:23 18   Q.      Could you read it, please?

11:46:24 19   A.      Yes, I see it.

11:46:32 20   Q.      Could you read it, please?

11:46:33 21   A.      Appendix 72, motor controller.  Motor control.

11:46:38 22   Q.      And then two pages later we see this.

11:46:40 23           MR. BASANTA:  Can you please bring up slide 53?

11:46:40 24   BY MR. BASANTA:

11:46:45 25   Q.      This is a page within that appendix and you see it

Barry - Direct

11:46:48  1   says here -- there's a heading that says induction motor.

11:46:51  2           Do you see that?

11:46:51  3   A.    Yes.

11:46:52  4   Q.    Now, I'm not an electrical engineer, but reading

11:46:55  5   these highlighted passages from this paragraph it says, "The

11:46:58  6   motor is controlled by varying the controlled voltage to a

11:47:01  7   control system which indicates the speed desired, whereupon

11:47:05  8   the control system regulates its strength and frequency of

11:47:08  9   the input voltage in response."

11:47:10 10           Do you see that?

11:47:10 11   A.    Yes.

11:47:11 12   Q.    Next clip says, "An example of such a connection is

11:47:13 13   shown in Figure 1."

11:47:14 14           Do you see that?

11:47:15 15   A.    Yes.

11:47:18 16   Q.    On the next page --

11:47:19 17           MR. BASANTA:  Can you please bring up Slide 54?

11:47:19 18   BY MR. BASANTA:

11:47:22 19   Q.    It is Figure 1.  Do you see that?

11:47:24 20   A.    Yes, sir.

11:47:25 21   Q.    "Example of a connection of an asynchronous motor

11:47:29 22   with a control system."

11:47:30 23           Do you do you see that?

11:47:31 24   A.    Yes.

11:47:31 25   Q.    Is it still your opinion that the Evolo Report does

Barry - Direct

11:47:33  1    not disclose a motor speed controller?

11:47:34  2    A.      Reporter -- I stand corrected, sir.

11:47:38  3    Q.      So you acknowledge that this is a motor speed

11:47:41  4    controller?

11:47:41  5    A.      It is.

11:47:41  6    Q.      And it is within the pages of the Evolo Report?

11:47:44  7    A.      It is.

11:47:44  8    Q.      Thank you.

11:47:46  9            Let's talk about Claim 5.

11:47:49 10            When you were last testifying you said that

11:47:51 11    every wing has an a airfoil design.  Do you remember that?

11:47:54 12    A.      Every wing has an airfoil design.

11:47:57 13    Q.      Every wing has an airfoil design.  Do you remember

11:48:00 14    saying that?

11:48:00 15    A.      I -- I'll -- what are we referring to?

11:48:04 16    Q.      I'm sorry.  I can't hear you, Mr. Barry.

11:48:05 17    A.      What are we referring to?

11:48:07 18    Q.      When you were on the stand the other day.

11:48:09 19    A.      Yeah.  Okay.

11:48:10 20    Q.      Do you remember saying that?

11:48:11 21    A.      I said that.

11:48:12 22    Q.      Okay.  Every wing has an airfoil design.  So you

11:48:18 23    agree then that the Evolo hydrofoil wing has an airfoil did

11:48:19 24    design.

11:48:19 25    A.      Well, the Evolo hydrofoil wing -- the Evolo hydrofoil

Barry - Direct

11:48:23 1    object, I wouldn't even consider it a wing because it

11:48:25 2    doesn't have an airfoil.  It's a flat plate.

11:48:29 3    Q.    It's not a wing you say?

11:48:30 4    A.    Well, you could call it a wing.  But it's no more a

11:48:33 5    wing than -- it's no more a wing than a garbage can lid is.

11:48:36 6    Q.    Does a garbage can lid produce lift --

11:48:39 7    A.    Yes.

11:48:39 8    Q.    -- if you try to ride on it?

11:48:41 9    A.    Yes.  Yes.  You can throw one on it's like a frisbee.

11:48:43 10   Q.    Okay.  And we acknowledge that the Evolo Report's

11:48:45 11   wings produce lifts?

11:48:46 12   A.    Yes.

11:48:46 13   Q.    Okay.  And you also agreed that every wing has a

11:48:53 14   planform design; yes?

11:48:54 15   A.    Yes.

11:48:55 16   Q.    And you testified that even if a wing has no twist,

11:48:58 17   that's still a tailoring of span-wise twist distribution?

11:49:01 18   A.    Yes.

11:49:03 19   Q.    But you disagree that, I presume, the Evolo hydrofoil

11:49:07 20   has a planform design?

11:49:08 21   A.    It does have a planform design, yes.

11:49:11 22   Q.    Okay.  Thank you for that answer.

11:49:13 23         Do you agree then that the Evolo hydrofoil has a

11:49:17 24   tailoring of the span-wise twist distribution?

11:49:18 25   A.    It has no twist.

897

Barry - Direct

11:49:21  1   Q.      So if doesn't twist?

11:49:22  2   A.      It doesn't twist.

11:49:23  3   Q.      But you said that to satisfy this claim element to

11:49:26  4   actually have the tailoring of the span-wise twist

11:49:30  5   distribution, you don't need twist.  Didn't you say that

11:49:33  6   yesterday?

11:49:33  7   A.      That's correct.

11:49:35  8   Q.      Okay.  Let's talk about Claim 6.  When you last

11:49:45  9   testified, you're agreed that wing-shaped hydrofoils with

11:49:47 10   curved front and rear edges were known before 2013; do you

11:49:51 11   remember that?

11:49:51 12   A.      Yes.

11:49:53 13   Q.      And you must have seen that the Evolo Report

11:49:55 14   disclosed a variation of its hydrofoil design that has

11:49:58 15   curved edges; yes?

11:50:00 16   A.      Yes.  They were curved forwardly.

11:50:06 17   Q.      They were curved forwardly.  Okay.

11:50:09 18             MR. BASANTA:  Can we please bring up Slide 30?

11:50:14 19   Could you rotate that, please, Carol?

11:50:14 20   BY MR. BASANTA:

11:50:27 21   Q.      Do you see -- have you seen this picture before?

11:50:28 22   A.      Yes, I have.

11:50:29 23   Q.      Okay.  I'm looking at the back side of the straight

11:50:31 24   part of the wing.  Do you see that?

11:50:32 25   A.      Yes.

Barry - Direct

11:50:33  1    Q.      You see how it's curved?

11:50:34  2    A.      Yes, sir.

11:50:35  3    Q.      Okay.

11:50:39  4    A.      You want to continue with that, discuss that further

11:50:45  5    or would you like Mr. Theuerkauf to follow-up?

11:50:47  6    Q.      Mr. Theuerkauf can.

11:50:48  7            So, you remember Dr. Triantafyllou in his

11:50:52  8    reporting, I'm referring to now --

11:50:54  9    A.      Yes.

11:50:54 10    Q.      -- gave the opinion that when designing a hydrofoil

11:50:56 11    wing that a whole laundry list of design variables needed to

11:51:01 12    be considered.

11:51:01 13            Do you remember that?

11:51:01 14    A.      Yes.

11:51:03 15            MR. BASANTA:  Can we please bring up Slide 31?

11:51:03 16    BY MR. BASANTA:

11:51:07 17    Q.      This is -- this is a paragraph out of

11:51:10 18    Dr. Triantafyllou's opening report.  This is where he says

11:51:12 19    that the variables must be considered when designing a

11:51:15 20    hydrofoil wing.  "Include the items in the list below."

11:51:19 21            Do you see that?

11:51:19 22    A.      Yes.

11:51:19 23    Q.      I've highlighted one here.  Do you see it?

11:51:21 24    A.      Yes, sir.

11:51:22 25    Q.      And one of items that must be considered is the shape

Barry - Direct

11:51:25  1   of the primary or secondary wing.

11:51:27  2   A.    Yes, sir.

11:51:27  3   Q.    Do you see that?

11:51:28  4         You remember that in responding to

11:51:29  5   Dr. Triantafyllou's report you said that a person of

11:51:32  6   ordinary skill in the art in the art would readily recognize

11:51:35  7   these are variables that may be optimized?

11:51:37  8   A.    Yes, sir.

11:51:39  9   Q.    So, in other words, curved wings like we saw in

11:51:41 10   Claim 6 would have just been ordinary optimization to a

11:51:45 11   person of ordinary skill in the art, wouldn't it?

11:51:46 12   A.    Yes.

11:51:49 13   Q.    Let's talk about enablement.

11:51:53 14   A.    Do you want me to --

11:51:55 15   Q.    Mr. Theuerkauf can talk about it.

11:51:58 16         All right.  That covers the specific claims that

11:52:02 17   we need to talk about with respect to the Evolo Report.  But

11:52:04 18   before we leave it, there was some suggestion in your

11:52:09 19   reporting that you thought the Evolo Report itself does not

11:52:13 20   enable a person of ordinary skill in the art to make and use

11:52:16 21   a passively stable eFoil?

11:52:18 22   A.    Yes.

11:52:20 23   Q.    That's still your argument?

11:52:21 24   A.    Well, if you follow the Evolo Report, you'd get what

11:52:25 25   they have which doesn't work.

| | | |
|---|---|---|
| 11:52:30 | 1 | Q.      So, yes, you're still make that argument? |
| 11:52:32 | 2 | A.      That's right.  A person of ordinary skill in the art |
| 11:52:35 | 3 | reading the Evolo Report would conclude that an automatic |
| 11:52:39 | 4 | control system was required. |
| 11:52:40 | 5 | Q.      Got it. |
| 11:52:41 | 6 | And one of the factors that you need to consider |
| 11:52:48 | 7 | when you're opining on an enablement argument is the |
| 11:52:53 | 8 | quantity of experimentation that's necessary; right? |
| 11:52:55 | 9 | A.      Yes. |
| 11:52:58 | 10 | Q.      Okay.  But you don't offer any opinion in your |
| 11:53:02 | 11 | reporting or elsewhere that I've heard about how much |
| 11:53:05 | 12 | experimentation the Evolo team actually did, do you? |
| 11:53:08 | 13 | A.      No, I don't.  They did a great deal of |
| 11:53:10 | 14 | experimentation. |
| 11:53:11 | 15 | Q.      Okay.  But for purposes of the courtroom today, how |
| 11:53:17 | 16 | much experimentation did they do? |
| 11:53:18 | 17 | A.      Well, I believe we -- I believe Dr. Langelaan built a |
| 11:53:25 | 18 | prototype and the first prototype flew successfully.  So, |
| 11:53:30 | 19 | somewhere between the amount of experimentation he did, |
| 11:53:32 | 20 | which is one experiment and it works or several months of |
| 11:53:38 | 21 | experiments and it doesn't work, presumably somewhere in |
| 11:53:43 | 22 | between those is an appropriate quantity of experimentation. |
| 11:53:47 | 23 | Q.      Are you saying that Dr. Langelaan was on the Evolo |
| 11:53:49 | 24 | team? |
| 11:53:50 | 25 | A.      No, he wasn't.  I'm just saying you asked me to |

901

Barry - Direct

11:53:53  1    define the quantity of experimentation.

11:53:56  2    Q.      I did not actually.

11:53:57  3    A.      Oh.

11:53:58  4    Q.      What I asked you was --

11:53:59  5    A.      Sorry, I should ask you to clarify.

11:54:01  6    Q.      Okay.  What I was asking you was -- is:  Do you offer

11:54:05  7    an opinion anywhere in your reports on how much

11:54:08  8    experimentation the Evolo team actually did?

11:54:10  9    A.      No, I don't I don't think I did.  It's obvious from

11:54:15 10    the report that they did a great deal of experimentation.

11:54:17 11    Q.      Okay.  But you didn't quantify it?

11:54:19 12    A.      I believe they have a prototype 10, up to prototype

11:54:24 13    10 and then a final, something like that.  So they're -- I

11:54:27 14    mean, saying how much experimentation, you have to have a --

11:54:30 15    you have to have a measure, and one is how many prototypes

11:54:34 16    that you did and it's obvious.  You can look at the report,

11:54:38 17    Evolo Report and see they did somewhere between 10 and

11:54:42 18    perhaps 14 different versions.

11:54:46 19    Q.      So when you're talking you about the development work

11:54:48 20    they did from the start of the project to the end of the

11:54:50 21    project you're talking about those, the lettered X

11:54:53 22    prototypes?

11:54:53 23    A.      I believe so.  Yep.  Yes, that's what I'm talking

11:54:57 24    about.

11:54:57 25    Q.      Okay.  But all of those prototypes, the X prototypes

Barry - Direct

11:55:00 1   happened before they finalized their design, didn't it?

11:55:03 2   A.     Well, you asked how many how much experimentation is

11:55:06 3   required to get a -- get a design.  If you start out by just

11:55:12 4   throwing something together, that's your first experiment.

11:55:16 5   If you throw something together several times and then

11:55:19 6   figure out what's going on and throw more things together,

11:55:22 7   that's continued experiment.  The first time you actually

11:55:27 8   put something in real water or in a model test tank, that's

11:55:31 9   an experiment.

11:55:33 10  Q.     So, are you saying that, in your view, the clock, if

11:55:37 11  you will, for when you started your enablement analysis back

11:55:41 12  when they started the project?

11:55:42 13  A.     No.  The clock was when they took -- when did their

11:55:44 14  first experiment.  In the course of ship design, we regard

11:55:51 15  the first experiment as the day you put your hull into the

11:55:54 16  model basin.

11:55:55 17  Q.     But the issue in the Court today is whether the Evolo

11:55:58 18  Report itself in its final form would enable a person to

11:56:03 19  make and use a passively stable eFoil?

11:56:07 20  A.     No.  It shows a whole bunch of experiments that

11:56:11 21  didn't work.

11:56:13 22  Q.     My question, Mr. Barry:  You're saying that the Evolo

11:56:16 23  Report itself doesn't enable a person to make and use a

11:56:21 24  passively stable eFoil; yes?

11:56:24 25  A.     Only in the sense that it tells a person what not to

Barry - Direct

11:56:27 1    do.

11:56:29 2    Q.      But again, it's the report, yes?

11:56:32 3    A.      The report says we did this and that and the other --

11:56:36 4    and the other thing and it didn't work.  So...

11:56:39 5    Q.      Mr. Barry, my question is more simple than that.

11:56:41 6    A.      No.  Does the report -- no, the report doesn't tell

11:56:43 7    you how -- it doesn't ever tell you how to get a successful

11:56:46 8    craft.

11:56:46 9    Q.      Right.  But it's the report that we're talking about,

11:56:48 10   yes?

11:56:49 11   A.      Right.

11:56:49 12   Q.      And you're saying that when they started their X7

11:56:52 13   experiment before the report was finished that the report

11:56:55 14   couldn't teach you how to do it?

11:56:57 15   A.      It doesn't teach me how to do it.

11:56:59 16   Q.      You seem to be missing my point, Mr. Barry.  I'm

11:57:02 17   asking about the time periods here.

11:57:03 18   A.      Yes, sir.

11:57:04 19   Q.      You're saying that the Evolo Report can teach them

11:57:06 20   how to do it before the Evolo Report was finished.

11:57:09 21   A.      I don't understand that question at all.

11:57:11 22   Q.      Okay.  So, you don't discuss in your reports anywhere

11:57:17 23   the date the team actually finalized the final Evolo design;

11:57:22 24   right?

11:57:22 25   A.      No, I don't think so.

Barry - Direct

11:57:23 1   Q.      You don't know when that happened?

11:57:25 2   A.      I believe it happened in a -- well, in a time frame,

11:57:29 3   June, I believe, of 2009, when they put their -- when they

11:57:35 4   put their final model into the water.

11:57:37 5   Q.      Okay.  So I'm asking --

11:57:38 6   A.      What?

11:57:39 7   Q.      I'm sorry.  I'm asking you a different question.

11:57:40 8   A.      Okay.

11:57:41 9   Q.      I know you think that the prototype hit the water in

11:57:43 10  June of 2009.  I'm asking a different question.  When did

11:57:46 11  they finalize the design for that prototype?

11:57:49 12  A.      So a little -- a little bit earlier.

11:57:52 13  Q.      And how much is a little bit?

11:57:52 14  A.      I don't know.

11:57:53 15  Q.      Okay.  So you don't know how long it took them to go

11:57:56 16  from the final design to sticking a prototype in the water

11:57:59 17  of the final design?

11:58:00 18  A.      I don't know for sure.  It was probably a couple

11:58:03 19  months.

11:58:03 20  Q.      Okay.  Either you don't know for sure or it's

11:58:07 21  probably a couple months?

11:58:08 22  A.      I think it's -- yeah, I think it was on the order of

11:58:10 23  one or two months.

11:58:11 24  Q.      And you're basing --

11:58:12 25  A.      I don't know for sure.  I'm -- that's when I'm not

Barry - Direct

11:58:15  1    absolutely clear of when they did their final design review,

11:58:21  2    et cetera, because they don't quite mark those milestones in

11:58:25  3    a way that I'm used to.

11:58:26  4    Q.    So when you say one to two months, you're guessing?

11:58:28  5    A.    I am guessing.  Again, the problem is they don't have

11:58:33  6    a clear milestone of a comprehensive final design review

11:58:37  7    which would have occurred on a certain date and would have

11:58:40  8    locked the configuration.

11:58:42  9    Q.    Do you usually get that kind of review with student

11:58:45 10    projects at a university?

11:58:46 11    A.    They have them -- well, I'll find out.  On the 10th

11:58:50 12    I'm going to a Naval Academy student project, and every year

11:58:54 13    they've had final design review and then presented things.

11:58:59 14    So, yes.  They do.  And they even use the right acronyms.

11:59:02 15    Q.    But, you know, when you find out whatever you said

11:59:04 16    you're going to find out, that's going to be long after this

11:59:06 17    trial is over; right?

11:59:07 18    A.    No.  Well, no, I've been to the Naval Academy student

11:59:11 19    projects for about 20 years in a row now.

11:59:14 20    Q.    So you're saying you're going to do that while this

11:59:17 21    trial is happening?

11:59:17 22    A.    I'm going to do it.  I'm supposed to be there on the

11:59:20 23    10th of April.

11:59:21 24    Q.    The trial is ending on Friday, Mr. Barry.

11:59:23 25    A.    Yes.  No, I'm not going do it while the trial is

Barry - Direct

11:59:26 1    happening.

11:59:26 2    Q.      Okay.

11:59:27 3    A.      After the trial I am going to this.  And I've done it

11:59:30 4    about 20 times in the past.

11:59:32 5    Q.      Okay.  So you said you knew -- you said you saw that

11:59:35 6    they -- you had an approximate date for when they put the

11:59:38 7    final prototype in the water, yes?

11:59:40 8    A.      Yes.

11:59:40 9    Q.      Okay.  But you don't discuss in your reports when the

11:59:42 10   team actually finished building that prototype; right?

11:59:45 11   A.      No.

11:59:46 12   Q.      And you don't discuss in your report whether the team

11:59:48 13   built more than one of these final prototypes; right?

11:59:50 14   A.      No.

11:59:53 15   Q.      And you don't discuss in your report why they didn't

11:59:55 16   build a second prototype, do you?

11:59:57 17   A.      A second final prototype?

11:59:59 18   Q.      Right.

11:59:59 19   A.      After configuration closed?

12:00:02 20   Q.      I don't know what configuration closed means.

12:00:04 21   A.      Configuration closed means this is it, this is our

12:00:07 22   object.

12:00:08 23   Q.      Right.  Right.  You don't discuss anywhere in your

12:00:12 24   reports why they didn't build a second prototype after

12:00:14 25   design closed, correct?

907

Barry - Direct

12:00:16  1    A.      Well, can we I -- can I explain that a little bit

12:00:23  2    sir?

12:00:23  3    Q.      Again, you can talk to Mr. Theuerkauf about it?

12:00:23  4    A.      I'm sorry.

12:00:23  5    Q.      You can talk to Mr. Theuerkauf about that.

12:00:26  6            Let me ask you this:  If they had a chance to

12:00:28  7    build the second prototype, you think what they would have

12:00:31  8    done differently is put an automatic control system on it?

12:00:33  9    A.      I don't know what they would have done.

12:00:35 10    Q.      You have no idea?

12:00:36 11    A.      I don't know what they would have done.

12:00:39 12    Q.      You've --

12:00:39 13    A.      I don't speak Swedish and, again, I can't read their

12:00:42 14    minds in Swedish.

12:00:43 15    Q.      You keep saying you don't speak Swedish but you

12:00:45 16    reviewed an English language version of the report, did you

12:00:48 17    not?

12:00:48 18    A.      Yes, I did.

12:00:49 19    Q.      So why do keep saying that you don't speak Swedish,

12:00:51 20    Mr. Barry?

12:00:52 21    A.      Well I'd have to talk to them.  I'd have to

12:00:54 22    presumably talk to them to ask them what their next plan was

12:00:57 23    after their report, after their student project ended.

12:01:02 24    Q.      Okay.  So in your view, the report says nothing

12:01:05 25    whatsoever that a person of ordinary skill could read that

Barry - Direct

12:01:08   1     would indicate what they would have done differently if they

12:01:10   2     had a chance to make a second prototype?

12:01:12   3     A.      No.  No, it doesn't.  All of their prototypes have

12:01:15   4     involved the issues that cause their problems.

12:01:20   5     Q.      Okay.  Well let me refresh --

12:01:21   6     A.      -- recognizing those issue.

12:01:23   7     Q.      Okay.  Let me refresh your memory, Mr. Barry.  Let's

12:01:27   8     start with the final design itself, can we please bring up

12:01:30   9     the first page of the Evolo Report.  Page B2 or B2 -- DTX

12:01:35  10     325 B2.

12:01:37  11            And you recognize this as the first page of the

12:01:40  12     Evolo Report?

12:01:41  13     A.      Yes.

12:01:42  14     Q.      Can you please flip through a couple pages, Carol

12:01:44  15     until we get to page 27?

12:01:46  16     A.      Go back to the front page so we can see what the date

12:01:49  17     was.

12:01:49  18     Q.      Yes, of course.

12:01:50  19     A.      Thank you.

12:01:51  20     Q.      Can you bring up that bottom set of text, Carol?

12:01:54  21     A.      I can see it.

12:01:55  22     Q.      Okay.

12:01:56  23     A.      Okay.  So, the final report was given on the 4th,

12:02:02  24     23rd day of March 2009.

12:02:05  25     Q.      Yes.  You're notice that now?

Barry - Direct

12:02:07  1          THE COURT:  That's probably April.

12:02:09  2          THE WITNESS:  Oh, I'm sorry, you're right.

12:02:10  3  Sorry.

12:02:11  4  BY MR. BASANTA:

12:02:11  5  Q.     So you're noticing that now for the first time but

12:02:14  6  that's not in your report?

12:02:15  7  A.     No, I knew it was in March that they were kind of

12:02:18  8  getting ready, that they had pretty much finished up their

12:02:22  9  craft.

12:02:23 10  Q.     Okay.  Could we go to the next page, Carol?

12:02:26 11          And you recognize that image as the final

12:02:28 12  design?

12:02:28 13  A.     Yes.

12:02:29 14  Q.     Next page.

12:02:30 15          And you recognize that as schematics drawings of

12:02:34 16  the final design?

12:02:34 17  A.     These are the -- these are some of the key

12:02:34 18  dimensions.

12:02:38 19  Q.     Right.  And it has a table of dimensions that

12:02:40 20  actually give you the size of these various components?

12:02:42 21  A.     Yes.

12:02:43 22  Q.     Next page please, next page.

12:02:45 23          And you see that this is just an isolated view

12:02:48 24  of the floatation device, do you see that?

12:02:49 25  A.     Yes.

Barry - Direct

12:02:49  1    Q.    They modeled it after that boat you see there?

12:02:51  2    A.    Yes.

12:02:52  3    Q.    All right.  Next page, please.

12:02:55  4    A.    Yes.

12:02:56  5    Q.    It's a hydrofoil, a strut, next page.

12:02:58  6    A.    Yes, I see.

12:02:59  7    Q.    I'm sorry.  Can you go back one page, Carol?

12:03:04  8          All right so let's look here.  You see there's a

12:03:05  9    section called hydrofoil/underwater body?

12:03:07 10    A.    Yes, I see it.

12:03:09 11    Q.    Can you please enlarge that section, just the text?

12:03:11 12    A.    Yes.

12:03:12 13    Q.    And it says here Evolo's underwater body and

12:03:15 14    hydrofoil placement are made to work with Torqeedo Cruise

12:03:21 15    4.0, do you see that?

12:03:21 16    A.    Yes, sir.

12:03:22 17    Q.    You recognize the Torqeedo Cruise as being a brand

12:03:25 18    name of electric motor?

12:03:26 19    A.    Yes, sir.  Electric motor and electric propulsion.

12:03:33 20    The stopped version.

12:03:35 21    Q.    And later in the report we learn that the Torqeedo

12:03:38 22    Cruise has a power output of 4,000 watts; right, Mr. Barry?

12:03:41 23    A.    Four-kilowatts, yes.

12:03:42 24    Q.    Okay.  Can we please go to that page slide 38?

12:03:45 25    A.    Yeah.

911

Barry - Direct

| | | |
|---|---|---|
| 12:03:48 | 1 | Q.      Here we see the large Torqeedo Cruise 4.0.  This |
| 12:03:52 | 2 | larger motor has a power output of 4,000 watts, which is |
| 12:03:55 | 3 | what you just said, yes? |
| 12:03:56 | 4 | A.      Yes, sir. |
| 12:03:56 | 5 | Q.      Do we know whether the team used a Torqeedo 4.0 in |
| 12:04:01 | 6 | its final prototype that you saw in that video? |
| 12:04:05 | 7 | A.      I believe they used a -- they were not able to get |
| 12:04:08 | 8 | that one.  They used a smaller one.  I don't -- I'm a little |
| 12:04:11 | 9 | confused about which motor.  I thought they had a |
| 12:04:13 | 10 | four-kilowatt motor on the final version. |
| 12:04:16 | 11 | Q.      So you're confused but you thought it was |
| 12:04:17 | 12 | four-kilowatts? |
| 12:04:18 | 13 | A.      I believe it's a four-kilowatt.  I can't absolutely |
| 12:04:21 | 14 | confirm it. |
| 12:04:21 | 15 | Q.      Okay.  Carol, can we please bring up page .545. |
| 12:04:29 | 16 |         So this is appendix 77.  Do you see it on the |
| 12:04:34 | 17 | screen? |
| 12:04:34 | 18 | A.      Yes. |
| 12:04:35 | 19 | Q.      And it's regarding the final design, do you see that? |
| 12:04:37 | 20 | A.      Yes. |
| 12:04:38 | 21 | Q.      Can you flip through a couple pages, Carol? |
| 12:04:41 | 22 |         And you see, again, we've got the same model |
| 12:04:45 | 23 | there on the upper right and we've got very similar |
| 12:04:49 | 24 | drawings, schematics down below, you see that? |
| 12:04:51 | 25 | A.      Yes. |

912

Barry - Direct

12:04:52  1    Q.    Okay.  Keep going.  We've got some dimensions.  Keep

12:04:56  2    going.  Please turn and flip over to page .551, same

12:05:01  3    drawings.  551.  Okay, stop here please.

12:05:04  4          You see a section here, Mr. Barry, that says

12:05:08  5    propulsion and motor, can we enlarge that section just to

12:05:11  6    the bullets, just the bullets?

12:05:12  7          You see the section, Mr. Barry?

12:05:16  8    A.    Yes, sir.

12:05:17  9    Q.    Can you highlight that first sentence underneath the

12:05:19 10    word motor.  It says, "Finding a motor that meets the

12:05:22 11    requirements was easier said than done."  Do you see that?

12:05:26 12    A.    Yes.

12:05:27 13    Q.    The next one says, the next sentence says, "The

12:05:30 14    project has at its disposal a Toqeedo motor that has a rated

12:05:34 15    power of two-kilowatts.

12:05:37 16    A.    Okay.

12:05:39 17    Q.    You see that?

12:05:40 18    A.    Yes, sir.

12:05:41 19    Q.    So, they designed it as we just saw, for a

12:05:44 20    four-kilowatt motor?

12:05:46 21    A.    Yes.

12:05:47 22    Q.    But they only be able to get their hands on a

12:05:50 23    two-kilowatt motor?

12:05:51 24    A.    That was -- that was part of what I recall was they

12:05:54 25    were all unable to get the largest motor they wanted.

913

Barry - Direct

12:05:56  1    Q.      So you recall that?

12:05:57  2    A.      Yes, I do recall that.  That's why I just expressed

12:06:00  3    some question as to whether they had -- the final prototype

12:06:03  4    had a two- or a four-kilowatt motor.

12:06:05  5    Q.      I think the words you used was confusion; right?

12:06:08  6    A.      Well, yes, I'm not -- yeah, I was not sure exactly

12:06:11  7    what ended up on the final design when it went in the water.

12:06:15  8    Q.      Okay.  But this pretty clearly tells you it was not

12:06:17  9    motor they designed it for?

12:06:18 10    A.      It clearly tell us me that, yes, they put a

12:06:22 11    two-kilowatt motor on there.

12:06:24 12    Q.      Okay.  And the very last sentence on that paragraph

12:06:27 13    says, "Thus there are two options."  You see that?

12:06:29 14    A.      Yes.

12:06:30 15    Q.      The first bullet says, "Find a larger motor that

12:06:33 16    meets the requirements for power and speed."  Do you see

12:06:36 17    that?

12:06:36 18    A.      Yes, sir.

12:06:37 19    Q.      Okay.  So before when I was asking you what the Evolo

12:06:40 20    team said they would do in the Evolo Report you said had you

12:06:43 21    no idea.  You said you couldn't read their minds because

12:06:45 22    they were Swedish and things like that?

12:06:47 23    A.      Yeah.

12:06:47 24    Q.      But we see here this statement clearly says that they

12:06:50 25    were going to -- they wanted a bigger motor and to fix the

Barry - Direct

12:06:53  1    problems with the smaller motor all they had to do was find

12:06:57  2    the larger motor.  You see that?

12:06:58  3    A.    I see that.  Could you continue looking at the -- at

12:07:07  4    the next paragraph?  The next point.

12:07:10  5    Q.    So 2,000 watts is half the power the team needed;

12:07:13  6    right?

12:07:13  7    A.    Yes.  The -- yes.

12:07:14  8    Q.    The team needed 4,000 and only had 2,000?

12:07:19  9    A.    That's what they thought.

12:07:19 10    Q.    That's what they thought?

12:07:20 11    A.    That's what they thought.

12:07:21 12    Q.    So you think they got it wrong?

12:07:22 13    A.    Absolutely.

12:07:24 14    Q.    They got it wrong absolutely.  A college project, a

12:07:26 15    capstone project, they're getting their masters degree, you

12:07:30 16    think they're just lying in their report?

12:07:31 17    A.    No, they're not lying in the report.

12:07:33 18    Q.    So if, naturally if they were going to build a second

12:07:36 19    final prototype or if they were just going to improve the

12:07:38 20    first final prototype, the team would just have a larger

12:07:41 21    motor; right, Mr. Barry?

12:07:42 22    A.    Yes, they could have.

12:07:43 23    Q.    In fact, they said that's what they wanted to do;

12:07:45 24    right?

12:07:45 25    A.    They said that.

Barry - Direct

12:07:46 1    Q.      In the report?

12:07:47 2    A.      That's in the report.

12:07:53 3    Q.      So the report, you have to agree that the report

12:07:55 4    itself is teaching that the final prototype that you saw in

12:07:58 5    a video that they built and posted videos of it would have

12:08:02 6    been faster if it had a larger motor; right, Mr. Barry?

12:08:05 7    A.      It would have been different -- it would have -- it

12:08:10 8    might have gone faster.

12:08:11 9    Q.      Might have?  It says right here.  Find a larger motor

12:08:14 10   to meet the requirements for speed, its right in front of

12:08:18 11   you, Mr. Barry.

12:08:18 12   A.      Well, if they can't get to that speed without a sea

12:08:22 13   crash it doesn't matter how big the motor is.

12:08:26 14   Q.      So, you heard Dr. Triantafyllou say yesterday that as

12:08:30 15   an eFoil increases the speed it increase its stability;

12:08:33 16   right?

12:08:33 17   A.      Yes, I heard him say that.

12:08:34 18   Q.      And is disagree I guess?

12:08:36 19   A.      Yes, sir.

12:08:40 20   Q.      You criticize the Evolo Report, the Evolo team, for

12:08:42 21   in your view not including any analysis of any equations

12:08:45 22   regarding stability, remember that?

12:08:47 23   A.      That's correct.

12:08:48 24   Q.      And you know Dr. Triantafyllou disagrees with you

12:08:51 25   about that; right?

916

Barry - Direct

12:08:51 1    A.    Yes, sir.

12:08:52 2    Q.    Just that we're on the same page, though, the patents

12:08:54 3    themselves don't include any stability calculations, do

12:08:56 4    they?

12:08:56 5    A.    You're going too fast, sir.  I'm sorry.  I'm trying,

12:09:01 6    yeah.

12:09:02 7    Q.    I hear you, Mr. Barry.  I'll do better.

12:09:04 8          So, just so we are on at same page:  The patents

12:09:07 9    themselves don't include any stability calculations either,

12:09:09 10   do they?

12:09:10 11   A.    They don't include -- no, they don't -- they don't

12:09:15 12   include stability calculations.  They didn't -- well, but I

12:09:21 13   would -- I think they would -- they usually would include

12:09:24 14   anything that the inventor wants to include.

12:09:24 15   Q.    Can you face your microphone a little bit and say

12:09:27 16   that, again?  I'm sorry.

12:09:27 17   A.    A patent -- I believe a patent can include anything

12:09:30 18   that the inventor wants to include.

12:09:33 19   Q.    Right.  In this case the inventor didn't want to

12:09:35 20   include stability calculations?

12:09:37 21   A.    The inventor didn't -- didn't include numeric

12:09:40 22   stability calculations, no.

12:09:41 23   Q.    Okay.  Let's talk now about Woolley and Namanny,

12:09:47 24   okay?

12:09:47 25   A.    Okay.

Barry - Direct

12:09:48   1    Q.      That's the obviousness argument that Waydoo is

12:09:50   2    making?

12:09:50   3    A.      Yes.

12:09:52   4    Q.      So, you don't deny anywhere in your reports, and as

12:09:54   5    far as I could tell, not in your testimony today, that

12:09:58   6    battery technology was improving in the 2010 time frame;

12:10:01   7    right?

12:10:01   8    A.      Yes.  I'm not -- yes, it has.

12:10:04   9    Q.      Let me just try that one more time.

12:10:06  10            You don't deny that battery technology was

12:10:08  11    improving in the 2010 time frame?

12:10:10  12    A.      No, I don't deny that.

12:10:12  13    Q.      Okay.  And you know that that's basically the crux of

12:10:16  14    Dr. Triantafyllou's argument here; right?

12:10:17  15    A.      I believe -- I believe it may be -- I believe it's an

12:10:22  16    element of his argument.

12:10:27  17            MR. BASANTA:  Can we please bring up DTX 73?

12:10:27  18    BY MR. BASANTA:

12:10:33  19    Q.      You recognize this as the Woolley patent?

12:10:34  20    A.      I do.

12:10:39  21    Q.      And as you must know, Mr. Barry, again, my colleague

12:10:42  22    just read it a little while ago, the parties have stipulated

12:10:44  23    that Woolley discloses a hydrofoil having no movable surface

12:10:48  24    as claimed in Claim 1; right?

12:10:49  25    A.      Yes, sir.

Barry - Direct

12:10:51  1  Q.     But nevertheless, in your opinion, Woolley does not

12:10:54  2  disclose weight shift control; right?

12:10:56  3  A.     Well, Woolley can't -- Woolley can only have limited

12:11:00  4  weight shift control because of the rider being confined.

12:11:03  5  And in addition, it has an additional means of control

12:11:07  6  comprising moving the tow rope.

12:11:10  7  Q.     Okay.  But you know that Dr. Triantafyllou's argument

12:11:11  8  is that you're going to put a motor onto Woolley, so you

12:11:15  9  don't need a tow rope; right?

12:11:16 10  A.     That's -- you don't need a tow rope for propulsion.

12:11:20 11  Q.     So even though you think -- so you think

12:11:22 12  Dr. Triantafyllou's argument is that even though he's

12:11:25 13  putting a motor on it, you still need a tow rope?

12:11:27 14  A.     No.  It won't be stable if you put it there.

12:11:32 15  Q.     You're saying that if you put a motor on Woolley, it

12:11:34 16  won't be stable?

12:11:35 17  A.     That correct.  The tow rope pulls from high, the

12:11:38 18  motor pulls from low.

12:11:40 19  Q.     And a person of ordinary skill would not be able to

12:11:43 20  compensate for that?

12:11:43 21  A.     Not without the hindsight of the Langelaan -- the two

12:11:49 22  patents at issue.

12:11:50 23  Q.     So we're not talking about Langelaan's patents.

12:11:52 24  A.     No, we're not talking about Langelaan patents.

12:11:57 25  Q.     We're talking about --

919

Barry - Direct

12:11:57 1   A.      Dr. Triantafyllou is speaking in 2003.

12:11:59 2   Dr. Langelaan -- the patents at issue came out in 2016.

12:12:02 3              So, now someone who would do Woolley could

12:12:09 4   observe the Waydoo device, they could observe -- so a person

12:12:14 5   of ordinary skill today could easily, perhaps -- if you say

12:12:20 6   combine the two, that's not really it.  They could make one

12:12:24 7   look like that.  But that is in the hindsight of seeing the

12:12:28 8   objects in question.

12:12:29 9   Q.      And you know that Dr. Triantafyllou's opinion about

12:12:31 10  combining Woolley and Namanny?

12:12:33 11  A.      Yes.

12:12:33 12  Q.      He takes the point of view of before Langelaan's

12:12:36 13  patents issue?

12:12:37 14  A.      Yes, I understand that he does that.

12:12:39 15  Q.      Okay.  So, again, I think we were saying your view is

12:12:48 16  that -- I'm sorry.  You're going to have to help me.

12:12:51 17             Does Woolley disclose or does not disclose

12:12:53 18  weight shift control?

12:12:54 19  A.      Woolley discloses -- discloses weight shift as an

12:12:58 20  element of control, but the tow line is actually a much more

12:13:04 21  powerful element of control because the Woolley -- the rider

12:13:07 22  in the Woolley -- Woolley patent is confined to moving only

12:13:12 23  a limited portion of his upper body.

12:13:14 24  Q.      So Woolley discloses weight shift control?

12:13:16 25  A.      I actually am not -- I don't recall whether he

Barry - Direct

12:13:22  1    explicitly disclosed weight shift control in the claim.

12:13:24  2              MR. BASANTA:  Okay.  Can we have slide 57?

12:13:27  3              THE WITNESS:  You have to refresh my memory.

12:13:27  4    BY MR. BASANTA:

12:13:27  5    Q.    I will do that right now, sir.

12:13:28  6    A.    Thank you.

12:13:29  7    Q.    It says here, "The seat advantageous --

12:13:31  8    A.    Okay.  I -- I thought -- did it -- does it -- it

12:13:34  9    discloses it in the specification.  Does it mention the

12:13:36 10    claims?  I guess it doesn't matter, does it?

12:13:38 11    Q.    Does it?

12:13:38 12    A.    Is weight shift control mentioned in the claims?

12:13:41 13    Q.    I don't know.  You tell me?

12:13:43 14    A.    I don't recall.

12:13:44 15    Q.    Does it matter?

12:13:45 16    A.    Well, it certainly is disclosed here.

12:13:50 17    Q.    So in your view, Woolley does not disclose stability;

12:13:54 18    correct?

12:13:54 19    A.    No.  Woolley has -- Woolley is a completely different

12:13:59 20    object which may or may not be stable, but it isn't weight

12:14:07 21    shift -- entirely weight-shift controlled.  The inventor

12:14:09 22    does not realize that the craft derives a significant

12:14:14 23    portion of its stability and control from the tow line.

12:14:17 24              So, a person trying to combine Woolley and

12:14:21 25    Namanny would largely fail because of the element of the tow

921

Barry - Direct

12:14:26  1    line.  Removing the tow line would make the vessel -- would

12:14:30  2    make the craft likely to be unstable because the shift of

12:14:37  3    force and the absence of the ability to control -- to

12:14:40  4    control the stability with a rope.

12:14:44  5    Q.    Okay.  So, Mr. Barry, I'm going to bring us back to

12:14:46  6    the question, which was:  It's your opinion that Woolley

12:14:49  7    does not disclose stability; correct?

12:14:51  8    A.    It -- it says something about -- it says -- it says

12:14:57  9    it -- it says it is -- it should be stable.  And it may be

12:15:04 10    stable, but it doesn't disclose a means of getting to

12:15:08 11    stability without a tow rope.

12:15:11 12           A person of ordinary skill, to me, in the art,

12:15:16 13    would not either -- not recognize the aspect of the tow rope

12:15:21 14    and fail or require substantial and additional

12:15:24 15    experimentation to produce in Woolley a chair -- a flying

12:15:29 16    chair that would be stable without the teachings of the '044

12:15:36 17    and '659 patent.

12:15:37 18    Q.    Okay.  So you recognize that Woolley does disclose

12:15:39 19    stability?

12:15:40 20    A.    Woolley talks -- Woolley mentions stability.

12:15:42 21    Q.    Okay.  And it's talking about it in the context of a

12:15:46 22    hydrofoil watercraft with no movable surfaces?

12:15:48 23    A.    It is.

12:15:49 24    Q.    Okay.  And you know that Woolley discloses that wing

12:15:54 25    up, wing down configuration that you said is the usual way

Barry - Direct

12:15:58  1   you achieve passive stability; right?

12:16:01  2   A.      It does.  It does.

12:16:06  3   Q.      And you don't deny -- changing gears slightly for a

12:16:10  4   moment.

12:16:11  5           You heard Dr. Triantafyllou talk quite a bit

12:16:13  6   about as you increase speed that you increase stability?

12:16:19  7   A.      I'm sorry.  I heard Dr. Triantafyllou say that.

12:16:22  8   Q.      Yes.  That was my question.

12:16:23  9   A.      Yes, I heard him say that.

12:16:25 10   Q.      Okay.  And you don't deny that as an eFoil increase

12:16:29 11   in speed, the rider has to move forward on the board; right?

12:16:32 12   A.      That's correct.

12:16:33 13   Q.      Okay.  So, if you were to put a -- hypothetically, I

12:16:39 14   know you don't agree with this, but if you were to motor a

12:16:41 15   put a motor on Woolley, which is what Dr. Triantafyllou

12:16:44 16   suggests, and it was flying, the rider would have to move

12:16:47 17   forwards on the craft to maintain stability; yes?

12:16:51 18   A.      Yes.

12:16:53 19   Q.      But the rider couldn't move forward on Woolley if

12:16:57 20   they were strapped to a chair; right?

12:16:58 21   A.      That's correct.

12:16:59 22   Q.      So, you would just take the chair off; no?

12:17:02 23   A.      You could, then -- now you're -- now you're taking

12:17:07 24   away the essence of Woolley, which is to provide a chair for

12:17:12 25   the rider to -- who might be partially disabled to ride on.

Barry - Direct

12:17:16  1    Q.      Well, so what's the important part of the analysis?

12:17:18  2    What's the essence of Woolley, like you said, or just what

12:17:21  3    Woolley teaches you?

12:17:22  4    A.      Well, Woolley teaches a craft with a chair.

12:17:27  5    Q.      And that's it, that the only thing it teaches?

12:17:29  6    A.      No.  That is the beginning of what it -- that is the

12:17:32  7    essence -- essence of it, is a hydrofoil watercraft with a

12:17:36  8    chair to which the rider is strapped.

12:17:39  9    Q.      And as you just agreed, if you put a motor a Woolley

12:17:42 10    you could take the chair off?

12:17:43 11    A.      If you put a motor on Woolley you could take the

12:17:45 12    chair off.

12:17:46 13    Q.      So somewhere didn't you say that Namanny's motor

12:17:48 14    isn't big enough to power an eFoil?

12:17:50 15    A.      I'm not -- I don't -- no, I don't -- it might be, but

12:17:54 16    it would to -- Namanny's motor, it's not the motor.  It's

12:17:58 17    the battery.  It might be able to power an eFoil for a very

12:18:03 18    short period of time.  The Namanny motor consistent is

12:18:06 19    explicitly designed for short periods of time.

12:18:09 20    Q.      Right?

12:18:10 21    A.      So it might be able to run an eFoil for a short

12:18:14 22    period of time, but it can't provide the functionality of an

12:18:17 23    eFoil of riding half an hour, 20 minutes, an hour and a

12:18:22 24    half, whatever it is that provides a satisfactory craft.

12:18:28 25    Q.      You remember we talked earlier about

Barry - Direct

12:18:31 1    Dr. Triantafyllou's laundry list of design variables for a

12:18:35 2    hydrofoil wing?

12:18:35 3    A.     We did.  Yes.

12:18:36 4               MR. BASANTA:  Can we please bring that up,

12:18:38 5    Slide 59?

12:18:38 6    BY MR. BASANTA:

12:18:39 7    Q.     And one of those variables was power the propulsion

12:18:42 8    system.  You remember that?

12:18:43 9    A.     Yes.

12:18:44 10   Q.     Would that include the size of the motor?

12:18:46 11   A.     Yes, it does.

12:18:47 12   Q.     Would that include -- would that include the size of

12:18:53 13   the battery?

12:18:53 14   A.     No.  No.  The power doesn't power is -- power is

12:18:57 15   power.  It isn't energy.

12:18:59 16   Q.     Power is power, power is not energy?

12:19:02 17   A.     Power is not energy.  Power is energy -- energy to

12:19:05 18   flow divided by time.

12:19:11 19   Q.     Well, let just say for arguments sake you did need to

12:19:13 20   put a bigger motor onto Woolley, or a bigger motor than what

12:19:17 21   Namanny discloses.  If you wanted to put a bigger motor on

12:19:21 22   Woolley than is disclosed in Namanny, would a person of

12:19:24 23   ordinary skill be able to do that?

12:19:27 24   A.     That would result in an unstable craft.

12:19:31 25   Q.     I'm not asking about stability.

925

Barry - Direct

12:19:33 1   A.      Well, we're asking about could you do that?  Yeah,

12:19:36 2   you could do that and it would be -- it would be an

12:19:38 3   unsafe -- unstable craft.

12:19:40 4   Q.      Okay.

12:19:40 5   A.      You could do that.  You could do many things.  You

12:19:42 6   could put an airplane -- you could put an airplane propeller

12:19:46 7   behind him, but...

12:19:47 8   Q.      But in your?

12:19:48 9   A.      You wouldn't -- a person of ordinary -- I presume a

12:19:52 10  person of ordinary skill in the arts would be attempting to

12:19:55 11  build a successful object.  So, not just randomly throwing

12:20:01 12  things together.

12:20:02 13  Q.      Okay.  But my question was:  In your view, a person

12:20:05 14  of ordinary skill in the art would have understood it was

12:20:07 15  just routine optimization to choose the size of the motor

12:20:10 16  that they would need for the application they were using;

12:20:12 17  yes?

12:20:12 18  A.      Well, again, we -- what he said here is power, not

12:20:17 19  energy.

12:20:19 20  Q.      Right.  And you said power related to the motor;

12:20:21 21  right?

12:20:21 22  A.      I'm sorry?

12:20:22 23  Q.      The power relates to the size of the motor?

12:20:24 24  A.      Yes, it does.

12:20:24 25  Q.      Okay.  So my question, again, is:  Do you think that

Barry - Direct

12:20:26  1  it would have been within the skill set of a person of

12:20:30  2  ordinary skill, routine optimization, to properly size a

12:20:33  3  motor to self propel Woolley?

12:20:35  4  A.     They could -- yes.  They could size the motor to

12:20:41  5  properly propel a craft.

12:20:42  6  Q.     Right.  And when you're picking a bigger motor,

12:20:45  7  you're going to need bigger batteries, aren't you?

12:20:47  8  A.     Yes.

12:20:51  9  Q.     And the logical place to put a battery would be in

12:20:54 10  the floatation device.  That's the largest volume on the

12:20:57 11  craft; isn't it?

12:20:57 12  A.     It is the largest volume on the craft, but it's

12:21:00 13  not -- not what -- necessarily what Namanny teaches.

12:21:04 14  Namanny -- the essence of the Namanny device is a small

12:21:09 15  object that can be put onto a craft moved from craft to

12:21:14 16  craft presumably, that is totally self-contained.  And

12:21:18 17  then -- and provides a short period of time -- provides

12:21:24 18  power for just a short period of time.

12:21:26 19         So, the essence of Namanny is not reasonable to

12:21:31 20  combine to make a -- with Woolley or any other hydrofoil

12:21:38 21  craft.  It's essence is completely different.

12:21:42 22  Q.     Its essence.

12:21:43 23  A.     The essence -- the purpose of the craft.

12:21:46 24         Yeah.  The purpose of -- the purpose of the

12:21:49 25  invention is a portable little object you can put on

Barry - Direct

12:21:52  1   whatever boat -- whatever craft you want and drive it around

12:21:54  2   for a few minute.

12:21:55  3   Q.     But isn't another aspect of what Woolley did just

12:21:57  4   sticking a motor on a surfboard?

12:21:59  5   A.     I'm sorry.  Yes.  It's a motor on a surfboard.  It's

12:22:03  6   not a --

12:22:04  7   Q.     Yeah.  Thank you, Mr. Barry.

12:22:06  8          So you think the asserted -- I'm switching gears

12:22:16  9   again.  I'm going to talk about the patents now for a

12:22:18 10   moment.  Okay?

12:22:19 11   A.     Mm-hmm.

12:22:19 12   Q.     Okay, Mr. Barry?

12:22:20 13   A.     Oh, yes.  Go ahead.

12:22:22 14   Q.     So you think that the asserted patents enable a

12:22:24 15   person to make and use a claimed invention; right?

12:22:26 16   A.     Yes, the '044 and '659 patents you're speaking of

12:22:30 17   now.

12:22:31 18   Q.     I'm speaking of the patents that we're here for, yes.

12:22:33 19   A.     Well, it's '044 and '659 -- we are -- we've got two

12:22:36 20   patents you brought up as well.  We are talking about the

12:22:38 21   '044 and '659 patents; right?  You asked this question?

12:22:42 22   Q.     Are you saying there's a difference between the two

12:22:44 23   of them with respect to enablement?

12:22:46 24   A.     No.  No, sir.  I am -- you are -- I just wanted to be

12:22:49 25   clear that you were asking me -- you just said "the

928

Barry - Direct

12:22:52  1    patents."

12:22:53  2    Q.    The patents that we're here for -- that we're all

12:22:56  3    here --

12:22:56  4    A.    The patents that we are here for, '044 and '659.  I

12:22:59  5    just want to be absolutely clear about what you're saying,

12:23:02  6    sir.

12:23:02  7    Q.    Okay.  Okay.  So you think the patents discuss the

12:23:07  8    characteristics of the hydrofoil, including the size, shape,

12:23:10  9    location and necessary requirements for the hydrofoil to be

12:23:12 10    stable?

12:23:13 11    A.    Yes, sir.

12:23:14 12    Q.    So it's got a requirement that it be stable, but you

12:23:17 13    think it goes further than that requirement.  You think it

12:23:20 14    teaches you how to do it?

12:23:21 15    A.    Yes, sir.

12:23:22 16    Q.    Okay.  But the only passages of the patents that you

12:23:22 17    cite --

12:23:27 18         MR. BASANTA:  Can we please bring up the Barry

12:23:30 19    rebuttal report?  Paragraph 76 should be the -- it's PTX

12:23:35 20    105.30.

12:23:35 21    BY MR. BASANTA:

12:23:37 22    Q.    And when you make that statement in your report -- it

12:23:43 23    will come up in a second.  It's paragraph 76.  All right.

12:23:55 24    Just give me a second.  I've got to find this sentence here.

12:24:01 25         Right there.  Just one, two, three, four -- the

Barry - Direct

12:24:04   1    fifth line up from the bottom.

12:24:06   2              It says -- or sixth line up.  It says,

12:24:10   3    "Moreover."  You cite to certain passages, Column 3, line 57

12:24:17   4    to Column 4, line 3.

12:24:19   5              Do you see that?

12:24:19   6    A.    Yes, sir.

12:24:20   7    Q.    Then, again, you cite Column 5, line 36 through

12:24:25   8    Column 7, Line 6.

12:24:27   9    A.    Yes.

12:24:27  10    Q.    And that's where you say the patents discuss the

12:24:30  11    characteristics of the hydrofoil including size, shape,

12:24:32  12    location, and the necessary requirement for the hydrofoil to

12:24:35  13    be stable.

12:24:37  14    A.    I -- that is where it starts, yes, sir.

12:24:40  15    Q.    Okay.  So let's look at those passages from the

12:24:43  16    patent.  I'll bring -- I'll bring up one so we can see it.

12:24:47  17              MR. BASANTA:  Slide 42, please.

12:24:47  18    BY MR. BASANTA:

12:25:00  19    Q.    So this passage here is talking about -- take your

12:25:03  20    time and read this, Mr. Barry, please.

12:25:04  21    A.    Yes, sir.

12:25:05  22    Q.    This is talking about airfoil design, planform design

12:25:07  23    and span-wise twist distribution?

12:25:09  24    A.    Yes, sir.

12:25:09  25    Q.    Do you see that?

Barry - Direct

12:25:10  1    A.      Yes, sir.

12:25:10  2    Q.      And you agreed that those things are not new?

12:25:12  3    A.      I'm sorry?

12:25:14  4    Q.      You've agreed that those things are not new?

12:25:16  5    A.      Yes, sir.

12:25:19  6    Q.      And you'll agree that this passage also talks about

12:25:22  7    hydrofoil wings being generally in the range of 1 to 4 feet.

12:25:25  8    It's about the middle of the top excerpt.

12:25:28  9    A.      Yes.

12:25:30 10    Q.      Hydrofoil wings being 1 to 4 feet wide is not new;

12:25:33 11    right?

12:25:33 12    A.      Not new.

12:25:35 13    Q.      Correct.  That's my question.

12:25:36 14    A.      Thank you.  I hear you sort of stopping at the end

12:25:40 15    and --

12:25:40 16    Q.      I'm sorry.

12:25:41 17    A.      I hear my wife the same way.  I'm sorry.

12:25:43 18    Q.      Okay.  My question, though, is you agree that

12:25:45 19    hydrofoil wings that are 1 to 4 feet wide are not new?

12:25:48 20    A.      No.  No, they're not.  They're not new.

12:25:51 21    Q.      Okay.  And you agree that the passage here also talks

12:25:54 22    about canards and horizontal tail wings?

12:25:56 23    A.      It does.

12:25:57 24    Q.      Those things are not new?

12:25:58 25    A.      No.

Barry - Direct

12:26:02  1    Q.      Let's look at the second citation that you had from

12:26:03  2    your report.

12:26:03  3                MR. BASANTA:  Can you please bring up Slide 43?

12:26:03  4    BY MR. BASANTA:

12:26:09  5    Q.      And you see that this passage here is talking about

12:26:11  6    Figure 8.  Do you see that?

12:26:12  7    A.      Yes, I see that.

12:26:20  8                MR. BASANTA:  Can you bring up Slide 44?

12:26:20  9    BY MR. BASANTA:

12:26:24 10    Q.      Is anything in Figure 8 new?

12:26:26 11    A.      No.  No.  Not necessarily, no.

12:26:28 12    Q.      So let's look at the next paragraph, starting at

12:26:31 13    column 5, line 55.

12:26:33 14                MR. BASANTA:  This is Slide 45, Carol.

12:26:36 15    BY MR. BASANTA:

12:26:36 16    Q.      It says here, "The preferred embodiments of the

12:26:38 17    present invention provide a hydrofoil watercraft with a

12:26:41 18    fixed hydrofoil connected to a floatation board by one or

12:26:44 19    more struts with the fixed hydrofoil having no movable or

12:26:48 20    adjustable surfaces."

12:26:49 21                Do you see that?

12:26:50 22    A.      Yes, sir.

12:26:51 23    Q.      And those are just the physical parts of an eFoil,

12:26:54 24    aren't they?

12:26:54 25    A.      Yes.

Barry - Direct

12:26:55 1    Q.    And MHL already admitted that the Evolo has all of

12:26:58 2    those physical parts; right?

12:26:59 3    A.    Yes.

12:27:01 4    Q.    The next sentence in this paragraph says, "No movable

12:27:04 5    hydrofoil is provided, but secondary hydrofoils on one or

12:27:07 6    more struts may be included."

12:27:09 7          Do you see that?

12:27:09 8    A.    Yes, sir.

12:27:10 9    Q.    Again, that's just physical parts, yes?

12:27:12 10   A.    I'm sorry.  That's just -- repeat your -- I'm sorry.

12:27:14 11   Q.    Those are just physical components; right?

12:27:16 12   A.    Yes.

12:27:18 13   Q.    And, again, MHL agrees that the Evolo has all that?

12:27:21 14   A.    Yes.

12:27:25 15   Q.    The next sentence in this paragraph says,

12:27:26 16   "Additionally no movable steering system is provided as the

12:27:30 17   watercraft is maneuvered by weight shifts."

12:27:32 18         Physical parts again, yes?

12:27:34 19   A.    Yes.

12:27:36 20   Q.    MHL agrees the Evolo Report has?

12:27:37 21   A.    I believe that's been stipulated, yes.

12:27:39 22   Q.    Okay.  So there's nothing new here?

12:27:40 23   A.    I'm sorry?  There's nothing new here?

12:27:45 24   Q.    That's my question.  There's nothing this new here;

12:27:48 25   right?

Barry - Direct

12:27:48  1   A.      Well, I don't know.  The specific stipulation, I

12:27:52  2   believe, is that they're not going to -- they're not going

12:27:54  3   to argue about this.  I don't know if that means the same as

12:27:57  4   nothing new.

12:27:59  5   Q.      But you're an expert in the art, aren't you?

12:28:01  6   A.      I'm an expert in the art.

12:28:02  7   Q.      So I'm asking you:  Is any of that new --

12:28:04  8   A.      No.

12:28:05  9   Q.      -- from 2013?

12:28:06 10   A.      No, that is not new.

12:28:09 11           MR. BASANTA:  Go to Slide 46, please.

12:28:09 12   BY MR. BASANTA:

12:28:10 13   Q.      This is another passage from the thing that you

12:28:12 14   quoted.

12:28:13 15           First two sentences say that "The invention

12:28:18 16   exploits passive stability to obviate the need for

12:28:21 17   mechanisms or active control systems to provide stability.

12:28:24 18   This passive stability allows the watercraft to be

12:28:26 19   controlled by weight shift rather than by mechanical

12:28:29 20   systems."

12:28:29 21           Do you see that?

12:28:30 22   A.      Yes.

12:28:31 23   Q.      So the patent's hearsay that you should aim for

12:28:34 24   passive stability; is that fair to say?

12:28:37 25   A.      It does say that -- well, it says what it says.

934

Barry - Direct

12:28:41 1    Q.    And I'm asking you:  Is it fair to say that the
12:28:43 2    patents are telling you that you should aim for passive
12:28:46 3    stability?
12:28:46 4    A.    The patents actually tell you how to achieve passive
12:28:49 5    stability.
12:28:50 6    Q.    That's not my question, Mr. Barry.  I'm just asking
12:28:52 7    you:  Are the patents telling you that you should aim for
12:28:55 8    passive stability?
12:28:55 9    A.    The passive -- I don't really understand the
12:28:58 10   engineering aspect of aim for.  Passive stability is
12:29:03 11   required by this patent.
12:29:05 12   Q.    Would you understand the word "aim" to be similar to
12:29:07 13   the word "goal"?
12:29:08 14   A.    Well, it doesn't say "aim."  It says "achieve."  The
12:29:13 15   past -- the patent requires that the outcome be achieved,
12:29:17 16   not that you want -- not that you express a desire to want
12:29:19 17   it.
12:29:20 18   Q.    Okay.  But this statement here is really just the
12:29:22 19   goal?
12:29:23 20   A.    What?
12:29:24 21   Q.    This statement here is really just talking about the
12:29:27 22   goal of passive stability.
12:29:29 23   A.    Yes.  It -- this -- well, it explains what the
12:29:34 24   passive stability required by the invention allows.  It
12:29:38 25   doesn't express that it should be a goal.  It tells you what

Barry - Direct

12:29:42 1    the passive stability of the invention produces.

12:29:51 2    Q.    Okay.  So the rest of this passage in the second

12:29:54 3    passage that you record in your report, the rest of this

12:29:57 4    passage was all -- is all from Column 6 and a little bit of

12:30:00 5    Column 7.  That's what we're sort of talking about now.

12:30:03 6          And this -- this has to be where the magic is in

12:30:07 7    this patent, right, Mr. Barry, Column 6 and a little bit of

12:30:10 8    Column 7?

12:30:10 9    A.    This is where some of the teaching is in the patent

12:30:13 10   yes, sir.

12:30:13 11   Q.    Some of the teaching?

12:30:14 12   A.    Some of the teaching.

12:30:15 13   Q.    Some of the teaching about stability?

12:30:17 14   A.    Some of the teaching the teaching about stability.

12:30:19 15   The patent also teaches about motors and such.

12:30:22 16   Q.    Okay.  But we -- really we're talking about

12:30:23 17   stability; right?

12:30:24 18   A.    Yes, sir.

12:30:24 19   Q.    Okay.  So the magic about stability is in Column 6?

12:30:27 20   A.    Column 6 and part of Column 7.

12:30:29 21   Q.    That's where the magic is?

12:30:30 22   A.    That's where the teaching of how to achieve it is.

12:30:34 23   Q.    Okay.  So Column 6, Column 7, that's what's going to

12:30:37 24   give the reader an understanding of how to make a passively

12:30:41 25   stable eFoil?

Barry - Direct

12:30:41  1   A.      Actually as -- as per the opening, it begins -- well,

12:30:46  2   actually -- well, it begins even before Column -- before

12:30:48  3   the -- the Column 5, as you've just pointed out, which

12:30:53  4   discusses the figures.  But the teachings is -- essentially

12:30:57  5   runs through -- runs from what is Column 3 through the

12:31:01  6   beginning at least of Column 7.  And so, the whole -- the

12:31:08  7   whole -- that whole portion explains in a successive way how

12:31:15  8   to achieve a passively stable weight-controlled craft.

12:31:19  9   Q.      So something outside of Column 6 is --

12:31:22 10   A.      You, sir, just brought up Column 4 which discusses

12:31:26 11   various configurations.

12:31:29 12   Q.      Mr. Barry, I was talking about Column 6.

12:31:31 13   A.      Yes, I understand you're talking about Column 6.

12:31:33 14   Column 6 is part of the teachings of how to achieve

12:31:36 15   stability.

12:31:36 16            MR. BASANTA:  Can we please play clip B.

12:31:39 17            (Video playing.)

12:31:45 18   Q.      If and when you review the '044 patents, what

12:31:49 19   information is in here that gives the reader a -- you know,

12:31:58 20   an understanding of how to make the craft stable?

12:32:02 21   A.      Well, it -- the teaching -- are we talking about the

12:32:05 22   teaching now, the specification?

12:32:07 23   Q.      The specification of the patent, correct.

12:32:09 24   A.      Yes.

12:32:11 25   Q.      That's in Column 6, right?

Barry - Direct

12:32:13  1    A.      Yes.

12:32:14  2    Q.      Well, no, anything else in the patent other than that

12:32:18  3    that helps a -- the reader understand how to build a stable

12:32:28  4    hydrofoil watercraft?

12:32:30  5    A.      Well, that's -- that's what's necessary to build a

12:32:36  6    stable hydrofoil watercraft.

12:32:38  7    Q.      Right.  The information in Column 6, that's also in

12:32:41  8    the authoritative textbooks?

12:32:43  9    A.      That's right.

12:32:44 10            (Conclusion of video.)

12:32:45 11    BY MR. BASANTA:

12:32:46 12    Q.      Okay.  So, there you said the things that you're

12:32:48 13    teaching, the patent teaches, are in Column 6?

12:32:50 14    A.      Well, that's correct.  In order to assure that the

12:32:54 15    craft is stable, the teachings of Column 6 are the key.

12:33:00 16    However, counselor, well, I guess Robert can bring that up.

12:33:04 17    Q.      Well, but what you said there you didn't mention

12:33:06 18    Column 3 there; right?

12:33:07 19    A.      No.  No.

12:33:08 20    Q.      Okay.  And you mentioned something about text --

12:33:12 21    counsel or you mentioned something about textbooks in that

12:33:15 22    clip, do you remember that?

12:33:16 23    A.      Yes.

12:33:16 24    Q.      And one of the authoritative textbooks with regard to

12:33:19 25    flight principles that you've applied and that

Barry - Direct

12:33:21  1    Dr. Triantafyllou applied is called Introduction to Flight

12:33:24  2    by John Anderson; right?

12:33:25  3    A.     Well, that is one of the authoritative textbooks

12:33:28  4    that's been considered.  I believe I was using Coffey

12:33:31  5    (phonetic).

12:33:32  6    Q.     Are you saying you're not relying --

12:33:34  7    A.     I have -- I have at least seven textbooks that

12:33:40  8    discuss flight stability in addition to a number of videos

12:33:47  9    on using AVL, et cetera.  So, but Anderson has the -- has

12:33:53 10    teachings on flight stability.  Has teachings on trimmable

12:33:59 11    pitch stability.

12:34:03 12    Q.     Okay.  And you've called John Anderson's Introduction

12:34:07 13    to Flight an authoritative textbook, you have said that

12:34:10 14    yourself?

12:34:10 15    A.     It is one of a number, perhaps a couple dozen

12:34:14 16    authoritative textbooks, yes.

12:34:16 17    Q.     Okay.  And that textbook by Anderson is teaching the

12:34:19 18    same thing about stability that the patents teach about

12:34:22 19    stability; right?

12:34:22 20    A.     Yes.

12:34:26 21    Q.     And Anderson was published decades ago in the 1960s;

12:34:30 22    right?

12:34:30 23    A.     Well the version I have I think is '85, yes.  I'd be

12:34:35 24    willing to believe.

12:34:36 25    Q.     I won't bring that clip up.  All right.  So it's fair

Barry - Direct

12:34:38 1    to say then that the patents do not teach stability in any

12:34:40 2    more detail than Anderson does and that stability was

12:34:43 3    already very well known by the time this patent was filed;

12:34:47 4    right?

12:34:47 5    A.     Yes.

12:34:53 6    Q.     All right.  Mr. Barry, so we just looked at all the

12:34:55 7    parts of patent spec that you said enabled a person to make

12:35:00 8    a passively stable eFoil.

12:35:02 9    A.     Yes.

12:35:02 10   Q.     But all of it was already known because it was all

12:35:05 11   already in textbooks?

12:35:07 12   A.     Each of the pieces was already known, yes, sir.

12:35:11 13   Q.     But everything, each of those pieces that is in the

12:35:14 14   patent Column 6 was already in textbooks for decades?

12:35:18 15   A.     In the -- in parts of patent in parts of Column 6,

12:35:24 16   yes.

12:35:25 17   Q.     Mr. Barry, you keep looking over to my right.  Who

12:35:28 18   are you looking at?

12:35:29 19   A.     I'm just -- I am not really, I'm just looking around.

12:35:32 20   I'm not.

12:35:33 21   Q.     No, you really are.  I'm seeing you do it.

12:35:35 22   A.     Oh, yeah.  Well, I'm not.

12:35:36 23   Q.     What are you looking at?

12:35:38 24   A.     I am not getting any signals from him.

12:35:40 25   Q.     What's that?

Barry - Direct

12:35:40  1    A.      I'm not getting any signals from him.  I'm also

12:35:46  2    trying to look at the jury, but.

12:35:49  3    Q.      The Jury is much further that way, Mr. Barry.

12:35:51  4    A.      I know that.

12:35:52  5    Q.      Okay.  All right.  So everything in the patents is in

12:35:55  6    textbooks, but at some point you gave the opinion that using

12:35:58  7    aircraft flight dynamics technology in the area of marine

12:36:02  8    hydrofoils had not been done before the patent did it;

12:36:04  9    right?

12:36:05 10    A.      That's correct.  The using -- using the teachings of

12:36:11 11    flight dynamics is new to the marine hydrofoil field.

12:36:17 12    Q.      As of 2013 when the patent was filed?

12:36:19 13    A.      As of 2013.

12:36:19 14    Q.      And that's still your view?

12:36:21 15    A.      No, it's not -- it's known now.

12:36:25 16    Q.      Mr. Barry, my question is:  You still have the view

12:36:27 17    that using aircraft flight dynamics in the area of marine

12:36:35 18    hydrofoils had not been done before October of 2013?

12:36:40 19    A.      Using the teachings of -- of this -- of flight

12:36:44 20    dynamics as regard longitudinal and, excuse me, using the

12:36:50 21    teachings specifically cited in here was not done in marine

12:36:55 22    hydrofoils.  Marine hydrofoils at that time and up to the

12:36:59 23    present used either automatic controls or surface piercing

12:37:04 24    elements.

12:37:05 25    Q.      Okay.  And my question though is:  That opinion you

941

Barry - Direct

12:37:07 1    just expressed, you have that opinion as you sit here?

12:37:11 2    A.    Yes.

12:37:11 3    Q.    But didn't the Evolo team apply airplane stability

12:37:15 4    technology into marine hydrofoils?

12:37:15 5    A.    They cited some of the -- some of the criteria, but

12:37:21 6    actually applying something requires running the numbers.

12:37:25 7    They did not run the numbers.  As an engineer I could pile

12:37:30 8    equations on top of equations on top of equations and if it

12:37:35 9    were an exam I'd get partial credit.  But the -- to get the

12:37:40 10   ship to float you have to run the numbers.

12:37:43 11   Q.    Okay.  So the Evolo team as you recognized, I

12:37:46 12   believe, relied on textbooks by Anderson, the same

12:37:49 13   Dr. Anderson that we were talking about before?

12:37:50 14   A.    They cited it.

12:37:52 15   Q.    The team relied on textbooks by Anderson in the

12:37:55 16   report, didn't they?

12:37:56 17   A.    I'm sorry, they relied on.

12:37:59 18   Q.    The Evolo team relied on textbooks published by

12:38:02 19   Dr. Anderson in the report, the Evolo report itself; yes?

12:38:07 20   A.    They refer -- they refer to them and copied some

12:38:10 21   equations out of them.

12:38:12 22   Q.    And so the Evolo team had all the information about

12:38:14 23   stability, and let me emphasize this, the Evolo team had all

12:38:18 24   the information about stability -- about stability that's in

12:38:24 25   the patents; right, Mr. Barry?

12:38:26  1    A.      They, yes, they did.  They would have had all the

12:38:31  2    information, I believe, that's in the -- in that section of

12:38:33  3    the patent.

12:38:34  4    Q.      Okay.

12:38:35  5    A.      That we're discussing.

12:38:43  6    Q.      Just give me a second, Mr. Barry.  Sorry about that,

12:39:00  7    Mr. Barry.

12:39:00  8            So you were talking a little bit about delta

12:39:09  9    wings and flat plates.  Do you remember that in our opening

12:39:14 10    comments?

12:39:15 11    A.      Yes.

12:39:16 12    Q.      And you said that in your reports that the Evolo

12:39:20 13    hydrofoils were flat plates; right?

12:39:21 14    A.      It is.  Yes, I said that.

12:39:24 15    Q.      Okay.  And you've also said that the Evolo's

12:39:27 16    hydrofoils could not achieve stability based on being flat

12:39:30 17    plates alone?

12:39:31 18    A.      Being flat plates is deleterious to stability, yes.

12:39:36 19    Q.      Okay.  But you said that it could not achieve

12:39:39 20    stability simply from being a flat plate; right?

12:39:42 21    A.      That's correct.  Yes.

12:39:44 22    Q.      Okay.

12:39:44 23    A.      That's what I said.

12:39:47 24    Q.      Okay.  And you recall that Dr. Triantafyllou called

12:39:50 25    your arguments about delta wings erroneous.  Do you remember

Barry - Direct

12:39:53  1    that?

12:39:53  2    A.    I recall him saying so, yes.

12:39:55  3    Q.    Okay.  In fact, he said more or less, I'm

12:39:58  4    paraphrasing, that whatever you said about delta wings the

12:40:02  5    opposite is true.  Remember him saying something like that?

12:40:04  6    A.    I think yes, I remember -- I remember what he said.

12:40:06  7    Q.    Okay.  Can we please bring up Dr. Triantafyllou's

12:40:10  8    reply report?

12:40:11  9    A.    I'm sorry, you swallowed your.

12:40:13 10    Q.    I'm talking to my team?

12:40:14 11    A.    I'm sorry.

12:40:15 12    Q.    Talking to my team?

12:40:16 13    A.    Oh, sorry.

12:40:20 14    Q.    You recognize this document?

12:40:21 15    A.    Yes, I do.

12:40:22 16    Q.    Can you please flip to the figure?  The figure,

12:40:36 17    please.

12:40:37 18              And you also had some comments about sweep

12:40:44 19    angle, you remember that?

12:40:45 20    A.    Yes, sir.

12:40:46 21    Q.    And you said, you were reading from the patent, you

12:40:48 22    said something to the effect of sweep angles greater than

12:40:53 23    60 degrees will not lead to a reliable design or reliable

12:40:58 24    results?

12:40:58 25    A.    Yes.

Barry - Direct

12:41:00  1    Q.    But the patents don't talk whatsoever about delta

12:41:05  2    wings, do they?

12:41:05  3    A.    No.  That is -- that would be the definition of a

12:41:08  4    delta wing or a swept wing.  A delta wing has a sweep angle.

12:41:13  5    Q.    But don't delta wings or can't delta wings operate

12:41:17  6    with sweep angles of 60 degrees as you see on this figure in

12:41:22  7    front of us?

12:41:23  8    A.    Of course they can.  If you're building a supersonic

12:41:25  9    aircraft you need them.

12:41:26 10    Q.    You're talking about the fighter jet in the picture

12:41:29 11    next to it?

12:41:29 12    A.    Or the Concorde.  Interestingly, if you notice, you

12:41:32 13    can even see the rounded nose of the fighter -- of the wing

12:41:35 14    on the fighter jet in this view.

12:41:39 15    Q.    What do we see?

12:41:40 16    A.    If you look at this -- at this picture you can see

12:41:43 17    that the wing on the -- delta wing on the fighter aircraft

12:41:50 18    has a rounded nose.  It's not a flat plate.

12:41:56 19    Q.    So you're saying that it's undesirable in a delta

12:42:00 20    wing to have it be flat?

12:42:02 21    A.    No, I just -- I just said -- what am I saying right

12:42:08 22    now?  I'm saying that the if the aircraft has a rounded

12:42:12 23    nose, that it is not a flat plate.  That's all I said, sir.

12:42:17 24    Q.    And now I'm asking you a follow-up question, which

12:42:19 25    is:  Are you saying it's undesirable for a delta wing to

Barry - Direct

12:42:22  1    have a sharp edge?

12:42:23  2    A.      No.  But it -- you -- the combination of the delta

12:42:30  3    wing and all the other aspects of the aircraft, you'll

12:42:32  4    notice also this aircraft has movable appendages to

12:42:37  5    counteract the effects of the flap of the delta wing.

12:42:43  6    Q.      Can we have the other image with the sharp edge,

12:42:46  7    please?  Can you blow up that image, please?

12:42:49  8            So this is an image out of John Anderson's

12:42:54  9    textbook, the one that you said is authoritative; right,

12:42:57 10    Mr. Barry?

12:42:58 11    A.      Yes, I actually believe this may have originally

12:43:02 12    showed up in Hoerner's book Fluid-Dynamic Lift.

12:43:08 13    Q.      Okay.  That's a delta wing, isn't it?

12:43:10 14    A.      That is a delta wing.

12:43:11 15    Q.      That delta wing has a sharp edge, doesn't it?

12:43:14 16    A.      It does.

12:43:14 17    Q.      His delta wing produces lift, doesn't it?

12:43:17 18    A.      It does.

12:43:17 19    Q.      His delta wing can achieve stability, can't it?

12:43:20 20    A.      It depends.  It's -- a delta wing is hard to achieve

12:43:25 21    stability with.  And you probably would need a movable

12:43:28 22    appendage to have adequate authority to be able -- to be

12:43:32 23    able to counteract some of the destabilizing effects of a

12:43:36 24    delta wing.

12:43:37 25            THE COURT:  All right.  So we're going to break

Barry - Direct

| | | |
|---|---|---|
| 12:43:39 | 1 | for lunch.  Can we take the jury out? |
| 12:43:46 | 2 | (Jury leaving the courtroom.) |
| 12:44:10 | 3 | THE COURT:  All right.  I think a half hour is |
| 12:44:14 | 4 | enough here.  And I suggest you figure out how to end this |
| 12:44:18 | 5 | examination.  We'll be in recess. |
| 12:44:21 | 6 | DEPUTY CLERK:  All rise. |
| 12:44:23 | 7 | (Recess was taken.) |
| 01:14:05 | 8 | DEPUTY CLERK:  All rise. |
| 01:14:09 | 9 | THE COURT:  All right.  Let's be seated. |
| 01:14:11 | 10 | Is everybody back?  Not quite. |
| 01:14:14 | 11 | MR. MURRELL:  I think they just went to get |
| 01:14:16 | 12 | them. |
| 01:14:16 | 13 | THE COURT:  What? |
| 01:14:17 | 14 | MR. MURRELL:  I think they just went to get |
| 01:14:18 | 15 | them. |
| 01:14:19 | 16 | THE COURT:  To get? |
| 01:14:20 | 17 | MR. MURRELL:  Mr. Basanta and other members. |
| 01:14:23 | 18 | MR. THEUERKAUF:  All the counsel. |
| 01:14:24 | 19 | THE COURT:  Well, in any event, we're not going |
| 01:14:27 | 20 | to start without them. |
| 01:14:27 | 21 | MR. BASANTA:  I'm sorry, Your Honor. |
| 01:14:37 | 22 | THE COURT:  It's all right. |
| 01:14:48 | 23 | All right.  We're ready to go? |
| 01:14:49 | 24 | MR. BASANTA:  I am, Your Honor. |
| 01:14:50 | 25 | THE COURT:  All right.  Let's get the jury. |

947

Barry - Direct

01:14:50 1              (Jury enters the courtroom.)

01:15:17 2              THE COURT:  All right.  Members of the jury,

01:15:18 3      welcome back.  Everyone may be seated.

01:15:21 4              Mr. Basanta.

01:15:22 5      BY MR. BASANTA:

01:15:23 6      Q.    Hi, Mr. Barry.  I'm just going to wrap -- wrap this

01:15:25 7      up.  I have a question or two.

01:15:27 8              So, you did a lot of opining about flat plate

01:15:31 9      airfoils and the likes.  We just had a long discussion about

01:15:33 10     that.

01:15:33 11     A.    Move closer to the microphone, please.  Sorry.

01:15:38 12     Q.    You've given some opinions about the flat plate

01:15:39 13     airfoils and we had a long discussion about flat plate

01:15:42 14     airfoils.

01:15:42 15             Do you recall?

01:15:42 16     A.    Yes, I have.

01:15:43 17     Q.    But you don't have any real scientific understanding

01:15:46 18     of what a flat plate airfoil even is.  Do you, Mr. Barry?

01:15:49 19     A.    I do.

01:15:50 20             MR. BASANTA:  Can you please play Clip N as in

01:15:52 21     Nancy.

01:15:53 22             (Video playing.)

01:15:57 23     Q.    What is a flat plate airfoil?

01:16:03 24     A.    It's basically a piece of flat plate that's flat.  I

01:16:08 25     mean, a flat plate is a flat plate.  I'm not sure how you

Barry - Redirect

01:16:15  1    define beyond saying it's flat and it's a plate.

01:16:17  2    Q.    Well, how about a planform.  Is its planform

01:16:21  3    rectangular?

01:16:21  4    A.    No, the flat plate defines it as being a flat plate.

01:16:25  5    And its planform is not -- is not the same the same as its

01:16:30  6    section.

01:16:31  7    Q.    And is the flat plate triangular?

01:16:34  8    A.    The flat plate can be a flat plate.  And you could --

01:16:39  9    it could be in the shape -- it could be in the shape of a

01:16:42 10    little rubber ducky.

01:16:45 11          MR. BASANTA:  No further questions.

01:16:47 12          THE COURT:  All right.  Mr. Theuerkauf?

01:16:52 13                     REDIRECT EXAMINATION

01:16:53 14    BY MR. THEUERKAUF:

01:16:54 15    Q.    So, earlier when Mr. Basanta started, he asked you

01:17:03 16    about -- he put up the definition of -- or he put up the

01:17:07 17    definition that was in the Evolo Report, then he put up the

01:17:11 18    definition that was provided here in this Court for

01:17:14 19    stability.

01:17:16 20          What's your opinion as to the differences

01:17:18 21    between what Evolo is teaching -- or what is disclosed in

01:17:22 22    Evolo and what's happening here in this Court with respect

01:17:25 23    to stability?

01:17:25 24    A.    Well, the key is that the Evolo Report talks about --

01:17:31 25    throws up some equations but it never actually uses them or

Barry - Redirect

01:17:36  1    says how to get to get to them.  It's -- puts up the same

01:17:43  2    criteria but never actually does anything with them or says

01:17:46  3    how to -- what -- what you should do to your hydrofoils to

01:17:51  4    get there.

01:17:52  5    Q.    Okay.  And that's important because if you don't know

01:17:56  6    what to do with your hydrofoils, how are you going achieve

01:18:00  7    stability?

01:18:00  8    A.    That's correct.  You have to -- you have to come

01:18:04  9    up -- you have to understand something about the airfoil

01:18:10 10    shape in planform and cross section sweep and so on.  Then,

01:18:16 11    you have to understand that -- the same thing for the aft

01:18:21 12    tail, if it's present.  You have to -- and then you have to

01:18:24 13    understand how far apart they need to be.  You have to

01:18:28 14    understand what the center of gravity is.  You have to

01:18:31 15    understand what Dr. Triantafyllou called a dihedral angle,

01:18:35 16    you can't just make it any angle.  And you have to get the

01:18:37 17    whole thing to balance and you have to run the calculations.

01:18:40 18          It's very simple.  If Mr. Theuerkauf and myself

01:18:43 19    got on a teeter-totter, even though we're pushing in the

01:18:47 20    right direction to get balance, it wouldn't balance.

01:18:50 21    Because I'm heavier by about 100 pounds than he is.  You

01:18:54 22    have to run the numbers to get the balance.

01:18:57 23    Q.    And so, I believe you had mentioned in your report

01:19:00 24    that the stability sort of discussion in Evolo was

01:19:09 25    ultimately, in your mind, a discussion of equilibrium.

Barry - Redirect

01:19:12   1           Can you explain that and what the difference is?

01:19:14   2   A.     It is at best equilibrium.  The discussion they

01:19:17   3   mention talks about -- does some things with the rate ratios

01:19:25   4   of the plates, which makes some assumptions, and then it

01:19:32   5   says that based on that in order to balance you'd have to be

01:19:36   6   at a certain -- I believe it's .55 meters forward or some

01:19:41   7   place.  But it never figures out that in order that the

01:19:47   8   craft be stable, not only does it have to balance but it has

01:19:51   9   to have the various components, the airfoil, part of the

01:19:59  10   wing tail, principally set up so that when you go -- you're

01:20:05  11   disturbed up, they push down.  And when you're disturbed

01:20:07  12   down, they push up.

01:20:09  13   Q.     Okay.  And the report that both you and

01:20:14  14   Dr. Triantafyllou had to review was a machine translation;

01:20:18  15   correct?

01:20:18  16   A.     The one I initially -- yeah, the one that I've seen

01:20:21  17   and went into my report, that's correct.

01:20:23  18   Q.     And that was true for Dr. Triantafyllou, too; right?

01:20:26  19   A.     I believe so.  Yes, sir.

01:20:27  20   Q.     Okay.  And then Mr. Basanta was showing you some

01:20:31  21   excerpts out of the Evolo Report earlier and it was some

01:20:36  22   descriptions about some of the experiments.

01:20:38  23           Do you recall that?

01:20:39  24   A.     Yes, sir.

01:20:41  25   Q.     And it -- one of them was talking about having 30 to

Barry - Redirect

01:20:45  1    40 seconds of flying time.

01:20:47  2            Do you recall that?

01:20:47  3    A.     Yes, sir.

01:20:48  4    Q.     Okay.  And they referred to the X7 and X8 prototypes.

01:20:54  5            Do you recall that?

01:20:55  6    A.     Yes, sir.

01:20:55  7    Q.     All right.  Were those X7 or X8 prototypes

01:21:01  8    self-propelled?

01:21:02  9    A.     No, they were towed.

01:21:04 10    Q.     Okay.  And what significance does that have?

01:21:07 11    A.     Well, a tow rope, even one down low, provides a

01:21:11 12    significant amount of stability.  For one thing, the -- when

01:21:18 13    you tow a -- when you pull a little red with wagon from the

01:21:22 14    front, it's stable in directionality.

01:21:26 15            But if you were to turn around and push it from

01:21:28 16    the back, even though they're in the same line, it would

01:21:31 17    probably diverge.  It would try this also.  Same thing with

01:21:35 18    a grocery cart, if you get a grocery cart that works right.

01:21:40 19            So, the tow rope pulls at a -- at a -- basically

01:21:46 20    a point that's fixed in space.  And so, the craft has to

01:21:49 21    follow it.  The other thing is the tow rope is -- the tow

01:21:55 22    rope's motion is suppressed by being in water.  It's

01:21:59 23    surrounded by water and water is heavy to move.  You can't

01:22:01 24    jump rope in a swimming pool.  So the tow rope provides an

01:22:05 25    additional stabilizing force by being under water.

Barry - Redirect

01:22:09 1    Q.     And because a craft comes out of the water -- well,

01:22:14 2    let me ask it this way:  Is lift the same thing as

01:22:17 3    stability?

01:22:17 4    A.     No.

01:22:19 5    Q.     And I recall Dr. Triantafyllou and Mr. Basanta asking

01:22:22 6    you a lot of questions about achieving lift; right?

01:22:25 7    A.     Yes.

01:22:26 8    Q.     But lift doesn't ensure stability; right?

01:22:29 9    A.     No, it doesn't.

01:22:29 10   Q.     And so simply because a craft can come up off the

01:22:33 11   water or out of the water, it doesn't mean it's stable; is

01:22:35 12   that right?

01:22:36 13   A.     No.

01:22:42 14          MR. THEUERKAUF:  I'd like to go to Page 62 of

01:22:44 15   the Evolo Report.

01:22:44 16   BY MR. BASANTA:

01:22:48 17   Q.     And so, you recall seeing this image?

01:22:51 18   A.     Yes, I do.

01:22:53 19   Q.     Okay.  And I believe Dr. Triantafyllou was looking at

01:22:56 20   this image and this is where he was talking about the wings

01:22:59 21   being angled; right?  And because the wings were angled, I

01:23:03 22   believe his testimony was, well, it's achieved stability.

01:23:07 23   Something to that effect; right?

01:23:08 24   A.     Yes.

01:23:09 25   Q.     Okay.  Do the angled -- simply angling wings relative

953

Barry - Redirect

01:23:14 1  to each other going to result in stability?

01:23:16 2  A.    No.

01:23:17 3  Q.    Okay.  And why is that?

01:23:18 4  A.    Because the -- just assuming everything else was

01:23:22 5  right with the wings, the angle that you select has to

01:23:28 6  produce balance and the appropriate restoring forces.  You

01:23:36 7  can try this with a paper airplane.  You can sweep the back

01:23:41 8  end up and it will (indicating) every time you throw it.

01:23:45 9  It's angled, it's not stable.

01:23:49 10  Q.    Okay.  And so, is the wing design shape going to

01:23:57 11  factor into this?

01:23:57 12  A.    All elements of a wing design shape -- the wing

01:24:00 13  design factor into the planform, the cross section, the

01:24:05 14  camber of the cross section and the angle that is set.  And

01:24:10 15  then that has to work with the back -- with the tail, as

01:24:13 16  well.  The tail has a -- would have -- could have a wing, an

01:24:19 17  airfoil section.

01:24:20 18        It could have camber depending on the decision

01:24:25 19  of the designer.  It has a certain area and it has a certain

01:24:29 20  distance in area from the front wing.

01:24:34 21  Q.    Okay.  And so I believe this was -- the image that

01:24:37 22  Dr. Triantafyllou was relying on.

01:24:39 23        Then, if we go to the next page, I think

01:24:42 24  Mr. Basanta was questioning you about this image on this

01:24:44 25  page.  Just very next page in that report.

Barry - Redirect

01:24:48  1          Do you see that?

01:24:48  2   A.      Yes, I do.

01:24:49  3   Q.      And you recall Mr. Basanta's questions regarding

01:24:53  4   that?

01:24:53  5   A.      Yes, I do.

01:24:54  6   Q.      Okay.  And I think if you look down here, I mean

01:24:56  7   we've got -- you know, there's some discussion there and a

01:24:59  8   bunch of -- who knows what it is, considering the machine

01:25:02  9   translation.

01:25:02 10          But if we go to the last or the -- yeah, the

01:25:07 11   last page in this section of the report, which I believe is

01:25:10 12   Page 66 of the report.

01:25:15 13          So, we here we go.  So we looked at what Dr. T

01:25:18 14   was relying on, we've just looked at the image that

01:25:23 15   Mr. Basanta was questioning you about.

01:25:24 16          What does this say about what we just looked at?

01:25:29 17   A.      Further analysis should be thus performed is the --

01:25:34 18   is one of the keys here.

01:25:36 19   Q.      Well, if you --

01:25:37 20   A.      Yes, sir.

01:25:37 21   Q.      Why don't you read it from the beginning, I think, to

01:25:40 22   give context?

01:25:40 23   A.      Okay.  "This analysis has not straightened out

01:25:43 24   whether this is an optimal configuration for the life of the

01:25:46 25   hydrofoil.  This result should be weighed against

Barry - Redirect

01:25:52  1   corrective -- the corrective action when exposed to a

01:25:55  2   particular disturbance.  The fact that a disturbance will

01:25:59  3   lead to a vertical acceleration should also be taken into

01:26:02  4   account.  Further analysis should be performed in order to

01:26:05  5   be able to determine how a disturbance affects the system.

01:26:09  6   Even if it is righting torque to exist, it is not certain it

01:26:14  7   will have time to straighten out the Evolo before the

01:26:17  8   floating body hits the water."

01:26:19  9   Q.     Is that description consistent with what we saw in

01:26:21 10   the video earlier?

01:26:23 11   A.     Well, with the addition of it's not certain it will

01:26:27 12   have time to straighten out before the wave comes out of the

01:26:30 13   water, yes.

01:26:40 14   Q.     So, there was some discussions about the size of the

01:26:45 15   motor?

01:26:46 16   A.     Yes.

01:26:47 17   Q.     Does the size of the motor change your opinion at all

01:26:51 18   as to what you've said about Evolo and its lack in teaching?

01:26:55 19   A.     Well, no.  No, it does not.

01:26:58 20   Q.     Okay.  And can you explain that a little bit?

01:27:01 21   A.     Well, first off, regardless of how fast -- of what

01:27:05 22   happens at high speeds, you have to get there.  So, if the

01:27:09 23   thing crashes before -- if the thing is stable -- would be

01:27:11 24   stable at 25 knots and it crashes at 10, you'll never get to

01:27:18 25   25 knots.

01:27:18 1          More important, as a general rule when things

01:27:22 2   are unstable in a marine environment, primarily because of

01:27:26 3   the free surface, it gets worse as you go faster.  If you

01:27:30 4   take a planing boat that bounces a little bit, so we call it

01:27:34 5   porpoising and you go fast, it bounces it a lot more.  So my

01:27:41 6   guess would be had they had a bigger motor on it, it would

01:27:44 7   have just had more spectacular crashes.

01:27:49 8   Q.    So, there was a lot of talk about the authoritative

01:27:53 9   texts earlier, too.  Do you recall that?

01:27:55 10  A.    Yes, sir.

01:27:56 11  Q.    Okay.  Do any of those authoritative texts teach

01:28:01 12  those skilled in the art how to make what the claimed

01:28:06 13  inventions are in these -- in the two MHL patents?

01:28:08 14  A.     No, they don't.  They explain the science -- the

01:28:12 15  basic science of airfoils, but they don't -- they don't

01:28:16 16  teach people how to make hydrofoils.  They don't take into

01:28:22 17  account any of the issues of water.

01:28:28 18  Q.    And prior to your engagement in this case, had you

01:28:33 19  ever seen an eFoil before or a hydrofoil watercraft like

01:28:37 20  these?

01:28:38 21  A.    No.

01:28:42 22  Q.    And the two prior art references that Mr. Basanta was

01:28:46 23  asking you about, the Woolley and Namanny, those were

01:28:55 24  considered by the Patent Office; correct?

01:28:56 25  A.    They were.

Barry - Redirect

01:28:58  1   Q.     Okay.  And I think you had mentioned in your

01:29:04  2   testimony that there was a lot of -- there were a lot of

01:29:07  3   moving part there to try to, I forget your exact words, but

01:29:12  4   just smack these things together?

01:29:14  5   A.     Yes.

01:29:14  6   Q.     Okay.  And can you explain just briefly a little bit

01:29:20  7   about why you can't just simply put these two things

01:29:23  8   together?

01:29:24  9   A.     Well, as it is described in the -- in the

01:29:33 10   specifications, Woolley is a small object and it's meant to

01:29:36 11   be attached to the bottom of some watercraft.  And it's

01:29:41 12   meant to provide a short period of time.  So, even if it has

01:29:45 13   the power, it can't provide a long ride.  It will run out of

01:29:50 14   power pretty quickly.  Even if it had a -- if it had a

01:29:57 15   larger battery and the thing that propels it becomes bigger

01:30:01 16   it takes more force to drive, and there's -- and then up get

01:30:05 17   into what we call the drag volume spiral of death.  Then if

01:30:12 18   you put it under water, there's a big increased pitch up

01:30:19 19   moment, which we see in the videos, where it throws the

01:30:23 20   vehicle upwards.  Then you lose the towing.  The towing

01:30:28 21   pulls you back down.  And then we -- and then we lose the

01:30:32 22   stabilizing effect of the tow and if you go up the tow is

01:30:35 23   going down a little bit you go down the tow is going up a

01:30:39 24   little bit.  And in addition, you can control it with a tow

01:30:43 25   rope.  And if you think maybe there's 3 -- 400 pounds of

Barry - Redirect

01:30:47  1   pull here, and you weigh a hundred pounds, and you can only

01:30:51  2   move your chest, which the weight shift control is going to

01:30:57  3   be much less effective than the tow shift control.  Move the

01:31:02  4   tow -- you can move the tow maybe a 6, 8 inches, 300 pounds

01:31:07  5   or so, that's a big moment.

01:31:14  6   Q.      So, MHL's patents that Dr. Langelaan's the inventor

01:31:22  7   on, there was some discussion again or questions from

01:31:25  8   Mr. Basanta about the specification, what's disclosed in

01:31:28  9   there; correct?

01:31:28 10   A.      Yes, sir.

01:31:29 11   Q.      Okay.  And that specification, what does it tell you

01:31:40 12   that, and if you can just describe for us generally, what

01:31:44 13   does it teach you or tell you that the Evolo Report doesn't?

01:31:47 14   A.      Well, it provides a selection of different kinds of

01:31:51 15   configurations.  It discusses, that is to say, front wing,

01:31:59 16   front wing in back to curve this way, no tail at all, tail

01:32:03 17   in vertical.  So it provides the options for the designer.

01:32:07 18   So the designer will know that he can select from this range

01:32:10 19   of options in the patent.  It then discusses some of the

01:32:15 20   effects of these things which would be a reminder at least,

01:32:20 21   if they -- if someone didn't already know, it would be a

01:32:22 22   reminder to go out to the text and combine the teachings of

01:32:28 23   the text with the configurations of the hydrofoil.  And then

01:32:32 24   it goes in and talks about the details of the text, the

01:32:38 25   details of flight stability in terms -- in mathematical

01:32:42 1    terms, and it advises to combine them with these other

01:32:46 2    elements to produce an effective craft.  So, it begins when

01:32:53 3    it -- it begins with the figures that it talks about that

01:32:56 4    show the various configurations and goes through.  It talks

01:33:00 5    about in the middle in Column 6, part of Column 6 we've

01:33:04 6    talked about that says how to get it to fly level, in other

01:33:09 7    words trimmable.  This is trim, also called pitch.  And it

01:33:13 8    says how to fly it level.  It makes it clear that the center

01:33:19 9    of gravity must be considered to control it and make it fly

01:33:21 10   level.  And then it goes on about and it says the same thing

01:33:25 11   about roll and pitch.

01:33:27 12   Q.      So it talks about?

01:33:28 13   A.      Yeah.

01:33:28 14   Q.      The multiple directions and not just the pitch?

01:33:31 15   A.      It talks about, yes, there's three directions, three

01:33:34 16   motions, pitch, roll and yaw.  And it talks about stability

01:33:40 17   in all three of them.

01:33:43 18   Q.      And then as you, I think you testified earlier today,

01:33:45 19   it also talks about certain situations that would be

01:33:48 20   unusable; correct?

01:33:49 21   A.      Yes, that's correct.  It -- it advises against

01:33:53 22   certain -- well, it specifically advises against a wing that

01:33:58 23   is swept more than 60 degrees

01:34:00 24   BY THE COURT:

01:34:01 25   Q.      So any questions Mr. Basanta asked you today change

01:34:07   1   any of your opinions regarding the validity of the MHL

01:34:11   2   patents?

01:34:11   3   A.      The validity of the patent, no.

01:34:15   4               MR. THEUERKAUF:  Thank you.  No more questions.

01:34:17   5               THE COURT:  All right.  Mr. Barry, you may step

01:34:20   6   down.  Watch your step.  Thank you.

01:34:22   7               THE WITNESS:  Yes.  Thank you, sir.

01:34:47   8               MR. McGRAW:  Your Honor, we have stipulated

01:34:49   9   facts.

01:34:49  10               THE COURT:  All right.  Just remind me, which

01:34:56  11   page of the Pretrial Order are you reading from?

01:34:57  12               MR. McGRAW:  Pages 9 and 10.

01:35:02  13               THE COURT:  All right.  Thank you.  Go ahead,

01:35:03  14   Mr. McGraw.

01:35:04  15               MR. McGRAW:  Each of the accused products has a

01:35:07  16   floatation device that has a four aft length greater than a

01:35:11  17   lateral width, the floatation device having a top surface,

01:35:14  18   and a bottom surface as claimed in Claim 1 of the

01:35:17  19   patents-in-suit.

01:35:18  20               Each of the accused products has a floatation

01:35:21  21   device wherein a user can be disposed on the top surface of

01:35:25  22   the floatation device in a prone, kneeling or standing

01:35:30  23   position as claimed in Claim 1 of the patents-in-suit.

01:35:33  24               Each of the accused products has a floatation

01:35:37  25   device having a forward section, a middle section and a rear

section as claimed in Claim 1 of the patents-in-suit.

Each of the accused products has a strut, having an upper end and a lower end.  The upper end fixedly interconnected with the floatation device between the middle section and the rear section of the floatation device as claimed in Claim 1 of the patents-in-suit.

Each of the accused products has a hydrofoil fixedly interconnected with the lower end of the strut, the hydrofoil having no movable surface as claimed in Claim 1 of the patents-in-suit.

Each of the accused products has a propulsion system for propelling the watercraft in a body of water as claimed in Claim 1 of the patents-in-suit.

Each of the accused products has a propulsion system wherein the propulsion system is connected to the hydrofoil as claimed in Claim 1 of the patents-in-suit.

Each of the accused products is a watercraft having no movable steering system as claimed in Claim 1 of the patents-in-suit.

And each of the accused products has a propulsion system wherein the propulsion system comprises a battery, an electric motor and a propulsor.  The propulsor selected from a propeller, a ducted propeller or a pump jet as claimed in Claim 2 of the patents-in-suit.

THE COURT:  All right.  Thank you, Mr. McGraw.

01:37:08  1                    All right.  You have anything more?

01:37:13  2                    MR. THEUERKAUF:  We just have a couple of

01:37:15  3     exhibits here we'd like to admit.

01:37:18  4                    THE COURT:  All right.

01:37:18  5                    MR. THEUERKAUF:  PTX 5 and PTX 206.

01:37:40  6                    MR. COLLETTI:  No objection, Your Honor.

01:37:41  7                    THE COURT:  All right.  They're admitted without

01:37:43  8     objection.

01:37:43  9                    (Exhibit Nos. PTX 5 and PTX 205 were admitted

01:37:46 10     into evidence.)

01:37:46 11                    MR. THEUERKAUF:  And we close, Your Honor.

01:37:48 12                    THE COURT:  All right.  Mr. Colletti, are we

01:37:50 13     done?

01:37:51 14                    MR. COLLETTI:  I believe so.

01:37:53 15                    THE COURT:  All right.  All right.  So members

01:37:56 16     of the jury, we've now heard all the evidence and so I'm

01:38:02 17     going to let you go in just a minute.  We will be ready to

01:38:07 18     start tomorrow morning at 9:30 as we have been more or less

01:38:12 19     every day.  And again, thank you for being here on time.

01:38:20 20                    So once again, be on time for tomorrow.

01:38:22 21                    And I do want to remind you that the case is not

01:38:27 22     yours to deliberate yet so don't talk to each other about

01:38:30 23     the case.  Don't talk to other people about the case.  Don't

01:38:33 24     let anybody talk to about the case to you.  And I also

01:38:37 25     remind you, you know, not to do any research of any kind on

01:38:46 1    your own about the case.  Your part of what's going to

01:38:50 2    happen tomorrow is closing arguments where the lawyers will

01:38:56 3    have a chance to tell you how they see the various things

01:38:59 4    you've heard fitting together for whichever side is doing

01:39:02 5    the talking.  And so, please follow those instructions.  And

01:39:10 6    I will see you tomorrow morning.  Can we take the jury out,

01:39:13 7    please?

01:39:14 8             (Jury leaving the courtroom.)  All right.  So,

01:39:44 9    why don't we go through the JMOL exercise and then I have

01:39:50 10   one question about the verdict form.  And then we'll

01:39:56 11   probably take a break.  But in any event let's do the JMOLs

01:40:03 12   first.  I guess it's now the Plaintiff's turn.

01:40:06 13             MR. McGRAW:  Thank you, Your Honor.  I'll just

01:40:09 14   try to go through this as quickly as I can.

01:40:12 15             THE COURT:  Not so quickly though that the court

01:40:14 16   reporter who's been incredibly stoic during this trial

01:40:19 17   finally loses it.

01:40:20 18             MR. McGRAW:  Absolutely.  Your Honor, the

01:40:22 19   Plaintiffs move for judgment as a matter of law as to

01:40:26 20   Defendants' lack of enablement defense.  No clear and

01:40:29 21   convincing evidence has been presented that the asserted

01:40:31 22   patents fail to teach a person of ordinary skill in the art

01:40:34 23   how to practice the invention.

01:40:36 24             The Plaintiff moves for judgment as a matter of

01:40:40 25   law that the Evolo Report does not qualify as a printed

01:40:44  1   publication.  No clear and convincing evidence has been

01:40:47  2   presented that the Evolo Report was publicly accessible

01:40:50  3   prior to October 10th, 2013.  The only evidence presented is

01:40:56  4   that the Evolo Report existed online and was indexed by

01:40:59  5   Google.

01:41:00  6           Defendants' own expert said that a person would

01:41:02  7   not have been able to find the Evolo Report online prior to

01:41:06  8   2013 unless you spoke Swedish.

01:41:08  9           Second, he further confirmed that you would have

01:41:11 10   to know what you were looking for to be able to find it.

01:41:14 11           Third, no evidence was presented that anyone

01:41:16 12   outside of the Evolo Project actually accessed the Evolo

01:41:20 13   Report prior to October of 2013.

01:41:21 14           Fourth, there was no evidence presented which

01:41:24 15   trace is the steps it would take for a person of ordinary

01:41:27 16   skill in the art to go on line, search, and then find the

01:41:31 17   Evolo Report.

01:41:31 18           And finally, the five witnesses in this case

01:41:34 19   with the most experience in this industry, Mr. Leason,

01:41:37 20   Mr. Barry, Dr. Langelaan, Mr. Wade and Dr. Triantafyllou all

01:41:42 21   testified that they had never heard of Evolo back in 2013.

01:41:45 22   Mr. Leason and Professor Langelaan both testified that they

01:41:48 23   did research for prior art and neither came across the Evolo

01:41:52 24   Report.

01:41:52 25           Plaintiff also moves for judgment as a matter of

01:41:57  1    law that the Evolo Report is not enabling.  Plaintiff moves

01:42:02  2    for judgment as a matters of law as to Defendants'

01:42:06  3    anticipation defense.  No clear and convincing evidence was

01:42:09  4    presented to show that the Evolo Report teaches each and

01:42:12  5    every limitation of the claims of the patents-in-suit.

01:42:15  6             Plaintiff moves for judgment as a matter of law

01:42:18  7    as to Defendants' obviousness defense.  To clear and

01:42:21  8    convincing evidence was presented that the patents were

01:42:23  9    obvious in light of the combination of Woolley and Namanny.

01:42:27 10             And then as to plaintiff's claims, Plaintiff

01:42:31 11    moves for direct or judgment as a matter of law as to the

01:42:36 12    '044 patent, Claim 1, Claim 5 and Claim 6, and as for direct

01:42:43 13    infringement of the '659 patent moves for judgment as a

01:42:46 14    matter of law as to Claim 1.

01:42:48 15             And finally, as to willful infringement,

01:42:52 16    Plaintiff moves for directed or for judgment as a matter of

01:42:54 17    law as to its claim for willful infringement.  There's no

01:42:57 18    evidence to rebut the evidence of willfulness presented by

01:43:00 19    Plaintiff.  Thank you.

01:43:02 20             THE COURT:  All right.  Thank you, Mr. McGraw.

01:43:04 21             All right.  So, I'm going to deny that as to

01:43:14 22    whether or not the Evolo is a printed -- a publicly

01:43:19 23    accessible printed publication.  I think the Defendant

01:43:24 24    presented enough evidence that the jury can decide it is.

01:43:28 25             I think, but I am not sure, that the fact that

01:43:34 1    one would have to speak Swedish perhaps to find it, actually

01:43:38 2    doesn't take it out of the realm of being a printed

01:43:46 3    publication.  I think the person of ordinary skill in the

01:43:50 4    art who, after all, can find all the relevant art in the

01:43:52 5    world, also speaks all the languages in the world, so I

01:43:57 6    don't think that's a good objection.

01:44:00 7            In terms of the Evolo Report being enabled,

01:44:13 8    working on the principle that the Plaintiff has to show it's

01:44:18 9    not enabled and I'm not a hundred percent sure that's the

01:44:21 10   right principle, but if that is, I'm going to deny that.

01:44:25 11           I'm going to deny the JMOL as to anticipation

01:44:29 12   based on Evolo.

01:44:31 13           I'm going to deny the motion for or find that

01:44:40 14   the JMOL that the infringement is willful which I regard as

01:44:47 15   fairly -- well, in any event I'm going to deny that.  The

01:44:53 16   finding that JMOL that all claims except for the Claims 2

01:44:58 17   infringe, I'm going to deny that finding.

01:45:02 18           I'm going deny the other two, also, though, you

01:45:08 19   know, Plaintiff has a pretty reasonable argument that the

01:45:14 20   Defendant did not show by clear and convincing evidence that

01:45:20 21   the patents were not enabled or that the combination of

01:45:25 22   Namanny and Woolley rendered them obvious.

01:45:28 23           But so I'm going to deny that.

01:45:34 24           All right.  You have some JMOLs, too?

01:45:37 25           MR. COLLETTI:  I do, Your Honor.

01:45:39 1         Defendants would like to move for judgment as a

01:45:44 2   matter of law with regard to invalidity.  There are two

01:45:49 3   disputed claims -- two disputed elements.  One of those

01:45:53 4   elements is weight shift control and the other element is

01:45:57 5   stability.

01:45:57 6         With regard to Evolo, plaintiff's expert,

01:46:02 7   Mr. Barry, admitted that there was weight-shift control.

01:46:07 8   And the discussion with regard to stability is in the

01:46:11 9   textbooks.  That's with regard to Claim 1.

01:46:14 10        With regard to Claim 2, which specifically

01:46:17 11  requires a motor speed controller, plaintiff's expert

01:46:21 12  admitted, on the record, that there is a motor speed

01:46:23 13  controller in the Evolo Report.

01:46:27 14        As to claims as to Claim 5 and 6, everything

01:46:31 15  that is present in those elements is also well known in the

01:46:37 16  prior art.

01:46:39 17        Defendant would also ask for judgment as a

01:46:43 18  matter of law that the Evolo Report is enabling.  It teaches

01:46:48 19  a person of ordinary skill to make the -- make the

01:46:53 20  invention.

01:46:53 21        Defendants would also move for judgment as a

01:46:56 22  matter of law that the Evolo is a printed publication.  We

01:47:01 23  heard from Mr. Lanterman on that who spoke not only about

01:47:05 24  the Google metadata, but also about the web logs.  And in

01:47:10 25  addition to that, the *Boat News* article has a link to the --

01:47:19 1    to the Court's website that contained the Evolo report.

01:47:23 2         Defendants also move for judgment as a matter of

01:47:27 3    law that the patents are not enabled.  They teach you

01:47:31 4    nothing new.

01:47:34 5         And, finally, Defendants move for judgment as a

01:47:38 6    matter of law with regard to secondary considerations.

01:47:41 7    Mr. Barry said nothing with regard to secondary

01:47:46 8    considerations.

01:47:48 9         And we also move for judgment as a matter of law

01:47:50 10   with regard to the nexus that's required for secondary

01:47:54 11   considerations.  The only nexus -- evidence of nexus was to

01:47:58 12   the LIFT 1 board.

01:48:01 13        They didn't show a nexus to the other boards.

01:48:13 14        THE COURT:  All right.

01:48:14 15        MR. COLLETTI:  Thank you.

01:48:14 16        THE COURT:  Is that it?

01:48:15 17        So, I'm going to deny all those JMOLs.  Starting

01:48:35 18   with the number of secondary considerations that are

01:48:37 19   actually in the case was pretty minimal.

01:48:42 20        All right.  So that takes care of that.

01:48:44 21        So, on the verdict form, and I mostly looked at

01:48:53 22   the Plaintiff's because I got that first, but I did see

01:48:58 23   enough of the Defendants' to see that it seemed to me like

01:49:01 24   the only place where there was any dispute that was,

01:49:07 25   essentially, other than kind of stylistic had to do with the

01:49:11  1    Defendants' wanting to have the three accused products done

01:49:17  2    separately.  And I'm just kind of wondering, based on the

01:49:21  3    testimony, was there any actual rationale basis that you

01:49:25  4    could decide one way on one accused product and a different

01:49:28  5    way on a different accused product?

01:49:33  6              MR. COLLETTI:  The products are obviously

01:49:36  7    different products and there are differences, Your Honor.

01:49:39  8    If you're asking to group them into one question, that would

01:49:43  9    be acceptable to us.

01:49:45 10              THE COURT:  Well, okay.  I guess I should have

01:49:47 11    been more direct.  All right.

01:49:51 12              MR. COLLETTI:  And just for purposes of -- yes,

01:49:54 13    we can group them into one.

01:49:55 14              THE COURT:  Okay.  All right.  No, I appreciate

01:49:57 15    that.

01:49:59 16              All right.  I didn't think there was anything

01:50:01 17    else in the verdict form that I needed to be concerned

01:50:07 18    about.  Is there?

01:50:11 19              MR. McGRAW:  Not from us, Your Honor.

01:50:14 20              MR. MURRELL:  I don't believe so.

01:50:15 21              THE COURT:  Okay.  All right.  Well, so we're

01:50:17 22    going to go and work on the verdict forms.

01:50:22 23              And so, why don't we meet at -- well, why don't

01:50:32 24    you be here at 2:30 and we will meet to discuss the jury

01:50:37 25    instructions whenever I'm ready after 2:30.  But I will be

01:50:42  1    able to be ready at 2:30.  Okay?

01:50:45  2                MR. COLLETTI:  Very good.

01:50:46  3                THE COURT:  All.  We'll be in recess until then.

01:50:50  4                DEPUTY CLERK:  All rise.

01:50:55  5                (Recess was taken.)

02:45:54  6                THE COURT:  All right.  Good afternoon,

02:45:55  7    everyone.

02:45:56  8                So, actually, my clerk is going to handout the

02:46:01  9    verdict form.  You can be seated.

02:46:13 10                So, but while -- so, let's talk about the jury

02:46:19 11    instructions here.

02:46:23 12                Okay.  And so -- so there are three things that

02:46:30 13    I highlighted in yellow, let me just go over them then we'll

02:46:33 14    go back and see whatever it is you want to talk about.

02:46:36 15                There's -- on Page 9 it says, "The claim

02:46:40 16    constructions are set forth in your juror notebooks."

02:46:43 17                Is that actually true?

02:46:45 18                MR. MURRELL:  So, Your Honor, we've been working

02:46:47 19    with counsel.  They had one change to it, we've agreed to

02:46:51 20    make it.  Once we get back to the hotel room, we'll make

02:46:54 21    that change and send it to everybody.  But I think it's

02:46:56 22    pretty much done.

02:46:57 23                THE COURT:  Okay.  And so is this something --

02:46:58 24    so it's not in their juror notebooks.  Should I be -- once

02:47:02 25    you make this change --

02:47:06  1          MR. MURRELL:  Do you want us to bring multiple

02:47:08  2   copies of it or do you want --

02:47:10  3          THE COURT:  Well, no.  Let me just think.

02:47:12  4          What I'm personally interested in is -- why

02:47:22  5   don't I change this to say these definitions are attached to

02:47:25  6   these jury instructions.

02:47:27  7          MR. MURRELL:  That would be great.  And then we

02:47:30  8   just email them to chambers this afternoon or...

02:47:33  9          THE COURT:  Yeah, that would be great.

02:47:34 10          MR. MURRELL:  Okay.  Thank you.

02:47:44 11          THE COURT:  All right.  Then the second one

02:47:47 12   is the next page, it's Page 10.  When -- when I was reading

02:47:52 13   through this, you know, I like to get rid of unnecessary

02:47:56 14   verbiage.  So I got rid of like "using" and "offered to

02:48:01 15   sell."  I was thinking of getting rid of "making," too, but

02:48:05 16   I want to see what you all thought because it seemed to me

02:48:08 17   it's all covered by selling and importing.

02:48:12 18          MR. MURRELL:  We talked about that at lunch and

02:48:14 19   I think we're fine with that, Your Honor.

02:48:16 20          THE COURT:  What about you all?

02:48:16 21          MR. COLLETTI:  We'd be fine with that, getting

02:48:18 22   rid of making as well.

02:48:19 23          THE COURT:  I'm sorry.  I heard Mr. Murrell.  I

02:48:23 24   understood your sentiment, but I didn't actually hear your

02:48:26 25   words so much.

02:48:26  1              MR. COLLETTI:  Yeah.  I wanted to make sure that

02:48:28  2  I understood.  If we're getting rid of making, we're fine

02:48:30  3  with that.

02:48:31  4              THE COURT:  Yes.

02:48:32  5              Okay.  That's it.

02:48:36  6              And then the third thing -- oh, yeah.  It had to

02:48:38  7  do with the secondary considerations.  Obviously,

02:48:42  8  Mr. Colletti moved for a judgment as a matter of law that

02:48:45  9  there aren't any.

02:48:46 10              I think what I was thinking is the -- I guess

02:49:05 11  what I was thinking is there's an argument for commercial

02:49:07 12  success, which is little A, and there's an argument for the

02:49:24 13  license which is, I guess, little G.  I wasn't so sure that

02:49:31 14  there are any of the rest of these.

02:49:36 15              But, Plaintiff, which one do you think there's

02:49:38 16  evidence of?

02:49:39 17              MR. THEUERKAUF:  Well, Your Honor, I guess I

02:49:42 18  would think that C was covered by Evolo's failure.  And I do

02:49:53 19  think there was some evidence of F.

02:49:58 20              THE COURT:  And what was the evidence of F?

02:50:01 21              MR. THEUERKAUF:  Mr. Leason's testimony

02:50:02 22  regarding the reactions to the eFoil when it was introduced

02:50:08 23  to the market.

02:50:08 24              THE COURT:  And can you be more specific?

02:50:10 25              MR. THEUERKAUF:  As I sit here, what I recall is

02:50:14 1   some testimony regarding the -- the release of the video,

02:50:20 2   the number of hits that it received.  And I do recall some

02:50:26 3   interactions that he had with people expressing their, I

02:50:31 4   guess, amazement from the product.

02:50:33 5          THE COURT:  Well, you can receive -- you know,

02:50:37 6   there was some lawyer who appeared with a cat face in a

02:50:40 7   video and that had like more hits than any invention -- or

02:50:44 8   any video in the world, but I don't think that was praise.

02:50:50 9          MR. THEUERKAUF:  Well, I mean, I think it's

02:50:52 10  different than the normal situation in that this literally

02:50:54 11  was the first eFoil ever on the market.  You know, if we

02:50:58 12  were in a situation where, you know, it was a new invention

02:51:02 13  and had something to do with an automobile, yes, I agree,

02:51:05 14  right.  But when this product has never existed on the

02:51:09 15  market and it's introduced, I think it all ties together.

02:51:21 16         THE COURT:  All right.  Mr. Colletti, so we've

02:51:23 17  got four candidates here, A, C, I guess F and G.

02:51:31 18         What do you have to say?

02:51:32 19         MR. COLLETTI:  It's -- well, with regard to C

02:51:36 20  and Evolo trying but failing, we don't agree with that.  We

02:51:39 21  don't see Evolo as a failure, as is quite evident from the

02:51:45 22  issues in the case.

02:51:46 23         THE COURT:  But, on that one shouldn't what I

02:51:49 24  do -- shouldn't I leave that in and they can argue that

02:51:57 25  Evolo was a failure and you can argue that it wasn't.

02:52:01 1          MR. COLLETTI:  We can do that.

02:52:02 2          THE COURT:  Okay.

02:52:03 3          MR. COLLETTI:  And with regard to F, I would say

02:52:05 4   it says did others in the field.  I don't think there's any

02:52:08 5   evidence that there's others in the field that are praising

02:52:11 6   the invention.  I don't think there's any evidence relating

02:52:13 7   to how many views there actually were.  And it also talks

02:52:18 8   about expressing surprise at the invention.  I don't think

02:52:21 9   there was anything related to expressing surprise, so I

02:52:25 10  would continue to disagree with that.

02:52:35 11          And I would just say, Your Honor, again, you

02:52:37 12  know, it is a unique situation where, you know, this product

02:52:40 13  did not exist.  But the praise that he did receive were

02:52:44 14  people that were in that water sports market, at least from

02:52:48 15  a general broader sense.

02:52:49 16          THE COURT:  Well, I mean that's -- the thing is,

02:52:52 17  you know, usually what I've -- when I've seen this before,

02:52:58 18  you have things that are in writing where you can tell who's

02:53:03 19  the one doing the praising, whether they're not -- they're

02:53:06 20  actually, you know, people who are roughly like people of

02:53:12 21  ordinary skill in the art or better.

02:53:17 22          And here, you know, we've got lots of clicks on

02:53:22 23  YouTube and people calling Mr. Leason and saying great job

02:53:26 24  or something like that.  I mean, that strikes me as about

02:53:34 25  the sum of it; right?

02:53:37  1                 MR. THEUERKAUF:  I'm really sorry.  I didn't

02:53:38  2    catch.

02:53:38  3                 THE COURT:  The total of it; right?

02:53:40  4                 MR. THEUERKAUF:  Oh, yes.  I don't recall the

02:53:44  5    testimony as I sit here but, I mean, I believe that is

02:53:46  6    close.

02:53:47  7                 THE COURT:  All right.  Well, so I don't think I

02:53:52  8    heard any expressed surprise.  I mean, obviously clicks on a

02:53:57  9    video can't --

02:54:01 10                 MR. THEUERKAUF:  I mean, we would be fine with

02:54:03 11    taking expressed surprise.  I mean, if we just limited it to

02:54:07 12    that others in the field praise the invention.

02:54:11 13                 THE COURT:  And you have to agree that

02:54:16 14    Mr. Leason was not very specific about who these people were

02:54:21 15    that he was talking to that were giving him at attaboys;

02:54:27 16    right?

02:54:27 17                 MR. THEUERKAUF:  I mean, I think he was specific

02:54:30 18    in that it was people that were in the market with him that

02:54:34 19    were selling the type of products that he was selling.  I do

02:54:38 20    believe he was that -- if I recall correctly, that specific.

02:54:45 21                 THE COURT:  All right.  So, I'm going to leave

02:54:49 22    that in, even though I have some doubt about that.

02:54:54 23                 And I'm going to -- is there anything more for

02:55:07 24    you -- more from you on this, Mr. Colletti?

02:55:10 25                 MR. COLLETTI:  I would just reiterate that I

02:55:12 1    don't think Mr. Leason's testimony rises to the level of

02:55:17 2    showing that others in the field praised the invention.

02:55:20 3    There was not all -- to the extent he got views, as you

02:55:23 4    indicated, those views did not indicate praise.  And to the

02:55:26 5    extent Mr. Barry had anything on this, none of that was

02:55:31 6    offered with regard to other publications praising him.

02:55:36 7              THE COURT:  Yes.  Well -- so, right.  I tend to

02:55:41 8    agree that the clicks really have nothing to do with praise.

02:55:46 9    It strikes me that this is pretty much limited to whatever

02:55:48 10   it is Mr. Leason said.  So, I'm going to leave it in for

02:55:55 11   now.  Maybe by -- so, you have my email address.

02:56:30 12             Mr. Theuerkauf, somebody on your team should

02:56:34 13   send me an email that cites to the transcript of

02:56:39 14   Mr. Leason's testimony of what you think counts as the

02:56:43 15   praise that would be the basis for this.

02:56:47 16             MR. THEUERKAUF:  Okay.

02:56:47 17             THE COURT:  And I will look at that.  And if I

02:56:51 18   think that sounds -- and, you know, as I'm talking I'm kind

02:56:56 19   of doubting it but, you know, you need to point out to me

02:57:00 20   specifically what you think is the praise and I will make a

02:57:05 21   decision after I look at whatever pages it is you cite to

02:57:10 22   me.  Okay?

02:57:11 23             MR. THEUERKAUF:  Sure.

02:57:11 24             THE COURT:  All right.  So by 6:00?

02:57:14 25             MR. McGRAW:  That's fine.

02:57:15 1                    THE COURT:  All right.  All right.  So, then I

02:57:21 2    will get rid of B, D, E and H.

02:57:29 3                    MR. THEUERKAUF:  And I'm sorry, Your Honor, did

02:57:30 4    you say, excuse me, B, D, E and H?

02:57:33 5                    THE COURT:  Yes.

02:57:34 6                    MR. THEUERKAUF:  Okay.

02:57:39 7                    THE COURT:  Yes.  All right.  So that's all that

02:57:41 8    I have.  Why don't we start with the Plaintiff.  What else

02:57:50 9    that I've got in here or don't have in here do you want to

02:57:54 10   bring to my attention?

02:57:56 11                   MR. McGRAW:  I think the only thing on our end,

02:57:59 12   Your Honor, is Instruction 5.3.

02:58:00 13                   THE COURT:  All right.  Which page?

02:58:02 14                   MR. McGRAW:  On the prior art.  It's on Page 16.

02:58:04 15                   THE COURT:  Okay.  Yes.

02:58:06 16                   MR. McGRAW:  And I think we would just maintain

02:58:10 17   that we would want the language existing on a website alone

02:58:14 18   is insufficient to show that a publication is publicly

02:58:17 19   accessible.  That's from the Fed Circuit's *Blue Calypso*

02:58:20 20   case.  And we would just preserve our objections to that

02:58:26 21   additional language.

02:58:28 22                   THE COURT:  All right.  Thank you, Mr. McGraw.

02:58:29 23   Hold on just a minute.

02:58:42 24                   So the thing about saying -- so, it may be true,

02:59:37 25   I don't know.  I haven't looked at it.  That Blue Calypso

02:59:41  1    had that sentence in there somewhere I'm sure since you say

02:59:45  2    it is that they do.  But, you know, not every sentence that

02:59:51  3    the Court of Appeals says in a case should become a jury

02:59:55  4    instruction.  And the jury instruction is really the

03:00:01  5    sentence before that, actually two sentences before that, it

03:00:07  6    says that public accessibility is if it were disseminated or

03:00:15  7    otherwise made available to the extent that persons

03:00:18  8    interested with ordinary skill in the subject matter of art

03:00:22  9    exercising reasonable diligence can locate it.  And that's

03:00:26 10    exactly what Mr. Lanterman has purported to back up with his

03:00:31 11    testimony.  So, I'm kind of inclined to think that I'm not

03:00:35 12    going to put that in.  But I will make a note.  I am making

03:00:44 13    a note of that and I will think about it.  Is there anything

03:00:47 14    you want to say on that, Mr. Colletti?

03:00:49 15                MR. COLLETTI:  No, Your Honor, but I have a

03:00:51 16    separate one on 5.3.

03:00:54 17                THE COURT:  Okay.  And what is that.

03:00:55 18                MR. COLLETTI:  With regard to 5.3, where we say

03:01:00 19    Waydoo must prove by clear and convincing evidence that the

03:01:02 20    Evolo Report was publically accessible.  I would ask for the

03:01:06 21    additional anywhere in the world to make it clear that a

03:01:10 22    person of ordinary skill in the art has -- is presumed to

03:01:13 23    have all the knowledge that's available and that's not

03:01:16 24    limited to the United States.  That's anywhere in the world.

03:01:19 25    And I ask --

03:01:21  1                THE COURT:  So, hold on a second.  Oh, sorry.

03:01:29  2   I'm looking at the wrong -- I've got two different versions

03:01:33  3   I'm looking at here.

03:01:35  4                And so, your proposal is on Page 16, the next to

03:01:40  5   the last paragraph in the last sentence, to say that the

03:01:44  6   Evolo Report was publically accessible before October 10,

03:01:48  7   2013, anywhere in the world?

03:01:50  8                MR. COLLETTI:  Yes, Your Honor.

03:01:51  9                THE COURT:  Hold on a minute.

03:02:07 10                So I'm inclined to accept that modification

03:02:14 11   because I think it correctly states the law.

03:02:20 12                Is that al right, Mr. McGraw?

03:02:22 13                MR. McGRAW:  Well, I don't know.  My concern is

03:02:24 14   it's not in any of the pattern instructions and I haven't

03:02:28 15   seen a case that says it.  I don't disagree that there might

03:02:31 16   be a case that says it.  But it's sort of the same thing

03:02:34 17   we're talking about with the language on existing on a

03:02:38 18   website alone.  So.

03:02:40 19                THE COURT:  Well, the difference is I haven't

03:02:44 20   heard -- a difference is I haven't heard anything from the

03:02:46 21   Defendants' yet that suggests that they're going to say or

03:02:52 22   they're going through all the back and forth of having

03:02:55 23   Mr. Lanterman here, that hey, we win on this because it's on

03:02:57 24   a website, end of story.

03:03:00 25                On the other hand, I have heard someone, I think

03:03:03 1   Mr. Theuerkauf, today suggest that for lack of better words,

03:03:09 2   Sweden doesn't count.  And at least things in Swedish don't

03:03:15 3   count.  And as I said, I think that's wrong.

03:03:19 4           MR. McGRAW:  I was the one that said that but I

03:03:21 5   wasn't implying.

03:03:22 6           THE COURT:  Oh, sorry.  Sorry Mr. Theuerkauf.

03:03:23 7           MR. THEUERKAUF:  I was sitting here wondering

03:03:25 8   when did I say that?

03:03:26 9           THE COURT:  Okay.  Mr. McGraw said it.  Sorry.

03:03:28 10          MR. THEUERKAUF:  It's all right.

03:03:29 11          THE COURT:  I knew somebody said it.  All right.

03:03:35 12  Well, okay.  So do you have anything else on that,

03:03:40 13  Mr. McGraw?

03:03:40 14          MR. McGRAW:  Well, I do think that, just a last

03:03:44 15  point, I do think that Mr. Lanterman's testimony was, you

03:03:47 16  know, as to what his view of public accessibility or

03:03:49 17  availability was, it was online, at a certain date and then

03:03:54 18  it was indexed on a certain date.  And I think that's the

03:03:57 19  extent of it.

03:03:58 20          THE COURT:  Well, for all indexed, downloaded,

03:04:01 21  downloaded in the United States, downloaded in the United

03:04:07 22  States like at least two years after the report was put on

03:04:12 23  the -- you know, was available.  I mean, I think it goes

03:04:16 24  beyond that.  In fact, you know, mentioned it in the Båtnytt

03:04:23 25  magazine.  I mean, I think there's quite a bit of it that

03:04:26  1    goes beyond that.  But if I hear an argument tomorrow that

03:04:31  2    sounds like the Defendant saying, Hey, as long as it's on a

03:04:34  3    website, we win, remind me and I'll give an instruction that

03:04:40  4    says that's not right.  Okay?

03:04:42  5              MR. McGRAW:  Okay.

03:04:43  6              THE COURT:  All right.  All right.  So I intend

03:04:46  7    to add anywhere in the world.

03:04:48  8              All right.  So, Mr. McGraw, we've gone through,

03:04:52  9    you sort of said you had one concern.  I've addressed that.

03:04:56 10              So, are you done now?

03:04:58 11              MR. McGRAW:  Yes, we are.

03:04:59 12              THE COURT:  All right.  Mr. Colletti, what about

03:05:01 13    you?

03:05:05 14              MR. COLLETTI:  Checking my notes, Your Honor.

03:05:08 15              THE COURT:  I understand the problem.  That's

03:05:14 16    the reason why green sticky things were invented.

03:05:24 17              MR. COLLETTI:  That's all I have.

03:05:25 18              THE COURT:  Okay.  Well, I know we haven't had a

03:05:31 19    lot of time to look at the jury verdict form, so why don't I

03:05:47 20    give you five minutes so you can look at it.  Make sure if

03:05:52 21    you've got a problem, you can tell me what it is.  So, we'll

03:05:55 22    just take a short break.

03:05:57 23              DEPUTY CLERK:  All rise.

03:05:59 24              (Recess was taken.)

03:13:37 25              THE COURT:  All right.  Have a seat.  Did you

03:13:40  1    all have a chance to look at the jury verdict form?

03:13:43  2                MR. THEUERKAUF:  We did, Your Honor.

03:13:44  3                MR. COLLETTI:  Yes.

03:13:45  4                MR. MURRELL:  We did.

03:13:45  5                THE COURT:  All right.  Is there any issues for

03:13:47  6    the Plaintiff?

03:13:48  7                MR. THEUERKAUF:  No, Your Honor.

03:13:49  8                THE COURT:  From the Defendant?

03:13:49  9                MR. COLLETTI:  We do have a few suggestions or

03:13:52 10    comments.

03:13:53 11                THE COURT:  Okay.

03:13:53 12                MR. COLLETTI:  On Page 3, under prior art.

03:13:57 13                THE COURT:  Yes.

03:13:58 14                MR. COLLETTI:  Those are two very separate

03:14:03 15    issues.  I guess the request would be whether we can break

03:14:06 16    them out into printed publication and the other one being

03:14:08 17    enablement.

03:14:16 18                THE COURT:  Well, your suggestion here is

03:14:22 19    basically that more captions are needed.

03:14:25 20                MR. COLLETTI:  Yes.  So there's a clear

03:14:28 21    distinction between what the issues are there.  The first

03:14:31 22    one being whether or not the Evolo Report is a printed

03:14:35 23    publication, publically accessible, and the second one being

03:14:38 24    a very different finding and to make clear, which I guess it

03:14:41 25    does at the top, the yes is -- especially because the yeses

03:14:44 1    are different for each question, right?  The yes is a

03:14:47 2    finding for Waydoo in 4 but the yes is a finding for MHL in

03:14:51 3    5.

03:14:59 4              THE COURT:  Here, let me hold onto that one.

03:15:02 5    What else, Mr. Colletti?

03:15:04 6              MR. COLLETTI:  For 7 and 8, its just -- I think

03:15:09 7    it's just a typo.  The second line, '659 patent, I think

03:15:13 8    it's are valid, the claims in the patent are valid.

03:15:19 9              THE COURT:  I think the subject of this is any,

03:15:23 10   any is invalid, any are.

03:15:26 11             MR. COLLETTI:  Okay.

03:15:29 12             THE COURT:  Well, in any event, let me take that

03:15:31 13   one under advisement.

03:15:34 14             And what else?

03:15:35 15             MR. COLLETTI:  And then the last comment was

03:15:37 16   with 10 and 11, where with 10 after the royalty base there's

03:15:42 17   a parenthetical saying the total number of accused eFoils

03:15:45 18   sold, it doesn't appear in 11.  I think there's a rationale

03:15:49 19   for that, but for consistency I would.

03:15:52 20             THE COURT:  No, right.  I understand what you're

03:15:54 21   saying.  So, like for the under the royalty base, you would

03:16:00 22   say net sales in dollars?  Or.

03:16:06 23             MR. COLLETTI:  That's right.

03:16:16 24             THE COURT:  You have any problem with that,

03:16:18 25   Mr. Theuerkauf?

03:16:19  1                    MR. THEUERKAUF:  Actually I'm not sure I

03:16:20  2    understood that.

03:16:21  3                    MR. MURRELL:  Talking about putting a dollar

03:16:23  4    sign on the second?

03:16:24  5                    THE COURT:  No, no.  So, in other words I think

03:16:25  6    what Mr. Colletti said is on 10, after the royalty base, it

03:16:29  7    has an explanation of what we mean.  The total number of

03:16:33  8    accused eFoils sold.  In the second one on 11, it just says

03:16:38  9    royalty base and there's no parenthetical.  So this

03:16:42 10    parenthetical that we're trying to get at is net sales in

03:16:50 11    dollars or I mean.

03:16:57 12                    MR. MURRELL:  That would be net sales -- right.

03:16:59 13                    THE COURT:  Right.

03:16:59 14                    MR. MURRELL:  It would be net sales in dollars

03:17:02 15    of eFoils sold; right?

03:17:03 16                    THE COURT:  I'm sorry, I'm hearing net sales in

03:17:06 17    dollars but whatever the other words are with it I'm not

03:17:09 18    hearing.

03:17:09 19                    MR. MURRELL:  I'm sorry.  In dollars.  I'm

03:17:13 20    sorry.  I'm not following you.  So.

03:17:17 21                    (Discussion held off the record.)

03:17:25 22                    MR. MURRELL:  Oh, yeah absolutely.  No worries.

03:17:29 23                    THE COURT:  Okay.  All right.  Well, I'll make

03:17:32 24    that change.

03:17:33 25                    Is that it, Mr. Colletti?

03:17:34  1            MR. COLLETTI:  That's all.

03:17:35  2            THE COURT:  Okay.  Yeah, actually, you know, I

03:17:54  3    think we used the singular for this any of kind of

03:17:59  4    formulation elsewhere, so I think I'm going to stick with

03:18:02  5    that.  Though, I appreciate the suggestion.

03:18:07  6            And I think I'm going to -- you know, I think

03:18:18  7    that's the reason why we have these bold headings, yes is

03:18:22  8    the finding for Waydoo or yes is a finding for MHL.  So, I

03:18:29  9    think I'm going to leave the prior art as is.

03:18:32 10            But I will -- I will make the one change.

03:18:36 11            And so, basically we will make these little

03:18:42 12    corrections to the jury instructions, wait to see whether we

03:18:48 13    get any -- actually, you know what, I think I'm going to

03:19:03 14    leave in the secondary consideration of praise.  I'm not a

03:19:17 15    hundred percent sure of it but what I've heard in this case

03:19:21 16    is exactly what the Federal Circuit had in mind as far as

03:19:23 17    praise or evidence of praise, but I think it's.

03:19:28 18            MR. THEUERKAUF:  Your Honor, after we discussed

03:19:30 19    I think we can save some time here.  We'll agree to take

03:19:32 20    that one out.

03:19:33 21            THE COURT:  Oh, okay.  Well, thank you.  So that

03:19:36 22    resolves that.

03:19:37 23            So, basically we'll send you or we'll make clean

03:19:42 24    copies, send it to Ms. Farnan and Mr. Ralli.  And I would

03:19:47 25    like you to just have your best proofreader read over the

03:19:53  1    clean copy and send something back to me saying, you know,

03:20:02  2    that you don't see anything I need to change, you know, for

03:20:06  3    grammatical, spelling, other silly mistake kind of reason.

03:20:15  4    And then when that's done, Mr. Ralli, the Plaintiff usually

03:20:22  5    has the privilege of making the 20 copies of the verdict

03:20:27  6    form and the jury instructions and bring them into Court in

03:20:31  7    the morning.

03:20:31  8             MR. RALLI:  I'll get right on that, Your Honor.

03:20:33  9             THE COURT:  Well, wait until we give you the

03:20:35 10    green light.  All right.  So is there anything else?

03:20:38 11             MR. COLLETTI:  No.

03:20:40 12             MR. MURRELL:  Length of closing, Your Honor.

03:20:41 13             THE COURT:  Oh, thank you very much,

03:20:43 14    Mr. Murrell.  Because yeah, I wrote myself a sticky but then

03:20:46 15    forgot to read it.  Goes to show you that stickies aren't

03:20:51 16    the answer to everything.

03:20:52 17             So, I had a time in mind but I'm curious as to

03:20:58 18    what time you all had in mind.  Did you talk to each other

03:21:03 19    about it?

03:21:04 20             MR. THEUERKAUF:  No, we really haven't.  I mean

03:21:06 21    I can tell both of you right now that I was thinking an

03:21:08 22    hour.

03:21:10 23             THE COURT:  Yes.  Mr. Colletti, what about you?

03:21:12 24             MR. COLLETTI:  Yeah.  I was thinking a little

03:21:14 25    more brief than that, 30 to 45 minutes.

03:21:18 1     THE COURT:  Okay.  Well I'm closer to

03:21:20 2 Mr. Colletti.  I really think that -- so I think 45 minutes

03:21:41 3 is enough.  And so, Mr. Theuerkauf, you can reserve up to

03:21:50 4 five of that 45 minutes for rebuttal.

03:21:52 5     MR. THEUERKAUF:  Okay.

03:21:53 6     THE COURT:  You can tell me tomorrow, but I

03:21:57 7 really think given the issues in the case and the way the

03:22:03 8 testimony has come in, I really think there is -- I just

03:22:15 9 don't think an hour is needed.

03:22:17 10    So, 45 minutes a side.  And just to make sure

03:22:21 11 we're understanding, the first thing is I'm going to read

03:22:24 12 them most of the jury instructions.  So, that will take

03:22:30 13 between 20 and 25 minutes, probably closer to 25.

03:22:38 14    You know, if they already look like their eyes

03:22:40 15 are glazed -- so, probably what I'll do is then I'll in some

03:22:45 16 way -- I won't go like, okay, Mr. Theuerkauf, stand up and

03:22:49 17 make closing argument.  I will do something, maybe I'll just

03:22:52 18 march them out and back.  But do something to give them a

03:22:55 19 chance to wake up from me.

03:22:58 20    And then when you're done, I'll give them a

03:23:01 21 break before the Defendants' argument.  But after the

03:23:04 22 Defendants' argument, we'll go right to your rebuttal, right

03:23:09 23 to -- the last couple of jury instructions about

03:23:13 24 deliberations, I don't give them until after you all are

03:23:16 25 done.  And I would think all things considered, they should

03:23:22  1    have the case by noon.  Okay?

03:23:26  2         All right.  Well, if there's nothing else, thank

03:23:28  3    you for your attention to this.  You know, I didn't see --

03:23:38  4    so, I have two questions that don't need to be on the

03:23:43  5    record.

03:26:30  6         (Discussion held off the stenographic record.)

03:26:30  7         THE COURT:  Okay.  Well, then I will see you

03:26:33  8    tomorrow morning and we'll send you these clean jury

03:26:38  9    instructions, hopefully get a fairly quick reply, let

03:26:44 10    Mr. Ralli know that he's ready to go into production and see

03:26:49 11    you tomorrow.  Okay?

03:26:50 12         DEPUTY CLERK:  All rise.

        13         (Court was recessed at 3:26 p.m.)

        14         I hereby certify the foregoing is a true and

        15    accurate transcript from my stenographic notes in the

        16    proceeding.

        17              /s/ Heather M. Triozzi
                        Certified Merit and Real-Time Reporter
        18              U.S. District Court

        19

        20

        21

        22

        23

        24

        25

## $

**$10** [1] - 840:17
**$10,000** [4] - 822:1, 822:21, 822:23, 843:17
**$2,000** [3] - 813:17, 813:19, 813:21
**$20,000** [2] - 812:18, 812:22
**$225,000** [1] - 844:19
**$3,000** [3] - 821:6, 843:15, 843:23
**$3,400** [2] - 821:10, 834:17
**$50** [3] - 840:11, 840:19, 840:22
**$500** [3] - 827:24, 828:11, 828:23
**$500,000** [1] - 844:22
**$560** [7] - 820:22, 837:23, 838:2, 838:10, 838:15, 842:14, 842:22
**$75** [2] - 840:14, 840:23
**$76.98** [1] - 828:3
**$77** [3] - 828:1, 828:9, 828:25
**$8,000** [1] - 823:6

## '

**'044** [9] - 850:9, 878:17, 921:16, 927:16, 927:19, 927:21, 928:4, 936:18, 965:12
**'659** [7] - 921:17, 927:16, 927:19, 927:21, 928:4, 965:13, 983:7
**'85** [1] - 938:23

## /

**/s** [1] - 988:17

## 1

**1** [37] - 847:18, 847:22, 847:25, 848:5, 848:8, 848:12, 848:15, 848:17, 849:2, 849:7, 849:10, 849:15, 849:18, 849:22, 849:24, 869:4, 872:13, 872:22, 873:12, 894:13,

894:19, 917:24, 930:7, 930:10, 930:19, 960:18, 960:23, 961:1, 961:6, 961:9, 961:13, 961:16, 961:18, 965:12, 965:14, 967:9, 968:12
**1,000** [1] - 813:17
**1,939** [1] - 832:13
**1,969** [1] - 832:13
**10** [15] - 845:6, 845:8, 868:17, 868:18, 868:21, 901:12, 901:13, 901:17, 955:24, 960:12, 971:12, 979:6, 983:16, 984:6
**100** [3] - 811:11, 818:18, 949:21
**102** [1] - 865:1
**103** [1] - 865:1
**104** [1] - 865:1
**105** [1] - 865:1
**105.30** [1] - 928:20
**10th** [5] - 820:10, 845:4, 905:11, 905:23, 964:3
**11** [5] - 805:12, 875:24, 983:16, 983:18, 984:8
**11:00** [1] - 867:22
**12** [3] - 805:11, 847:8, 878:5
**120** [1] - 811:11
**120-minute** [1] - 811:4
**14** [3] - 811:22, 878:16, 901:18
**15** [15] - 821:3, 821:25, 833:2, 833:20, 833:22, 836:8, 837:3, 837:8, 837:20, 842:10, 842:12, 845:6, 845:8, 845:23, 878:22
**15-minute** [2] - 867:22, 867:25
**15-year** [1] - 822:8
**15th** [2] - 820:10, 845:4
**16** [6] - 831:5, 831:12, 880:20, 881:1, 977:14, 979:4
**17** [1] - 839:16
**18** [3] - 846:10, 877:14, 882:25
**18.67** [2] - 820:15, 821:5

**19** [1] - 885:20
**192** [1] - 854:14
**1960s** [1] - 938:21

## 2

**2** [8] - 815:5, 845:25, 848:23, 850:5, 891:18, 961:24, 966:16, 967:10
**2,000** [2] - 914:5, 914:8
**2,000-difference** [1] - 814:9
**2.5** [3] - 814:20, 815:3, 845:19
**20** [16] - 823:1, 823:3, 823:4, 823:5, 823:15, 839:6, 868:17, 868:18, 868:21, 882:2, 882:5, 905:19, 906:4, 923:23, 986:5, 987:13
**2003** [1] - 919:1
**2009** [3] - 904:3, 904:10, 908:24
**2010** [2] - 917:6, 917:11
**2013** [11] - 891:20, 897:10, 933:9, 940:12, 940:13, 940:18, 964:3, 964:8, 964:13, 964:21, 979:7
**2016** [10] - 815:8, 816:10, 816:22, 817:2, 818:8, 818:12, 843:25, 844:1, 844:12, 919:2
**2019** [16] - 815:10, 815:21, 817:17, 818:9, 818:13, 818:16, 819:21, 820:7, 825:1, 838:22, 841:1, 844:5, 844:9, 845:3, 845:7
**2020** [3] - 820:7, 821:22, 844:19
**2021** [5] - 821:21, 829:15, 829:19, 830:14, 832:24
**2023** [1] - 798:12
**205** [1] - 962:9
**206** [2] - 809:20, 962:5
**20th** [1] - 820:10
**21-91-RGA** [1] - 798:5
**23rd** [1] - 908:24
**24** [1] - 799:19

**25** [4] - 955:24, 955:25, 987:13
**25,000** [1] - 835:12
**25th** [1] - 816:3
**27** [1] - 908:15
**29.2** [2] - 810:23, 811:3
**2:30** [3] - 969:24, 969:25, 970:1

## 3

**3** [8] - 835:11, 871:16, 929:3, 929:4, 936:5, 937:18, 957:25, 982:12
**30** [11] - 798:12, 811:11, 832:12, 832:14, 881:20, 881:23, 882:5, 897:18, 950:25, 986:25
**300** [1] - 958:4
**31** [1] - 898:15
**325** [3] - 880:10, 893:10, 908:10
**325B** [2] - 805:1, 877:11
**325D** [3] - 801:20, 801:22, 802:1
**33,333.33** [1] - 812:23
**35** [4] - 833:9, 833:12, 833:20, 833:21
**35,000** [1] - 812:23
**36** [1] - 929:7
**38** [1] - 910:24
**39** [1] - 846:18
**3:26** [1] - 988:13

## 4

**4** [6] - 929:4, 930:7, 930:10, 930:19, 936:10, 983:2
**4,000** [4] - 835:11, 910:22, 911:2, 914:8
**4.0** [3] - 910:15, 911:1, 911:5
**40** [4] - 853:14, 881:21, 881:23, 951:1
**400** [2] - 823:7, 957:25
**416** [4] - 880:10, 882:17
**417** [1] - 882:17
**42** [1] - 929:17
**43** [1] - 931:3
**44** [1] - 931:8
**444** [1] - 823:8
**45** [6] - 866:25,

931:14, 986:25, 987:2, 987:4, 987:10
**46** [1] - 933:11
**47** [1] - 810:19
**496** [1] - 893:11
**4th** [1] - 908:23

## 5

**5** [15] - 799:19, 809:8, 809:12, 809:15, 856:20, 864:23, 895:9, 929:7, 931:13, 936:3, 962:5, 962:9, 965:12, 967:14, 983:3
**5.2** [1] - 823:7
**5.3** [3] - 977:12, 978:16, 978:18
**5.6** [1] - 822:2
**50** [3] - 823:22, 838:25, 840:14
**53** [1] - 893:23
**54** [1] - 894:17
**545** [1] - 911:15
**55** [2] - 931:13, 950:6
**551** [2] - 912:2, 912:3
**560** [4] - 820:24, 822:2, 822:7, 837:18
**57** [2] - 920:2, 929:3
**59** [1] - 924:5
**595** [1] - 834:13

## 6

**6** [26] - 811:9, 817:22, 850:8, 897:8, 899:10, 929:8, 935:4, 935:7, 935:19, 935:20, 935:23, 936:9, 936:12, 936:13, 936:14, 936:25, 937:7, 937:13, 937:15, 939:14, 939:15, 958:4, 959:5, 965:12, 967:14
**60** [7] - 866:9, 867:1, 867:5, 880:15, 943:23, 944:6, 959:23
**61** [1] - 867:14
**62** [2] - 877:12, 952:14
**63** [1] - 877:13
**65** [2] - 867:15, 892:3
**66** [1] - 954:12
**6:00** [1] - 976:24

## 7

**7** [7] - 929:8, 935:5, 935:8, 935:20, 935:23, 936:6, 983:6
**72** [2] - 893:7, 893:21
**73** [4] - 805:1, 859:17, 863:4, 917:17
**74** [2] - 805:1, 860:5
**76** [2] - 928:19, 928:23
**77** [1] - 911:16
**7th** [1] - 844:11

## 8

**8** [4] - 931:6, 931:10, 958:4, 983:6
**800** [1] - 830:14
**844** [1] - 798:11

## 9

**9** [2] - 960:12, 970:15
**90** [1] - 862:3
**96** [1] - 834:13
**9:00** [1] - 798:13
**9:30** [1] - 962:18

## A

**a.m** [1] - 798:13
**ability** [1] - 921:3
**able** [16] - 799:21, 800:3, 855:6, 856:24, 911:7, 912:22, 918:19, 923:17, 923:21, 924:23, 945:22, 945:23, 955:5, 964:7, 964:10, 970:1
**absence** [1] - 921:3
**absolutely** [7] - 905:1, 911:13, 914:13, 914:14, 928:5, 963:18, 984:22
**Academy** [2] - 905:12, 905:18
**acceleration** [1] - 955:3
**accept** [4] - 807:25, 810:24, 888:7, 979:10
**acceptable** [3] - 840:6, 840:15, 969:9
**accessed** [1] - 964:12
**accessibility** [2] - 978:6, 980:16
**accessible** [6] - 964:2, 965:23, 977:19, 978:20, 979:6,

982:23
**according** [2] - 872:24, 881:13
**account** [3] - 842:15, 955:4, 956:17
**accounting** [2] - 832:5, 832:17
**accounts** [1] - 886:8
**accuracy** [5] - 830:8, 830:10, 831:3, 832:9, 833:4
**accurate** [1] - 988:15
**accused** [14] - 960:15, 960:20, 960:24, 961:2, 961:7, 961:11, 961:14, 961:17, 961:20, 969:1, 969:4, 969:5, 983:17, 984:8
**achieve** [17] - 854:10, 855:7, 856:2, 856:14, 857:4, 878:1, 922:1, 934:4, 934:14, 935:22, 936:8, 936:14, 942:16, 942:19, 945:19, 945:20, 949:6
**achieved** [2] - 934:15, 952:22
**achieves** [1] - 854:9
**achieving** [2] - 884:10, 952:6
**acknowledge** [2] - 895:3, 896:10
**acronyms** [1] - 905:14
**action** [1] - 955:1
**active** [1] - 933:17
**actual** [5] - 807:19, 807:20, 807:24, 830:15, 969:3
**add** [1] - 981:7
**added** [2] - 832:11, 865:11
**addition** [5] - 918:5, 938:8, 955:11, 957:24, 967:25
**additional** [8] - 832:12, 832:14, 867:4, 918:5, 921:14, 951:25, 977:21, 978:21
**Additionally** [1] - 932:16
**address** [2] - 799:14, 976:11
**addressed** [1] - 981:9
**adequate** [1] - 945:22
**adjustable** [1] - 931:20

**adjustment** [2] - 819:14, 840:22
**administrative** [3] - 836:14, 836:18, 836:22
**admit** [6] - 801:17, 802:13, 804:19, 804:24, 804:25, 962:3
**admitted** [11] - 799:18, 802:15, 803:6, 805:3, 809:21, 847:14, 932:1, 962:7, 962:9, 967:7, 967:12
**adopt** [1] - 841:25
**adopted** [1] - 845:20
**advantage** [2] - 838:16, 838:17
**advantageous** [1] - 920:7
**advertise** [2] - 810:9, 824:11
**advertising** [4] - 817:8, 818:2, 818:17, 836:9
**advisement** [1] - 983:13
**advises** [3] - 959:1, 959:21, 959:22
**aeronautical** [1] - 855:24
**affects** [1] - 955:5
**affordable** [5] - 824:12, 824:14, 825:10, 838:6, 838:19
**aft** [6] - 847:16, 848:25, 883:7, 883:9, 949:11, 960:16
**afternoon** [2] - 970:6, 971:8
**ago** [4] - 835:11, 886:11, 917:22, 938:21
**agree** [25] - 810:16, 825:2, 825:18, 827:7, 828:8, 838:8, 861:4, 872:15, 873:15, 873:18, 876:21, 886:9, 886:19, 895:23, 896:23, 915:3, 922:14, 930:6, 930:18, 930:21, 973:13, 973:20, 975:13, 976:8, 985:19
**agreed** [16] - 800:12,

800:23, 828:24, 829:5, 837:17, 842:22, 846:1, 871:10, 873:4, 891:19, 896:13, 897:9, 923:9, 930:2, 930:4, 970:19
**agreement** [13] - 814:24, 816:11, 819:4, 819:15, 820:23, 820:25, 821:2, 824:4, 824:5, 827:24, 828:10, 844:2, 844:16
**agrees** [3] - 803:25, 932:13, 932:20
**ahead** [6] - 799:17, 800:25, 847:4, 847:9, 927:13, 960:13
**aid** [1] - 874:4
**aim** [6] - 933:23, 934:2, 934:7, 934:10, 934:12, 934:14
**air** [2] - 862:21, 863:15
**aircraft** [16] - 855:11, 855:12, 855:20, 856:11, 856:13, 863:24, 865:6, 884:14, 884:15, 940:7, 940:17, 944:9, 944:17, 944:22, 945:3, 945:4
**airfoil** [14] - 863:14, 865:19, 895:11, 895:12, 895:13, 895:22, 895:23, 896:2, 929:22, 947:18, 947:23, 949:9, 950:9, 953:17
**airfoils** [5] - 855:17, 947:9, 947:13, 947:14, 956:15
**airplane** [5] - 866:25, 925:6, 941:3, 953:7
**airplanes** [4] - 863:19, 884:6, 884:8
**al** [1] - 979:12
**allocated** [1] - 833:18
**allows** [3] - 864:2, 933:18, 934:24
**almost** [1] - 822:11
**alone** [4] - 875:15, 942:17, 977:17, 979:18
**alternative** [3] - 838:11, 839:21, 840:7
**alternatives** [1] -

839:11
**amazement** [1] - 973:4
**amended** [4] - 844:2, 844:3, 844:13
**amendment** [4] - 844:4, 844:10, 844:17, 844:18
**amendments** [1] - 844:15
**amount** [2] - 900:19, 951:12
**analogy** [1] - 813:2
**analyses** [1] - 874:19
**analysis** [19] - 807:13, 808:17, 809:11, 809:16, 826:6, 842:23, 877:6, 877:8, 877:9, 878:9, 886:17, 886:19, 887:1, 902:11, 915:21, 923:1, 954:17, 954:23, 955:4
**analyzed** [3] - 851:25, 852:13, 877:2
**Anderson** [9] - 938:2, 938:9, 938:17, 938:21, 939:2, 941:12, 941:13, 941:15, 941:19
**Anderson's** [2] - 938:12, 945:8
**ANDREW** [1] - 798:17
**Andrews** [1] - 799:12
**ANDREWS** [1] - 798:15
**angle** [18] - 856:14, 856:15, 857:3, 857:24, 866:11, 883:4, 883:10, 883:15, 883:19, 883:20, 883:23, 943:19, 944:4, 949:15, 949:16, 953:5, 953:14
**angled** [4] - 952:21, 952:25, 953:9
**angles** [3] - 866:9, 943:22, 944:6
**angling** [1] - 952:25
**ANSWER** [1] - 835:7
**answer** [6] - 829:21, 871:20, 872:8, 879:13, 896:22, 986:16
**anticipate** [5] - 869:21, 869:24, 870:5, 870:14, 870:16
**anticipates** [1] -

851:25
**anticipation** [3] - 804:14, 965:3, 966:11
**apart** [2] - 813:18, 949:13
**apologize** [1] - 874:3
**Appeals** [1] - 978:3
**appear** [1] - 983:18
**APPEARANCES** [2] - 798:16, 799:1
**appeared** [1] - 973:6
**appendage** [1] - 945:22
**appendages** [1] - 945:4
**Appendix** [1] - 893:7
**appendix** [10] - 880:15, 880:22, 881:4, 882:16, 883:1, 885:15, 893:15, 893:21, 893:25, 911:16
**application** [1] - 925:16
**applications** [1] - 860:17
**applied** [4] - 824:19, 826:1, 937:25, 938:1
**apply** [1] - 941:3
**applying** [2] - 812:4, 941:6
**appreciate** [4] - 822:19, 828:22, 969:14, 985:5
**approach** [2] - 851:5, 856:17
**appropriate** [6] - 829:1, 829:3, 884:19, 884:20, 900:22, 953:16
**approximate** [1] - 906:6
**April** [5] - 844:5, 844:10, 844:11, 905:23, 909:1
**arbitrary** [1] - 883:18
**arc** [1] - 866:24
**area** [4] - 940:7, 940:17, 953:19, 953:20
**argue** [3] - 933:3, 973:24, 973:25
**arguing** [4] - 871:4, 873:21, 874:5, 874:8
**argument** [18] - 804:14, 871:8, 892:23, 899:23, 900:1, 900:7, 917:1, 917:14, 917:16,

918:7, 918:12, 966:19, 972:11, 972:12, 981:1, 987:17, 987:21, 987:22
**arguments** [3] - 924:19, 942:25, 963:2
**arrangement** [1] - 884:22
**arrived** [1] - 815:4
**arrow** [1] - 877:21
**art** [29] - 861:7, 862:9, 862:19, 864:5, 864:15, 864:18, 899:6, 899:11, 899:20, 900:2, 921:12, 925:14, 933:5, 933:6, 956:12, 956:22, 963:22, 964:16, 964:23, 966:4, 967:16, 974:21, 977:14, 978:8, 978:22, 982:12, 985:9
**article** [6] - 802:4, 803:8, 803:10, 804:12, 804:21, 967:25
**arts** [1] - 925:10
**aspect** [3] - 921:13, 927:3, 934:10
**aspects** [2] - 869:15, 945:3
**asserted** [3] - 927:8, 927:14, 963:21
**assertion** [2] - 888:7, 888:9
**assess** [1] - 827:12
**assessing** [1] - 882:2
**assignment** [1] - 851:15
**assume** [2] - 802:16, 822:10
**assumes** [1] - 837:25
**assuming** [2] - 822:8, 953:4
**assumptions** [1] - 950:4
**assure** [2] - 865:17, 937:14
**asynchronous** [1] - 894:21
**atrium** [1] - 865:18
**attaboys** [1] - 975:15
**attached** [2] - 957:11, 971:5
**attack** [8] - 856:15, 857:3, 883:4,

883:10, 883:15, 883:20, 883:23
**attempt** [1] - 872:18
**attempting** [1] - 925:10
**attention** [3] - 888:23, 977:10, 988:3
**audit** [4] - 831:6, 831:17, 833:4, 833:6
**authoritative** [8] - 937:8, 937:24, 938:3, 938:13, 938:16, 945:9, 956:8, 956:11
**authority** [1] - 945:22
**automatic** [5] - 858:25, 864:7, 900:3, 907:8, 940:23
**automobile** [1] - 973:13
**availability** [1] - 980:17
**available** [4] - 819:3, 978:7, 978:23, 980:23
**AVL** [1] - 938:9
**avoid** [1] - 827:3
**aware** [9] - 821:11, 821:19, 821:20, 823:2, 827:12, 830:13, 840:18, 843:10, 888:16

## B

**B2** [3] - 908:9, 908:10
**background** [2] - 808:15, 809:6
**balance** [8] - 884:19, 949:17, 949:20, 949:22, 950:5, 950:8, 953:6
**banana** [1] - 866:18
**Barry** [59] - 850:24, 851:1, 851:9, 851:22, 856:19, 868:12, 872:1, 872:10, 872:20, 873:24, 876:3, 877:15, 878:6, 881:2, 885:2, 886:25, 889:3, 890:2, 890:21, 892:1, 893:13, 895:16, 902:22, 903:5, 903:16, 905:24, 907:20, 908:7, 910:22, 912:4, 912:7, 914:21, 915:6,

915:11, 916:7, 917:21, 921:5, 927:7, 927:12, 928:18, 929:20, 934:6, 935:7, 936:12, 939:6, 939:17, 940:3, 940:16, 941:25, 942:6, 942:7, 945:10, 947:6, 947:18, 960:5, 964:20, 967:7, 968:7, 976:5
**Basanta** [12] - 868:9, 868:11, 946:17, 947:4, 948:15, 950:20, 952:5, 953:24, 954:15, 956:22, 958:8, 959:25
**BASANTA** [53] - 799:7, 804:7, 804:12, 854:15, 868:10, 869:4, 869:5, 871:15, 871:17, 884:25, 887:16, 887:18, 888:24, 889:2, 892:3, 892:4, 893:10, 893:12, 893:23, 893:24, 894:17, 894:18, 897:18, 897:20, 898:15, 898:16, 909:4, 917:17, 917:18, 920:2, 920:4, 924:4, 924:6, 928:18, 928:21, 929:17, 929:18, 931:3, 931:4, 931:8, 931:9, 931:14, 931:15, 933:11, 933:12, 936:16, 937:11, 946:21, 946:24, 947:5, 947:20, 948:11, 952:16
**Basanta's** [1] - 954:3
**base** [5] - 864:21, 983:16, 983:21, 984:6, 984:9
**based** [11] - 830:20, 840:9, 845:24, 884:1, 887:13, 891:4, 891:7, 942:16, 950:5, 966:12, 969:2
**bases** [2] - 843:9, 843:10
**basic** [1] - 956:15

**basin** [1] - 902:16
**basing** [1] - 904:24
**basis** [5] - 804:4, 825:13, 825:14, 969:3, 976:15
**batteries** [3] - 835:19, 862:11, 926:7
**battery** [11] - 810:7, 811:7, 848:20, 850:2, 917:6, 917:10, 923:17, 924:13, 926:9, 957:15, 961:22
**bear** [1] - 890:19
**become** [2] - 852:23, 978:3
**becomes** [2] - 822:2, 957:15
**BEFORE** [1] - 798:15
**begin** [1] - 868:3
**beginning** [6] - 845:19, 847:8, 864:23, 923:6, 936:6, 954:21
**begins** [4] - 936:1, 936:2, 959:2, 959:3
**behaving** [1] - 831:22
**behind** [1] - 925:7
**below** [3] - 826:21, 898:20, 911:24
**benefit** [1] - 826:9
**benefits** [1] - 842:3
**best** [6] - 810:9, 810:10, 824:1, 825:9, 950:2, 985:25
**better** [6] - 824:14, 880:24, 881:7, 916:7, 974:21, 980:1
**between** [25] - 803:8, 807:4, 807:7, 807:8, 807:17, 807:18, 809:6, 811:19, 814:22, 818:12, 819:24, 829:13, 837:12, 840:14, 848:3, 849:13, 867:14, 900:19, 900:22, 901:17, 927:22, 948:21, 961:4, 982:21, 987:13
**beyond** [3] - 948:1, 980:24, 981:1
**big** [9] - 823:12, 836:1, 855:21, 858:12, 863:21, 915:13, 923:14, 957:18, 987:13
**bigger** [8] - 913:25, 924:20, 924:21,

926:6, 926:7, 956:6, 957:15

**biggest** [2] - 819:20, 838:7

**binary** [1] - 819:23

**birds** [1] - 860:15

**bit** [18] - 821:15, 852:3, 855:5, 887:22, 904:12, 904:13, 907:1, 916:15, 922:5, 935:4, 935:7, 942:8, 955:20, 956:4, 957:6, 957:23, 957:24, 980:25

**blow** [1] - 945:7

**Blue** [2] - 977:19, 977:25

**BMW** [8] - 811:19, 812:5, 812:12, 812:13, 813:1, 813:22, 843:3, 843:5

**board** [52] - 801:7, 801:9, 809:3, 817:11, 820:19, 820:21, 822:1, 822:2, 822:7, 823:7, 824:6, 825:3, 825:5, 825:13, 827:1, 827:2, 827:25, 828:1, 828:3, 828:9, 828:11, 828:13, 828:23, 828:25, 834:15, 834:18, 836:16, 837:18, 837:22, 838:2, 840:11, 840:17, 840:19, 840:22, 853:21, 860:14, 887:21, 888:1, 888:2, 888:8, 888:12, 888:14, 889:11, 889:12, 889:13, 889:15, 889:22, 890:12, 922:11, 931:18, 968:12

**boards** [15] - 801:8, 801:11, 807:24, 808:14, 809:7, 830:14, 835:8, 835:17, 840:14, 843:14, 843:16, 843:19, 843:22, 889:4, 968:13

**Boat** [1] - 967:25

**boat** [8] - 802:3, 859:25, 862:4, 875:9, 889:15, 910:1, 927:1, 956:4

**body** [8] - 848:11, 849:21, 855:2, 910:9, 910:13, 919:23, 955:8, 961:12

**Boggs** [1] - 798:10

**bold** [1] - 985:7

**book** [1] - 945:12

**BORDLEY** [1] - 799:3

**bothering** [1] - 874:4

**bottom** [7] - 847:17, 849:2, 866:6, 908:20, 929:1, 957:11, 960:18

**bounce** [1] - 862:15

**bounces** [2] - 956:4, 956:5

**bound** [1] - 871:9, 873:4

**box** [2] - 871:9, 873:4

**brand** [2] - 843:9, 910:17

**break** [11] - 809:9, 860:19, 866:8, 867:22, 867:25, 870:2, 945:25, 963:11, 981:22, 982:15, 987:21

**BRIAN** [1] - 798:21

**brief** [1] - 986:25

**briefly** [4] - 859:15, 859:19, 860:7, 957:6

**bring** [28] - 801:7, 835:8, 863:2, 869:4, 877:11, 878:22, 892:3, 893:23, 894:17, 897:18, 898:15, 908:8, 908:20, 911:15, 917:17, 921:5, 924:4, 928:18, 929:16, 931:3, 931:8, 937:16, 938:25, 943:7, 971:1, 977:10, 986:6

**bringing** [1] - 869:6

**broad** [1] - 845:22

**broader** [1] - 974:15

**broken** [1] - 836:23

**brought** [2] - 927:20, 936:10

**build** [7] - 906:16, 906:24, 907:7, 914:18, 925:11, 937:3, 937:5

**building** [3] - 886:9, 906:10, 944:8

**built** [4] - 816:12, 900:17, 906:13, 915:5

**bullet** [1] - 913:15

**bullets** [2] - 912:6

**bunch** [2] - 902:20, 954:8

**business** [12] - 823:11, 823:13, 823:18, 824:2, 824:6, 824:7, 824:11, 825:3, 825:7, 825:19, 841:20, 841:22

**businesses** [1] - 824:21

**but..** [4] - 820:9, 826:3, 831:24, 925:7

**buy** [4] - 810:10, 812:20, 812:21, 814:1

**buyout** [1] - 844:20

**BY** [56] - 798:17, 798:20, 798:20, 798:21, 799:3, 799:3, 799:6, 799:6, 799:7, 799:7, 806:24, 808:11, 811:24, 834:14, 839:17, 841:16, 851:8, 851:21, 852:21, 854:17, 856:21, 858:16, 858:19, 859:8, 859:18, 860:6, 863:7, 864:10, 867:2, 868:11, 869:5, 871:17, 884:25, 887:18, 889:2, 892:4, 893:12, 893:24, 894:18, 897:20, 898:16, 909:4, 917:18, 920:4, 924:6, 928:21, 929:18, 931:4, 931:9, 931:15, 933:12, 937:11, 947:5, 948:14, 952:16, 959:24

**Båtnytt** [1] - 980:24

# C

**C.A** [1] - 798:5

**calculating** [1] - 812:3

**calculations** [7] - 875:5, 916:3, 916:9, 916:12, 916:20, 916:22, 949:17

**Caleb** [1] - 798:10

**Calypso** [2] - 977:19, 977:25

**camber** [3] - 855:19,

953:14, 953:18

**canards** [1] - 930:22

**candidates** [1] - 973:17

**candle** [1] - 855:22

**cannot** [3] - 869:11, 890:16, 891:10

**canoe** [1] - 860:15

**cap** [4] - 815:1, 815:4, 846:2, 846:6

**capstone** [1] - 914:15

**captions** [1] - 982:19

**car** [1] - 812:21

**care** [1] - 968:20

**careful** [1] - 861:24

**carefully** [1] - 888:23

**Carol** [8] - 897:19, 908:14, 908:20, 909:10, 910:7, 911:15, 911:21, 931:14

**carrier** [1] - 856:11

**cart** [2] - 951:18

**case** [50] - 799:19, 799:22, 799:23, 800:5, 800:7, 800:13, 805:20, 808:12, 812:8, 814:20, 825:23, 826:7, 826:20, 827:5, 827:12, 829:13, 831:6, 831:18, 832:3, 833:7, 836:11, 836:25, 842:19, 845:21, 851:15, 852:22, 858:2, 858:22, 859:1, 860:11, 864:11, 865:18, 874:6, 916:19, 956:18, 962:21, 962:23, 962:24, 963:1, 964:18, 968:19, 973:22, 977:20, 978:3, 979:15, 979:16, 985:15, 987:7, 988:1

**cases** [2] - 835:7, 854:8

**cat** [1] - 973:6

**catch** [1] - 975:2

**causes** [3] - 856:17, 858:6, 863:13

**caveat** [1] - 814:25

**cease** [1] - 841:4

**center** [4] - 865:24, 881:14, 949:14, 959:8

**certain** [15] - 829:25,

856:5, 863:24, 891:1, 905:7, 929:3, 950:6, 953:19, 955:6, 955:11, 959:19, 959:22, 980:17, 980:18

**certainly** [10] - 807:17, 808:24, 817:24, 818:19, 819:3, 819:12, 836:11, 854:9, 920:16

**certification** [1] - 835:21

**certifications** [2] - 835:18, 836:6

**Certified** [1] - 888:17

**certify** [1] - 988:14

**cetera** [4] - 855:12, 865:19, 905:2, 938:9

**chair** [10] - 859:22, 921:15, 921:16, 922:20, 922:22, 922:24, 923:4, 923:8, 923:10, 923:12

**challenging** [1] - 875:23

**chambers** [1] - 971:8

**chance** [5] - 907:6, 908:2, 963:3, 982:1, 987:19

**change** [15] - 840:10, 840:25, 841:3, 841:6, 841:9, 855:25, 955:17, 959:25, 970:19, 970:21, 970:25, 971:5, 984:24, 985:10, 986:2

**changed** [3] - 805:12, 808:3, 834:21

**changes** [1] - 855:24

**changing** [1] - 922:3

**channel** [2] - 824:16, 842:4

**channels** [1] - 817:14

**characteristics** [2] - 928:8, 929:11

**characterized** [1] - 875:22

**charge** [1] - 825:18

**charges** [1] - 828:15

**charging** [1] - 824:5

**cheaper** [4] - 826:15, 827:2, 827:21, 838:11

**cheapest** [1] - 814:8

**check** [1] - 833:4

**checked** [2] - 831:15, 890:2

**checking** [3] - 831:9, 831:23, 981:14
**chest** [1] - 958:2
**China** [1] - 834:5
**choice** [1] - 823:25
**choose** [2] - 826:15, 925:15
**chooses** [1] - 824:7
**chose** [1] - 830:1
**chosen** [4] - 823:10, 823:21, 825:3, 825:19
**Christopher** [1] - 850:24
**Circuit** [1] - 985:16
**Circuit's** [1] - 977:19
**citation** [1] - 931:1
**citations** [1] - 892:10
**cite** [4] - 928:17, 929:3, 929:7, 976:21
**cited** [3] - 940:21, 941:5, 941:14
**cites** [1] - 976:13
**Claim** [42] - 847:18, 847:22, 847:25, 848:5, 848:8, 848:12, 848:15, 848:17, 848:23, 849:2, 849:7, 849:10, 849:15, 849:18, 849:22, 849:24, 850:5, 850:8, 872:13, 872:22, 873:12, 891:18, 895:9, 897:8, 899:10, 917:24, 960:18, 960:23, 961:1, 961:6, 961:9, 961:13, 961:16, 961:18, 961:24, 965:12, 965:14, 967:9, 967:10, 967:14
**claim** [5] - 800:20, 897:3, 920:1, 965:17, 970:15
**claimed** [35] - 847:18, 847:22, 847:25, 848:5, 848:8, 848:11, 848:15, 848:17, 848:22, 849:2, 849:6, 849:10, 849:15, 849:18, 849:21, 849:24, 850:5, 850:8, 852:7, 864:19, 872:13, 872:21, 873:12, 917:24, 927:15,

956:12, 960:18, 960:23, 961:1, 961:6, 961:9, 961:13, 961:16, 961:18, 961:24
**Claims** [1] - 966:16
**claims** [22] - 800:20, 805:14, 852:1, 852:15, 869:21, 869:25, 870:5, 870:14, 870:16, 871:6, 873:23, 874:10, 899:16, 920:10, 920:12, 965:5, 965:10, 966:16, 967:3, 967:14, 983:8
**clarify** [4] - 826:9, 866:13, 870:1, 901:5
**clarity** [3] - 868:19, 868:22, 869:12
**clean** [4] - 805:19, 985:23, 986:1, 988:8
**clear** [15] - 820:24, 905:1, 905:6, 927:25, 928:5, 959:8, 963:20, 964:1, 965:3, 965:7, 966:20, 978:19, 978:21, 982:20, 982:24
**clearly** [8] - 828:16, 853:9, 874:14, 891:12, 892:5, 913:8, 913:10, 913:24
**CLERK** [8] - 799:11, 806:15, 868:1, 946:6, 946:8, 970:4, 981:23, 988:12
**clerk** [2] - 805:19, 970:8
**clicker** [1] - 846:9
**clicks** [3] - 974:22, 975:8, 976:8
**client** [3] - 828:8, 829:4, 830:24
**clip** [6] - 884:12, 888:20, 894:12, 936:16, 937:22, 938:25
**Clip** [4] - 887:12, 887:16, 888:24, 947:20
**clips** [1] - 891:15
**clock** [2] - 902:10, 902:13
**close** [4] - 857:17, 858:14, 962:11, 975:6

**closed** [6] - 799:22, 800:5, 906:19, 906:20, 906:21, 906:25
**closely** [3] - 830:21, 887:25, 888:3
**closer** [3] - 947:11, 987:1, 987:13
**closing** [3] - 963:2, 986:12, 987:17
**CO** [1] - 798:8
**Coffey** [1] - 938:4
**colleague** [3] - 872:11, 873:10, 917:21
**college** [1] - 914:14
**COLLETTI** [51] - 799:6, 799:15, 799:18, 800:2, 800:14, 801:13, 801:15, 801:23, 802:3, 802:25, 804:3, 804:9, 804:24, 805:7, 847:1, 847:7, 847:10, 850:11, 850:14, 850:20, 868:4, 962:6, 962:14, 966:25, 968:15, 969:6, 969:12, 970:2, 971:21, 972:1, 973:19, 974:1, 974:3, 975:25, 978:15, 978:18, 979:8, 981:14, 981:17, 982:3, 982:9, 982:12, 982:14, 982:20, 983:6, 983:11, 983:15, 983:23, 985:1, 986:11, 986:24
**Colletti** [11] - 962:12, 972:8, 973:16, 975:24, 978:14, 981:12, 983:5, 984:6, 984:25, 986:23, 987:2
**Column** [32] - 864:23, 929:3, 929:4, 929:7, 929:8, 935:4, 935:5, 935:7, 935:8, 935:19, 935:20, 935:23, 936:2, 936:3, 936:5, 936:6, 936:9, 936:10, 936:12, 936:13, 936:14, 936:25, 937:7, 937:13,

937:15, 937:18, 939:14, 939:15, 959:5
**column** [1] - 931:13
**combination** [5] - 861:8, 883:3, 945:2, 965:9, 966:21
**combine** [5] - 919:6, 920:24, 926:20, 958:22, 959:1
**combining** [2] - 860:24, 919:10
**coming** [1] - 846:20
**comment** [1] - 983:15
**comments** [3] - 942:10, 943:18, 982:10
**commercial** [3] - 817:4, 817:5, 972:11
**commercialize** [1] - 816:20
**commercializing** [1] - 816:19
**commercially** [1] - 840:15
**commonly** [1] - 826:18
**companies** [3] - 801:4, 824:18, 842:17
**company** [3] - 829:22, 830:2, 836:17
**compare** [3] - 814:7, 816:10, 824:3
**compared** [3] - 824:7, 830:16, 838:11
**compares** [1] - 878:23
**comparison** [5] - 802:15, 803:8, 811:19, 813:22, 813:24
**compensate** [1] - 918:20
**compensation** [3] - 844:16, 844:23, 844:25
**compete** [2] - 819:2, 826:14
**competing** [4] - 801:3, 801:8, 813:12
**competition** [12] - 807:6, 807:8, 807:14, 807:17, 808:17, 809:2, 809:12, 819:11, 819:15, 819:24, 842:18, 845:2
**competitive** [1] - 828:18
**competitor** [12] -

819:6, 819:8, 819:13, 819:19, 819:22, 819:23, 819:24, 820:1, 820:2, 820:8, 845:14
**competitors** [9] - 801:4, 807:15, 811:16, 825:21, 838:12, 843:7, 845:6, 845:8, 845:11
**complaint** [1] - 841:7
**completely** [5] - 858:1, 862:5, 882:8, 920:19, 926:21
**component** [2] - 860:9, 860:10
**components** [6] - 871:22, 871:25, 872:3, 909:20, 932:11, 950:9
**compound** [1] - 870:6
**comprehensive** [1] - 905:6
**comprises** [3] - 848:20, 850:2, 961:21
**comprising** [1] - 918:6
**computer** [1] - 815:20
**concept** [1] - 826:18
**concepts** [1] - 870:25
**concern** [2] - 979:13, 981:9
**concerned** [1] - 969:17
**concerning** [1] - 830:6
**conclude** [1] - 900:3
**concluded** [9] - 845:24, 846:6, 869:20, 869:24, 870:4, 870:13, 870:15, 889:19, 889:22
**conclusion** [3] - 853:7, 884:24, 937:10
**Concorde** [5] - 855:12, 855:20, 855:21, 856:7, 944:12
**condition** [6] - 857:10, 857:11, 858:5, 878:20, 879:17, 890:13
**conditions** [1] - 844:12
**conference** [2] - 805:13, 805:22
**configuration** [17] - 865:22, 874:18, 878:10, 881:11,

883:2, 883:7, 883:8, 884:2, 884:6, 884:9, 884:14, 905:8, 906:19, 906:20, 906:21, 921:25, 954:24

**configurations** [8] - 865:1, 865:2, 865:8, 865:23, 936:11, 958:15, 958:23, 959:4

**confined** [2] - 918:4, 919:22

**confirm** [2] - 814:12, 911:14

**confirmed** [2] - 801:7, 964:9

**confirming** [1] - 834:24

**confirms** [2] - 874:16, 874:17

**confused** [3] - 869:20, 911:9, 911:11

**confusing** [3] - 869:16, 869:17, 880:3

**confusion** [1] - 913:5

**connected** [3] - 848:14, 931:18, 961:15

**connection** [2] - 894:12, 894:21

**consider** [10] - 801:8, 808:25, 809:12, 819:1, 819:7, 824:13, 846:19, 876:6, 896:1, 900:6

**consideration** [1] - 985:14

**considerations** [5] - 968:6, 968:8, 968:11, 968:18, 972:7

**considered** [13] - 815:22, 835:19, 845:23, 846:15, 875:6, 876:22, 898:12, 898:19, 898:25, 938:4, 956:24, 959:9, 987:25

**considering** [2] - 809:1, 954:8

**consistency** [1] - 983:19

**consistent** [3] - 830:14, 923:18, 955:9

**consistently** [1] - 885:25

**construction** [1] - 817:12

**constructions** [1] - 970:16

**consumer** [7] - 808:24, 813:11, 815:20, 818:8, 822:15, 822:22, 841:25

**consumer's** [1] - 808:22

**consumers** [1] - 843:1

**contact** [1] - 835:21

**contained** [2] - 926:16, 968:1

**container** [1] - 835:9

**contains** [1] - 846:6

**context** [2] - 921:21, 954:22

**continue** [7] - 821:12, 821:25, 826:22, 857:13, 898:4, 914:3, 974:10

**CONTINUED** [1] - 799:1

**continued** [2] - 835:20, 902:7

**continues** [2] - 826:21, 827:18

**continuum** [2] - 819:11, 820:11

**contrast** [1] - 816:10

**control** [36] - 858:25, 861:20, 862:8, 864:7, 865:25, 871:10, 871:21, 871:24, 872:3, 873:6, 881:20, 893:21, 894:7, 894:8, 894:22, 900:4, 907:8, 918:2, 918:4, 918:5, 919:18, 919:20, 919:21, 919:24, 920:1, 920:12, 920:23, 921:3, 921:4, 933:17, 957:24, 958:2, 958:3, 959:9, 967:4, 967:7

**controlled** [17] - 853:5, 860:11, 861:20, 861:21, 862:8, 871:6, 872:17, 872:19, 873:1, 873:4, 873:18, 873:19, 894:6, 920:21, 933:19, 936:8

**controller** [9] - 850:3,

891:24, 892:11, 892:23, 893:21, 895:1, 895:4, 967:11, 967:13

**controllers** [1] - 891:20

**controls** [2] - 859:3, 940:23

**conversation** [1] - 832:7

**convert** [2] - 810:21, 810:24

**convincing** [6] - 963:21, 964:1, 965:3, 965:8, 966:20, 978:19

**COOCH** [1] - 798:17

**copied** [1] - 941:20

**copies** [3] - 971:2, 985:24, 986:5

**copy** [5] - 831:10, 832:10, 869:1, 869:2, 986:1

**core** [1] - 886:4

**corners** [1] - 804:13

**correct** [66] - 807:12, 807:24, 810:8, 813:4, 814:21, 815:3, 815:11, 816:6, 816:9, 816:13, 816:25, 818:15, 819:2, 819:3, 820:12, 820:20, 821:1, 821:4, 821:7, 821:8, 822:3, 822:23, 822:24, 824:24, 830:9, 830:20, 832:6, 833:2, 833:5, 833:6, 833:25, 835:1, 839:25, 851:17, 854:3, 854:4, 867:6, 867:7, 867:18, 867:19, 871:7, 877:4, 878:15, 883:12, 884:3, 884:4, 897:7, 906:25, 915:23, 918:17, 920:18, 921:7, 922:12, 922:21, 930:13, 936:23, 937:14, 940:10, 942:21, 949:8, 950:15, 950:17, 956:24, 958:9, 959:20, 959:21

**corrected** [1] - 895:2

**corrections** [1] - 985:12

**corrective** [2] - 955:1

**correctly** [3] - 816:4, 975:20, 979:11

**correspondence** [1] - 828:16

**cost** [20] - 810:12, 813:2, 813:6, 813:15, 813:19, 833:12, 833:13, 833:16, 834:15, 834:16, 835:9, 835:15, 836:15, 836:16, 837:22, 837:23, 838:9, 838:25, 839:1, 840:10

**cost-free** [1] - 838:9

**costing** [1] - 812:13

**costs** [7] - 834:2, 834:4, 835:4, 835:5, 837:10, 841:19, 842:2

**counsel** [7] - 841:19, 845:3, 845:18, 879:22, 937:21, 946:18, 970:19

**counselor** [1] - 937:16

**count** [2] - 980:2, 980:3

**counteract** [2] - 945:5, 945:23

**counts** [1] - 976:14

**couple** [11] - 828:10, 856:23, 863:9, 865:5, 904:18, 904:21, 908:14, 911:21, 938:15, 962:2, 987:23

**course** [4] - 886:24, 902:14, 908:18, 944:8

**COURT** [140] - 798:1, 799:13, 799:17, 799:25, 800:8, 800:16, 800:22, 801:5, 801:10, 801:14, 801:18, 802:1, 802:12, 802:16, 802:24, 803:2, 803:12, 803:16, 803:18, 804:5, 804:8, 804:11, 804:18, 805:3, 805:9, 806:4, 806:6, 806:17, 806:19, 806:21, 808:1, 841:13, 846:23, 847:4, 847:9, 850:13, 850:15, 850:18,

850:22, 850:25, 851:4, 851:6, 854:16, 866:22, 867:21, 867:24, 868:3, 868:5, 868:7, 909:1, 945:25, 946:3, 946:9, 946:13, 946:16, 946:19, 946:22, 946:25, 947:2, 948:12, 959:24, 960:5, 960:10, 960:13, 961:25, 962:4, 962:7, 962:12, 962:15, 963:15, 963:20, 968:14, 968:16, 969:10, 969:14, 969:21, 970:3, 970:6, 970:23, 971:3, 971:9, 971:11, 971:20, 971:23, 972:4, 972:20, 972:24, 973:5, 973:16, 973:23, 974:2, 974:16, 975:3, 975:7, 975:13, 975:21, 976:7, 976:17, 976:24, 977:1, 977:5, 977:7, 977:13, 977:15, 977:22, 978:17, 979:1, 979:9, 979:19, 980:6, 980:9, 980:11, 980:20, 981:6, 981:12, 981:15, 981:18, 981:25, 982:5, 982:8, 982:11, 982:13, 982:18, 983:4, 983:9, 983:12, 983:20, 983:24, 984:5, 984:13, 984:16, 984:23, 985:2, 985:21, 986:9, 986:13, 986:23, 987:1, 987:6, 988:7

**Court** [8] - 799:11, 902:17, 948:18, 948:22, 978:3, 986:6, 988:13, 988:18

**court** [1] - 963:15

**Court's** [1] - 968:1

**Courthouse** [1] - 798:10

**courtroom** [7] -

806:20, 867:23, 868:6, 900:15, 946:2, 947:1, 963:8
**cover** [2] - 806:10, 836:9
**covered** [2] - 971:17, 972:18
**covers** [1] - 899:16
**craft** [37] - 853:14, 857:8, 862:12, 874:17, 875:18, 875:22, 878:5, 881:13, 883:19, 889:16, 891:12, 903:8, 909:9, 920:22, 921:2, 922:17, 923:4, 923:24, 924:24, 925:3, 926:5, 926:11, 926:12, 926:15, 926:16, 926:21, 926:23, 927:1, 936:8, 936:20, 937:15, 950:8, 951:20, 952:1, 952:10, 959:2
**crash** [3] - 858:7, 862:21, 915:13
**crashes** [5] - 857:7, 857:12, 955:23, 955:24, 956:7
**create** [1] - 855:7
**created** [3] - 817:17, 818:14, 818:21
**credit** [1] - 941:9
**credited** [1] - 818:18
**criteria** [2] - 941:5, 949:2
**criticize** [1] - 915:20
**cross** [9] - 802:5, 802:15, 803:21, 831:9, 831:15, 831:23, 949:10, 953:13, 953:14
**CROSS** [1] - 806:23
**cross-checked** [1] - 831:15
**cross-checking** [2] - 831:9, 831:23
**CROSS-EXAMINATION** [1] - 806:23
**cross-examine** [1] - 803:21
**Cruise** [4] - 910:14, 910:17, 910:22, 911:1
**Crusader** [1] - 856:9
**crux** [1] - 917:13
**Cub** [2] - 863:20,

863:21
**curiosity** [1] - 885:4
**curious** [1] - 986:17
**current** [3] - 811:6, 823:13, 823:24
**curve** [3] - 850:8, 863:20, 958:16
**curved** [6] - 897:10, 897:15, 897:16, 897:17, 898:1, 899:9
**CUSTOM** [1] - 796:14
**customer** [2] - 834:7, 835:24
**customers** [6] - 824:10, 825:9, 826:14, 826:24, 827:11, 827:12
**customs** [3] - 834:6, 835:16, 836:5
**cut** [9] - 800:8, 855:15, 883:9, 883:13, 890:24, 891:1, 891:2, 891:8

## D

**damages** [1] - 830:24
**dark** [1] - 855:15
**data** [14] - 830:5, 830:8, 830:9, 830:11, 830:15, 830:22, 831:7, 831:10, 831:18, 831:22, 832:9, 832:11
**date** [10] - 810:3, 815:13, 816:3, 816:4, 903:23, 905:7, 906:6, 908:16, 980:17, 980:18
**deal** [2] - 900:13, 901:10
**dealt** [1] - 803:20
**death** [1] - 957:17
**decades** [2] - 938:21, 939:14
**decide** [3] - 838:24, 965:24, 969:4
**decided** [2] - 824:9, 824:12
**decision** [6] - 799:23, 800:5, 808:22, 824:22, 953:18, 976:21
**decisions** [2] - 824:17, 824:23
**deck** [1] - 846:11
**decline** [3] - 826:17, 837:25, 842:19

**declined** [1] - 844:25
**dedications** [1] - 835:20
**deeply** [1] - 856:9
**Defendant** [5] - 965:23, 966:20, 967:17, 981:2, 982:8
**Defendants** [5] - 798:9, 799:8, 967:21, 968:2, 968:5
**defendants** [1] - 967:1
**Defendants'** [11] - 801:20, 888:11, 963:20, 964:6, 965:2, 965:7, 968:23, 969:1, 979:21, 987:21, 987:22
**defense** [3] - 963:20, 965:3, 965:7
**defenses** [2] - 805:14, 851:16
**define** [3] - 826:19, 901:1, 948:1
**defines** [1] - 948:4
**defining** [1] - 883:18
**definition** [5] - 878:13, 944:3, 948:16, 948:17, 948:18
**definitions** [1] - 971:5
**degree** [9] - 809:2, 809:11, 822:20, 868:19, 868:22, 869:12, 883:10, 883:15, 914:15
**degrees** [12] - 862:3, 866:10, 866:25, 867:1, 867:5, 867:15, 870:24, 883:4, 943:23, 944:6, 959:23
**DELAWARE** [1] - 798:2
**Delaware** [1] - 798:11
**deleterious** [1] - 942:18
**deliberate** [1] - 962:22
**deliberations** [1] - 987:24
**delivery** [1] - 810:16
**delta** [28] - 855:8, 855:10, 855:11, 855:20, 856:5, 856:10, 883:3, 883:9, 942:8, 942:25, 943:4, 944:1, 944:4, 944:5, 944:17, 944:19, 944:25, 945:2, 945:5, 945:13,

945:14, 945:15, 945:17, 945:19, 945:20, 945:24
**DENNIS** [1] - 798:20
**deny** [14] - 917:4, 917:10, 917:12, 922:3, 922:10, 965:21, 966:10, 966:11, 966:13, 966:15, 966:17, 966:18, 966:23, 968:17
**dependent** [1] - 825:7
**deposition** [7] - 811:14, 829:18, 830:3, 830:12, 832:23, 832:24, 885:1
**DEPUTY** [8] - 799:11, 806:15, 868:1, 946:6, 946:8, 970:4, 981:23, 988:12
**deputy** [1] - 805:19
**derives** [1] - 920:22
**describe** [6] - 856:24, 859:15, 859:19, 860:7, 861:10, 958:12
**described** [4] - 811:15, 863:11, 866:17, 957:9
**describes** [2] - 850:6, 859:21
**describing** [2] - 836:3, 856:23
**description** [4] - 802:22, 852:14, 864:13, 955:9
**descriptions** [2] - 809:7, 950:22
**design** [40] - 853:12, 853:16, 866:10, 866:14, 867:18, 875:6, 875:12, 895:11, 895:12, 895:13, 895:22, 895:24, 896:14, 896:20, 896:21, 897:14, 898:11, 902:1, 902:3, 902:14, 903:23, 904:11, 904:16, 904:17, 905:1, 905:6, 905:13, 906:25, 908:8, 909:12, 909:16, 911:19, 913:7, 924:1, 929:22, 943:23, 953:10, 953:12, 953:13

**designed** [6] - 865:4, 874:20, 875:8, 912:19, 913:9, 923:19
**designer** [3] - 953:19, 958:17, 958:18
**designing** [2] - 898:10, 898:19
**designs** [2] - 867:6, 880:4
**desire** [1] - 934:16
**desired** [1] - 894:7
**desist** [1] - 841:4
**Despite** [1] - 892:9
**destabilize** [1] - 862:20
**destabilizing** [1] - 945:23
**detachable** [2] - 860:8, 862:7
**detachable/attachable** [1] - 860:9
**detail** [5] - 836:3, 852:3, 888:1, 888:6, 939:2
**details** [5] - 827:4, 865:11, 888:16, 958:24, 958:25
**determination** [6] - 875:15, 887:12, 890:7, 891:5, 891:7, 891:10
**determinations** [1] - 874:23
**determine** [2] - 826:4, 955:5
**determined** [1] - 807:13
**develop** [1] - 856:6
**developed** [1] - 818:12
**developing** [1] - 817:10
**development** [4] - 818:18, 837:9, 837:14, 901:19
**device** [26] - 847:15, 847:17, 847:19, 847:21, 847:23, 848:3, 848:4, 848:25, 849:1, 849:4, 849:6, 849:9, 849:13, 849:14, 854:8, 909:24, 919:4, 926:10, 926:14, 960:16, 960:17, 960:21, 960:22, 960:25, 961:4, 961:5

**devil** [1] - 864:3
**difference** [12] -
809:5, 812:2, 813:5,
813:21, 827:16,
829:16, 888:14,
888:17, 927:22,
950:1, 979:19,
979:20
**differences** [6] -
807:3, 807:6,
829:13, 888:6,
948:20, 969:7
**different** [28] - 807:20,
818:7, 823:17,
824:16, 829:24,
834:17, 836:23,
844:16, 851:15,
854:3, 862:5, 865:1,
901:18, 904:7,
904:10, 915:7,
920:19, 926:21,
958:14, 969:4,
969:5, 969:7,
973:10, 979:2,
982:24, 983:1
**differentiated** [1] -
843:8
**differently** [2] - 907:8,
908:1
**difficult** [2] - 861:20,
891:6
**dihedral** [1] - 949:15
**diligence** [1] - 978:9
**dimensions** [3] -
909:18, 909:19,
912:1
**direct** [13] - 807:2,
807:15, 819:6,
819:21, 822:15,
823:11, 824:10,
825:11, 841:25,
875:16, 965:11,
965:12, 969:11
**DIRECT** [1] - 851:7
**directed** [1] - 965:16
**direction** [4] - 880:25,
881:8, 881:11,
949:20
**directional** [1] -
865:14
**directionality** [1] -
951:14
**directions** [2] -
959:14, 959:15
**directly** [3] - 801:8,
824:10, 826:13
**disabled** [2] - 861:18,
922:25
**disadvantage** [1] -
838:18

**disagree** [6] - 874:12,
875:17, 896:19,
915:18, 974:10,
979:15
**disagreed** [1] - 891:23
**disagrees** [1] - 915:24
**disclose** [11] - 848:24,
849:8, 892:10,
895:1, 918:2,
919:17, 920:17,
921:7, 921:10,
921:18
**disclosed** [7] - 880:4,
897:14, 920:1,
920:16, 924:22,
948:21, 958:8
**discloses** [34] -
847:15, 847:19,
847:23, 848:1,
848:6, 848:10,
848:13, 848:16,
848:19, 849:4,
849:11, 849:16,
849:20, 849:23,
850:1, 859:20,
871:5, 872:12,
872:17, 872:18,
872:21, 873:11,
873:17, 873:22,
874:9, 882:13,
891:23, 917:23,
919:19, 919:24,
920:9, 921:24,
924:21
**disclosing** [1] -
875:18
**discount** [4] - 823:1,
823:5, 823:12,
823:15
**discuss** [11] - 860:11,
898:4, 903:22,
906:9, 906:12,
906:15, 906:23,
928:7, 929:10,
938:8, 969:24
**discussed** [5] - 809:8,
844:3, 845:22,
854:6, 985:18
**discusses** [6] -
865:11, 865:21,
936:4, 936:10,
958:15, 958:19
**discussing** [1] - 942:5
**Discussion** [2] -
984:21, 988:6
**discussion** [11] -
859:10, 864:25,
874:18, 947:9,
947:13, 949:24,
949:25, 950:2,

954:7, 958:7, 967:8
**discussions** [3] -
830:4, 853:10,
955:14
**disposal** [1] - 912:14
**disposed** [2] - 847:20,
849:5, 960:21
**dispute** [5] - 800:1,
800:2, 800:3, 801:1,
842:11, 968:24
**disputed** [3] - 801:18,
967:3
**disputes** [1] - 805:6
**disseminated** [1] -
978:6
**distance** [1] - 953:20
**distinction** [1] -
982:21
**distribute** [2] - 825:8,
835:22
**distribution** [8] -
834:2, 841:20,
842:4, 842:5,
896:17, 896:24,
897:5, 929:23
**distributor** [3] - 821:6,
823:22, 838:25
**distributors** [9] -
823:20, 824:15,
825:8, 828:19,
839:5, 843:13,
843:19, 843:20,
843:23
**District** [1] - 988:18
**DISTRICT** [2] - 798:1,
798:2
**disturbance** [7] -
858:6, 878:18,
879:1, 879:7, 955:2,
955:5
**disturbed** [2] - 950:11
**diverge** [1] - 951:17
**dives** [1] - 857:20
**divided** [1] - 924:18
**dock** [2] - 853:25,
877:3
**document** [2] -
880:13, 943:14
**documents** [3] -
823:3, 832:10, 839:8
**dollar** [2] - 846:2,
984:3
**dollars** [9] - 812:14,
815:1, 844:21,
846:4, 983:22,
984:11, 984:14,
984:17, 984:19
**done** [28] - 806:9,
815:6, 818:2, 824:3,
826:4, 827:4, 827:5,

827:6, 827:11,
831:11, 874:19,
906:3, 907:8, 907:9,
907:11, 908:1,
912:11, 940:8,
940:18, 940:21,
962:13, 969:1,
970:22, 981:10,
986:4, 987:20,
987:25
**Doo** [4] - 839:21,
839:22, 839:23,
840:6
**DORRONDA** [1] -
799:3
**double** [1] - 822:11
**doubling** [1] - 822:13
**doubt** [1] - 975:22
**doubting** [1] - 976:19
**down** [26] - 809:9,
821:14, 828:18,
831:2, 831:25,
835:13, 846:24,
857:19, 858:1,
862:18, 866:6,
866:19, 883:24,
884:3, 884:17,
887:2, 911:24,
921:25, 950:11,
950:12, 951:11,
954:6, 957:21,
957:23, 960:6
**downloaded** [3] -
980:20, 980:21
**dozen** [1] - 938:15
**Dr** [66] - 802:9, 802:20,
804:9, 804:19,
804:20, 807:4,
816:12, 819:7,
820:15, 820:18,
822:7, 825:23,
829:14, 833:21,
840:1, 840:2, 840:4,
842:11, 842:21,
842:23, 851:16,
854:2, 860:23,
860:25, 864:13,
867:17, 870:18,
871:2, 884:5,
886:19, 887:1,
892:9, 898:7,
898:18, 899:5,
900:17, 900:23,
915:14, 915:24,
917:14, 918:7,
918:12, 919:1,
919:2, 919:9, 922:5,
922:7, 922:15,
924:1, 938:1,
941:13, 941:19,

942:24, 943:7,
949:15, 950:14,
950:18, 952:5,
952:19, 953:22,
954:13, 958:6,
964:20
**drag** [1] - 957:17
**dramatic** [1] - 858:8
**drawing** [1] - 855:1
**drawings** [4] - 867:13,
909:15, 911:24,
912:3
**drive** [4] - 862:11,
927:1, 957:16
**driver** [2] - 881:20,
885:22
**droops** [1] - 856:7
**dropping** [1] - 856:18
**drops** [2] - 858:1,
858:3
**DTX** [12] - 801:22,
805:1, 859:17,
860:5, 863:4,
877:11, 880:10,
893:10, 908:9,
917:17
**ducky** [1] - 948:10
**ducted** [3] - 848:22,
850:4, 961:23
**duration** [2] - 820:24,
821:2
**during** [6] - 802:5,
802:15, 807:24,
851:13, 886:25,
963:16
**duty** [1] - 835:16
**DX** [1] - 854:14
**Dynamic** [1] - 945:12
**dynamics** [4] - 940:7,
940:11, 940:17,
940:20

**E**

**early** [4] - 819:21,
820:7, 832:19, 844:9
**earned** [1] - 824:20
**easier** [2] - 886:5,
912:11
**easily** [3] - 857:10,
888:18, 919:5
**easy** [5] - 810:15,
812:16, 812:19,
812:24
**economics** [1] -
826:19
**edge** [8] - 850:7,
863:25, 864:1,
864:2, 945:1, 945:6,
945:15

**edges** [2] - 897:10, 897:15
**edited** [3] - 890:14, 890:20, 890:23
**effect** [8] - 812:2, 856:10, 857:16, 865:21, 877:1, 943:22, 952:23, 957:22
**effective** [2] - 958:3, 959:2
**effectively** [2] - 825:2, 844:19
**effects** [5] - 865:13, 945:5, 945:23, 958:20
**eFoil** [26] - 808:23, 808:25, 816:12, 816:14, 816:20, 816:24, 817:1, 818:20, 818:23, 825:19, 827:24, 899:21, 902:19, 902:24, 915:15, 922:10, 923:14, 923:17, 923:21, 923:23, 931:23, 935:25, 939:8, 956:19, 972:22, 973:11
**eFoil's** [1] - 874:23
**eFoils** [7] - 807:20, 817:3, 817:18, 887:12, 983:17, 984:8, 984:15
**eight** [2] - 890:16, 891:11
**either** [10] - 819:23, 840:13, 858:7, 859:1, 888:11, 888:13, 904:20, 916:9, 921:13, 940:23
**elasticity** [7] - 826:4, 826:6, 826:7, 826:8, 826:18, 827:9, 827:13
**electric** [6] - 848:21, 850:2, 910:18, 910:19, 961:22
**electrical** [1] - 894:4
**electronically** [1] - 805:25
**electronics** [1] - 815:20
**element** [6] - 897:3, 917:16, 919:20, 919:21, 920:25, 967:4
**elements** [7] - 800:21,

940:24, 953:12, 959:2, 967:3, 967:4, 967:15
**elevators** [2] - 859:2, 859:5
**eliminate** [1] - 890:24
**elsewhere** [2] - 900:11, 985:4
**email** [4] - 806:10, 971:8, 976:11, 976:13
**embodied** [1] - 836:15
**embodiments** [1] - 931:16
**emergency** [1] - 835:21
**emphasize** [1] - 941:23
**employees** [3] - 836:14, 836:17, 836:19
**enable** [6] - 852:15, 864:17, 899:20, 902:18, 902:23, 927:14
**enabled** [5] - 939:7, 966:7, 966:9, 966:21, 968:3
**enablement** [6] - 899:13, 900:7, 902:11, 927:23, 963:20, 982:17
**enables** [1] - 865:24
**enabling** [2] - 965:1, 967:18
**end** [22] - 799:19, 804:1, 820:7, 824:19, 848:2, 848:7, 849:12, 849:17, 901:20, 930:14, 946:4, 953:8, 961:3, 961:8, 977:11, 979:24
**ended** [3] - 844:21, 907:23, 913:7
**ending** [1] - 905:24
**ends** [2] - 836:2, 855:14
**energy** [7] - 860:19, 924:15, 924:16, 924:17, 925:19
**engagement** [1] - 956:18
**engineer** [2] - 894:4, 941:7
**engineering** [1] - 934:10
**English** [2] - 803:15, 907:16
**enlarge** [2] - 910:11,

912:5
**ensure** [1] - 952:8
**entered** [1] - 845:10
**entering** [2] - 806:20, 868:6
**enters** [2] - 816:11, 947:1
**enthusiast** [1] - 835:25
**entire** [1] - 891:7
**entirely** [2] - 818:7, 920:21
**entirety** [1] - 892:22
**environment** [1] - 956:2
**equations** [6] - 915:21, 941:8, 941:21, 948:25
**equilibrium** [8] - 854:3, 854:9, 857:10, 857:11, 858:5, 949:25, 950:2
**equipped** [1] - 859:22
**equivalent** [2] - 822:12, 879:17
**erroneous** [1] - 942:25
**especially** [1] - 982:25
**ESQUIRE** [10] - 798:17, 798:20, 798:20, 798:21, 799:3, 799:3, 799:6, 799:7, 799:7
**essence** [9] - 922:24, 923:2, 923:7, 926:14, 926:19, 926:21, 926:22, 926:23
**essentially** [6] - 857:18, 859:24, 860:9, 860:24, 936:4, 968:25
**establish** [2] - 878:5, 878:10
**estimate** [1] - 830:20
**et** [4] - 855:12, 865:19, 905:2, 938:9
**evaluate** [1] - 851:15
**evaluated** [1] - 852:7
**eve** [1] - 815:13
**event** [5] - 806:9, 946:19, 963:11, 966:15, 983:12
**evidence** [24] - 804:22, 805:23, 809:21, 962:10, 962:16, 963:21, 964:1, 964:3, 964:11, 964:14, 965:3, 965:8, 965:18, 965:24,

966:20, 968:11, 972:16, 972:19, 972:20, 974:5, 974:6, 978:19, 985:17
**evident** [1] - 973:21
**Evolo** [148] - 802:2, 802:22, 802:23, 803:8, 804:13, 804:15, 847:10, 847:13, 847:15, 847:19, 847:23, 848:1, 848:6, 848:10, 848:13, 848:16, 848:19, 851:25, 852:24, 853:4, 853:18, 854:6, 854:8, 854:25, 855:5, 858:20, 858:21, 862:22, 867:9, 868:14, 869:11, 869:21, 870:4, 870:13, 870:15, 871:1, 871:5, 872:12, 872:15, 872:16, 872:20, 873:11, 873:16, 873:17, 873:22, 874:8, 874:14, 874:16, 875:18, 875:19, 876:5, 877:15, 878:7, 878:13, 878:23, 878:25, 879:21, 880:3, 880:7, 880:16, 881:10, 882:13, 882:22, 885:11, 885:16, 887:19, 891:12, 891:16, 891:23, 892:10, 892:24, 893:7, 894:25, 895:6, 895:23, 895:25, 896:10, 896:19, 896:23, 897:13, 899:17, 899:19, 899:24, 900:3, 900:12, 900:23, 901:8, 901:17, 902:17, 902:22, 903:19, 903:20, 903:23, 908:9, 908:12, 913:19, 913:20, 915:20, 932:1, 932:13, 932:20, 941:3, 941:11, 941:18, 941:19, 941:22, 941:23, 942:12, 948:17,

948:21, 948:22, 948:24, 949:24, 950:21, 952:15, 955:7, 955:18, 958:13, 963:25, 964:2, 964:4, 964:7, 964:12, 964:17, 964:21, 964:23, 965:1, 965:4, 965:22, 966:7, 966:12, 967:6, 967:13, 967:18, 967:22, 968:1, 973:20, 973:21, 973:25, 978:20, 979:6, 982:22
**Evolo's** [4] - 886:12, 910:13, 942:15, 972:18
**evolved** [1] - 845:1
**ex** [1] - 843:17
**exact** [2] - 817:23, 957:3
**exactly** [9] - 804:2, 810:3, 862:23, 868:24, 877:5, 883:17, 913:6, 978:10, 985:16
**exam** [1] - 941:9
**EXAMINATION** [4] - 806:23, 841:15, 851:7, 948:13
**examination** [1] - 946:5
**examine** [1] - 803:21
**examining** [1] - 874:17
**example** [7] - 812:13, 843:3, 855:20, 863:25, 866:9, 894:12, 894:21
**exceed** [1] - 837:20
**exceeds** [1] - 882:5
**except** [1] - 966:16
**excerpt** [2] - 890:9, 930:8
**excerpts** [1] - 950:21
**excess** [1] - 827:24
**exciting** [1] - 875:22
**excuse** [4] - 802:20, 887:19, 940:20, 977:4
**exemplary** [1] - 812:16
**exercise** [1] - 963:9
**exercising** [1] - 978:9
**exhibit** [2] - 801:17, 802:11
**Exhibit** [1] - 962:9
**exhibits** [3] - 801:20,

804:25, 962:3
**exist** [2] - 955:6, 974:13
**existed** [2] - 964:4, 973:14
**existing** [3] - 855:9, 977:17, 979:17
**exists** [1] - 819:11
**expect** [1] - 826:14
**expense** [7] - 834:6, 835:23, 836:5, 836:22, 837:12
**expenses** [4] - 833:14, 836:3, 836:12, 836:13
**expensive** [5] - 813:25, 814:6, 814:8, 826:15, 826:16
**experience** [1] - 964:19
**experienced** [1] - 885:22
**experiment** [9] - 880:16, 880:22, 900:20, 902:4, 902:7, 902:9, 902:14, 902:15, 903:13
**experimentation** [12] - 900:8, 900:12, 900:14, 900:16, 900:19, 900:22, 901:1, 901:8, 901:10, 901:14, 902:2, 921:15
**experiments** [6] - 882:22, 885:16, 886:9, 900:21, 902:20, 950:22
**expert** [8] - 801:10, 811:8, 830:24, 933:5, 933:6, 964:6, 967:6, 967:11
**explain** [12] - 835:2, 855:4, 861:10, 879:22, 879:24, 879:25, 885:13, 907:1, 950:1, 955:20, 956:14, 957:6
**explains** [2] - 934:23, 936:7
**explanation** [2] - 828:22, 984:7
**explicitly** [3] - 853:20, 920:1, 923:19
**exploits** [1] - 933:16
**exposed** [3] - 858:10, 879:1, 955:1

**express** [2] - 934:16, 934:25
**expressed** [4] - 913:2, 941:1, 975:8, 975:11
**expressing** [3] - 973:3, 974:8, 974:9
**extensively** [2] - 884:5, 886:17
**extent** [5] - 824:13, 976:3, 976:5, 978:7, 980:19
**extra** [1] - 838:10
**eyes** [1] - 987:14

**F**

**F-104** [1] - 863:25
**F-8** [1] - 856:9
**face** [2] - 916:15, 973:6
**fact** [20] - 800:11, 802:22, 817:17, 817:22, 819:13, 823:21, 834:8, 836:4, 836:16, 847:2, 847:14, 869:15, 884:9, 886:16, 890:10, 914:23, 943:3, 955:2, 965:25, 980:24
**factor** [4] - 808:22, 809:15, 953:11, 953:13
**Factor** [2] - 809:8, 809:12
**factories** [1] - 835:4
**factors** [13] - 807:10, 807:11, 808:14, 808:21, 808:22, 809:3, 809:4, 815:3, 845:24, 846:17, 846:20, 886:5, 900:6
**factory** [3] - 833:13, 833:14, 833:16
**facts** [11] - 799:19, 799:21, 799:25, 800:4, 800:9, 800:12, 800:18, 800:19, 814:11, 814:12, 960:9
**faded** [1] - 874:2
**fail** [2] - 920:25, 921:14, 963:22
**failing** [1] - 973:20
**failure** [3] - 972:18, 973:21, 973:25
**fair** [5] - 820:18, 865:5, 933:24, 934:1, 938:25

**fairly** [3] - 819:10, 966:15, 988:9
**fall** [1] - 837:12
**falls** [1] - 836:12
**familiar** [4] - 852:23, 864:12, 869:7, 882:20
**far** [7] - 857:5, 858:9, 863:23, 864:11, 917:5, 949:13, 985:16
**FARNAN** [2] - 799:3, 806:1
**Farnan** [1] - 985:24
**fashion** [1] - 840:15
**fast** [7] - 810:11, 810:15, 862:9, 864:1, 916:5, 955:21, 956:5
**faster** [3] - 915:6, 915:8, 956:3
**favor** [2] - 805:9, 822:9
**favorable** [2] - 822:11, 846:7
**features** [1] - 865:7
**Fed** [1] - 977:19
**Federal** [1] - 985:16
**fee** [1] - 835:24
**fees** [2] - 835:16, 844:18
**feet** [4] - 859:23, 930:7, 930:10, 930:19
**fellows** [1] - 860:20
**felt** [1] - 881:10
**Ferrari** [3] - 812:9, 812:11, 814:3
**few** [7] - 806:7, 841:14, 851:11, 882:19, 885:19, 927:2, 982:9
**field** [5] - 940:11, 974:4, 974:5, 975:12, 976:2
**fifth** [1] - 929:1
**fighter** [4] - 944:10, 944:13, 944:14, 944:17
**figure** [7] - 865:3, 877:13, 902:6, 943:16, 944:6, 946:4
**Figure** [5] - 877:14, 894:13, 894:19, 931:6, 931:10
**figures** [4] - 863:9, 936:4, 950:7, 959:3
**filed** [3] - 841:7, 939:3, 940:12
**fin** [3] - 858:9, 858:10

**final** [25] - 867:8, 901:13, 902:18, 903:23, 904:4, 904:16, 904:17, 905:1, 905:6, 905:13, 906:7, 906:13, 906:17, 908:8, 908:23, 909:11, 909:16, 911:6, 911:10, 911:19, 913:3, 913:7, 914:19, 914:20, 915:4
**finalize** [1] - 904:11
**finalized** [2] - 902:1, 903:23
**finally** [7] - 857:5, 862:14, 866:4, 963:17, 964:18, 965:15, 968:5
**financial** [7] - 817:21, 829:23, 830:1, 830:5, 830:7, 830:9, 830:11, 830:25, 831:7
**financially** [1] - 818:10
**financials** [1] - 836:24
**fine** [5] - 971:19, 971:21, 972:2, 975:10, 976:25
**FINGER** [1] - 799:2
**finish** [4] - 801:21, 805:23, 806:12, 843:9
**finished** [5] - 809:18, 903:13, 903:20, 906:10, 909:8
**finishing** [1] - 870:23
**fires** [1] - 857:25
**first** [38] - 800:18, 805:15, 814:24, 815:13, 816:4, 818:20, 818:23, 825:1, 834:16, 841:1, 844:4, 844:17, 852:20, 857:9, 858:11, 861:14, 882:15, 883:8, 886:8, 890:10, 900:18, 902:4, 902:7, 902:14, 902:15, 908:9, 908:11, 909:5, 912:9, 913:15, 914:20, 933:15, 955:21, 963:12, 968:22, 973:11, 982:21, 987:11
**first-hand** [1] - 886:8

**fit** [1] - 843:9
**fitting** [1] - 963:4
**five** [6] - 828:12, 883:10, 883:15, 964:18, 981:20, 987:4
**five-degree** [2] - 883:10, 883:15
**fix** [1] - 913:25
**fixed** [4] - 859:24, 931:18, 931:19, 951:20
**fixedly** [6] - 848:2, 848:6, 849:12, 849:16, 961:3, 961:8
**flap** [1] - 945:5
**flat** [26] - 855:14, 855:17, 896:2, 942:9, 942:13, 942:16, 942:18, 942:20, 944:18, 944:20, 944:23, 947:8, 947:12, 947:13, 947:18, 947:23, 947:24, 947:25, 948:1, 948:4, 948:7, 948:8
**flew** [1] - 900:18
**flexible** [1] - 808:5
**flight** [10] - 858:6, 885:25, 937:25, 938:8, 938:10, 940:7, 940:11, 940:17, 940:19, 958:25
**Flight** [2] - 938:1, 938:13
**flip** [4] - 908:14, 911:21, 912:2, 943:16
**Fliteboard** [25] - 807:9, 807:18, 811:2, 813:16, 818:16, 819:18, 819:22, 822:14, 822:21, 823:10, 823:18, 824:3, 824:4, 824:9, 827:23, 828:10, 828:15, 828:19, 828:20, 838:11, 838:17, 839:5, 843:18, 843:19, 843:22
**Fliteboard's** [4] - 824:7, 824:22, 828:17, 828:23
**float** [1] - 941:10
**floatation** [25] - 847:15, 847:17,

847:19, 847:21, 847:23, 848:3, 848:4, 848:24, 849:1, 849:4, 849:5, 849:8, 849:13, 849:14, 859:21, 909:24, 926:10, 931:18, 960:16, 960:17, 960:20, 960:22, 960:24, 961:4, 961:5
**floating** [3] - 853:21, 855:2, 955:8
**flow** [1] - 924:18
**fluctuates** [1] - 835:10
**Fluid** [1] - 945:12
**Fluid-Dynamic** [1] - 945:12
**fly** [6] - 856:8, 857:25, 864:3, 959:6, 959:8, 959:9
**Flyer** [2] - 811:3, 813:17
**flying** [10] - 853:23, 853:24, 865:4, 865:6, 881:21, 881:24, 890:12, 921:15, 922:16, 951:1
**focus** [1] - 810:6
**focused** [2] - 809:16, 809:18
**focusing** [1] - 843:25
**foil** [1] - 863:14
**Foil** [2] - 838:19, 838:21
**foils** [1] - 858:13
**Foils** [1] - 865:1
**follow** [5] - 898:5, 899:24, 944:24, 951:21, 963:5
**follow-up** [2] - 898:5, 944:24
**following** [1] - 984:20
**followup** [1] - 892:22
**FOR** [1] - 798:2
**force** [3] - 921:3, 951:25, 957:16
**forces** [2] - 855:25, 953:6
**fore** [2] - 847:16, 848:25
**foregoing** [1] - 988:14
**forget** [2] - 865:3, 957:3
**forgot** [1] - 986:15
**form** [8] - 902:18, 963:10, 968:21, 969:17, 970:9, 981:19, 982:1, 986:6

**Form** [1] - 806:11
**formed** [4] - 853:3, 860:22, 861:3, 861:6
**Forms** [1] - 805:11
**forms** [1] - 969:22
**formulation** [1] - 985:4
**forth** [2] - 970:16, 979:22
**fortunate** [1] - 835:13
**forward** [6] - 847:24, 849:9, 922:11, 922:19, 950:6, 960:25
**forwardly** [2] - 897:16, 897:17
**forwards** [1] - 922:17
**four** [12] - 804:13, 835:11, 845:13, 910:23, 911:10, 911:12, 911:13, 912:20, 913:4, 928:25, 960:16, 973:17
**four-kilowatt** [4] - 911:10, 911:13, 912:20, 913:4
**four-kilowatts** [2] - 910:23, 911:12
**Fourth** [1] - 964:14
**frame** [3] - 904:2, 917:6, 917:11
**free** [2] - 838:9, 956:3
**frequency** [1] - 894:8
**frequently** [1] - 827:10
**Friday** [1] - 905:24
**frisbee** [1] - 896:9
**front** [17] - 850:7, 863:21, 881:15, 883:3, 883:21, 884:2, 886:22, 887:2, 897:10, 908:16, 915:10, 944:7, 951:14, 953:20, 958:15, 958:16
**full** [4] - 822:23, 866:24, 890:15, 893:4
**fully** [2] - 836:15, 874:20
**functionality** [1] - 923:22
**functions** [1] - 836:18
**fundamental** [1] - 861:14
**fundraising** [1] - 817:6
**fundraising-type** [1] - 817:6

**funny** [1] - 855:13

## G

**gadget** [2] - 860:12, 860:13
**gains** [1] - 881:20
**garbage** [2] - 896:5, 896:6
**gas** [1] - 835:13
**gear** [1] - 856:12
**gears** [2] - 922:3, 927:8
**general** [9] - 817:15, 831:1, 832:1, 835:23, 836:21, 861:15, 956:1, 974:15
**generally** [5] - 842:17, 852:10, 883:25, 930:7, 958:12
**generation** [1] - 811:6
**gentleman** [1] - 890:10
**Georgia** [6] - 807:10, 809:12, 809:15, 845:24, 846:17, 846:20
**Georgia-Pacific** [5] - 809:12, 809:15, 845:24, 846:17, 846:20
**gesture** [2] - 886:21, 887:2
**given** [5] - 829:1, 893:6, 908:23, 947:12, 987:7
**glazed** [1] - 987:15
**goal** [8] - 876:6, 876:12, 876:22, 876:25, 934:13, 934:19, 934:22, 934:25
**Google** [2] - 964:5, 967:24
**GP** [1] - 809:8
**gradually** [1] - 835:13
**grammatical** [1] - 986:3
**graph** [1] - 820:2
**gravity** [4] - 865:24, 881:14, 949:14, 959:9
**GRAY** [1] - 798:19
**great** [7] - 870:17, 885:19, 900:13, 901:10, 971:7, 971:9, 974:23
**greater** [6] - 847:16, 848:25, 866:9,

867:5, 943:22, 960:16
**green** [2] - 981:16, 986:10
**grocery** [2] - 951:18
**gross** [2] - 833:15, 833:16
**group** [2] - 969:8, 969:13
**grow** [1] - 826:22
**guess** [17] - 803:22, 834:16, 835:24, 875:14, 915:18, 920:10, 937:16, 956:6, 963:12, 969:10, 972:10, 972:13, 972:17, 973:4, 973:17, 982:15, 982:24
**guessing** [2] - 905:4, 905:5
**guidance** [1] - 866:4
**guideposts** [1] - 846:12
**guy** [1] - 862:4

## H

**half** [7] - 815:5, 845:25, 867:14, 914:5, 923:23, 923:24, 946:3
**hand** [7] - 807:7, 812:9, 812:10, 814:23, 819:17, 839:9, 886:8, 886:21, 979:25
**handle** [1] - 835:22
**handout** [1] - 970:8
**hands** [1] - 912:22
**happy** [1] - 828:6
**hard** [6] - 831:9, 832:10, 863:15, 887:25, 888:15, 945:20
**harm** [1] - 800:17
**HAUG** [1] - 799:5
**hazardous** [1] - 835:20
**head** [2] - 843:6
**head-to-head** [1] - 843:6
**heading** [1] - 894:1
**headings** [1] - 985:7
**hear** [9] - 804:6, 870:18, 871:2, 895:16, 916:7, 930:14, 930:17, 971:24, 981:1
**heard** [24] - 818:1,

854:2, 859:9, 860:23, 870:21, 870:25, 883:13, 884:5, 900:11, 915:14, 915:17, 922:5, 922:7, 922:9, 962:16, 963:4, 964:21, 967:23, 971:23, 975:8, 979:20, 979:25, 985:15
**hearing** [3] - 874:4, 984:16, 984:18
**hearsay** [4] - 804:4, 804:19, 804:22, 933:23
**Heather** [1] - 988:17
**heavier** [1] - 949:21
**heavy** [2] - 890:11, 951:23
**height** [1] - 859:3
**held** [2] - 984:21, 988:6
**hello** [2] - 841:17, 841:18
**help** [3] - 884:22, 892:1, 919:16
**helps** [1] - 937:3
**hereby** [1] - 988:14
**hi** [1] - 947:6
**HIGDON** [1] - 798:19
**high** [15] - 825:20, 825:21, 835:12, 853:14, 856:8, 856:14, 856:15, 857:6, 858:2, 858:7, 859:4, 861:16, 862:12, 918:17, 955:22
**higher** [4] - 827:17, 842:8, 865:7, 882:18
**highest** [1] - 813:20
**highlight** [1] - 912:9
**highlighted** [6] - 806:7, 869:11, 883:5, 894:5, 898:23, 970:13
**himself** [1] - 817:7
**hindsight** [2] - 918:21, 919:7
**hit** [1] - 904:9
**hits** [5] - 856:11, 856:12, 955:8, 973:2, 973:7
**hmm** [2] - 876:2, 927:11
**Hoerner's** [1] - 945:12
**hold** [5] - 861:24, 977:23, 979:1, 979:9, 983:4

**Honda** [10] - 811:19,
812:5, 812:10,
812:18, 812:21,
813:2, 813:22,
813:23, 843:3, 843:5
**Hondas** [1] - 813:25
**honestly** [1] - 831:4
**Honor** [46] - 799:16,
801:2, 801:13,
803:10, 804:3,
804:7, 805:2, 805:8,
806:1, 806:3,
806:18, 808:9,
841:14, 847:1,
850:10, 850:12,
850:17, 850:19,
850:23, 851:5,
854:15, 868:10,
946:21, 946:24,
960:8, 962:6,
962:11, 963:13,
963:18, 966:25,
969:7, 969:19,
970:18, 971:19,
972:17, 974:11,
977:3, 977:12,
978:15, 979:8,
981:14, 982:2,
982:7, 985:18,
986:8, 986:12
**HONORABLE** [1] -
798:15
**Honorable** [1] -
799:12
**hopefully** [2] - 806:11,
988:9
**horizontal** [2] -
865:12, 930:22
**hotel** [1] - 970:20
**hour** [11] - 810:19,
810:20, 810:24,
811:4, 811:11,
923:23, 946:3,
986:22, 987:9
**hours** [3] - 868:16,
868:18, 868:21
**hull** [1] - 902:15
**hundred** [4] - 812:14,
958:1, 966:9, 985:15
**hydrofoil** [69] - 848:6,
848:8, 848:14,
849:16, 849:17,
850:6, 850:7, 853:6,
853:13, 853:16,
854:12, 854:18,
854:22, 862:24,
863:6, 863:10,
863:13, 863:14,
865:19, 866:14,
866:17, 871:5,

873:12, 873:22,
874:9, 874:18,
875:10, 877:9,
878:1, 878:10,
878:19, 886:12,
895:23, 895:25,
896:19, 896:23,
897:14, 898:10,
898:20, 910:5,
910:14, 917:23,
921:22, 923:7,
924:2, 926:20,
928:8, 928:9,
929:11, 929:12,
930:7, 930:10,
930:19, 931:17,
931:18, 931:19,
932:5, 937:4, 937:6,
940:11, 954:25,
956:19, 958:23,
961:7, 961:9, 961:16
**hydrofoil/
underwater** [1] -
910:9
**hydrofoils** [14] -
855:9, 859:2, 897:9,
932:5, 940:8,
940:18, 940:22,
941:4, 942:13,
942:16, 949:3,
949:6, 956:16
**hypothetical** [21] -
812:25, 814:15,
815:9, 816:8,
816:23, 817:16,
819:15, 820:5,
824:4, 824:25,
825:17, 828:7,
829:4, 829:7,
837:16, 838:22,
844:5, 844:7,
845:10, 846:4,
846:13
**hypothetically** [1] -
922:13

**I**

**ICE** [1] - 798:19
**idea** [5] - 822:20,
836:25, 891:9,
907:10, 913:21
**identified** [1] - 832:13
**identify** [1] - 837:7
**illustrate** [1] - 812:2
**image** [9] - 909:11,
945:6, 945:7, 945:8,
952:17, 952:20,
953:21, 953:24,
954:14

**imagine** [1] - 866:24
**immediately** [1] -
857:6
**impact** [3] - 826:10,
842:15, 842:23
**impeach** [1] - 802:22
**impeaches** [1] -
803:23
**impeaching** [1] -
803:24
**implemented** [1] -
840:14
**implied** [1] - 845:18
**implying** [1] - 980:5
**import** [1] - 835:7
**important** [5] -
814:25, 886:5,
923:1, 949:5, 956:1
**importation** [1] -
835:16
**importing** [1] - 971:17
**improve** [1] - 914:19
**improvement** [1] -
885:21
**improving** [2] - 917:6,
917:11
**IN** [1] - 798:1
**inappropriate** [1] -
799:21
**INC** [2] - 798:4, 798:7
**inches** [1] - 958:4
**inclined** [2] - 978:11,
979:10
**include** [16] - 833:22,
865:2, 898:20,
916:3, 916:9,
916:11, 916:12,
916:13, 916:14,
916:17, 916:18,
916:20, 916:21,
924:10, 924:12
**included** [6] - 809:7,
814:25, 833:12,
837:10, 837:11,
932:6
**including** [3] - 915:21,
928:8, 929:11
**increase** [8] - 838:2,
842:14, 842:17,
843:1, 915:15,
922:6, 922:10
**increased** [4] -
837:22, 842:25,
886:4, 957:18
**increases** [2] - 822:8,
915:15
**increasing** [2] -
842:24, 862:17
**incredibly** [1] - 963:16
**incurred** [1] - 836:12

**indexed** [3] - 964:4,
980:18, 980:20
**indicate** [3] - 826:23,
908:1, 976:4
**indicated** [2] - 832:8,
976:4
**indicates** [3] - 828:17,
828:19, 894:7
**indicating** [4] -
799:20, 855:22,
863:22, 953:8
**indicators** [1] - 845:23
**individual** [1] - 836:16
**induction** [1] - 894:1
**industry** [2] - 853:14,
964:19
**information** [10] -
818:9, 829:23,
830:1, 830:25,
867:4, 936:19,
937:7, 941:22,
941:24, 942:2
**infrastructure** [1] -
842:6
**infringe** [1] - 966:17
**infringement** [8] -
799:22, 800:4,
800:6, 815:13,
965:13, 965:15,
965:17, 966:14
**infringing** [4] -
839:11, 839:20,
840:6, 840:21
**initial** [2] - 879:1,
879:15
**input** [2] - 808:16,
894:9
**instabilities** [1] -
855:24
**instance** [5] - 805:15,
813:1, 821:21,
831:20, 838:19
**instead** [4] - 830:2,
844:20, 856:12,
860:16
**Instruction** [1] -
977:12
**instruction** [4] -
805:22, 978:4, 981:3
**instructions** [11] -
805:25, 963:5,
969:25, 970:11,
971:6, 979:14,
985:12, 986:6,
987:12, 987:23,
988:9
**insufficient** [1] -
977:18
**INTELLIGENCE** [1] -
798:7

**intend** [1] - 981:6
**intended** [1] - 843:4
**interactions** [1] -
973:3
**interconnected** [6] -
848:3, 848:7,
849:13, 849:17,
961:4, 961:8
**interested** [2] - 971:4,
978:8
**interestingly** [1] -
944:12
**interpret** [3] - 868:18,
868:22, 869:3
**interpreted** [1] -
869:12
**interpreting** [1] -
869:19
**interrupt** [1] - 808:1
**introduced** [4] -
803:11, 803:14,
972:22, 973:15
**introducing** [2] -
803:15, 803:18
**Introduction** [2] -
938:1, 938:12
**invalid** [1] - 983:10
**invalidity** [5] - 799:23,
800:7, 800:14,
851:16, 967:2
**invented** [2] - 860:25,
981:16
**invention** [14] -
926:25, 927:15,
931:17, 933:15,
934:24, 935:1,
963:23, 967:20,
973:7, 973:12,
974:6, 974:8,
975:12, 976:2
**inventions** [3] - 852:8,
864:19, 956:13
**inventor** [6] - 916:14,
916:18, 916:19,
916:21, 920:21,
958:6
**invest** [1] - 842:5
**invites** [2] - 856:15,
856:16
**invoices** [2] - 831:15,
832:3
**involved** [1] - 908:4
**ion** [1] - 835:19
**irrelevant** [1] - 805:16
**isolated** [1] - 909:23
**issue** [17] - 807:20,
829:14, 832:15,
852:1, 852:5, 852:8,
852:11, 852:15,
852:20, 859:9,

876:24, 876:25, 902:17, 908:6, 918:22, 919:2, 919:13
**issues** [14] - 799:14, 799:15, 832:17, 832:20, 832:21, 853:15, 854:6, 908:4, 956:17, 973:22, 982:5, 982:15, 982:21, 987:7
**items** [2] - 898:20, 898:25
**itself** [12] - 826:21, 843:13, 843:14, 853:11, 863:6, 864:22, 899:19, 902:18, 902:23, 908:8, 915:4, 941:19

## J

**Jack** [1] - 819:7
**January** [10] - 815:9, 815:12, 815:15, 815:18, 815:19, 815:21, 817:17, 818:9, 844:9, 844:10
**JASON** [1] - 799:6
**jet** [5] - 848:22, 850:5, 944:10, 944:14, 961:23
**JMOL** [4] - 963:9, 966:11, 966:14, 966:16
**JMOLs** [3] - 963:11, 966:24, 968:17
**job** [1] - 974:23
**John** [3] - 938:2, 938:12, 945:8
**judgment** [15] - 963:19, 963:24, 964:25, 965:2, 965:6, 965:11, 965:13, 965:16, 967:1, 967:17, 967:21, 968:2, 968:5, 968:9, 972:8
**jump** [1] - 951:24
**June** [2] - 904:3, 904:10
**juror** [2] - 970:16, 970:24
**jury** [57] - 805:22, 805:25, 806:14, 806:19, 806:20, 806:21, 807:3, 807:23, 808:2, 809:14, 811:25,

814:13, 815:18, 818:1, 818:25, 819:6, 820:14, 826:9, 827:14, 827:22, 828:24, 832:16, 833:19, 839:10, 840:9, 840:16, 840:18, 840:20, 843:4, 856:23, 856:24, 867:23, 868:5, 868:6, 868:7, 886:22, 940:2, 946:1, 946:2, 946:25, 947:2, 962:16, 963:6, 963:8, 965:24, 969:24, 970:10, 971:6, 978:3, 978:4, 981:19, 982:1, 985:12, 986:6, 987:12, 987:23, 988:8
**Jury** [3] - 798:13, 940:3, 947:1

## K

**Kanter** [1] - 841:13
**KANTER** [4] - 799:6, 841:14, 841:16, 846:22
**keep** [7] - 812:23, 857:21, 907:15, 907:19, 912:1, 939:17
**keeping** [1] - 804:4
**KELLY** [1] - 799:3
**key** [3] - 909:17, 937:15, 948:24
**keys** [1] - 954:18
**kilometers** [3] - 810:18, 810:19, 810:21
**kilowatt** [6] - 911:10, 911:13, 912:20, 912:23, 913:4, 913:11
**kilowatts** [3] - 910:23, 911:12, 912:15
**kind** [11] - 800:22, 853:17, 905:9, 909:7, 962:25, 968:25, 969:2, 976:18, 978:11, 985:3, 986:3
**kinds** [5] - 855:23, 855:24, 860:10, 863:18, 958:14
**King** [1] - 798:11

**Kline** [6] - 801:2, 806:22, 808:4, 809:22, 841:17, 846:23
**kneeling** [3] - 847:21, 849:6, 960:22
**knock** [1] - 805:16
**knots** [2] - 955:24, 955:25
**knowing** [1] - 830:18
**knowledge** [5] - 816:25, 818:8, 841:9, 842:13, 978:23
**known** [8] - 839:23, 891:20, 897:10, 939:3, 939:10, 939:12, 940:15, 967:15
**knows** [1] - 954:8

## L

**labor** [1] - 833:13
**lack** [3] - 955:18, 963:20, 980:1
**landed** [1] - 834:16
**landing** [1] - 856:12
**lands** [1] - 856:11
**Langelaan** [31] - 814:14, 814:23, 815:6, 816:11, 816:12, 816:18, 816:22, 816:24, 817:7, 817:10, 819:1, 819:2, 819:7, 819:13, 819:15, 844:2, 844:24, 844:25, 845:20, 846:1, 846:2, 846:7, 846:8, 860:25, 900:17, 900:23, 918:21, 918:24, 919:2, 964:20, 964:22
**Langelaan's** [6] - 844:15, 864:13, 867:17, 918:23, 919:12, 958:6
**language** [4] - 907:16, 977:17, 977:21, 979:17
**languages** [1] - 966:5
**Lanterman** [5] - 803:11, 803:20, 967:23, 978:10, 979:23
**Lanterman's** [1] - 980:15
**large** [2] - 855:21,

911:1
**largely** [1] - 920:25
**larger** [7] - 911:2, 913:15, 914:2, 914:20, 915:6, 915:9, 957:15
**largest** [3] - 912:25, 926:10, 926:12
**last** [17] - 801:16, 839:10, 845:14, 852:13, 871:9, 873:3, 891:19, 895:10, 897:8, 913:12, 954:10, 954:11, 979:5, 980:14, 983:15, 987:23
**lateral** [4] - 847:16, 848:25, 866:1, 960:17
**laundry** [2] - 898:11, 924:1
**LAVERY** [1] - 799:7
**law** [16] - 963:19, 963:25, 965:1, 965:2, 965:6, 965:11, 965:14, 965:17, 967:2, 967:18, 967:22, 968:3, 968:6, 968:9, 972:8, 979:11
**lawyer** [1] - 973:6
**lawyers** [1] - 963:2
**LAYTON** [1] - 799:2
**lead** [5] - 862:13, 866:10, 867:6, 943:23, 955:3
**leads** [1] - 853:7
**lean** [2] - 808:8, 857:3
**leaning** [1] - 808:7
**leans** [1] - 857:5
**learn** [2] - 810:15, 910:21
**Leason** [7] - 811:14, 829:8, 964:19, 964:22, 974:23, 975:14, 976:10
**Leason's** [4] - 860:20, 972:21, 976:1, 976:14
**least** [6] - 936:6, 938:7, 958:20, 974:14, 980:2, 980:22
**leave** [7] - 858:2, 899:18, 973:24, 975:21, 976:10, 985:9, 985:14
**leaving** [3] - 867:23, 946:2, 963:8

**led** [4] - 858:22, 858:23, 864:6
**ledger** [2] - 831:1, 832:1
**left** [8] - 839:20, 878:24, 879:15, 889:11, 889:12, 889:13, 889:16, 889:17
**legal** [1] - 815:24
**length** [6] - 847:16, 848:25, 866:1, 874:21, 960:16, 986:12
**less** [13] - 807:18, 819:21, 824:6, 825:3, 825:4, 825:6, 825:12, 825:18, 891:12, 891:16, 943:3, 958:3, 962:18
**lettered** [1] - 901:21
**letters** [1] - 841:4
**level** [11] - 807:6, 807:8, 807:14, 807:17, 812:3, 812:4, 890:12, 959:6, 959:8, 959:10, 976:1
**levels** [2] - 819:24, 826:11
**leveraging** [1] - 824:15
**license** [23] - 814:14, 814:24, 814:25, 815:6, 816:11, 816:22, 819:1, 820:23, 820:24, 821:2, 824:4, 824:5, 827:24, 828:8, 828:25, 843:18, 844:13, 845:20, 846:1, 846:2, 846:5, 846:7, 972:13
**licensee** [1] - 824:20
**lid** [2] - 896:5, 896:6
**life** [2] - 811:7, 954:24
**lifetime** [1] - 810:7
**Lift** [2] - 877:25, 945:12
**lift** [21] - 856:6, 856:18, 857:4, 857:7, 857:10, 857:11, 857:18, 857:19, 857:25, 858:3, 858:14, 877:10, 878:1, 883:21, 886:16, 886:18, 896:6, 945:17, 952:2, 952:6, 952:8

**LIFT** [5] - 810:18, 811:5, 819:7, 888:13, 968:12
**lifting** [1] - 856:6
**lifts** [3] - 884:2, 884:15, 896:11
**light** [2] - 965:9, 986:10
**likely** [4] - 805:17, 829:6, 867:18, 921:2
**limitation** [1] - 965:5
**limited** [5] - 918:3, 919:23, 975:11, 976:9, 978:24
**Line** [1] - 929:8
**line** [15] - 821:23, 826:17, 919:20, 920:23, 921:1, 929:1, 929:2, 929:3, 929:4, 929:7, 931:13, 951:16, 964:16, 983:7
**lines** [1] - 877:3
**lining** [1] - 818:4
**link** [1] - 967:25
**list** [3] - 898:11, 898:20, 924:1
**literally** [1] - 973:10
**literature** [1] - 855:9
**lithium** [1] - 835:19
**LLP** [1] - 799:5
**locate** [1] - 978:9
**located** [1] - 881:14
**location** [4] - 817:13, 865:24, 928:9, 929:12
**locked** [1] - 905:8
**logical** [1] - 926:9
**logs** [1] - 967:24
**longitudinal** [1] - 940:20
**look** [47] - 804:16, 809:3, 809:20, 810:17, 811:8, 811:9, 813:12, 813:15, 813:16, 816:22, 816:23, 819:1, 827:16, 827:25, 828:16, 844:14, 852:19, 855:8, 855:11, 855:19, 861:8, 863:19, 864:22, 867:9, 869:7, 875:12, 877:4, 882:20, 885:19, 888:5, 901:16, 910:8, 919:7, 929:15, 931:1,

931:12, 940:2, 944:16, 954:6, 976:17, 976:21, 981:19, 981:20, 982:1, 987:14
**looked** [14] - 808:13, 809:2, 809:15, 810:17, 817:21, 827:7, 831:21, 845:22, 939:6, 954:13, 954:14, 954:16, 968:21, 977:25
**looking** [33] - 808:6, 809:10, 810:4, 813:11, 813:19, 819:9, 827:15, 860:23, 864:4, 864:6, 866:18, 874:24, 875:1, 875:3, 887:6, 887:25, 888:3, 888:15, 889:19, 889:21, 889:24, 897:23, 914:3, 939:17, 939:18, 939:19, 939:23, 952:19, 964:10, 979:2, 979:3
**looks** [1] - 886:18
**lose** [4] - 842:3, 856:17, 957:20, 957:21
**loses** [5] - 857:6, 857:18, 857:19, 858:3, 963:17
**lost** [2] - 825:24, 826:1
**low** [9] - 835:10, 840:17, 859:5, 860:14, 860:17, 862:18, 864:3, 918:18, 951:11
**lower** [12] - 821:21, 826:13, 828:20, 834:22, 848:2, 848:7, 849:12, 849:17, 854:24, 855:1, 961:3, 961:8
**lowest** [4] - 813:15, 813:19, 838:8, 845:16
**LTD** [1] - 798:8
**lucky** [1] - 886:1
**lunch** [2] - 946:1, 971:18
**lying** [2] - 914:16, 914:17

**M**

**machine** [2] - 950:14, 954:8
**magazine** [1] - 980:25
**magic** [3] - 935:6, 935:19, 935:21
**main** [1] - 881:15
**maintain** [2] - 922:17, 977:16
**major** [1] - 888:6
**manage** [1] - 881:23
**management** [1] - 836:14
**manager** [1] - 805:20
**manages** [1] - 881:20
**maneuvered** [1] - 932:17
**manufacturer** [1] - 839:24
**manufacturing** [5] - 817:13, 833:9, 833:18, 836:13, 837:12
**march** [1] - 987:18
**March** [13] - 798:12, 815:9, 815:12, 815:19, 816:3, 817:17, 838:22, 841:1, 844:9, 844:10, 908:24, 909:7
**margin** [9] - 832:22, 832:25, 833:1, 833:9, 833:10, 833:15, 833:17, 837:3, 837:20
**marine** [7] - 940:7, 940:11, 940:17, 940:21, 940:22, 941:4, 956:2
**MARK** [1] - 799:7
**mark** [1] - 905:2
**market** [54] - 809:19, 810:5, 810:9, 810:10, 810:16, 817:2, 817:6, 817:17, 817:19, 818:7, 818:8, 818:12, 818:14, 818:17, 818:18, 818:21, 818:22, 818:23, 819:19, 819:20, 820:1, 820:2, 820:6, 820:8, 824:10, 824:12, 824:14, 824:16, 825:10, 825:11, 828:18, 829:2, 830:21, 833:24,

834:2, 838:7, 838:13, 838:20, 838:21, 841:1, 842:18, 844:1, 844:12, 845:1, 845:4, 845:6, 845:9, 845:11, 845:12, 972:23, 973:11, 973:15, 974:14, 975:18
**marketed** [1] - 818:10
**marketing** [10] - 817:3, 817:4, 817:5, 817:8, 817:11, 817:12, 833:22, 834:2, 836:9, 837:5
**marketplace** [3] - 813:11, 820:11, 820:13
**markets** [1] - 826:19
**master's** [1] - 870:23
**masters** [1] - 914:15
**material** [1] - 835:20
**materials** [2] - 809:19, 833:13
**math** [10] - 812:16, 812:17, 812:19, 812:23, 822:3, 822:4, 822:18, 823:6, 828:3, 828:5
**mathematical** [1] - 958:25
**matter** [19] - 844:12, 915:13, 920:10, 920:15, 963:19, 963:24, 964:25, 965:6, 965:11, 965:14, 965:16, 967:2, 967:18, 967:22, 968:2, 968:6, 968:9, 972:8, 978:8
**matters** [2] - 815:25, 965:2
**maximize** [1] - 824:2
**maximizing** [1] - 825:13
**McGraw** [37] - 798:21, 800:19, 801:6, 801:16, 801:19, 801:22, 801:25, 802:10, 802:12, 802:14, 802:18, 803:6, 806:2, 806:5, 960:8, 960:12, 960:14, 960:15, 961:25, 963:13, 963:18, 965:20, 969:19, 976:25, 977:11, 977:14,

977:16, 977:22, 979:12, 979:13, 980:4, 980:9, 980:13, 980:14, 981:5, 981:8, 981:11
**mean** [38] - 802:19, 811:3, 814:5, 818:20, 820:4, 821:9, 825:4, 843:6, 843:9, 844:14, 853:22, 866:16, 868:24, 869:3, 871:22, 872:3, 882:8, 883:12, 884:14, 886:21, 888:1, 901:14, 947:25, 952:11, 954:6, 973:9, 974:16, 974:24, 975:5, 975:8, 975:10, 975:11, 975:17, 980:23, 980:25, 984:7, 984:11, 986:20
**means** [16] - 861:19, 871:10, 873:1, 873:5, 873:16, 882:9, 883:14, 883:16, 883:20, 883:24, 906:20, 906:21, 918:5, 921:10, 933:3
**meant** [4] - 860:17, 878:25, 957:10, 957:12
**measure** [2] - 867:14, 901:15
**mechanical** [1] - 933:19
**mechanically** [1] - 859:1
**mechanism** [2] - 840:5, 859:3
**mechanisms** [1] - 933:17
**meet** [3] - 915:10, 969:23, 969:24
**meets** [2] - 912:10, 913:16
**Melissa** [3] - 811:23, 834:12, 839:15
**members** [6] - 806:21, 808:2, 868:7, 946:17, 947:2, 962:15
**memorized** [1] - 893:5
**memory** [3] - 892:1, 908:7, 920:3
**mention** [9] - 835:4, 861:17, 879:7,

879:10, 886:22, 887:4, 920:9, 937:17, 950:3
**mentioned** [15] - 835:3, 846:17, 851:14, 854:11, 866:14, 867:5, 886:11, 887:3, 920:12, 937:20, 937:21, 949:23, 957:1, 980:24
**mentioning** [2] - 854:19, 854:23
**mentions** [5] - 853:18, 853:20, 860:18, 865:22, 921:20
**Merit** [1] - 988:17
**met** [1] - 829:8
**metadata** [1] - 967:24
**meters** [1] - 950:6
**metrics** [1] - 811:13
**MHL** [55] - 798:4, 799:19, 807:7, 807:8, 807:18, 808:14, 809:3, 810:18, 811:15, 812:9, 813:6, 813:16, 813:20, 814:6, 814:8, 814:23, 816:11, 817:17, 817:19, 818:4, 818:14, 818:17, 818:19, 819:2, 819:6, 819:8, 819:18, 819:22, 820:4, 822:23, 823:14, 823:18, 825:14, 825:17, 825:22, 827:1, 828:8, 828:17, 828:24, 830:12, 838:11, 838:16, 839:5, 843:16, 844:20, 844:21, 846:3, 846:7, 932:1, 932:13, 932:20, 956:13, 960:1, 985:8
**MHL's** [9] - 819:18, 824:25, 826:22, 830:16, 841:19, 845:3, 864:13, 958:6
**mic** [2] - 808:2, 808:3
**microphone** [2] - 916:15, 947:11
**middle** [10] - 847:24, 848:3, 849:9, 849:13, 874:2, 877:18, 930:8, 959:5, 960:25, 961:4

**might** [12] - 856:24, 862:10, 865:3, 865:9, 874:22, 915:8, 915:9, 922:25, 923:15, 923:17, 923:21, 979:15
**mileage** [1] - 843:6
**miles** [5] - 810:20, 810:22, 810:23, 811:3, 811:11
**milestone** [1] - 905:6
**milestones** [1] - 905:2
**military** [1] - 859:1
**million** [5] - 815:1, 817:22, 844:21, 846:2, 846:4
**million-dollar** [1] - 846:2
**mind** [7] - 846:10, 856:22, 890:19, 949:25, 985:16, 986:17, 986:18
**minds** [3] - 876:18, 907:14, 913:21
**minimal** [1] - 968:19
**minor** [1] - 799:15
**minute** [7] - 852:4, 875:15, 885:12, 927:2, 962:17, 977:23, 979:9
**minutes** [9] - 799:24, 811:11, 923:23, 981:20, 986:25, 987:2, 987:4, 987:10, 987:13
**misconstrued** [1] - 869:22
**missed** [1] - 869:22
**missing** [1] - 903:16
**mistake** [1] - 986:3
**mode** [2] - 881:21, 881:24
**model** [14] - 823:11, 823:13, 823:18, 824:6, 824:7, 825:3, 825:7, 825:19, 841:22, 841:25, 902:8, 902:16, 904:4, 911:22
**modeled** [1] - 910:1
**modification** [1] - 979:10
**modifications** [1] - 865:14
**moment** [7] - 865:23, 878:19, 886:11, 922:4, 927:10, 957:19, 958:5
**money** [5] - 817:9,

824:18, 824:20, 825:12, 837:18
**months** [7] - 825:1, 828:10, 900:20, 904:19, 904:21, 904:23, 905:4
**Moreover** [1] - 929:3
**morning** [13] - 799:13, 805:6, 806:21, 806:25, 807:1, 851:9, 851:10, 868:12, 868:13, 962:18, 963:6, 986:7, 988:8
**most** [11] - 805:17, 814:8, 822:14, 829:6, 835:7, 838:6, 855:19, 884:8, 884:15, 964:19, 987:12
**mostly** [2] - 823:11, 968:21
**motion** [6] - 850:21, 866:1, 884:19, 884:20, 951:22, 966:13
**motions** [2] - 850:16, 959:16
**motor** [68] - 848:21, 850:3, 859:25, 891:20, 891:24, 892:11, 892:23, 893:21, 894:1, 894:6, 894:21, 895:1, 895:3, 910:18, 910:19, 911:2, 911:9, 911:10, 912:5, 912:10, 912:14, 912:20, 912:23, 912:25, 913:4, 913:9, 913:11, 913:15, 913:25, 914:1, 914:2, 914:21, 915:6, 915:9, 915:13, 918:8, 918:13, 918:15, 918:18, 922:14, 922:15, 923:9, 923:11, 923:13, 923:16, 923:18, 924:10, 924:20, 924:21, 925:15, 925:20, 925:23, 926:3, 926:4, 926:6, 927:4, 927:5, 955:15, 955:17, 956:6, 961:22, 967:11, 967:12

**motorboat** [1] - 862:4
**motors** [1] - 935:15
**movable** [23] - 848:8, 848:17, 849:18, 849:23, 871:11, 871:22, 871:25, 872:3, 872:13, 872:16, 872:21, 872:25, 873:12, 873:16, 917:23, 921:22, 931:19, 932:4, 932:16, 945:4, 945:21, 961:9, 961:18
**move** [17] - 808:7, 858:6, 891:18, 922:11, 922:16, 922:19, 947:11, 951:23, 958:2, 958:3, 958:4, 963:19, 967:1, 967:21, 968:2, 968:5, 968:9
**moved** [2] - 926:15, 972:8
**moves** [7] - 963:24, 964:25, 965:1, 965:6, 965:11, 965:13, 965:16
**moving** [9] - 801:17, 862:1, 863:16, 877:7, 877:9, 878:2, 918:6, 919:22, 957:3
**MR** [232] - 799:15, 799:18, 800:2, 800:14, 800:19, 801:2, 801:6, 801:12, 801:13, 801:15, 801:16, 801:19, 801:21, 801:22, 801:23, 801:25, 802:3, 802:8, 802:10, 802:11, 802:14, 802:18, 802:19, 802:25, 803:1, 803:4, 803:6, 803:10, 803:14, 803:17, 804:3, 804:7, 804:9, 804:12, 804:16, 804:24, 805:2, 805:7, 805:8, 806:2, 806:3, 806:5, 806:18, 806:24, 808:10, 808:11, 811:22, 811:24, 834:12, 834:14, 839:15, 839:17, 841:14, 841:16,

846:22, 847:1, 847:7, 847:10, 850:11, 850:14, 850:16, 850:19, 850:20, 850:23, 851:5, 851:8, 851:19, 851:21, 852:19, 852:21, 854:13, 854:15, 854:17, 856:20, 856:21, 857:13, 857:21, 858:16, 858:18, 858:19, 859:6, 859:8, 859:16, 859:18, 860:4, 860:6, 863:4, 863:7, 864:8, 864:10, 867:2, 867:20, 868:4, 868:10, 868:11, 869:4, 869:5, 871:15, 871:17, 884:25, 887:16, 887:18, 888:24, 889:2, 892:3, 892:4, 893:10, 893:12, 893:23, 893:24, 894:17, 894:18, 897:18, 897:20, 898:15, 898:16, 909:4, 917:17, 917:18, 920:2, 920:4, 924:4, 924:6, 928:18, 928:21, 929:17, 929:18, 931:3, 931:4, 931:8, 931:9, 931:14, 931:15, 933:11, 933:12, 936:16, 937:11, 946:11, 946:14, 946:17, 946:18, 946:21, 946:24, 947:5, 947:20, 948:11, 948:14, 952:14, 952:16, 960:4, 960:8, 960:12, 960:15, 962:2, 962:5, 962:6, 962:11, 962:14, 963:13, 963:18, 966:25, 968:15, 969:6, 969:12, 969:19, 969:20, 970:2, 970:18, 971:1, 971:7, 971:10, 971:18, 971:21, 972:1, 972:17, 972:21, 972:25, 973:9, 973:19, 974:1,

974:3, 975:1, 975:4, 975:10, 975:17, 975:25, 976:16, 976:23, 976:25, 977:3, 977:6, 977:11, 977:14, 977:16, 978:15, 978:18, 979:8, 979:13, 980:4, 980:7, 980:10, 980:14, 981:5, 981:11, 981:14, 981:17, 982:2, 982:3, 982:4, 982:7, 982:9, 982:12, 982:14, 982:20, 983:6, 983:11, 983:15, 983:23, 984:1, 984:3, 984:12, 984:14, 984:19, 984:22, 985:1, 985:18, 986:8, 986:11, 986:12, 986:20, 986:24, 987:5

**MS** [1] - 806:1
**multiple** [2] - 959:14, 971:1
**MURRELL** [37] - 798:20, 801:2, 801:12, 801:21, 802:8, 803:10, 803:14, 805:2, 806:3, 806:18, 806:24, 808:10, 808:11, 811:22, 811:24, 834:12, 834:14, 839:15, 839:17, 850:16, 850:19, 946:11, 946:14, 946:17, 969:20, 970:18, 971:1, 971:7, 971:10, 971:18, 982:4, 984:3, 984:12, 984:14, 984:19, 984:22, 986:12
**Murrell** [2] - 971:23, 986:14
**must** [7] - 893:6, 897:13, 898:19, 898:25, 917:21, 959:9, 978:19

# N

**Namanny** [24] - 847:11, 848:24, 849:4, 849:8, 849:20, 849:23,

850:1, 859:10, 859:13, 860:4, 862:6, 916:23, 919:10, 920:25, 923:18, 924:21, 924:22, 926:13, 926:14, 926:19, 956:23, 965:9, 966:22
**Namanny's** [2] - 923:13, 923:16
**name** [3] - 840:1, 893:15, 910:18
**Nancy** [1] - 947:21
**naturally** [1] - 914:18
**nature** [1] - 870:2
**Naval** [2] - 905:12, 905:18
**necessarily** [4] - 807:15, 838:9, 926:13, 931:11
**necessary** [4] - 900:8, 928:9, 929:12, 937:5
**need** [22] - 804:24, 858:24, 858:25, 864:7, 865:18, 884:16, 897:5, 899:17, 900:6, 918:9, 918:10, 918:13, 924:19, 925:16, 926:7, 933:16, 944:9, 945:21, 949:13, 976:19, 986:2, 988:4
**needed** [7] - 835:22, 898:11, 914:5, 914:8, 969:17, 982:19, 987:9
**negative** [3] - 883:10, 883:15, 883:23
**negotiation** [19] - 814:15, 815:9, 816:8, 816:23, 816:24, 817:16, 819:16, 820:5, 824:25, 825:17, 828:8, 829:4, 829:7, 837:16, 838:22, 844:6, 844:8, 845:10, 846:13
**net** [5] - 983:22, 984:10, 984:12, 984:14, 984:16
**never** [18] - 816:20, 831:11, 831:17, 835:14, 845:9, 853:13, 855:10, 869:2, 874:19, 875:6, 886:12, 887:2, 948:25,

949:2, 950:7, 955:24, 964:21, 973:14
**nevertheless** [1] - 918:1
**new** [19] - 812:21, 881:11, 930:2, 930:4, 930:10, 930:12, 930:19, 930:20, 930:24, 931:10, 932:22, 932:23, 932:24, 933:4, 933:7, 933:10, 940:11, 968:4, 973:12
**News** [1] - 967:25
**news** [1] - 802:3
**next** [21] - 894:12, 894:16, 907:22, 909:10, 909:14, 909:22, 910:3, 910:5, 912:13, 914:4, 931:12, 932:4, 932:15, 944:11, 953:23, 953:25, 971:12, 979:4
**nexus** [4] - 968:10, 968:11, 968:13
**nice** [2] - 860:15, 863:19
**nine** [3] - 890:2, 890:5, 891:11
**non** [4] - 839:11, 839:20, 840:6, 840:21
**non-infringing** [4] - 839:11, 839:20, 840:6, 840:21
**none** [3] - 817:13, 817:14, 976:5
**noon** [1] - 988:1
**normal** [9] - 831:23, 842:19, 884:10, 884:11, 884:14, 884:23, 885:5, 885:7, 973:10
**normally** [1] - 803:23
**North** [1] - 798:11
**Nos** [1] - 962:9
**nose** [11] - 855:18, 855:21, 856:7, 856:18, 883:9, 883:13, 887:25, 888:7, 944:13, 944:18, 944:23
**nosed** [3] - 863:11, 863:12, 863:13
**note** [2] - 978:12, 978:13

**notebooks** [2] - 970:16, 970:24
**notes** [2] - 981:14, 988:15
**nothing** [12] - 801:15, 806:13, 816:16, 907:24, 932:22, 932:23, 932:24, 933:4, 968:4, 968:7, 976:8, 988:2
**notice** [4] - 799:19, 908:25, 944:12, 945:4
**noticing** [1] - 909:5
**NSX** [1] - 814:1
**number** [17] - 817:23, 829:14, 829:17, 829:18, 841:19, 842:10, 843:8, 843:10, 846:20, 853:15, 865:6, 938:8, 938:15, 968:18, 973:2, 983:17, 984:7
**numbers** [8] - 814:4, 818:1, 835:21, 882:18, 941:6, 941:7, 941:10, 949:22
**numeric** [1] - 916:21
**numerical** [2] - 865:16, 865:17
**numerous** [1] - 880:4

# O

**oath** [1] - 829:18
**object** [14] - 801:24, 802:7, 804:3, 862:7, 862:15, 875:7, 896:1, 906:22, 920:20, 925:11, 926:15, 926:25, 957:10
**objection** [8] - 804:20, 805:2, 805:4, 854:15, 854:16, 962:6, 962:8, 966:6
**objections** [1] - 977:20
**objects** [1] - 919:8
**observe** [2] - 919:4
**obviate** [1] - 933:16
**obvious** [6] - 852:8, 888:6, 901:9, 901:16, 965:9, 966:22
**obviously** [5] - 835:17, 835:23, 969:6, 972:7, 975:8

**obviousness** [2] - 917:1, 965:7
**occurred** [2] - 817:14, 905:7
**October** [4] - 940:18, 964:3, 964:13, 979:6
**odd** [1] - 854:12
**OF** [1] - 798:2
**offer** [4] - 815:14, 815:22, 900:10, 901:6
**offered** [2] - 971:14, 976:6
**offering** [1] - 814:16
**offers** [1] - 865:8
**Office** [1] - 956:24
**offset** [1] - 825:20
**older** [1] - 860:20
**once** [9] - 856:5, 857:10, 857:17, 886:22, 887:3, 962:20, 970:20, 970:24
**one** [111] - 801:2, 801:17, 801:19, 807:6, 807:7, 807:10, 808:12, 808:24, 812:3, 812:9, 812:12, 814:23, 826:6, 826:10, 826:12, 827:5, 827:11, 827:17, 827:21, 829:13, 830:10, 831:4, 835:10, 837:10, 837:17, 839:10, 839:20, 845:17, 846:15, 846:19, 852:13, 853:17, 855:2, 860:7, 861:16, 861:20, 861:25, 862:2, 862:18, 863:17, 865:3, 865:6, 866:9, 867:13, 877:13, 880:7, 880:8, 880:11, 882:18, 887:7, 888:10, 888:20, 889:3, 889:6, 889:8, 889:10, 891:13, 896:9, 898:23, 898:25, 900:6, 900:20, 901:15, 904:23, 905:4, 906:13, 910:7, 911:8, 912:13, 917:9, 919:6, 924:7, 928:25, 929:16,

931:18, 932:5,
937:24, 938:3,
938:15, 945:9,
950:16, 950:25,
951:11, 951:12,
954:18, 963:10,
966:1, 967:3, 969:4,
969:8, 969:13,
970:19, 971:11,
972:15, 973:23,
974:19, 978:16,
980:4, 981:9,
982:16, 982:22,
982:23, 983:4,
983:13, 984:8,
985:10, 985:20
**One** [1] - 888:11
**one's** [1] - 805:11
**ones** [2] - 810:17,
818:21
**online** [3] - 964:4,
964:7, 980:17
**Oops** [1] - 857:15
**open** [2] - 806:8,
875:8
**opening** [4] - 877:2,
898:18, 936:1, 942:9
**operate** [1] - 944:5
**operates** [1] - 859:2
**operating** [6] - 832:22,
832:25, 833:1,
837:3, 837:12,
842:11
**operator** [1] - 859:23
**operator's** [1] - 859:23
**opining** [2] - 900:7,
947:8
**opinion** [19] - 807:4,
814:19, 852:5,
852:10, 852:17,
856:2, 864:17,
894:25, 898:10,
900:10, 901:7,
918:1, 919:9, 921:6,
940:6, 940:25,
941:1, 948:20,
955:17
**opinions** [10] - 807:4,
808:12, 837:17,
853:3, 860:22,
861:6, 861:10,
862:25, 947:12,
960:1
**opposed** [1] - 813:22
**opposite** [1] - 943:5
**optimal** [1] - 954:24
**optimization** [3] -
899:10, 925:15,
926:2
**optimizations** [1] -

824:21
**optimized** [1] - 899:7
**optimizes** [1] - 824:18
**option** [1] - 819:4
**options** [3] - 913:13,
958:17, 958:19
**or..** [1] - 971:8
**orange** [1] - 863:22
**Order** [3] - 847:6,
847:8, 960:11
**order** [6] - 847:12,
904:22, 937:14,
950:5, 950:7, 955:4
**ordinary** [28] - 861:7,
862:19, 864:5,
864:15, 864:18,
865:2, 865:9, 899:6,
899:10, 899:11,
899:20, 900:2,
907:25, 918:19,
919:5, 921:12,
924:23, 925:9,
925:10, 925:14,
926:2, 963:22,
964:15, 966:3,
967:19, 974:21,
978:8, 978:22
**original** [6] - 832:9,
846:1, 846:2, 858:5,
878:19, 879:16
**originally** [1] - 945:11
**otherwise** [1] - 978:7
**outcome** [2] - 829:6,
934:15
**output** [2] - 910:22,
911:2
**outside** [3] - 804:13,
936:9, 964:12
**oval** [1] - 877:18
**overall** [1] - 825:14
**overhead** [2] - 833:18,
835:23
**overlap** [1] - 814:5
**overnight** [1] - 808:3
**overruled** [2] - 804:23,
854:16
**own** [5] - 807:13,
814:2, 838:6, 963:1,
964:6

**P**

**P.A** [2] - 798:17, 799:2
**p.m** [1] - 988:13
**Pacific** [6] - 807:11,
809:12, 809:15,
845:24, 846:17,
846:20
**paddling** [1] - 860:17
**Page** [13] - 811:9,

834:13, 847:8,
877:12, 880:10,
893:11, 952:14,
954:12, 970:15,
971:12, 977:14,
979:4, 982:12
**page** [34] - 869:6,
880:11, 880:13,
881:3, 882:15,
882:20, 883:1,
893:13, 893:25,
894:16, 908:9,
908:11, 908:15,
908:16, 909:10,
909:14, 909:22,
910:3, 910:5, 910:7,
910:24, 911:15,
912:2, 916:2, 916:8,
953:23, 953:25,
954:11, 960:11,
971:12, 977:13
**pages** [9] - 805:11,
805:12, 882:19,
893:22, 895:6,
908:14, 911:21,
960:12, 976:21
**paid** [5] - 815:4,
828:20, 834:17,
846:4
**pandemic** [1] - 835:12
**paper** [1] - 953:7
**paragraph** [14] -
803:7, 869:9,
875:25, 876:3,
894:5, 898:17,
913:12, 914:4,
928:19, 928:23,
931:12, 932:4,
932:15, 979:5
**parameters** [2] -
866:14, 866:17
**paraphrasing** [1] -
943:4
**parenthetical** [3] -
983:17, 984:9,
984:10
**part** [20] - 800:11,
800:12, 800:17,
836:1, 841:20,
842:4, 850:21,
851:14, 851:24,
866:19, 897:24,
912:24, 923:1,
935:20, 936:14,
950:9, 957:3, 959:5,
963:1
**partial** [1] - 941:9
**partially** [1] - 922:25
**particular** [2] - 853:16,
955:2

**particularly** [2] -
860:18, 861:17
**parties** [6] - 800:23,
819:25, 872:11,
872:20, 873:11,
917:22
**PARTNERS** [1] -
799:5
**parts** [10] - 805:16,
855:1, 870:2,
931:23, 932:2,
932:9, 932:18,
939:7, 939:15
**pass** [1] - 839:1
**passage** [8] - 929:19,
930:6, 930:21,
931:5, 933:13,
935:2, 935:3, 935:4
**passages** [4] - 894:5,
928:16, 929:3,
929:15
**passing** [1] - 838:15
**passive** [15] - 876:6,
876:23, 876:25,
922:1, 933:16,
933:18, 933:24,
934:2, 934:4, 934:8,
934:9, 934:10,
934:22, 934:24,
935:1
**passively** [10] -
873:23, 874:9,
874:20, 875:18,
899:21, 902:19,
902:24, 935:24,
936:8, 939:8
**past** [2] - 906:4,
934:15
**Patent** [1] - 956:24
**patent** [37] - 850:9,
859:20, 859:21,
861:15, 862:6,
864:16, 878:14,
878:17, 879:4,
916:17, 917:19,
919:22, 921:17,
929:16, 934:11,
934:15, 935:7,
935:9, 935:15,
936:23, 937:2,
937:13, 939:3,
939:7, 939:14,
939:15, 940:8,
940:12, 942:3,
943:21, 958:19,
960:3, 965:12,
965:13, 983:7, 983:8
**patent's** [1] - 933:23
**patents** [77] - 847:18,
847:22, 847:25,

848:5, 848:9,
848:12, 848:15,
848:18, 848:23,
849:3, 849:7,
849:10, 849:15,
849:19, 849:22,
849:25, 850:5,
852:1, 852:8,
852:15, 859:13,
860:24, 861:8,
864:13, 864:16,
864:19, 867:17,
878:24, 885:4,
885:7, 885:9, 916:2,
916:8, 918:22,
918:23, 918:24,
919:2, 919:13,
927:9, 927:14,
927:16, 927:18,
927:20, 927:21,
928:1, 928:2, 928:4,
928:7, 928:16,
929:10, 934:2,
934:4, 934:7,
936:18, 938:18,
939:1, 940:5,
941:25, 944:1,
956:13, 958:6,
960:2, 960:19,
960:23, 961:1,
961:6, 961:10,
961:13, 961:16,
961:19, 961:24,
963:22, 965:5,
965:8, 966:21, 968:3
**patents-in-suit** [27] -
847:18, 847:22,
847:25, 848:5,
848:9, 848:12,
848:15, 848:18,
848:23, 849:3,
849:7, 849:10,
849:15, 849:19,
849:22, 849:25,
850:5, 960:19,
960:23, 961:1,
961:6, 961:10,
961:13, 961:16,
961:19, 961:24,
965:5
**PATRICK** [1] - 799:7
**pattern** [1] - 979:14
**pay** [11] - 825:2,
825:4, 827:1,
827:20, 828:1,
835:5, 835:6,
841:20, 842:1,
844:20, 888:22
**paying** [6] - 822:22,
827:23, 828:23,

836:4, 844:21, 846:3
**pays** [6] - 828:25, 834:5, 834:6, 834:7
**penny** [1] - 817:7
**people** [15] - 810:5, 825:11, 826:25, 827:19, 835:25, 855:17, 956:16, 962:23, 973:3, 974:14, 974:20, 974:23, 975:14, 975:18
**per** [22] - 810:19, 810:20, 810:24, 811:3, 811:11, 812:3, 820:19, 820:21, 822:2, 822:5, 822:11, 823:6, 824:6, 825:3, 825:5, 825:13, 825:18, 827:25, 828:3, 828:13, 936:1
**per-unit** [1] - 812:3
**percent** [34] - 814:20, 815:3, 815:5, 818:18, 820:15, 821:5, 822:2, 823:1, 823:3, 823:4, 823:5, 823:7, 823:15, 823:22, 828:12, 833:2, 833:9, 833:12, 833:20, 833:21, 833:22, 836:8, 837:3, 837:8, 837:20, 838:25, 839:6, 842:10, 842:12, 845:19, 845:25, 966:9, 985:15
**percentage** [2] - 822:5, 822:12
**perception** [1] - 843:9
**perfect** [1] - 826:25
**performance** [7] - 808:13, 808:22, 808:24, 809:2, 809:4, 809:16, 809:17
**performed** [3] - 826:6, 954:17, 955:4
**performs** [1] - 863:17
**perhaps** [4] - 901:18, 919:5, 938:15, 966:1
**period** [8] - 816:7, 822:8, 832:19, 923:18, 923:22, 926:17, 926:18, 957:12
**periods** [2] - 903:17, 923:19

**permission** [1] - 847:2
**person** [33] - 861:7, 862:9, 862:19, 864:5, 864:15, 864:18, 865:2, 865:9, 899:5, 899:11, 899:20, 900:2, 902:18, 902:23, 902:25, 907:25, 918:19, 919:4, 920:24, 921:12, 924:22, 925:9, 925:10, 925:13, 926:1, 927:15, 939:7, 963:22, 964:6, 964:15, 966:3, 967:19, 978:22
**personal** [4] - 853:6, 871:5, 873:22, 874:9
**personally** [1] - 971:4
**personnel** [1] - 842:8
**persons** [2] - 861:18, 978:7
**phonetic** [1] - 938:5
**photographs** [1] - 807:21
**phrase** [1] - 869:3
**physical** [6] - 875:6, 931:23, 932:2, 932:9, 932:11, 932:18
**picking** [1] - 926:6
**picture** [5] - 839:22, 863:6, 897:21, 944:10, 944:16
**pictures** [1] - 862:13
**piece** [2] - 855:15, 947:24
**pieces** [2] - 939:12, 939:13
**piercing** [1] - 940:23
**pile** [1] - 941:7
**pilot** [2] - 856:7, 856:11
**Ping** [4] - 832:4, 832:7, 837:2, 837:21
**Ping's** [2] - 829:12, 830:2
**Piper** [2] - 863:20, 863:21
**pitch** [17] - 858:7, 866:1, 878:11, 880:24, 881:7, 881:11, 884:20, 885:5, 885:8, 886:4, 938:11, 957:18, 959:7, 959:11, 959:14, 959:16
**place** [3] - 926:9,

950:7, 968:24
**placement** [1] - 910:14
**places** [1] - 863:11
**plain** [1] - 871:1
**plaintiff** [1] - 965:1
**Plaintiff** [14] - 798:5, 798:22, 963:24, 964:25, 965:6, 965:10, 965:16, 965:19, 966:8, 966:19, 972:15, 977:8, 982:6, 986:4
**plaintiff's** [3] - 965:10, 967:6, 967:11
**Plaintiff's** [3] - 888:12, 963:12, 968:22
**Plaintiffs** [1] - 963:19
**plan** [2] - 823:24, 907:22
**planform** [11] - 866:19, 896:14, 896:20, 896:21, 929:22, 948:2, 948:5, 949:10, 953:13
**planing** [1] - 956:4
**plate** [20] - 855:14, 855:17, 896:2, 942:20, 944:18, 944:23, 947:8, 947:12, 947:13, 947:18, 947:23, 947:24, 947:25, 948:1, 948:4, 948:7, 948:8
**plates** [5] - 942:9, 942:13, 942:17, 942:18, 950:4
**play** [8] - 856:22, 863:1, 884:12, 887:16, 887:24, 888:24, 936:16, 947:20
**played** [2] - 818:19, 886:16
**player** [3] - 819:20, 836:6, 838:19
**playing** [9] - 857:1, 857:14, 857:21, 857:22, 884:13, 887:17, 889:1, 936:17, 947:22
**PLLC** [1] - 798:19
**plus** [2] - 823:3, 883:4
**point** [17] - 816:13, 818:15, 822:7, 825:16, 830:15, 830:19, 853:19, 854:20, 865:10,

880:4, 903:16, 914:4, 919:12, 940:6, 951:20, 976:19, 980:15
**pointed** [1] - 936:3
**pointing** [1] - 877:21
**pointless** [1] - 800:22
**points** [1] - 819:19
**pool** [1] - 951:24
**pops** [1] - 856:10
**porpoising** [1] - 956:5
**portable** [1] - 926:25
**portion** [5] - 891:1, 891:2, 919:23, 920:23, 936:7
**position** [13] - 800:4, 819:21, 824:10, 824:13, 824:25, 829:1, 847:21, 849:6, 858:5, 858:7, 879:2, 879:16, 960:23
**positioned** [1] - 838:5
**positive** [8] - 874:23, 875:14, 883:20, 887:11, 890:6, 891:5, 891:7, 891:10
**positively** [1] - 889:19
**possibility** [1] - 819:2
**posted** [1] - 915:5
**potential** [1] - 819:8
**potentially** [1] - 813:12
**pounds** [4] - 949:21, 957:25, 958:1, 958:4
**power** [24] - 862:18, 910:22, 911:2, 912:15, 913:16, 914:5, 923:14, 923:17, 924:7, 924:14, 924:15, 924:16, 924:17, 925:18, 925:20, 925:23, 926:18, 957:13, 957:14
**powerful** [1] - 919:21
**PowerPoint** [4] - 811:18, 851:20, 859:7, 864:9
**practical** [1] - 853:15
**practice** [1] - 963:23
**praise** [10] - 973:8, 974:13, 975:12, 976:4, 976:8, 976:15, 976:20, 985:14, 985:17
**praised** [1] - 976:2
**praising** [3] - 974:5, 974:19, 976:6
**preferred** [1] - 931:16

**premium** [1] - 824:9
**preparing** [1] - 811:15
**present** [4] - 931:17, 940:23, 949:12, 967:15
**presentation** [1] - 811:18
**presented** [10] - 905:13, 963:21, 964:2, 964:3, 964:11, 964:14, 965:4, 965:8, 965:18, 965:24
**preserve** [2] - 850:20, 977:20
**presiding** [1] - 799:12
**presumable** [1] - 825:20
**presumably** [11] - 818:6, 824:17, 825:10, 825:13, 838:1, 841:2, 843:1, 860:13, 900:21, 907:22, 926:16
**presume** [2] - 896:19, 925:9
**presumed** [1] - 978:22
**presumption** [1] - 875:12
**pretrial** [1] - 805:13
**Pretrial** [3] - 847:6, 847:7, 960:11
**pretty** [13] - 811:12, 813:25, 820:11, 830:14, 851:12, 892:5, 909:8, 913:8, 957:14, 966:19, 968:19, 970:22, 976:9
**prevent** [2] - 843:18, 843:22
**previously** [1] - 834:22
**price** [40] - 810:7, 812:3, 812:4, 813:5, 813:6, 813:9, 813:10, 813:20, 814:5, 819:19, 820:19, 820:21, 821:6, 821:10, 822:1, 822:2, 822:6, 822:8, 822:21, 823:1, 823:6, 823:23, 826:4, 826:6, 826:7, 826:8, 826:18, 826:21, 827:9, 827:13, 834:19, 834:21, 834:25, 835:10, 838:2, 838:15,

838:16, 842:14, 843:1
**priced** [3] - 826:12, 827:17, 838:10
**prices** [11] - 821:12, 821:14, 821:17, 821:21, 821:23, 821:25, 822:10, 835:13, 842:18, 842:25, 843:12
**pricing** [10] - 809:19, 821:24, 826:10, 826:17, 826:22, 827:8, 827:16, 828:17, 838:8, 842:24
**primarily** [4] - 809:17, 823:19, 861:21, 956:2
**primary** [3] - 808:16, 819:18, 899:1
**principally** [1] - 950:10
**principle** [2] - 966:8, 966:10
**principles** [1] - 937:25
**printed** [7] - 963:25, 965:22, 965:23, 966:2, 967:22, 982:16, 982:22
**privilege** [1] - 986:5
**problem** [4] - 905:5, 981:15, 981:21, 983:24
**problematic** [1] - 855:6
**problems** [3] - 832:5, 908:4, 914:1
**procedures** [5] - 831:6, 831:17, 831:20, 833:4, 833:6
**proceeding** [1] - 988:16
**PROCEEDINGS** [1] - 799:10
**produce** [9] - 853:5, 875:5, 875:11, 886:16, 896:6, 896:11, 921:15, 953:6, 959:2
**produced** [5] - 830:16, 831:7, 831:17, 832:9, 832:11
**produces** [2] - 935:1, 945:17
**producing** [1] - 858:14
**product** [32] - 810:18, 812:3, 812:4, 813:6, 813:7, 813:16,

813:17, 813:20, 814:8, 816:5, 817:19, 818:10, 824:15, 825:12, 826:10, 826:15, 826:16, 826:17, 827:19, 833:9, 833:24, 836:15, 839:22, 840:6, 840:21, 969:4, 969:5, 973:4, 973:14, 974:12
**production** [2] - 886:18, 988:10
**products** [29] - 801:3, 807:19, 807:23, 809:18, 810:5, 811:5, 813:12, 814:6, 814:7, 819:7, 822:14, 825:8, 826:12, 827:8, 835:22, 960:15, 960:20, 960:24, 961:2, 961:7, 961:11, 961:14, 961:17, 961:20, 969:1, 969:6, 969:7, 975:19
**products'** [1] - 801:8
**Professor** [11] - 802:6, 803:22, 804:25, 816:18, 817:10, 819:13, 844:15, 844:24, 844:25, 846:8, 864:22
**profit** [9] - 832:25, 833:1, 833:9, 837:12, 837:20, 838:4, 842:10, 842:11
**project** [9] - 851:14, 901:20, 901:21, 902:12, 905:12, 907:23, 912:14, 914:14, 914:15
**Project** [1] - 964:12
**projects** [2] - 905:10, 905:19
**promise** [1] - 805:18
**promote** [2] - 825:8, 855:23
**promotes** [1] - 811:6
**prone** [3] - 847:21, 849:6, 960:22
**pronounced** [1] - 840:3
**proofreader** [1] - 985:25
**propel** [2] - 926:3, 926:5

**propelled** [2] - 861:16, 951:8
**propeller** [7] - 848:22, 850:4, 925:6, 961:23
**propelling** [3] - 848:11, 849:21, 961:12
**propels** [1] - 957:15
**proper** [1] - 857:24
**properly** [3] - 865:4, 926:2, 926:5
**proposal** [1] - 979:4
**propose** [1] - 827:25
**Proposed** [1] - 805:11
**proposed** [1] - 805:25
**proposing** [1] - 820:24
**propulsion** [18] - 848:10, 848:13, 848:14, 848:19, 848:20, 849:20, 850:1, 850:2, 877:10, 910:19, 912:5, 918:10, 924:7, 961:11, 961:14, 961:15, 961:21
**propulsor** [6] - 848:21, 850:3, 850:4, 961:22
**prototype** [25] - 816:14, 816:16, 881:4, 882:13, 882:16, 886:9, 900:18, 901:12, 904:9, 904:11, 904:16, 906:7, 906:10, 906:16, 906:17, 906:24, 907:7, 908:2, 911:6, 913:3, 914:19, 914:20, 915:4
**prototypes** [10] - 880:5, 880:7, 901:15, 901:22, 901:25, 906:13, 908:3, 951:4, 951:7
**prove** [2] - 847:14, 978:19
**proven** [1] - 825:24
**provide** [10] - 830:25, 838:24, 884:19, 884:20, 922:24, 923:22, 931:17, 933:17, 957:12, 957:13
**provided** [9] - 809:6, 829:17, 829:20, 829:23, 830:2, 932:5, 932:16,

948:18
**provides** [9] - 830:24, 866:4, 923:24, 926:17, 951:11, 951:24, 958:14, 958:17
**providing** [2] - 831:3, 883:21
**PTX** [7] - 809:20, 856:20, 928:19, 962:5, 962:9
**public** [3] - 818:9, 978:6, 980:16
**publically** [3] - 978:20, 979:6, 982:23
**publication** [7] - 964:1, 965:23, 966:3, 967:22, 977:18, 982:16, 982:23
**publications** [1] - 976:6
**publicly** [3] - 964:2, 965:22, 977:18
**published** [2] - 938:21, 941:18
**pull** [6] - 832:3, 834:12, 860:4, 862:15, 951:13, 958:1
**pulled** [1] - 831:13
**pulls** [5] - 857:19, 918:17, 918:18, 951:19, 957:21
**pump** [3] - 848:22, 850:5, 961:23
**purchasing** [3] - 808:23, 808:25, 833:13
**purported** [1] - 978:10
**purpose** [10] - 801:6, 802:12, 804:19, 804:22, 861:15, 861:16, 878:9, 926:23, 926:24
**purposes** [2] - 900:15, 969:12
**push** [4] - 862:16, 950:11, 950:12, 951:15
**pushes** [2] - 884:3, 884:16
**pushing** [2] - 883:24, 949:19
**put** [41] - 799:24, 802:5, 802:8, 804:21, 811:22, 839:15, 859:16, 860:10, 860:13,

871:15, 875:9, 875:24, 902:8, 902:15, 904:3, 904:4, 906:6, 907:8, 913:10, 918:8, 918:14, 918:15, 922:13, 922:15, 923:9, 923:11, 924:20, 924:21, 925:6, 926:9, 926:15, 926:25, 948:16, 948:17, 957:7, 957:18, 978:12, 980:22
**puts** [2] - 813:23, 949:1
**putting** [5] - 862:2, 862:17, 918:13, 984:3

## Q

**qualify** [1] - 963:25
**quality** [1] - 809:18
**quantify** [1] - 901:11
**quantity** [3] - 900:8, 900:22, 901:1
**quarter** [1] - 828:12
**QUESTION** [1] - 828:23
**questioning** [2] - 953:24, 954:15
**questions** [12] - 841:14, 843:11, 843:25, 867:20, 870:7, 948:11, 952:6, 954:3, 958:7, 959:25, 960:4, 988:4
**quick** [4] - 851:12, 854:13, 866:13, 988:9
**quickly** [5] - 820:12, 881:20, 957:14, 963:14, 963:15
**quietly** [1] - 860:16
**quite** [7] - 888:16, 890:21, 905:2, 922:5, 946:10, 973:21, 980:25
**quoted** [1] - 933:14

## R

**R&D** [4] - 833:22, 836:10, 836:15, 837:9
**radar** [1] - 859:2
**radius** [1] - 863:22
**raised** [1] - 817:10
**Ralli** [3] - 985:24,

986:4, 988:10
**RALLI** [2] - 798:17, 986:8
**ran** [3] - 880:16, 882:22, 885:16
**randomly** [1] - 925:11
**range** [3] - 845:23, 930:7, 958:18
**ranges** [1] - 814:5
**ranked** [1] - 820:2
**rate** [12] - 812:3, 814:20, 814:22, 815:3, 815:4, 820:15, 820:19, 822:5, 822:11, 822:12, 950:3
**rated** [1] - 912:14
**rates** [2] - 819:9, 819:14
**rather** [4] - 805:20, 827:20, 863:12, 933:19
**rationale** [3] - 825:10, 969:3, 983:18
**ratios** [1] - 950:3
**raw** [1] - 833:13
**reach** [1] - 825:9
**reached** [1] - 808:12
**reaction** [1] - 888:22
**reactions** [1] - 972:22
**read** [28] - 799:18, 799:21, 799:24, 799:25, 800:3, 800:9, 800:12, 800:18, 847:2, 847:10, 853:1, 868:14, 868:24, 872:11, 873:10, 876:17, 893:18, 893:20, 907:13, 907:25, 913:21, 917:22, 929:20, 954:21, 985:25, 986:15, 987:11
**reader** [3] - 935:24, 936:19, 937:3
**readily** [1] - 899:6
**reading** [10] - 800:3, 847:6, 847:7, 858:20, 875:4, 894:4, 900:3, 943:21, 960:11, 971:12
**ready** [8] - 806:17, 868:3, 909:8, 946:23, 962:17, 969:25, 970:1, 988:10
**Real** [1] - 988:17
**real** [5] - 830:17,

854:13, 866:13, 902:8, 947:17
**Real-Time** [1] - 988:17
**realize** [2] - 834:1, 920:22
**really** [19] - 800:1, 804:1, 853:16, 889:13, 889:15, 919:6, 934:9, 934:18, 934:21, 935:16, 939:19, 939:21, 975:1, 976:8, 978:4, 986:20, 987:2, 987:7, 987:8
**realm** [1] - 966:2
**rear** [8] - 847:24, 848:4, 849:9, 849:14, 850:7, 897:10, 960:25, 961:5
**rearwardly** [1] - 850:8
**reason** [5] - 803:19, 822:4, 981:16, 985:7, 986:3
**reasonable** [8] - 846:5, 853:12, 868:19, 868:22, 869:12, 926:19, 966:19, 978:9
**reasons** [4] - 826:25, 856:4, 861:14, 863:18
**rebut** [1] - 965:18
**rebuttal** [9] - 800:13, 800:14, 850:24, 869:6, 875:25, 892:6, 928:19, 987:4, 987:22
**receipts** [2] - 831:2, 832:1
**receive** [2] - 973:5, 974:13
**received** [2] - 841:3, 973:2
**receiving** [1] - 871:19
**recently** [2] - 812:21, 821:18
**recess** [3] - 806:14, 946:5, 970:3
**Recess** [5] - 806:16, 868:2, 946:7, 970:5, 981:24
**recessed** [1] - 988:13
**recite** [1] - 876:12
**reciting** [1] - 874:5
**recognize** [18] - 851:22, 877:15, 878:6, 880:12, 880:18, 881:4,

887:19, 887:21, 888:10, 899:6, 908:11, 909:11, 909:15, 910:17, 917:19, 921:13, 921:18, 943:14
**recognized** [2] - 808:21, 941:11
**recognizing** [1] - 908:6
**record** [8] - 819:18, 855:22, 872:11, 935:3, 967:12, 984:21, 988:5, 988:6
**records** [1] - 817:21
**rectangular** [1] - 948:3
**red** [1] - 951:13
**REDIRECT** [2] - 841:15, 948:13
**redirect** [1] - 802:9
**redone** [1] - 832:10
**redress** [1] - 875:14
**reduced** [1] - 844:16
**refer** [2] - 941:20
**reference** [2] - 812:11, 860:5
**referenced** [2] - 809:10, 827:10
**references** [4] - 859:10, 864:4, 864:6, 956:22
**referred** [3] - 809:17, 852:23, 951:4
**referring** [5] - 826:8, 826:10, 895:15, 895:17, 898:8
**reflect** [1] - 830:21
**reflects** [1] - 824:20
**refresh** [3] - 908:5, 908:7, 920:3
**regard** [17] - 800:4, 902:14, 937:24, 940:20, 966:14, 967:2, 967:6, 967:8, 967:9, 967:10, 968:6, 968:7, 968:10, 973:19, 974:3, 976:6, 978:18
**regarding** [12] - 842:10, 853:3, 853:8, 860:22, 861:6, 877:10, 911:19, 915:22, 954:3, 960:1, 972:22, 973:1
**regardless** [1] - 955:21
**regular** [1] - 883:4
**regulates** [1] - 894:8
**reiterate** [1] - 975:25

**related** [4] - 806:8, 865:23, 925:20, 974:9
**relates** [1] - 925:23
**relating** [1] - 974:6
**relationship** [2] - 839:2, 842:20
**relative** [3] - 807:8, 883:18, 952:25
**release** [1] - 973:1
**relevant** [1] - 966:4
**reliable** [2] - 943:23
**relied** [6] - 833:21, 836:8, 941:12, 941:15, 941:17, 941:18
**rely** [1] - 830:1
**relying** [5] - 832:22, 833:21, 938:6, 953:22, 954:14
**remain** [2] - 838:3, 861:24
**remember** [44] - 803:3, 803:4, 804:2, 807:3, 811:5, 811:20, 811:25, 814:16, 816:4, 839:12, 839:18, 871:12, 871:19, 872:2, 872:7, 872:8, 873:8, 876:3, 878:14, 880:8, 882:1, 882:12, 885:1, 887:14, 890:8, 891:21, 892:7, 895:11, 895:13, 895:20, 897:11, 898:7, 898:13, 899:4, 915:22, 923:25, 924:8, 937:22, 942:9, 942:25, 943:5, 943:6, 943:19
**remind** [5] - 844:7, 960:10, 962:21, 962:25, 981:3
**reminder** [2] - 958:20, 958:22
**removing** [1] - 921:1
**rendered** [1] - 966:22
**repeat** [2] - 873:25, 932:10
**reply** [2] - 943:8, 983:9
**Report** [89] - 802:2, 804:14, 804:15, 847:13, 847:15, 847:19, 847:23, 848:1, 848:6, 848:10, 848:13, 848:16, 848:19,

851:25, 852:24, 853:4, 853:18, 854:7, 854:25, 858:20, 858:21, 868:14, 869:11, 869:21, 870:4, 870:13, 870:15, 871:1, 871:5, 872:12, 872:16, 872:17, 872:21, 873:11, 873:16, 873:17, 873:22, 874:8, 875:18, 876:5, 877:16, 878:7, 878:23, 878:25, 879:21, 880:3, 882:13, 885:12, 891:23, 892:10, 892:24, 893:7, 894:25, 895:6, 897:13, 899:17, 899:19, 899:24, 900:3, 901:17, 902:18, 902:23, 903:19, 903:20, 908:9, 908:12, 913:20, 915:20, 932:20, 948:17, 948:24, 950:21, 952:15, 958:13, 963:25, 964:2, 964:4, 964:7, 964:13, 964:17, 964:24, 965:1, 965:4, 966:7, 967:13, 967:18, 978:20, 979:6, 982:22
**report** [65] - 808:16, 808:18, 808:19, 811:8, 811:15, 828:20, 840:23, 853:11, 853:19, 869:7, 869:20, 870:4, 870:22, 874:19, 875:4, 876:1, 876:21, 876:24, 886:17, 892:6, 892:13, 892:16, 892:17, 893:4, 898:18, 899:5, 901:10, 901:16, 903:2, 903:3, 903:6, 903:9, 903:13, 906:12, 906:15, 907:16, 907:23, 907:24, 908:23, 909:6, 910:21, 914:16, 914:17, 915:1, 915:2, 915:3,

928:19, 928:22,
931:2, 935:3,
941:16, 941:19,
943:8, 949:23,
950:13, 950:17,
953:25, 954:11,
954:12, 968:1,
980:22
**Report's** [1] - 896:10
**reported** [2] - 885:16,
885:18
**reporter** [2] - 895:2,
963:16
**Reporter** [1] - 988:17
**reporting** [3] - 898:8,
899:19, 900:11
**reports** [6] - 901:7,
903:22, 906:9,
906:24, 917:4,
942:12
**represent** [1] - 877:24
**representation** [1] -
810:25
**representative** [1] -
830:12
**represented** [1] -
810:23
**represents** [1] -
877:19
**request** [3] - 804:23,
808:3, 982:15
**require** [2] - 871:25,
921:14
**required** [8] - 847:14,
875:5, 877:10,
900:4, 902:3,
934:11, 934:24,
968:10
**requirement** [5] -
853:21, 877:5,
928:12, 928:13,
929:12
**requirements** [5] -
876:13, 912:11,
913:16, 915:10,
928:9
**requires** [4] - 864:2,
934:15, 941:6,
967:11
**requiring** [1] - 844:20
**research** [4] - 837:9,
837:13, 962:25,
964:23
**reseller** [1] - 822:25
**resellers** [4] - 818:4,
823:12, 823:14,
839:6
**reserve** [1] - 987:3
**resist** [1] - 862:16
**resolves** [1] - 985:22

**respect** [16] - 803:5,
804:15, 844:13,
852:5, 852:10,
854:1, 854:6, 856:1,
859:9, 862:24,
862:25, 867:9,
892:23, 899:17,
927:23, 948:22
**responding** [1] -
899:4
**response** [2] - 803:5,
894:9
**responsible** [2] -
834:1, 834:4
**rest** [3] - 935:2, 935:3,
972:14
**resting** [2] - 850:13,
850:14
**restoring** [2] - 878:19,
953:6
**result** [3] - 924:24,
953:1, 954:25
**results** [2] - 878:18,
943:24
**retail** [7] - 813:9,
813:10, 823:22,
826:21, 838:25,
839:6, 843:11
**return** [2] - 858:4,
879:1
**returning** [1] - 879:10
**returns** [1] - 878:19
**review** [7] - 840:10,
905:1, 905:6, 905:9,
905:13, 936:18,
950:14
**reviewed** [5] - 811:15,
831:20, 858:21,
859:12, 907:16
**reviewing** [4] - 830:4,
830:5, 830:7, 868:16
**RICHARD** [1] - 798:15
**Richard** [1] - 799:12
**RICHARDS** [1] - 799:2
**rid** [6] - 971:13,
971:14, 971:15,
971:22, 972:2, 977:2
**ride** [7] - 810:6, 810:7,
810:11, 811:4,
896:8, 922:25,
957:13
**rider** [7] - 918:4,
919:21, 922:11,
922:16, 922:19,
922:25, 923:8
**riding** [1] - 923:23
**righting** [3] - 881:14,
882:8, 955:6
**rise** [9] - 799:11,
806:15, 806:16,

868:1, 946:6, 946:8,
970:4, 981:23,
988:12
**rises** [2] - 857:6, 976:1
**Robert** [1] - 937:16
**ROBERT** [2] - 798:20,
799:6
**role** [2] - 818:19,
818:20
**roll** [4] - 866:1,
959:11, 959:16
**rolling** [1] - 885:22
**room** [1] - 970:20
**rope** [16] - 861:22,
861:24, 918:6,
918:9, 918:10,
918:13, 918:17,
921:4, 921:11,
921:13, 951:11,
951:19, 951:21,
951:24, 957:25
**rope's** [1] - 951:22
**rotate** [1] - 897:19
**roughly** [2] - 855:22,
974:20
**rounded** [6] - 855:18,
855:21, 863:20,
944:13, 944:18,
944:22
**routine** [2] - 925:15,
926:2
**row** [1] - 905:19
**royalties** [5] - 815:1,
827:23, 844:21,
844:22, 846:4
**royalty** [22] - 814:20,
814:22, 815:3,
819:9, 820:15,
820:18, 822:23,
824:19, 825:13,
825:15, 828:20,
842:15, 842:22,
845:20, 845:23,
846:5, 846:20,
983:16, 983:21,
984:6, 984:9
**rubber** [1] - 948:10
**rule** [1] - 956:1
**run** [16] - 824:11,
831:1, 831:2, 831:7,
831:17, 831:25,
833:6, 881:19,
886:1, 923:21,
941:7, 941:10,
949:17, 949:22,
957:13
**running** [2] - 831:9,
941:6
**runs** [2] - 936:5

**S**

**sake** [1] - 924:19
**sale** [4] - 815:14,
815:23, 816:17,
816:24
**sales** [34] - 817:14,
823:1, 824:16,
825:15, 825:22,
825:24, 826:1,
826:11, 826:16,
826:22, 827:8,
827:18, 828:16,
830:6, 830:15,
830:16, 830:22,
831:18, 831:21,
832:9, 832:11,
832:14, 837:25,
838:2, 842:16,
842:19, 842:22,
842:24, 983:22,
984:10, 984:12,
984:14, 984:16
**samples** [4] - 831:2,
831:9, 831:13
**satisfactory** [1] -
923:24
**satisfy** [1] - 897:3
**save** [3] - 811:9,
860:19, 985:19
**saw** [17] - 838:5,
858:8, 858:10,
862:22, 862:25,
867:16, 880:4,
886:15, 887:1,
890:5, 890:17,
899:9, 906:5, 911:6,
912:19, 915:4, 955:9
**schematics** [2] -
909:15, 911:24
**science** [2] - 956:14,
956:15
**scientific** [1] - 947:17
**screen** [8] - 809:22,
870:8, 872:2,
872:25, 892:15,
892:20, 892:21,
911:17
**sea** [5] - 835:8, 857:7,
858:7, 862:21,
915:12
**Sea** [4] - 839:21,
839:22, 839:23,
840:6
**Sea-Doo** [4] - 839:21,
839:22, 839:23,
840:6
**search** [1] - 964:16
**seat** [2] - 920:7,
981:25

**seated** [5] - 806:22,
868:8, 946:9, 947:3,
970:9
**second** [26] - 808:1,
819:20, 844:18,
882:5, 883:5,
890:16, 890:17,
891:11, 906:16,
906:17, 906:24,
907:7, 908:2,
914:18, 928:23,
928:24, 931:1,
935:2, 942:6, 964:9,
971:11, 979:1,
982:23, 983:7,
984:4, 984:8
**secondary** [8] - 899:1,
932:5, 968:6, 968:7,
968:10, 968:18,
972:7, 985:14
**seconds** [7] - 881:21,
881:23, 882:3,
882:5, 890:2, 890:5,
951:1
**section** [31] - 808:15,
809:6, 847:24,
847:25, 848:4,
849:9, 849:10,
849:14, 864:25,
880:21, 910:9,
910:11, 912:4,
912:5, 912:7, 942:2,
948:6, 949:10,
953:13, 953:14,
953:17, 954:11,
960:25, 961:1, 961:5
**see** [115] - 809:23,
809:24, 812:15,
826:20, 827:17,
834:16, 836:7,
844:14, 855:5,
855:10, 856:7,
863:18, 867:10,
870:8, 875:4, 876:7,
877:5, 877:18,
877:21, 877:22,
878:11, 879:2,
879:5, 879:7,
879:10, 880:12,
880:21, 881:8,
881:10, 881:13,
881:17, 881:18,
881:19, 881:21,
881:23, 883:2,
883:5, 883:7,
883:10, 885:23,
885:24, 886:2,
886:5, 888:16,
892:12, 892:14,
892:16, 892:19,

892:21, 893:15, 893:19, 893:22, 893:25, 894:2, 894:10, 894:14, 894:19, 894:23, 897:21, 897:24, 898:1, 898:21, 898:23, 899:3, 901:17, 908:16, 908:21, 909:23, 909:24, 910:1, 910:6, 910:8, 910:10, 910:15, 911:1, 911:16, 911:19, 911:22, 911:24, 912:4, 912:7, 912:11, 912:17, 913:13, 913:16, 913:24, 914:2, 914:3, 929:5, 929:16, 929:25, 931:5, 931:6, 931:7, 931:21, 932:7, 933:21, 944:6, 944:13, 944:15, 944:16, 954:1, 957:19, 963:3, 963:6, 968:22, 968:23, 970:14, 971:16, 973:21, 985:12, 986:2, 988:3, 988:7, 988:10

**seeing** [7] - 856:1, 885:1, 891:1, 891:2, 919:7, 939:21, 952:17

**seem** [1] - 903:16

**sees** [1] - 857:18

**segment** [2] - 809:19, 825:10

**select** [4] - 865:3, 865:9, 953:5, 958:18

**selected** [4] - 848:21, 850:4, 875:11, 961:23

**selection** [3] - 865:19, 958:14

**selectively** [3] - 890:14, 890:20, 890:24

**self** [6] - 861:16, 881:14, 882:8, 926:3, 926:16, 951:8

**self-contained** [1] - 926:16

**self-propelled** [2] - 861:16, 951:8

**self-righting** [2] - 881:14, 882:8

**sell** [17] - 807:20,

819:19, 822:22, 822:25, 823:5, 823:6, 823:11, 823:19, 823:21, 824:10, 838:7, 839:5, 842:1, 843:14, 843:16, 971:15

**selling** [10] - 810:11, 811:2, 821:6, 822:17, 830:18, 843:19, 843:22, 971:17, 975:19

**sells** [3] - 822:14, 823:14, 828:19

**send** [7] - 805:19, 970:21, 976:13, 985:23, 985:24, 986:1, 988:8

**sense** [4] - 823:19, 831:22, 902:25, 974:15

**senses** [1] - 858:25

**sent** [2] - 805:24, 806:4

**sentence** [14] - 869:11, 883:5, 883:8, 893:1, 912:9, 912:13, 913:12, 928:24, 932:4, 932:15, 978:1, 978:2, 978:5, 979:5

**sentences** [2] - 933:15, 978:5

**sentiment** [1] - 971:24

**separate** [2] - 978:16, 982:14

**separately** [2] - 847:11, 969:2

**series** [1] - 865:8

**serious** [1] - 811:16

**service** [2] - 834:7, 835:24

**session** [1] - 799:12

**set** [6] - 817:13, 908:20, 926:1, 950:10, 953:14, 970:16

**sets** [2] - 807:23, 892:5

**setup** [1] - 810:15

**seven** [1] - 938:7

**several** [7] - 832:5, 832:17, 853:8, 863:11, 864:25, 900:20, 902:5

**shape** [12] - 877:18, 886:20, 886:23, 887:3, 898:25, 928:8, 929:11,

948:9, 949:10, 953:10, 953:12

**shaped** [2] - 850:7, 897:9

**sharp** [10] - 863:11, 863:12, 863:13, 863:23, 863:25, 864:1, 864:2, 945:1, 945:6, 945:15

**SHENZEN** [1] - 798:7

**shift** [28] - 865:25, 871:6, 871:10, 871:21, 871:24, 872:2, 872:17, 872:19, 873:1, 873:5, 873:6, 873:17, 873:19, 918:2, 918:4, 919:18, 919:19, 919:24, 920:1, 920:12, 920:21, 921:2, 933:19, 958:2, 958:3, 967:4, 967:7

**shifting** [1] - 862:1

**shifts** [1] - 932:17

**ship** [2] - 902:14, 941:10

**shipping** [10] - 833:23, 834:4, 834:5, 835:4, 835:5, 835:8, 835:18, 836:5, 836:9, 837:5

**shirt** [1] - 890:11

**shoots** [1] - 857:11

**short** [9] - 800:9, 891:13, 923:18, 923:19, 923:21, 926:17, 926:18, 957:12, 981:22

**shorter** [1] - 805:17

**shoulders** [1] - 860:21

**show** [15] - 801:9, 815:15, 815:20, 854:13, 856:19, 874:25, 887:13, 888:20, 959:4, 965:4, 966:8, 966:20, 968:13, 977:18, 986:15

**showed** [5] - 803:7, 804:13, 811:19, 839:14, 945:12

**showing** [6] - 811:25, 839:18, 890:25, 891:4, 950:20, 976:2

**shown** [1] - 894:13

**shows** [6] - 810:13, 815:19, 890:10, 890:11, 902:20

**side** [7] - 801:16, 862:2, 888:21, 897:23, 963:4, 987:10

**sides** [1] - 805:24

**sign** [1] - 984:4

**signals** [2] - 939:24, 940:1

**significance** [1] - 951:10

**significant** [3] - 832:16, 920:22, 951:12

**significantly** [2] - 891:12, 891:16

**silly** [1] - 986:3

**similar** [9] - 811:12, 811:13, 819:19, 856:10, 857:16, 862:22, 911:23, 934:12

**simple** [6] - 822:3, 822:4, 822:18, 823:6, 903:5, 949:18

**simply** [7] - 836:16, 837:22, 845:19, 942:20, 952:10, 952:25, 957:7

**single** [2] - 886:1, 893:1

**singular** [1] - 985:3

**sit** [5] - 834:8, 834:10, 941:1, 972:25, 975:5

**sitting** [3] - 853:24, 877:2, 980:7

**situation** [5] - 818:7, 819:23, 973:10, 973:12, 974:12

**situations** [1] - 959:19

**sixth** [1] - 929:2

**size** [12] - 855:22, 909:20, 924:10, 924:12, 925:15, 925:23, 926:2, 926:4, 928:8, 929:11, 955:14, 955:17

**sizes** [1] - 865:7

**ski** [4] - 859:25, 860:2, 861:17, 861:25

**skied** [1] - 861:23

**skill** [27] - 861:7, 862:19, 864:5, 864:15, 864:18, 865:3, 865:9, 899:6, 899:11, 899:20, 900:2, 907:25, 918:19, 919:5, 921:12, 924:23, 925:10, 925:14,

926:1, 926:2, 963:22, 964:16, 966:3, 967:19, 974:21, 978:8, 978:22

**skilled** [2] - 862:9, 956:12

**Slide** [15] - 869:4, 871:15, 875:24, 878:5, 885:20, 892:3, 894:17, 897:18, 898:15, 924:5, 929:17, 931:3, 931:8, 931:14, 933:11

**slide** [22] - 810:12, 811:19, 811:22, 811:25, 815:19, 839:14, 839:16, 839:18, 846:10, 846:18, 878:16, 878:22, 878:23, 880:20, 881:1, 882:25, 893:23, 910:24, 920:2

**slides** [1] - 851:11

**slightly** [4] - 806:8, 834:20, 861:25, 922:3

**slow** [3] - 862:6, 862:8, 862:9

**slowly** [1] - 860:16

**smack** [1] - 957:4

**small** [4] - 865:6, 891:2, 926:14, 957:10

**smaller** [3] - 820:9, 911:8, 914:1

**smart** [1] - 829:10

**Smith** [1] - 835:24

**smoothly** [1] - 863:16

**snaps** [4] - 882:9, 882:10, 882:12

**so..** [2] - 875:23, 903:4

**sold** [10] - 816:4, 817:22, 817:24, 818:10, 829:15, 829:18, 830:13, 983:18, 984:8, 984:15

**solely** [1] - 873:4

**solution** [3] - 840:12, 840:13

**someone** [4] - 803:24, 919:3, 958:21, 979:25

**sometime** [2] - 805:23, 806:12

**sometimes** [2] - 813:15, 830:23

**somewhere** [7] - 823:7, 882:16, 900:19, 900:21, 901:17, 923:13, 978:1

**sonar** [1] - 859:2

**sooner** [1] - 805:20

**sorry** [58] - 803:17, 804:11, 811:3, 815:20, 825:6, 854:22, 860:3, 866:1, 868:20, 869:25, 870:1, 873:25, 876:13, 879:13, 879:23, 880:25, 881:2, 885:6, 887:7, 888:13, 889:14, 891:25, 895:16, 901:5, 904:7, 907:4, 909:2, 909:3, 910:7, 916:5, 916:16, 919:16, 922:7, 925:22, 927:5, 930:3, 930:16, 930:17, 932:10, 932:23, 941:17, 942:6, 943:9, 943:11, 943:13, 946:21, 947:11, 971:23, 975:1, 977:3, 979:1, 980:6, 980:9, 984:16, 984:19, 984:20

**sort** [14] - 805:18, 824:12, 824:16, 826:24, 831:22, 859:3, 859:22, 860:14, 874:2, 930:14, 935:5, 949:24, 979:16, 981:9

**sorts** [2] - 831:23, 831:24

**sounds** [3] - 828:4, 976:18, 981:2

**sources** [1] - 853:11

**space** [1] - 951:20

**span** [4] - 896:17, 896:24, 897:4, 929:23

**span-wise** [4] - 896:17, 896:24, 897:4, 929:23

**speaking** [3] - 919:1, 927:16, 927:18

**speaks** [1] - 966:5

**spec** [1] - 939:7

**specific** [7] - 826:7, 899:16, 933:1,

972:24, 975:14, 975:17, 975:20

**specifically** [9] - 836:11, 836:20, 837:7, 837:15, 854:20, 940:21, 959:22, 967:10, 976:20

**specification** [14] - 852:14, 864:12, 864:16, 864:22, 866:3, 866:15, 866:18, 867:3, 867:16, 920:9, 936:22, 936:23, 958:8, 958:11

**specifications** [2] - 869:18, 957:10

**spectacular** [1] - 956:7

**speed** [25] - 809:17, 810:6, 811:6, 843:5, 850:3, 853:14, 860:14, 860:17, 861:16, 862:12, 891:20, 891:24, 892:11, 892:23, 894:7, 895:1, 895:3, 913:16, 915:10, 915:12, 915:15, 922:6, 922:11, 967:11, 967:12

**speeds** [3] - 864:3, 865:7, 955:22

**spelling** [1] - 986:3

**spend** [1] - 868:16

**spent** [3] - 817:7, 817:10, 837:13

**spiral** [1] - 957:17

**spite** [2] - 870:3, 876:10

**sport** [1] - 836:1

**sports** [2] - 839:23, 974:14

**spots** [1] - 856:23

**spreadsheet** [1] - 829:24

**square** [1] - 855:14

**stability** [97] - 853:8, 853:18, 853:20, 854:3, 854:10, 855:7, 856:3, 865:14, 865:17, 874:24, 875:5, 875:6, 875:11, 876:6, 876:23, 876:25, 877:8, 878:14, 878:24, 880:25, 881:8, 882:2, 884:10,

884:11, 884:21, 884:22, 885:5, 885:8, 885:22, 886:4, 890:7, 890:17, 890:18, 915:15, 915:22, 916:3, 916:9, 916:12, 916:20, 916:22, 920:17, 920:23, 921:4, 921:7, 921:11, 921:19, 921:20, 922:1, 922:6, 922:17, 924:25, 933:16, 933:17, 933:18, 933:24, 934:3, 934:5, 934:8, 934:10, 934:22, 934:24, 935:1, 935:13, 935:14, 935:17, 935:19, 936:15, 938:8, 938:10, 938:11, 938:18, 938:19, 939:1, 939:2, 941:3, 941:23, 941:24, 942:16, 942:18, 942:20, 945:19, 945:21, 948:19, 948:23, 949:7, 949:24, 951:12, 952:3, 952:8, 952:22, 953:1, 958:25, 959:16, 967:5, 967:8

**stabilizing** [2] - 951:25, 957:22

**stable** [55] - 853:5, 853:9, 858:4, 858:6, 873:23, 874:10, 874:14, 874:20, 875:2, 875:8, 875:13, 875:18, 875:20, 875:21, 876:10, 876:11, 876:15, 876:16, 878:5, 878:11, 878:18, 878:25, 881:11, 887:13, 889:24, 890:1, 891:13, 891:16, 899:21, 902:19, 902:24, 918:14, 918:16, 920:20, 921:9, 921:10, 921:16, 928:10, 928:12, 929:13, 935:25, 936:8, 936:20, 937:3, 937:6, 937:15, 939:8, 950:8,

951:14, 952:11, 953:9, 955:23, 955:24

**stall** [3] - 856:16, 863:14, 863:24

**stand** [5] - 803:5, 866:21, 895:2, 895:18, 987:16

**standard** [2] - 882:1, 882:5

**standing** [3] - 847:21, 849:6, 960:22

**start** [9] - 847:5, 856:6, 867:22, 901:20, 902:3, 908:8, 946:20, 962:18, 977:8

**started** [4] - 902:11, 902:12, 903:12, 948:15

**starting** [3] - 865:9, 931:12, 968:17

**starts** [1] - 929:14

**state** [1] - 876:24

**statement** [17] - 869:23, 870:3, 870:8, 870:10, 870:12, 876:13, 876:21, 877:4, 878:6, 878:23, 879:15, 879:16, 881:10, 913:24, 928:22, 934:18, 934:21

**statements** [6] - 847:2, 847:13, 879:7, 879:10, 879:17, 885:19

**states** [1] - 979:11

**STATES** [1] - 798:1

**States** [4] - 815:21, 978:24, 980:21, 980:22

**static** [1] - 858:5

**stationary** [1] - 853:21

**stay** [2] - 812:12, 822:17

**Stec** [8] - 820:18, 825:23, 829:14, 833:21, 842:11, 842:21, 842:23

**Stec's** [3] - 807:4, 820:15, 822:7

**steel** [1] - 855:16

**steering** [14] - 840:5, 848:17, 849:24, 871:11, 871:13, 871:22, 871:25, 872:4, 872:13, 872:16, 872:21,

872:25, 932:16, 961:18

**stenographic** [2] - 988:6, 988:15

**step** [4] - 846:24, 960:5, 960:6

**steps** [1] - 964:15

**stick** [1] - 985:4

**stickies** [1] - 986:15

**sticking** [2] - 904:16, 927:4

**sticky** [2] - 981:16, 986:14

**still** [18] - 838:10, 838:14, 838:15, 838:16, 851:1, 869:20, 870:4, 870:6, 870:13, 872:25, 890:22, 894:25, 896:17, 899:23, 900:1, 918:13, 940:14, 940:16

**stipulate** [1] - 800:19

**stipulated** [8] - 800:20, 800:23, 872:12, 872:20, 873:11, 917:22, 932:21, 960:8

**stipulation** [1] - 933:1

**stipulations** [1] - 800:11

**stoic** [1] - 963:16

**Stoke** [1] - 835:24

**stop** [3] - 858:18, 886:1, 912:3

**stopped** [2] - 846:3, 910:20

**stopping** [1] - 930:14

**storage** [1] - 835:17

**story** [1] - 979:24

**straight** [3] - 821:23, 883:4, 897:23

**straighten** [2] - 955:7, 955:12

**straightened** [1] - 954:23

**straightforward** [1] - 819:10

**strapped** [5] - 859:23, 859:24, 861:21, 922:20, 923:8

**Street** [1] - 798:11

**strength** [1] - 894:8

**strikes** [2] - 974:24, 976:9

**strut** [7] - 848:1, 848:7, 849:11, 849:17, 910:5, 961:2, 961:8

**struts** [2] - 931:19, 932:6
**student** [4] - 905:9, 905:12, 905:18, 907:23
**students** [2] - 870:22, 870:23
**study** [4] - 826:4, 826:7, 827:4, 827:9
**stylistic** [1] - 968:25
**subject** [2] - 978:8, 983:9
**sublicensing** [1] - 844:18
**submits** [1] - 805:17
**subsequently** [2] - 865:16, 890:12
**substantial** [4] - 818:19, 818:20, 822:6, 921:14
**substantially** [9] - 818:12, 820:9, 824:6, 825:18, 826:13, 826:21, 826:23, 827:17, 846:6
**substitutes** [1] - 826:25
**success** [3] - 885:17, 885:18, 972:12
**successful** [4] - 818:11, 833:24, 903:7, 925:11
**Successful** [1] - 881:19
**successfully** [2] - 890:12, 900:18
**successive** [1] - 936:7
**sucks** [1] - 857:19
**sudden** [1] - 822:2
**suddenly** [2] - 855:25, 856:18
**sufficient** [1] - 862:18
**suggest** [3] - 874:19, 946:4, 980:1
**suggested** [3] - 819:14, 823:22, 839:6
**suggestion** [3] - 899:18, 982:18, 985:5
**suggestions** [3] - 812:8, 858:24, 982:9
**suggests** [2] - 922:16, 979:21
**suit** [27] - 847:18, 847:22, 847:25, 848:5, 848:9, 848:12, 848:15, 848:18, 848:23,

849:3, 849:7, 849:10, 849:15, 849:19, 849:22, 849:25, 850:5, 960:19, 960:23, 961:1, 961:6, 961:10, 961:13, 961:16, 961:19, 961:24, 965:5
**sum** [1] - 974:25
**summaries** [1] - 809:6
**summarized** [1] - 808:15
**summary** [1] - 852:4
**supersonic** [3] - 855:12, 863:24, 944:8
**supposed** [1] - 905:22
**suppressed** [1] - 951:22
**surface** [20] - 847:17, 847:18, 847:20, 848:8, 849:1, 849:2, 849:5, 849:18, 856:17, 858:15, 859:1, 859:4, 863:17, 917:23, 940:23, 956:3, 960:17, 960:18, 960:21, 961:9
**surfaces** [5] - 873:7, 873:12, 873:16, 921:22, 931:20
**surfboard** [3] - 859:22, 927:4, 927:5
**surfboards** [2] - 860:11, 860:18
**surprise** [4] - 974:8, 974:9, 975:8, 975:11
**surrounded** [1] - 951:23
**survey** [2] - 827:11, 827:12
**swallowed** [1] - 943:9
**Sweden** [1] - 980:2
**Swedish** [15] - 803:16, 803:17, 868:25, 869:1, 869:2, 876:17, 876:18, 907:13, 907:14, 907:15, 907:19, 913:22, 964:8, 966:1, 980:2
**sweep** [15] - 866:9, 866:11, 866:20, 866:23, 866:25, 867:4, 867:9, 867:14, 943:18, 943:22, 944:4, 944:6, 949:10, 953:7

**swept** [3] - 856:9, 944:4, 959:23
**swimming** [1] - 951:24
**swing** [1] - 856:8
**Swiss** [1] - 803:15
**switching** [1] - 927:8
**sworn** [2] - 830:3, 851:1
**system** [38] - 808:3, 832:5, 832:17, 848:10, 848:13, 848:14, 848:17, 848:19, 848:20, 849:20, 849:24, 850:1, 850:2, 858:3, 858:25, 862:20, 864:7, 871:11, 872:4, 872:13, 872:16, 872:21, 873:1, 877:9, 894:7, 894:8, 894:22, 900:4, 907:8, 924:8, 932:16, 955:5, 961:12, 961:15, 961:18, 961:21
**systems** [4] - 871:23, 871:25, 933:17, 933:20

---

# T

**table** [1] - 909:19
**tacked** [1] - 837:23
**tail** [14] - 856:12, 865:12, 874:18, 883:23, 884:2, 884:16, 930:22, 949:12, 950:10, 953:15, 953:16, 958:16
**tailoring** [3] - 896:17, 896:24, 897:4
**talks** [15] - 865:13, 880:15, 921:20, 930:6, 930:21, 948:24, 950:3, 958:24, 959:3, 959:4, 959:12, 959:15, 959:16, 959:19, 974:7
**tank** [1] - 902:8
**target** [1] - 833:10
**TAYLOR** [1] - 798:17
**teach** [13] - 843:4, 885:4, 885:7, 903:14, 903:15, 903:19, 938:18, 939:1, 956:11, 956:16, 958:13,

963:22, 968:3
**teaches** [9] - 923:3, 923:4, 923:5, 926:13, 928:14, 935:15, 937:13, 965:4, 967:18
**teaching** [15] - 862:12, 915:4, 935:9, 935:11, 935:12, 935:13, 935:14, 935:22, 936:21, 936:22, 937:13, 938:17, 948:21, 955:18
**teachings** [11] - 862:12, 921:16, 936:4, 936:14, 937:15, 938:10, 940:10, 940:19, 940:21, 958:22
**team** [28] - 875:19, 878:4, 878:13, 880:16, 882:22, 885:16, 886:8, 900:12, 900:24, 901:8, 903:23, 906:10, 906:12, 911:5, 913:20, 914:5, 914:8, 914:20, 915:20, 941:3, 941:11, 941:15, 941:18, 941:22, 941:23, 943:10, 943:12, 976:12
**teams** [1] - 805:10
**technical** [3] - 853:15, 869:15, 869:17
**TECHNOLOGY** [1] - 798:7
**technology** [4] - 917:6, 917:10, 940:7, 941:4
**teeter** [1] - 949:19
**teeter-totter** [1] - 949:19
**ten** [2] - 867:22, 883:4
**tend** [2] - 826:23, 976:7
**tendency** [3] - 858:4, 862:16, 862:17
**tends** [1] - 862:15
**term** [1] - 883:13
**terms** [7] - 805:5, 846:7, 874:17, 883:12, 958:25, 959:1, 966:7
**test** [6] - 830:8, 830:10, 831:3, 881:19, 892:1, 902:8

**testified** [18] - 802:21, 816:18, 819:10, 821:9, 821:16, 830:13, 830:17, 833:8, 833:10, 833:11, 837:2, 837:21, 889:3, 896:16, 897:9, 959:18, 964:21, 964:22
**testify** [2] - 815:24, 833:1
**testifying** [2] - 891:19, 895:10
**testimony** [38] - 806:8, 806:12, 807:2, 814:16, 821:19, 821:20, 823:1, 829:12, 829:24, 830:3, 830:5, 831:11, 831:24, 832:23, 833:5, 836:7, 839:8, 840:9, 851:13, 861:1, 864:11, 870:18, 871:18, 875:16, 875:17, 891:15, 917:5, 952:22, 957:2, 969:3, 972:21, 973:1, 975:5, 976:1, 976:14, 978:11, 980:15, 987:8
**tether** [1] - 840:13
**text** [6] - 908:20, 910:11, 937:20, 958:22, 958:23, 958:24
**textbook** [3] - 938:13, 938:17, 945:9
**textbooks** [13] - 937:8, 937:21, 937:24, 938:3, 938:7, 938:16, 939:11, 939:14, 940:6, 941:12, 941:15, 941:18, 967:9
**texts** [2] - 956:9, 956:11
**THE** [153] - 798:1, 798:2, 798:15, 799:13, 799:17, 799:25, 800:8, 800:16, 800:22, 801:5, 801:10, 801:14, 801:18, 802:1, 802:12, 802:16, 802:24, 803:2, 803:12, 803:16, 803:18,

804:5, 804:8,
804:11, 804:18,
805:3, 805:9, 806:4,
806:6, 806:17,
806:19, 806:21,
808:1, 808:9,
841:13, 846:23,
846:25, 847:4,
847:9, 850:13,
850:15, 850:18,
850:22, 850:25,
851:3, 851:4, 851:6,
854:16, 857:2,
857:15, 857:23,
863:5, 866:22,
866:23, 867:21,
867:24, 868:3,
868:5, 868:7, 909:1,
909:2, 920:3,
945:25, 946:3,
946:9, 946:13,
946:16, 946:19,
946:22, 946:25,
947:2, 948:12,
959:24, 960:5,
960:7, 960:10,
960:13, 961:25,
962:4, 962:7,
962:12, 962:15,
963:15, 965:20,
968:14, 968:16,
969:10, 969:14,
969:21, 970:3,
970:6, 970:23,
971:3, 971:9,
971:11, 971:20,
971:23, 972:4,
972:20, 972:24,
973:5, 973:16,
973:23, 974:2,
974:16, 975:3,
975:7, 975:13,
975:21, 976:7,
976:17, 976:24,
977:1, 977:5, 977:7,
977:13, 977:15,
977:22, 978:17,
979:1, 979:9,
979:19, 980:6,
980:9, 980:11,
980:20, 981:6,
981:12, 981:15,
981:18, 981:25,
982:5, 982:8,
982:11, 982:13,
982:18, 983:4,
983:9, 983:12,
983:20, 983:24,
984:5, 984:13,
984:16, 984:23,
985:2, 985:21,

986:9, 986:13,
986:23, 987:1,
987:6, 988:7
**theirs** [1] - 823:14
**themselves** [4] -
838:5, 842:2, 916:3,
916:9
**theory** [2] - 831:4,
881:14
**therefore** [1] - 872:15
**Theuerkauf** [15] -
879:25, 885:14,
898:5, 898:6,
899:15, 907:3,
907:5, 948:12,
949:18, 976:12,
980:1, 980:6,
983:25, 987:3,
987:16
**THEUERKAUF** [63] -
798:20, 802:11,
802:19, 803:1,
803:4, 803:17,
804:16, 805:8,
850:23, 851:5,
851:8, 851:19,
851:21, 852:19,
852:21, 854:13,
854:17, 856:20,
856:21, 857:13,
857:21, 858:16,
858:18, 858:19,
859:6, 859:8,
859:16, 859:18,
860:4, 860:6, 863:4,
863:7, 864:8,
864:10, 867:2,
867:20, 946:18,
948:14, 952:14,
960:4, 962:2, 962:5,
962:11, 972:17,
972:21, 972:25,
973:9, 975:1, 975:4,
975:10, 975:17,
976:16, 976:23,
977:3, 977:6, 980:7,
980:10, 982:2,
982:7, 984:1,
985:18, 986:20,
987:5
**they've** [5] - 805:12,
821:22, 821:23,
823:21, 905:13
**thickness** [1] - 855:18
**thinking** [5] - 971:15,
972:10, 972:11,
986:21, 986:24
**third** [9] - 820:1,
820:2, 820:8,
820:10, 820:11,

820:13, 845:4,
964:11, 972:6
**thousand** [1] - 812:14
**three** [19] - 799:24,
810:6, 813:2, 813:5,
813:6, 813:13,
813:14, 819:24,
825:1, 835:11,
845:12, 890:17,
928:25, 959:15,
959:17, 969:1,
970:12
**throw** [4] - 896:9,
902:5, 902:6, 953:8
**throwing** [2] - 902:4,
925:11
**throws** [2] - 948:25,
957:19
**thrust** [1] - 877:10
**thruster** [1] - 862:18
**Thursday** [1] - 798:12
**ties** [1] - 973:15
**tilted** [1] - 856:5
**tip** [1] - 863:24
**tips** [1] - 863:23
**today** [7] - 900:15,
902:17, 917:5,
919:5, 959:18,
959:25, 980:1
**together** [9] - 817:13,
902:4, 902:5, 902:6,
925:12, 957:4,
957:8, 963:4, 973:15
**tomorrow** [8] -
962:18, 962:20,
963:2, 963:6, 981:1,
987:6, 988:8, 988:11
**took** [5] - 844:19,
845:19, 855:15,
902:13, 904:15
**top** [13] - 835:5,
839:20, 843:5,
847:17, 847:20,
849:1, 849:5, 930:8,
941:8, 960:17,
960:21, 982:25
**topic** [1] - 839:10
**topics** [2] - 801:3,
806:8
**Toqeedo** [1] - 912:14
**torch** [1] - 855:15
**Torqeedo** [5] - 910:14,
910:17, 910:21,
911:1, 911:5
**torque** [1] - 955:6
**total** [4] - 844:20,
975:3, 983:17, 984:7
**totally** [1] - 926:16
**totter** [1] - 949:19
**tow** [27] - 861:21,

861:24, 862:2,
918:6, 918:9,
918:10, 918:13,
918:17, 919:20,
920:23, 920:25,
921:1, 921:11,
921:13, 951:11,
951:13, 951:19,
951:21, 951:24,
957:22, 957:23,
957:24, 958:3, 958:4
**towed** [3] - 859:24,
861:18, 951:9
**towing** [3] - 861:18,
957:20
**toy** [4] - 859:25, 860:2,
861:15, 861:17
**trace** [1] - 964:15
**trade** [1] - 815:15
**transcript** [5] - 804:17,
834:11, 871:18,
976:13, 988:15
**translation** [2] - 802:4,
950:14, 954:9
**transport** [1] - 835:15
**trends** [2] - 827:8,
831:21
**Trial** [2] - 798:4,
798:13
**trial** [10] - 803:21,
807:24, 820:3,
834:11, 905:17,
905:21, 905:24,
905:25, 906:3,
963:16
**trials** [1] - 886:1
**triangular** [1] - 948:7
**Triantafyllou** [32] -
802:6, 802:9,
802:20, 803:22,
804:9, 804:20,
804:25, 840:2,
840:3, 840:4,
851:16, 854:2,
860:23, 871:2,
884:5, 898:7,
915:14, 915:24,
919:1, 922:5, 922:7,
922:15, 938:1,
942:24, 949:15,
950:14, 950:18,
952:5, 952:19,
953:22, 964:20
**Triantafyllou's** [12] -
870:18, 886:19,
887:1, 892:9,
898:18, 899:5,
917:14, 918:7,
918:12, 919:9,
924:1, 943:7

**tried** [2] - 812:20,
875:21
**trim** [2] - 865:22,
959:7
**trimmable** [2] -
938:10, 959:7
**Triozzi** [1] - 988:17
**trouble** [1] - 869:19
**true** [19] - 800:24,
807:11, 808:23,
809:4, 811:16,
817:8, 817:18,
817:19, 818:11,
818:13, 818:22,
826:5, 832:2,
838:17, 943:5,
950:18, 970:17,
977:24, 988:14
**try** [11] - 822:17,
825:11, 835:8,
851:11, 861:8,
896:8, 917:9,
951:17, 953:7,
957:3, 963:14
**trying** [13] - 804:25,
810:5, 817:13,
827:3, 838:7,
875:19, 876:9,
878:4, 916:5,
920:24, 940:2,
973:20, 984:10
**turn** [8] - 800:10,
861:25, 862:1,
862:3, 887:5, 912:2,
951:15, 963:12
**turned** [1] - 808:2
**turning** [2] - 846:10,
887:8
**twice** [2] - 827:1,
844:3
**twist** [9] - 896:16,
896:17, 896:24,
896:25, 897:1,
897:2, 897:4, 897:5,
929:23
**two** [45] - 799:15,
805:10, 810:15,
814:5, 826:12,
844:14, 854:3,
854:6, 860:24,
861:8, 864:4, 864:6,
870:2, 870:6,
888:11, 888:21,
890:17, 893:22,
904:23, 905:4,
912:15, 912:23,
913:4, 913:11,
913:13, 918:21,
919:6, 927:19,
927:22, 928:25,

933:15, 947:7,
956:13, 956:22,
957:7, 966:18,
967:2, 967:3, 978:5,
979:2, 980:22,
982:14, 988:4
**two-kilowatt** [2] -
912:23, 913:11
**two-kilowatts** [1] -
912:15
**two-year** [1] - 810:15
**type** [3] - 817:6, 831:7,
975:19
**typically** [1] - 837:11
**typo** [1] - 983:7

## U

**U.S** [8] - 816:5, 820:1,
822:15, 823:22,
830:18, 834:2,
845:12, 988:18
**U.S.D.C.J** [1] - 798:15
**ultimate** [1] - 814:19
**ultimately** [2] -
814:19, 949:25
**unable** [2] - 857:4,
912:25
**unaware** [1] - 812:11
**uncertain** [5] - 817:23,
823:16, 832:8,
834:8, 834:10
**unclear** [1] - 815:17
**under** [10] - 819:4,
820:23, 829:17,
844:16, 858:13,
951:25, 957:18,
982:12, 983:13,
983:21
**underneath** [1] -
912:9
**understood** [5] -
891:14, 925:14,
971:24, 972:2, 984:2
**underwater** [1] -
910:13
**undesirable** [2] -
944:19, 944:25
**undisputed** [1] - 847:3
**unedited** [2] - 889:21,
889:25
**unfortunately** [2] -
835:14, 866:8
**unicycle** [2] - 802:15,
803:6
**unicycles** [2] - 802:21,
803:9
**unique** [2] - 883:3,
974:12
**unit** [3] - 812:3, 822:5,

822:11
**UNITED** [1] - 798:1
**United** [4] - 815:21,
978:24, 980:21
**units** [7] - 829:14,
829:18, 830:18,
832:12, 832:13,
832:24
**university** [1] - 905:10
**unless** [1] - 964:8
**unlikely** [3] - 866:10,
867:6, 875:11
**unnecessary** [1] -
971:13
**unsafe** [1] - 925:3
**unstable** [11] - 802:21,
803:7, 857:11,
857:25, 874:25,
889:4, 889:17,
921:2, 924:24,
925:3, 956:2
**unusable** [2] - 867:18,
959:20
**unusual** [1] - 853:16
**up** [106] - 800:6, 802:5,
802:8, 805:19,
809:21, 810:14,
811:22, 815:19,
817:13, 818:4,
821:10, 821:12,
821:14, 821:17,
821:23, 821:25,
823:1, 834:12,
834:19, 834:25,
836:2, 836:23,
839:15, 844:17,
844:19, 844:21,
851:17, 856:8,
856:10, 858:2,
859:5, 859:16,
860:4, 860:25,
862:2, 862:15,
862:21, 863:2,
863:16, 868:20,
869:4, 869:6,
871:15, 875:24,
877:11, 877:21,
878:22, 882:9,
882:10, 882:12,
884:2, 884:16,
887:2, 892:3,
893:23, 894:17,
897:18, 898:5,
898:15, 901:12,
908:8, 908:20,
909:8, 911:15,
913:7, 917:17,
921:25, 924:4,
927:20, 928:18,
928:23, 929:1,

929:2, 929:16,
931:3, 931:8,
936:10, 937:16,
938:25, 940:22,
943:7, 944:24,
945:7, 945:12,
947:7, 948:16,
948:17, 948:25,
949:1, 949:9,
950:10, 950:11,
950:12, 952:10,
953:8, 957:16,
957:18, 957:22,
957:23, 978:10,
987:3, 987:16,
987:19
**updated** [1] - 832:11
**upper** [10] - 848:2,
849:12, 855:2,
893:16, 911:23,
919:23, 961:3
**upward** [1] - 819:14
**upwards** [2] - 857:12,
957:20
**USA** [1] - 798:7
**useable** [1] - 867:6
**useful** [1] - 861:17
**user** [4] - 847:20,
849:5, 873:5, 960:21
**uses** [1] - 948:25
**usual** [1] - 921:25

## V

**valid** [2] - 983:8
**validity** [2] - 960:1,
960:3
**value** [3] - 810:9,
827:19, 843:9
**values** [2] - 865:16,
865:17
**variables** [5] - 898:11,
898:19, 899:7,
924:1, 924:7
**variants** [2] - 821:24,
822:6
**variation** [1] - 897:14
**variety** [1] - 856:4
**various** [13] - 853:10,
855:23, 855:24,
860:10, 865:2,
865:7, 865:13,
865:23, 909:20,
936:11, 950:9,
959:4, 963:3
**varying** [1] - 894:6
**vehicle** [2] - 881:20,
957:20
**verbiage** [1] - 971:14
**Verdict** [2] - 805:11,

806:11
**verdict** [8] - 963:10,
968:21, 969:17,
969:22, 970:9,
981:19, 982:1, 986:5
**version** [10] - 802:2,
803:15, 805:18,
889:21, 889:25,
907:16, 910:20,
911:10, 938:23
**versions** [3] - 805:19,
901:18, 979:2
**versus** [8] - 813:20,
813:22, 813:23,
814:14, 818:9,
831:10, 838:18,
843:3
**vertical** [5] - 865:12,
882:11, 882:12,
955:3, 958:17
**vessel** [1] - 921:1
**via** [2] - 835:8
**Victor** [1] - 888:25
**video** [46] - 856:19,
856:22, 857:1,
857:14, 857:22,
862:22, 874:16,
875:15, 882:2,
884:13, 884:24,
887:13, 887:17,
887:24, 888:3,
889:1, 889:17,
889:20, 889:21,
889:25, 890:2,
890:5, 890:10,
890:14, 890:15,
890:16, 890:20,
890:23, 890:25,
891:2, 891:4, 891:7,
891:11, 891:13,
911:6, 915:5,
936:17, 937:10,
955:10, 973:1,
973:7, 973:8, 975:9
**Video** [1] - 947:22
**videos** [14] - 853:10,
874:15, 874:24,
874:25, 875:1,
886:15, 887:6,
887:8, 888:15,
888:21, 890:17,
915:5, 938:8, 957:19
**view** [15] - 807:15,
825:17, 826:24,
902:10, 907:24,
909:23, 915:21,
919:12, 919:15,
920:17, 925:13,
940:14, 940:16,
944:14, 980:16

**views** [3] - 974:7,
976:3, 976:4
**Volkswagen** [1] -
813:23
**voltage** [2] - 894:6,
894:9
**Volume** [1] - 798:4
**volume** [6] - 825:20,
825:22, 838:7,
926:10, 926:12,
957:17
**vortex** [1] - 863:17

## W

**Wade** [10] - 821:9,
821:16, 834:1,
836:4, 838:25,
839:3, 840:12,
841:20, 842:4,
964:20
**Wagner** [4] - 817:25,
829:8, 830:11,
830:17
**Wagner's** [1] - 830:5
**wagon** [1] - 951:13
**wait** [2] - 985:12,
986:9
**wake** [1] - 987:19
**walk** [1] - 851:12
**wants** [2] - 916:14,
916:18
**warehouse** [3] -
834:5, 835:23, 836:5
**warrantee** [1] - 810:15
**watch** [6] - 846:24,
860:15, 860:16,
882:2, 888:22, 960:6
**water** [46] - 839:23,
848:11, 849:21,
856:16, 856:17,
857:5, 857:6,
857:18, 857:19,
857:20, 857:24,
858:1, 858:2, 858:9,
858:11, 858:13,
860:2, 860:14,
861:15, 861:17,
861:23, 861:25,
875:9, 888:1, 888:2,
888:17, 902:8,
904:4, 904:9,
904:16, 906:7,
913:7, 951:22,
951:23, 951:25,
952:1, 952:11,
955:8, 955:13,
956:17, 957:18,
961:12, 974:14
**watercraft** [24] -

848:11, 848:16,
849:21, 849:23,
860:10, 861:16,
871:5, 872:12,
873:22, 874:9,
875:20, 875:21,
878:18, 921:22,
923:7, 931:17,
932:17, 933:18,
937:4, 937:6,
956:19, 957:11,
961:12, 961:17
**watts** [3] - 910:22,
911:2, 914:5
**wave** [1] - 955:12
**Waydoo** [72] - 807:7,
809:4, 809:25,
810:2, 810:4, 811:2,
811:16, 812:9,
813:7, 813:16,
813:20, 814:7,
814:8, 815:19,
819:6, 819:12,
820:4, 820:6, 821:6,
821:13, 822:9,
823:17, 824:4,
824:5, 824:12,
825:2, 825:4, 825:7,
825:15, 825:18,
825:19, 826:20,
827:2, 827:25,
828:9, 828:25,
829:23, 830:6,
830:13, 830:18,
832:6, 835:6, 836:4,
836:12, 837:13,
837:17, 837:22,
840:14, 840:21,
841:25, 842:14,
842:23, 842:24,
842:25, 843:13,
843:14, 845:3,
845:10, 851:16,
871:4, 873:21,
874:5, 875:17,
887:21, 888:8,
888:14, 891:16,
917:1, 919:4,
978:19, 983:2, 985:8
**WAYDOO** [2] - 798:7,
798:7
**Waydoo's** [15] -
819:21, 822:1,
822:10, 824:23,
825:3, 829:1, 830:9,
830:11, 830:22,
841:22, 842:11,
842:16, 842:22,
871:8, 874:8
**ways** [3] - 827:9,

836:23, 885:9
**wearing** [1] - 890:11
**web** [1] - 967:24
**website** [10] - 803:19,
809:25, 810:2,
810:4, 838:6, 968:1,
977:17, 979:18,
979:24, 981:3
**websites** [1] - 807:21
**week** [1] - 851:13
**weigh** [1] - 958:1
**weighed** [1] - 954:25
**weight** [31] - 853:5,
861:19, 862:1,
865:25, 871:6,
871:10, 871:21,
871:24, 872:2,
872:17, 872:19,
873:1, 873:4, 873:6,
873:17, 873:19,
918:2, 918:4,
919:18, 919:19,
919:24, 920:1,
920:12, 920:20,
920:21, 932:17,
933:19, 936:8,
958:2, 967:4, 967:7
**weight-controlled** [1]
- 936:8
**weight-shift** [12] -
871:6, 871:10,
871:21, 871:24,
872:2, 872:17,
872:19, 873:1,
873:17, 873:19,
920:21, 967:7
**welcome** [3] - 806:22,
868:8, 947:3
**well-known** [1] -
839:23
**whatnot** [1] - 866:5
**whatsoever** [2] -
907:25, 944:1
**wherein** [9] - 847:20,
848:14, 848:20,
849:4, 850:1, 850:6,
960:21, 961:15,
961:21
**whichever** [1] - 963:4
**whole** [8] - 865:8,
875:4, 898:11,
902:20, 936:6,
936:7, 949:17
**wholesale** [1] - 813:9
**wide** [2] - 930:10,
930:19
**width** [3] - 847:16,
849:1, 960:17
**wife** [3] - 860:14,
874:4, 930:17

**willful** [3] - 965:15,
965:17, 966:14
**willfulness** [1] -
965:18
**willing** [3] - 826:25,
827:20, 938:24
**Wilmington** [1] -
798:11
**win** [2] - 979:23, 981:3
**wing** [93] - 850:7,
854:11, 854:12,
854:18, 854:22,
855:5, 855:8, 856:9,
856:10, 856:15,
856:16, 857:17,
862:24, 863:20,
863:21, 865:4,
866:10, 866:12,
867:4, 867:9,
881:15, 883:2,
883:3, 883:4, 883:7,
883:8, 883:9,
883:21, 883:23,
884:1, 884:2, 884:6,
884:9, 884:15,
886:20, 886:23,
887:2, 887:3,
895:11, 895:12,
895:13, 895:22,
895:23, 895:25,
896:1, 896:3, 896:4,
896:5, 896:13,
896:16, 897:9,
897:24, 898:11,
898:20, 899:1,
921:24, 921:25,
924:2, 944:4,
944:13, 944:17,
944:20, 944:25,
945:3, 945:5,
945:13, 945:14,
945:15, 945:17,
945:19, 945:20,
945:24, 950:10,
953:10, 953:12,
953:16, 953:20,
958:15, 958:16,
959:22
**wing-shaped** [1] -
897:9
**winged** [1] - 855:20
**winglets** [1] - 865:12
**wings** [24] - 855:10,
855:11, 855:13,
856:5, 863:18,
865:6, 866:24,
877:19, 896:11,
899:9, 930:7,
930:10, 930:19,
930:22, 942:9,

942:25, 943:4,
944:2, 944:5,
952:20, 952:21,
952:25, 953:5
**wise** [4] - 896:17,
896:24, 897:4,
929:23
**wish** [1] - 876:25
**witness** [3] - 871:9,
873:2, 873:4
**WITNESS** [11] - 808:9,
846:25, 851:3,
857:2, 857:15,
857:23, 863:5,
866:23, 909:2,
920:3, 960:7
**witnesses** [2] -
850:11, 964:18
**wondering** [4] -
803:22, 808:4,
969:2, 980:7
**Woolley** [54] - 847:11,
848:24, 849:8,
849:11, 849:16,
850:6, 859:10,
859:12, 859:19,
859:21, 862:25,
916:23, 917:19,
917:23, 918:1,
918:3, 918:8,
918:15, 919:3,
919:10, 919:17,
919:19, 919:21,
919:22, 919:24,
920:17, 920:19,
920:24, 921:6,
921:15, 921:18,
921:20, 921:24,
922:15, 922:19,
922:24, 923:2,
923:3, 923:4, 923:9,
923:11, 924:20,
924:22, 926:3,
926:20, 927:3,
956:23, 957:10,
965:9, 966:22
**word** [3] - 912:10,
934:12, 934:13
**Word** [1] - 805:19
**words** [19] - 808:5,
863:12, 863:15,
869:7, 869:13,
872:24, 881:5,
892:7, 892:15,
892:19, 892:21,
899:9, 913:5, 957:3,
959:7, 971:25,
980:1, 984:5, 984:17
**works** [4] - 828:13,
865:5, 900:20,

951:18
**world** [8] - 816:25,
966:5, 973:8,
978:21, 978:24,
979:7, 981:7
**worries** [1] - 984:22
**worse** [1] - 956:3
**wrap** [2] - 947:6
**wrist** [2] - 860:12,
862:8
**write** [1] - 869:9
**writing** [3] - 876:3,
892:7, 974:18
**written** [4] - 852:14,
864:12, 870:21,
870:23
**wrote** [5] - 808:19,
870:12, 892:15,
893:6, 986:14

**X**

**X7** [9] - 880:8, 880:15,
880:22, 880:24,
881:4, 881:7,
903:12, 951:4, 951:7
**X8** [8] - 882:13,
882:15, 882:22,
885:12, 885:15,
885:16, 951:4, 951:7
**X8's** [2] - 884:1, 884:9

**Y**

**yaw** [2] - 866:2,
959:16
**year** [3] - 810:15,
815:7, 905:12
**years** [10] - 821:3,
821:25, 831:5,
831:12, 832:6,
832:17, 835:11,
853:14, 905:19,
980:22
**yellow** [2] - 806:7,
970:13
**yeses** [1] - 982:25
**yesterday** [26] -
799:20, 801:21,
802:5, 807:2,
811:18, 812:1,
812:6, 814:17,
816:19, 820:14,
821:10, 821:16,
831:21, 832:16,
833:19, 834:13,
839:11, 840:16,
844:3, 845:22,
854:2, 874:21,
884:6, 890:18,

897:6, 915:14
**yourself** [1] - 938:14
**YouTube** [1] - 974:23

## Z

**zero** [4] - 866:20,
866:23, 866:25,
883:19
**zoom** [1] - 877:13