# EXHIBIT 4

```
1                   IN THE UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF DELAWARE

3

4    MHL CUSTOM, INC.,                )
                                      ) Trial Volume VI
5                   Plaintiff,        )
                                      ) C.A. No. 21-91-RGA
6    v.                               )
                                      )
7    WAYDOO USA, INC. and SHENZEN     )
     WAYDOO INTELLIGENCE TECHNOLOGY   )
8    CO., LTD.,                       )
                                      )
9                   Defendants.       )

10
                                      J. Caleb Boggs Courthouse
11                                    844 North King Street
                                      Wilmington, Delaware
12
                                      Friday, March 31, 2023
13                                    9:08 a.m.
                                      Jury Trial
14

15   BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

16   APPEARANCES:

17             COOCH & TAYLOR, P.A.
               BY:  ANDREW A. RALLI, ESQUIRE
18
                         -and-
19
               GRAY ICE & HIGDON, PLLC
20             BY:  ROBERT THEUERKAUF, ESQUIRE
               BY:  DENNIS MURRELL, ESQUIRE
21             BY:  BRIAN McGRAW, ESQUIRE

22                                    For the Plaintiff

23

24

25
```

1     APPEARANCES CONTINUED:

2

3             RICHARDS LAYTON & FINGER, P.A.
            BY:  KELLY E. FARNAN, ESQUIRE
            BY:  DORRONDA R. BORDLEY, ESQUIRE

4

5                      -and-

6             HAUG PARTNERS LLP
            BY:  ROBERT E. COLLETTI, ESQUIRE
            BY:  JASON KANTER, ESQUIRE

7             BY:  MARK BASANTA, ESQUIRE
            BY:  PATRICK LAVERY, ESQUIRE

8

                          For the Defendants

08:53:11  9

08:53:11
08:48:41 10                 ***  PROCEEDINGS  ***

08:51:09 11         DEPUTY CLERK:  All rise.  Court is now in

09:08:11 12 session.  The Honorable Richard G. Andrews presiding.

09:08:11 13         DEPUTY CLERK:  All rise.

09:08:16 14         THE COURT:  Good morning.  I just wanted to --

09:08:19 15 everyone can be seated.

09:08:20 16         I just wanted to check and make sure that

09:08:22 17 everything is in good shape and there's nothing you need

09:08:26 18 from me, and you'll be ready to go at 9:30.

09:08:30 19         MR. THEUERKAUF:  Yes, Your Honor.

09:08:31 20         MR. MURRELL:  One itty bitty little thing.  And

09:08:34 21 I was just talking to Mr. Kanter.  We both submitted

09:08:38 22 financial summaries for our clients.  They're like one-page

09:08:42 23 document summaries, 1006.  We would both like to have them

09:08:46 24 sealed, if we can, and we can deal with that after it goes

09:08:49 25 back to the jury.

09:08:50  1                    THE COURT:  Okay.  All right.  Well, we can deal

09:08:54  2     with that then.

09:08:55  3                    MR. MURRELL:  Okay.

09:08:56  4                    THE COURT:  Anything -- so, you're good.

09:08:57  5                    Mr. Colletti, are you good?

09:08:58  6                    MR. COLLETTI:  I'm good.

09:08:59  7                    THE COURT:  All right.  Well, then I think we've

09:09:02  8     got things under control, and I will be back hopefully with

09:09:05  9     the jury at 9:30.

09:09:07 10                    DEPUTY CLERK:  All rise.

09:09:38 11                    (Recess was taken.)

09:28:15 12                    DEPUTY CLERK:  All rise.  Court is now in

09:28:17 13     session.  The Honorable Richard G. Andrews presiding.

09:28:17 14                    THE COURT:  All right.  Please be seated.  The

09:28:19 15     jury is all here.

09:28:21 16                    By the way, I noticed that the claim

09:28:28 17     constructions are not actually attached to the jury

09:28:30 18     instructions.  Do we actually have that page?  Because I can

09:28:36 19     just hand it out separately.

09:28:49 20                    MR. McGRAW:  We have it.  We'll have to, I

09:28:51 21     guess, just get it really quick.

09:28:55 22                    THE COURT:  All right.  Well, so but you'll be

09:28:57 23     able to make it so that by the time we're through with

09:29:02 24     closing arguments, I'll be able to -- my deputy clerk will

09:29:06 25     be able to hand that out to each individual juror?

09:29:09  1                MR. McGRAW:  Yes, Your Honor.

09:29:10  2                THE COURT:  Okay.  All right.  Well, let's get

09:29:12  3       the jury then.

09:29:32  4                (Jury entering the courtroom.)

09:31:05  5                THE COURT:  All right.  Members of the jury,

09:31:32  6       good morning.  Everyone else you may be seated.

09:31:35  7                So, there should be, members of the jury, either

09:31:40  8       on your chairs or nearby, copies of the final jury

09:31:44  9       instructions and the verdict form.

09:31:46 10                And so, I'm going to read you now most of the

09:31:50 11       final jury instructions.  Again, you can listen, you can

09:31:58 12       read along.  You should do at least one of those two things.

09:32:03 13                I do also want to say that you still have the

09:32:06 14       preliminary jury instructions I gave you.  They still apply,

09:32:11 15       but I'm not going to repeat them or almost I'm not going to

09:32:14 16       repeat them.  And the instructions I gave you during trial,

09:32:18 17       which there were not very many, those also apply.

09:32:21 18                Members of the jury, now it is time for me to

09:32:25 19       instruct you about the law that you must follow in deciding

09:32:28 20       this case.

09:32:30 21                Please listen very carefully to everything I

09:32:33 22       say.  In following my instructions, you must follow all of

09:32:35 23       them and not single out some and ignore others.  They are

09:32:39 24       all important.  You will have a written copy of these

09:32:42 25       instructions with you in the jury room for your reference

09:32:45  1   during deliberations.  You will also have a verdict form,

09:32:47  2   which will list the questions that you must answer to decide

09:32:51  3   this case.

09:32:53  4          You have two main duties as jurors.  The first

09:32:56  5   one is to decide what the facts are from the evidence that

09:33:00  6   you saw and heard here in Court.  Deciding what the facts

09:33:03  7   are is your job, not mine, and nothing that I have said or

09:33:08  8   done during this trial was meant to influence your decision

09:33:11  9   about the facts in any way.

09:33:13 10          Your second duty is to take the law that I give

09:33:18 11   you, apply it to the facts, and decide, under the

09:33:21 12   appropriate burden of proof, which party should prevail on

09:33:26 13   each of the claims and defenses presented.

09:33:28 14          Perform your duties fairly.  Do not let any

09:33:33 15   bias, sympathy or prejudice that you may feel toward one

09:33:36 16   side or the other influence your decision in any way.

09:33:44 17          In any legal action, facts must be proven by a

09:33:47 18   required standard of evidence, known as the burden of proof.

09:33:50 19   In a patent case, such as this, there are two different

09:33:53 20   burdens of proof.  The first is preponderance of the

09:33:57 21   evidence, and the second is clear and convincing evidence.

09:33:59 22          MHL has the burden of proving patent

09:34:03 23   infringement by what is called a preponderance of the

09:34:07 24   evidence.  That means MHL has to produce evidence which,

09:34:11 25   when considered in light of all of the facts, leads you to

09:34:15  1   believe that infringement is more likely true than not.

09:34:17  2           In addition to denying that it infringed the

09:34:21  3   asserted claims, Waydoo asserts that the asserted claims are

09:34:24  4   invalid.  Waydoo has the burden of proving that the asserted

09:34:28  5   claims are invalid by what is called clear and convincing

09:34:32  6   evidence.  Clear and convincing evidence means that it is

09:34:35  7   highly probable that a fact is true.

09:34:39  8           Now, before you can decide the issues in this

09:34:43  9   case, you need to understand the important role of patent

09:34:46 10   claims.  The patent claims are the numbered sentences at the

09:34:50 11   end of the patent.  The patent claims are important because

09:34:53 12   it is the words of the claims that define what the patent

09:34:56 13   covers.  The claims are intended to define the boundaries of

09:35:00 14   the invention that constitute the patent owner's property

09:35:04 15   rights.  Neither the written description preceding the

09:35:07 16   claims, nor the drawings or figures in a patent, constitute

09:35:11 17   the patent owner's property rights.  Only the claims define

09:35:15 18   the boundaries of the patent owner's property.

09:35:22 19           The claims can be stated in two different ways

09:35:25 20   in a patent.  The first way a patent claim can be stated is

09:35:28 21   in the form of an independent claim.  An independent claim

09:35:33 22   sets forth all of the requirements that must be met in order

09:35:37 23   for an accused product to be covered by that claim, and thus

09:35:41 24   infringe that claim.  An independent claim is read alone to

09:35:44 25   determine its scope.

09:35:46 1          In this case, Claim 1 of each of the asserted

09:35:53 2     patents are independent claims.  You know this because these

09:35:55 3     claims do not refer to any other claims.

09:35:57 4          The second way a claim can be stated is in the

09:36:01 5     form of a dependent claim.  A dependent claim does not

09:36:04 6     itself recite all the requirements of the claim, but instead

09:36:08 7     it incorporates the requirements of another claim and adds

09:36:12 8     its own additional requirements.  In this way, the claim

09:36:17 9     depends on another claim.

09:36:19 10          To determine what a dependent claim covers, it

09:36:22 11     is necessary to look at both the dependent claim and the

09:36:25 12     other claims from which it depends.  For example, Claim 2 of

09:36:30 13     the '044 patent is a dependent claim because it incorporates

09:36:34 14     the requirements of Claim 1 of that patent, and as a result,

09:36:39 15     Claim 2 includes all the requirements of Claim 1 and all the

09:36:45 16     additional requirements of Claim 2.

09:36:49 17          Now, before you decide whether Waydoo has

09:36:52 18     infringed the asserted claims or whether the asserted claims

09:36:55 19     are invalid, you will have to understand the patent claims.

09:36:59 20     It is my job as a judge to provide to you the meaning of any

09:37:03 21     claim language that must be interpreted.  In this case, I

09:37:06 22     have interpreted three terms from the asserted claims.

09:37:09 23          It was my intention to attach these definitions

09:37:15 24     to these jury instructions, but if you look at the end of

09:37:17 25     them you'll see that I haven't done that.  But they will be

09:37:20 1    provided to you separately, a copy for each juror.  And you

09:37:26 2    must accept the meanings that are given for those terms and

09:37:31 3    use them when deciding whether any claim is infringed or

09:37:35 4    invalid.  You must ignore any different definitions used by

09:37:38 5    the witnesses or the attorneys.  For words that I have not

09:37:41 6    defined, you should give them their ordinary meaning.

09:37:48 7         MHL is asserting Claims 1, 2, 5 and 6 of the

09:37:54 8    '044 patent and Claims 1 and 2 of the '659 patent.  I've

09:38:00 9    already referred to these as the asserted claims.  MHL

09:38:04 10   contends that Waydoo infringes the asserted claims by

09:38:07 11   selling and importing products that MHL argues are covered

09:38:11 12   by one or more of the asserted claims.  The products that

09:38:14 13   are alleged to infringe the asserted claims are the Flyer,

09:38:18 14   the Flyer ONE and the Flyer ONE Plus model eFoils.  I will

09:38:23 15   refer to these as the accused products.  Waydoo denies that

09:38:27 16   it infringes the asserted claims.

09:38:29 17        Waydoo contends that the asserted claims of both

09:38:34 18   of the asserted patents are invalid for anticipation,

09:38:38 19   obviousness, and failure to satisfy the enablement

09:38:42 20   requirement.

09:38:42 21        If any of the asserted claims have been

09:38:46 22   infringed and is not invalid, you will then need to decide

09:38:50 23   the amount of money damages to be awarded to MHL to

09:38:53 24   compensate it for the infringement.

09:38:57 25        Patent law provides that any person or business

09:39:01 1    entity that makes, uses, sells, imports or offers for sale,

09:39:06 2    without the patent owner's permission, any product covered

09:39:09 3    by at least one claim of a United States patent before the

09:39:13 4    patent expires, infringes the patent.

09:39:16 5           Infringement must be assessed on a

09:39:20 6    claim-by-claim basis.  Therefore, there may be infringement

09:39:23 7    as to one or more claims, but no infringement as to others.

09:39:26 8           In patent law, the requirements of the claim are

09:39:30 9    often referred to as claim elements.  To prove infringement

09:39:35 10   of a claim, MHL must prove by a preponderance of the

09:39:39 11   evidence that the accused products satisfy each and every

09:39:43 12   element of the claim.  The presence of other elements in an

09:39:46 13   accused product beyond those claimed, however, does not

09:39:49 14   negate infringement, as long as every claimed element is

09:39:53 15   present.

09:39:54 16          You have heard evidence about both MHL's

09:39:59 17   products and Waydoo's accused products.  In deciding the

09:40:03 18   issue of infringement, you may not compare MHL's products to

09:40:08 19   Waydoo's products.  You must only compare Waydoo's accused

09:40:12 20   products to the asserted claims.

09:40:14 21          A party can infringe a patent without knowing of

09:40:19 22   the patent or without knowing that what it was doing was

09:40:23 23   patent infringement.  A party may also infringe a patent,

09:40:27 24   even though the belief is in good faith that the patent is

09:40:29 25   invalid.  Thus, whether Waydoo knew of the asserted patents

09:40:32  1   and their intent are irrelevant to your determination of

09:40:37  2   infringement.

09:40:41  3        If you decide that an independent claim is not

09:40:47  4   infringed, then there cannot be infringement of any

09:40:51  5   dependent claim that refers directly or indirectly to the

09:40:57  6   independent claim.

09:40:59  7        If you find that it is more likely true than not

09:41:03  8   that Waydoo infringed a claim of the asserted patents, then

09:41:06  9   you must also determine whether or not the infringement was

09:41:11 10   willful.  To show that Waydoo's infringement was willful,

09:41:16 11   MHL must prove by a preponderance of the evidence that

09:41:21 12   Waydoo knew of the asserted patents, and deliberately or

09:41:24 13   intentionally infringed them.  For example, you may consider

09:41:28 14   whether Waydoo acted despite a risk of infringement that was

09:41:31 15   either known or so obvious that it should have been known.

09:41:35 16   Knowledge of the asserted patent is a prerequisite to

09:41:40 17   willfulness.

09:41:40 18        You may not, however, determine that

09:41:43 19   infringement was willful just because Waydoo knew of MHL's

09:41:45 20   asserted patents, without more.  Willfulness is assessed at

09:41:50 21   the time the infringement occurred.  In determining whether

09:41:53 22   MHL has proved that Waydoo's infringement was willful, you

09:41:56 23   must consider all of the circumstances and assess Waydoo's

09:42:00 24   knowledge at the time the challenged conduct occurred.

09:42:06 25        Waydoo asserts that the asserted claims are

09:42:10  1    invalid based on anticipation, obviousness and lack of

09:42:14  2    enablement.

09:42:15  3            Some issues in patent cases are determined by

09:42:20  4    considering the perspective of a person of ordinary skill in

09:42:24  5    the art in the field of the invention at the time the

09:42:27  6    invention was made.  In this case, the date of the invention

09:42:30  7    for the asserted claims is October 10, 2013.  You must

09:42:35  8    determine the level of ordinary skill in the field of the

09:42:38  9    invention.

09:42:43 10            In addressing some of Waydoo's invalidity

09:42:46 11    defenses, you will have to consider what is disclosed in the

09:42:49 12    prior art.

09:42:49 13            The parties agree that the Namanny patent and

09:42:53 14    the Woolley patent are prior art.  Waydoo contends that the

09:42:58 15    Evolo Report is prior art, and MHL disagrees.  Therefore,

09:43:03 16    you will have to decide whether Waydoo has proven by clear

09:43:07 17    and convincing evidence that the Evolo Report was publicly

09:43:11 18    accessible before October 10, 2013.

09:43:14 19            The Evolo Report is publicly accessible, if it

09:43:20 20    was disseminated or otherwise made available to the extent

09:43:24 21    that persons interested and ordinarily skilled in the

09:43:27 22    subject matter or art exercising reasonable diligence can

09:43:32 23    locate it.  Before you may consider the Evolo Report to be

09:43:35 24    prior art for purposes of Waydoo's defense of anticipation,

09:43:39 25    Waydoo must prove by clear and convincing evidence that the

09:43:43  1    Evolo Report was publicly accessible before October 10,

09:43:49  2    2013, anywhere in the world.

09:43:50  3            In addition, MHL contends that the Evolo Report

09:43:55  4    is not enabled.  A prior art publication such as the Evolo

09:44:00  5    Report is presumed to be enabled.  In order to overcome that

09:44:05  6    presumption, MHL must prove by a preponderance of the

09:44:10  7    evidence that the Evolo Report is not enabled.  You should

09:44:14  8    consider the same factors that I will lay out for you with

09:44:17  9    respect to Waydoo's enablement defense when determining if

09:44:21 10    the Evolo Report is enabled.

09:44:25 11            In order for a patent to be valid, the invention

09:44:30 12    must be new.  In general, inventions are new when they have

09:44:34 13    not been made, used or disclosed before.  The legal name for

09:44:37 14    a challenge to the validity of a patent claim on the basis

09:44:41 15    that the claim is not new is anticipation.

09:44:43 16            In this case, Waydoo contends that the invention

09:44:48 17    of the asserted claims are anticipated by the Evolo Report.

09:44:52 18    Waydoo must prove by clear and convincing evidence that each

09:44:55 19    asserted claim was not new based on the Evolo Report.

09:44:59 20            Invalidity by anticipation requires that a

09:45:04 21    single prior art reference disclose each and every

09:45:10 22    requirement, or limitation of a claimed invention.  You may

09:45:15 23    not combine two or more items of prior art to find

09:45:18 24    anticipation.  In determining whether every one of the

09:45:22 25    elements of the claimed invention is found in the Evolo

09:45:25 1  Report, you should take into account what a person of

09:45:29 2  ordinary skill in the art would have understood from his or

09:45:32 3  her review of the Evolo Report.

09:45:40 4          Waydoo asserts that all of the asserted claims

09:45:42 5  are invalid based on obviousness in light of the Woolley

09:45:45 6  reference in combination with the Namanny reference.

09:45:47 7          In order to show that the claimed invention is

09:45:50 8  obvious, Waydoo must prove by clear and convincing evidence,

09:45:54 9  as to the particular claim you are considering, that a

09:45:59 10 person of ordinary skill in the field of the invention, who

09:46:02 11 knew about all the prior art existing before October 10,

09:46:07 12 2013, would have conceived the invention at that time.

09:46:11 13 Unlike anticipation, which allows you to consider only a

09:46:16 14 single item of prior art, obviousness may be shown by

09:46:19 15 considering one or more items of prior art in combination.

09:46:23 16         In deciding obviousness, you should put yourself

09:46:27 17 in the position of a person with ordinary skill in the field

09:46:30 18 before October 10, 2013.  You must not use hindsight:  In

09:46:36 19 other words, you may not consider what is known now or what

09:46:42 20 was learned from MHL's patent.  In addition, you may not use

09:46:47 21 MHL's patent as a roadmap for selecting and combining items

09:46:51 22 of prior art.

09:46:52 23         In making your decision regarding obviousness,

09:46:56 24 you are to consider each of the following factors:  The

09:47:01 25 scope and content of the prior art.  You may consider prior

09:47:05  1    art that was reasonably relevant to the problem the inventor

09:47:09  2    faced that a person of ordinary skill would consider in

09:47:12  3    attempting to solve the problem.

09:47:14  4            You may consider any differences between the

09:47:19  5    prior art and the invention in the patent claim that you are

09:47:22  6    considering.

09:47:23  7            You may consider the level -- you actually are

09:47:28  8    to consider all of these things, but including the level of

09:47:31  9    ordinary skill in the field of the invention before

09:47:34 10    October 10th of 2013.

09:47:36 11            And you are to consider additional factors, if

09:47:39 12    there are any, that indicate that the invention was obvious

09:47:43 13    or not obvious.  And I will define them and talk about them

09:47:48 14    in the next instruction.

09:47:51 15            So, as I just stated, in deciding obviousness,

09:47:55 16    you should consider whether any of the following are true,

09:47:58 17    which, if so, may indicate the invention was not obvious.

09:48:02 18            First, has the invention achieved commercial

09:48:07 19    success?  If so, is that success based on the invention

09:48:10 20    itself, rather than on advertising, promotion, sales

09:48:15 21    tactics, or features of the product other than those found

09:48:17 22    in the claimed invention?

09:48:19 23            Second, did others try, but fail to solve the

09:48:25 24    problems solved by the claimed invention?

09:48:27 25            And third, did others seek or obtain a license

09:48:31 1   to the asserted patents?

09:48:33 2          Not all of these factors may be present.  No

09:48:37 3   single factor is more or less important than the others.

09:48:39 4   However, there must be a connection between the secondary

09:48:42 5   consideration and the claimed invention if this evidence is

09:48:46 6   to be given weight by you in arriving at your conclusion on

09:48:50 7   the obviousness issue.

09:48:57 8          The patent law contains certain requirements for

09:49:00 9   the part of the patent called the specification.  One of

09:49:03 10  those requirements is called the enablement requirement.

09:49:06 11  Waydoo contends that each of the asserted claims are invalid

09:49:10 12  because the specification does not enable the full scope of

09:49:14 13  the claimed invention.  To succeed, Waydoo must show by

09:49:18 14  clear and convincing evidence that the patent specification

09:49:21 15  does not contain a sufficiently full and clear description

09:49:24 16  to have allowed a person of ordinary skill in the art to

09:49:29 17  make and use the full scope of the claimed invention as of

09:49:33 18  October 10, 2013 without undue experimentation.  If a patent

09:49:39 19  claim is not enabling, it is invalid.  A patent does not

09:49:44 20  have to state information that persons of ordinary skill in

09:49:48 21  the field would be likely to know.

09:49:50 22         The question of undue experimentation is a

09:49:54 23  matter of degree, and what is required is that the amount of

09:49:58 24  experimentation not be unduly extensive.  Some amount of

09:50:02 25  experimentation to make and use the invention is allowable.

1    In deciding whether a person of ordinary skill in the art

2    would have to experiment unduly in order to make and use the

3    invention, you can consider several factors.

4         The time and cost of any necessary

5    experimentation;

6         How routine any necessary experimentation is in

7    the field of personal hydrofoil watercraft;

8         Whether the patent discloses specific working

9    examples of the claimed invention;

10        The amount of guidance presented in the patent;

11        The nature and predictability of the field of

12   personal hydrofoil watercraft;

13        The level of ordinary skill in the field of

14   personal hydrofoil watercraft;

15        And the nature and scope of the claimed

16   invention.

17        No one of these factors alone is dispositive.

18   Rather, you must make your decision about whether or not the

19   degree of experimentation required is undue based upon all

20   of the evidence presented to you.  You should weigh these

21   factors and determine whether or not, in the context of the

22   invention and the state of the art at the time of

23   October 10, 2013, a person having ordinary skill would need

24   to experiment unduly to make and use the full scope of the

25   claimed invention.

09:51:26  1          If you find that Waydoo infringed one or more of

09:51:29  2   the asserted claims, and you find those claims not to be

09:51:33  3   invalid, you must then determine the amount of damages to

09:51:37  4   award to MHL.  If you find that none of the asserted claims

09:51:42  5   are infringed or if you find that all of the infringed

09:51:45  6   claims are invalid, then you need not address damages in

09:51:49  7   your deliberation.

09:51:50  8          I will now instruct you about the measure of

09:51:54  9   damages.  By instructing you on damages, I am not suggesting

09:51:58 10   which party should win this case or which should prevail on

09:52:02 11   any issue.

09:52:02 12          The damages you award must be adequate to

09:52:07 13   compensate MHL for the infringement.  They are not meant to

09:52:10 14   punish an infringer.  Your damages award, if you reach this

09:52:14 15   issue, should put MHL in approximately the same financial

09:52:18 16   position that it would have been in had the parties reached

09:52:22 17   an agreement for Waydoo to license the patents before the

09:52:25 18   alleged infringement began.

09:52:27 19          MHL has the burden to establish the amount of

09:52:31 20   its damages by a preponderance of the evidence.  In other

09:52:33 21   words, you should award only those damages that MHL

09:52:37 22   establishes that it more likely than not suffered.  While

09:52:41 23   MHL is not required to prove the amount of its damages with

09:52:45 24   mathematical precision, it must prove them with reasonable

09:52:50 25   certainty.  You may not award damages that are speculative,

09:52:53 1    damages that are only possible, or damages that are based on

09:52:56 2    guesswork.

09:53:01 3            MHL is seeking a reasonable royalty in this

09:53:03 4    case.  A royalty is a payment made to a patent holder in

09:53:07 5    exchange for the right to make, use, or sell the claimed

09:53:09 6    invention.  A reasonable royalty is the amount of royalty

09:53:13 7    payment that a patent holder and the alleged infringer would

09:53:17 8    have agreed to in a hypothetical negotiation taking place at

09:53:22 9    a time just prior to when the infringement first began.

09:53:25 10           In considering this hypothetical negotiation,

09:53:30 11   you should focus on what the expectations of MHL and Waydoo

09:53:34 12   would have been had they entered into an agreement at that

09:53:37 13   time and had they acted reasonably in their negotiations.

09:53:41 14   In determining this, you must assume that both parties

09:53:44 15   believed the patent was valid and infringed and that both

09:53:47 16   parties were willing to enter into an agreement.  The

09:53:50 17   reasonable royalty you determine must be a royalty that

09:53:54 18   would have resulted from the hypothetical negotiation, and

09:53:56 19   not simply a royalty either party would have preferred.

09:54:00 20           A reasonable royalty is typically made up of a

09:54:04 21   royalty base and a royalty rate that is applied to that

09:54:08 22   base.  There may be more than one way to calculate a royalty

09:54:12 23   base and a royalty rate.  The ultimate combination of

09:54:15 24   royalty base and royalty rate must reflect the value

09:54:18 25   attributable to the infringing features of the product and

1  no more.

2           Damages are not based on a hindsight evaluation

3  of what happened, but on what MHL and Waydoo would have

4  agreed upon at the time of the hypothetical negotiation on

5  March 1st of 2019.  I think actually the testimony in the

6  record is maybe not focused in on that exact date.  The date

7  of the hypothetical negotiation, that's a fact for you to

8  determine.  Nevertheless, evidence relevant to the

9  negotiation is not necessarily limited to facts that

10  occurred on or before the date of the hypothetical

11  negotiation.  You may also consider information the parties

12  would have foreseen or estimated during the hypothetical

13  negotiation, which may, under certain circumstances, include

14  evidence of usage after infringement started, license

15  agreements entered into by the parties shortly after the

16  date of the hypothetical negotiations, profits earned by the

17  infringer and non-infringing alternatives.

18           In determining the amount of a reasonable

19  royalty, you should consider all the facts known and

20  available to the parties at the time the infringement began.

21  Some of the factors you may consider in making your

22  determination are:

23           The value that the claimed invention contributes

24  to the accused products.

25           The value that factors other than the claimed

09:55:51  1    invention contributes to the accused products.

09:55:54  2           Comparable license agreements, such as those

09:55:57  3    covering the use of the claimed invention or similar

09:56:00  4    technology.

09:56:00  5           No one factor is dispositive and you can, and

09:56:04  6    should, consider all the evidence that has been presented to

09:56:07  7    you in this case that would have increased or decreased the

09:56:10  8    royalty the infringer would have been willing to pay and the

09:56:14  9    patent holder would have been willing to accept acting as

09:56:17 10    normal, prudent business people.

09:56:19 11           MHL is required to prove the amount of a

09:56:23 12    reasonable royalty to a reasonable probability and may not

09:56:27 13    recover amounts that are speculative.

09:56:33 14           Comparable license agreements are one factor

09:56:36 15    that may inform your decision as to the proper amount and

09:56:39 16    form of the reasonable royalty award, similar to the way in

09:56:42 17    which the value of a house is determined relative to

09:56:44 18    comparable houses sold in the same neighborhood.

09:56:47 19           Whether a License Agreement is comparable to the

09:56:50 20    license under the hypothetical license scenario depends on

09:56:57 21    many factors, such as whether they involve comparable

09:56:59 22    technologies, comparable economic circumstances, comparable

09:57:03 23    structure, and comparable scope.  If there are differences

09:57:06 24    between a License Agreement and the hypothetical license,

09:57:09 25    you must take those into account when you make your

09:57:12  1   reasonable royalty determination.

09:57:13  2           The hypothetical license is deemed to be a

09:57:18  3   voluntary agreement.  When determining if a License

09:57:21  4   Agreement is comparable to the hypothetical license, you may

09:57:24  5   consider whether the License Agreement between parties to a

09:57:27  6   lawsuit and whether the License Agreement was a settlement

09:57:34  7   influenced by a desire to avoid further litigation.

09:57:37  8           In determining a reasonable royalty, you may

09:57:39  9   also consider evidence concerning the availability and cost

09:57:43 10   of accepting non-infringing substitutes to the patented

09:57:46 11   invention.  An acceptable substitute must be a product or

09:57:50 12   method that is licensed under the patent or that does not

09:57:53 13   infringe the patent.

09:57:57 14           All right.  So, members of the jury, there's a

09:58:00 15   couple more instructions about deliberations.  I'm going to

09:58:02 16   give them after you've heard the closing arguments.  I know

09:58:05 17   you've only been in court a little time, but listening to me

09:58:08 18   talk for 25 minutes is a sleep-inducing event.  So, what I'd

09:58:12 19   like to do is take you out so you can go walk around the

09:58:17 20   jury room for a minute or two, make sure you're wake, and

09:58:20 21   then come back and then we'll start the closing arguments.

09:58:23 22           Okay?  Can we take the jury out?

09:58:29 23           (Jury leaving the courtroom.)

09:58:57 24           THE COURT:  All right.  Well, it's a

09:58:59 25   sleep-inducing event for everyone else, too.  Before I go or

09:59:03  1    take a break for a minute, are there any objections to the

09:59:06  2    instructions as read?

09:59:10  3                    MR. MURRELL:  Just we preserve the ones we

09:59:13  4    tendered, Your Honor.

09:59:14  5                    THE COURT:  Okay.

09:59:14  6                    MR. MURRELL:  Other than that, no.

09:59:15  7                    THE COURT:  Okay.  All right.

09:59:19  8                    Your side?

09:59:20  9                    MR. COLLETTI:  No objection, Your Honor.

09:59:21 10                    THE COURT:  Okay.  Thanks.  So, we will just

09:59:23 11    take a very short break, and we'll be back.

09:59:30 12                    DEPUTY CLERK:  All rise.

10:00:01 13                    (Recess was taken.)

10:02:54 14                    DEPUTY CLERK:  All rise.

10:02:54 15                    THE COURT:  All right.  We'll get the jury.

10:02:58 16                    And I don't know if I've said this before, but

10:03:01 17    in whatever, Mr. Theuerkauf and Mr. Colletti, you're doing,

10:03:05 18    imagine there's a line between me and Mr. Murrell.  Don't

10:03:09 19    pass that line.

10:03:12 20                    So, if you step to this side of the jury at the

10:03:14 21    podium, that's fine.  Or if you want to roam around back

10:03:17 22    there, that's fine.  But don't get too close to the jury.

10:03:20 23    Okay?

10:03:22 24                    (Jury entering the courtroom.)

10:03:37 25                    THE COURT:  All right.  Members of the jury,

10:03:39 1    welcome back.  Everyone, you may be seated.

10:03:41 2              Mr. Theuerkauf.

10:03:42 3              MR. THEUERKAUF:  Yes.  Thank you, Your Honor.

10:03:51 4              Good morning, ladies and gentlemen.  First of

10:03:55 5    all, I just wanted to thank you for your service.  I know

10:03:58 6    it's been a long week, and I know everybody is anxious to

10:04:00 7    get back to their regular lives.  But as I mentioned at the

10:04:04 8    beginning of this case, it's a very important case for MHL,

10:04:09 9    so we really appreciate the attention you've given us this

10:04:11 10   week.

10:04:11 11             This case is important because MHL is a family

10:04:17 12   business that created an entirely new industry.  They

10:04:21 13   created this entirely new industry based on the technology

10:04:25 14   and the inventions disclosed in the patents at issue in this

10:04:28 15   case.  The patents and the products covered by those patents

10:04:33 16   are MHL's core business.

10:04:35 17             You heard Mr. Leason talk about the cutthroat

10:04:39 18   nature of the water sports industry and how important it is

10:04:44 19   to legally protect those innovations.  Revolutionary

10:04:50 20   products are everything in this industry.  And the time,

10:04:56 21   effort and risk involved in such innovations must be

10:05:00 22   rewarded and protected.

10:05:03 23             Patents don't come around every day, Especially

10:05:07 24   those that create a new industry, create a new market.  As

10:05:11 25   inventions are created, released and gain popularity, most

10:05:18  1    people respect those rights, but there are some that don't.

10:05:25  2    History teaches us that those that don't respect those

10:05:28  3    rights don't care about right and wrong and will do anything

10:05:34  4    they can to gain the system to get away with it.

10:05:37  5            In this case, Waydoo justifies their actions by

10:05:43  6    saying they are doing nothing more than asserting defenses.

10:05:48  7    But what they are really doing is making every possible

10:05:51  8    excuse in an attempt to get away with it.  So, what

10:05:56  9    are those excuses?

10:05:57 10            They're telling you they don't infringe; right?

10:06:02 11    But if we do infringe, well, okay, then the patents are

10:06:08 12    invalid because they're anticipated by Evolo.

10:06:12 13            Then, well, okay, if we do infringe and the

10:06:16 14    patents are not invalid because of Evolo, then the patents

10:06:20 15    are invalid because they're obvious in light of Woolley and

10:06:23 16    Namanny.

10:06:24 17            Well, then it's, okay.  Well, if we do infringe,

10:06:29 18    and they're not invalid because of Evolo, and they're not

10:06:33 19    invalid because of Woolley and Namanny, then the patents are

10:06:36 20    invalid because they're not enabled.

10:06:39 21            All right.  Well, then it's, okay.  If we do

10:06:43 22    infringe, they're not invalid because of Evolo and they're

10:06:48 23    not invalid because of Woolley and Namanny, and they're not

10:06:51 24    invalid because the patents are enabled, then MHL hardly

10:06:58 25    suffered any damages.  Right?

10:07:00  1          Then it's, okay.  Well, if we do infringe, and

10:07:04  2   the patents are valid and MHL is owed a royalty, then we

10:07:12  3   didn't infringe intentionally.  Right.

10:07:16  4          Well, if your head is spinning after all of that

10:07:19  5   and you're confused, don't feel bad.  Why?  Because that was

10:07:23  6   their point.  That was their goal.  Confusion.

10:07:26  7          Others like MHL respect those patent rights and

10:07:32  8   do the right thing.

10:07:36  9          I've told you what's brought us here, so let's

10:07:38 10   talk a little bit about what you are going to need to decide

10:07:41 11   after the closing arguments.

10:07:42 12          The first issue is infringement.  MHL's burden

10:07:47 13   on this issue, as you heard from the Judge earlier and as

10:07:50 14   you heard last Friday, is a preponderance of the evidence.

10:07:55 15   And as you'll see here, what that means is that when

10:08:00 16   considered -- when the facts are considered in light of all

10:08:02 17   of the facts, it leads you to believe that the infringement

10:08:04 18   is more likely than not.  Right.  It was that scale that you

10:08:08 19   heard about.  If the evidence slightly leans in MHL's favor,

10:08:13 20   then they have met their burden.

10:08:15 21          So, what's infringement?  You heard

10:08:21 22   Judge Andrews tell you that the claims of the patent are

10:08:26 23   what you're going to have to look at for infringement.

10:08:29 24          If we can go to Number 3.

10:08:31 25          And to prove infringement of a claim, MHL must

10:08:35  1    show by a preponderance of the evidence that the accused

10:08:38  2    products satisfy each and every element of the claim.

10:08:42  3                    Now, I'm not going to go through all the claims.

10:08:45  4    You're going to have all of those, you know, back in the

10:08:48  5    jury room with you, but let's take a moment to look at

10:08:51  6    Claim 1 of each patent and what's really at issue here.

10:08:54  7                    So, if we look at -- if you go to number 11.

10:09:07  8                    So, this is Claim 1 of the '044 patent.  And as

10:09:12  9    you've heard throughout this trial, there's really just two

10:09:14 10    main issues, right.  All these other elements have been

10:09:19 11    stipulated to.  So, what looks daunting to begin with really

10:09:23 12    is not that complicated.

10:09:24 13                    What the two main issues are are the controlled

10:09:27 14    via weight shift of the user and that the hydrofoil design

10:09:30 15    to provide passive static stability.  Similarly, with the

10:09:35 16    other -- with the patent, the '659 patent, the claim is

10:09:44 17    similar.  The claim is similar.  It still regards the

10:10:00 18    controlled via weight shift of the user.  And instead of

10:10:03 19    reciting static stability, it recites simply stability.  And

10:10:07 20    you've heard the difference in those two claim terms with

10:10:10 21    static stability simply being the initial tendency to return

10:10:14 22    to the original condition.

10:10:16 23                    And then in the '659 patent, as you're seeing

10:10:19 24    here, that the term stable then requires the additional

10:10:23 25    element of that it ultimately gets back to that initial

10:10:26  1    condition.

10:10:27  2            But there really is no disagreement on the

10:10:34  3    issues regarding stability and/or weight shift.  Weight

10:10:39  4    shift is pretty obvious.  And you can see it with your own

10:10:43  5    eyes, and you've seen it from all the evidence in this case.

10:10:45  6    These crafts, the Waydoo crafts, are controlled via weight

10:10:49  7    shift.

10:10:49  8            And at the end of the day, there's really no

10:10:52  9    disagreement on the fact that they're stable.  You've seen

10:10:57 10    it with your own eyes.

10:10:59 11            But who else told you this?  First, Mr. Leason.

10:11:05 12    He has ridden eFoils more times than he can count.  He's

10:11:10 13    ridden the Waydoo eFoils.  He's testified that they were

10:11:14 14    stable.

10:11:16 15            Who else?  Kevin Wade.  Kevin Wade is the

10:11:19 16    distributor for Waydoo.  He's been in this water sports

10:11:24 17    industry most of his life.  He's ridden Waydoo's eFoils.

10:11:29 18    He's told you that they're stable.

10:11:32 19            Who else?  Mr. Christopher Barry.  He has

10:11:37 20    designed and built watercrafts for 40-plus years.  And he

10:11:42 21    has three patents on hydrofoil watercrafts.  He has

10:11:46 22    confirmed what the others have said through math,

10:11:51 23    observation, and common sense.  He is the only one that has

10:11:55 24    done any calculations in this case to confirm what you can

10:11:58 25    see with your own eyes.

10:12:00  1          Dr. Triantafyllou, while he tried hard to
10:12:05  2   convince you that the math was inaccurate and that the
10:12:09  3   Waydoo eFoils aren't stable, he eventually admitted that
10:12:14  4   they were as well.  I think it was:  They're stable.  They
10:12:19  5   have to be because people like them.  If they weren't
10:12:23  6   stable, nobody would buy them.
10:12:24  7          Who else has told you this?  Waydoo.  Let's take
10:12:29  8   a look at their website.  What does Waydoo say about their
10:12:33  9   own products?  I think you can see here, great stability.
10:12:39 10          Now, Waydoo has shown some video clips in an
10:12:43 11   attempt to, again, cause confusion by showing some people
10:12:47 12   falling off of the Waydoo craft; right?  Well, if somebody
10:12:50 13   falls off, it must not be stable.  But the reality is -- and
10:12:53 14   I think you heard it from Mr. Wade and others, that a
10:12:58 15   beginner, a newbie can be up and flying on these boards in
10:13:02 16   less than 30 minutes.  And why is that?  Because it's a
10:13:05 17   stable craft.
10:13:06 18          What you see from their cherry-picked videos is
10:13:10 19   it's not an unstable craft.  It's that the person is
10:13:15 20   unstable until he becomes or she becomes used to that flying
10:13:18 21   sensation.
10:13:20 22          So, let's talk a little bit more about
10:13:22 23   Mr. Barry.  He was hired by MHL to independently evaluate
10:13:28 24   what MHL already believed and really what MHL already knew.
10:13:33 25   But rather than just sitting back and saying, you know, I've

10:13:37 1    ridden these, I know they're stable, let's have somebody do

10:13:40 2    the calculations to confirm what we know.  And that's what

10:13:44 3    he did.  And then he crosschecked that with how the products

10:13:48 4    operate in reality.

10:13:51 5          He did this for all of the Waydoo models and

10:13:54 6    confirmed both that they are weight-shift controlled and

10:13:57 7    that they are stable.

10:14:00 8          Now, Waydoo, on the other hand, didn't give you

10:14:03 9    an explanation as to why Waydoo doesn't infringe.  They only

10:14:09 10   criticize Mr. Barry.  If Dr. Triantafyllou was so convinced

10:14:16 11   that Waydoo did not infringe, why didn't he do his own math?

10:14:23 12   Remember that?  I don't need to plug numbers in.  Well, if

10:14:28 13   you thought they didn't infringe, all you had to do was plug

10:14:31 14   the numbers in and you could have shown it.  He didn't do

10:14:34 15   that.

10:14:35 16         Dr. Triantafyllou's never even spoken with

10:14:40 17   anybody at Waydoo.  He didn't ask for any of the technical

10:14:44 18   documents that Mr. Barry analyzed.  And Dr. Triantafyllou

10:14:50 19   said he didn't do the math because he wasn't asked to do the

10:14:54 20   math.

10:14:56 21         Who didn't ask him?  Waydoo.  They didn't want

10:14:59 22   the answer.  They didn't want him to have the answer.

10:15:02 23         Who told him not to give his own opinion on

10:15:06 24   infringement in this case?  Waydoo.  Who paid him to come in

10:15:12 25   here and say Evolo is stable but Waydoo isn't stable?

10:15:18  1  Waydoo.

10:15:19  2              Both MHL and Waydoo have made millions of

10:15:23  3  dollars off of these products.  Do you think that would have

10:15:28  4  happened if they weren't stable?  No.  Nobody could ride

10:15:31  5  them.

10:15:31  6              Dr. Triantafyllou even said, again, they must be

10:15:36  7  stable or they wouldn't be selling them.  And there's

10:15:40  8  nothing more true than that.

10:15:41  9              So, let's talk about Waydoo's excuses for a few

10:15:47 10  minutes.

10:15:50 11              As you heard from the video you watched last

10:15:52 12  Friday, our Constitution provides for patent rights.  These

10:16:00 13  rights are not to be taken lightly.

10:16:05 14              Clear and convincing evidence, let's talk about

10:16:08 15  that just for a minute.  This is a critical concept that

10:16:12 16  you'll need to understand.  In order to invalidate these

10:16:18 17  claims or these patents, Waydoo has to prove, by clear and

10:16:22 18  convincing evidence, that they're invalid.  That is, that it

10:16:26 19  is highly probable a fact is true.  But the evidence in this

10:16:31 20  case does not begin to reach that level.

10:16:33 21              So, if you could go to the jury instructions,

10:16:39 22  please.

10:16:41 23              So, let's talk about Evolo for a minute.  And

10:16:46 24  this public accessibility and what Judge Andrews was telling

10:16:51 25  you this morning about there is this threshold issue.

10:16:55 1          Evolo doesn't even come into play if it's such

10:16:58 2     that a person of ordinary skill in the art could not have

10:17:01 3     found it back in October of 2013 when Dr. Langelaan filed

10:17:06 4     his patent applications.

10:17:08 5          So, what did we hear from Waydoo on this issue?

10:17:13 6     We heard from Mr. Lanterman that it was available online.

10:17:24 7     He told us 17 people downloaded it and seven were in the

10:17:30 8     United States.  But he didn't tell you who they were and he

10:17:35 9     didn't produce any records to show who these people were.

10:17:40 10         Prior to 2006 -- I'm sorry.  Prior to 2013, only

10:17:46 11    17 people in the whole world.  We don't know who they are,

10:17:53 12    and there just happened to be 17 people associated with the

10:17:57 13    Evolo Report.  I don't think that's coincidental.

10:18:03 14         As I said, Mr. Lanterman did not produce any

10:18:06 15    records to show who these people are, were they grad

10:18:11 16    students, seven of them that had moved to the United States?

10:18:15 17    Were they family or friends?  We have no way of knowing

10:18:20 18    because they didn't produce any records to tell us.

10:18:23 19         Regardless of this, downloads -- the fact that

10:18:29 20    there were 17 downloads is not even the issue.  The issue is

10:18:35 21    whether Waydoo presented clear and convincing evidence as to

10:18:39 22    how a person ordinarily skilled in this art could find the

10:18:43 23    Evolo Report.  Or if a person skilled in the art, how they

10:18:51 24    would find it.

10:18:54 25         They produced no evidence on this issue.  We

10:18:57 1    don't know anything about how somebody would have gone about

10:19:01 2    finding this report or even if they could have found the

10:19:05 3    report.  Mr. Lanterman admitted that he did not know what

10:19:10 4    search terms could have been used to find it.  Mr. Lanterman

10:19:16 5    admitted that he didn't know what combination of search

10:19:20 6    terms could have been used.  He admitted that he had no idea

10:19:25 7    if a person skilled in the art could find it.

10:19:28 8            So, they're asking you to assume that a person

10:19:32 9    skilled in the art could have found it.  Being required to

10:19:36 10   assume something like that is not clear and convincing

10:19:39 11   evidence.

10:19:40 12           In fact, the evidence here is the opposite.  The

10:19:46 13   only people at this trial that would know knew nothing about

10:19:52 14   the Evolo Report back in 2013.  Dr. Langelaan, the inventor

10:19:59 15   on these patents, searched for prior art and didn't find it.

10:20:03 16   And you heard him testify about all the different search

10:20:06 17   terms that he used and that he had searched for weeks.  He

10:20:11 18   didn't find it.

10:20:14 19           Mr. Leason went to his patent attorney, his

10:20:18 20   cousin, and they searched and they didn't find it, either.

10:20:22 21   But what did Mr. Leason find?  Dr. Langelaan's patents.  The

10:20:27 22   patents that are at issue in this case.

10:20:29 23           Mr. Wade, who has spent most of his life in

10:20:34 24   water sports, he didn't know about the Evolo patent until a

10:20:40 25   couple years ago when this litigation started.

10:20:45  1          Mr. Barry, he's been in the watercraft industry

10:20:49  2     for over 40 years, right.  He had never heard about it until

10:20:53  3     this litigation.

10:20:54  4          Dr. Triantafyllou, Waydoo's own expert, you

10:20:59  5     heard about all of his credentials, right.  Again, 40-plus

10:21:03  6     years in this industry.  He didn't know about Evolo until

10:21:09  7     this litigation.

10:21:10  8          So, what is Waydoo going to tell you, though?

10:21:14  9     That we didn't have an expert.  That MHL didn't have an

10:21:17 10     expert on this issue.  We didn't need an expert because

10:21:23 11     Mr. Lanterman told us exactly what we want an expert on our

10:21:28 12     side to say.  That is, they don't know that a person of

10:21:33 13     ordinary skill in the art could find it or how a person of

10:21:38 14     ordinary skill could find it.  That is what we would have

10:21:41 15     been looking for.  And Mr. Lanterman gave us that.

10:21:44 16          So, without meeting that threshold issue, if the

10:21:54 17     Evolo Report couldn't have been found, you don't need to

10:21:58 18     worry about the Evolo Report.  It's not prior art.

10:22:03 19          And I'll say the reason that is such a crucial

10:22:08 20     issue is that our Government does not want to take away

10:22:11 21     someone's rights with respect to their innovations for some

10:22:16 22     obscure thing that those skilled in the art would have no

10:22:19 23     reason to know about.  And nobody had any reason to know

10:22:23 24     about the Evolo Report.

10:22:24 25          So, if we could go to Number 6.  But beyond

10:22:33  1   that, if the Evolo Report were to anticipate Dr. Langelaan's

10:22:39  2   patents, MHL's patents, Waydoo would have to prove by clear

10:22:43  3   and convincing evidence that each and every requirement or

10:22:48  4   limitation of the claims are found in that report.  Right?

10:22:53  5   You can't go outside the four corners of that report.  Is

10:22:57  6   each and every element of the claims that they're trying to

10:23:00  7   invalidate in that report?

10:23:02  8          Waydoo has not produced clear and convincing

10:23:07  9   evidence that the Evolo Report teaches and demonstrates

10:23:11 10   stability.  If they would have been teaching stability with

10:23:15 11   this, you've heard, 5-, 600-page report, then shouldn't they

10:23:21 12   have been able to demonstrate stability?  Again, if Waydoo

10:23:27 13   was convinced that the Evolo Report disclosed how to make

10:23:32 14   the watercraft stable, don't you think Dr. T would have done

10:23:38 15   the math to show it?

10:23:41 16          So, with respect to Mr. Barry, Waydoo's twisting

10:23:46 17   his words in an attempt to convince you that Mr. Barry is

10:23:50 18   confused.  Mr. Barry is not confused.  What's confusing is

10:23:54 19   the Evolo Report.  This is the type of gibberish that is in

10:23:59 20   that report.  It is that that is confusing.  It's not

10:24:04 21   Mr. Barry that's confused.

10:24:06 22          The report that they both looked at, both

10:24:14 23   Mr. Barry and Dr. Triantafyllou, is a machine translation.

10:24:18 24   You can't make heads or tails of it.  You've seen videos

10:24:23 25   from both MHL and Waydoo that show the foils sailing over

10:24:28 1   the water with lift and stability.  You haven't seen the

10:24:34 2   same thing from Evolo, despite a dozen or more prototypes

10:24:38 3   that these students built.

10:24:41 4           (Video playing.)

10:24:51 5           MR. THEUERKAUF:  The MHL boards, the top left,

10:24:57 6   the Waydoo board is at the top right, they're very much like

10:25:02 7   magic carpets sailing over the water.  And how is that?

10:25:06 8   Because they're stable watercrafts.  It's the design of the

10:25:10 9   hydrofoil that's disclosed in Dr. Langelaan's patents.

10:25:14 10           And Waydoo wants you to believe that what's at

10:25:21 11   the bottom there is stable.  But at the same time, they want

10:25:29 12   you to believe what's at the top right and top left is not

10:25:33 13   stable.  It's not logical.  It's illogical.

10:25:40 14           So, if we could go to Number 22.  And why is

10:25:58 15   Evolo not stable?  Because of the hydrofoil design.  It was

10:26:03 16   never going to be successful.  The students put in a lot of

10:26:08 17   hard work, no doubt, but they did not teach and they weren't

10:26:13 18   out to accomplish what Dr. Langelaan accomplished.  And it's

10:26:18 19   this hydrofoil wing that Mr. Barry explained to you, it was

10:26:23 20   never going to be stable.  The wing from the very beginning

10:26:27 21   was problematic.  They would never reach stability.  The

10:26:32 22   report never taught how to get a stable craft.

10:26:36 23           As Mr. Barry explained, the hydrofoil with that

10:26:42 24   flat delta wing that you see will create lift, but then will

10:26:46 25   quickly stall and lose lift and crash.  That's exactly what

10:26:50  1    we just saw on that video.  A delta wing for a hydrofoil

10:26:56  2    simply wouldn't work.

10:27:00  3                So, the Evolo Report does not disclose or teach

10:27:04  4    a stable watercraft.  It was not the wave of the future.

10:27:09  5    How do we know?

10:27:10  6                First, no one even knew about it.  It did not

10:27:14  7    teach anyone how to make a stable watercraft because if it

10:27:19  8    did, why wasn't it commercialized?  Why didn't an eFoil show

10:27:25  9    up in the market until after Dr. Langelaan's patents and

10:27:31 10    MHL?

10:27:36 11                So, let's go to the next -- if we can go to

10:27:42 12    Number 7.

10:27:43 13                So, then after Evolo, their next excuse, their

10:27:47 14    next reason is obviousness.  Woolley and Namanny.  So, to

10:27:57 15    find that the patents are invalid based on obviousness,

10:28:01 16    again, it has to be by clear and convincing evidence.  And

10:28:06 17    this time, in this excuse, they're saying, well, it would

10:28:10 18    have been obvious to slap these two pieces of prior art

10:28:14 19    together and we would have had your invention.

10:28:18 20                And what are they showing you to try to convince

10:28:21 21    you of that?  You've seen these patents, right?  If we can

10:28:28 22    go to 17.

10:28:29 23                I'm sorry.  So, I'm sorry.  If you go to 16.

10:28:51 24                So, here are the two patents, the Woolley and

10:28:53 25    the Namanny, right.  So, first of all, as you can see

10:28:57  1   highlighted down here, the Woolley has been around since

10:29:00  2   1999.  The Namanny patent has been around since 2003.  Yet

10:29:07  3   nobody invented an eFoil until Dr. Langelaan came along.

10:29:12  4         So, it needs to be noted here, too, that not

10:29:21  5   only is that the case, but these two patents were cited and

10:29:26  6   considered by the Patent Office when Dr. Langelaan filed his

10:29:29  7   application.  The Patent Office considered these.

10:29:34  8         And what did the Patent Office say?

10:29:36  9   Dr. Langelaan's patents aren't obvious.  The Patent Office

10:29:42  10  had already looked at these.  If it could have been

10:29:48  11  combined, if these two could have been combined like Waydoo

10:29:51  12  is trying to convince you, someone would have done it.

10:29:58  13        So, let's look at the secondary considerations.

10:30:09  14  So, there's some other things to consider when you're

10:30:11  15  determining whether or not the patent's invalid because this

10:30:15  16  combination of these two patents.  One of the things -- if

10:30:21  17  you could go to 8.  One of the things that you can look at

10:30:29  18  to confirm that something like what Dr. Langelaan has done

10:30:32  19  or invented was not obvious is commercial success.  Right?

10:30:37  20  Lift's products have been commercially successful.  And they

10:30:43  21  were so right off the bat.  And they were the first one in

10:30:48  22  the market.

10:30:49  23        That success tells you that it wasn't obvious.

10:30:54  24  If it was so obvious they wouldn't -- first, they wouldn't

10:30:57  25  have been the first ones to the market.  And, second, it

10:31:00  1   wouldn't have been so successful.

10:31:02  2           The other thing that you would look at is:  Did

10:31:05  3   others try but fail to solve the problem?  Well, we've got a

10:31:09  4   good example of the failure here.  And it was Evolo.  And

10:31:13  5   not until years later did Dr. Langelaan submit his

10:31:18  6   application to an electric hydrofoil that actually worked

10:31:23  7   and that was actually stable.  That tells us his invention

10:31:27  8   was not obvious.

10:31:28  9           And then the other thing that you can look at

10:31:31  10  here is:  Did others seek or obtain a license to the

10:31:34  11  asserted patents?  We did.  We know that.  MHL first reached

10:31:39  12  out to Dr. Langelaan.  Then Fliteboard has reached out to

10:31:43  13  MHL and taken a license.  And there were others that

10:31:47  14  Dr. Langelaan testified that had reached out to him after he

10:31:50  15  had entered into his agreement with MHL.

10:31:52  16          That tells you that this was not an obvious

10:31:56  17  invention.  You would not have people wanting to take a

10:32:00  18  license like they have if it was so obvious.

10:32:04  19          So, what Dr. Triantafyllou and Waydoo are doing

10:32:13  20  here is exactly what the jury instructions tell you you

10:32:18  21  can't do.  They're using hindsight.  They're using

10:32:21  22  Dr. Langelaan's patents as a roadmap.  Of course, all these

10:32:26  23  inventions are obvious in hindsight, right, and that's what

10:32:30  24  they're doing.

10:32:30  25          So, let's go to their last excuse.  Number 9.

10:32:43  1          So, if you disregard all those, Waydoo still

10:32:49  2    says, Look, okay, Dr. Langelaan's patents aren't enabled.

10:32:55  3    Again, they must prove this by clear and convincing

10:33:00  4    evidence.  And it's got to be such that the specification

10:33:04  5    doesn't teach somebody how to make and use the claimed

10:33:08  6    invention.

10:33:09  7          How do we know that the specification in

10:33:12  8    Dr. Langelaan's patents is sufficient?  Because as soon as

10:33:16  9    Dr. Langelaan got that patent and MHL teamed up with him,

10:33:23 10    they were producing boards.  They were producing eFoils.

10:33:26 11    And you saw Dr. Langelaan with an eFoil on the lake

10:33:29 12    immediately after writing up this application and submitting

10:33:33 13    it to the Patent Office.

10:33:34 14          And there's a whole industry behind this now.

10:33:40 15    These patents taught MHL how to produce this eFoil, and it

10:33:47 16    taught others how to produce it, too.  Because there is a

10:33:50 17    whole industry now.  In fact, MHL has made over -- actually

10:33:56 18    almost 6,000 eFoils to date.  Fliteboard has made over 2,000

10:34:02 19    eFoils.  And Waydoo has made over 2,000 eFoils.  These

10:34:08 20    patents teach them how to do it.

10:34:12 21          In contradiction to that, how many sales have we

10:34:15 22    seen come from the Evolo Project?  Zero.

10:34:25 23          So, obviously, MHL is going to be asking you to

10:34:30 24    award damages in this case.  So, let's take just a minute

10:34:34 25    and look at that.

10:34:39  1          So, you've heard a lot about the hypothetical

10:34:41  2    negotiation.  Now, I know that's sort of a weird construct,

10:34:47  3    right.  I mean, how do you put yourself back in time and

10:34:51  4    determine what these parties -- what kind of deal these

10:34:55  5    parties would have reached?  But there's evidence in this

10:34:57  6    case that shows you or tells you what was going on roughly

10:35:02  7    back at that time.  Right.  And so, we know that Fliteboard

10:35:08  8    had taken a license from MHL, right.  And you heard a lot

10:35:12  9    about the percentages and what the dollar amount was.  Well,

10:35:17 10    the reality of it is MHL is -- I'm sorry, Fliteboard is

10:35:21 11    paying MHL over $500 a board to have the license.  Right.

10:35:29 12          Waydoo is coming in here and telling you that

10:35:32 13    they should only pay $77.  $77 per board.  Do you think that

10:35:39 14    is a reasonable outcome in this hypothetical negotiation

10:35:45 15    between Mr. Leason and Flite -- I mean, I'm sorry, Waydoo?

10:35:49 16    It just wouldn't have been.  It's not logical.

10:35:52 17          Now, you have to consider the business that MHL

10:35:57 18    created and the sales that they would lose in such a

10:36:03 19    situation, right.  MHL's not trying to put Waydoo out of

10:36:08 20    business, but is asking for fair compensation for their use

10:36:14 21    of these patents.  Just like Fliteboard is paying a fair

10:36:19 22    compensation for the use of the patents.

10:36:21 23          Waydoo chose their business model.  And MHL

10:36:28 24    shouldn't suffer for Waydoo's decision to sell through a

10:36:32 25    distributor at 50-percent margin.  The fact that they sell

10:36:38  1    under market and have their distributor do a lot of the work

10:36:44  2    for them, that shouldn't put MHL at a disadvantage.  Waydoo

10:36:51  3    should pay a fair rate and then they can choose how they

10:36:56  4    want to set up their business model.  They've got the

10:37:01  5    choice.  They're the one selling to a distributor at

10:37:04  6    50 percent.  They can change that.

10:37:06  7              So, if we go to Slide 19.  So, this is what

10:37:17  8    we're going to be asking, right.  As Dr. Stec had pointed

10:37:23  9    out or testified to, a fair rate for these eFoils is $560

10:37:31 10    per unit.  They've sold 2,668 of these eFoils.  So, MHL will

10:37:39 11    be asking you to award them the $1.494 million that you see

10:37:44 12    here.  It's fair compensation for Waydoo's use of the

10:37:50 13    technology.

10:37:54 14              So, if we can go to the last here.  Willfulness.

10:38:04 15    We'll also be asking you to find that Waydoo's infringement

10:38:07 16    has been willful.  MHL announced to the world the eFoil in

10:38:13 17    January of 2017.  It had never been seen before.  MHL sells

10:38:20 18    the first-ever eFoil in May of 2018.  Just so happens that

10:38:27 19    Waydoo forms their business that same month, same year.

10:38:32 20              What did Waydoo do before it was formed?  It was

10:38:37 21    in an agricultural industry.  It was in agriculture.  Yet,

10:38:43 22    just seven months after it was formed, after Waydoo was

10:38:48 23    formed, they're at the CES show in Las Vegas with a product

10:38:55 24    ready to sell.  I don't think it's a coincidence that they

10:39:03 25    were able to do something so quickly in seven months when

10:39:06  1    they had no experience in the industry.

10:39:11  2              So, what happened after this CES show?  MHL sent

10:39:16  3    its first cease and desist letter to Waydoo.  No response.

10:39:24  4              Waydoo starts selling their products in March.

10:39:28  5    MHL sends two more cease and desist letters in April, both

10:39:36  6    to the e-mail address and a physical address.  No response.

10:39:42  7              Waydoo continues to sell.  Waydoo does admit to

10:39:49  8    knowledge of MHL's patents and the issues here in August of

10:39:54  9    2019.

10:39:56 10              But what do they do?  They continue to sell.

10:40:01 11              MHL finally files the complaint that initiated

10:40:04 12    this lawsuit.  What happens?  Waydoo continues to sell.

10:40:11 13    Nothing in response.  There is willfulness.  They've known

10:40:17 14    about the patents, and they continued.

10:40:22 15              Thank you.

10:40:24 16              THE COURT:  All right.  Thank you,

10:40:25 17    Mr. Theuerkauf.

10:40:25 18              Members of the jury, we'll take another

10:40:29 19    relatively short break before we hear from the Defendants.

10:40:33 20              All right.

10:40:34 21              (Jury leaving the courtroom.)

10:41:01 22              THE COURT:  All right.  So, we'll take a break.

10:41:04 23    It will be at least five minutes.

10:41:06 24              DEPUTY CLERK:  All rise.

10:41:08 25              (Recess was taken.)

10:48:32  1                    DEPUTY CLERK:  All rise.

10:48:33  2                    THE COURT:  All right.  You ready, Mr. Colletti?

10:48:35  3                    MR. COLLETTI:  Yes.

10:48:36  4                    THE COURT:  All right.  Let's get the jury.

10:48:38  5                    (Jury entering the courtroom.)

10:49:10  6                    THE COURT:  All right.  Members of the jury,

10:49:17  7    welcome back.

10:49:18  8                    Everyone, you may be seated.

10:49:20  9                    Mr. Colletti.

10:49:21 10                    MR. COLLETTI:  Thank you.

10:49:23 11             Let me also first thank you for your service and

10:49:28 12    for your efforts this week.  I appreciate your time and I'm

10:49:32 13    going to do my best to be concise and clear and brief in

10:49:37 14    this closing argument.

10:49:38 15             First thing I want to talk about is the evidence

10:49:41 16    that you're going to have in the jury room.

10:49:43 17             You're going to have the Evolo Report.  It's DTX

10:49:47 18    325B.  There's been a lot of talk about that and you haven't

10:49:51 19    been able to actually put your hands on it and read it.

10:49:55 20    What I'd like to do is bring it up now and show you a few

10:49:59 21    pages that we've looked at during the trial.

10:50:02 22             What you see here is the final report, the cover

10:50:06 23    page, right.  And you can see the date there, that's

10:50:09 24    April 23rd, 2009.  That's the European format.

10:50:15 25                    If you turn to the next page.

10:50:17  1          You see the summary right at the very top.  It

10:50:20  2  says Evolo is a new type of watercraft that travels on a

10:50:24  3  hydrofoil and is intended for one person.  It's powered by

10:50:27  4  an electric motor and is controlled only by means of center

10:50:31  5  of gravity movement.  That's the weight-shift control.  And

10:50:33  6  I'm going to come back to that in a minute.

10:50:37  7          If you turn to the next page, you see the

10:50:40  8  diagrams.

10:50:42  9          And if you go to the next page, we see a Table

10:50:44 10  of Contents, right.  And this Table of Contents is for the

10:50:50 11  report -- for the executive summary that you see at the

10:50:56 12  beginning of the Evolo Report.  That executive summary goes

10:50:59 13  on for about 16 pages.  And then at the end of those 16

10:51:04 14  pages, there's a Table of Contents.

10:51:06 15          I'd like to turn to DTX 325B.14.

10:51:10 16          Okay.  The Evolo Report, it's not difficult,

10:51:21 17  it's not confusing.  There are 77 exhibits.  Each of these

10:51:25 18  exhibits, what do they tell you?  They tell you the subject

10:51:29 19  matter of each of those chapters.

10:51:31 20          So, if you look at Appendix 7 -- highlight that

10:51:36 21  for a moment -- that's the pitch stability chapter.

10:51:43 22          All right.  Page 60 of the Evolo Report -- from

10:51:45 23  60 to 70, that talks about pitch stability.  That's the

10:51:49 24  chapter that Professor Triantafyllou was discussing.  He had

10:51:55 25  pointed to you with the figures.  He showed you the dynamic

10:52:00  1    control configuration of the wings, that all important

10:52:01  2    configuration that would generate the lift.

10:52:06  3           In addition to that, all the prototypes -- if

10:52:07  4    you go -- Carol, if you go down to the Appendix 58

10:52:12  5    through 64 -- those are the chapters dealing with the

10:52:14  6    prototypes that I was discussing with

10:52:17  7    Professor Triantafyllou.

10:52:18  8           If you go to the following page, Page 18 of the

10:52:24  9    Evolo Report, Appendix 71 and Appendix 72, they tell you

10:52:29 10    about the motor options, the motor control.

10:52:32 11           And then at the very end, you have the final

10:52:34 12    design.  The final design of Evolo on Page 544.

10:52:38 13           This is not a difficult report to understand.

10:52:43 14    Yes, you need to spend time, you need to read it, but it's

10:52:46 15    all in there.  All the subject matter is in there.  It

10:52:49 16    shouldn't be confusing at all.

10:52:51 17           So, let's turn now to the slides, Carol.

10:52:58 18           When we started this case, I said there were two

10:53:01 19    issues.  One of the issues was -- Carol, if you go to the

10:53:07 20    next slide -- with regard to Claim 1.  And you just heard

10:53:10 21    Mr. Theuerkauf say the same thing.

10:53:11 22           What are the two issues?  Controlled via weight

10:53:14 23    shift of the user and whether or not the hydrofoil is

10:53:19 24    designed to provide passive static stability.  And you see

10:53:23 25    that in Claim 1 of the '044 patent.

10:53:26 1          If you go to the next slide.

10:53:27 2          You see the same thing, a passively stable,

10:53:30 3   weight-shift controlled personal hydrofoil.  Same two

10:53:34 4   issues.

10:53:34 5          One of those issues doesn't exist anymore;

10:53:37 6   right?  Weight-shift control.  We heard Mr. Barry.  He

10:53:40 7   admitted Evolo was weight-shift controlled.

10:53:43 8          The question was:  The Evolo Report also

10:53:47 9   discloses that it is a weight shift -- that it is

10:53:50 10  weight-shift controlled.  Do you agree?  And his answer was:

10:53:54 11  Yes, it's weight-shift controlled.  That's no longer an

10:53:57 12  issue.

10:53:58 13         And if it was an issue, it's in the report;

10:54:01 14  right?  I showed it to you in the opening, the Evolo Report

10:54:05 15  in the summary.

10:54:06 16         If you also turn -- Carol, if you go back to the

10:54:08 17  Evolo Report, DTX 325B.29.

10:54:19 18         And you see under stability, 2.3, controlled by

10:54:24 19  means of center of gravity shift.  Okay.  That's weight

10:54:27 20  shifting your body.  That's how this is operated.  That's

10:54:30 21  not an issue anymore.  It's admitted by their expert.

10:54:34 22         And what that raises -- when you -- we

10:54:39 23  litigated -- this case has been litigated for two years.  He

10:54:45 24  looks -- Mr. Barry looks at two pages of the Evolo Report at

10:54:50 25  trial and he decides -- he admits that it is weight-shift

10:54:57  1    controlled.  He also admitted that there was a motor speed

10:54:59  2    controller.  He looked at two documents and decided there

10:55:02  3    was a motor speed controller.  I want to show you that.

10:55:07  4              In the Evolo Report, at Page 325B.498, there's a

10:55:22  5    discussion induction motor.  And we showed him in the middle

10:55:27  6    of that it says:  The motor -- nine lines down, Carol -- the

10:55:31  7    motor is controlled by varying the frequency of the input

10:55:34  8    voltage by varying a control voltage to a control system.  A

10:55:39  9    so-called inverter or pulse monitor indicates which speed or

10:55:43 10    torque is desired.  We showed him that statement -- and if

10:55:48 11    you go to the next page, Carol -- and we showed him this

10:55:50 12    schematic.

10:55:52 13              And what did he say?

10:55:54 14              "Is it still your opinion that the Evolo Report

10:55:57 15    does not disclose a motor speed controller?

10:56:00 16              "ANSWER:  I stand corrected, sir.

10:56:04 17              "So, you acknowledge that this is a motor speed

10:56:06 18    controller?

10:56:07 19              "ANSWER:  It is.

10:56:08 20              "And it's within the pages of the Evolo Report."

10:56:11 21              "It is."

10:56:12 22              Okay.  That's the only issue in Claim 2.

10:56:15 23    Mr. Theuerkauf didn't show you Claim 2.  The only issue in

10:56:18 24    Claim 2 is whether or not Evolo disclosed the motor speed

10:56:22 25    controller.  Evolo absolutely discloses a motor speed

10:56:26  1    controller and that controller was admitted to by Mr. Barry.

10:56:32  2            Now, I do want to spend a moment to talk about

10:56:39  3    credibility.  In your preliminary jury instructions, you

10:56:47  4    were given an instruction with regard to the credibility of

10:56:50  5    witnesses.  The Judge has instructed you that you are the

10:56:53  6    sole judges of each witness's credibility.  You should

10:56:57  7    consider each witness's means of knowledge, strength of

10:57:01  8    memory, opportunity to observe, how reasonable or

10:57:06  9    unreasonable the testimony is, whether it is consistent or

10:57:10 10    inconsistent and whether it has been contradicted.

10:57:15 11            Mr. Barry's testimony was contradicted and was

10:57:18 12    impeached multiple times.  You have to weigh his credibility

10:57:23 13    against the credibility of Professor Triantafyllou.

10:57:28 14            Let me talk a little bit now about the public

10:57:37 15    accessibility issue, and you heard from Mr. Lanterman with

10:57:41 16    regard to that.  We know that MHL has no expert of their

10:57:45 17    own, and so Mark's evidence of public accessibility is

10:57:50 18    unchallenged.  All right.  And he provided us two paths --

10:57:54 19    at least two paths to get to the Evolo Report.

10:57:59 20            One is the fact you could do a Google search.

10:58:02 21    He gave us the Google information, which we went out, we

10:58:07 22    subpoenaed Google.  And what did we ask Google for?  We

10:58:10 23    asked them for their metadata with regard to the Evolo

10:58:13 24    Report.  And what they told us -- these were the documents

10:58:16 25    that were produced to us.  And what they told us was it was

10:58:20  1   first seen June of 2009, it was crawled June (sic) 30th,

10:58:28  2   2010.

10:58:30  3           This report -- Google went out and you could

10:58:33  4   find this report on Google.  He gave us a second route,

10:58:38  5   also, though.  He also gave us the *Boat News* article.  So,

10:58:43  6   before I get to the *Boat News* article, I want to talk a

10:58:45  7   little bit more about that report.

10:58:47  8           He showed you -- he explained that it was

10:58:50  9   created and posted on the Internet in 2009.  And that

10:58:53 10   beginning in January of 2010, it could be found and it could

10:58:57 11   be accessed by anyone using Google.

10:59:00 12           And then he showed you that it was actually

10:59:03 13   downloaded.  Hundreds of thousands of people would go to the

10:59:09 14   course website, and he actually showed you that it was

10:59:11 15   downloaded.

10:59:12 16           Now, I want to make a point here.  The web logs

10:59:14 17   that he's referring to go from 2011 to 2013.  Okay.  That's

10:59:21 18   two years after the Evolo Report was first -- it's dated in

10:59:26 19   2009 and it was online right after that.

10:59:31 20           The web logs that we have start in 2011 and go

10:59:34 21   through the critical date of October of 2013.  That when we

10:59:39 22   went out and sought those documents, that's what was

10:59:41 23   available.  We don't have the web logs from 2009 and 2010.

10:59:46 24           But what MHL wants you to believe is that the 17

10:59:50 25   people who downloaded it, those are just the authors.  Those

10:59:54  1    are the authors.  They must have just downloaded it.

10:59:56  2              It's not credible.  It's not credible.  Two

11:00:00  3    years after they want you to believe that, oh, it must have

11:00:03  4    just been downloaded by the authors of the report.  Not

11:00:07  5    credible at all.

11:00:07  6              What is more likely -- if we go to Slide 6,

11:00:15  7    Carol -- this is a Swedish publication, Båtnytt means *Boat

11:00:23  8    News*.  There was a feature, a five, six-page article with

11:00:29  9    regard to this project in this magazine.  In the magazine,

11:00:32 10    and you see it highlighted on the screen, is the link to the

11:00:38 11    Evolo course website, which leads you to the report.  This

11:00:42 12    is how people are finding the Evolo Report.  Okay.

11:00:48 13              So, let's go to the evidence of the web server

11:00:51 14    logs.  Next slide, please, Carol.

11:00:53 15              As I just said, the web server logs are from

11:00:57 16    November to October of 2013, so we don't even have '9 and

11:01:02 17    '10.  So, just in this time period alone, there's 5,661

11:01:08 18    unique visitors to the course website.  There's 120 visitors

11:01:13 19    to the Evolo Project web page.  And then you get 25

11:01:16 20    downloads of the report in this time period; right?  Seven

11:01:22 21    of them are in the U.S.

11:01:24 22              What has MHL done?  Where is their evidence?

11:01:27 23    There is no evidence.  They're silent on all of this.  They

11:01:29 24    paint a picture.  They paint a conspiracy theory of, oh, it

11:01:32 25    must have just been the authors that downloaded it;

11:01:35  1    therefore, it's not publicly accessible.

11:01:38  2             The Evolo Report was publicly accessible.

11:01:43  3             Carol, if you go to the next page.

11:01:48  4             Okay.  So, let's talk about this for a moment.

11:01:56  5    At the top here, "A Preview of What Tomorrow's Water Toys

11:01:59  6    Might Look Like."  Okay.  That is what we read on Page 481

11:02:04  7    of the Evolo Report.  And they were -- it was prophetic.

11:02:12  8    That's exactly what this was.

11:02:16  9             We have the -- Waydoo's prior art is the report.

11:02:20 10    And I said this in the opening and I want to say it again,

11:02:23 11    we're relying on the report.  All the information you need

11:02:26 12    is in this report.  When you compare this report, the

11:02:30 13    information that's available in here, to the information

11:02:32 14    that's available in the patent, the difference is

11:02:39 15    staggering.

11:02:39 16             So, I encourage you, please, to look at the

11:02:42 17    patent, look at the Evolo Report, and look at the amount of

11:02:45 18    information that's in the report.  It really is encyclopedic

11:02:50 19    compared to the information that's in the patent.

11:02:52 20             The information in the patent, what did the

11:02:56 21    witnesses tell you about the information in the patent?

11:02:57 22    What do we know?  We know that there are sketches,

11:02:59 23    PowerPoint sketches that Professor Langelaan drew up when he

11:03:04 24    filed this application.  And the information relating to

11:03:08 25    stability, right, the other big issue, the two issues,

11:03:11   1   weight-shift control, I think, is not an issue anymore.

11:03:14   2           You have the issue of stability.  What does he

11:03:17   3   tell us about stability?  What did their expert tell you?

11:03:21   4   All the information relating to stability in the patent,

11:03:25   5   it's in the textbooks.  Right.  So, he's not providing

11:03:31   6   anything new in the patent.  He's not teaching anyone how to

11:03:35   7   build an eFoil.  He's not teaching anyone -- he's not --

11:03:38   8   it's just not enabled.  He's not teaching a person of

11:03:41   9   ordinary skill in the art what they need to do in order to

11:03:43 10   make the invention.

11:03:44 11           Now, the Evolo does do that.  They do that

11:03:47 12   throughout the whole report.  It's all their work.  All

11:03:51 13   their work is being documented, and they're telling you how

11:03:54 14   to build it.  And they did build it.  You have this final

11:03:58 15   prototype that you see on the screen here.  What we also

11:04:04 16   learned, though, and this is important because

11:04:06 17   Professor Triantafyllou discussed it, right, and you heard

11:04:09 18   it with Mr. Barry as well.  They wanted a 4,000-watt motor.

11:04:14 19   What they wanted, that was what -- let me show you this.  I

11:04:18 20   think it's very important.

11:04:24 21           If we go to the Page DTX 325B.8.  At the bottom

11:04:37 22   of the page there, it talks about the motor for Evolo,

11:04:40 23   right.  It says the motor for Evolo was chosen after

11:04:43 24   extensive investigation.  See these five appendices, right.

11:04:50 25   I showed you where you could find those in the report.  71

11:04:53 1    and 72 I think are the motor control appendices.

11:04:57 2            And then they talk about the Torqeedo Cruise

11:04:59 3    4.0R.  This is the motor that they want to use.  This is

11:05:03 4    what they're designing it for.  This is because the motor

11:05:06 5    delivers the power required to drive the Evolo to the flying

11:05:09 6    position, without weighing too much, right.

11:05:13 7            But then, and what do we know about this motor?

11:05:19 8    Carol, if we go to 325B.150.

11:05:23 9            In the middle of the page, the alternative

11:05:33 10   available, it's the third paragraph down under problem

11:05:35 11   formulation.  The alternative available to the Torqeedo

11:05:40 12   Cruise 2 is the larger Torqeedo Cruise 4.  This larger motor

11:05:45 13   has an output of 4,000 watts.  Right.  So, that's what they

11:05:49 14   want to -- what they've designed this for.  They want to use

11:05:53 15   it with 4,000 watts.  It has the same overall efficiency as

11:05:57 16   2, which means that it delivers double the output compared

11:06:01 17   to the Torqeedo Cruise 2.

11:06:04 18           So, they're looking to use the bigger motor.

11:06:06 19   They want to use the Torqeedo Cruise 4 because it's got the

11:06:10 20   4,000 watts, enough power that it needs as opposed to the

11:06:14 21   Torqeedo Cruise 2.

11:06:16 22           But what do they tell us at the end of the

11:06:23 23   report when they're building the prototype?  325B.551,

11:06:28 24   please.

11:06:28 25           And now, this is in the final report.  We looked

11:06:41 1  down at the motor and what do they say, they say, "Finding a

11:06:44 2  motor that meets the requirements was easier said than done.

11:06:48 3  The project has at its disposal a Torqeedo motor that has

11:06:52 4  rated power of 2 kilowatts."  That's 2,000 watts.  So, the

11:06:55 5  motor that they have to use is the 2,000 watts, not the

11:06:59 6  4,000 watts that they had designed it for.

11:07:03 7        So, but they reported knowledge into all that.

11:07:06 8  The report understands stability.  Everything relating to

11:07:10 9  stability is in the report and it teaches it.  And they

11:07:13 10 teach it well before Professor Langelaan filed for his

11:07:18 11 patent application.  Right.

11:07:20 12       And now, we heard a little bit about, you know,

11:07:33 13 who did this first.  And I told you MHL thought they did it

11:07:36 14 first.  Right.  And then what did he do?  He goes and he

11:07:40 15 finds Professor Langelaan.  He goes and looks for patents.

11:07:43 16 He finds that Professor Langelaan did it first.

11:07:45 17       But the reality is that Professor Langelaan

11:07:49 18 didn't do it first, either.  Evolo did it first.  And I

11:07:51 19 think that's very clear from the evidence that's been

11:07:54 20 presented during this trial.

11:07:56 21       And I wish I could show you more of the Evolo

11:08:04 22 Report.  You're going to have it, but I want -- the

11:08:06 23 takeaway, if you go back to Slide 8, that there are lot of

11:08:10 24 different modifications that are discussed in the report.

11:08:14 25 There's a lot of information in the report regarding

11:08:18  1    potential modifications to the Evolo final design.

11:08:23  2            Okay.  So, if we go to Slide 9.  We heard from

11:08:32  3    Professor Triantafyllou about stability.  And there was some

11:08:39  4    complicated formulas that he showed us, but the point that

11:08:42  5    he was trying to get across was stability increases with

11:08:46  6    speed.  As the board goes faster, it becomes more stable.

11:08:53  7    You need to -- and I think I gave you the bicycle analogy in

11:08:57  8    my opening statement.  You're teaching your child to ride

11:09:02  9    their bike.  They need to get a certain amount of speed in

11:09:05 10    order for that bike to be stable.  And the skill of the

11:09:10 11    rider also plays a role.  There is a difference between a

11:09:14 12    professional surfer trying to ride one of these and a

11:09:18 13    beginner trying to ride one of these.

11:09:20 14            So, but what Professor Triantafyllou is telling

11:09:23 15    us is absolutely speed, those formulas, you only need the

11:09:27 16    formulas, and you understand that the more speed you have,

11:09:31 17    it's more likely you're going to be stable.  You are going

11:09:34 18    to be stable.  And stability is a concept that, as we've

11:09:41 19    heard and we know, it's been around.  Planes don't fall out

11:09:44 20    of the sky.  Boats don't tip over.  People know how to

11:09:48 21    design for stability.

11:09:50 22            Okay.  Next slide, please.  Okay.

11:09:58 23            Again, this is just the timeline of Evolo before

11:10:02 24    Professor Langelaan, before MHL came into the market.

11:10:06 25            Next slide.

11:10:07  1          For purposes of anticipation, we need to show

11:10:14  2     you that each and every element was in the Evolo Report.

11:10:18  3     And each and every element is there.  The only element that

11:10:23  4     is even in dispute is stability, and the Evolo Report

11:10:28  5     discloses stability completely.

11:10:37  6          Okay.  So, let me -- I want to talk a little bit

11:10:39  7     more about Mr. Barry.  Let's go to the next slide.

11:10:53  8          Mr. Barry contradicted himself repeatedly on the

11:10:58  9     witness stand.  He said the Evolo Report could not be

11:11:01 10     interpreted.  Okay.  When you get an opportunity to look at

11:11:04 11     it, read the executive summary, look at the subject matter

11:11:09 12     appendix and the various different chapters that lay out

11:11:12 13     exactly what you need to do.

11:11:16 14          He said he was confused about the technical

11:11:19 15     specifications and he was confused about the motor.  But

11:11:22 16     there should be no confusion.  The report is very

11:11:26 17     straightforward.

11:11:27 18          Okay.  If we go to the next slide.

11:11:32 19          He wants you to believe that the Evolo Report

11:11:35 20     doesn't teach you how to make a stable watercraft.  Okay.

11:11:39 21     And what does he -- what is he relying on for that?  Right.

11:11:47 22          And with regard to infringement, he does this

11:11:50 23     AVL analysis.  And let me move to infringement for a minute.

11:11:54 24     He does his own analysis and what does he show?  He shows

11:12:00 25     that the boards are unstable.  And, again, he admits that.

11:12:04  1    He admits the eigenvalue analysis that the points are not on

11:12:08  2    the right side and that indicates instability.  And so, he's

11:12:13  3    showing that the Waydoo boards and the MHL boards are

11:12:21  4    invalid -- are invalid -- are not infringing.  Right.

11:12:25  5         So, here is the eigenvalue analysis.  This is

11:12:30  6    for the Lift One and you can see the point here -- there's

11:12:32  7    two points, actually.  Okay.

11:12:34  8         Can we go back, Carol?

11:12:36  9         Yeah, there's two points actually indicating

11:12:38 10    that Lift One is unstable.  If you go back another slide,

11:12:41 11    this is the Flyer One, again, indicating instability.

11:12:47 12    Right.

11:12:47 13         Now, there was a discussion with regard to

11:12:50 14    burdens of proof.  It's MHL's burden to show infringement.

11:12:57 15    What they showed us was that the boards were unstable.

11:13:01 16         Okay.  This is Mr. Barry's work showing that the

11:13:04 17    boards are unstable.  It's their burden of proof.  Right.

11:13:09 18    He spoke a lot about that.  We spoke about the preponderance

11:13:13 19    of the evidence versus clear and convincing.  Well, what you

11:13:16 20    have here is evidence that it is unstable, Mr. Barry's work.

11:13:22 21         So, what does he try to do to explain that?  He

11:13:26 22    shows you a marble in a bowl, puts some water in there and

11:13:31 23    he says damping.  Damping would make it stable.

11:13:34 24         But the reality is that demonstration, it's not

11:13:40 25    a valid demonstration, okay.  What these water vehicles,

11:13:46  1   they're moving at, what did Mr. Murrell tell us?  They're

11:13:49  2   moving at 30 miles per hour in the water.  Right.  That's

11:13:53  3   very different than a sphere being put in water.

11:13:57  4         So, to say that damping accounts for this is --

11:14:03  5   and he doesn't quantify it, right.  He wants to wave his

11:14:06  6   hand and say, Hey, damping.  But there's no quantification.

11:14:10  7   He doesn't quantify what effect damping would have had on

11:14:14  8   these particular eFoils.

11:14:19  9         So, the work that he has shows that we don't

11:14:23 10   infringe with the eigenvalue analysis.  And then he tries to

11:14:27 11   say, Well, how about damping?  And damping works both ways.

11:14:31 12   Damping isn't necessarily always stabilizing.  And you heard

11:14:34 13   Professor Triantafyllou speak to this.  It can also be

11:14:37 14   destabilizing.

11:14:39 15         And then, finally, he relies on, Well, I can

11:14:42 16   look at it and I can tell that it's stable.  And we've gone

11:14:46 17   back and forth on this with various different videos.

11:14:50 18         And let me jump ahead here and look.  Carol, if

11:14:55 19   we go to slide 15.  I'd like to take a look at that for a

11:14:59 20   moment.

11:14:59 21         Can we play the video?

11:15:03 22         (Video playing.)

11:15:17 23         MR. COLLETTI:  So, what are we comparing here?

11:15:18 24   We're comparing the Evolo on the left with Waydoo on the

11:15:24 25   right.  And he wants you to believe that Evolo's unstable,

11:15:29  1    but Waydoo is stable.  Right.  And, again, it doesn't make

11:15:35  2    sense.  And you have to use your common sense here to come

11:15:39  3    to a rational conclusion.

11:15:43  4              They're either both stable or they're both

11:15:46  5    unstable, but they can't have it both ways.  They can't say

11:15:51  6    that we're stable, but the Evolo is unstable.  Right.

11:15:58  7              So, let me discuss -- Slide 14, Carol.  Okay.

11:16:17  8              So, what do we know that Mr. Barry got wrong

11:16:20  9    about the Evolo Report?  Weight-shift controlled, he admits

11:16:26 10    that it's weight-shift controlled.  Motor speed controller,

11:16:29 11    he admits that there is a motor speed controller.

11:16:31 12              And there's other claims, too.  There's Claim 5

11:16:34 13    and there's Claim 6 that you'll also be evaluating.  And

11:16:37 14    Mr. Barry also admitted every wing has a plane form design

11:16:40 15    and an airfoil design, and all wings are tailored for

11:16:45 16    span-wise twist because no twist counts, right.

11:16:47 17              So, for Claim 5, there's no infringement.  And

11:16:52 18    Claim 6, I think was their rearwardly curving wings.  All of

11:16:57 19    that information, as Professor Triantafyllou was discussing,

11:17:00 20    is found in the Evolo Report.  And as I've indicated the

11:17:05 21    Evolo Report was publicly accessible because it was on

11:17:09 22    Google and because the link was published in a magazine.

11:17:14 23    Anyone of -- a person of ordinary skill in the art would be

11:17:17 24    able to find the Evolo Report.

11:17:20 25              Okay.  So, let me talk a little bit more now

11:17:30  1    about Woolley and Namanny.  And Woolley and Namanny have all

11:17:39  2    the components of the invention.  Woolley has the floatation

11:17:45  3    device, the strut, the hydrofoil.  It talks about being

11:17:50  4    stable, and it talks about weight-shift control.  Woolley

11:17:52  5    has all of that.  What it was missing was the propulsion

11:17:56  6    system.  And there would have been a motivation to combine

11:17:59  7    these two references.

11:18:01  8           We heard from Mr. Theuerkauf.  You know, why

11:18:04  9    wasn't it -- why didn't someone do it sooner?  And I touched

11:18:07 10    on that in the opening.  And we also spoke to

11:18:11 11    Professor Triantafyllou with regard to that.  Okay.

11:18:14 12           A lot of that was the battery technology, the

11:18:17 13    state of the battery technology in this time frame.  The

11:18:21 14    reason why people began to, whether it was Mr. Leason or

11:18:26 15    Professor Langelaan, or the Evolo team, the reason why they

11:18:30 16    were able to bring this idea to fruition, the Evolo team,

11:18:35 17    was because of the battery technology.  Lithium ion

11:18:39 18    batteries were available.  They were available in the right

11:18:42 19    size.  They were much cheaper, and the power of those

11:18:47 20    batteries was going up.  So, people were in a position to be

11:18:50 21    able to put electric motors and combine it with other,

11:18:55 22    whether it was a hydrofoil, whether it's automobiles,

11:18:59 23    whether it's phones, it's the battery technology that is now

11:19:02 24    allowing a person of ordinary skill to combine references to

11:19:08 25    get to the invention.

11:19:09 1                Okay.  And I want to make another point, too,

11:19:14 2     because there's been some discussion about, Oh, well they

11:19:16 3     were known to the Patent Office.  Okay.  They were not

11:19:20 4     considered together.  When you look at the face of the

11:19:23 5     patent, when you look at the references, the Namanny

11:19:28 6     reference is there, but it was not a reference that was

11:19:31 7     cited by the examiner in an office action rejecting the

11:19:36 8     application.

11:19:37 9                Okay.  Namanny is there, but there's not a

11:19:41 10    specific rejection by the examiner using these two in

11:19:45 11    combination.

11:19:46 12               Okay.  How about enablement; right?  So, if we

11:19:54 13    go to the next slide.

11:19:56 14               What MHL is asking you to believe is that their

11:19:59 15    patent, the limited amount of information in here, no data,

11:20:04 16    no prototypes, that this is enabling.  Right.  But then they

11:20:11 17    want you to believe that the Evolo Report is not enabling.

11:20:14 18    There's not enough information in here to tell you how to

11:20:19 19    make an eFoil, but there's enough information in here.

11:20:22 20               And, again, it just doesn't make sense that when

11:20:26 21    you look at that and you evaluate that, it doesn't make

11:20:29 22    sense to say that, yeah, a person of ordinary skill gets it

11:20:32 23    from these drawings, but doesn't get it from the Evolo

11:20:36 24    Report.

11:20:36 25               And the prototype that we did see, the prototype

1148

11:20:45 1    from Professor Langelaan, we did see a photograph.  None of

11:20:48 2    that information -- to the extent he got information from

11:20:52 3    that, that's not in the patent.

11:20:54 4           And more importantly, he had a video.  We don't

11:20:58 5    have that video.  We don't know how that prototype -- how it

11:21:04 6    compares to Evolo, or Waydoo or MHL.

11:21:10 7           What we do know, though, is that they both also

11:21:13 8    had the Evolo Report.  And there's some testimony about, oh,

11:21:17 9    they couldn't find it.  They couldn't find it.  But they

11:21:19 10   found it in 2017.  They both testified that they knew about

11:21:23 11   it.

11:21:23 12          So, somebody had found it.  Multiple people had

11:21:26 13   found it, as we saw from the Google data, right.  2017, when

11:21:31 14   was that?  It was shortly after the patents issued, right.

11:21:36 15   The second patent issued in 2016.  When did they find out

11:21:40 16   about it?  2017.

11:21:41 17          Can we go to Slide 19, please?

11:21:49 18          Again, with regard to enablement, what did we

11:21:56 19   hear from Professor Triantafyllou?  Okay.  He went through

11:22:00 20   the patents and he went through the Evolo Report.  And what

11:22:04 21   did he tell us?  He said, Okay.  Yeah, they both have

11:22:07 22   well-known stability principles in them.  The people writing

11:22:11 23   them are engineers.  They understand these stability

11:22:16 24   principles which have been around for over 50 years.

11:22:20 25          But let's go a little further.  What does the

11:22:23 1    Evolo Report teach us?  Well, it certainly teaches us the

11:22:27 2    importance of the dual wings and the configuration of those

11:22:30 3    wings; right?  The front wing up and the rear wing down.

11:22:34 4              Mr. Barry even said that's the way you do it.

11:22:37 5    That's the way you stabilize a plane.  That's a known

11:22:39 6    configuration.

11:22:40 7              Well, that's discussed in the Evolo Report.

11:22:44 8    Remember the figure?  I don't want to keep going back to the

11:22:47 9    Evolo Report, but the figure is in the stability section.

11:22:51 10   The students understand that and they design the Evolo

11:22:54 11   Report to have the front wing up, the rear wing down.

11:22:57 12             It also discusses the center of gravity.  Moving

11:23:02 13   forward of the front wing is important in order to -- the

11:23:06 14   Professor talked about the seesawing, right, on the

11:23:09 15   hydrofoil.

11:23:10 16             So, the Evolo Report discusses that.  It

11:23:12 17   discusses the importance of speed, the importance of weight.

11:23:16 18   And then he gives you data, data from actual experiments.

11:23:20 19   Right.  They're running experiments.  They're towing it --

11:23:23 20   they're towing it, and it's flying above the water as

11:23:26 21   they're towing it.  They need the engine.  They get the

11:23:30 22   engine and the engine they have isn't as powerful, but it's

11:23:33 23   certainly powerful enough to show that it works.  It's

11:23:37 24   coming out of the water.  It's flying above the water.  And

11:23:40 25   they want you to believe that, oh, you know, that's an

11:23:43  1    unstable board.

11:23:44  2            But when you compare it to Waydoo's board,

11:23:47  3    that's the birth of the eFoil.  That's the first time

11:23:50  4    someone's riding something like that.  Right.  And they want

11:23:53  5    you to believe that this doesn't teach stability and based

11:23:58  6    on a video.  That's what they're really asking you, and that

11:24:02  7    just doesn't make sense.

11:24:04  8            So, with regard to enablement -- to finish on

11:24:07  9    this slide -- the Evolo Report is enabled and it teaches you

11:24:13 10    a hell of a lot more than what the asserted patents are

11:24:16 11    teaching.

11:24:17 12            Again, the asserted patents, they're sketches.

11:24:21 13    And please, I encourage you to read it -- look at the

11:24:24 14    sketches and look at the information that's in that patent,

11:24:27 15    as opposed to what's in the Evolo Report.

11:24:28 16            Okay.  So, if you go to Slide 22, I just want to

11:24:40 17    touch upon damages for a moment.

11:24:43 18            You heard from Mr. Kline and you heard from

11:24:47 19    Mr. Stec.  There are two agreements -- two license

11:24:50 20    agreements that we discussed.  One of them was at a

11:24:55 21    2.5-percent royalty rate.  The other was at a 5.25-percent

11:24:59 22    royalty rate.  Right.  Those are the comparable licenses.

11:25:02 23    That's the evidence to be looking at in terms of this.  The

11:25:05 24    royalty rate -- there shouldn't be any damages, right.  The

11:25:10 25    patent is invalid in light of Evolo, and it's invalid in

11:25:14 1   light of Woolley and Namanny.  And it's not enabled.  There

11:25:17 2   shouldn't be any damages.

11:25:18 3        To the extent in some world where you reach

11:25:22 4   damages, then the royalty rate should be between 2.5 percent

11:25:25 5   and 5.25 percent.  It's not an 18.67 percent rate as

11:25:31 6   proposed by Dr. Stec.

11:25:33 7        So, let me conclude by just showing you the next

11:25:41 8   slide, 23.

11:25:41 9        This is the verdict form.  And what we're asking

11:25:45 10  you to do, we're asking with regard to infringement, that

11:25:50 11  you find for us.  You find that there was no infringement.

11:25:53 12  They didn't carry their burden.  Mr. Barry has shown that we

11:25:59 13  don't infringe.  His analytical work shows that we don't

11:26:02 14  infringe.  And as such, there's no willful infringement, so

11:26:07 15  there's nothing to check there.

11:26:10 16       If you go to the next slide.

11:26:12 17       With regard to prior art, the question is:  Do

11:26:16 18  you find by clear and convincing evidence that the Evolo

11:26:19 19  Report was publicly accessible before October 10, 2013?  And

11:26:23 20  the answer there is "yes."  And that goes back to the

11:26:26 21  testimony -- the unrebutted, the unchallenged testimony of

11:26:31 22  our expert, Mr. Lanterman, who told us it was indexed.  It

11:26:35 23  was on Google.  It could be found through Google.

11:26:38 24       And in addition to that, there's a *Boat News*

11:26:42 25  article, which Mr. Theuerkauf didn't even mention.  It has

11:26:44  1    the link.  It brings you -- it's accessible.  It brings you

11:26:47  2    to the report.

11:26:49  3              There's a second question there that says:  Do

11:26:53  4    you find by a preponderance of the evidence that the Evolo

11:26:56  5    Report is not enabling?  And, again, the answer there is

11:27:00  6    "no."  If anything is enabled, it's the Evolo Report.  It's

11:27:04  7    the Evolo Report that has the information well beyond the

11:27:08  8    information that's set forth in the patents.

11:27:11  9              And then on the second page -- here, also,

11:27:14 10    there's a question with regard to anticipation, whether or

11:27:18 11    not you find by clear and convincing evidence that any of

11:27:21 12    the following claims of the two patents, whether they're

11:27:26 13    invalid because they're anticipated by the Evolo Report.

11:27:28 14    And we're asking you to find that each and every one of

11:27:31 15    these claims is invalid.

11:27:32 16              The issue in Claim 1, stability.  Claim 2, Barry

11:27:36 17    admits -- both Claim 2s, he admits that the motor speed

11:27:40 18    controller is, in fact, present in Evolo.  And 5 and 6,

11:27:46 19    similar admissions.

11:27:47 20              If we go to the next page.

11:27:52 21              There's the obviousness defense.  And the

11:27:56 22    obviousness, again, it's Woolley and Namanny disclosed each

11:27:59 23    and every element of those claims.  We're asking for a

11:28:03 24    finding that, yes, the patent would have been obvious.

11:28:06 25              And, finally, we're asking for you to find that

11:28:09  1    each of these -- with regard to enablement:  Do you find by

11:28:14  2    clear and convincing evidence that any of the following

11:28:17  3    claims is invalid because the patents do not enable?  And,

11:28:20  4    again, we're asking you to say, "yes," because the patent is

11:28:25  5    not enabled, but the Evolo Report certainly is.

11:28:29  6            So, thank you so much.  I know it's been a long

11:28:34  7    week, and I appreciate your time, and I wish you all the

11:28:39  8    best.

11:28:43  9            THE COURT:  All right.  Thank you, Mr. Colletti.

11:28:44 10            Mr. Theuerkauf, you have up to five minutes for

11:28:50 11    rebuttal.

11:28:51 12            MR. THEUERKAUF:  Thank you.

11:28:52 13            Give me just one minute here.

11:29:09 14            All right.  Thank you.

11:29:12 15            So, there's a lot to unpack there, but I just

11:29:14 16    want to make a couple of points.

11:29:16 17            If Evolo taught stability, how come they didn't

11:29:21 18    accomplish it?

11:29:21 19            If you can go to DTX 325, Page 66.

11:29:25 20            They tell you in the report themselves that they

11:29:31 21    don't there in the conclusion, and it was exactly for the

11:29:34 22    reasons why Mr. Barry showed you and what we see in the

11:29:36 23    video.  That delta wing could never be stable.

11:29:43 24            So, what is Waydoo doing?  They're showing video

11:29:47 25    excerpts and they're trying to trick you with them.

11:29:50  1        Have you seen an Evolo video where it flies

11:29:54  2  above the water stable, like the magic carpet that we see

11:29:59  3  from MHL and Waydoo?  You've not seen a video like that.

11:30:02  4  The reason is because it can't.  Otherwise, you would have

11:30:06  5  seen the video.

11:30:07  6        So, let's pull up the verdict form real quick.

11:30:15  7  And I'm going to try to go through this quickly.

11:30:17  8        But, obviously, we want you to find for MHL on

11:30:20  9  each one of these issues.  So, a finding of yes for MHL on

11:30:25 10  infringement is checking yes.

11:30:30 11        Go to the next one.

11:30:36 12        We also will ask you on the issue of willfulness

11:30:43 13  to find that Waydoo's infringement is willful.  They knew

11:30:49 14  about the patents.  Checking yes, again, is a finding for

11:30:53 15  MHL.

11:30:53 16        And then with respect to the prior art -- go to

11:31:02 17  the next one -- so, here's the first question about whether

11:31:10 18  or not the Evolo Report was publicly accessible.  No is a

11:31:15 19  finding for MHL.  And if you check no, you don't have to

11:31:20 20  worry about the Evolo Report.

11:31:22 21        Now, let me just mention a couple of items with

11:31:24 22  respect to that.

11:31:25 23        He showed you all this data from Mr. Lanterman,

11:31:29 24  but what is important there is Mr. Lanterman never told you

11:31:33 25  how somebody would find it.  How a person of ordinary skill

11:31:37 1    in the art would actually find it.  What would they do?

11:31:40 2    What would they search?  Nobody knows how to find it.  He

11:31:44 3    didn't show you how to find it.

11:31:46 4              And it had to have been that way prior to 2013.

11:31:52 5    If you check no for Number 4, you don't have to worry about

11:31:57 6    the Evolo Report.  You check yes for Number 5.  It's another

11:32:01 7    finding for MHL, and you don't have to worry about the Evolo

11:32:04 8    Report.

11:32:04 9              And Number 5 is that the Evolo Report doesn't

11:32:08 10   teach stability.  It's not enabling itself.  And we've seen

11:32:12 11   that from the videos.

11:32:13 12             And if we go to the next slide.  If you get past

11:32:18 13   that threshold issue, and, obviously, we're asking you to

11:32:21 14   check no for MHL, that none of these claims are invalid.

11:32:28 15   Evolo doesn't anticipate.  It doesn't teach stability.  It

11:32:32 16   never accomplishes that.

11:32:33 17             So, if we go to the next one.  Obviousness.

11:32:39 18   Again, checking no is for MHL.  It wasn't obvious.  If it

11:32:46 19   was obvious, it would have been out long before

11:32:48 20   Dr. Langelaan submitted his patent.

11:32:51 21             So, if we can go to the next one.

11:32:56 22             Enablement.  No is a finding for MHL.  They are

11:33:06 23   enabled, and we've seen that because the products came out

11:33:09 24   on the market after Dr. Langelaan's patents.

11:33:12 25             And then damages.  We're asking for the dollar

11:33:17  1      amount per eFoil.

11:33:19  2                 And then if you go to the next one.

11:33:22  3                 And this on the left is not going to be able to

11:33:29  4      go back with you, but this is what we're asking you to write

11:33:33  5      down and write down in these boxes that there's $560 per

11:33:38  6      unit at 2,668 eFoils, which totals $1,494,080.  That's what

11:33:47  7      you're asked -- we're asking you to compensate MHL for

11:33:50  8      Waydoo's use of these patents.

11:33:52  9                 So, finally, I will say MHL did it right by

11:33:58 10      getting a license from Dr. Langelaan.  Fliteboard did it

11:34:02 11      right by getting a license from MHL.  This case is about

11:34:07 12      respecting intellectual property rights.  To reward

11:34:11 13      innovation, you have to protect innovation.  To incentivize

11:34:17 14      innovation, you have to protect innovation.

11:34:21 15                 MHL respects the property rights of others.  We

11:34:24 16      are asking you to make Waydoo do the same.  We are asking

11:34:28 17      you to disregard Waydoo's excuses and trust your own eyes.

11:34:34 18                 Thank you.

11:34:39 19                 THE COURT:  All right.  Thank you,

11:34:39 20      Mr. Theuerkauf.

11:34:39 21                 So, members of the jury, I do have a few more

11:34:42 22      instructions.  If you're following along, we're on Page 28.

11:34:48 23                 So, I'm going to end by explaining how you will

11:34:56 24      conduct your deliberations in the jury room and about your

11:34:59 25      possible verdicts.

11:35:00  1            When you start deliberating, do not talk to the

11:35:02  2    jury officer, to me or to anyone but each other about the

11:35:05  3    case.  If you have any questions or messages, you must write

11:35:09  4    them on a piece of paper, sign them and give them to the

11:35:11  5    jury officer.  The officer will give them to me and I will

11:35:15  6    respond as soon as I can.  That usually takes a while

11:35:19  7    because I usually have to talk to the lawyers about what

11:35:21  8    you've asked, so it may take some time to get back to you.

11:35:24  9            Any questions or messages normally should be

11:35:27 10    sent through your foreperson who, by custom of the court, is

11:35:31 11    Juror Number 1.

11:35:32 12            So, one more thing about messages.  Never write

11:35:38 13    down or tell anyone how you stand on your votes, except each

11:35:42 14    other.  For example, do not write down or tell anyone that

11:35:45 15    the jury is stuck 4 to 4 or 6 to 2, or whatever the vote

11:35:49 16    happens to be.  The jury's vote should stay secret until you

11:35:53 17    are finished.

11:35:54 18            In order for you, as a jury, to return a

11:35:57 19    verdict, it is necessary that each juror agree to the

11:35:59 20    verdict.  Your verdict must be unanimous.

11:36:02 21            A form of verdict has been prepared for you.

11:36:05 22    You will take -- you've just seen it during closing

11:36:09 23    arguments.  You will take this form to the jury room and

11:36:11 24    when you have reached your unanimous agreement as to your

11:36:14 25    verdict, you will have your foreperson fill in, date and

11:36:17  1   sign the form.  You will then return to the courtroom and

11:36:20  2   your foreperson will give your verdict.

11:36:27  3              Now that all the evidence is in and the

11:36:29  4   arguments are completed, you are free to talk about the case

11:36:31  5   in the jury room.  In fact, it is your duty to talk with

11:36:34  6   each other about the evidence and to make every reasonable

11:36:37  7   effort you can to reach unanimous agreement.  Talk with each

11:36:40  8   other, listen carefully and respectfully to each other's

11:36:44  9   views and keep an open mind as you listen to what your

11:36:47 10   fellow jurors have to say.

11:36:49 11              Try your best to work out your differences.  Do

11:36:53 12   not hesitate to change your mind if you are convinced that

11:36:56 13   other jurors are right and that your original position was

11:36:59 14   incorrect.

11:37:00 15              But do not change your mind just because other

11:37:03 16   jurors see things differently, or just to get the case over

11:37:07 17   with.  In the end, your vote must be exactly that, your own

11:37:11 18   vote.  It is important for you to reach unanimous agreement,

11:37:14 19   but only if you can do so honestly and in good conscience.

11:37:18 20              No one will be allowed to hear your discussions

11:37:21 21   in the jury room and no record will be made of what you say,

11:37:25 22   so you should all feel free to speak your minds.

11:37:29 23              Listen carefully to what the other jurors have

11:37:31 24   to say, and then decide for yourself.

11:37:35 25              During your deliberations, you must not

11:37:38  1    communicate with or provide any information to anyone by any

11:37:42  2    means about this case.  You may not use any electronic

11:37:46  3    device or media, such as a telephone, a cell phone,

11:37:50  4    Smartphone, tablet or computer, the Internet, or any

11:37:54  5    Internet service, any text or instant messaging service, any

11:37:57  6    Internet chat room, blog or website to communicate to anyone

11:38:03  7    any information about this case or to conduct any research

11:38:06  8    about this case until after I accept your verdict.

11:38:10  9             In other words, you cannot talk to anyone on the

11:38:14 10    phone, correspond with anyone or electronically communicate

11:38:18 11    with anyone about this case.  You can only discuss the case

11:38:21 12    in the jury room with your fellow jurors during

11:38:23 13    deliberations.

11:38:26 14             So, let me finish up by repeating something that

11:38:29 15    I said to you earlier.  Nothing that I have said or done

11:38:32 16    during this trial was meant to influence your decision in

11:38:35 17    any way.  You must decide the case yourself based on the

11:38:39 18    evidence presented.

11:38:40 19             Could the jury officer approach, please?

11:38:50 20             DEPUTY CLERK:  Do you solemnly swear that you

         21    will keep this jury in some quiet and convenient place; that

         22    you will not suffer anyone to speak to them, or speak to

         23    them yourself, touching the issue before them unless it be

         24    to ask them if they have agreed upon their verdict, so help

         25    you God?

11:39:11  1          THE MARSHALL:  I do.

11:39:11  2          THE COURT:  All right.  Can you take the jury

11:39:13  3  out?

11:39:22  4          (Jury leaving the courtroom.)

11:39:32  5          THE COURT:  All right.  So, make sure the deputy

11:39:43  6  clerk has ways to get in touch with you that will be

11:39:49  7  100 percent constantly monitored so that if we have a

11:39:53  8  question or a verdict, there's no delay in reaching you.  If

11:40:00  9  we do have a question and it's a hard question, you know,

11:40:08 10  maybe you delegate some of your people to start trying to

11:40:11 11  figure it out, but I want the lawyers who are in charge to

11:40:16 12  get to court quickly and not to dawdle while you try to

11:40:21 13  figure out what the issue might be.

11:40:24 14          Any questions about anything?

11:40:26 15          MR. THEUERKAUF:  No, Your Honor.

11:40:27 16          MR. COLLETTI:  No, Your Honor.

11:40:27 17          THE COURT:  Okay.  Well, thank you.  We'll be in

11:40:31 18  recess until further notice.

11:40:33 19          DEPUTY CLERK:  All rise.

11:41:58 20          (Recess was taken.)

02:01:51 21          DEPUTY CLERK:  All rise.

02:02:00 22          THE COURT:  All right.  Please be seated.  I

02:02:02 23  understand that we have a verdict, so we're going to get the

02:02:05 24  jury and see what the verdict is.

02:02:07 25          (Jury entering the courtroom.)

02:03:10  1                    THE COURT:  All right.  Everyone be seated.  So,

02:03:17  2      I'm going to ask:  Madam Foreperson, has the jury

02:03:20  3      unanimously agreed upon its verdicts?

02:03:25  4                    THE JUROR:  Yes, we have.

02:03:26  5                    THE COURT:  All right.  I'm going to ask if you

02:03:28  6      can hand the verdict form to the deputy clerk so I can, as

02:03:31  7      they say, inspect it for regularity of form.

02:04:58  8                    All right.  Thank you.

02:04:59  9                    So, I'm now going to ask the deputy clerk to

02:05:05 10      read the parts of this that are the verdict as opposed to

02:05:08 11      like the instructions.  And I want you to listen carefully

02:05:13 12      to what she says because you might be asked when she's done

02:05:22 13      whether you agree with everything she said, each of you

02:05:25 14      individually.  Okay?  So, listen carefully.

02:05:28 15                    Would you please publish the verdict?

02:05:32 16                    DEPUTY CLERK:  Infringement.  Do you find by a

02:05:35 17      preponderance of the evidence that the accused products

02:05:37 18      infringe any of the following claims of the '044 patent and

02:05:40 19      the '659 patent?

02:05:44 20                    '044 patent, Claim 1.  Yes.

02:05:46 21                    '044 patent, Claim 2.  Yes.

02:05:49 22                    '044 patent, Claim 5.  Yes.

02:05:52 23                    '044 patent, Claim 6.  Yes.

02:05:56 24                    '659 patent, Claim 1.  Yes.

02:06:04 25                    '659 patent, Claim 2.  Yes.

02:06:06  1          Willful infringement.  Do you find by a
02:06:10  2  preponderance of the evidence that Waydoo's actions
02:06:12  3  constituted willful infringement of any of the asserted
02:06:15  4  claims of the '044 patent?  Yes.
02:06:19  5          Do you find by a preponderance of the evidence
02:06:21  6  that Waydoo's actions constituted willful infringement of
02:06:26  7  any of the asserted claims of the '659 patent?  Yes.
02:06:30  8          Prior art.  Do you find by clear and convincing
02:06:34  9  evidence that the Evolo Report was publicly accessible
02:06:38 10  before October 10th, 2013?  No.
02:06:43 11          Do you find by a preponderance of the evidence
02:06:46 12  that the Evolo Report is not enabling?  Yes.
02:06:53 13          Obviousness.  Do you find by clear and
02:06:58 14  convincing evidence that any of the following claims of the
02:07:01 15  '044 patent and the '659 patent is invalid because it would
02:07:06 16  have been obvious based on Woolley in combination with
02:07:09 17  Namanny?
02:07:10 18              '044 patent, Claim 1.  No.
02:07:13 19              '044 patent, Claim 2.  No.
02:07:16 20              '044 patent, Claim 5.  No.
02:07:19 21              '044 patent, Claim 6.  No.
02:07:23 22              '659 patent, Claim 1.  No.
02:07:26 23              '659 patent, Claim 2.  No.
02:07:33 24          Enablement.  Do you find by clear and convincing
02:07:37 25  evidence that any of the following claims of the '044 patent

02:07:40 1   and the '659 patent is invalid because the patents do not

02:07:44 2   enable a person of ordinary skill in the art to make and use

02:07:48 3   the claimed invention?

02:07:50 4           For the '044 patent, Claim 1.  No.

02:07:53 5           '044 patent, Claim 2.  No.

02:07:56 6           '044 patent, Claim 5.  No.

02:07:59 7           '044 patent, Claim 6.  No.

02:08:02 8           '659 patent, Claim 1.  No.

02:08:06 9           '659 patent, Claim 2.  No.

02:08:09 10          Damages.  Do you find that a reasonable royalty

02:08:13 11  based on a hypothetical negotiation between MHL and Waydoo

02:08:18 12  would be a dollar amount per eFoil sold or a percentage of

02:08:22 13  sales?  The jury checked dollar amount per eFoil.

02:08:29 14          Through December 31st, 2022, what do you find,

02:08:35 15  by a preponderance of the evidence, to be the reasonable

02:08:39 16  royalty rate, B, the royalty base sold and C, the total

02:08:46 17  amount of damages in dollars that results from multiplying

02:08:49 18  the royalty rate and the royalty base?

02:08:52 19          For the royalty rate; $500 per eFoil.

02:08:57 20          For the royalty base, $2,668 for eFoils sold,

02:09:05 21  sorry.

02:09:05 22          Total damages, $1,334,000.

02:09:14 23          Members of the jury, is this the verdict you

02:09:16 24  have agreed upon and so say you all?

02:09:19 25          THE JURY:  Yes.

02:09:20  1                    THE COURT:  All right.  Are there any requests?

02:09:23  2                    MR. COLLETTI:  Yes, I would ask to have the jury

02:09:26  3      polled, Your Honor.

02:09:26  4                    THE COURT:  All right.

02:09:27  5                    DEPUTY CLERK:  Juror Number 1, is the verdict as

02:09:31  6      read the verdict you have agreed upon?

02:09:32  7                    THE JUROR:  Yes.

02:09:33  8                    DEPUTY CLERK:  Juror Number 2, is the verdict as

02:09:35  9      read the verdict you have agreed upon?

02:09:37 10                    THE JUROR:  Me?

02:09:40 11                    DEPUTY CLERK:  Yes.

02:09:41 12                    THE JUROR:  I'm sorry, yeah.

02:09:43 13                    DEPUTY CLERK:  That's okay.

02:09:43 14                    Juror Number 3, is the verdict as read the

02:09:46 15      verdict you have agreed upon?

02:09:47 16                    THE JUROR:  Yes.

02:09:47 17                    DEPUTY CLERK:  Juror Number 4, is the verdict as

02:09:49 18      read the verdict you have agreed upon?

02:09:51 19                    THE JUROR:  Yes.

02:09:52 20                    DEPUTY CLERK:  Juror Number 5, is the verdict as

02:09:54 21      read the verdict you have agreed upon?

02:09:56 22                    THE JUROR:  Yes.

02:09:57 23                    DEPUTY CLERK:  Juror Number 6, is the verdict as

02:09:59 24      read the verdict you have agreed upon?

02:10:00 25                    THE JUROR:  Yes.

02:10:01 1          DEPUTY CLERK:  Juror Number 7, is the verdict as

02:10:03 2   read the verdict you have agreed upon?

02:10:04 3          THE JUROR:  Yes.

02:10:05 4          DEPUTY CLERK:  Juror Number 8, is the verdict as

02:10:08 5   read the verdict you have agreed upon?

02:10:10 6          THE JUROR:  Yes.

02:10:11 7          THE COURT:  All right.  So, members of the jury,

02:10:15 8   that concludes your service on this case.  On behalf of the

02:10:21 9   parties and on behalf of the Court, I want to thank you for

02:10:24 10   your time and efforts on the case.  After my deputy clerk

02:10:33 11   takes you out, I've got to do something with the lawyers for

02:10:38 12   like 30 seconds.

02:10:40 13          Then I would like -- you know, if you're in a

02:10:43 14   hurry to go somewhere, you should leave.  But I would like

02:10:46 15   to come back and personally thank you.  So, if you're still

02:10:50 16   around after 30 seconds, you'll probably see me in the jury

02:10:54 17   room.

02:10:55 18          All right.  Can we take the jury out?

02:10:57 19          (Jury leaving the courtroom.)

02:11:08 20          THE COURT:  All right.  So, can I ask the

02:11:20 21   Plaintiff to sort of by Monday, on Monday to submit a trial

02:11:29 22   verdict form after running it by the Defendants?  I can sign

02:11:37 23   that.  And I guess you can meet and confer and decide how

02:11:45 24   you want to proceed from this point and perhaps let me know

02:11:51 25   by some kind of status report maybe by the end of next week.

02:11:57  1    Okay?

02:11:58  2                    MR. THEUERKAUF:  Yes, Your Honor.

02:11:59  3                    MR. COLLETTI:  Yes, Your Honor.

02:12:00  4                    THE COURT:  All right.  Well, thank you for your

02:12:01  5    efforts on this case.

02:12:03  6                    MR. THEUERKAUF:  Thank you.

02:12:03  7                    THE COURT:  I have to say the trial, from my

02:12:05  8    point of view, went very smoothly.  So, that's usually not

02:12:12  9    because of anything I do, but because of what the lawyers

02:12:14 10    do.

02:12:14 11                    So, thank you.

02:12:15 12                    MR. THEUERKAUF:  Thank you.

02:12:16 13                    MR. COLLETTI:  Thank you, Your Honor.

02:12:17 14                    THE COURT:  So we'll be in recess.

02:12:19 15                    DEPUTY CLERK:  All rise.

02:12:22 16                    (Court was recessed at 2:12 p.m.)

         17                    I hereby certify the foregoing is a true and

         18    accurate transcript from my stenographic notes in the

         19    proceeding.

         20                    /s/ Heather M. Triozzi
                              Certified Merit and Real-Time Reporter
         21                    U.S. District Court

         22

         23

         24

         25

## $

**$1,334,000** [1] - 1065:14
**$1,494,080** [1] - 1057:23
**$1.494** [1] - 1029:14
**$2,668** [1] - 1065:12
**$500** [2] - 1028:14, 1065:11
**$560** [2] - 1029:12, 1057:22
**$77** [2] - 1028:16

## '

**'044** [20] - 995:14, 996:10, 1014:11, 1034:3, 1063:10, 1063:12, 1063:13, 1063:14, 1063:15, 1063:21, 1064:7, 1064:10, 1064:11, 1064:12, 1064:13, 1064:17, 1064:21, 1064:22, 1064:23, 1064:24
**'10** [1] - 1038:19
**'659** [13] - 996:10, 1014:19, 1015:2, 1063:11, 1063:16, 1063:17, 1063:24, 1064:7, 1064:14, 1064:15, 1064:18, 1064:25, 1065:1

## /

**/s** [1] - 1068:10

## 1

**1** [20] - 995:2, 995:15, 995:17, 996:9, 996:10, 1014:9, 1014:11, 1033:23, 1034:3, 1045:7, 1045:10, 1054:9, 1059:3, 1063:12, 1063:16, 1064:10, 1064:14, 1064:21, 1064:25, 1065:22
**10** [8] - 999:9, 999:20, 1000:3, 1001:14, 1001:20, 1003:20, 1004:24, 1053:12
**100** [1] - 1061:24
**1006** [1] - 990:23
**10th** [2] - 1002:12, 1064:2

**11** [1] - 1014:10
**120** [1] - 1038:20
**14** [1] - 1047:6
**15** [1] - 1046:18
**16** [3] - 1025:2, 1032:16
**17** [6] - 1019:11, 1019:15, 1019:17, 1019:25, 1025:1, 1037:25
**18** [1] - 1033:11
**18.67** [1] - 1052:23
**19** [2] - 1029:10, 1050:12
**1999** [1] - 1025:5
**1st** [1] - 1007:6

## 2

**2** [22] - 995:13, 995:16, 995:18, 996:9, 996:10, 1035:24, 1035:25, 1036:1, 1041:13, 1041:17, 1041:18, 1041:22, 1042:5, 1054:9, 1059:7, 1063:13, 1063:17, 1064:11, 1064:15, 1064:22, 1065:1, 1065:25
**2,000** [4] - 1027:21, 1027:22, 1042:5, 1042:6
**2,668** [1] - 1029:13, 1057:23
**2.3** [1] - 1034:20
**2.5** [2] - 1052:13, 1052:22
**2003** [1] - 1025:6
**2006** [1] - 1019:14
**2009** [5] - 1032:2, 1037:3, 1037:10, 1037:20, 1037:24
**2010** [3] - 1037:3, 1037:11, 1037:24
**2011** [2] - 1037:18, 1037:21
**2013** [17] - 999:9, 999:20, 1000:4, 1001:14, 1001:20, 1002:12, 1003:20, 1004:24, 1019:7, 1019:15, 1020:19, 1037:18, 1037:22, 1038:18, 1053:12, 1056:21, 1064:2
**2016** [1] - 1050:10
**2017** [3] - 1029:20, 1050:6, 1050:8, 1050:11

**2018** [1] - 1029:21
**2019** [2] - 1007:6, 1030:13
**2022** [1] - 1065:6
**2023** [1] - 989:12
**21-91-RGA** [1] - 989:5
**22** [2] - 1023:19, 1052:9
**23** [1] - 1053:1
**23rd** [1] - 1032:2
**25** [2] - 1009:19, 1038:21
**28** [1] - 1058:14
**2:12** [1] - 1068:6
**2s** [1] - 1054:10

## 3

**3** [2] - 1014:2, 1066:6
**30** [4] - 1016:20, 1046:2, 1067:4, 1067:7
**30th** [1] - 1037:3
**31** [1] - 989:12
**31st** [1] - 1065:6
**325** [1] - 1055:11
**325B** [1] - 1031:21
**325B.14** [1] - 1032:18
**325B.150** [1] - 1041:9
**325B.29** [1] - 1034:19
**325B.498** [1] - 1035:6
**325B.551** [1] - 1041:24
**325B.8** [1] - 1040:22

## 4

**4** [6] - 1041:13, 1041:20, 1056:22, 1059:7, 1066:9
**4,000** [4] - 1041:14, 1041:16, 1041:21, 1042:7
**4,000-watt** [1] - 1040:19
**4.0R** [1] - 1041:3
**40** [2] - 1021:7, 1021:10
**40-plus** [1] - 1015:23
**481** [1] - 1039:8

## 5

**5** [12] - 996:9, 1022:16, 1040:25, 1047:11, 1047:16, 1054:11, 1056:23, 1057:1, 1063:14, 1064:12, 1064:23, 1066:12
**5,661** [1] - 1038:19
**5.25** [2] - 1052:14,

1052:23
**50** [3] - 1029:3, 1029:9, 1050:19
**544** [1] - 1033:15
**58** [1] - 1033:7

## 6

**6** [11] - 996:9, 1022:5, 1038:7, 1047:12, 1047:17, 1054:11, 1059:7, 1063:15, 1064:13, 1064:24, 1066:15
**6,000** [1] - 1027:21
**60** [2] - 1032:25, 1033:1
**600-page** [1] - 1022:16
**64** [1] - 1033:8
**66** [1] - 1055:11

## 7

**7** [3] - 1024:17, 1032:23, 1066:18
**70** [1] - 1033:1
**71** [2] - 1033:12, 1041:1
**72** [2] - 1033:12, 1041:1
**77** [1] - 1032:20

## 8

**8** [3] - 1025:22, 1042:24, 1066:21
**844** [1] - 989:11

## 9

**9** [3] - 1027:4, 1038:18, 1043:3
**9:00** [1] - 989:13
**9:30** [2] - 990:18, 991:9

## A

**a.m** [1] - 989:13
**able** [10] - 991:24, 991:25, 992:1, 1022:17, 1030:4, 1031:22, 1047:23, 1048:14, 1048:19, 1057:20
**absolutely** [2] - 1036:2, 1043:16
**accept** [3] - 996:4, 1008:10, 1060:25
**acceptable** [1] -

1009:12
**accepting** [1] - 1009:11
**accessed** [1] - 1037:12
**accessibility** [3] - 1019:3, 1036:17, 1036:19
**accessible** [10] - 999:20, 999:21, 1000:3, 1039:3, 1039:4, 1047:20, 1053:12, 1053:19, 1056:10, 1064:1
**accomplish** [2] - 1023:23, 1055:11
**accomplished** [1] - 1023:23
**accomplishes** [1] - 1057:8
**account** [2] - 1001:3, 1009:1
**accounts** [1] - 1046:4
**accurate** [1] - 1068:8
**accused** [10] - 994:24, 996:17, 997:13, 997:15, 997:19, 997:21, 1007:25, 1008:2, 1014:4, 1063:9
**achieved** [1] - 1002:20
**acknowledge** [1] - 1035:19
**acted** [2] - 998:16, 1006:14
**acting** [1] - 1008:10
**action** [2] - 993:18, 1049:5
**actions** [3] - 1012:8, 1063:19, 1063:23
**actual** [1] - 1051:12
**addition** [5] - 994:3, 1000:5, 1001:22, 1033:6, 1053:17
**additional** [4] - 995:9, 995:17, 1002:13, 1015:3
**address** [3] - 1005:7, 1030:10
**addressing** [1] - 999:12
**adds** [1] - 995:8
**adequate** [1] - 1005:12
**admissions** [1] - 1054:12
**admit** [1] - 1030:11
**admits** [7] - 1035:2, 1045:1, 1047:8, 1047:10, 1054:10

**admitted** [9] - 1016:6, 1020:8, 1020:10, 1020:11, 1034:10, 1034:23, 1035:3, 1036:3, 1047:13
**advertising** [1] - 1002:22
**ago** [1] - 1021:5
**agree** [4] - 999:15, 1034:13, 1059:11, 1063:5
**agreed** [13] - 1006:9, 1007:5, 1061:16, 1062:20, 1065:16, 1065:23, 1066:1, 1066:7, 1066:10, 1066:13, 1066:16, 1066:19, 1066:22
**agreement** [13] - 1005:17, 1006:13, 1006:17, 1008:20, 1008:25, 1009:4, 1009:5, 1009:6, 1009:7, 1026:19, 1059:16, 1059:24, 1060:10
**agreements** [5] - 1007:16, 1008:3, 1008:15, 1052:12, 1052:13
**agricultural** [1] - 1029:24
**agriculture** [1] - 1029:24
**ahead** [1] - 1046:18
**airfoil** [1] - 1047:14
**alleged** [3] - 996:15, 1005:18, 1006:8
**allowable** [1] - 1004:2
**allowed** [2] - 1003:18, 1060:12
**allowing** [1] - 1048:22
**allows** [1] - 1001:15
**almost** [2] - 992:16, 1027:21
**alone** [3] - 994:25, 1004:18, 1038:19
**alternative** [2] - 1041:10, 1041:12
**alternatives** [1] - 1007:18
**amount** [19] - 996:25, 1003:25, 1004:1, 1004:11, 1005:4, 1005:19, 1005:23, 1006:7, 1007:19, 1008:12, 1008:16, 1028:12, 1039:18, 1043:10, 1049:12, 1057:18, 1065:4,

1065:5, 1065:9
**amounts** [1] - 1008:14
**analogy** [1] - 1043:8
**analysis** [5] - 1044:23, 1044:25, 1045:2, 1045:6, 1046:10
**analytical** [1] - 1053:6
**analyzed** [1] - 1017:22
**ANDREW** [1] - 989:17
**Andrews** [4] - 990:12, 991:13, 1013:25, 1019:3
**ANDREWS** [1] - 989:15
**announced** [1] - 1029:19
**ANSWER** [2] - 1035:18, 1035:21
**answer** [6] - 993:3, 1018:1, 1034:13, 1053:13, 1053:23
**anticipate** [2] - 1022:6, 1057:7
**anticipated** [3] - 1000:19, 1012:15, 1054:6
**anticipation** [9] - 996:20, 999:3, 1000:1, 1000:17, 1000:22, 1001:1, 1001:15, 1044:2, 1054:3
**anxious** [1] - 1011:8
**APPEARANCES** [2] - 989:16, 990:1
**appendices** [2] - 1040:25, 1041:2
**appendix** [1] - 1044:13
**Appendix** [4] - 1032:23, 1033:7, 1033:12
**application** [6] - 1025:11, 1026:10, 1027:15, 1039:25, 1042:12, 1049:6
**applications** [1] - 1019:8
**applied** [1] - 1006:22
**apply** [3] - 992:15, 992:18, 993:12
**appreciate** [3] - 1011:11, 1031:15, 1054:25
**approach** [1] - 1061:11
**appropriate** [1] - 993:13
**April** [2] - 1030:9, 1032:2

**argues** [1] - 996:13
**argument** [1] - 1031:17
**arguments** [6] - 991:25, 1009:17, 1009:23, 1013:14, 1059:15, 1059:21
**arriving** [1] - 1003:8
**art** [38] - 999:7, 999:14, 999:16, 999:17, 999:24, 1000:1, 1000:6, 1000:23, 1000:25, 1001:4, 1001:13, 1001:16, 1001:17, 1001:24, 1002:2, 1002:3, 1002:7, 1003:18, 1004:3, 1004:23, 1019:6, 1020:2, 1020:3, 1020:12, 1020:14, 1020:21, 1021:18, 1021:23, 1022:2, 1024:23, 1039:11, 1040:10, 1047:22, 1053:10, 1056:8, 1056:18, 1063:25, 1064:19
**article** [4] - 1037:6, 1037:7, 1038:9, 1053:18
**asserted** [35] - 994:4, 994:5, 995:2, 995:20, 995:24, 996:11, 996:12, 996:14, 996:15, 996:18, 996:19, 996:20, 996:23, 997:22, 998:2, 998:10, 998:14, 998:18, 998:22, 999:2, 999:9, 1000:19, 1000:21, 1001:6, 1003:3, 1003:13, 1005:3, 1005:5, 1026:14, 1052:3, 1052:5, 1063:20, 1063:24
**asserting** [2] - 996:9, 1012:9
**asserts** [3] - 994:4, 999:2, 1001:6
**assess** [1] - 998:25
**assessed** [2] - 997:7, 998:22
**associated** [1] - 1019:17
**assume** [3] - 1006:15, 1020:13, 1020:15
**attach** [1] - 995:25

**attached** [1] - 991:17
**attempt** [3] - 1012:11, 1016:15, 1022:22
**attempting** [1] - 1002:5
**attention** [1] - 1011:11
**attorney** [1] - 1020:24
**attorneys** [1] - 996:7
**attributable** [1] - 1007:1
**August** [1] - 1030:12
**authors** [4] - 1038:1, 1038:2, 1038:5, 1039:2
**automobiles** [1] - 1048:20
**availability** [1] - 1009:10
**available** [10] - 999:22, 1007:21, 1019:10, 1037:24, 1039:15, 1039:16, 1041:11, 1041:12, 1048:16
**AVL** [1] - 1044:23
**avoid** [1] - 1009:8
**award** [8] - 1005:5, 1005:12, 1005:14, 1005:21, 1005:25, 1008:17, 1028:2, 1029:14
**awarded** [1] - 996:25

**B**

**bad** [1] - 1013:8
**Barry** [24] - 1015:22, 1017:2, 1017:14, 1017:22, 1021:6, 1022:21, 1022:22, 1022:23, 1023:1, 1023:3, 1023:24, 1024:4, 1034:9, 1035:1, 1036:3, 1040:19, 1044:7, 1044:9, 1047:7, 1047:13, 1050:24, 1053:5, 1054:9, 1055:14
**Barry's** [3] - 1036:13, 1045:16, 1045:20
**BASANTA** [1] - 990:7
**base** [7] - 1006:22, 1006:23, 1006:24, 1006:25, 1065:8, 1065:10, 1065:12
**based** [13] - 999:3, 1000:21, 1001:7, 1002:21, 1004:20, 1006:1, 1007:3,

1011:15, 1024:20, 1051:24, 1061:9, 1064:8, 1065:3
**basis** [2] - 997:8, 1000:16
**bat** [1] - 1026:1
**batteries** [2] - 1048:16, 1048:18
**battery** [4] - 1048:10, 1048:11, 1048:15, 1048:21
**becomes** [3] - 1016:24, 1043:7
**BEFORE** [1] - 989:15
**began** [4] - 1005:18, 1006:10, 1007:21, 1048:12
**begin** [2] - 1014:14, 1018:24
**beginner** [2] - 1016:19, 1043:14
**beginning** [4] - 1011:10, 1024:1, 1032:15, 1037:11
**behalf** [2] - 1066:25, 1067:1
**behind** [1] - 1027:17
**belief** [1] - 998:1
**best** [3] - 1031:16, 1055:1, 1060:3
**between** [9] - 1002:6, 1003:6, 1008:25, 1009:6, 1010:20, 1028:17, 1043:12, 1052:22, 1065:3
**beyond** [3] - 997:15, 1022:5, 1053:25
**bias** [1] - 993:16
**bicycle** [1] - 1043:8
**big** [1] - 1040:1
**bigger** [1] - 1041:19
**bike** [2] - 1043:10, 1043:11
**birth** [1] - 1051:21
**bit** [8] - 1013:13, 1017:1, 1036:16, 1037:8, 1042:13, 1042:14, 1044:7, 1047:24
**bitty** [1] - 990:20
**blog** [1] - 1060:23
**board** [6] - 1023:11, 1028:14, 1028:16, 1043:7, 1051:19, 1051:20
**boards** [8] - 1016:19, 1023:10, 1027:13, 1045:1, 1045:4, 1045:15, 1045:16
**Boat** [4] - 1037:6,

1037:7, 1038:8, 1053:17
**boats** [1] - 1043:21
**body** [1] - 1034:22
**Boggs** [1] - 989:10
**BORDLEY** [1] - 990:3
**bottom** [2] - 1023:16, 1040:22
**boundaries** [2] - 994:14, 994:19
**bowl** [1] - 1045:22
**boxes** [1] - 1057:22
**break** [4] - 1010:3, 1010:13, 1030:22, 1030:25
**BRIAN** [1] - 989:21
**brief** [1] - 1031:16
**bring** [2] - 1031:23, 1048:14
**brings** [1] - 1053:19
**brought** [1] - 1013:12
**build** [3] - 1040:8, 1040:15
**building** [1] - 1041:24
**built** [2] - 1015:23, 1023:8
**burden** [10] - 993:13, 993:19, 993:23, 994:5, 1005:19, 1013:15, 1013:23, 1045:14, 1045:17, 1053:5
**burdens** [2] - 993:21, 1045:14
**business** [9] - 997:2, 1008:11, 1011:14, 1011:19, 1028:20, 1028:23, 1029:1, 1029:7, 1029:22
**buy** [1] - 1016:9
**BY** [10] - 989:17, 989:20, 989:20, 989:21, 990:3, 990:3, 990:6, 990:6, 990:7, 990:7
**Båtnytt** [1] - 1038:8

## C

**C.A** [1] - 989:5
**calculate** [1] - 1006:23
**calculations** [2] - 1016:2, 1017:6
**Caleb** [1] - 989:10
**cannot** [2] - 998:6, 1061:1
**care** [1] - 1012:6
**carefully** [5] - 992:22, 1059:25, 1060:15, 1063:3, 1063:6

**Carol** [13] - 1033:7, 1033:20, 1033:22, 1034:18, 1035:9, 1035:13, 1038:8, 1038:16, 1039:5, 1041:9, 1045:8, 1046:18, 1047:6
**carpet** [1] - 1055:19
**carpets** [1] - 1023:12
**carry** [1] - 1053:5
**case** [39] - 992:21, 993:4, 993:20, 994:10, 995:2, 995:23, 999:8, 1000:18, 1005:10, 1006:4, 1008:8, 1011:10, 1011:13, 1011:17, 1012:8, 1015:9, 1016:2, 1018:3, 1018:24, 1021:2, 1025:9, 1028:2, 1028:9, 1033:21, 1034:25, 1058:3, 1058:20, 1059:21, 1060:8, 1060:19, 1060:24, 1060:25, 1061:3, 1061:9, 1066:25, 1067:2, 1067:21
**cases** [1] - 999:5
**cease** [2] - 1030:7, 1030:9
**cell** [1] - 1060:20
**center** [3] - 1032:7, 1034:21, 1051:7
**certain** [3] - 1003:10, 1007:14, 1043:10
**certainly** [3] - 1050:21, 1051:16, 1054:23
**certainty** [1] - 1005:25
**Certified** [1] - 1068:10
**certify** [1] - 1068:7
**CES** [2] - 1030:1, 1030:6
**chairs** [1] - 992:9
**challenge** [1] - 1000:16
**challenged** [1] - 999:1
**change** [3] - 1029:9, 1060:4, 1060:7
**chapter** [2] - 1032:24, 1033:2
**chapters** [3] - 1032:22, 1033:8, 1044:13
**charge** [1] - 1062:3
**chat** [1] - 1060:23
**cheaper** [1] - 1048:17
**check** [6] - 990:16,

1053:8, 1056:11, 1056:22, 1056:23, 1057:6
**checked** [1] - 1065:5
**checking** [3] - 1056:2, 1056:6, 1057:10
**cherry** [1] - 1016:22
**cherry-picked** [1] - 1016:22
**child** [1] - 1043:9
**choice** [1] - 1029:8
**choose** [1] - 1029:6
**chose** [1] - 1029:1
**chosen** [1] - 1040:24
**Christopher** [1] - 1015:22
**circumstances** [3] - 998:25, 1007:14, 1008:23
**cited** [2] - 1025:9, 1049:5
**claim** [41] - 991:16, 994:21, 994:22, 994:24, 994:25, 995:5, 995:6, 995:7, 995:8, 995:9, 995:10, 995:11, 995:12, 995:14, 995:23, 996:5, 997:5, 997:7, 997:8, 997:10, 997:11, 997:12, 997:14, 998:5, 998:7, 998:8, 998:10, 1000:16, 1000:17, 1000:21, 1001:11, 1002:7, 1003:21, 1014:3, 1014:5, 1014:19, 1014:21, 1014:24
**Claim** [38] - 995:2, 995:13, 995:15, 995:16, 995:17, 995:18, 1014:9, 1014:11, 1033:23, 1034:3, 1035:24, 1035:25, 1036:1, 1047:11, 1047:12, 1047:16, 1047:17, 1054:9, 1054:10, 1063:12, 1063:13, 1063:14, 1063:15, 1063:16, 1063:17, 1064:10, 1064:11, 1064:12, 1064:13, 1064:14, 1064:15, 1064:21, 1064:22, 1064:23, 1064:24, 1064:25, 1065:1
**claimed** [19] - 997:15, 997:16, 1000:24,

1001:2, 1001:9, 1002:24, 1003:1, 1003:7, 1003:15, 1003:19, 1004:10, 1004:16, 1005:1, 1006:6, 1007:24, 1008:1, 1008:4, 1027:9, 1064:20
**claims** [54] - 993:14, 994:4, 994:6, 994:11, 994:12, 994:13, 994:14, 994:17, 994:18, 994:20, 995:3, 995:4, 995:13, 995:20, 995:21, 995:24, 996:11, 996:12, 996:14, 996:15, 996:18, 996:19, 996:23, 997:9, 997:22, 999:2, 999:9, 1000:19, 1001:6, 1003:13, 1005:3, 1005:5, 1005:7, 1013:25, 1014:6, 1018:21, 1022:9, 1022:11, 1047:11, 1054:5, 1054:7, 1054:16, 1054:21, 1057:6, 1063:10, 1063:21, 1063:24, 1064:6, 1064:17
**Claims** [2] - 996:9, 996:10
**clear** [26] - 993:22, 994:6, 994:7, 999:18, 1000:2, 1000:20, 1001:10, 1003:16, 1003:17, 1018:18, 1018:21, 1020:1, 1020:15, 1022:7, 1022:13, 1024:21, 1027:7, 1031:16, 1042:20, 1045:19, 1053:11, 1054:4, 1054:20, 1063:25, 1064:5, 1064:16
**clerk** [5] - 991:25, 1061:23, 1062:23, 1063:1, 1067:2
**CLERK** [22] - 990:11, 990:13, 991:10, 991:12, 1010:14, 1010:16, 1031:2, 1031:4, 1061:12, 1062:11, 1062:13, 1063:8, 1065:22, 1065:25, 1066:3,

1066:5, 1066:9, 1066:12, 1066:15, 1066:18, 1066:21, 1068:5
**clients** [1] - 990:22
**clips** [1] - 1016:14
**close** [1] - 1010:24
**closing** [6] - 991:25, 1009:17, 1009:22, 1013:14, 1031:17, 1059:14
**CO** [1] - 989:8
**coincidence** [1] - 1030:3
**coincidental** [1] - 1019:18
**COLLETTI** [10] - 990:6, 991:6, 1010:11, 1031:6, 1031:13, 1046:22, 1062:8, 1065:19, 1067:19, 1068:3
**Colletti** [5] - 991:5, 1010:19, 1031:5, 1031:12, 1055:2
**combination** [7] - 1001:8, 1001:17, 1006:24, 1020:10, 1025:21, 1049:8, 1064:8
**combine** [4] - 1000:25, 1048:5, 1048:19, 1048:22
**combined** [2] - 1025:15, 1025:16
**combining** [1] - 1001:23
**coming** [2] - 1028:15, 1051:17
**commercial** [2] - 1002:20, 1025:24
**commercialized** [1] - 1024:13
**commercially** [1] - 1025:25
**common** [2] - 1016:1, 1047:1
**communicate** [3] - 1060:18, 1060:23, 1061:2
**comparable** [10] - 1008:3, 1008:15, 1008:19, 1008:20, 1008:22, 1008:23, 1008:24, 1009:5, 1052:15
**compare** [4] - 997:20, 997:21, 1039:14, 1051:20
**compared** [2] -

1039:20, 1041:17
**compares** [1] - 1050:2
**comparing** [2] -
1046:22, 1046:23
**compensate** [3] -
997:1, 1005:13,
1057:24
**compensation** [3] -
1028:23, 1028:25,
1029:15
**complaint** [1] -
1030:14
**completed** [1] -
1059:21
**completely** [1] -
1044:6
**complicated** [2] -
1014:15, 1043:5
**components** [1] -
1048:1
**computer** [1] -
1060:21
**conceived** [1] -
1001:14
**concept** [2] - 1018:19,
1043:19
**concerning** [1] -
1009:10
**concise** [1] - 1031:16
**conclude** [1] -
1052:25
**concludes** [1] -
1066:25
**conclusion** [3] -
1003:8, 1047:2,
1055:13
**condition** [2] - 1015:1,
1015:5
**conduct** [3] - 999:1,
1058:16, 1060:24
**confer** [1] - 1067:14
**configuration** [4] -
1033:4, 1033:5,
1050:22, 1051:1
**confirm** [3] - 1016:2,
1017:6, 1025:23
**confirmed** [2] -
1015:24, 1017:10
**confused** [6] - 1013:8,
1022:23, 1023:1,
1044:15, 1044:16
**confusing** [4] -
1022:23, 1022:25,
1032:20, 1033:19
**confusion** [3] -
1013:9, 1016:15,
1044:17
**connection** [1] -
1003:6
**conscience** [1] -

1060:11
**consider** [25] - 998:15,
998:25, 999:13,
999:25, 1000:10,
1001:15, 1001:21,
1002:1, 1002:2,
1002:4, 1002:6,
1002:9, 1002:10,
1002:13, 1002:18,
1004:5, 1007:12,
1007:20, 1007:22,
1008:7, 1009:6,
1009:10, 1025:19,
1028:20, 1036:9
**consideration** [1] -
1003:7
**considerations** [1] -
1025:18
**considered** [6] -
994:1, 1013:19,
1025:10, 1025:11,
1049:2
**considering** [5] -
999:6, 1001:11,
1001:17, 1002:8,
1006:11
**consistent** [1] -
1036:11
**conspiracy** [1] -
1039:1
**constantly** [1] -
1061:24
**constitute** [2] -
994:15, 994:17
**constituted** [2] -
1063:20, 1063:23
**constitution** [1] -
1018:16
**construct** [1] - 1028:5
**constructions** [1] -
991:17
**contain** [1] - 1003:17
**contains** [1] - 1003:10
**contends** [6] - 996:12,
996:19, 999:16,
1000:5, 1000:18,
1003:13
**content** [1] - 1002:2
**contents** [3] -
1032:13, 1032:17
**context** [1] - 1004:22
**continue** [1] - 1030:13
**CONTINUED** [1] -
990:1
**continued** [1] -
1030:17
**continues** [2] -
1030:11, 1030:15
**contradicted** [3] -
1036:12, 1036:13,

1044:9
**contradiction** [1] -
1027:24
**contributes** [2] -
1007:24, 1008:2
**control** [11] - 991:8,
1014:22, 1032:8,
1033:4, 1033:13,
1034:9, 1035:10,
1040:2, 1041:2,
1048:3
**controlled** [14] -
1014:16, 1015:10,
1017:10, 1032:7,
1033:25, 1034:6,
1034:10, 1034:13,
1034:14, 1034:20,
1035:3, 1035:9,
1047:8, 1047:9
**controller** [10] -
1035:4, 1035:5,
1035:17, 1035:20,
1036:2, 1036:3,
1047:9, 1047:10,
1054:11
**convenient** [1] -
1061:13
**convince** [4] - 1016:5,
1022:22, 1024:25,
1025:16
**convinced** [3] -
1017:14, 1022:18,
1060:4
**convincing** [23] -
993:22, 994:6,
994:7, 999:19,
1000:2, 1000:20,
1001:10, 1003:16,
1018:18, 1018:22,
1020:1, 1020:15,
1022:8, 1022:13,
1024:21, 1027:7,
1045:19, 1053:11,
1054:4, 1054:20,
1063:25, 1064:6,
1064:16
**COOCH** [1] - 989:17
**copies** [1] - 992:9
**copy** [2] - 992:25,
996:3
**core** [1] - 1011:19
**corners** [1] - 1022:10
**corrected** [1] -
1035:18
**correspond** [1] -
1061:2
**cost** [2] - 1004:6,
1009:10
**count** [1] - 1015:16
**counts** [1] - 1047:15

**couple** [4] - 1009:16,
1021:5, 1055:9,
1056:13
**course** [4] - 1027:1,
1037:15, 1038:12,
1038:20
**COURT** [35] - 989:1,
990:14, 991:1,
991:4, 991:7,
991:14, 991:23,
992:3, 992:6,
1010:1, 1010:7,
1010:9, 1010:12,
1010:17, 1011:2,
1030:19, 1030:25,
1031:5, 1031:7,
1031:9, 1055:2,
1058:11, 1061:19,
1061:22, 1062:9,
1062:14, 1062:18,
1062:22, 1065:18,
1065:21, 1066:24,
1067:11, 1067:20,
1067:23, 1068:4
**Court** [9] - 990:11,
991:12, 993:7,
1009:18, 1059:2,
1062:4, 1067:1,
1068:6, 1068:11
**Courthouse** [1] -
989:10
**courtroom** [9] - 992:5,
1009:25, 1011:1,
1030:24, 1031:8,
1059:18, 1061:21,
1062:17, 1067:10
**cousin** [1] - 1020:25
**cover** [1] - 1031:25
**covered** [4] - 994:24,
996:13, 997:4,
1011:18
**covering** [1] - 1008:4
**covers** [2] - 994:14,
995:11
**craft** [6] - 1015:10,
1016:16, 1016:21,
1016:23, 1024:3
**crash** [1] - 1024:6
**crawled** [1] - 1037:3
**create** [3] - 1012:1,
1012:2, 1024:5
**created** [5] - 1011:14,
1011:15, 1012:2,
1028:21, 1037:10
**credentials** [1] -
1021:10
**credibility** [5] -
1036:5, 1036:6,
1036:8, 1036:14,
1036:15

**credible** [3] - 1038:3,
1038:5
**critical** [2] - 1018:19,
1037:22
**criticize** [1] - 1017:14
**crosschecked** [1] -
1017:7
**crucial** [1] - 1021:24
**Cruise** [6] - 1041:3,
1041:13, 1041:18,
1041:20, 1041:22
**curving** [1] - 1047:17
**custom** [1] - 1059:2
**CUSTOM** [1] - 989:4
**cutthroat** [1] - 1011:20

## D

**damages** [24] -
996:25, 1005:4,
1005:7, 1005:9,
1005:12, 1005:14,
1005:20, 1005:21,
1005:23, 1005:25,
1006:1, 1007:3,
1013:2, 1028:2,
1052:10, 1052:17,
1052:20, 1052:22,
1057:17, 1065:2,
1065:9, 1065:14
**damping** [8] -
1045:23, 1046:4,
1046:6, 1046:7,
1046:11, 1046:12
**data** [5] - 1049:12,
1050:8, 1051:12,
1056:15
**date** [9] - 999:8,
1007:7, 1007:11,
1007:17, 1027:21,
1032:1, 1037:22,
1059:17
**dated** [1] - 1037:19
**daunting** [1] - 1014:14
**dawdle** [1] - 1062:4
**deal** [3] - 990:24,
991:1, 1028:7
**dealing** [1] - 1033:8
**December** [1] - 1065:6
**decide** [12] - 993:3,
993:6, 993:12,
994:9, 995:19,
996:24, 998:5,
999:18, 1013:13,
1060:16, 1061:9,
1067:14
**decided** [1] - 1035:4
**decides** [1] - 1035:2
**deciding** [7] - 992:20,
993:7, 996:5,

997:19, 1001:18, 1002:17, 1004:3

**decision** [7] - 993:9, 993:17, 1001:25, 1004:19, 1008:16, 1029:2, 1061:8

**decreased** [1] - 1008:8

**deemed** [1] - 1009:3

**Defendants** [4] - 989:9, 990:8, 1030:22, 1067:13

**defense** [3] - 1000:1, 1000:11, 1054:14

**defenses** [3] - 993:14, 999:13, 1012:9

**define** [4] - 994:13, 994:14, 994:18, 1002:15

**defined** [1] - 996:8

**definitions** [2] - 995:25, 996:6

**degree** [2] - 1003:25, 1004:20

**DELAWARE** [1] - 989:2

**Delaware** [1] - 989:11

**delay** [1] - 1061:25

**delegate** [1] - 1062:2

**deliberately** [1] - 998:14

**deliberating** [1] - 1058:18

**deliberation** [1] - 1005:8

**deliberations** [5] - 993:2, 1009:16, 1058:16, 1060:17, 1061:5

**delivers** [1] - 1041:5, 1041:17

**delta** [3] - 1024:5, 1024:8, 1055:15

**demonstrate** [1] - 1022:17

**demonstrates** [1] - 1022:14

**demonstration** [2] - 1045:24, 1045:25

**denies** [1] - 996:17

**DENNIS** [1] - 989:20

**denying** [1] - 994:3

**dependent** [6] - 995:6, 995:11, 995:12, 995:14, 998:7

**DEPUTY** [22] - 990:11, 990:13, 991:10, 991:12, 1010:14, 1010:16, 1031:2, 1031:4, 1061:12,

---

1062:11, 1062:13, 1063:8, 1065:22, 1065:25, 1066:3, 1066:5, 1066:9, 1066:12, 1066:15, 1066:18, 1066:21, 1068:5

**deputy** [5] - 991:25, 1061:22, 1062:23, 1063:1, 1067:2

**description** [2] - 994:16, 1003:17

**design** [10] - 1014:17, 1023:13, 1023:20, 1033:15, 1043:2, 1043:22, 1047:13, 1047:14, 1051:5

**designed** [4] - 1015:23, 1034:2, 1041:15, 1042:7

**designing** [1] - 1041:4

**desire** [1] - 1009:8

**desired** [1] - 1035:12

**desist** [2] - 1030:7, 1030:9

**despite** [2] - 998:16, 1023:7

**destabilizing** [1] - 1046:14

**determination** [3] - 998:3, 1007:23, 1009:2

**determine** [10] - 995:1, 995:11, 998:11, 998:20, 999:10, 1004:22, 1005:4, 1006:18, 1007:9, 1028:7

**determined** [2] - 999:5, 1008:18

**determining** [8] - 998:23, 1000:11, 1001:1, 1006:15, 1007:19, 1009:4, 1009:9, 1025:20

**device** [2] - 1048:2, 1060:20

**diagrams** [1] - 1032:11

**difference** [3] - 1014:24, 1039:16, 1043:12

**differences** [3] - 1002:6, 1008:24, 1060:3

**different** [8] - 993:20, 994:20, 996:6, 1020:22, 1042:24, 1044:13, 1046:3, 1046:17

---

**differently** [1] - 1060:8

**difficult** [2] - 1032:19, 1033:16

**diligence** [1] - 999:24

**directly** [1] - 998:7

**disadvantage** [1] - 1029:5

**disagreement** [2] - 1015:6, 1015:13

**disagrees** [1] - 999:17

**disclose** [4] - 1000:23, 1004:9, 1024:9, 1035:17

**disclosed** [7] - 999:13, 1000:15, 1011:16, 1022:19, 1023:14, 1036:1, 1054:15

**discloses** [3] - 1034:12, 1036:2, 1044:6

**discuss** [2] - 1047:6, 1061:3

**discussed** [4] - 1040:18, 1042:25, 1051:2, 1052:13

**discusses** [3] - 1051:7, 1051:10, 1051:11

**discussing** [3] - 1033:2, 1033:9, 1047:18

**discussion** [3] - 1035:7, 1045:13, 1048:25

**discussions** [1] - 1060:12

**disposal** [1] - 1042:4

**dispositive** [2] - 1004:18, 1008:6

**dispute** [1] - 1044:5

**disregard** [2] - 1027:5, 1058:9

**disseminated** [1] - 999:22

**distributor** [4] - 1015:19, 1029:3, 1029:4, 1029:8

**DISTRICT** [2] - 989:1, 989:2

**District** [1] - 1068:11

**document** [1] - 990:22

**documented** [1] - 1040:14

**documents** [4] - 1017:22, 1035:4, 1037:1, 1037:23

**dollar** [4] - 1028:12, 1057:17, 1065:4, 1065:5

---

**dollars** [2] - 1018:7, 1065:9

**done** [10] - 993:9, 996:2, 1016:1, 1022:20, 1025:17, 1025:23, 1038:24, 1042:3, 1061:7, 1063:5

**DORRONDA** [1] - 990:3

**double** [1] - 1041:17

**doubt** [1] - 1023:22

**down** [11] - 1025:4, 1033:7, 1035:8, 1041:11, 1042:2, 1050:24, 1051:6, 1057:22, 1059:5, 1059:6

**downloaded** [7] - 1019:11, 1037:14, 1037:16, 1038:1, 1038:2, 1038:5, 1039:2

**downloads** [3] - 1019:24, 1019:25, 1038:21

**dozen** [1] - 1023:7

**Dr** [33] - 1016:4, 1017:14, 1017:20, 1017:22, 1018:10, 1019:8, 1020:20, 1021:1, 1021:9, 1022:6, 1022:20, 1023:3, 1023:14, 1023:23, 1024:15, 1025:7, 1025:10, 1025:12, 1025:23, 1026:9, 1026:16, 1026:17, 1026:23, 1027:1, 1027:6, 1027:11, 1027:12, 1027:14, 1029:11, 1054:24, 1057:12, 1057:16, 1058:2

**drawings** [2] - 994:17, 1049:20

**drew** [1] - 1039:24

**drive** [1] - 1041:5

**DTX** [5] - 1031:20, 1032:18, 1034:19, 1040:22, 1055:11

**dual** [1] - 1050:22

**during** [10] - 992:17, 993:2, 993:9, 1007:13, 1031:24, 1042:21, 1059:14, 1060:17, 1061:4, 1061:8

**duties** [2] - 993:5, 993:15

---

**duty** [2] - 993:11, 1059:22

**dynamic** [1] - 1033:3

**E**

**e-mail** [1] - 1030:10

**earned** [1] - 1007:17

**easier** [1] - 1042:3

**economic** [1] - 1008:23

**effect** [1] - 1046:7

**efficiency** [1] - 1041:16

**effort** [2] - 1011:24, 1059:24

**efforts** [3] - 1031:15, 1067:2, 1067:21

**eFoil** [13] - 1024:14, 1025:7, 1027:14, 1027:18, 1029:19, 1029:21, 1040:8, 1049:16, 1051:21, 1057:18, 1065:4, 1065:5, 1065:11

**eFoils** [14] - 996:16, 1015:15, 1015:16, 1015:20, 1016:6, 1027:13, 1027:21, 1027:22, 1029:12, 1029:13, 1046:8, 1057:23, 1065:12

**eigenvalue** [3] - 1045:2, 1045:6, 1046:10

**either** [6] - 992:8, 998:17, 1006:20, 1020:25, 1042:19, 1047:2

**electric** [3] - 1026:10, 1032:7, 1048:19

**electronic** [1] - 1060:19

**electronically** [1] - 1061:2

**element** [9] - 997:14, 997:16, 1014:5, 1015:4, 1022:11, 1044:3, 1044:4, 1054:16

**elements** [4] - 997:11, 997:14, 1001:2, 1014:13

**enable** [3] - 1003:14, 1054:21, 1064:19

**enabled** [13] - 1000:6, 1000:7, 1000:9, 1000:12, 1012:23, 1013:2, 1027:6, 1040:9, 1052:2,

1052:19, 1053:24, 1054:23, 1057:15
**enablement** [10] - 996:21, 999:4, 1000:11, 1003:12, 1049:9, 1050:13, 1052:1, 1054:19, 1057:14, 1064:16
**enabling** [6] - 1003:21, 1049:13, 1049:14, 1053:23, 1057:2, 1064:4
**encourage** [2] - 1039:17, 1052:6
**encyclopedic** [1] - 1039:19
**end** [9] - 994:12, 996:1, 1015:12, 1032:16, 1033:14, 1041:23, 1058:15, 1060:9, 1067:16
**engine** [3] - 1051:15, 1051:16
**engineers** [1] - 1050:18
**enter** [1] - 1006:17
**entered** [3] - 1006:13, 1007:16, 1026:18
**entering** [4] - 992:5, 1011:1, 1031:8, 1062:17
**entirely** [2] - 1011:14, 1011:15
**entity** [1] - 997:3
**Especially** [1] - 1012:1
**ESQUIRE** [10] - 989:17, 989:20, 989:20, 989:21, 990:3, 990:3, 990:6, 990:6, 990:7, 990:7
**establish** [1] - 1005:19
**establishes** [1] - 1005:22
**estimated** [1] - 1007:13
**European** [1] - 1032:2
**evaluate** [2] - 1017:2, 1049:18
**evaluating** [1] - 1047:12
**event** [2] - 1009:19, 1010:2
**eventually** [1] - 1016:6
**evidence** [64] - 993:6, 993:19, 993:22, 993:25, 994:7, 997:13, 997:18, 998:13, 999:19, 1000:2, 1000:9,

1000:20, 1001:10, 1003:7, 1003:16, 1004:21, 1005:20, 1007:9, 1007:15, 1008:7, 1009:10, 1013:17, 1013:22, 1014:4, 1015:9, 1018:18, 1018:22, 1018:23, 1020:1, 1020:5, 1020:16, 1020:17, 1022:8, 1022:14, 1024:21, 1027:8, 1028:8, 1031:18, 1036:19, 1038:15, 1038:24, 1038:25, 1042:20, 1045:19, 1045:20, 1052:16, 1053:11, 1053:22, 1054:4, 1054:20, 1059:20, 1059:23, 1061:10, 1063:9, 1063:19, 1063:22, 1064:1, 1064:3, 1064:6, 1064:17, 1065:7
**Evolo** [114] - 999:17, 999:19, 999:21, 999:25, 1000:3, 1000:5, 1000:6, 1000:9, 1000:12, 1000:19, 1000:21, 1001:2, 1001:5, 1012:15, 1012:17, 1012:21, 1012:25, 1018:4, 1019:2, 1019:5, 1019:17, 1020:3, 1020:19, 1021:4, 1021:11, 1021:22, 1021:23, 1022:4, 1022:6, 1022:14, 1022:18, 1022:24, 1023:7, 1023:20, 1024:9, 1024:18, 1026:8, 1027:25, 1031:20, 1032:5, 1032:15, 1032:19, 1032:25, 1033:12, 1033:15, 1034:10, 1034:11, 1034:17, 1034:19, 1035:1, 1035:6, 1035:16, 1035:22, 1036:1, 1036:2, 1036:21, 1036:25, 1037:19, 1038:12, 1038:13, 1038:21, 1039:4, 1039:9, 1039:18, 1040:12, 1040:23, 1040:24, 1041:6, 1042:19, 1042:22, 1043:2,

1043:24, 1044:3, 1044:5, 1044:10, 1044:20, 1046:23, 1047:4, 1047:8, 1047:19, 1047:20, 1047:23, 1048:13, 1048:14, 1049:14, 1049:20, 1050:2, 1050:4, 1050:15, 1050:21, 1051:2, 1051:4, 1051:5, 1051:10, 1052:2, 1052:8, 1052:18, 1053:11, 1053:22, 1053:24, 1053:25, 1054:6, 1054:11, 1054:23, 1055:10, 1055:18, 1056:10, 1056:12, 1056:23, 1056:24, 1057:1, 1057:7, 1064:1, 1064:4
**Evolo's** [1] - 1046:24
**exact** [1] - 1007:7
**exactly** [7] - 1021:16, 1024:6, 1026:24, 1039:10, 1044:14, 1055:13, 1060:9
**examiner** [2] - 1049:5, 1049:7
**example** [4] - 995:13, 998:15, 1026:8, 1059:6
**examples** [1] - 1004:10
**except** [1] - 1059:5
**excerpts** [1] - 1055:17
**exchange** [1] - 1006:6
**excuse** [4] - 1012:11, 1024:18, 1024:22, 1027:4
**excuses** [3] - 1012:12, 1018:13, 1058:9
**executive** [3] - 1032:14, 1032:15, 1044:12
**exercising** [1] - 999:24
**exhibits** [2] - 1032:20, 1032:21
**exist** [1] - 1034:8
**existing** [1] - 1001:13
**expectations** [1] - 1006:12
**experience** [1] - 1030:5
**experiment** [2] - 1004:4, 1004:25
**experimentation** [7] - 1003:20, 1003:24,

1004:1, 1004:2, 1004:7, 1004:20
**experiments** [2] - 1051:12, 1051:13
**expert** [9] - 1021:9, 1021:14, 1021:15, 1021:16, 1034:23, 1036:18, 1040:5, 1053:15
**expires** [1] - 997:6
**explain** [1] - 1045:21
**explained** [3] - 1023:24, 1024:4, 1037:9
**explaining** [1] - 1058:15
**explanation** [1] - 1017:13
**extensive** [2] - 1004:1, 1040:24
**extent** [3] - 999:22, 1049:24, 1052:21
**eyes** [4] - 1015:9, 1015:14, 1016:3, 1058:9

## F

**face** [1] - 1049:2
**faced** [1] - 1002:4
**fact** [11] - 994:8, 1007:8, 1015:13, 1018:23, 1019:24, 1020:17, 1027:20, 1029:3, 1036:22, 1054:11, 1059:22
**factor** [3] - 1003:5, 1008:6, 1008:15
**factors** [10] - 1000:10, 1002:1, 1002:13, 1003:4, 1004:5, 1004:18, 1004:22, 1007:22, 1008:1, 1008:22
**facts** [10] - 993:6, 993:7, 993:10, 993:12, 993:18, 994:1, 1007:10, 1007:20, 1013:19, 1013:20
**fail** [2] - 1002:25, 1026:7
**failure** [2] - 996:21, 1026:8
**fair** [5] - 1028:23, 1028:24, 1029:6, 1029:12, 1029:15
**fairly** [1] - 1007:18
**faith** [1] - 998:1
**fall** [1] - 1043:20

**falling** [1] - 1016:16
**falls** [1] - 1016:17
**family** [2] - 1011:13, 1019:22
**FARNAN** [1] - 990:3
**faster** [1] - 1043:7
**favor** [1] - 1013:22
**feature** [1] - 1038:9
**features** [2] - 1002:23, 1007:1
**fellow** [2] - 1060:2, 1061:4
**few** [3] - 1018:13, 1031:23, 1058:13
**field** [9] - 999:7, 999:10, 1001:12, 1001:19, 1002:11, 1003:23, 1004:8, 1004:12, 1004:14
**figure** [4] - 1051:3, 1051:4, 1062:3, 1062:5
**figures** [2] - 994:17, 1033:3
**filed** [4] - 1019:8, 1025:10, 1039:25, 1042:11
**files** [1] - 1030:14
**fill** [1] - 1059:17
**final** [8] - 992:9, 992:12, 1031:25, 1033:14, 1033:15, 1040:16, 1042:1, 1043:2
**finally** [4] - 1030:14, 1046:15, 1054:18, 1058:1
**financial** [2] - 990:21, 1005:15
**fine** [2] - 1010:23, 1010:24
**FINGER** [1] - 990:2
**finish** [2] - 1052:1, 1061:6
**finished** [1] - 1059:9
**first** [27] - 993:5, 993:21, 994:21, 1002:20, 1006:10, 1011:6, 1013:15, 1015:15, 1024:11, 1025:4, 1026:2, 1026:4, 1026:15, 1029:21, 1030:7, 1031:14, 1031:18, 1037:2, 1037:19, 1042:14, 1042:15, 1042:18, 1042:19, 1051:21, 1056:9
**five** [3] - 1031:1, 1038:9, 1055:3

**flat** [1] - 1024:5
**flies** [1] - 1055:18
**Flite** [1] - 1028:18
**Fliteboard** [6] - 1026:16, 1027:21, 1028:10, 1028:13, 1028:24, 1058:2
**floatation** [1] - 1048:1
**Flyer** [4] - 996:15, 996:16, 1045:11
**flying** [5] - 1016:19, 1016:24, 1041:6, 1051:14, 1051:18
**focus** [1] - 1006:12
**focused** [1] - 1007:7
**foils** [1] - 1023:5
**follow** [2] - 992:20, 992:23
**following** [10] - 992:23, 1002:1, 1002:18, 1033:11, 1054:5, 1054:20, 1058:14, 1063:10, 1064:6, 1064:17
**FOR** [1] - 989:2
**foregoing** [1] - 1068:7
**foreperson** [3] - 1059:2, 1059:17, 1059:19
**Foreperson** [1] - 1062:19
**form** [14] - 992:10, 993:2, 994:22, 995:6, 1008:17, 1047:13, 1053:2, 1055:23, 1059:13, 1059:15, 1059:18, 1062:23, 1062:24, 1067:13
**format** [1] - 1032:2
**formed** [3] - 1029:23, 1029:25, 1030:1
**forms** [1] - 1029:22
**formulas** [3] - 1043:5, 1043:16, 1043:17
**formulation** [1] - 1041:12
**forth** [3] - 994:23, 1046:17, 1054:1
**forward** [1] - 1051:8
**four** [1] - 1022:10
**frame** [1] - 1048:11
**free** [2] - 1059:21, 1060:14
**frequency** [1] - 1035:9
**Friday** [3] - 989:12, 1013:17, 1018:16
**friends** [1] - 1019:22
**front** [3] - 1050:23, 1051:6, 1051:8

**fruition** [1] - 1048:14
**full** [4] - 1003:14, 1003:17, 1003:19, 1004:25
**future** [1] - 1024:11

## G

**gain** [2] - 1012:3, 1012:7
**general** [1] - 1000:14
**generate** [1] - 1033:5
**gentlemen** [1] - 1011:6
**gibberish** [1] - 1022:24
**given** [4] - 996:4, 1003:8, 1011:11, 1036:6
**goal** [1] - 1013:9
**God** [1] - 1061:17
**Google** [11] - 1036:22, 1036:23, 1036:24, 1037:4, 1037:5, 1037:12, 1047:21, 1050:8, 1053:16
**Government** [1] - 1021:25
**grad** [1] - 1019:20
**gravity** [3] - 1032:8, 1034:21, 1051:7
**GRAY** [1] - 989:19
**great** [1] - 1016:13
**guess** [3] - 991:22, 1006:2, 1067:14
**guidance** [1] - 1004:11

## H

**hand** [5] - 991:20, 992:1, 1017:12, 1046:6, 1062:23
**hands** [1] - 1031:22
**hard** [3] - 1016:4, 1023:22, 1062:1
**hardly** [1] - 1013:2
**HAUG** [1] - 990:5
**head** [1] - 1013:7
**heads** [1] - 1023:4
**hear** [4] - 1019:9, 1030:22, 1050:14, 1060:12
**heard** [30] - 993:7, 997:18, 1009:17, 1011:19, 1013:16, 1013:17, 1013:22, 1013:24, 1014:12, 1014:24, 1016:18, 1018:15, 1019:10,

1020:21, 1021:7, 1021:10, 1022:16, 1028:4, 1028:11, 1033:23, 1034:9, 1036:17, 1040:18, 1042:13, 1043:3, 1043:20, 1046:12, 1048:6, 1052:11
**Heather** [1] - 1068:10
**hell** [1] - 1052:3
**help** [1] - 1061:16
**hereby** [1] - 1068:7
**hesitate** [1] - 1060:4
**HIGDON** [1] - 989:19
**highlight** [1] - 1032:23
**highlighted** [2] - 1025:4, 1038:11
**highly** [2] - 994:8, 1018:23
**himself** [1] - 1044:9
**hindsight** [4] - 1001:20, 1007:3, 1026:25, 1027:2
**hired** [1] - 1017:2
**history** [1] - 1012:5
**holder** [3] - 1006:5, 1006:8, 1008:10
**honestly** [1] - 1060:11
**Honor** [11] - 990:19, 992:2, 1010:6, 1010:11, 1011:5, 1062:7, 1062:8, 1065:20, 1067:18, 1067:19, 1068:3
**HONORABLE** [1] - 989:15
**Honorable** [2] - 990:12, 991:13
**hopefully** [1] - 991:8
**hour** [1] - 1046:2
**house** [1] - 1008:18
**houses** [1] - 1008:19
**hundreds** [1] - 1037:14
**hurry** [1] - 1067:5
**hydrofoil** [17] - 1004:8, 1004:13, 1004:15, 1014:17, 1015:24, 1023:14, 1023:20, 1023:24, 1024:4, 1024:8, 1026:10, 1032:6, 1034:1, 1034:6, 1048:2, 1048:20, 1051:10
**hypothetical** [15] - 1006:9, 1006:11, 1006:19, 1007:5, 1007:8, 1007:11, 1007:13, 1007:17,

1008:21, 1008:25, 1009:3, 1009:5, 1028:4, 1028:17, 1065:3

## I

**ICE** [1] - 989:19
**idea** [2] - 1020:11, 1048:14
**ignore** [2] - 992:24, 996:6
**illogical** [1] - 1023:18
**imagine** [1] - 1010:20
**immediately** [1] - 1027:15
**impeached** [1] - 1036:14
**importance** [3] - 1050:22, 1051:11
**important** [13] - 992:25, 994:10, 994:12, 1003:5, 1011:10, 1011:13, 1011:21, 1033:4, 1040:17, 1040:21, 1051:8, 1056:16, 1060:10
**importantly** [1] - 1049:25
**importing** [1] - 996:13
**imports** [1] - 997:3
**IN** [1] - 989:1
**inaccurate** [1] - 1016:5
**INC** [2] - 989:4, 989:7
**incentivize** [1] - 1058:6
**include** [1] - 1007:14
**includes** [1] - 995:16
**including** [1] - 1002:10
**inconsistent** [1] - 1036:12
**incorporates** [2] - 995:8, 995:15
**incorrect** [1] - 1060:6
**increased** [1] - 1008:8
**increases** [1] - 1043:6
**independent** [6] - 994:22, 994:25, 995:3, 998:5, 998:8
**independently** [1] - 1017:2
**indexed** [1] - 1053:15
**indicate** [2] - 1002:14, 1002:19
**indicated** [1] - 1047:19
**indicates** [2] -

1035:11, 1045:3
**indicating** [2] - 1045:9, 1045:11
**indirectly** [1] - 998:7
**individual** [1] - 992:1
**individually** [1] - 1063:6
**inducing** [2] - 1009:19, 1010:2
**induction** [1] - 1035:7
**industry** [12] - 1011:14, 1011:15, 1011:20, 1011:24, 1012:2, 1015:20, 1021:6, 1021:11, 1027:17, 1027:20, 1029:24, 1030:5
**influence** [3] - 993:9, 993:17, 1061:8
**influenced** [1] - 1009:8
**inform** [1] - 1008:16
**information** [24] - 1003:22, 1007:12, 1036:23, 1039:13, 1039:15, 1039:19, 1039:20, 1039:21, 1039:22, 1039:25, 1040:5, 1043:1, 1047:18, 1049:12, 1049:15, 1049:16, 1049:24, 1052:7, 1053:25, 1054:1, 1060:18, 1060:24
**infringe** [19] - 994:25, 996:15, 997:23, 997:25, 1009:14, 1012:13, 1012:14, 1012:16, 1012:20, 1012:24, 1013:4, 1013:5, 1017:13, 1017:15, 1017:17, 1046:10, 1053:6, 1053:7, 1063:10
**infringed** [11] - 994:3, 995:20, 996:5, 996:24, 998:6, 998:10, 998:15, 1005:2, 1005:6, 1006:16
**infringement** [43] - 993:24, 994:2, 997:1, 997:7, 997:8, 997:9, 997:11, 997:16, 997:20, 997:25, 998:4, 998:6, 998:11, 998:12, 998:16, 998:21, 998:23, 998:24, 1005:13,

1005:18, 1006:10, 1007:15, 1007:21, 1013:15, 1013:20, 1013:24, 1014:1, 1014:3, 1018:3, 1029:18, 1044:23, 1044:24, 1045:14, 1047:16, 1053:3, 1053:4, 1053:7, 1056:2, 1056:5, 1063:8, 1063:18, 1063:20, 1063:23
**infringer** [4] - 1005:14, 1006:8, 1007:18, 1008:9
**infringes** [3] - 996:12, 996:18, 997:6
**infringing** [4] - 1007:1, 1007:18, 1009:11, 1045:5
**initial** [2] - 1014:25, 1015:4
**initiated** [1] - 1030:14
**innovation** [4] - 1058:5, 1058:6, 1058:7
**innovations** [3] - 1011:22, 1011:25, 1022:1
**input** [1] - 1035:10
**inspect** [1] - 1062:24
**instability** [2] - 1045:3, 1045:11
**instant** [1] - 1060:22
**instead** [2] - 995:7, 1014:22
**instruct** [2] - 992:20, 1005:8
**instructed** [1] - 1036:7
**instructing** [1] - 1005:9
**instruction** [2] - 1002:16, 1036:6
**instructions** [15] - 991:18, 992:10, 992:12, 992:15, 992:17, 992:23, 993:1, 996:1, 1009:16, 1010:4, 1018:25, 1026:24, 1036:5, 1058:14, 1063:3
**intellectual** [1] - 1058:4
**INTELLIGENCE** [1] - 989:7
**intended** [2] - 994:14, 1032:6
**intent** [1] - 998:3
**intention** [1] - 995:25

**intentionally** [2] - 998:15, 1013:6
**interested** [1] - 999:23
**Internet** [4] - 1037:10, 1060:21, 1060:22, 1060:23
**interpreted** [3] - 995:23, 995:24, 1044:11
**invalid** [35] - 994:5, 994:6, 995:21, 996:6, 996:20, 996:24, 998:2, 999:3, 1001:7, 1003:13, 1003:21, 1005:4, 1005:7, 1012:15, 1012:17, 1012:18, 1012:20, 1012:21, 1012:22, 1012:24, 1012:25, 1013:1, 1018:22, 1024:20, 1025:20, 1045:4, 1045:5, 1052:18, 1054:5, 1054:8, 1054:21, 1057:6, 1064:7, 1064:18
**invalidate** [2] - 1018:20, 1022:12
**invalidity** [2] - 999:12, 1000:22
**invented** [2] - 1025:6, 1025:24
**invention** [42] - 994:15, 999:7, 999:8, 999:11, 1000:13, 1000:18, 1000:24, 1001:2, 1001:9, 1001:12, 1001:14, 1002:7, 1002:11, 1002:14, 1002:19, 1002:20, 1002:21, 1002:24, 1003:1, 1003:7, 1003:15, 1003:19, 1004:2, 1004:5, 1004:10, 1004:17, 1004:23, 1005:1, 1006:7, 1007:24, 1008:2, 1008:4, 1009:12, 1024:24, 1026:11, 1026:21, 1027:10, 1040:11, 1048:1, 1048:23, 1064:20
**inventions** [4] - 1000:14, 1011:16, 1012:2, 1027:2
**inventor** [2] - 1002:3, 1020:20

**inverter** [1] - 1035:11
**investigation** [1] - 1040:25
**involve** [1] - 1008:22
**involved** [1] - 1011:24
**ion** [1] - 1048:15
**irrelevant** [1] - 998:3
**issue** [31] - 997:20, 1003:9, 1005:11, 1005:15, 1011:17, 1013:15, 1013:16, 1014:9, 1019:4, 1019:9, 1019:25, 1020:5, 1021:2, 1021:15, 1021:21, 1021:25, 1034:15, 1034:16, 1034:23, 1035:24, 1035:25, 1036:17, 1040:1, 1040:2, 1040:3, 1054:9, 1056:4, 1057:5, 1061:15, 1062:5
**issued** [2] - 1050:9, 1050:10
**issues** [13] - 994:9, 999:5, 1014:13, 1014:16, 1015:7, 1030:12, 1033:22, 1033:25, 1034:7, 1034:8, 1040:1, 1056:1
**item** [1] - 1001:16
**items** [4] - 1000:25, 1001:17, 1001:23, 1056:13
**itself** [3] - 995:7, 1002:22, 1057:2
**itty** [1] - 990:20

# J

**January** [2] - 1029:20, 1037:11
**JASON** [1] - 990:6
**job** [2] - 993:8, 995:22
**judge** [1] - 995:22
**Judge** [4] - 1013:16, 1013:25, 1019:3, 1036:7
**judges** [1] - 1036:8
**jump** [1] - 1046:18
**June** [2] - 1037:3
**Juror** [1] - 1059:3
**juror** [11] - 992:1, 996:3, 1059:11, 1065:22, 1065:25, 1066:6, 1066:9, 1066:12, 1066:15, 1066:18, 1066:21

**JUROR** [10] - 1062:21, 1065:24, 1066:2, 1066:4, 1066:8, 1066:11, 1066:14, 1066:17, 1066:20, 1066:23
**jurors** [6] - 993:5, 1060:2, 1060:5, 1060:8, 1060:15, 1061:4
**Jury** [1] - 989:13
**jury** [57] - 990:25, 991:9, 991:15, 991:17, 992:4, 992:5, 992:6, 992:8, 992:9, 992:12, 992:15, 992:19, 993:1, 996:1, 1009:15, 1009:21, 1009:24, 1009:25, 1010:17, 1010:22, 1010:24, 1011:1, 1011:2, 1014:8, 1018:25, 1026:24, 1030:21, 1030:24, 1031:7, 1031:8, 1031:9, 1031:19, 1036:5, 1058:13, 1058:16, 1058:19, 1058:22, 1059:7, 1059:10, 1059:15, 1059:22, 1060:13, 1061:4, 1061:11, 1061:13, 1061:19, 1061:21, 1062:16, 1062:17, 1062:19, 1065:5, 1065:15, 1065:19, 1066:24, 1067:8, 1067:9, 1067:10
**JURY** [1] - 1065:17
**jury's** [1] - 1059:8
**justifies** [1] - 1012:8

# K

**KANTER** [2] - 990:6
**Kanter** [1] - 990:21
**keep** [3] - 1051:3, 1060:1, 1061:13
**KELLY** [1] - 990:3
**Kevin** [2] - 1015:18
**kilowatts** [1] - 1042:5
**kind** [2] - 1028:7, 1067:16
**King** [1] - 989:11
**Kline** [1] - 1052:11
**knowing** [3] - 997:23, 997:24, 1019:22
**knowledge** [5] -

998:18, 999:1, 1030:12, 1036:9, 1042:8
**known** [9] - 993:19, 998:17, 1001:21, 1007:20, 1030:16, 1049:1, 1050:17, 1050:25
**knows** [1] - 1056:19

# L

**lack** [1] - 999:3
**ladies** [1] - 1011:6
**lake** [1] - 1027:14
**Langelaan** [21] - 1019:8, 1020:20, 1023:23, 1025:7, 1025:10, 1025:23, 1026:9, 1026:16, 1026:17, 1027:12, 1027:14, 1039:24, 1042:11, 1042:16, 1042:17, 1042:18, 1043:25, 1048:13, 1049:23, 1057:12, 1058:2
**Langelaan's** [9] - 1021:1, 1022:6, 1023:14, 1024:15, 1025:12, 1027:1, 1027:6, 1027:11, 1057:16
**language** [1] - 995:23
**Lanterman** [10] - 1019:10, 1019:19, 1020:8, 1020:9, 1021:16, 1021:20, 1036:17, 1053:15, 1056:15, 1056:16
**larger** [2] - 1041:13
**Las** [1] - 1030:1
**last** [4] - 1013:17, 1018:15, 1027:4, 1029:17
**LAVERY** [1] - 990:7
**law** [4] - 993:11, 997:2, 997:10, 1003:10
**laws** [1] - 992:20
**lawsuit** [1] - 1009:7, 1030:15
**lawyers** [4] - 1058:24, 1062:3, 1067:3, 1067:25
**lay** [1] - 1044:13
**layout** [1] - 1000:10
**LAYTON** [1] - 990:2
**leads** [3] - 994:1, 1013:20, 1038:12

**leans** [1] - 1013:22
**learned** [2] - 1001:22, 1040:17
**Leason** [6] - 1011:19, 1015:15, 1020:24, 1021:1, 1028:18, 1048:12
**least** [4] - 992:13, 997:5, 1031:1, 1036:21
**leave** [1] - 1067:5
**leaving** [4] - 1009:25, 1030:24, 1061:21, 1067:10
**left** [4] - 1023:10, 1023:17, 1046:23, 1057:20
**legal** [2] - 993:18, 1000:15
**legally** [1] - 1011:21
**less** [3] - 1003:5, 1007:9, 1016:20
**letter** [1] - 1030:7
**letters** [1] - 1030:21
**level** [5] - 999:10, 1002:9, 1002:10, 1004:14, 1018:24
**license** [23] - 1003:2, 1005:17, 1007:15, 1008:3, 1008:15, 1008:20, 1008:21, 1008:25, 1009:3, 1009:4, 1009:5, 1009:6, 1009:7, 1026:14, 1026:17, 1026:22, 1028:11, 1028:14, 1052:12, 1058:2, 1058:3
**licensed** [1] - 1009:13
**licenses** [1] - 1052:15
**life** [2] - 1015:20, 1021:3
**lift** [4] - 1023:6, 1024:5, 1024:6, 1033:5
**LIFT** [2] - 1045:7, 1045:10
**LIFT's** [1] - 1025:25
**light** [6] - 994:1, 1001:7, 1012:18, 1013:19, 1052:18
**lightly** [1] - 1018:17
**likely** [7] - 994:2, 998:9, 1003:23, 1005:22, 1013:21, 1038:7, 1043:18
**limitation** [2] - 1000:24, 1022:9
**limited** [2] - 1007:10, 1049:12

**line** [2] - 1010:20, 1010:21
**lines** [1] - 1035:8
**link** [3] - 1038:12, 1047:21, 1053:19
**list** [1] - 993:3
**listen** [7] - 992:12, 992:22, 1059:25, 1060:1, 1060:15, 1063:3, 1063:6
**listening** [1] - 1049:18
**lithium** [1] - 1048:15
**litigated** [2] - 1034:25
**litigation** [4] - 1009:8, 1021:5, 1021:8, 1021:12
**lives** [1] - 1011:9
**LLP** [1] - 990:5
**locate** [1] - 999:25
**logical** [2] - 1023:18, 1028:19
**logs** [5] - 1037:17, 1037:21, 1037:24, 1038:16, 1038:17
**Look** [1] - 1039:8
**look** [26] - 995:12, 996:1, 1014:1, 1014:8, 1014:10, 1016:11, 1025:18, 1025:22, 1026:6, 1026:13, 1027:6, 1028:3, 1032:23, 1039:17, 1039:18, 1044:11, 1044:12, 1046:15, 1046:18, 1046:19, 1049:2, 1049:3, 1049:18, 1052:6, 1052:7
**looked** [5] - 1023:2, 1025:13, 1031:24, 1035:4, 1042:1
**looking** [3] - 1021:20, 1041:19, 1052:16
**looks** [2] - 1014:14, 1035:1, 1042:16
**lose** [2] - 1024:6, 1028:21
**LTD** [1] - 989:8

# M

**machine** [1] - 1023:3
**Madam** [1] - 1062:19
**magazine** [3] - 1038:10, 1038:11, 1047:21
**magic** [2] - 1023:12, 1055:19
**mail** [1] - 1030:10
**main** [3] - 993:5,

1014:13, 1014:16
**marble** [1] - 1045:22
**March** [3] - 989:12, 1007:6, 1030:8
**margin** [1] - 1029:3
**MARK** [1] - 990:7
**Mark's** [1] - 1036:19
**market** [7] - 1012:2, 1024:14, 1026:2, 1026:4, 1029:4, 1043:25, 1057:16
**MARSHALL** [1] - 1061:18
**math** [6] - 1015:25, 1016:5, 1017:15, 1017:23, 1017:24, 1022:20
**mathematical** [1] - 1005:24
**matter** [5] - 999:24, 1003:25, 1032:22, 1033:18, 1044:12
**McGRAW** [3] - 989:21, 991:21, 992:2
**mean** [2] - 1028:6, 1028:18
**meaning** [2] - 995:22, 996:8
**meanings** [1] - 996:4
**means** [9] - 993:25, 994:7, 1013:18, 1032:7, 1034:21, 1036:9, 1038:8, 1041:17, 1060:19
**meant** [3] - 993:9, 1005:13, 1061:8
**measure** [1] - 1005:9
**media** [1] - 1060:20
**meet** [1] - 1067:14
**meeting** [1] - 1021:21
**meets** [1] - 1042:3
**members** [10] - 992:6, 992:8, 992:19, 1009:15, 1011:2, 1030:21, 1031:9, 1058:13, 1065:15, 1066:24
**memory** [1] - 1036:10
**mention** [2] - 1053:18, 1056:13
**mentioned** [1] - 1011:9
**Merit** [1] - 1068:10
**messages** [3] - 1058:20, 1059:1, 1059:4
**messaging** [1] - 1060:22
**met** [2] - 994:23, 1013:23

**metadata** [1] - 1036:25
**method** [1] - 1009:13
**MHL** [78] - 989:4, 993:23, 993:25, 996:9, 996:11, 996:13, 996:25, 997:12, 998:13, 998:24, 999:17, 1000:5, 1000:8, 1005:5, 1005:13, 1005:15, 1005:19, 1005:21, 1005:23, 1006:3, 1006:12, 1007:4, 1008:12, 1011:10, 1011:13, 1013:2, 1013:5, 1013:10, 1013:14, 1017:2, 1017:3, 1018:6, 1021:14, 1023:5, 1023:10, 1024:15, 1026:15, 1026:16, 1026:19, 1027:12, 1027:18, 1027:20, 1028:11, 1028:13, 1028:14, 1028:20, 1029:1, 1029:5, 1029:13, 1029:19, 1029:20, 1030:6, 1030:8, 1030:14, 1036:18, 1037:25, 1038:24, 1042:14, 1043:25, 1045:4, 1049:11, 1050:2, 1055:20, 1055:25, 1056:1, 1056:7, 1056:11, 1056:24, 1057:6, 1057:10, 1057:14, 1057:24, 1058:1, 1058:3, 1058:7, 1065:3
**MHL's** [12] - 997:18, 997:20, 998:21, 1001:22, 1001:23, 1011:19, 1013:15, 1013:22, 1022:7, 1028:22, 1030:12, 1045:14
**middle** [2] - 1035:7, 1041:10
**might** [2] - 1062:5, 1063:4
**Might** [1] - 1039:8
**miles** [1] - 1046:2
**million** [1] - 1029:14
**millions** [1] - 1018:6
**mind** [3] - 1060:1, 1060:4, 1060:7
**minds** [1] - 1060:14

**mine** [1] - 993:8
**minute** [8] - 1009:21, 1010:3, 1018:19, 1019:2, 1028:2, 1032:9, 1044:24, 1055:6
**minutes** [5] - 1009:19, 1016:20, 1018:14, 1031:1, 1055:3
**missing** [1] - 1048:4
**model** [3] - 996:16, 1029:1, 1029:7
**models** [1] - 1017:9
**modifications** [1] - 1042:25, 1043:2
**moment** [6] - 1014:8, 1032:24, 1036:4, 1039:6, 1046:19, 1052:10
**Monday** [1] - 1067:12
**money** [1] - 996:25
**monitor** [1] - 1035:11
**monitored** [1] - 1061:24
**month** [1] - 1029:22
**months** [2] - 1029:25, 1030:4
**morning** [4] - 990:14, 992:7, 1011:6, 1019:4
**most** [5] - 992:11, 1012:3, 1015:20, 1021:3
**motivation** [1] - 1048:5
**motor** [29] - 1032:7, 1033:13, 1035:3, 1035:5, 1035:7, 1035:8, 1035:9, 1035:17, 1035:19, 1036:1, 1036:2, 1040:19, 1040:23, 1040:24, 1041:2, 1041:3, 1041:5, 1041:8, 1041:13, 1041:19, 1042:2, 1042:3, 1042:4, 1042:6, 1044:16, 1047:9, 1047:10, 1054:10
**motors** [1] - 1048:19
**move** [1] - 1044:24
**moved** [1] - 1019:21
**movement** [1] - 1032:8
**moving** [3] - 1046:1, 1046:2, 1051:7
**MR** [23] - 990:19, 990:20, 991:3, 991:6, 991:21,

992:2, 1010:5, 1010:8, 1010:11, 1011:5, 1023:10, 1031:6, 1031:13, 1046:22, 1055:5, 1062:7, 1062:8, 1065:19, 1067:18, 1067:19, 1067:22, 1068:2, 1068:3
**multiple** [2] - 1036:14, 1050:7
**multiplying** [1] - 1065:9
**MURRELL** [5] - 989:20, 990:20, 991:3, 1010:5, 1010:8
**Murrell** [2] - 1010:20, 1046:1
**must** [45] - 992:20, 992:23, 993:3, 993:18, 994:23, 995:23, 996:4, 996:6, 997:7, 997:12, 997:21, 998:11, 998:13, 998:25, 999:9, 1000:2, 1000:8, 1000:14, 1000:20, 1001:10, 1001:20, 1003:6, 1003:15, 1004:19, 1005:4, 1005:12, 1005:24, 1006:15, 1006:18, 1006:25, 1009:1, 1009:12, 1011:25, 1014:3, 1016:17, 1018:10, 1027:7, 1038:2, 1038:4, 1039:2, 1058:20, 1059:12, 1060:9, 1060:17, 1061:9

**N**

**Namanny** [15] - 999:15, 1001:8, 1012:19, 1012:22, 1013:1, 1024:19, 1025:3, 1025:5, 1047:25, 1049:4, 1049:6, 1052:19, 1054:15, 1064:9
**name** [1] - 1000:15
**nature** [3] - 1004:12, 1004:16, 1011:20
**nearby** [1] - 992:9
**necessarily** [2] - 1007:10, 1046:12
**necessary** [4] -

995:12, 1004:6, 1004:7, 1059:11
**need** [20] - 990:17, 994:10, 996:24, 1004:24, 1005:7, 1013:13, 1017:16, 1018:20, 1021:15, 1021:22, 1033:17, 1039:13, 1040:11, 1043:8, 1043:10, 1043:16, 1044:2, 1044:14, 1051:15
**needs** [2] - 1025:8, 1041:21
**negate** [1] - 997:16
**negotiation** [11] - 1006:9, 1006:11, 1006:19, 1007:5, 1007:8, 1007:10, 1007:12, 1007:14, 1028:5, 1028:17, 1065:3
**negotiations** [2] - 1006:14, 1007:17
**neighborhood** [1] - 1008:19
**never** [12] - 1007:9, 1017:20, 1021:7, 1023:21, 1023:25, 1024:1, 1024:2, 1029:20, 1055:15, 1056:16, 1057:8, 1059:4
**new** [10] - 1000:14, 1000:17, 1000:21, 1011:14, 1011:15, 1012:1, 1012:2, 1032:5, 1040:7
**newbie** [1] - 1016:19
**News** [4] - 1037:6, 1037:7, 1038:9, 1053:17
**next** [27] - 1002:16, 1024:16, 1024:18, 1024:19, 1032:3, 1032:10, 1032:12, 1033:23, 1034:4, 1035:13, 1038:16, 1039:5, 1043:23, 1044:1, 1044:8, 1044:19, 1049:10, 1052:25, 1053:9, 1054:13, 1056:3, 1056:9, 1057:4, 1057:9, 1057:13, 1057:19, 1067:16
**nine** [1] - 1035:8
**nobody** [5] - 1016:9, 1018:8, 1022:3, 1025:6, 1056:19

**non** [2] - 1007:18, 1009:11
**non-infringing** [2] - 1007:18, 1009:11
**none** [3] - 1005:5, 1049:23, 1057:6
**normal** [1] - 1008:11
**normally** [1] - 1059:1
**North** [1] - 989:11
**noted** [1] - 1025:8
**notes** [1] - 1068:8
**nothing** [8] - 990:17, 993:8, 1012:9, 1018:12, 1020:19, 1030:16, 1053:8, 1061:7
**notice** [1] - 1062:10
**noticed** [1] - 991:16
**November** [1] - 1038:18
**Number** [17] - 1014:2, 1022:5, 1023:19, 1024:16, 1027:4, 1056:22, 1056:23, 1057:1, 1059:3, 1065:22, 1065:25, 1066:6, 1066:9, 1066:12, 1066:15, 1066:18, 1066:21
**number** [1] - 1014:10
**numbered** [1] - 994:11
**numbers** [2] - 1017:16, 1017:18

**O**

**objection** [1] - 1010:11
**objections** [1] - 1010:3
**obscure** [1] - 1022:2
**observation** [1] - 1015:25
**observe** [1] - 1036:10
**obtain** [2] - 1003:2, 1026:14
**obvious** [20] - 998:17, 1001:10, 1002:14, 1002:15, 1002:19, 1012:18, 1015:8, 1024:23, 1025:13, 1025:24, 1026:3, 1026:12, 1026:20, 1026:22, 1027:2, 1054:17, 1057:10, 1057:11, 1064:8
**obviously** [3] - 1028:1, 1055:25, 1057:5
**obviousness** [14] -

996:21, 999:3, 1001:7, 1001:16, 1001:18, 1001:25, 1002:17, 1003:9, 1024:19, 1024:20, 1054:14, 1054:15, 1057:9, 1064:5
**occurred** [3] - 998:23, 999:1, 1007:11
**October** [13] - 999:9, 999:20, 1000:3, 1001:14, 1001:20, 1002:12, 1003:20, 1004:24, 1019:7, 1037:22, 1038:18, 1053:12, 1064:2
**OF** [1] - 989:2
**offers** [1] - 997:3
**Office** [6] - 1025:10, 1025:11, 1025:12, 1025:13, 1027:16, 1049:1
**office** [1] - 997:11
**officer** [4] - 1058:19, 1058:22, 1061:11
**often** [1] - 997:11
**one** [39] - 990:20, 990:22, 992:13, 993:6, 993:16, 996:14, 997:5, 997:8, 1001:1, 1001:17, 1003:11, 1004:18, 1005:2, 1006:23, 1008:6, 1008:15, 1016:1, 1024:11, 1025:21, 1025:22, 1026:2, 1029:8, 1032:6, 1033:22, 1034:8, 1036:22, 1043:13, 1043:14, 1052:13, 1054:7, 1055:6, 1056:1, 1056:3, 1056:9, 1057:9, 1057:13, 1057:19, 1059:4, 1060:12
**ONE** [2] - 996:16
**One** [1] - 1045:11
**one-page** [1] - 990:22
**ones** [2] - 1010:5, 1026:4
**online** [2] - 1019:10, 1037:20
**op** [1] - 1020:17
**open** [1] - 1060:1
**opening** [4] - 1034:17, 1039:12, 1043:9, 1048:8
**operate** [1] - 1017:8
**operated** [1] - 1034:22

**opinion** [2] - 1018:2, 1035:16
**opportunity** [2] - 1036:10, 1044:11
**opposed** [3] - 1041:21, 1052:8, 1063:2
**opposite** [1] - 1020:18
**options** [1] - 1033:13
**order** [10] - 994:23, 1000:7, 1000:13, 1001:9, 1004:4, 1018:20, 1040:11, 1043:11, 1051:8, 1059:10
**ordinarily** [2] - 999:23, 1020:2
**ordinary** [22] - 996:8, 999:6, 999:10, 1001:4, 1001:12, 1001:19, 1002:4, 1002:11, 1003:18, 1003:22, 1004:3, 1004:14, 1004:24, 1019:6, 1021:17, 1021:18, 1040:10, 1047:22, 1048:22, 1049:19, 1056:17, 1064:19
**original** [2] - 1015:1, 1060:5
**otherwise** [2] - 999:22, 1055:21
**outcome** [1] - 1028:17
**output** [2] - 1041:14, 1041:17
**outside** [1] - 1022:10
**overall** [1] - 1041:16
**overcome** [1] - 1000:7
**owed** [1] - 1013:5
**own** [12] - 995:9, 1015:8, 1015:14, 1016:3, 1016:12, 1017:15, 1018:2, 1021:9, 1036:18, 1044:25, 1058:9, 1060:9
**owner's** [4] - 994:15, 994:18, 994:19, 997:4

**P**

**P.A** [2] - 989:17, 990:2
**p.m** [1] - 1068:6
**page** [15] - 990:22, 991:19, 1032:1, 1032:3, 1032:10, 1032:12, 1033:11, 1035:13, 1038:9,

1038:21, 1039:5, 1040:23, 1041:10, 1054:2, 1054:13
**Page** [8] - 1032:25, 1033:11, 1033:15, 1035:6, 1039:8, 1040:22, 1055:11, 1058:14
**pages** [5] - 1031:24, 1032:16, 1032:17, 1035:1, 1035:22
**paid** [1] - 1018:3
**paint** [2] - 1039:1
**paper** [1] - 1058:21
**paragraph** [1] - 1041:11
**part** [1] - 1003:11
**particular** [2] - 1001:11, 1046:8
**parties** [11] - 999:15, 1005:16, 1006:15, 1006:17, 1007:12, 1007:16, 1007:21, 1009:6, 1028:7, 1028:8, 1067:1
**PARTNERS** [1] - 990:5
**parts** [1] - 1063:2
**party** [5] - 993:13, 997:23, 997:25, 1005:10, 1006:20
**pass** [1] - 1010:21
**passive** [2] - 1014:18, 1034:2
**passively** [1] - 1034:5
**past** [1] - 1057:4
**patent** [108] - 993:20, 993:23, 994:10, 994:11, 994:12, 994:13, 994:15, 994:17, 994:18, 994:19, 994:21, 995:14, 995:15, 995:21, 996:10, 997:2, 997:4, 997:5, 997:6, 997:10, 997:23, 997:24, 997:25, 998:1, 998:18, 999:5, 999:15, 999:16, 1000:13, 1000:16, 1001:22, 1001:23, 1002:7, 1003:10, 1003:11, 1003:16, 1003:21, 1004:9, 1004:11, 1006:5, 1006:8, 1006:16, 1008:10, 1009:13, 1009:14, 1013:10, 1013:25, 1014:9,

1014:11, 1014:19, 1015:2, 1018:16, 1019:8, 1020:24, 1021:4, 1025:6, 1027:12, 1034:3, 1039:16, 1039:18, 1039:20, 1039:21, 1039:22, 1040:6, 1040:7, 1042:12, 1049:3, 1049:12, 1049:25, 1050:10, 1052:7, 1052:17, 1054:17, 1054:22, 1057:12, 1063:10, 1063:11, 1063:12, 1063:13, 1063:14, 1063:15, 1063:16, 1063:17, 1063:21, 1063:24, 1064:7, 1064:10, 1064:11, 1064:12, 1064:13, 1064:14, 1064:15, 1064:17, 1064:18, 1064:21, 1064:22, 1064:23, 1064:24, 1064:25, 1065:1
**Patent** [6] - 1025:10, 1025:11, 1025:12, 1025:13, 1027:16, 1049:1
**patent's** [1] - 1025:20
**patented** [1] - 1009:11
**patents** [55] - 995:3, 996:20, 998:2, 998:10, 998:14, 998:22, 1003:3, 1005:17, 1011:16, 1011:18, 1011:19, 1011:25, 1012:14, 1012:17, 1012:22, 1013:1, 1013:4, 1015:24, 1018:21, 1020:20, 1021:1, 1021:2, 1022:7, 1023:14, 1024:15, 1024:20, 1025:1, 1025:3, 1025:9, 1025:12, 1025:21, 1026:15, 1027:1, 1027:6, 1027:11, 1027:18, 1027:23, 1028:24, 1028:25, 1030:12, 1030:17, 1042:17, 1050:9, 1050:15, 1052:3, 1052:5, 1054:1, 1054:5, 1054:21, 1056:6, 1057:16, 1057:25, 1064:18
**paths** [2] - 1036:20,

1036:21
**PATRICK** [1] - 990:7
**pay** [3] - 1008:9, 1028:16, 1029:6
**paying** [2] - 1028:14, 1028:24
**payment** [2] - 1006:5, 1006:8
**people** [21] - 1008:11, 1012:3, 1016:8, 1016:15, 1019:11, 1019:13, 1019:15, 1019:17, 1019:20, 1020:18, 1026:21, 1037:14, 1038:1, 1038:13, 1043:21, 1048:12, 1048:18, 1050:7, 1050:17, 1062:2
**per** [8] - 1028:16, 1029:13, 1046:2, 1057:18, 1057:22, 1065:4, 1065:5, 1065:11
**percent** [8] - 1029:3, 1029:9, 1052:13, 1052:14, 1052:22, 1052:23, 1061:24
**percentage** [1] - 1065:4
**percentages** [1] - 1028:12
**perform** [1] - 993:15
**perhaps** [1] - 1067:15
**period** [2] - 1038:19, 1038:22
**permission** [1] - 997:4
**person** [24] - 997:2, 999:6, 1001:3, 1001:12, 1001:19, 1002:4, 1003:18, 1004:3, 1004:24, 1016:23, 1019:6, 1020:2, 1020:3, 1020:12, 1020:13, 1021:17, 1021:18, 1032:6, 1040:10, 1047:22, 1048:22, 1049:19, 1056:17, 1064:19
**personal** [4] - 1004:8, 1004:13, 1004:15, 1034:6
**personally** [1] - 1067:6
**persons** [2] - 999:23, 1003:22
**perspective** [1] - 999:6
**phone** [1] - 1060:20,

1061:2
**phones** [1] - 1048:21
**photograph** [1] - 1049:23
**physical** [1] - 1030:10
**picked** [1] - 1016:22
**picture** [1] - 1039:1
**piece** [1] - 1058:21
**pieces** [1] - 1024:23
**pitch** [2] - 1032:24, 1033:1
**place** [2] - 1006:9, 1061:13
**Plaintiff** [3] - 989:5, 989:22, 1067:12
**plane** [2] - 1047:13, 1050:25
**planes** [1] - 1043:20
**play** [2] - 1019:5, 1046:20
**playing** [2] - 1023:9, 1046:21
**plays** [1] - 1043:12
**PLLC** [1] - 989:19
**plug** [2] - 1017:16, 1017:17
**plus** [1] - 1021:10
**Plus** [1] - 996:16
**podium** [1] - 1010:23
**point** [7] - 1013:9, 1037:17, 1043:5, 1045:7, 1048:24, 1067:15, 1067:24
**pointed** [2] - 1029:11, 1033:3
**points** [4] - 1045:2, 1045:8, 1045:9, 1055:9
**polled** [1] - 1065:20
**popularity** [1] - 1012:3
**position** [5] - 1001:19, 1005:16, 1041:6, 1048:18, 1060:5
**possible** [3] - 1006:1, 1012:10, 1058:17
**posted** [1] - 1037:10
**potential** [1] - 1043:1
**power** [4] - 1041:5, 1041:21, 1042:5, 1048:17
**powered** [1] - 1032:6
**powerful** [2] - 1051:16, 1051:17
**PowerPoint** [1] - 1039:24
**preceding** [1] - 994:16
**precision** [1] - 1005:24
**predictability** [1] - 1004:12

**preferred** [1] - 1006:20
**prejudice** [1] - 993:16
**preliminary** [2] - 992:15, 1036:5
**prepared** [1] - 1059:13
**preponderance** [15] - 993:21, 993:24, 997:12, 998:13, 1000:8, 1005:20, 1013:17, 1014:4, 1045:18, 1053:22, 1063:9, 1063:19, 1063:22, 1064:3, 1065:7
**prerequisite** [1] - 998:18
**presence** [1] - 997:14
**present** [3] - 997:17, 1003:4, 1054:11
**presented** [7] - 993:14, 1004:11, 1004:21, 1008:7, 1020:1, 1042:20, 1061:10
**preserve** [1] - 1010:5
**presiding** [2] - 990:12, 991:13
**presumed** [1] - 1000:7
**presumption** [1] - 1000:8
**pretty** [1] - 1015:8
**prevail** [2] - 993:13, 1005:11
**Preview** [1] - 1039:7
**principles** [2] - 1050:17, 1050:19
**probability** [1] - 1008:13
**probable** [2] - 994:8, 1018:23
**problem** [4] - 1002:3, 1002:5, 1026:7, 1041:11
**problematic** [1] - 1024:1
**problems** [1] - 1003:1
**proceed** [4] - 1067:15
**proceeding** [1] - 1068:9
**PROCEEDINGS** [1] - 990:10
**produce** [6] - 993:25, 1019:13, 1019:19, 1019:23, 1027:18, 1027:19
**produced** [3] - 1020:5, 1022:13, 1037:2
**producing** [2] - 1027:13

**product** [7] - 994:24, 997:4, 997:15, 1002:23, 1007:1, 1009:12, 1030:1
**products** [21] - 996:13, 996:14, 996:17, 997:13, 997:19, 997:20, 997:21, 997:22, 1007:25, 1008:2, 1011:18, 1011:23, 1014:5, 1016:12, 1017:7, 1018:7, 1025:25, 1030:8, 1057:15, 1063:9
**professional** [1] - 1043:13
**Professor** [19] - 1033:2, 1033:10, 1036:15, 1039:24, 1040:18, 1042:11, 1042:16, 1042:17, 1042:18, 1043:4, 1043:15, 1043:25, 1046:13, 1047:18, 1048:9, 1048:13, 1049:23, 1050:14, 1051:9
**profits** [1] - 1007:7
**project** [2] - 1038:10, 1042:4
**Project** [2] - 1027:25, 1038:21
**promotion** [1] - 1002:22
**proof** [5] - 993:13, 993:19, 993:21, 1045:14, 1045:17
**proper** [1] - 1008:16
**property** [5] - 994:15, 994:18, 994:19, 1058:4, 1058:7
**prophetic** [1] - 1039:9
**proposed** [1] - 1052:24
**propulsion** [1] - 1048:4
**protect** [3] - 1011:21, 1058:5, 1058:6
**protected** [1] - 1011:25
**prototype** [5] - 1040:16, 1041:24, 1049:22, 1050:2
**prototypes** [4] - 1023:7, 1033:6, 1033:9, 1049:13
**prove** [14] - 997:11, 997:12, 998:13, 1000:2, 1000:8,

1000:20, 1001:10, 1005:23, 1005:24, 1008:12, 1014:3, 1018:21, 1022:7, 1027:7
**proved** [1] - 998:24
**proven** [2] - 993:18, 999:18
**provide** [4] - 995:22, 1014:18, 1034:2, 1060:18
**provided** [2] - 996:3, 1036:20
**provides** [2] - 997:2, 1018:16
**providing** [1] - 1040:7
**proving** [2] - 993:23, 994:5
**prudent** [1] - 1008:11
**public** [3] - 1019:3, 1036:16, 1036:19
**publication** [2] - 1000:6, 1038:8
**publicly** [9] - 999:19, 999:21, 1000:3, 1039:3, 1039:4, 1047:20, 1053:12, 1056:10, 1064:1
**publish** [1] - 1063:7
**published** [1] - 1047:21
**pull** [1] - 1055:23
**pulse** [1] - 1035:11
**punish** [1] - 1005:14
**purposes** [2] - 1000:1, 1044:2
**put** [9] - 1001:18, 1005:15, 1023:21, 1028:6, 1028:22, 1029:5, 1031:22, 1046:3, 1048:19
**puts** [1] - 1045:22

## Q

**quantification** [1] - 1046:6
**quantify** [2] - 1046:5, 1046:7
**questions** [4] - 993:3, 1058:20, 1059:1, 1062:5
**quick** [2] - 991:22, 1055:23
**quickly** [4] - 1024:6, 1030:4, 1055:24, 1062:4
**quiet** [1] - 1061:13

## R

**raises** [1] - 1034:24
**RALLI** [1] - 989:17
**rate** [13] - 1006:22, 1006:24, 1006:25, 1029:6, 1029:12, 1052:14, 1052:17, 1052:22, 1052:23, 1065:8, 1065:10, 1065:11
**rated** [1] - 1042:5
**rather** [3] - 1002:22, 1004:19, 1017:4
**rational** [1] - 1047:2
**reach** [6] - 1005:14, 1018:24, 1024:1, 1052:21, 1059:24, 1060:10
**reached** [6] - 1005:16, 1026:15, 1026:16, 1026:18, 1028:8, 1059:16
**reaching** [1] - 1061:25
**read** [18] - 992:11, 992:13, 994:25, 1010:4, 1031:22, 1033:17, 1039:8, 1044:12, 1052:6, 1063:2, 1065:23, 1066:1, 1066:6, 1066:10, 1066:13, 1066:16, 1066:19, 1066:22
**ready** [3] - 990:18, 1030:2, 1031:5
**Real** [1] - 1068:10
**real** [1] - 1055:23
**Real-Time** [1] - 1068:10
**reality** [5] - 1016:17, 1017:8, 1028:13, 1042:18, 1045:24
**really** [11] - 991:22, 1011:11, 1012:10, 1014:9, 1014:12, 1014:14, 1015:6, 1015:12, 1017:3, 1039:19, 1051:24
**rear** [2] - 1050:23, 1051:6
**rearwardly** [1] - 1047:17
**reason** [7] - 1021:24, 1022:3, 1024:19, 1048:12, 1048:13, 1055:21
**reasonable** [17] - 999:24, 1005:24, 1006:3, 1006:7,

1006:18, 1006:21, 1007:19, 1008:13, 1008:17, 1009:2, 1009:9, 1028:17, 1036:10, 1059:23, 1065:2, 1065:7
**reasonably** [2] - 1002:3, 1006:14
**reasons** [1] - 1055:13
**rebuttal** [1] - 1055:4
**recess** [2] - 1062:10, 1068:4
**Recess** [4] - 991:11, 1010:15, 1031:3, 1062:12
**recessed** [1] - 1068:6
**recite** [1] - 995:7
**recites** [1] - 1014:23
**reciting** [1] - 1014:22
**record** [2] - 1007:7, 1060:13
**records** [3] - 1019:13, 1019:20, 1019:23
**recover** [1] - 1008:14
**ref** [1] - 1049:3
**refer** [2] - 995:4, 996:17
**reference** [6] - 993:1, 1000:23, 1001:8, 1049:4
**references** [3] - 1048:6, 1048:22, 1049:3
**referred** [2] - 996:11, 997:11
**referring** [1] - 1037:18
**refers** [1] - 998:7
**reflect** [1] - 1006:25
**regard** [14] - 1033:23, 1036:6, 1036:18, 1036:25, 1038:10, 1044:23, 1045:13, 1048:9, 1050:13, 1052:1, 1053:3, 1053:10, 1054:3, 1054:19
**regarding** [3] - 1001:25, 1015:7, 1043:1
**regardless** [1] - 1019:24
**regards** [1] - 1014:21
**regular** [1] - 1011:9
**regularity** [1] - 1062:24
**rejecting** [1] - 1049:5
**rejection** [1] - 1049:7
**relating** [3] - 1039:25, 1040:5, 1042:9
**relative** [1] - 1008:18

**relatively** [1] - 1030:22
**released** [1] - 1012:3
**relevant** [2] - 1002:3, 1007:9
**relies** [1] - 1046:15
**relying** [2] - 1039:13, 1044:22
**remember** [2] - 1017:16, 1051:3
**repeat** [2] - 992:16, 992:17
**repeatedly** [1] - 1044:9
**repeating** [1] - 1061:6
**Report** [76] - 999:17, 999:19, 999:21, 999:25, 1000:3, 1000:5, 1000:7, 1000:9, 1000:12, 1000:19, 1000:21, 1001:3, 1001:5, 1019:17, 1020:3, 1020:19, 1021:22, 1021:23, 1022:4, 1022:6, 1022:14, 1022:18, 1022:24, 1024:9, 1031:20, 1032:15, 1032:19, 1032:25, 1033:12, 1034:11, 1034:18, 1034:19, 1035:1, 1035:6, 1035:16, 1035:22, 1036:21, 1036:25, 1037:19, 1038:13, 1039:4, 1039:9, 1039:18, 1042:23, 1044:3, 1044:5, 1044:10, 1044:20, 1047:8, 1047:19, 1047:20, 1047:23, 1049:14, 1049:21, 1050:4, 1050:15, 1050:21, 1051:2, 1051:4, 1051:6, 1051:10, 1052:2, 1052:8, 1053:12, 1053:23, 1053:24, 1053:25, 1054:6, 1054:23, 1056:10, 1056:12, 1056:23, 1056:25, 1057:1, 1064:1, 1064:4
**report** [36] - 1020:7, 1020:8, 1022:9, 1022:10, 1022:12, 1022:16, 1022:25, 1023:2, 1024:2, 1031:25, 1032:14, 1033:16, 1034:16,

1037:4, 1037:5, 1037:8, 1038:5, 1038:13, 1038:22, 1039:11, 1039:13, 1039:14, 1039:19, 1040:13, 1041:1, 1041:24, 1042:1, 1042:9, 1042:10, 1042:25, 1043:1, 1044:17, 1053:20, 1055:12, 1067:16
**reported** [1] - 1042:8
**Reporter** [1] - 1068:10
**requests** [1] - 1065:18
**required** [7] - 993:19, 1003:25, 1004:20, 1005:23, 1008:12, 1020:14, 1041:5
**requirement** [4] - 996:22, 1000:24, 1003:12, 1022:8
**requirements** [11] - 994:23, 995:7, 995:8, 995:9, 995:15, 995:17, 997:10, 1003:10, 1003:12, 1042:3
**requires** [3] - 995:16, 1000:22, 1015:3
**research** [1] - 1060:24
**respect** [8] - 1000:11, 1012:4, 1012:5, 1013:10, 1022:1, 1022:21, 1056:8, 1056:14
**respectfully** [1] - 1059:25
**respecting** [1] - 1058:4
**respects** [1] - 1058:7
**respond** [1] - 1058:23
**response** [3] - 1030:7, 1030:10, 1030:16
**result** [1] - 995:16
**resulted** [1] - 1006:19
**results** [1] - 1065:9
**return** [3] - 1014:25, 1059:10, 1059:18
**review** [1] - 1001:5
**revolutionary** [1] - 1011:23
**reward** [1] - 1058:4
**rewarded** [1] - 1011:25
**Richard** [2] - 990:12, 991:13
**RICHARD** [1] - 989:15
**RICHARDS** [1] - 990:2
**ridden** [4] - 1015:15, 1015:16, 1015:20,

1017:5
**ride** [4] - 1018:8, 1043:9, 1043:13, 1043:14
**rider** [1] - 1043:12
**riding** [1] - 1051:22
**rights** [10] - 994:16, 994:18, 1012:4, 1012:6, 1013:10, 1018:16, 1018:17, 1022:1, 1058:4, 1058:7
**rise** [11] - 990:11, 990:13, 991:10, 991:12, 1010:14, 1010:16, 1031:2, 1031:4, 1062:11, 1062:13, 1068:5
**risk** [2] - 998:16, 1011:24
**roadmap** [2] - 1001:23, 1027:1
**roam** [1] - 1010:23
**ROBERT** [2] - 989:20, 990:6
**role** [2] - 994:10, 1043:12
**room** [11] - 993:1, 1009:21, 1014:8, 1031:19, 1058:16, 1059:15, 1059:22, 1060:13, 1060:23, 1061:4, 1067:8
**roughly** [1] - 1028:9
**route** [1] - 1037:5
**routine** [1] - 1004:7
**royalty** [32] - 1006:3, 1006:5, 1006:7, 1006:18, 1006:20, 1006:21, 1006:22, 1006:23, 1006:24, 1006:25, 1007:20, 1008:9, 1008:13, 1008:17, 1009:2, 1009:9, 1013:5, 1052:14, 1052:16, 1052:22, 1065:2, 1065:8, 1065:10, 1065:11, 1065:12
**running** [2] - 1051:13, 1067:13

## S

**sailing** [2] - 1023:5, 1023:12
**sale** [1] - 997:3
**sales** [4] - 1002:22, 1027:24, 1028:21, 1065:5

**satisfy** [3] - 996:21, 997:13, 1014:5
**saw** [4] - 993:7, 1024:7, 1027:14, 1050:8
**scale** [1] - 1013:21
**scenario** [1] - 1008:21
**schematic** [1] - 1035:14
**scope** [7] - 995:1, 1002:2, 1003:14, 1003:19, 1004:16, 1004:25, 1008:24
**screen** [2] - 1038:11, 1040:16
**sealed** [1] - 990:23
**search** [5] - 1020:9, 1020:10, 1020:22, 1036:22, 1056:19
**searched** [3] - 1020:20, 1020:23, 1020:25
**seated** [7] - 990:15, 991:14, 992:7, 1011:3, 1031:11, 1062:14, 1062:18
**second** [9] - 993:11, 993:22, 995:5, 1002:25, 1026:5, 1037:5, 1050:9, 1053:21, 1054:2
**secondary** [2] - 1003:6, 1025:18
**seconds** [2] - 1067:4, 1067:7
**secret** [1] - 1059:8
**section** [1] - 1051:4
**see** [29] - 996:2, 1013:18, 1015:8, 1016:2, 1016:12, 1016:22, 1024:5, 1025:4, 1029:14, 1031:25, 1032:1, 1032:4, 1032:10, 1032:12, 1032:14, 1034:2, 1034:5, 1034:20, 1038:11, 1040:16, 1040:25, 1045:7, 1049:22, 1049:23, 1055:14, 1055:19, 1060:8, 1062:16, 1067:7
**seeing** [1] - 1015:2
**seek** [2] - 1003:2, 1026:14
**seeking** [1] - 1006:3
**seesawing** [1] - 1051:9
**selecting** [1] - 1001:23

**sell** [7] - 1006:6, 1029:2, 1029:3, 1030:2, 1030:11, 1030:13, 1030:15
**selling** [4] - 996:13, 1018:11, 1029:8, 1030:8
**sells** [2] - 997:3, 1029:20
**sends** [1] - 1030:8
**sensation** [1] - 1016:25
**sense** [6] - 1016:1, 1047:1, 1049:17, 1049:19, 1051:25
**sent** [2] - 1030:6, 1059:2
**sentences** [1] - 994:11
**separately** [2] - 991:20, 996:3
**server** [2] - 1038:15, 1038:17
**service** [5] - 1011:7, 1031:14, 1060:22, 1066:25
**session** [2] - 990:12, 991:13
**set** [2] - 1029:7, 1054:1
**sets** [1] - 994:23
**settlement** [1] - 1009:7
**seven** [5] - 1019:11, 1019:21, 1029:25, 1030:4, 1038:22
**several** [1] - 1004:5
**shape** [1] - 990:17
**SHENZEN** [1] - 989:7
**shift** [20] - 1014:17, 1014:22, 1015:7, 1015:8, 1015:11, 1017:10, 1032:8, 1034:1, 1034:6, 1034:9, 1034:10, 1034:12, 1034:13, 1034:14, 1034:21, 1035:2, 1040:2, 1047:8, 1047:9, 1048:3
**shifting** [1] - 1034:22
**short** [2] - 1010:13, 1030:22
**shortly** [2] - 1007:16, 1050:9
**show** [21] - 998:12, 1001:9, 1003:15, 1014:4, 1019:13, 1019:20, 1022:20, 1023:5, 1024:14, 1030:1, 1030:6,

1031:23, 1035:5, 1035:25, 1040:20, 1042:22, 1044:2, 1044:25, 1045:14, 1051:17, 1056:20
**showed** [13] - 1033:3, 1034:17, 1035:7, 1035:12, 1035:14, 1037:9, 1037:13, 1037:15, 1040:25, 1043:5, 1045:15, 1055:14, 1056:15
**showing** [6] - 1016:15, 1024:25, 1045:3, 1045:16, 1052:25, 1055:16
**shown** [4] - 1001:16, 1016:14, 1017:18, 1053:5
**shows** [5] - 1028:9, 1044:25, 1045:21, 1046:9, 1053:6
**sic** [1] - 1037:3
**side** [5] - 993:17, 1010:10, 1010:22, 1021:16, 1045:3
**sign** [3] - 1058:21, 1059:18, 1067:13
**silent** [1] - 1038:25
**similar** [5] - 1008:4, 1008:17, 1014:20, 1014:21, 1054:12
**similarly** [1] - 1014:18
**simply** [4] - 1006:20, 1014:23, 1014:25, 1024:8
**single** [4] - 992:24, 1000:23, 1001:16, 1003:5
**sitting** [1] - 1017:4
**situation** [1] - 1028:22
**six** [1] - 1038:9
**size** [1] - 1048:17
**sketches** [4] - 1039:23, 1039:24, 1052:5, 1052:7
**skill** [22] - 999:6, 999:10, 1001:4, 1001:12, 1001:19, 1002:4, 1002:11, 1003:18, 1003:22, 1004:3, 1004:14, 1004:24, 1019:6, 1021:18, 1021:19, 1040:10, 1043:11, 1047:22, 1048:22, 1049:19, 1056:17, 1064:19
**skilled** [6] - 999:23, 1020:2, 1020:3,

1020:12, 1020:14, 1022:2
**sky** [1] - 1043:21
**slap** [1] - 1024:23
**sleep** [2] - 1009:19, 1010:2
**sleep-inducing** [2] - 1009:19, 1010:2
**Slide** [6] - 1029:10, 1038:7, 1042:24, 1043:3, 1050:12, 1052:9
**slide** [15] - 1033:23, 1034:4, 1038:16, 1043:23, 1044:1, 1044:8, 1044:19, 1045:10, 1046:18, 1047:6, 1049:10, 1052:2, 1053:1, 1053:9, 1057:4
**slides** [1] - 1033:20
**slightly** [1] - 1013:22
**Smartphone** [1] - 1060:21
**smoothly** [1] - 1067:24
**so-called** [1] - 1035:11
**sold** [5] - 1008:19, 1029:13, 1065:4, 1065:8, 1065:12
**sole** [1] - 1036:8
**solemnly** [1] - 1061:12
**solve** [3] - 1002:5, 1002:25, 1026:7
**solved** [1] - 1003:1
**someone** [2] - 1025:17, 1048:7
**somewhere** [1] - 1067:5
**soon** [2] - 1027:11, 1058:23
**sooner** [1] - 1048:7
**sorry** [7] - 1019:14, 1025:2, 1028:13, 1028:18, 1065:13, 1066:4
**sort** [2] - 1028:5, 1067:12
**sought** [1] - 1037:23
**span** [1] - 1047:14
**specific** [2] - 1004:9, 1049:7
**specification** [5] - 1003:11, 1003:14, 1003:16, 1027:8, 1027:10
**specifications** [1] - 1044:16
**speculative** [2] -

1005:25, 1008:14
**speed** [15] - 1035:3, 1035:5, 1035:12, 1035:17, 1035:19, 1036:1, 1036:2, 1043:7, 1043:10, 1043:16, 1043:17, 1047:9, 1047:10, 1051:11, 1054:10
**spend** [3] - 1021:3, 1033:17, 1036:4
**sphere** [1] - 1046:3
**spinning** [1] - 1013:7
**spoken** [1] - 1017:20
**sports** [3] - 1011:20, 1015:19, 1021:4
**stability** [35] - 1014:18, 1014:23, 1014:25, 1015:7, 1016:13, 1022:15, 1022:17, 1023:6, 1024:2, 1032:24, 1033:1, 1034:2, 1034:20, 1040:1, 1040:3, 1040:4, 1040:6, 1042:9, 1042:10, 1043:4, 1043:6, 1043:19, 1043:22, 1044:5, 1044:6, 1050:17, 1050:18, 1051:4, 1051:23, 1054:9, 1055:10, 1057:2, 1057:7
**stabilize** [1] - 1050:25
**stabilizing** [1] - 1046:12
**stable** [39] - 1015:3, 1015:13, 1015:17, 1015:21, 1016:6, 1016:7, 1016:9, 1016:17, 1016:21, 1017:5, 1017:11, 1018:4, 1018:8, 1018:11, 1022:19, 1023:13, 1023:16, 1023:18, 1023:20, 1023:25, 1024:2, 1024:10, 1024:12, 1026:11, 1034:6, 1043:7, 1043:11, 1043:18, 1043:19, 1044:21, 1045:23, 1046:16, 1046:25, 1047:2, 1047:4, 1048:3, 1055:15, 1055:19
**staggering** [1] - 1039:17
**stall** [1] - 1024:6

**stand** [3] - 1035:18, 1044:10, 1059:5
**standard** [1] - 993:19
**start** [4] - 1009:22, 1037:21, 1058:18, 1062:2
**started** [3] - 1007:15, 1021:5, 1033:21
**starts** [1] - 1030:8
**state** [3] - 1003:22, 1004:23, 1048:11
**statement** [2] - 1035:13, 1043:9
**States** [3] - 997:5, 1019:12, 1019:21
**STATES** [1] - 989:1
**static** [4] - 1014:18, 1014:23, 1014:24, 1034:2
**status** [1] - 1067:16
**stay** [1] - 1059:8
**Stec** [1] - 1029:11, 1052:12, 1052:24
**stenographic** [1] - 1068:8
**step** [1] - 1010:22
**still** [6] - 992:14, 992:15, 1014:21, 1027:5, 1035:16, 1067:7
**stipulated** [1] - 1014:14
**straightforward** [1] - 1044:18
**Street** [1] - 989:11
**strength** [1] - 1036:9
**structure** [1] - 1008:24
**strut** [1] - 1048:2
**stuck** [1] - 1059:7
**students** [4] - 1019:21, 1023:8, 1023:21, 1051:5
**subject** [4] - 999:24, 1032:21, 1033:18, 1044:12
**submit** [2] - 1026:9, 1067:12
**submitted** [2] - 990:21, 1057:12
**submitting** [1] - 1027:15
**subpoenaed** [1] - 1036:24
**substitute** [1] - 1009:12
**substitutes** [1] - 1009:11
**succeed** [1] - 1003:15
**success** [4] - 1002:21, 1025:24, 1026:2

**successful** [3] - 1023:21, 1025:25, 1026:5
**suffer** [2] - 1029:2, 1061:14
**suffered** [2] - 1005:22, 1013:2
**sufficient** [1] - 1027:11
**sufficiently** [1] - 1003:17
**suggesting** [1] - 1005:10
**summaries** [2] - 990:22, 990:23
**summary** [5] - 1032:4, 1032:14, 1032:15, 1034:18, 1044:12
**surfer** [1] - 1043:13
**swear** [1] - 1061:12
**Swedish** [1] - 1038:8
**sympathy** [1] - 993:16
**system** [3] - 1012:7, 1035:11, 1048:4

## T

**table** [3] - 1032:12, 1032:13, 1032:17
**tablet** [1] - 1060:21
**tactics** [1] - 1002:23
**tailored** [1] - 1047:14
**tails** [1] - 1023:4
**talks** [1] - 1033:1, 1040:23, 1048:2, 1048:3
**taught** [4] - 1024:2, 1027:18, 1027:19, 1055:10
**TAYLOR** [1] - 989:17
**teach** [11] - 1023:22, 1024:10, 1024:12, 1027:9, 1027:23, 1042:11, 1044:21, 1050:21, 1051:23, 1057:2, 1057:7
**teaches** [5] - 1012:5, 1022:14, 1042:10, 1050:21, 1052:2
**teaching** [6] - 1022:15, 1040:8, 1040:10, 1043:9, 1052:4
**team** [2] - 1048:13, 1048:14
**teamed** [1] - 1027:12
**technical** [2] - 1017:21, 1044:15
**technologies** [1] - 1008:23

**TECHNOLOGY** [1] - 989:7
**technology** [7] - 1008:5, 1011:16, 1029:16, 1048:10, 1048:11, 1048:15, 1048:21
**telephone** [1] - 1060:20
**tendency** [1] - 1014:25
**tendered** [1] - 1010:6
**term** [1] - 1015:3
**terms** [7] - 995:24, 996:4, 1014:24, 1020:9, 1020:11, 1020:22, 1052:16
**testified** [4] - 1015:17, 1026:18, 1029:12, 1050:6
**testify** [1] - 1020:21
**testimony** [6] - 1007:6, 1036:11, 1036:13, 1050:4, 1053:14
**text** [1] - 1060:22
**textbooks** [1] - 1040:6
**THE** [49] - 989:1, 989:2, 989:15, 990:14, 991:1, 991:4, 991:7, 991:14, 991:23, 992:3, 992:6, 1010:1, 1010:7, 1010:9, 1010:12, 1010:17, 1011:2, 1030:19, 1030:25, 1031:5, 1031:7, 1031:9, 1055:2, 1058:11, 1061:18, 1061:19, 1061:22, 1062:9, 1062:14, 1062:18, 1062:21, 1062:22, 1065:17, 1065:18, 1065:21, 1065:24, 1066:2, 1066:4, 1066:8, 1066:11, 1066:14, 1066:17, 1066:20, 1066:23, 1066:24, 1067:11, 1067:20, 1067:23, 1068:4
**the'** [1] - 995:14
**themselves** [1] - 1055:12
**theory** [1] - 1039:1
**therefore** [3] - 997:8, 999:17, 1039:3
**THEUERKAUF** [9] - 989:20, 990:19,

1011:5, 1023:10, 1055:5, 1062:7, 1067:18, 1067:22, 1068:2
**Theuerkauf** [9] - 1010:19, 1011:4, 1030:20, 1033:24, 1035:25, 1048:6, 1053:18, 1055:3, 1058:12
**they've** [4] - 1029:7, 1029:13, 1030:16, 1041:15
**third** [2] - 1003:2, 1041:11
**thousands** [1] - 1037:14
**three** [2] - 995:24, 1015:24
**threshold** [3] - 1019:4, 1021:21, 1057:5
**throughout** [3] - 1014:12, 1040:13
**timeline** [1] - 1043:24
**tip** [1] - 1043:21
**together** [2] - 1024:24, 1049:2
**Tomorrow's** [1] - 1039:7
**top** [6] - 1023:10, 1023:11, 1023:17, 1032:4, 1039:7
**Torqeedo** [7] - 1041:3, 1041:12, 1041:13, 1041:18, 1041:20, 1041:22, 1042:4
**torque** [1] - 1035:12
**total** [2] - 1065:8, 1065:14
**totals** [1] - 1057:23
**touch** [2] - 1052:10, 1061:23
**touched** [1] - 1048:7
**touching** [1] - 1061:15
**toward** [1] - 993:16
**towing** [3] - 1051:13, 1051:14, 1051:15
**Toys** [1] - 1039:7
**transcript** [1] - 1068:8
**translation** [1] - 1023:3
**travels** [1] - 1032:5
**trial** [10] - 992:17, 993:9, 1014:12, 1020:18, 1031:24, 1035:2, 1042:21, 1061:8, 1067:12, 1067:23
**Trial** [2] - 989:4, 989:13

**Triantafyllou** [17] - 1016:4, 1017:14, 1017:22, 1018:10, 1021:9, 1023:3, 1026:23, 1033:2, 1033:10, 1036:15, 1040:18, 1043:4, 1043:15, 1046:13, 1047:18, 1048:9, 1050:14
**Triantafyllou's** [1] - 1017:20
**trick** [1] - 1055:17
**tried** [1] - 1016:4
**tries** [1] - 1046:10
**Triozzi** [1] - 1068:10
**true** [7] - 994:2, 994:8, 998:9, 1002:18, 1018:12, 1018:23, 1068:7
**trust** [1] - 1058:9
**try** [7] - 1002:25, 1024:25, 1026:7, 1045:21, 1055:24, 1060:3, 1062:4
**trying** [5] - 1022:11, 1025:16, 1028:22, 1043:6, 1043:13, 1043:14, 1055:17, 1062:2
**turn** [5] - 1032:3, 1032:10, 1032:18, 1033:20, 1034:18
**twist** [2] - 1047:15
**twisting** [1] - 1022:21
**two** [33] - 992:13, 993:5, 993:20, 994:20, 1000:25, 1009:21, 1014:12, 1014:16, 1014:24, 1024:23, 1025:3, 1025:9, 1025:15, 1025:21, 1030:9, 1033:21, 1033:25, 1034:7, 1034:25, 1035:1, 1035:4, 1036:20, 1036:21, 1037:19, 1038:3, 1040:1, 1045:7, 1045:9, 1048:5, 1049:7, 1052:12, 1054:5
**type** [2] - 1022:24, 1032:5
**typically** [1] - 1006:21

**U**

**U.S** [2] - 1038:23, 1068:11

**U.S.D.C.J** [1] - 989:15
**ultimate** [1] - 1006:24
**ultimately** [1] - 1015:4
**unanimous** [4] - 1059:12, 1059:16, 1059:24, 1060:10
**unanimously** [1] - 1062:20
**unchallenged** [2] - 1036:20, 1053:14
**under** [8] - 991:8, 993:12, 1007:14, 1008:21, 1009:13, 1029:4, 1034:20, 1041:11
**understood** [1] - 1001:4
**undue** [3] - 1003:20, 1003:24, 1004:20
**unduly** [3] - 1004:1, 1004:4, 1004:25
**unique** [1] - 1038:20
**unit** [2] - 1029:13, 1057:23
**United** [3] - 997:5, 1019:12, 1019:21
**UNITED** [1] - 989:1
**unless** [1] - 1061:15
**unlike** [1] - 1001:15
**unpack** [1] - 1055:8
**unreasonable** [1] - 1036:11
**unrebutted** [1] - 1053:14
**unstable** [11] - 1016:23, 1016:24, 1045:1, 1045:10, 1045:15, 1045:17, 1045:20, 1046:24, 1047:3, 1047:4, 1051:19
**up** [14] - 1006:21, 1016:19, 1024:14, 1027:12, 1027:15, 1029:7, 1031:23, 1039:24, 1048:18, 1050:23, 1051:6, 1055:3, 1055:23, 1061:6
**USA** [1] - 989:7
**usage** [1] - 1007:15
**user** [3] - 1014:17, 1014:22, 1034:1
**uses** [1] - 997:3

**V**

**valid** [4] - 1000:13, 1006:16, 1013:5, 1045:25

**validity** [1] - 1000:16
**valuation** [1] - 1007:3
**value** [4] - 1006:25, 1007:24, 1008:1, 1008:18
**various** [2] - 1044:13, 1046:17
**varying** [1] - 1035:9, 1035:10
**Vegas** [1] - 1030:1
**vehicles** [1] - 1042:1
**verdict** [36] - 992:10, 993:2, 1053:2, 1055:23, 1059:10, 1059:11, 1059:12, 1059:13, 1059:17, 1059:19, 1060:25, 1061:16, 1061:25, 1062:15, 1062:16, 1062:23, 1063:2, 1063:7, 1065:15, 1065:22, 1065:23, 1065:25, 1066:1, 1066:6, 1066:7, 1066:9, 1066:10, 1066:12, 1066:13, 1066:15, 1066:16, 1066:18, 1066:19, 1066:21, 1066:22, 1067:13
**verdicts** [2] - 1058:17, 1062:20
**versus** [1] - 1045:19
**VI** [1] - 989:4
**via** [4] - 1014:17, 1014:22, 1015:10, 1033:25
**video** [14] - 1016:14, 1018:15, 1023:9, 1024:7, 1046:20, 1046:21, 1050:1, 1051:24, 1055:14, 1055:16, 1055:18, 1055:20, 1055:22
**videos** [4] - 1016:22, 1023:4, 1046:17, 1057:3
**view** [1] - 1067:24
**views** [1] - 1060:1
**visitors** [2] - 1038:20
**voltage** [1] - 1035:10
**Volume** [1] - 989:4
**voluntary** [1] - 1009:4
**vote** [4] - 1059:7, 1059:8, 1060:9, 1060:10
**votes** [1] - 1059:5

**W**

**Wade** [4] - 1015:18, 1016:18, 1021:3
**wake** [1] - 1009:22
**walk** [1] - 1009:20
**wants** [5] - 1023:15, 1037:25, 1044:20, 1046:5, 1046:24
**watched** [1] - 1018:15
**water** [13] - 1011:20, 1015:19, 1021:4, 1023:6, 1023:12, 1045:22, 1045:25, 1046:2, 1046:3, 1051:14, 1051:18, 1055:19
**Water** [1] - 1039:7
**watercraft** [12] - 1004:8, 1004:13, 1004:15, 1015:23, 1015:24, 1021:6, 1022:19, 1023:13, 1024:10, 1024:12, 1032:5, 1044:21
**watts** [8] - 1041:14, 1041:16, 1041:21, 1042:5, 1042:6, 1042:7
**wave** [2] - 1024:10, 1024:5
**Waydoo** [79] - 994:4, 994:5, 995:19, 996:12, 996:17, 996:19, 998:2, 998:10, 998:14, 998:16, 998:21, 999:2, 999:16, 999:18, 1000:2, 1000:18, 1000:20, 1001:6, 1001:10, 1003:13, 1003:15, 1005:2, 1005:17, 1006:12, 1007:4, 1012:8, 1015:10, 1015:16, 1015:19, 1016:6, 1016:10, 1016:12, 1016:14, 1016:16, 1017:9, 1017:12, 1017:13, 1017:15, 1017:21, 1017:25, 1018:3, 1018:4, 1018:5, 1018:6, 1018:21, 1019:9, 1020:1, 1021:13, 1022:7, 1022:13, 1022:18, 1023:5, 1023:11, 1023:15, 1025:16, 1026:23, 1027:5,

1027:22, 1028:15, 1028:18, 1028:22, 1029:1, 1029:5, 1029:22, 1029:23, 1029:25, 1030:7, 1030:8, 1030:11, 1030:15, 1045:4, 1046:23, 1046:25, 1050:2, 1055:16, 1055:20, 1058:8, 1065:3

**WAYDOO** [2] - 989:7, 989:7

**Waydoo's** [23] - 997:19, 997:21, 998:12, 998:24, 998:25, 999:12, 1000:1, 1000:11, 1015:20, 1018:13, 1021:9, 1022:21, 1029:2, 1029:15, 1029:18, 1039:11, 1051:20, 1056:5, 1057:25, 1058:9, 1063:19, 1063:23

**ways** [4] - 994:20, 1046:11, 1047:3, 1061:23

**web** [6] - 1037:17, 1037:21, 1037:24, 1038:15, 1038:17, 1038:21

**website** [5] - 1016:11, 1037:15, 1038:12, 1038:20, 1060:23

**week** [5] - 1011:8, 1011:12, 1031:15, 1054:25, 1067:16

**weeks** [1] - 1020:23

**weigh** [2] - 1004:21, 1036:14

**weighing** [1] - 1041:6

**weight** [22] - 1003:8, 1014:17, 1014:22, 1015:7, 1015:10, 1017:10, 1032:8, 1033:25, 1034:6, 1034:9, 1034:10, 1034:12, 1034:13, 1034:14, 1034:21, 1035:2, 1040:2, 1047:8, 1047:9, 1048:3, 1051:11

**weight-shift** [10] - 1017:10, 1032:8, 1034:6, 1034:9, 1034:10, 1034:13, 1034:14, 1035:2, 1047:8, 1047:9

**weird** [1] - 1028:5

**welcome** [2] - 1011:3, 1031:10

**well-known** [1] - 1050:17

**whole** [4] - 1019:15, 1027:17, 1027:20, 1040:13

**willful** [10] - 998:12, 998:21, 998:24, 1029:19, 1053:7, 1056:5, 1063:18, 1063:20, 1063:23

**willfulness** [5] - 998:19, 998:22, 1029:17, 1030:16, 1056:4

**willing** [3] - 1006:17, 1008:9, 1008:10

**Wilmington** [1] - 989:11

**win** [1] - 1005:10

**wing** [11] - 1023:24, 1023:25, 1024:5, 1024:8, 1047:13, 1050:23, 1051:6, 1051:8, 1055:15

**wings** [5] - 1033:4, 1047:14, 1047:17, 1050:22, 1050:23

**wise** [1] - 1047:15

**wish** [2] - 1042:22, 1054:25

**witness** [1] - 1044:10

**witness's** [2] - 1036:8, 1036:9

**witnesses** [3] - 996:7, 1036:7, 1039:22

**Woolley** [15] - 999:16, 1001:7, 1012:18, 1012:21, 1012:25, 1024:19, 1025:3, 1025:5, 1047:25, 1048:1, 1048:3, 1052:19, 1054:15, 1064:8

**words** [6] - 994:13, 996:7, 1001:21, 1005:21, 1022:22, 1061:1

**works** [2] - 1046:11, 1051:17

**world** [4] - 1000:4, 1019:16, 1029:19, 1052:21

**worry** [4] - 1021:23, 1056:12, 1056:22, 1056:24

**write** [5] - 1057:21, 1057:22, 1058:20, 1059:4, 1059:6

**writing** [2] - 1027:15, 1050:17

**written** [2] - 992:25, 994:16

## Y

**year** [1] - 1029:22

**years** [9] - 1015:23, 1021:5, 1021:7, 1021:11, 1026:9, 1034:25, 1037:19, 1038:3, 1050:19

**yourself** [5] - 1001:18, 1028:6, 1060:16, 1061:9, 1061:15

## Z

**zero** [1] - 1027:25